*Orig*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| GO MEDICAL INDUSTRIES, PTY LTD. and ALEXANDER G.B. O'NEIL, | CIVIL ACTION FILE |
| Plaintiffs, | NO. 101-CV-0313-TWT |
| v. | |
| INMED CORP., d/b/a RÜSCH, and ALPINE MEDICAL, INC. (formerly known as Medical Marketing Group, Inc.), | |
| Defendants. | |

**FILED IN OPEN COURT**
U.S.D.C. . . .

FEB   2 2004

LUTHER . . . . Clerk
By: *A Sewell*
Deputy Clerk

## APPENDIX OF AUTHORITY SUPPORTING
## PLAINTIFFS' REQUESTED JURY INSTRUCTIONS



# TABLE OF CONTENTS

<u>Cited Authority</u>                                                   <u>Tab</u>

15 U.S.C. § 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
35 U.S.C. § 271 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
O.C.G.A. § 13-3-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
O.C.G.A. § 51-12-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
O.C.G.A. § 51-12-5.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car Co.,*
238 F.3d 378 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

American Bar Association,
<u>Model Jury Instructions For Business Tort Litigation,</u> (2d ed. 1988)
§ 1.03[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
§ 1.03[4][c] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
§ 1.03[4][e] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
§ 1.03[5][a] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
§ 1.03[5][b] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
§ 1.03[5][c] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
§ 1.03[5][d] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
§ 1.05[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
§ 1.06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252 (5th Cir. 1980) . .   16

*Blackstone Indus., Inc. v. Andre,* 208 S.E.2d 815 (Ga. 1974) . . . . . . . .   17

*Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,*
597 F.2d 71 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Budget Rent-A-Car of Atlanta, Inc. v. Webb,*
469 S.E.2d 712 (Ga. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.,*
139 F.3d 1396 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Conagra, Inc. v. Singleton,* 743 F.2d 1508 (11th Cir. 1984) . . . . . . . . . .   21

<u>Cited Authority</u>                                                        <u>Tab</u>

*Cotton Ginny, Ltd. v. Cotton Gin, Inc.,*
691 F. Supp. 1347 (S.D. Fla. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Council of Superior Court Judges of Georgia,
<u>Suggested Pattern Jury Instructions, Civil Cases</u>, (3d ed. 2001)
Page 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23
Pages 92 – 94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*Crawford W. Long Memorial Hosp. of Emory Univ. v. Yerby,*
373 S.E.2d 749 (Ga. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Cumulus Media, Inc. v. Clear Channel Communications, Inc.,*
304 F.3d 1167 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Emmpresa Cubana Del Tabaco v. Culbro Corp.,*
213 F.Supp.2d 247 (S.D.N.Y.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

*Energy Four, Inc. v. Dornier Medical Systems, Inc.,*
765 F. Supp. 724 (N.D. Ga. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070 (5th Cir. 1997) .   29

*Holiday Inns v. Airport Holiday Corp.,*
493 F. Supp. 1025 (N.D. Tex. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*Howard Johnson Co. v. Khimani,* 892 F.2d 1512 (11th Cir. 1990) . . . .   31

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,*
716 F.2d 833 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

*Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,*
549 F.2d 368 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*LaSonde v. Chase Mortg. Co.,* 577 S.E.2d 822 (Ga.App. 2003) . . . . . . .   34

<u>Ninth Circuit Model Civil Jury Instructions</u>
Instruction § 18.0 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
Instruction § 18.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

ATL01/11590868v1

<u>Cited Authority</u>                                                          <u>Tab</u>

<u>Ninth Circuit Model Civil Jury Instructions</u>
Instruction § 18.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
Instruction § 18.19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
Instruction § 18.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

O'Malley, Kevin F., et al.,
<u>Federal Jury Practice and Instructions, Civil</u> (5th Ed. 2000)
§ 104.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
§ 126.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
§ 159.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
§ 159.41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
§ 159.48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
§ 159.49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
§ 159.63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46
§ 159.75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47
§ 159.92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

*Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.,*
514 F.2d 665 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

*Ramada Inns, Inc. v. Gadsden Motel Co.,*
804 F.2d 1562 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . .   50

*Savannah Coll. of Art & Design, Inc. v. School of Visual Arts*
*of Savannah, Inc.,* 464 S.E.2d 895 (Ga. App. 1995) . . . . . . . . . . . . . . .   51

*Turner v. HMH Publ'g Co.,* 380 F.2d 224 (5th Cir. 1967) . . . . . . . . . .   52

*Univ. of Ga. Athletic Ass'n v. Laite,* 756 F.2d 1535 (11th Cir. 1985) . .   53

*Vaughn v. Metro. Property & Casualty Ins. Co.,*
260 Ga.App. 573 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

*WCVB-TV v. Boston Athletic Ass'n,*
926 F.2d 42 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

*Witty v. McNeal Agency, Inc.,* 521 S.E.2d 619 (Ga.App. 1999) . . . . .   56

<u>Cited Authority</u>                                                    <u>Tab</u>

*Woodruff v. Hughes*, 58 S.E. 551 (Ga. App. 1907) . . . . . . . . . . . . . . .   57

*Woodstock's Enters., Inc. (California) v. Woodstock's
Enters., Inc. (Oregon)*, 43 U.S.P.Q.2d (BAN) 1440 (T.T.A.B. 1997) . .   58

ATL01/11590868v1



# EXHIBIT / ATTACHMENT

_____ \ _____

(To be scanned in place of tab)

210 • Patent, Trademark, and Copyright Laws, 2001 Edition

transfer in the United States of such registration shall be governed by the provisions of this Act.

(g) *Trade or commercial names of foreign nationals protected without registration.* — Trade names or commercial names of persons described in subsection (b) of this section shall be protected without the obligation of filing or registration whether or not they form parts of marks.

(h) *Protection of foreign nationals against unfair competition.* — Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this Act shall be entitled to effective protection against unfair competition, and the remedies provided herein for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

(i) *Citizens or residents of United States entitled to benefits of section.* — Citizens or residents of the United States shall have the same benefits as are granted by this section to persons described in subsection (b) of this section.

(July 5, 1946, ch. 540, title IX, §44, 60 Stat. 441; Oct. 3, 1961, Pub. L. 87-333, §2, 75 Stat. 748; Oct. 9, 1962, Pub. L. 87-772, §20, 76 Stat. 774; Nov. 16, 1988, Pub. L. 100-667, §133, 102 Stat. 3946; Oct. 30, 1998, Pub. L. 105-330, §108, 112 Stat. 3068.)

### § 1127   Construction and definitions; intent of chapter [Section 45]

In the construction of this Act, unless the contrary is plainly apparent from the context —

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

The term "principal register" refers to the register provided for by sections 1 through 22 hereof [§§1051-1072], and the term "supplemental register" refers to the register provided for by sections 23 through 28 thereof [§§1091-1096].

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this Act includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation,

**15 U.S.C. § 1127**

2001 Edition

hall be governed by

*ected without registra-*
ns described in sub-
ut the obligation of
of marks.

*etition.* — Any person
d to the benefits and
d to effective protec-
provided herein for
they may be appro-

*benefits of section.* —
the same benefits as
ubsection (b) of this

, Pub. L. 87-333, §2, 75
Nov. 16, 1988, Pub. L.
., §108, 112 Stat. 3068.)

apter [Section 45]

is plainly apparent

which is under its

n may lawfully be

provided for by sec-
rm "supplemental
ons 23 through 28

d to designate the
or rendered liable
nerson as well as a
firm, corporation,

---

union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes the United States, any agency or instrumentality thereof; or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this Act in the same manner and to the same extent as any nongovernmental entity.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this Act in the same manner and to the same extent as any nongovernmental entity.

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

The terms "trade name" and "commercial name" mean any name used by a person to identify his or her business or vocation.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof —

   (1) used by a person, or

   (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this Act,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

**15 U.S.C. § 1127**

The term "service mark" means any word, name, symbol, or device, or any combination thereof—

    (1) used by a person, or

    (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this Act,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof—

    (1) used by a person other than its owner, or

    (2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this Act,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

The term "collective mark" means a trademark or service mark—

    (1) used by the members of a cooperative, an association, or other collective group or organization, or

    (2) which such cooperative, association, or other collective group or organization has a bona fide intention to use in commerce and applies to register on the principal register established by this Act,

and includes marks indicating membership in a union, an association, or other organization.

The term "mark" includes any trademark, service mark, collective mark, or certification mark.

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a

**15 U.S.C. § 1127**

mark. For purposes of this Act, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

A mark shall be deemed to be "abandoned" when either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "dilution" means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—

(1) competition between the owner of the famous mark and other parties, or

(2) likelihood of confusion, mistake, or deception.





# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

110 • Patent, Trademark, and Copyright Laws, 2001 Edition

(July 19, 1952, ch. 950, §1, 66 Stat. 810; Dec. 8, 1994, Pub. L. 103-465, §533, 108 Stat. 4988.)

CHAPTER 27 — GOVERNMENT INTERESTS IN PATENTS

SEC.

266.    [Repealed.]
267.    Time for taking action in Government applications.

§ 266    [Repealed] (July 24, 1965, Pub. L. 89-83, § 8, 79 Stat. 261.)

§ 267    Time for taking action in Government applications

Notwithstanding the provisions of sections 133 and 151 of this title, the Director may extend the time for taking any action to three years, when an application has become the property of the United States and the head of the appropriate department or agency of the Government has certified to the Director that the invention disclosed therein is important to the armament or defense of the United States.

(July 19, 1952, ch. 950, §1, 66 Stat. 811.)

CHAPTER 28 — INFRINGEMENT OF PATENTS

Sec.

271.    Infringement of patent.
272.    Temporary presence in the United States.
273.    Defense to infringement based on earlier inventor.

§ 271    Infringement of patent*

(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufac-

_____

* *Ed. Note:* Pub. L. 103-465, §533(a), which expanded the definition of infringement to include offers to sell patented inventions and importation into the U.S., became effective as of Jan. 1, 1996.

**35 U.S.C. § 266**

vs, 2001 Edition

*ub. L. 103-465, §533, 10* 

*N* PATENTS

ons.

8, 79 Stat. 261.)

plications
1 151 of this title, the
to three years, when
iited States and the
he Government has
therein is important

*TS*

without author-
ntion, within the
:nted invention
.t.

' all be liable as
.

tes or imports
ne, manufac-

nent to include of-
Jan. 1, 1996.

Patents • 111

ture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

(e) (1) It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913) which is primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques) solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

(2) It shall be an act of infringement to submit —

(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act

35 U.S.C. § 271

for a drug claimed in a patent or the use of which is claimed in a patent, or

(B) an application under section 512 of such Act or under the Act of March 4, 1913 (21 U.S.C. 151-158) for a drug or veterinary biological product which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques and which is claimed in a patent or the use of which is claimed in a patent,

if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug or veterinary biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

(3) In any action for patent infringement brought under this section, no injunctive or other relief may be granted which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States of a patented invention under paragraph (1).

(4) For an act of infringement described in paragraph (2) —

(A) the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,

(B) injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug or veterinary biological product, and

(C) damages or other monetary relief may be awarded against an infringer only if there has been commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug or veterinary biological product.

The remedies prescribed by subparagraphs (A), (B), and (C) are the only remedies which may be granted by a court for an act of in-

35 U.S.C. § 271

ch is claimed in a

or under the Act
or veterinary bio-
tured using re-
technology, or
ic manipulation
e use of which

oval under such
sale of a drug
t or the use of
uch patent.

er this section,
would prohibit
e United States
vention under

?) —

pproval of the
the infringe-
of the expira-

fringer to pre-
or sale within
tes of an ap-

ed against an
ture, use, of-
tation into the
y biological

d (C) are the
n act of in-

fringement described in paragraph (2), except that a court may award attorney fees under section 285.

(f) (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(g) Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after —

(1) it is materially changed by subsequent processes; or

(2) it becomes a trivial and nonessential component of another product.

(h) As used in this section, the term "whoever" includes any State, any instrumentality of a State, and any officer or employee of a State or in-

35 U.S.C. § 271

114 • Patent, Trademark, and Copyright Laws, 2001 Edition

strumentality of a State acting in his official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any non-governmental entity.

(i) As used in this section, an "offer for sale" or an "offer to sell" by a person other than the patentee, or any designee of the patentee, is that in which the sale will occur before the expiration of the term of the patent.

(July 19, 1952, ch. 950, §1, 66 Stat. 811; Sept. 24, 1984, Pub. L. 98-417, §202, 98 Stat. 1603; Nov. 8, 1984, Pub. L. 98-622, §101, 98 Stat. 3383; Aug. 23, 1988, Pub. L. 100-418, §9003, 102 Stat. 1563-64; Nov. 16, 1988, Pub. L. 100-670, §201, 102 Stat. 3988-3989; Nov. 19, 1988, Pub. L. 100-703, §201, 102 Stat. 4676; Oct. 28, 1992, Pub. L. 102-560, §2, 106 Stat. 4230; Dec. 8, 1994, Pub. L. 103-465, §533, 108 Stat. 4988.)

§ 272   Temporary presence in the United States

The use of any invention in any vessel, aircraft or vehicle of any country which affords similar privileges to vessels, aircraft or vehicles of the United States, entering the United States temporarily or accidentally, shall not constitute infringement of any patent, if the invention is used exclusively for the needs of the vessel, aircraft or vehicle and is not offered for sale or sold in or used for the manufacture of anything to be sold in or exported from the United States.

(July 19, 1952, ch. 950, §1, 66 Stat. 812; Dec. 8, 1994, Pub. L. 103-465, §533, 108 Stat. 4989.)

§ 273   Defense to infringement based on earlier inventor

(a) *Definitions.* – For purposes of this section –

(1) the terms "commercially used" and "commercial use" mean use of a method in the United States, so long as such use is in connection with an internal commercial use or an actual arm's-length sale or other arm's-length commercial transfer of a useful end result, whether or not the subject matter at issue is accessible to or otherwise known to the public, except that the subject matter for which commercial marketing or use is subject to a premarketing regulatory review period during which the safety or efficacy of the subject matter is established, including any period specified in section 156(g),

35 U.S.C. § 272



EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

Case 1:01-cv-00313-TWT   Document 233   Filed 02/02/04   Page 18 of 363

# CHAPTER 3

## ELEMENTS AND FORMATION GENERALLY

### Article 1

### General Provisions

Sec.
13-3-1.  Essentials of contracts generally.
13-3-2.  Contract incomplete without assent of parties to terms thereof; withdrawal of bid or proposition by party.
13-3-3.  When written acceptance of offer made by letter takes effect; acceptance of offer containing alternative propositions.
13-3-4.  Effect of conditions precedent or subsequent upon rights of parties under contracts.
13-3-5.  Effect of impossible, immoral, and illegal conditions.

### Article 2

### Capacity of Parties

13-3-20. Minors — Contracts for property or valuable consideration; contracts for necessaries.
13-3-21. Same — Contracts relating to practice of profession, trade, or business.
13-3-22. Same — Marriage contracts and settlements.
13-3-23. Same — Contracts, promissory notes, etc., for loans from trust funds for educational purposes.

Sec.
13-3-24. Insane, mentally ill, mentally retarded, or mentally incompetent persons.
13-3-25. Intoxicated persons.

### Article 3

### Consideration

13-3-40. Necessity for consideration; presumption of consideration.
13-3-41. Types of consideration.
13-3-42. Acts which constitute consideration; effect of consideration given or received by persons other than promisor or promisee.
13-3-43. Effect of satisfying requirement of consideration.
13-3-44. Effect of promise which is reasonably expected to induce action, etc., by promisee or third person; requirement as to proof of reliance in cases of charitable subscriptions or marriage settlements.
13-3-45. Effect of partially valid consideration; effect of illegal consideration.
13-3-46. Effect of inadequacy of consideration.
13-3-47. Effect of impossible and possible but improbable consideration.

**Cross references.** — As to formation and construction of sales contracts, see §§ 11-2-201 et seq. and 11-2-301 et seq.

## ARTICLE 1

## GENERAL PROVISIONS

### 13-3-1. Essentials of contracts generally.

To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can

operate. (Orig. Code 1863, § 2682; Code 1868, § 2678; Code 1873, § 2720; Code 1882, § 2720; Civil Code 1895, § 3637; Civil Code 1910, § 4222; Code 1933, § 20-107.)

**Cross references.** — As to formation of contracts under Uniform Commercial Code, see § 11-2-204. As to acceptance of offer under Uniform Commercial Code, see §§ 11-2-206, 11-2-207. As to correlation of capacity to contract with capacity to make will, see § 53-2-21.

**Law reviews.** — For article discussing interpretation in Georgia of insurance policies containing evidentiary conditions, see 12 Ga. L. Rev. 783 (1978).

For comment on Georgia Power Co. v. Roper, 73 Ga. App. 826, 38 S.E.2d 91 (1946), see 9 Ga. B.J. 89 (1946).

## JUDICIAL DECISIONS

### ANALYSIS

GENERAL CONSIDERATION
CONSIDERATION
ASSENT TO TERMS
REQUISITE CERTAINTY
SUBJECT MATTER

### General Consideration

**Binding contract may consist of several consistent writings.** — It is not essential that contract be contained in single document. Binding contracts may consist of several writings — provided there is no conflict between various parts. Cassville-White Assocs. v. Bartow Assocs., 150 Ga. App. 561, 258 S.E.2d 175 (1979).

**To be enforceable a contract must be sufficiently definite as to subject matter and time.** King v. State Farm Mut. Auto. Ins. Co., 117 Ga. App. 192, 160 S.E.2d 230 (1968).

**Consideration and subject matter are separate essentials of contract.** — Among essentials of a contract consideration is one thing, while subject matter is another and different thing. McCann v. Glynn Lumber Co., 199 Ga. 669, 34 S.E.2d 839 (1945).

**Requirement of capacity to contract refers not to voidable contracts, but to valid binding contracts.** Georgia Power Co. v. Roper, 201 Ga. 760, 41 S.E.2d 226 (1947).

**Novation or accord and satisfaction is itself a contract and must have all essential elements of a de novo contract.** Mayer v. Turner, 142 Ga. App. 63, 234 S.E.2d 853 (1977).

**There can be no recovery upon incomplete contract of insurance.** Thurmond v. Sovereign Camp, W.O.W., 171 Ga. 446, 155 S.E. 760 (1930).

**Generally, intention of parties must relate to something of monetary value in eyes of law.** — To constitute a valid contract, intention of parties must refer to legal relations, so that courts may take cognizance of it, and it is generally said that the test of this quality of the contract is that intention of parties must relate to something which is of monetary value in eyes of the law. Huckeby v. Smith, 42 Ga. App. 719, 157 S.E. 234 (1931).

**Contracts of agency must, like other agreements, involve assumption of legal rights and duties,** as opposed to engagements of mere civic or social character, or of such other nature as to exclude monetary values. Huckeby v. Smith, 42 Ga. App. 719, 157 S.E. 234 (1931).

**One seeking enforcement bears burden of proof as to essentials of contract.** — Burden to show that there had been contract between itself and defendants as basis of indebtedness is upon plaintiff, and to carry this burden, it is necessary for plaintiff to show, by preponderance of evidence, every necessary essential of a valid contract, which, includes acceptance of policies of insurance by defendants after

93



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

Measure of damages for wrongful removal of earth, sand, or gravel from land, 1 ALR3d 801.

Absolute liability for blasting operations as extending to injury or damage not directly caused by debris or concussion from explosion, 56 ALR3d 1017.

Excessiveness or adequacy of damages awarded for injuries to, or conditions induced in, sexual organs and processes, 13 ALR4th 183.

Excessiveness or adequacy of damages awarded for injuries to legs and feet, 13 ALR4th 212.

Excessiveness or adequacy of damages awarded for injuries to head or brain, or for mental or nervous disorders, 14 ALR4th 328.

Excessiveness or adequacy of damages awarded for injuries to, or conditions induced in, circulatory, digestive, and glandular systems, 14 ALR4th 539.

Excessiveness or adequacy of damages awarded for injuries to back, neck, or spine, 15 ALR4th 294.

Excessiveness or adequacy of damages awarded for injuries to, or conditions induced in, respiratory system, 15 ALR4th 519.

Validity of verdict awarding medical expenses to personal injury plaintiff, but failing to award damages for pain and suffering, 55 ALR4th 186.

Recovery of anticipated lost profits of new business: post-1965 cases, 55 ALR4th 507.

Excessiveness or adequacy of damages awarded for injuries to head or brain, 50 ALR5th 1.

Excessiveness or adequacy of damages awarded for injuries to nerves or nervous system, 51 ALR5th 467.

## 51-12-4. Damages given as compensation for injury; measure of damages generally; nominal damages.

Damages are given as compensation for injury; generally, such compensation is the measure of damages where an injury is of a character capable of being estimated in money. If an injury is small or the mitigating circumstances are strong, nominal damages only are given. (Orig. Code 1863, § 2997; Code 1868, § 3010; Code 1873, § 3065; Code 1882, § 3065; Civil Code 1895, § 3905; Civil Code 1910, § 4502; Code 1933, § 105-2001.)

**Law reviews. —** For article, "The Torok Tort: Recovery for Abusive Litigation," see 23 Ga. St. B.J. 84 (1987). For article, "Pre-Impact Pain and Suffering," see 26 Ga. St. B.J. 60 (1989). For article, "The Discount Rate in Georgia Personal Injury and Wrongful Death Damage Calculations," see 13 Ga. St. U. L. Rev. 431 (1997).

For comment on Burnett v. Western & A.R.R., 79 Ga. App. 530, 54 S.E.2d 357 (1949), see 12 Ga. B.J. 211 (1949). For comment on Padgett v. Williams, 82 Ga. App. 509, 61 S.E.2d 676 (1950), see 13 Ga. B.J. 339 (1951).

### JUDICIAL DECISIONS

#### ANALYSIS

GENERAL CONSIDERATION
MEASURE OF DAMAGES APPLICABLE TO SPECIFIC CASES
COLLATERAL SOURCE RULE
PROFITS
EVIDENCE
JURY INSTRUCTIONS

#### General Consideration

**This section and §§ 51-12-5 and 51-12-6 must be construed in pari materia.** Blanchard v. Westview Cem., 133 Ga. App.

262, 211 S.E.2d 135, modified, 234 Ga. 216 S.E.2d 776 (1974).

**Rule stated in this section applies to tions in contract equally as those in tort.** In every case of breach of contract the



# EXHIBIT / ATTACHMENT

_____   _____ **5**_____

(To be scanned in place of tab)

Excessiveness or adequacy of damages awarded for injuries to, or conditions induced in, sexual organs and processes, 13 ALR4th 183.

Excessiveness or adequacy of damages awarded for injuries to legs and feet, 13 ALR4th 212.

Liability insurance coverage as extending to liability for punitive or exemplary damages, 16 ALR4th 11.

Effect of plaintiff's comparative negligence in reducing *punitive damages* recoverable, 27 ALR4th 318.

Claim for punitive damages in tort action as *surviving death of tortfeasor or person wronged*, 30 ALR4th 707.

Necessity of determination or showing of liability for punitive damages before discovery or reception of evidence of defendant's wealth, 32 ALR4th 432.

Excessiveness or inadequacy of punitive damages awarded in *personal injury or death cases*, 35 ALR4th 441.

Evidence of defendant's rehabilitation or *reformation* as relevant on issue of punitive damages, 39 ALR4th 1122.

Sufficiency of showing of actual damages to support award of punitive damages — modern cases, 40 ALR4th 11.

Discovery of defendant's sales, earnings, or profits on issue of punitive damages in tort action, 54 ALR4th 998.

Punitive damages as within coverage of uninsured or underinsured motorist insurance, 54 ALR4th 1186.

Punitive damages: power of equity court to award, 58 ALR4th 844.

Standard of proof as to conduct underlying punitive damage awards — modern status, 58 ALR4th 878.

Plaintiff's rights to punitive or multiple damages when cause of action renders both available, 2 ALR5th 449.

Right to prejudgment interest on punitive or multiple damages awards, 9 ALR5th 63.

Excessiveness or inadequacy of punitive damages awarded in personal injury or death cases, 12 ALR5th 195.

Intoxication of automobile driver as basis for awarding punitive damages, 33 ALR5th 303.

Allowance of punitive damages in medical malpractice action, 35 ALR5th 145.

Damages for wrongful termination of franchise other than automobile dealership contracts, 40 ALR5th 57.

Products liability: cement and concrete, 60 ALR5th 413.

## 51-12-5.1. Punitive damages.

(a) As used in this Code section, the term "punitive damages" is *synonymous* with the terms "vindictive damages," "exemplary damages," and other descriptions of additional damages awarded because of aggravating circumstances in order to penalize, punish, or deter a defendant.

(b) Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

(c) Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant.

(d) (1) An award of punitive damages must be specifically prayed for in a complaint. In any case in which punitive damages are claimed, the trier of fact shall first resolve from the evidence produced at trial whether an award of punitive damages shall be made. This finding shall be made specially through an appropriate form of verdict, along with the other required findings.



(2) If it is found that punitive damages are to be awarded, the trial shall immediately be recommenced in order to receive such evidence as is relevant to a decision regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case. It shall then be the duty of the trier of fact to set the amount to be awarded according to subsection (e), (f), or (g) of this Code section, as applicable.

(e) (1) In a tort case in which the cause of action arises from product liability, there shall be no limitation regarding the amount which may be awarded as punitive damages. Only one award of punitive damages may be recovered in a court in this state from a defendant for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such act or omission.

(2) Seventy-five percent of any amounts awarded under this subsection as punitive damages, less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge, shall be paid into the treasury of the state through the Office of Treasury and Fiscal Services. Upon issuance of judgment in such a case, the state shall have all rights due a judgment creditor until such judgment is satisfied and shall stand on equal footing with the plaintiff of the original case in securing a recovery after payment to the plaintiff of damages awarded other than as punitive damages. A judgment debtor may remit the state's proportional share of punitive damages to the clerk of the court in which the judgment was rendered. It shall be the duty of the clerk to pay over such amounts to the Office of Treasury and Fiscal Services within 60 days of receipt from the judgment debtor. This paragraph shall not be construed as making the state a party at interest and the sole right of the state is to the proceeds as provided in this paragraph.

(f) In a tort case in which the cause of action does not arise from product liability, if it is found that the defendant acted, or failed to act, with the specific intent to cause harm, or that the defendant acted or failed to act while under the influence of alcohol, drugs other than lawfully prescribed drugs administered in accordance with prescription, or any intentionally consumed glue, aerosol, or other toxic vapor to that degree that his or her judgment is substantially impaired, there shall be no limitation regarding the amount which may be awarded as punitive damages against an active tort-feasor but such damages shall not be the liability of any defendant other than an active tort-feasor.

(g) For any tort action not provided for by subsection (e) or (f) of this Code section in which the trier of fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00.

51-12-5.1            DAMAGES            51-12-5.1

(h) This Code section shall apply only to causes of action arising on or after April 14, 1997. (Code 1981, § 51-12-5.1, enacted by Ga. L. 1987, p. 915, § 5; Ga. L. 1993, p. 1402, § 18; Ga. L. 1997, p. 837, § 1.)

**Code Commission notes.** — Pursuant to Code Section 28-9-5, in 1997, in subsection (f) "tort-feasor" was substituted for "tortfeasor" in two places and "judgment" was substituted for "judgement" near the middle and "April 14, 1997" was substituted for "the effective date of this subsection" at the end of subsection (h).

**Law reviews.** — For article, "Products Liability Law in Georgia Including Recent Developments," see 43 Mercer L. Rev. 27 (1991). For article, "The Case for Allowing Punitive Damages in Georgia Wrongful Death Actions: The Need to Remove an Unjust Anomaly in Georgia Law," see 45 Mercer L. Rev. 1 (1993). For article commenting on the 1997 amendment of this section, see 14 Georgia St. U. L. Rev. 63

(1997). For annual survey article on tort law, see 50 Mercer L. Rev. 335 (1998). For annual survey article discussing tort law, see 51 Mercer L. Rev. 461 (1999).

For note, "Mack Trucks, Inc. v. Conkle: The Georgia Supreme Court Tells the Legislature to Keep On Truckin' When Appropriating Punitive Damage Awards to the State Treasury," see 45 Mercer L. Rev. 1439 (1994).

For comment, "Are Excessive Punitive Damages Unconstitutional in Georgia?: This Question and More in Colonial Pipeline Co. v. Brown," see 6 Ga. St. U.L. Rev. 85 (1989). For comment, "Statutory Punitive Damage Caps and the Profit Motive: An Economic Perspective," see 40 Emory L.J. 303 (1991).

## JUDICIAL DECISIONS

### ANALYSIS

GENERAL CONSIDERATION
PURPOSE
EVIDENTIARY STANDARD
PRODUCT LIABILITY
OTHER CASES
PROCEDURE

### General Consideration

**Constitutionality.** — The one-award provision dealing with product liability punitive damages as set forth in the second sentence of paragraph (e)(1) is unconstitutional, null and void, in that it violates the equal protection and due process clauses of the Georgia and federal constitutions. McBride v. GMC, 737 F. Supp. 1563 (M.D. Ga. 1990).

Paragraph (e)(2) violates the 1983 Georgia constitutional provisions contained in Art. III, Sec. V, Par. III, because it contains matter different from that expressed in the title of the Tort Reform Act and contains subject matter different from other subject matter in the body of the act. McBride v. GMC, 737 F. Supp. 1563 (M.D. Ga. 1990).

Paragraph (e)(2) violates the due process and equal protection clauses of the Georgia and federal constitutions, the excessive fines provisions of the eighth amendment to the

United States Constitution and Ga. Const. 1983, Art. I, Sec. I, Par. XVII, and the double jeopardy provision of the fifth amendment to the United States Constitution. McBride v. GMC, 737 F. Supp. 1563 (M.D. Ga. 1990).

Paragraph (e)(2), requiring that 75 percent of punitive damages awarded in a product liability action be paid into the state treasury, does not violate the equal protection clauses of the United States and Georgia Constitutions. State v. Moseley, 263 Ga. 680, 436 S.E.2d 632 (1993), cert. denied,   U.S.  , 113 S. Ct. 2101, 128 L. Ed. 2d 663 (1994); Mack Trucks, Inc. v. Conkle, 263 Ga. 539, 436 S.E.2d 635 (1993).

Paragraph (e)(2), requiring that 75 percent of punitive damages awarded in a product liability action be paid into the state treasury, does not constitute a "taking" under the fifth and fourteenth amendments to the United States Constitution. State v.

649



# EXHIBIT / ATTACHMENT

## 6

(To be scanned in place of tab)

238 F.3d 378
57 U.S.P.Q.2d 1561
(Cite as: 238 F.3d 378)

Page 1

# H

Briefs and Other Related Documents

United States Court of Appeals,
Fifth Circuit.

ADVANTAGE RENT-A-CAR, INC., Plaintiff-Counter
Defendant-Appellee,
v.
ENTERPRISE RENT-A-CAR, CO., Defendant-Counter
Plaintiff-Appellant.

No. 99-51145.

Jan. 22, 2001.
Rehearing Denied March 7, 2001.

Competing car rental companies sued each other under state and federal law for trademark dilution. The United States District Court for the Western District of Texas, Sam Sparks, J., denied relief for either party, and appeal was taken. The Court of Appeals, Goodwin, Circuit Judge, sitting by designation, held that: (1) company's "We'll Pick You Up" slogan was not sufficiently famous in car rental market to warrant protection from dilution under Lanham Act, and (2) Texas and Louisiana anti-dilution statutes required only distinctiveness, not fame, in order for mark to be protected.

Affirmed in part; vacated and remanded in part.

West Headnotes

**[1] Trade Regulation** ☞366
382k366 Most Cited Cases

To prevail on federal trademark dilution claim, mark owner must prove that its mark is famous and distinctive; that defendant adopted its mark after it had become famous and distinctive; that defendant caused dilution of owner's mark, and actual economic harm. Lanham Trade-Mark Act, § 43(c), 15 U.S.C.A. § 1125(c).

**[2] Trade Regulation** ☞366
382k366 Most Cited Cases

Mark is famous, for purpose of dilution claim, if it is famous within owner's industry, even if it is not famous in broader market. Lanham Trade-Mark Act, § 43(c), 15 U.S.C.A. § 1125(c).

**[3] Trade Regulation** ☞366
382k366 Most Cited Cases

Car rental company's "We'll Pick You Up" slogan was not sufficiently famous in car rental market to warrant

protection from dilution. Lanham Trade-Mark Act, § 43(c), 15 U.S.C.A. § 1125(c).

**[4] Trade Regulation** ☞366
382k366 Most Cited Cases

Neither Texas nor Louisiana anti-dilution statutes require mark to be famous in order to be protected; mark need only be distinctive. V.T.C.A., Bus. & C. § 16.29; LSA-R.S. 51:223.1.

*378 William D. Raman (argued), Amber Lee Hatfield, Thompson & Knight, Austin, TX, John Craig Cain, Arnold, White & Durkee, Houston, TX, for Advantage Rent-A-Car, Inc.

Rudolph A. Telscher, Jr. (argued), St. Louis, MO, Dana Livingston Cobb, Cook, Roach & Lawless, Austin, TX, for Enterprise Rent-A-Car, Co.

Appeal from the United States District Court for the Western District of Texas.

Before GOODWIN [FN1], GARWOOD and JONES, Circuit Judges.

> FN1. Circuit Judge of the Ninth Circuit, sitting by designation.

GOODWIN, Circuit Judge:

Enterprise Rent-A-Car Company (Enterprise) appeals the judgment and order denying Enterprise's post-judgment motion, which disposed of all claims between Enterprise and Advantage Rent-A-Car, Inc. (Advantage) under the Federal Trademark Dilution Act (FTDA) and the Texas, Louisiana, Arkansas, and New Mexico anti-dilution statutes over use of the slogan "We'll Pick You Up."

*379 FACTUAL & PROCEDURAL BACKGROUND

Both Enterprise and Advantage are rental car companies. The rental car market is divided into two segments: one that caters primarily to business and leisure travelers and one that provides replacement cars to drivers whose cars are in the shop for repair. Both companies are active in both segments.

In 1990, Advantage produced a television commercial that depicted an actor holding a steering wheel. A voice-over discussed the various reasons the actor might need a rental car. At the end of the commercial, a taller actor entered and lifted the first actor off the ground and into his arms, while the voice- over stated: "We'll even pick you up." The commercial aired on the Spurs Network at least 24 times in 1992, at least 12 times in 1993, at least 17 times in 1994,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

238 F.3d 378
57 U.S.P.Q.2d 1561
(Cite as: 238 F.3d 378)

Page 2

and at least 49 times by the end of the professional basketball season in May 1995. From August 1997 to April 1998, the commercial aired 289 times on Fox Sport Southwest. The commercial is the only advertising piece in which Advantage employed the phrase "We'll Even Pick You Up " Although Advantage has received several federal registrations for various slogans, it did not file an application to register the phrase "We'll Even Pick You Up" until May 3, 1999.

Meanwhile, Enterprise began using the phrases "Pick the Company that Picks You Up" and "Pick Enterprise, We'll Pick You Up" from 1994-1995. It first used the slogan "We'll Pick You Up" in 1994 and obtained federal service mark registrations for "Pick Enterprise, We'll Pick You Up" on January 16, 1996 and "We'll Pick You Up" on August 5, 1997. Enterprise estimates that it has spent more than $130 million on advertising containing the slogan, "We'll Pick You Up." It has used the slogan in all of the media forms in which it advertises, including print ads, yellow pages, radio ads, and commercials shown on prime time national television on major broadcast networks and cable stations. Approximately 75 percent of Enterprise's advertising includes the phrase "We'll Pick You Up." Enterprise has won marketing awards for its advertising campaign involving the "We'll Pick You Up" slogan.

Both Enterprise and Advantage became aware that variations of the slogan "We'll Pick You Up" were appearing in advertisements, and after some correspondence back and forth, Advantage filed suit against Enterprise. Enterprise answered that it did not infringe on Advantage's right in the phrase, and counterclaimed against Advantage. Enterprise asserted that Advantage had infringed Enterprise's federally registered "We'll Pick You Up" slogan and was diluting Enterprise's rights in the slogan.

Advantage moved for summary judgment against Enterprise's FTDA dilution claim on the ground that the FTDA expressly provides relief only if the accused use "begins after the mark has become famous," 15 U.S.C. § 1125(c)(1), and that the FTDA could not be applied retroactively against Advantage's use of its slogan. Whether or not Enterprise had attained fame with its slogan became the principal issue in the case.

After months of discovery, the parties narrowed the issues by entering into a partial consent judgement on May 24, 1999. They agreed that due, at least in part, to the presence of their respective company names in conjunction with the phrases, consumers were not confused by the competing advertisements that used the slogans. As a result of the partial consent judgment, Advantage's claims against Enterprise dropped out of the case, and only Enterprises claims for dilution under the FTDA and under the four state

dilution statutes remained.

After trial, the district court entered a judgment that denied Enterprise relief on any of its dilution claims. Having found that Enterprise did not demonstrate that its mark was sufficiently famous or distinctive, the district court did not reach the *380 questions whether: (1) Enterprise's claim under the FTDA must fail because of Advantage's prior use of its slogan; (2) Enterprise's claim under the FTDA must fail because the FTDA does not apply retroactively; (3) Enterprise met its burden of proof on dilution and/or likelihood of dilution; or (4) Enterprise met its burden of proof by clear and convincing evidence that Advantage abandoned its rights in its slogan. The district court dismissed Advantage's pending motions for summary judgment as moot.

Enterprise then filed a motion under FRCP 52 and 59, in which it requested that the district court: (1) amend its conclusions of law and reach new conclusions by applying the statutory factors on fame under the FTDA and (2) enter judgment in favor of Enterprise on the "fame" requirements of the FTDA and the Arkansas and New Mexico anti-dilution statutes, and on the less stringent "distinctiveness" standard of the Texas and Louisiana anti-dilution statutes.

The district court denied Enterprise's post-judgment motion, and Enterprise appealed.

## DISCUSSION

[1] To prevail on its federal dilution claim, Enterprise must prove that its slogan is "famous and distinctive;" that Advantage adopted its mark after Enterprise's had become "famous and distinctive;" and that Advantage caused dilution of Enterprise's mark. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 670 (5th Cir.2000). Enterprise must prove actual economic harm. *See id.* The New Mexico and Arkansas anti-dilution statutes also require that the mark be famous. *See* AR ST § 4-71-213 and NM ST § 57-3B-15.

The district court disposed of the federal dilution claim on the ground that Enterprise's slogan was insufficiently famous for the states' or the FTDA's anti-dilution protections to attach. It conducted an impressive review of dilution law and noted that the FTDA provides a nonexclusive list of factors that courts may consider in deciding whether a mark is distinctive and famous for dilution purposes. [FN2]

> FN2. The FTDA provides:
> In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to--

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(A) the degree of inherent or acquired distinctiveness of the mark;
(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
(C) the duration and extent of advertising and publicity of the mark;
(D) the geographical extent of the trading area in which the mark is used;
(E) the channels of trade for the goods or services with which the mark is used;
(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and
(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.
15 U.S.C. § 1125(c)(1). The language of the Arkansas and New Mexico statutes is identical. *See* AR ST § 4-71-213 and NM ST § 57-3B-15.

[2] To the extent that the district court's opinion can be read to suggest that Enterprise needed to prove fame beyond its market, we disagree. Rather, we agree with the Seventh Circuit, which has rejected this reading of the statute. *See Syndicate Sales Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 640 (7th Cir.1999). *See also Restatement (Third) Of Unfair Competition* § 25 cmt. e (1995) (stating that "[a] mark that is highly distinctive only to a select class or group of purchasers may be protected from diluting uses directed at that particular class or group"). Enterprise needed only to show that its "We'll Pick You Up" mark is famous within the car rental industry, not in a broader market.

**\*381** [3] Enterprise did not prove that its slogan was sufficiently "famous," even within the car rental market. As the district court explained, dilution is an extraordinary remedy, and Enterprise failed to prove that such common, descriptive words as "we'll pick you up" should be given monopoly protection in favor of an early user any more than such words as "we deliver" or "we pay the postage."

[4] However, the district court's holding that the Texas and Louisiana anti-dilution statutes require a mark to be famous is unsupported by state law. The court's only explanation for its conclusion that fame was necessary under Texas and Louisiana appeared in parenthetical citations to *J. Thomas McCarthy, Trademarks and Unfair Competition* (4th ed. 1999) § 2:108 (noting that "[w]ithout such a requirement, an anti-dilution statute becomes a rogue law that turns every trademark, no matter how weak, into an anti-competitive weapon") and *Exxon Corp. v. Oxford Clothes, Inc.*, 109

F.3d 1070, 1081 n. 14 (5th Cir.1997) (stating that "[i]t is clear that anti-dilution statutes ... are designed to protect only strong, well-recognized marks").

The Texas anti-dilution statute explicitly requires only distinctiveness, not fame. Courts applying the statute have not required fame for a party to prevail on a dilution claim. Under Texas law, to determine whether a mark is distinctive enough for dilution, the court considers factors much like those used in the FTDA fame analysis: whether the mark is arbitrary, the length of time the user has employed the mark, the scope of the user's advertising and promotions, the nature and extent of the first user's business, and the scope of the first user's reputation. *See Pebble Beach Co. v. Tour 18 I. Ltd.*, 942 F.Supp. 1513,1565 (S.D.Tex.1996) affd. as modified, 155 F.3d 526, rehearing denied. The court added that "a somewhat stricter standard is to be applied in determining 'strength' in dilution analysis than in likelihood of confusion analysis." *Id.*

Like the Texas statute, the Louisiana statute requires distinctiveness, not fame. Louisiana courts have provided little guidance on the meaning of distinctiveness for dilution purposes. In *Prudhomme v. Procter & Gamble Co.*, 800 F.Supp. 390, 395 (E.D.La.1992), the court noted that the anti-dilution statute protects a mark based upon its strength and that "such strength can be demonstrated by showing a mark to either be distinctive or to have acquired a secondary meaning." *Id.*

Louisiana courts have not addressed the issue whether the distinctiveness required for dilution purposes is different from the distinctiveness required for trademark infringement purposes. The Supreme Court of Louisiana has followed federal Supreme Court precedent in interpreting the state's distinctiveness requirement to mean that the mark must either be inherently distinctive or have acquired distinctiveness through secondary meaning in the context of trademark infringement, but it has not made clear whether these requirements extend to dilution cases. *See Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 652 So.2d 1306 (La.1995) (discussing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)).

There appears to be no basis for the district court's holding that the Louisiana and Texas statutes require fame. Although there seems to be no established difference between fame under the FTDA and distinctiveness under the Texas and Louisiana statutes, principally because both are such nebulous standards, the substantive difference, if any, is one of degree.

Accordingly, we AFFIRM the district court's holding that "We'll Pick You Up" is insufficiently famous for the FTDA and the New Mexico and Arkansas anti- dilution statutes, but VACATE and REMAND for a determination whether it

238 F.3d 378
57 U.S.P.Q.2d 1561
(Cite as: 238 F.3d 378)

Page 4

is sufficiently distinctive under Texas or Louisiana law.

*382 Neither party to recover costs on appeal.

238 F.3d 378, 57 U.S.P.Q.2d 1561

Briefs and Other Related Documents (Back to top)

• 2000 WL 33993296 (Appellate Brief) Reply Brief of Appellant (Jun. 21, 2000)

• 2000 WL 33993295 (Appellate Brief) Brief of Appellee (Jun. 05, 2000)

• 2000 WL 33993294 (Appellate Brief) Brief of Appellant (Mar. 27, 2000)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

### 7

(To be scanned in place of tab)

ort of interference balances
ness relationships with the
her parties coexisting in the
common law demonstrates
he boundaries within which
so as not to interfere with

ducing a breach of contract
contract, induces its breach
in the legitimate exercise of
party's cause of action ex-
s in an actual breach of the
sults in substantial interfer-
nution of the value of the
368 (1953); 8 P.O.F.2d 267,
he right to perform a con-
g therefrom, and also the
ty, are property rights enti-
.2d 1227, 1240–41 (1952); 8
ir. 2d *Interference* §§ 1, 39

## 1.03 Inducing Breach of Contract: Elements of Liability

### 1.03[1] Generally

For the plaintiff to recover on his claim against the defendant, the plaintiff must prove, by a preponderance of the evidence, each of five [six] things:

1. That at the time of the acts of the defendant, _____ [name], which are complained of, the plaintiff, _____ [name], was a party to a valid contract with _____ [name of breaching party] to _____ [state purpose of contract];

2. That the defendant either knew of the existence, or under the circumstances, should have known of the existence, of that contract;

3. That the acts of the defendant in inducing _____ [name of breaching party] to breach his contract with the plaintiff were intentional within the meaning of the word *intent,* which I will provide you with later in my instructions;

4. [optional—depending upon law of jurisdiction] That the conduct of the defendant was improper under the factors I will instruct you to consider;

5. That, as a proximate result of the acts of the defendant, _____ [name of breaching party] was induced to breach his contract with the plaintiff; and

6. That as a direct and proximate result of the defendant's conduct, the plaintiff suffered damage.

If you find from your consideration of all of the evidence that the plaintiff has proved each of these elements by a preponderance of the evidence, then you will consider the question of the amount of money damages under instructions I will give you.

If you find, however, from your consideration of all of the evidence that the plaintiff has not proved any one or more of these elements by a preponderance of the evidence, then the defendant is not liable, and your verdict should be against the plaintiff and for the defendant.

## Comment:

This charge reflects the traditional standard for establishing liability, and includes the optional element of improper conduct on the part of the defendant. This element, now included in the *Restatement (Second) of Torts,* is being used by an increasing number of jurisdictions.



# EXHIBIT / ATTACHMENT

_____

**(To be scanned in place of tab)**

### 1.03[4][c] Proof of Intent

Intent may be proved by indirect or circumstantial evidence. Indeed, it can rarely be established by any other means. While witnesses may see and hear, and may be able to give direct evidence of what a person does or fails to do, they do not likewise see and hear what a person intends to do or to refrain from doing.

### Comment:

*Cf. Piedmont Cotton Mills, Inc. v. H. W. Ivey Construction Co.,* 109 Ga. App. 876, 137 S.E.2d 528 (1964); Annot., 26 A.L.R.2d 1247, 1277 (1952).

se or aim or state of
. Ordinarily, it is rea-
natural and probable

on of *intent. See, e.g.,*
962), *cert. denied,* 372
*n Mills, Inc. v. H. W.*
S.E.2d 528 (1964).

13



# EXHIBIT / ATTACHMENT

**9**

(To be scanned in place of tab)

lice" [Optional]

ust find that the defendant
d in this sense, sometimes
ly to the intentional doing of
or excuse—that is, the will-
not necessary for the plain-
sense of hatred, ill will, or


malice" be shown, this charge
dictions where intent need only
ra. This charge includes the tra-
alice and legal malice. *See, e.g.,*
69); *Mid-Continent Telephone*
Supp. 1176 (N.D. Miss. 1970);
*Therm Insulation Systems, Inc.,*

the use of the word *malice,* Pro-
erm. Prosser, *supra* at 983–84.
simplified by replacing this sec-
included in the definition of *in-*

established in order to prove the
nse of spite, hostility, or ill will
nses: (1) Proof of legal malice
e. 45 Am. Jur. 2d *Interference* §
lly be proved in order to obtain
1.07[2], *infra.*

.h the concept of actual malice
ll will) from the constitutional
by the United States Supreme
*an,* 376 U.S. 254 (1964), and


### 1.03[4][e] Summary of Requirement of Intent

Thus, in making your determination as to whether the defen-
dant intentionally interfered with the contract between the plain-
tiff and _____ [name of breaching party], you may look at
the defendant's conduct and, in the absence of evidence to the
contrary, draw an inference in order to make your finding con-
cerning the defendant's intent. That inference is that the defen-
dant intended by his conduct, or lack of conduct, those natural
and probable consequences that one standing in like circum-
stances, and possessing like knowledge, should reasonably have
expected to result from the same act knowingly done, or know-
ingly omitted, by him. If you thereby find that the defendant's
conduct was in willful violation of a known right of the plaintiff,
then the requisite intent was present.


### Comment:

This charge is recommended to collect and reinforce for the jury the
various elements of the requirement that intent be proved as an ele-
ment of the tort.



# EXHIBIT / ATTACHMENT

_____ 10 _____

(To be scanned in place of tab)

**1.03[5][a] Breach Defined**

Breach of contract means the failure of a party to a contract, in the absence of legal excuse or impossibility of performance, to perform any promise which forms the whole or part of the contract. A breach may occur with regard to either an express or implied provision of the contract. An express provision is one which is specifically agreed to by the parties either orally or in writing. An implied provision is one that is recognized by the parties to exist and bind them in their actions despite the fact that it was not specifically spelled out or agreed to by the parties to the contract. An implied provision often arises out of terms which *were* expressly set forth in the contract and agreed to by the parties, and an implied promise constitutes a valid part of the contract.

**Comment:**

This charge is based upon the traditional definition of *breach of contract* set forth in *Black's Law Dictionary* 171 (5th ed. 1979). General contract law, including an analysis of what constitutes breach of contract and the related concepts of materiality and substantial performance, is beyond the scope of these instructions. The definitions herein are included only because a requisite element of this tort is some form of breach of or interference with a contract.

For a detailed analysis of what constitutes breach of contract, counsel should consult one of the standard texts or treatises in the area of contract law. *E.g.*, J. Calamari & J. Perillo, *Law of Contracts* §§ 174–85 (3d ed. 1987); E. Allen Farnsworth, *Contracts* (1982).

*(left margin:)*
...nship with _____
...lawful, you may find the
...re.

...ct complained of may have
... charge, which incorporates
... presumed to intend the con-
...*nont Cotton Mills, Inc. v. H.*
...76, 137 S.E.2d 528 (1964); 45

17



# EXHIBIT / ATTACHMENT

## _____ 11 _____

(To be scanned in place of tab)

### 1.03[5][b] Breach Required

For the plaintiff to prevail on his claim against the defendant, you must find that the contract in question has been breached. This means that you must find that _____ [name of breaching party] failed to perform as he agreed to do under the contract, either by virtue of the express provisions of the contract or as may be implied from the express provisions, in accordance with the definitions of express and implied contractual provisions for which I have already instructed you.

### Comment:

For the definitions of *breach, express condition,* and *implied condition,* see 1.03[5][a] and the comment thereto, *supra.*

It is axiomatic that breach is a requisite element of the tort of inducing breach of contract. *See, e.g., George A. Fuller Co. v. Chicago College of Osteopathic Medicine,* 719 F.2d 1326 (7th Cir. 1983); *National Educational Advertising Service, Inc. v. Cass Student Advertising Inc.,* 454 F. Supp. 71 (N.D. Ill. 1977). For a discussion of the requirement that the contract in question be valid and enforceable (which this instruction implicitly assumes), see 1.03[2] and comment thereto, *supra.*

18



# EXHIBIT / ATTACHMENT

_____ 12 _____

(To be scanned in place of tab)

against the defendant,
on has been breached.
_____ [name of
agreed to do under the
provisions of the con-
:ss provisions, in accor-
ad implied contractual
ucted you.


tition, and *implied condi-*
), *supra.*
-ment of the tort of induc-
*Fuller Co. v. Chicago Col-*
) (7th Cir. 1983); *National*
*s Student Advertising Inc.,*
ussion of the requirement
nforceable (which this in-
d comment thereto, *supra.*

### 1.03[5][c] Causal Relationship: Generally

You, the jury, must determine whether the defendant was re-
sponsible for the refusal of _____ [name of breaching
party] to go forward with the contract with the plaintiff. This
means that before you can decide in favor of the plaintiff, you
must find, by a preponderance of the evidence, that but for the
actions of the defendant, the contract which would otherwise
have been performed was not performed.


### Comment:

This general causation charge, containing the traditional "but for"
test, finds wide support among the courts. *See, e.g., Freed v. Manches-
ter Service, Inc.,* 165 Cal. App. 2d 186, 331 P.2d 689 (1958); *Smith v.
Citizens and Southern National Bank,* 241 S.C. 285, 128 S.E.2d 112
(1962); *Special Event Entertainment v. Rockefeller Center, Inc.,* 458 F.
Supp. 72 (S.D.N.Y. 1978); *Martin v. Texaco, Inc.,* 304 F. Supp. 498 (S.D.
Miss. 1969); *State Enterprises, Inc. v. Southridge Cooperative Section
One, Inc.,* 18 A.D.2d 226, 238 N.Y.S.2d 724 (N.Y. App. Div. 1963). *See
also* 45 Am. Jur. 2d *Interference* § 5 (1969) ("it must be shown that by
reason of defendant's act, a contract which would otherwise have been
performed was abandoned").



# EXHIBIT / ATTACHMENT

## 13

(To be scanned in place of tab)

### 1.03[5][d] Proximate Cause

If you find that the plaintiff did suffer the losses he claims, you must then determine whether the defendant's conduct was the proximate cause of the plaintiff's loss or damage.

In this regard, the defendant's conduct will be considered to be the proximate cause of the plaintiff's loss or damage if you find that it was a substantial factor in causing that loss or damage. It need not be the *only* cause. The conduct will be a substantial factor in causing the loss or damage if it had such an effect in producing the loss that reasonable men and women would regard it as a cause of the loss or damage, considering the number of other contributing factors, whether defendant's conduct created a condition or chain of events which was continuous and active up to the time of the damage to the plaintiff, and the lapse of time between the defendant's conduct and the damage to the plaintiff.

## Comment:

This charge is based upon *Acme Cigarette Services, Inc. v. Gallegos,* 91 N.M. 577, 577 P.2d 885 (N.M. Ct. App. 1978), and reflects the traditional definition of proximate cause. *See Restatement (Second) of Torts* § 433 (1965). The requirement of causal effect may be stated in somewhat different terms depending upon the jurisdiction. *See generally* Prosser, *supra* at 989.

Although there is some overlap between this instruction and the charge set forth in 1.03[5][b], instructing the jury with both charges will not lead to inconsistent verdicts. The rationale behind two separate causation instructions is that the first charge is designed to inform the jury that the plaintiff has the burden of proving that except for the defendant's actions, the plaintiff would have more likely than not received the benefits of its contract with the third party. Instructing the jury with the instant charge will make it clear to the jury that the defendant's conduct must have been more than merely a contributing cause, it must be a *substantial* factor in inducing the breach. If this latter instruction is not accepted in a certain jurisdiction, the charge set forth in 1.03[5][b] may be given alone with no adverse impact.

*Note:* In *Eltolad Music, Inc. v. April Music, Inc.,* 139 Cal. App. 3d 697, 188 Cal. Rptr. 858 (1983), the Court of Appeals of California granted the defendant/appellant a new trial based upon the trial court's instruction to the jury that proximate cause constituted "a" moving cause of the breach. The California court held that the correct instruction, as requested by the defendant, was that proximate cause is

suffer the losses he claims,
he defendant's conduct was
s loss or damage.
duct will be considered to be
s loss or damage if you find
ising that loss or damage. It
uct will be a substantial fac-
it had such an effect in pro-
and women would regard it
considering the number of
defendant's conduct created
ι was continuous and active
: plaintiff, and the lapse of
uct and the damage to the

ιrette Services, Inc. v. Gallegos,
pp. 1978), and reflects the tradi-
See Restatement (Second) of
. causal effect may be stated in
pon the jurisdiction. See gener-

ween this instruction and the
ing the jury with both charges
The rationale behind two sepa-
st charge is designed to inform
ı of proving that except for the
d have more likely than not re-
the third party. Instructing the
t clear to the jury that the de-
ore than merely a contributing
inducing the breach. If this lat-
ain jurisdiction, the charge set
with no adverse impact.

l Music, Inc., 139 Cal. App. 3d
urt of Appeals of California
ew trial based upon the trial
roximate cause constituted "a"
nia court held that the correct
nt, was that proximate cause is

"the" moving cause of the breach. Such an interpretation does not ap-
pear to be the majority view.

Compare Eltolad with Lanning v. Poulsbo Rural Telephone Associ-
ation, 8 Wash. App. 402, 507 P.2d 1218 (1973).

21



# EXHIBIT / ATTACHMENT



## 14

(To be scanned in place of tab)

### 1.05[2] Proper or Improper Interference Defined

The determination of whether the defendant's conduct was or was not improper depends upon your consideration of all the facts and circumstances of the case, and a balancing of the following factors:

1. The nature of the defendant's conduct;
2. The defendant's motive;
3. The interests of the plaintiff with which the defendant's conduct interfered;
4. The interests sought to be advanced by the defendant;
5. The social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;
6. The proximity or remoteness of the defendant's conduct to the interference claimed by the plaintiff; and
7. The relationship among the plaintiff, _____ [name of breaching party], and the defendant.


## Comment:

This charge is generally based upon *Restatement (Second) of Torts* § 767 (1977). The comments to this *Restatement* section explain the significance of the various factors in depth and should be readily consulted by counsel. By and large, a growing number of jurisdictions are approaching the issue of whether a defendant's interference is proper or improper through an analysis of the seven specific factors set forth by the *Restatement*. *See, e.g., Heheman v. E. W. Scripps Co.,* 661 F.2d 1115, 1127–28 (6th Cir. 1981), *cert. denied,* 456 U.S. 991 (1982); *Gross v. Lowder Realty, Inc.,* 494 So. 2d 590, 593–600 (Ala. 1986); *Bendix Corp. v. Adams,* 610 P.2d 24, 30 (Alaska 1980); *Dawson v. Radewicz,* 63 N.C. App. 731, 306 S.E.2d 171, 173 (1983). *See also* 45 Am. Jur. 2d *Interference* § 27 (1969); Annot., 26 A.L.R.2d 1227, 1267 (1952).

The lack of improper interference on the part of the defendant, i.e., justification for the defendant's conduct *(see* § 1.05[1], *supra),* is by far the most popular defense advanced by defendants in actions for inducing breach of contract. *See* 45 Am. Jur. 2d *Interference* § 27 (1969) and cases cited therein.

With respect to the means employed by the defendant in inducing the breach of contract, see 1.04[2] and the comment thereto, *supra.*

With regard to the defendant's motive in inducing the breach, see 1.04[3] and the comment thereto, *supra.*

Although improper interference is a question of fact for the jury to determine in accordance with the several factors set forth in this in-

e Defined

defendant's conduct was or
ur consideration of all the
and a balancing of the fol-

:onduct;

with which the defendant's

inced by the defendant;
ig the freedom of action of
iterests of the plaintiff;
: the defendant's conduct to
ntiff; and
intiff, _____ [name of

Restatement (Second) of Torts §
tement section explain the sig-
th and should be readily con-
ing number of jurisdictions are
fendant's interference is proper
seven specific factors set forth
n v. E. W. Scripps Co., 661 F.2d
ed, 456 U.S. 991 (1982); Gross v.
593–600 (Ala. 1986); Bendix
.a 1980); Dawson v. Radewicz,
(1983). See also 45 Am. Jur. 2d
.L.R.2d 1227, 1267 (1952).

the part of the defendant, i.e.,
t (see § 1.05[1], supra), is by far
defendants in actions for induc-
2d Interference § 27 (1969) and

d by the defendant in inducing
the comment thereto, supra.
ve in inducing the breach, see
·a.
question of fact for the jury to
ral factors set forth in this in-

struction, the existence and exercise of a superior or an absolute right
on the part of the defendant is a question of law for the court. For a
discussion on the distinction between absolute and ordinary rights, see
1.04[3] and the comment and note thereto, supra.



# EXHIBIT / ATTACHMENT

## 15

**(To be scanned in place of tab)**

nproper if you find that he
:lfare. To find that the de-
blic welfare, you must find
 established public policy
:nsuring the stability of the
:ample of such a situation
1 have injured the public

'endant's conduct was proper
furtherance of the public wel-
nterest served against the pri-
. 2d *Interference* § 29 (1969);
*v. Mohammed*, 586 F.2d 530
:4 (1979); *Edwards v. Travelers
System Operations, Inc. v. Sci-
'. Supp. 130 (D.N.J. 1977); *Ru-
ra, Inc.*, 91 Misc. 2d 264, 397
· *Products & Excavating Corp.
1.J. 507, 181 A.2d 774 (1962);
. 349, 354 S.W.2d 823 (1962).

## 1.06 Compensatory Damages

### 1.06[1] Generally

Should you find that the defendant is liable for procuring or causing a breach of the plaintiff's contract, and that his actions were neither justified nor privileged, then you may award such damages as will reasonably compensate the plaintiff for the losses he has sustained from that breach of his contract.

## Comment:

In cases of inducing breach of contract, courts apply the broad tort principle that damages are limited to compensation for the actual loss incurred. 45 Am. Jur. 2d *Interference* § 57 (1969); Annot. 26 A.L.R.2d 1272 (1952). *See Restatement (Second) of Torts* § 774A (1977).

*See* 1.06[3] for recoverable elements of compensatory damages.

37

**1.06[2] Damages: Impossibility of Precise Calculation No Bar to Recovery**

If you find that the plaintiff has in fact suffered damage to his business or property, the fact that the precise amount of damage may be difficult to ascertain does not impair his right to recover damages. Although you may not render a verdict based upon mere speculation or guesswork, the plaintiff is allowed some reasonable leeway in his method and proof of damage.

While the law places a burden upon the plaintiff to prove such facts as will enable you, the jury, to arrive at the amount of damages with reasonable certainty, it is not necessary that the plaintiff prove the amount of those damages with mathematical precision. It is only required that the plaintiff present such evidence as might reasonably be expected to be available under the circumstances.

You are permitted to determine the amount of damage by estimation or approximation, so long as a reasonable basis for such estimate or approximation is shown with reasonable certainty. You may use any formula or theory for determining damages which is based upon the evidence in the case and which you believe to be reasonable; you are not bound to reject a formula or theory simply because it does not measure damages to the exact dollar and cent.

**Comment:**

This instruction reflects the established rule that absolute precision is not required for an award of damages, even though total speculation may not be used. Estimation is permitted so long as its method is justified by the record admitted into evidence. 45 Am. Jur. 2d *Interference* § 57; *ABC-Paramount Records, Inc. v. Topps Record Distributing Co.,* 374 F.2d 455 (5th Cir. 1967); *Daly v. Nau,* 167 Ind. App. 541, 339 N.E.2d 71, 78–79 (1975); *Selby v. Pelletier,* 1 Conn. App. 320, 472 A.2d 1285, 1288 (1984); *Steitz v. Gifford,* 280 N.Y. 15, 19 N.E.2d 661 (1939). *See Restatement (Second) of Torts* § 912 (1977). For rule applied to other torts, *see, e.g., Monotronics Corp. v. Baylor,* 107 Ill. App. 3d 14, 436 N.E.2d 1062, 1065 (1982); *Vendo Co. v. Stoner,* 58 Ill. 2d 289, 321 N.E.2d 1, 13 (1974), *cert. denied* 420 U.S. 975 (1975); *Daniels Towing Services, Inc. v. Nat Harrison Associates, Inc.,* 432 F.2d 103 (5th Cir. 1970); *Washington State Bowling Proprietors Association v. Pacific Lanes, Inc.,* 356 F.2d 371, 378–79 (9th Cir. 1966).

e Calculation No Bar to

act suffered damage to his
precise amount of damage
impair his right to recover
der a verdict based upon
intiff is allowed some rea-
of of damage.

the plaintiff to prove such
ive at the amount of dam-
t necessary that the plain-
nages with mathematical
plaintiff present such evi-
to be available under the

amount of damage by esti-
reasonable basis for such
with reasonable certainty.
for determining damages
e case and which you be-
and to reject a formula or
sure damages to the exact

rule that absolute precision
en though total speculation
long as its method is justi-
45 Am. Jur. 2d *Interference*
*Topps Record Distributing
lau,* 167 Ind. App. 541, 339
. Conn. App. 320, 472 A.2d
.Y. 15, 19 N.E.2d 661 (1939).
:1977). For rule applied to
*Baylor,* 107 Ill. App. 3d 14,
*v. Stoner,* 58 Ill. 2d 289, 321
975 (1975); *Daniels Towing
'nc.,* 432 F.2d 103 (5th Cir.
.ors Association v. Pacific
. 1966).

### 1.06[3] Recoverable Elements of Damages

In determining the amount of compensatory damages, you
may consider whether the plaintiff suffered any measurable loss
of profits by reason of the defendant's conduct. You should be
guided by the rule that the plaintiff is entitled to any profits
which he would, with reasonable certainty, have enjoyed, were it
not for the breach of his contract. In arriving at the amount of
profits lost by the plaintiff, you are entitled to consider the plain-
tiff's past earnings in his business and, in particular, those past
earnings resulting from contracts of the nature of the contract in
this case. You should also consider all of the other evidence con-
cerning general economic and competitive conditions that you
may find to have a bearing on the issue of lost profits.

In addition to lost profits, the plaintiff is entitled to recover
any reasonable costs he incurred in an effort to mitigate or re-
duce his damages and to recover business he lost due to the de-
fendant's wrongful conduct. As a result, you may consider the
plaintiff's expenses in determining the amount of compensatory
damages.

### Comment:

Concerning lost profits, *see, e.g.,* 45 Am. Jur. 2d *Interference*
§§ 57, 58 (1969); *Central Telecommunications, Inc. v. TCI Cablevi-
sion, Inc.,* 800 F.2d 711 (8th Cir. 1986); *Selby v. Pelletier,* 1 Conn. App.
320, 472 A.2d 1285, 1288 (1984); *Franklin Music Co. v. American
Broadcasting Co.,* 616 F.2d 528 (3d Cir. 1980); *Hutchins v. Bethel Meth-
odist Home,* 370 F. Supp. 954, 964 (S.D.N.Y. 1974) (benefit-of-bargain
measure of damages); *Dillon v. Magner,* 29 A.D.2d 759, 760, 287
N.Y.S.2d 519, 521 (N.Y. App. Div. 1968); *Coonis v. Rogers,* 429 S.W.2d
709 (Mo. 1968).

Concerning recovery of costs of mitigation or recoupment, *see* An-
not., 26 A.L.R.2d 1227, 1272 (1952).

While the measure of damages recoverable in an action for inducing
a breach of contract varies among jurisdictions, it is generally said that
the defendant should be held responsible for all of the quantifiable
consequences of his tortious conduct. *E.g.,* 45 Am. Jur. 2d *Interfer-
ence* (1969); *Restatement (Second) of Torts* § 774A (1977); *Daly v. Nau,*
167 Ind. App. 541, 339 N.E.2d 71, 78–79 (1975). Counsel should exam-
ine the case law in each jurisdiction to determine the extent of damages
to which the plaintiff may be entitled.

### 1.06[4] Plaintiff's Burden of Proof

The law distinguishes between the measure of proof necessary to establish the fact that the plaintiff sustained an injury, and that which is required to enable you to fix the amount of that damage. As I have instructed you, the fact of injury by reason of the alleged violation must be established by a preponderance of the evidence. This is a higher or more strict degree of proof than is required in proving the amount of damages. In proving the amount of damages, the law requires only that the plaintiff prove such facts as will enable you to arrive at the amount of damages with reasonable certainty. Moreover, the plaintiff is not required to prove the exact amount of damages, but only to have presented such evidence as might reasonably be expected to be available under the circumstances.

## Comment:

This instruction represents the general rule imposing a lesser burden of proof on the plaintiff with respect to the amount of damage than for the fact of some damage or for establishing the defendant's liability. *E.g., ABC-Paramount Records, Inc. v. Topps Record Distributing Co.,* 374 F.2d 455, 460–61 (5th Cir. 1967); *Franklin Music Co. v. American Broadcasting Co.,* 616 F.2d 528, 545–46 (3d Cir. 1980).



# EXHIBIT / ATTACHMENT

_____ 16 _____

**(To be scanned in place of tab)**

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
**(Cite as: 615 F.2d 252)**

United States Court of Appeals,
Fifth Circuit.

AMSTAR CORPORATION, Plaintiff-Appellee,
v.
DOMINO'S PIZZA, INC. and Atlanta Pizza, Inc., Pizza
Enterprises, Inc. and Pizza
Services, Inc., Hanna Creative Enterprises, Inc.,
Defendants-Appellants.

No. 79-3650.

April 8, 1980.
Rehearing and Rehearing En Banc Denied May 2, 1980.

Suit was brought alleging trademark infringement, unfair competition, and dilution. The United States District Court for the Northern District of Georgia, at Atlanta, Richard C. Freeman, J., entered judgment in favor of plaintiff, and defendants appealed. The Court of Appeals, Ainsworth, Circuit Judge, held that: (1) test of likelihood of confusion applicable in trademark infringement case is also applicable to deceptive trade practices claim, common-law unfair competition, and claim of false designation of origin or false description; (2) use of trademark "Domino's Pizza" in connection with sale of fast-food delivered hot pizza pies did not create likelihood of confusion in connection with plaintiff's use of trademark "Domino" for sugar, sold in grocery stores, and individual packets of condiment items, often used in restaurants, in absence of solid evidence of actual confusion, and in light of limited strength of plaintiff's mark outside its line, dissimilarities in trademark design, products, retail outlets, purchasers and advertising, and existence of third-party registrations; and (3) there was no violation of Georgia antidilution statute since the marks themselves were not confusing and plaintiff's mark, outside plaintiff's line of sugars and portion-controlled items, had already become a weak mark.

Reversed.

West Headnotes

**[1] Trade Regulation ⬅726**
382k726 Most Cited Cases

Likelihood of confusion in a trademark case is a question of fact on which the district court's findings can be set aside only if clearly erroneous. Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.

**[2] Courts ⬅106**
106k106 Most Cited Cases

Practice of allowing counsel for prevailing party to write trial judge's opinion should be discouraged.

**[3] Federal Courts ⬅850.1**
170Bk850.1 Most Cited Cases
(Formerly 170Bk850)

**[3] Federal Courts ⬅852**
170Bk852 Most Cited Cases

"Clearly erroneous" standard of review applies to a trial judge's findings of fact whether judge prepared them or they were developed by one of the parties and mechanically adopted by the judge, but Court of Appeals can take into account the district court's lack of personal attention to the factual findings in applying the "clearly erroneous" rule. Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.

**[4] Federal Courts ⬅853**
170Bk853 Most Cited Cases
Finding of fact is "clearly erroneous" when, though there is evidence to support it, reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A.

**[5] Trade Regulation ⬅407**
382k407 Most Cited Cases

**[5] Trade Regulation ⬅870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Test of likelihood of confusion applicable in trademark infringement case is also applicable to deceptive trade practices claim, common-law unfair competition, and claim of false designation of origin or false description. Lanham Trade-Mark Act, §§ 32(1), 43, 15 U.S.C.A. §§ 1114(1), 1125; Code Ga. § 106-701 et seq.

**[6] Trade Regulation ⬅331**
382k331 Most Cited Cases
Strength and distinctiveness of plaintiff's trademark is a vital consideration in determining the scope of protection it should be accorded.

**[7] Trade Regulation ⬅334.1**
382k334.1 Most Cited Cases
(Formerly 382k334)

For purposes of trademark protection, the greater the number of identical or similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion.

**[8] Trade Regulation ⬅363.1**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

Page 2

382k363.1 Most Cited Cases
(Formerly 382k363)

Existence of some 72 third-party uses and registrations of
mark limited the protection to be accorded plaintiff's mark
outside the uses to which plaintiff had already put its mark.

[9] Trade Regulation ☞483
382k483 Most Cited Cases

Where mark was the surname of a good number of people
and was a common English noun, although its application to
plaintiff's product might be arbitrary, it was not to be
accorded the same degree of protection as given to coined
and fanciful terms.

[10] Trade Regulation ☞474
382k474 Most Cited Cases

If defendant's mark had been adopted with the intent of
deriving benefit from reputation in plaintiff's mark, that fact
alone might be sufficient to justify inference that there was
confusing similarity.

[11] Trade Regulation ☞335
382k335 Most Cited Cases

Evidence of actual confusion is not necessary to finding of
likelihood of confusion in trademark infringement case, but
it is the best evidence of likelihood of confusion.

[12] Trade Regulation ☞335
382k335 Most Cited Cases

In undertaking to demonstrate likelihood of confusion in a
trademark infringement case by use of survey evidence,
appropriate "survey universe" should include a fair sampling
of those purchasers most likely to partake of the alleged
infringer's goods or services.

[13] Trade Regulation ☞596
382k596 Most Cited Cases

Survey based on a "word association" test did not present
any meaningful evidence of likelihood of confusion in
trademark infringement case.

[14] Trade Regulation ☞354
382k354 Most Cited Cases

Use of trademark "Domino's Pizza" in connection with sale
of fast-food delivered hot pizza pies did not create
likelihood of confusion in connection with plaintiff's use of
trademark "Domino" for sugar, sold in grocery stores, and
individual packets of condiment items, often used in
restaurants, in absence of solid evidence of actual confusion,

and in light of limited strength of plaintiff's mark outside its
line, dissimilarities in trademark design, products, retail
outlets, purchasers and advertising, and existence of third-
party registrations. Lanham Trade-Mark Act, §§ 1 et seq.,
12(a), 32(1), 43, 43(a), 15 U.S.C.A. §§ 1051 et seq.,
1062(a), 1114(1), 1125, 1125(a); Code Ga., § 106-701 et
seq.

[15] Trade Regulation ☞366
382k366 Most Cited Cases

"Dilution" of trademark occurs where use of trademark by
subsequent user will lessen the uniqueness of the prior user's
mark with the possible future result that a strong mark may
become a weak mark. Code Ga. § 106- 115.

[16] Trade Regulation ☞366
382k366 Most Cited Cases

Where the marks themselves were not confusing and
plaintiff's mark "Domino" had already become a weak mark
outside plaintiff's line of sugars and portion- controlled
items, defendant's use of mark "Domino's Pizza" in
connection with sale of fast-food delivered hot pizza pies
did not violate Georgia's antidilution statute. Code Ga. §
106-115.

[17] Trade Regulation ☞257.1
382k257.1 Most Cited Cases
(Formerly 382k257)

Right granted owner of registered trademark is a monopoly
and should not be extended unless the owner is clearly
entitled thereto.
*254 Newton, Hopkins & Ormsby, Todd Deveau, William
H. Needle, Atlanta, Ga., Beaman & Beaman, Jackson,
Mich., George M. Hopkins, Atlanta, Ga., Miles J.
Alexander, Jerre B. Swann, Virginia S. Taylor, Atlanta, Ga.,
for defendants- appellants.

Browne, Beveridge, DeGrandi, Kline & Lunsford, Julius R.
Lunsford, Jr., J. Rodgers Lunsford, III, Atlanta, Ga.,
Cooper, Dunham, Clark, Griffin & Moran, Gerald W.
Griffin, Norman H. Zivin, New York City, for
plaintiff-appellee.

Appeal from the United States District Court for the
Northern District of Georgia.

Before AINSWORTH and HENDERSON, Circuit Judges,
and HUNTER,[FN*] District Judge.

> FN* District Judge of the Western District of
> Louisiana, sitting by designation.

615 F.2d 252                                                                          Page 3
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

AINSWORTH, Circuit Judge:

Amstar Corporation brought this suit asserting trademark infringement and unfair competition against Domino's Pizza, Inc. (DPI) and several of its franchisees [FN1] to enjoin their use of Amstar's federal registration of the "Domino" trademark. The complaint is based on allegations that defendants' use of the mark "Domino's Pizza" in connection with the sale of fast-food delivered hot pizza pies constitutes trademark infringement and a false designation of origin or representation in violation of the Trademark Act of 1946, 15 U.S.C. s 1051 et seq.; [FN2] also that said use constitutes unfair competition in violation of the *255 Georgia Uniform Deceptive Trade Practices Act, Ga.Code Ann. s 106-701 et seq., and dilutes the distinctive quality of plaintiff's mark "Domino" in violation of the Georgia anti-dilution statute, Ga.Code Ann. s 106-115.[FN3] Defendants denied that plaintiff was entitled to any equitable relief, asserted trademark misuse by plaintiff, and counterclaimed for cancellation of plaintiff's registration of the "Domino" mark for salt.[FN4] The district court ruled in favor of plaintiff, dismissed defendants' counterclaim, and permanently enjoined defendants' use of the names "Domino" or "Domino's Pizza." Defendants then filed this appeal. We reverse because we find that the district court's decision was fundamentally erroneous since it was predicated on a holding that there was a likelihood of confusion between the use of "Domino's Pizza" by defendants in connection with pizza store services and the use of "Domino" by plaintiff in connection with the sale of sugar and individual packets of condiment items.

FN1. Atlanta Pizza, Inc.; Pizza Enterprises, Inc.; Pizza Services, Inc.; and Hanna Creative Enterprises, Inc. As found by the district court, all the foregoing corporations with the exception of Hanna Creative Enterprises, Inc., are now defunct. Findings of Fact Nos. 6, 7.

FN2. Provisions of the Trademark Act pertinent to this litigation provide:
Any person who shall, without the consent of the registrant
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to

be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.    .
15 U.S.C. s 1114(1).
Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
15 U.S.C. s 1125(a).

FN3. The Georgia Uniform Deceptive Trade Practices Act provides in part:
(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
(1) Passes off goods or services as those of another;
(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
(4) Uses deceptive representations or designations of geographic origin in connection with goods or services;
(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;
(6) Represents that goods are original or new if they are deteriorated, altered, reconditioned,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

Page 4

reclaimed, used, or secondhand;

(7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparages the goods, services, or business of another by false or misleading representation of fact;

(9) Advertises goods or services with intent not to sell them as advertised;

(10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this Chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State. (Acts 1968, pp. 337, 338.)

Ga.Code Ann. s 106-702.

The Georgia anti-dilution statute provides:

Every person, association, or union of working men adopting and using a trade-mark, trade name, label or form of advertisement may proceed by suit and all courts having jurisdiction thereof shall grant injunctions, to enjoin subsequent use by another of the same or any similar trade-mark, trade name, label or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the trade-mark, trade name, label, or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services; except that the provisions of this section shall not deprive any party of any vested lawful rights acquired prior to the effective date of this section. (Acts 1955, pp. 453, 454.)

Ga.Code Ann. s 106-115.

FN4. Defendants' counterclaim for cancellation of the "Domino" mark for salt is based on its contention that the registration was obtained through false representations concerning the date of first use in commerce of "Domino" salt on June 4, 1964. Defendants contend they are damaged by

this registration because it is the only "Domino" registration for non- sugar products which purports to show a first use date prior to that of the first use date of the mark "Domino's Pizza" by DPI on February 12, 1965.

I. Background of Dispute

Amstar Corporation holds several federal registrations for the widely known "Domino" *256 trademark,[FN5] and the mark has been used since the turn of the century on plaintiff's various sugar products. Since 1965, plaintiff has also packaged single-serving (portion-control) envelopes of salt, pepper, sugar, mustard, ketchup, mayonnaise, jams and jellies, salad dressings, taco sauce, honey, cranberry sauce, tartar sauce and table syrup under the "Domino" mark. Plaintiff has spent more than $54 million since 1947 in advertising and promoting its "Domino" products, and as a result there is wide public recognition of the mark as a source of sugar products. Amstar's non-sugar, single-serving condiment packages introduced in 1965 have become the nation's largest line of portion-control items, with sales currently running at a rate of about $14 million per year.

> FN5. Plaintiff is the owner of the following trademark registrations issued by the U.S. Patent and Trademark Office:

| Trademark Registration Date | Reg. No. Goods | |
|---|---|---|
| DOMINO (renewed 1951, 1971) | Hard sugar design | 37,082 | 9/17/01 1931, |
| DOMINO (renewed 1951, 1971) | Hard sugar | 37,177 | 10/8/01 1931, |
| DOMINO (renewed 1949, 1969) | Hard sugar | 73,099 | 3/16/09 1929, |
| DOMINO Portion-control mustard | | 812,656 | 8/9/66 |
| DOMINO Portion-control ketchup | | 812,657 | 8/9/66 |

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

615 F.2d 252                                                                                          Page 5
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

| DOMINO<br>Salt | 813,101 | 8/16/66 |
|---|---|---|
| DOMINO<br>Portion-control<br>pepper | 813,113 | 8/16/66 |
| DOMINO<br>Jams and jellies | 920,834 | 9/21/71 |
| DOMINO<br>Salad dressing,<br>mayonnaise,<br>cucumber relish | 927,856 | 1/25/72 |
| DOMINO<br>12/12/78<br>cream substitute | 1,108,831<br>Non-dairy powdered | |

Findings of Fact Nos. 12, 50.

Defendant DPI is the nation's largest chain of fast-food delivered pizza pie outlets, with 287 stores in 30 states and current sales exceeding $43 million annually. The chain has used the name "Domino's Pizza" since early in 1965. Prior to that date, the pizzeria from which the chain grew was known as "Dominick's," named after its founder, Dominick Devarti. Devarti sold his pizzeria located in Ypsilanti, Michigan to Thomas Monaghan in December of 1960. In 1963 Devarti withdrew his permission to use the name "Dominick's," and for an interim period Monaghan called the store "Ypsilanti Dominick's." During this period Monaghan searched for a suitable new name for his pizzeria. In 1965 an employee suggested the name "Domino's Pizza," and Monaghan adopted the name immediately. At trial, Monaghan stated that he selected the name because it sounded Italian, it resembled "Dominick's," and he was unaware of any other pizzerias using the name. The company initially prospered, and in 1967 the first "Domino's Pizza" franchise was sold. By the end of 1969, there were 42 "Domino's Pizza" stores in operation in three states.

The plaintiff first became aware of DPI on June 24, 1970 when defendants' "Domino's" and "Domino's plus design" marks were published in the Official Gazette of the Patent Office, pending registration of the marks by the U. S. Patent Office. Pursuant to 15 U.S.C. s 1063, plaintiff filed notices of opposition to registration of the marks. DPI at the time was in serious *257 financial difficulty, and the oppositions were not answered. Registration of the marks was therefore refused by the Patent Office.

In early 1971 plaintiff's counsel wrote to DPI's predecessor, Domino's Inc., requesting that the "Domino's Pizza" mark be changed. Domino's Inc. did not respond to the letter, and plaintiff took no further action at that time. Plaintiff did, however, order credit reports on DPI for the next three years which were used in monitoring DPI's business.

In 1972 and 1974 DPI again sought to register the trademark "Domino's Pizza" with the U. S. Patent Office. The mark was passed for publication in the Official Gazette of the Patent Office on each occasion, signifying that an examiner of the office had concluded that the mark was entitled to registration, 15 U.S.C. s 1062(a). Plaintiff filed notices of opposition to each of the foregoing applications, and defendant withdrew each application. Plaintiff ultimately filed this suit against DPI in September 1975.

In a lengthy memorandum of Findings of Fact and Conclusions of Law, the district court held that the defendants were guilty of trademark infringement (15 U.S.C. s 1114(1)), false designation of origin (15 U.S.C. s 1125(a)), and dilution, unfair competition and deceptive trade practices under Georgia law. The court detailed at length the plaintiff's use of the "Domino" trademark in connection with sugar, and more recently with portion-control items. It found that "(c)onsumers are highly likely to associate any food products sold or available for sale in supermarkets, groceries or other food stores under the DOMINO mark with the DOMINO food products sold by plaintiff." Finding of Fact No. 31. It further concluded that "(a)s a result of plaintiff's widespread use, advertising and promotion of the DOMINO trademark on a great variety of food products, the consuming public is very likely to believe that DOMINO's Pizza, sold in a separate food store outside of the supermarket, is in some way or manner sponsored by or affiliated with, or connected with, or emanates from plaintiff." Finding of Fact No. 61. The court found that the mark "Domino's Pizza" is "so similar to plaintiff's famous mark DOMINO in sound and appearance that the public cannot always perceive any differences between them." Finding of Fact No. 63. The court concluded that, as a matter of law, "(u)se of virtually identical marks for food products distributed to and in food stores to the consuming public is likely to result in confusion, mistake or deception." Conclusion of Law No. 10.

On appeal, defendants contend the district court erred in concluding that use of virtually identical marks for food products is likely to result in confusion or deception, and defendants also contend that the court erred "by misapplying or failing to apply the critical factors to be weighed in assessing likelihood of confusion." Brief for Appellants at 10. Plaintiff Amstar contends that the court's finding of likelihood of confusion or mistake is not clearly erroneous,

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

Page 6

and must therefore be sustained by this court. Plaintiff contends that this finding is substantiated by many factors, including the notoriety and strength of the "Domino" mark, the confusing similarity of the marks "Domino's Pizza" and "Domino," the related nature of defendants' goods and services to those of plaintiff, the fact that customers for both plaintiff's and defendants' goods are the general consuming public, the existence of some actual confusion, and the results of two surveys which tend to confirm the likelihood of confusion.

Based on the record before us, we are convinced that the trial court erred in enjoining defendants' use of the mark "Domino's Pizza." We therefore reverse the decision of the district court, and vacate the injunction entered against defendants.

## II. Standard of Review

[1] Initially, we must determine the appropriate standard of review applicable to the district court's finding of likelihood of confusion. The issue as to whether confusion is likely has been held to present a question of law, *258Fleischman Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 152 (9th Cir. 1963), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963); a mixed question of law and fact, B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1261 (5th Cir. 1971), and a question of fact, T.G.I. Fridays v. International Restaurant Group, Inc., 569 F.2d 895, 899 (5th Cir. 1978). This circuit has held that likelihood of confusion is a question of fact which can only be set aside if clearly erroneous. T.G.I. Fridays, supra ; Fed.R.Civ.P. 52(a). The record in the present case indicates that the district court's finding of likelihood of confusion is clearly erroneous.

[2][3] The court's 54-page memorandum of Findings of Fact and Conclusions of Law was copied almost verbatim from proposed Findings of Fact and Conclusions of Law submitted by plaintiff's counsel. While the practice of allowing counsel for the prevailing party to write the trial judge's opinion has not been proscribed by this circuit, it should nevertheless be discouraged. Even though the court, in adopting plaintiff's findings and conclusions, stated that it had "individually considered" them and adopted them because it "believed them to be factually and legally correct," a cursory reading of the district court's memorandum leaves one with the impression that it was indeed written by the prevailing party to a bitter dispute. While the "clearly erroneous" rule of Fed.R.Civ.P. 52(a) applies to a trial judge's findings of fact whether he prepared them or they were developed by one of the parties and mechanically adopted by the judge, "we can take into account the District Court's lack of personal attention to factual findings in applying the clearly erroneous rule."

Wilson v. Thompson, 593 F.2d 1375, 1384 n.16 (5th Cir. 1979). See also James v. Stockham Valves & Fittings Co., 559 F.2d 310, 314 n.1 (5th Cir. 1977); Volkswagen of America, Inc. v. Jahre, 472 F.2d 557, 559 (5th Cir. 1973). As was stated in James :

"(T)he appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered" when factual findings were not the product of personal analysis and determination by the trial judge. 559 F.2d at 314 n.1, quoting Louis Dreyfus & Cie. v. Panama Canal Co., 298 F.2d 733, 738 (5th Cir. 1962).

[4] A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "In other words, we reverse when the result in a particular case does not reflect the truth and the right of the case." Armstrong Cork Co. v. World Carpets, Inc., 597 F.2d 496, 501 (5th Cir. 1979). Such is the case here. Having reviewed all the evidence in this case in light of established legal precedent, we are left with the definite and firm conviction that the district court was mistaken in concluding that defendants' use of the mark "Domino's Pizza" is likely to cause confusion, mistake or deception.

## III. Likelihood of Confusion

[5] Infringement of a registered mark is governed by the provisions of 15 U.S.C. s 1114(1), which imposes liability against "use . . . likely to cause confusion, or to cause mistake, or to deceive." The same test is applicable to the deceptive trade practices claim, Ga.Stat.Ann. s 106-701 et seq.; Baker Realty Co. v. Baker, 228 Ga. 766, 187 S.E.2d 850, 852 (1972), and common law unfair competition, Holiday Inns, Inc. v. Holiday Out in America, 481 F.2d 445, 449 (5th Cir. 1973); B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1262 (5th Cir. 1971). Likewise, defendants' use of the mark "Domino's Pizza" can represent a false designation of origin or false description, proscribed by 15 U.S.C. s 1125, only if defendants' use of the mark is likely to be confused with plaintiff's "Domino" mark. Boston Professional Hockey Ass'n. Inc. v. Dallas Cap and Emblem Mfg., Inc., 510 F.2d 1004, 1013 (5th Cir.), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Plaintiff's claims against defendants, except the dilution claim, therefore, *259 turn on the determination of whether defendants' use of the mark "Domino's Pizza" is likely to cause confusion, mistake, or deception.

In this circuit likelihood of confusion is determined by evaluating a variety of factors including the type of trademark at issue; similarity of design; similarity of product; identity of retail outlets and purchasers; identity

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

Page 7

of advertising media utilized; defendant's intent; and actual confusion.

Roto-Rooter Corporation v. O'Neal, 513 F.2d 44, 45 (5th Cir. 1975), citing Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963); Sears, Roebuck & Co. v. All States Life Insurance Co., 246 F.2d 161 (5th Cir.), cert. denied, 355 U.S. 894, 78 S.Ct. 268, 2 L.Ed.2d 192 (1957). See also Restatement of Torts s 729 (1938).[FN6]

> FN6. The Restatement of Torts lists the following as important factors in determining confusing similarity:
> (a) the degree of similarity between the designation and the trade-mark or trade name in
> (i) appearance; (ii) pronunciation of the words used;
> (iii) verbal translation of the pictures or designs involved;
> (iv) suggestion;
> (b) the intent of the actor in adopting the designation;
> (c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;
> (d) the degree of care likely to be exercised by purchasers.
> Restatement of Torts s 729 (1938).

An evaluation of these factors leads us to conclude that defendants' use of the trademark "Domino's Pizza" presents no likelihood of confusion, mistake, or deception.

1. Type of trademark

[6] We consider, first, whether "Domino" is a "strong" or a "weak" mark since the strength and distinctiveness of plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded. "Strong marks are widely protected, as contrasted to weak marks." Lunsford, Julius R., Jr., "Trademark Basics," 59 Trademark Rep. 873, 878 (1969).

[7] At trial, defendants introduced into evidence or tendered into court some 72 third-party registrations of the mark "Domino" in the U. S. Patent Office. Brief for Appellant at 18-24. These registrations were for such products as canned fruits, citrus, cigarettes, cheese, wheat flours, chrome-tanned leather, canned sardines, animal feed, envelopes, pencils, fishing line, candy mints, whiskey, ladies' hosiery and haircream. In addition, defendants presented extensive evidence of 15 third-party uses of the "Domino" mark from 1885 until the present. These uses included "Domino" cigarettes and matches, which are currently sold in grocery stores, two restaurants currently operating under the

Domino's" mark, a small chain of supermarkets in the Bronx, New York, with sales of $3,900,000 in 1976, and a "Domino Donut Mix" distributed by General Mills to commercial bakers since 1959. The district court dismissed these and other third-party uses as either long abandoned; remote as to goods or geography; small, obscure and localized; or used only in shipments to the trade. We do not believe that such extensive third-party use and registration of "Domino" can be so readily dismissed. The impact of such evidence is not dispelled merely because "Domino" cigarettes and matches are not leading brands, or because some uses of the mark "Domino" by third parties have not been related to food products. As was stated by one commentator, "If the owner of KODAK should permit its use by others on washing powders, shoes, candy bars, or cosmetics, or if The Coca-Cola Company should permit COCA-COLA or COKE to be used for rain coats, cigarette lighters, golf balls, or jewelry not of its manufacture, it would not take long for even these giants in the trademark world to be reduced to pigmy size." Lunsford, supra at 878-79. As stated in comment g to the Restatement of Torts s 729 (1938), "The greater the number of identical or more or less similar trade-marks already in use on *260 different kinds of goods, the less is the likelihood of confusion . . . ." The extensive third-party uses documented in this case were entitled to much greater weight than were accorded them by the district court. See Armstrong Cork Co. v. World Carpets, Inc., 597 F.2d 496, 505 (5th Cir. 1979) (multiple uses of mark "World" discussed in denying injunctive relief); American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 13 (5th Cir. 1974) (multiple uses of "Heritage" discussed in denying injunctive relief); Holiday Inns, Inc. v. Holiday Out in America, 481 F.2d 445, 448 (5th Cir. 1973) (multiple uses of "Holiday" discussed in denying injunctive relief).

[8] Defendants do not contend, nor does this court hold, that plaintiff's mark is not a distinctive, well-known mark for its sugar and related products. The third-party uses and registrations discussed above merely limit the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark. American Sugar Co. v. Texas Farm Products Co., 159 U.S.P.Q. 679, 681 (T.T.A.B.1968); [FN7] Scott Paper Co. v. Scott's Liquid Gold, Inc., 598 F.2d 1225 (3rd Cir. 1978) (plaintiff's ownership of the mark "Scott" as applied to paper products does not preclude defendant's use of "Scott" on furniture polish).

> FN7. In American Sugar Co. v. Texas Farm Products Co., 159 U.S.P.Q. 679, 681 (T.T.A.B.1968), American Sugar (predecessor in interest to Amstar) opposed registration by Texas Farm Products of the mark "Domino" for use on its cattle feed. The evidence established that American

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

Page 9



We must also consider the commercial impression created by the mark as a whole. Seabrook Foods, Inc. v. Bar-Well Foods, Ltd., 568 F.2d 1342, 1346 (Cust. & Pat.App.1977); Colgate-Palmolive Co. v. Carter-Wallace, Inc., 432 F.2d 1400, 1402, 56 CCPA 973 (1970). "It is the overall impression that counts." Armstrong Cork Co. v. World Carpets, Inc., 597 F.2d 496, 502 (5th Cir. 1979). "Domino," in possessive form, next to the word "pizza," produces a commercial impression quite different from the same mark placed next to "sugar." "Domino" is derived from Latin, is an Italian surname, and in combination with "pizza" creates an Italian connotation. "The setting in which a designation is used affects its appearance and colors the impression conveyed by it." Restatement of Torts s 729, comment b (1938). The impression conveyed by defendants' use of "Domino's Pizza" is substantially different from that created by plaintiff's use of "Domino Sugar."

Additionally, the U. S. Patent Office has made, on three separate occasions, an initial determination that DPI is entitled to register the mark "Domino's Pizza." DPI applied to register "Domino's" or "Domino's Pizza" plus corresponding designs three different times. Each time, a trademark examiner in the office determined that DPI was entitled to have the mark registered. See 15 U.S.C. s 1062(a). The trademark examiner on one of these occasions wrote that "(a) search of the Office records fails to show that the mark, when applied to applicant's services, is confusingly similar to any registered mark." Record on Appeal at 2815. At the time this search was made, plaintiff had registered "Domino" for sugar, mustard, ketchup, salt and pepper. Id.

3. Similarity of products

The district court stated in some detail its view of the similarities between defendants' pizza and plaintiff's sugar, salt, mustard, ketchup and other condiments. The court at

one point went so far as to state the "consuming public considers sugar to be a related food product to pizza." Finding of Fact No. 84. However, we fail to see any great similarity between the respective parties' wares. "About the only things they have in common are that they are edible." California Fruit Growers Exchange v. Sunkist Baking Co., 166 F.2d 971, 973 (7th Cir. 1947).

*262 4. Identity of retail outlets and purchasers

Dissimilarities between the retail outlets for and the predominant consumers of plaintiff's and defendants' goods lessen the possibility of confusion, mistake, or deception. The dissimilarities here are substantial.

Plaintiff's "Domino" sugar products are distributed to the public primarily through grocery stores; defendants' pizzas and soft drinks are distributed exclusively through fast-food outlets specializing in home delivery or counter pickup, but offering no facilities for sit-down service. Plaintiff attempts to narrow the gap between itself and defendants by arguing that its single-serving sugar packets, and more recently its line of single-serving condiments, are widely used in fast-food outlets and restaurants. Thus, it argues, the public has come to associate the mark "Domino" with restaurants and fast-food establishments. While the argument carries some weight, it is insufficient to overcome basic differences between plaintiff's and defendants' modes of distributing their products.

Although "Domino" sugar and individual condiment packages are distributed to the public through restaurants and fast-food chains, they are not sold to the public by plaintiff but are generally distributed to customers by the restaurant owners. Amstar is not engaged in the direct sale of condiment packages to the public. In contrast, "Domino's Pizza" products are sold directly to the public through "Domino's Pizza" outlets. While the public may decide to purchase a pizza based on its perception of "Domino's Pizza" quality, it is unlikely anyone would choose to frequent or avoid a restaurant because of the brand of condiment packages carried by the restaurant. Thus, while Amstar might broadly be classified as "in the restaurant business," it is in that business at a different level than defendants.

There are substantial dissimilarities between the predominant purchasers of plaintiff's and defendants' products. According to surveys presented at trial, "Domino's Pizza" patrons are primarily young (85.6% under 35 years of age), single (61%) males (63.3%). This coincides with the fact that 75% of the "Domino's Pizza" stores throughout the country are situated in college campus towns or around military bases where the advertising for "Domino's Pizza" is directed to the 18- to 34-year-old single male. In contrast, "Domino" sugar purchasers are predominantly middle-aged

615 F.2d 252                                                                                    Page 10
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

housewives.

5. Identity of advertising media utilized

The district court made extensive findings of fact regarding plaintiff's advertising of its "Domino" mark. The court found Amstar advertised extensively in nationally circulated magazines, newspapers and trade journals, and spent substantial sums of money on radio and television commercials. It stated "DOMINO is the only sugar on network television every week." Finding of Fact No. 23. In contrast to plaintiff's broadly based national advertising, defendants' advertising has a completely different focus. Because over 80% of defendants' pizza sales involve free delivery, defendants' advertising is of two principal types: (i) store signs, flyers, delivery car signs and other like materials designed for maximum impact in the 1.5-mile delivery area of a "Domino's Pizza" outlet, and (ii) "Yellow Page" ads. Unlike the national audience sought by Amstar, defendants' advertising is targeted at young, male college students.

The substantial dissimilarities between plaintiff's and defendants' advertising campaigns tend to negate any inference of unfair competition or trademark infringement. Defendants' advertising program is geared to seek out and exploit a highly localized and rather specialized class of consumers. Defendants have not sought to mine the good will established by plaintiff. In short, hardly anyone would confuse a "Domino" sugar ad with a "Domino's Pizza" sales pitch, nor would they likely believe the two advertisements emanated from the same source, considering the significant differences between the advertisements in message content and presentation.

**\*263 6. Defendants' intent**

[10] The intent of defendants in adopting the "Domino's Pizza" mark is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of "Domino" that fact alone "may be sufficient to justify the inference that there is confusing similarity." Restatement of Torts s 729, comment f (1938). Bad faith in the adoption and use of a trademark normally involves the imitation of packaging material, use of identical code numbers, adopting of similar distribution methods or other efforts by a party to "pass off" its product as that of another. Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 382-83 (5th Cir. 1977). There is no evidence that defendants have ever attempted to "pass off" their goods as those of plaintiff. Evidence introduced at trial established that the name "Domino's Pizza" was adopted because Mr. Monaghan had been told he could no longer use the name "Dominick's," the new name sounded Italian, and it was quite close to the old name. Although Monaghan was aware of "Domino" sugar at the time, he was unaware

of any other pizzerias by that name. There is no evidence the name was adopted with any intent to confuse, mislead, or deceive the public.[FN9]

> FN9. Counsel for plaintiff conceded at trial that defendants did not adopt "Domino's Pizza" with an intent to deceive, although the mark was adopted with knowledge of plaintiff's use of "Domino." Tr. 1547.

7. Actual confusion

[11] Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion. Roto-Rooter Corp. v. O'Neal, 513 F.2d 44, 46 (5th Cir. 1975). The evidence of actual confusion in this case is minimal. Plaintiff's evidence of actual confusion amounted to two verbal inquiries as to whether "Domino's Pizza" was related to "Domino" sugar, and one misaddressed letter.[FN10] In view of the fact that both plaintiff's and defendants' sales currently run into the millions of dollars each year, these isolated instances of actual confusion are insufficient to sustain a finding of likelihood of confusion. Armstrong Cork Co. v. World Carpets, Inc., 597 F.2d 496, 506 (5th Cir. 1979); Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3rd Cir. 1978). Indeed, the fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future. FS Services, Inc. v. Custom Farm Services, Inc., 325 F.Supp. 153, 162 (N.D.Ill.1970), aff'd, 471 F.2d 671 (7th Cir. 1972).

> FN10. The two verbal inquiries were made to employees of DPI who were asked if DPI was related to Amstar. The misaddressed letter was received by a DPI employee from a doctor who had treated him. The doctor's bill was addressed to "Domino Sugar." Record on Appeal at 2819.

At trial, both parties introduced survey evidence on the issue of likelihood of confusion. The trial court characterized the defendants' survey as "about as contrived a survey as I have ever run across," [FN11] but found plaintiff's survey "properly conducted and fair." Finding of Fact No. 90. Our own examination of the survey evidence convinces us that both surveys are substantially defective.

> FN11. The judge's comment was made during a hearing held November 2, 1979 on a motion by defendants to stay the district court's injunction pending this appeal. Hearing Tr. 63.

Plaintiff's survey was made by Dr. Russ Haley, Professor of Marketing at the University of New Hampshire. It was

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

conducted in ten cities among female heads of households primarily responsible for making food purchases. Each participant was shown, in her own home, a "Domino's Pizza" box and was asked if she believed the company that made the pizza made any other product. If she answered yes, she was asked, "What products other than pizza do you think are made by the company that makes Domino's Pizza?" Finding of Fact No. 90(d). Seventy-one percent of those asked the second question answered "sugar."

*264 [12] While the possible confusion level shown by the Haley study is high, there are several defects in the survey which significantly reduce its probative value. First, one of the most important factors in assessing the validity of an opinion poll is the adequacy of the "survey universe," that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation. American Basketball Ass'n v. AMF Voit, Inc., 358 F.Supp. 981, 986 (S.D.N.Y.), aff'd, 487 F.2d 1393 (2d Cir. 1973), cert. denied, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974); Hawley Products Co. v. United States Trunk Co., 259 F.2d 69, 77 (1st Cir. 1958). The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services. American Basketball, supra ; Hawley Products, supra. Of the ten cities in which the Haley survey was conducted, eight had no "Domino's Pizza" outlets, and the outlets in the remaining two had been open for less than three months. Additionally, the persons interviewed consisted entirely of women found at home during six daylight hours who identified themselves as the member of the household primarily responsible for grocery buying. As plaintiff's sugar is sold primarily in grocery stores, participants in the Haley survey would have been repeatedly exposed to plaintiff's mark, but would have had little, if any, exposure to defendants' mark. Furthermore, the survey neglected completely defendants' primary customers young, single, male college students. Thus, we do not believe that the proper universe was examined, and the results of the survey must therefore be discounted. Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 429 (1960).

[13] Of additional concern, plaintiff's survey was a "word association" test. Participants in the survey were confronted with the "Domino's Pizza" mark, and more or less asked if it brought anything else to mind. We have previously held that such a procedure degenerates "into a mere word-association test entitled to little weight." Holiday Inns, Inc. v. Holiday Out in America, 481 F.2d 445, 448 (5th Cir. 1973). We do not believe the Haley survey presents any meaningful evidence of likelihood of confusion.[FN12]

FN12. Other courts have rejected surveys performed by Dr. Haley as slanted or biased.

American Footwear Corp. v. General Footwear Company, Ltd., 609 F.2d 655, 660-61 n.4 (2d Cir. 1979); Charles Revson, Inc. v. Max Factor & Co., 76 Civ. 5215, Findings of Fact Nos. 101-08 (S.D.N.Y.1977); Phillip Morris. Inc. v. R. J. Reynolds Tobacco Co., 188 U.S.P.Q. 289, 293-94 (S.D.N.Y.1975).

The trial court discounted defendants' survey for largely the same reasons just discussed it was conducted on the premises of "Domino's Pizza" outlets and therefore did not examine a proper survey universe, and the questioning procedures used were improper. Thus, defendants' survey is likewise not probative of the presence or absence of confusion.[FN13]

FN13. The actual results of defendants' survey are disputed. Plaintiff argues the survey shows a 6.8% confusion level, and the court in copying plaintiff's proposed Findings of Fact adopted that argument. Defendants argue the survey showed an actual confusion level of only 0.4%. They contend the 6.8% figure can be derived only by eliminating all respondents to the survey who were either not familiar with "Domino" sugar or who responded "don't know" when asked if the same entity made both "Domino" sugar and "Domino's Pizza." They argue that such a procedure is as unwarranted as excluding the percentage of "undecided" voters in a political poll. While we note the conflict between plaintiff and defendants on this issue, our holding discounting the survey evidence in this case makes it unnecessary for us to resolve it.

[14] Accordingly, we conclude that the trial court was clearly in error when it held defendants' use of the trademark "Domino's Pizza" was likely to cause confusion, mistake, or deception. In the absence of any solid evidence of actual confusion, the limited strength of the "Domino" mark outside plaintiff's line of sugars and portion-control condiments compels the opposite conclusion, especially in light of the marked dissimilarities between plaintiff and defendants in trademark design, products, retail outlets, *265 purchasers and advertising. We also note that plaintiff has not been vigilant in protecting its rights in the "Domino" mark. Since it first began using the mark, it has failed to object to 72 third-party registrations of "Domino." When infringing third-party uses of the mark have become known, as in General Mills' use of "Domino" on a widely distributed doughnut mix, plaintiff has written letters requesting discontinuance of the mark, but has never brought suit against any such infringement until now. As noted by the district judge in the course of the trial, plaintiff "has not maintained, has not policed its mark." Tr. 1664. Plaintiff brought this suit after nearly ten years of simultaneous use

615 F.2d 252
29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969
(Cite as: 615 F.2d 252)

Page 12

of the mark "Domino" by Amstar and DPI. A trademark owner that strongly believed its customers were being deceived would hardly have remained idle for such an extended period of time.

Our conclusion that there is no likelihood of confusion in this case is fatal to most of plaintiff's claims. With no likelihood of confusion, there can be no trademark infringement, 15 U.S.C. s 1114(1). Since there is no likelihood of confusing defendants' goods with those of plaintiff's, the false designation of origin claim also falls. 15 U.S.C. s 1125; Boston Professional Hockey Ass'n, Inc. v. Dallas Cap and Emblem Mfg. Co., Inc., 510 F.2d 1004 (5th Cir.), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Common law unfair competition turns primarily on likelihood of customer confusion, and therefore defendants must prevail herein on that issue. Holiday Inns, Inc. v. Holiday Out in America, 481 F.2d 445 (5th Cir. 1973); B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254 (5th Cir. 1971). Finally, the crux of a complaint based on the Georgia Uniform Deceptive Trade Practices Act is the likelihood of confusion between goods. Baker Realty Co. v. Baker, 228 Ga. 766, 187 S.E.2d 850 (1972). This claim also is without merit.

## IV. Dilution

[15][16] Georgia's anti-dilution statute protects against "dilution of the distinctive quality of the trade-mark . . . notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services . . . ." Ga.Code Ann. s 106-115. Dilution, as we have previously noted, occurs "where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark." Holiday Inns, Inc. v. Holiday Out in America, 481 F.2d 445, 450 (5th Cir. 1973). The concept is not applicable in this situation, however, because "it has been determined that the marks themselves are not confusing," id., and as discussed at length previously, "Domino," outside plaintiff's line of sugars and portion-control items, has already become a weak mark. Plaintiff's claim against defendants under the Georgia statute is therefore invalid.

## V. Conclusion

[17] In reversing the district court and vacating the injunction entered against defendants, we do not intimate that the mark "Domino," as applied to plaintiff's sugars and portion-control items, is not a widely known mark deserving substantial protection. However, "(t)he right granted to the owner of a registered trademark is a monopoly and should not be extended unless the owner is clearly entitled thereto." S. C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129, 136 (6th Cir.), cert. denied, 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d

65 (1959). Since defendants' use of the mark "Domino's Pizza" is not likely to confuse, mislead, or deceive the public, the district court's order and injunction to the contrary are set aside, and the judgment is

REVERSED.

615 F.2d 252, 29 Fed.R.Serv.2d 1528, 205 U.S.P.Q. 969

END OF DOCUMENT



EXHIBIT  ATTACHMENT

_____  *17*_____

(To be scanned in place of tab)

208 S.E.2d 815
(Cite as: 232 Ga. 715, 208 S.E.2d 815)

Page 1

C

Supreme Court of Georgia.

BLACKSTONE INDUSTRIES, INC., et al.
v.
Carolyn Annette ANDRE et al.

No. 28932.

Sept. 6, 1974.

Tenants sued landlord and others seeking an injunction and damages allegedly resulting from a civil conspiracy to force them from leased premises where they operated a beauty shop. The Superior Court, Chatham County, Frank S. Cheatham, Jr., J., dismissed some of the defendants and overruled motions for summary judgment filed by other defendants. The other defendants appealed. The Supreme Court, Nichols, P.J., held that material issues of fact precluded the granting of summary judgment in favor of defendants and that opinion evidence offered in support of defendants' contention that the building was untenantable did not authorize a summary judgment.

Affirmed.

West Headnotes

[1] Judgment ⬤186
228k186 Most Cited Cases

Whether trial court permits introduction of oral evidence on hearing of a motion for summary judgment is a matter within the sound discretion of the trial judge.

[2] Conspiracy ⬤19
91k19 Most Cited Cases

To show conspiracy, it is not necessary to prove an express compact or agreement of conspirators.

[3] Conspiracy ⬤19
91k19 Most Cited Cases

To show a conspiracy, it is sufficient to prove that two or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design.

[4] Conspiracy ⬤13
91k13 Most Cited Cases

Anyone who knows of the existence of a conspiracy and its purposes, and joins therein, becomes as much a party thereto as if he had been an original member of the conspiracy.

[5] Judgment ⬤181(24)
228k181(24) Most Cited Cases

In action by tenants seeking an injunction and damages for a civil conspiracy to force them from leased premises where they operated a beauty shop, material issues of fact precluded the granting of summary judgment in favor of the landlord who alleged the building was untenantable.

[6] Judgment ⬤185(5)
228k185(5) Most Cited Cases

Opinion evidence will not authorize the grant of a summary judgment.
**815 *717 Falligant, Doremus, Karsman, Kent & Toporek, Stanley Karsman, Smith & Portman, Savannah, for appellants.

John J. Sullivan, Joseph B. Bergen, Savannah, for appellees.

Syllabus Opinion by the Court

*715 NICHOLS, Presiding Justice.

Carolyn Annette Andre and Christine Lee Green filed the present action seeking an injunction and damages allegedly resulting from a civil conspiracy to force them from **816 leased premises where they operated a beauty shop. Some of the defendants were dismissed by the trial court and no appeal taken. Motions to dismiss, treated as motions for summary judgment, of other defendants were overruled and after a certificate of immediate review was granted, the present appeal was filed.

The sole enumeration of error complains that the trial court erred in overruling the appellants' motions for summary judgment on the ground that the 'documentary evidence submitted by appellants established that all appellants' motions for summary judgment should have been sustained as a matter of law and that there is no issue of fact to be tried before a jury.'

The judgments of the trial court showed that the court 'considered the pleadings, depositions, affidavits, and all evidence submitted in support and in opposition to the motion.'

[1] Whether or not the trial court permits the introduction of oral evidence on the hearing of a motion for summary judgment is a matter within the sound discretion of the trial judge. See Price v. Star Service & Petroleum Corp., 119 Ga.App. 171, 178, 166 S.E.2d 593. Here the trial court did permit the introduction of oral evidence and there was no objection by the appellants. The denial of the summary judgments was based in part upon the oral evidence.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

208 S.E.2d 815
(Cite as: 232 Ga. 715, 208 S.E.2d 815)

Page 2

"'[2][3][4] To show conspiracy, it is not necessary to prove an express compact or agreement to the parties thereto. The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally, or entered into any explicit or formal agreement; nor is it essential that it should appear that either by words or by writings they formulated their unlawful objects. It is sufficient that two *716 or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design. And anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto as if he had been an original member.' 1 Eddy on Comb. s 368.' Woodruff v. Hughes, 2 Ga.App. 361, 365, 58 S.E. 551, 553; Huckaby v. Griffin Hosiery Mills, 205 Ga. 88, 91, 52 S.E.2d 585; Horton v. Johnson, 192 Ga. 338, 346, 15 S.E.2d 605.' Cook v. Robinson, 216 Ga. 328(5), 116 S.E.2d 742.

[5] The evidence, including the oral evidence adduced upon the hearing for summary judgment, did not demand the finding, as contended by the appellants that their motions for summary judgment should have been granted.

[6] The evidence to support the contention that the building was untenantable was opinion evidence. Opinion evidence would not authorize the grant of a summary judgment. See Ginn v. Morgan, 225 Ga. 192, 167 S.E.2d 393; Harrison v. Tuggle, 225 Ga. 211, 213, 167 S.E.2d 395.

If indeed the building was in need of repair, could it be done without the plaintiffs moving out? If so, it was the responsibility of the landlord to make such repairs under the terms of the lease. There was evidence that such repair was not feasible and that the building was beyond economical repair. Whether the repair was economically feasible for the landlord was not the question, rather, his responsibility under the lease.

The statements made by the president of the owner of the building in the presence of the plaintiffs' customers, the action of procuring a demolition permit, the statements made by the employee when the permit was posted, all create a jury question as to whether a conspiracy existed to unlawfully evict the plaintiffs from the leased premises prior to the termination of the lease. The trial court did not err in overruling the appellants' motions for summary judgment.

Judgment affirmed.

All the Justices concur.

208 S.E.2d 815, 232 Ga. 715

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

_18_

(To be scanned in place of tab)

597 F.2d 71                                                                                                                    Page 1
202 U.S.P.Q. 536
**(Cite as: 597 F.2d 71)**

▷

United States Court of Appeals,
Fifth Circuit.

BOSTON PROFESSIONAL HOCKEY ASSOCIATION,
INC., et al., Plaintiffs-Appellees
Cross-Appellants,
v.
DALLAS CAP & EMBLEM MANUFACTURING, INC.,
Defendant-Appellant Cross-Appellee.

No. 77-1280.

June 18, 1979.

Action was brought by hockey league and member teams to
enjoin emblem manufacturer from making and selling
embroidered cloth emblems embodying teams' registered
trademarks and service marks. The United States District
Court for the Northern District of Texas, 360 F.Supp. 459,
granted injunctive relief in part and denied prayer for
damages, and league and teams appealed. The Court of
Appeals, 510 F.2d 1004, affirmed in part and reversed in
part and remanded. On remand, the District Court, Sarah
Tilghman Hughes, J., awarded damages of $137,200, and
manufacturer appealed. The Court of Appeals, Gee, Circuit
Judge, held that: (1) manufacturer, which usurped right to
manufacture and sell marks as embroidered emblems
through retail outlets, caused economic injury to league and
teams' business interest; (2) although district court correctly
found that manufacturer usurped right to manufacture and
distribute emblems, finding that right was an exclusive one
was clearly erroneous and thus awards based on this finding
were also clearly erroneous; (3) based upon amounts offered
for three-year nonexclusive license to manufacture and sell
emblems through retail outlets, manufacturer's infringement
resulted in actual damages of $40,000 to league and teams,
and (4) increased damages under the Lanham Act could not
be upheld on basis of findings made.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Trade Regulation** ⬤⟳**671.1**
382k671.1 Most Cited Cases
(Formerly 382k671)

A trademark owner may recover for all elements of an
injury to its business proximately resulting from infringer's
wrongful acts.

**[2] Trade Regulation** ⬤⟳**356**
382k356 Most Cited Cases

Where hockey league and member teams had acquired
property right in artistic symbols used to designate
individual teams which extended to reproduction and sale of
those marks as embroidered patches for wearing apparel,
emblem manufacturers' usurpation of right to manufacture
and sell marks caused economic injury to business interests
of hockey league and teams, which were deprived of
economic benefits they normally would have received by
licensing use of their marks in connection with sale of cloth
patches, that rendered manufacturer liable under the
Lanham Act. Lanham Trade-Mark Act, § 35, 15 U.S.C.A. §
1117.

**[3] Trade Regulation** ⬤⟳**726**
382k726 Most Cited Cases

Amount of damages trial court found to have been suffered
by hockey league and member teams as result of emblem
manufacturer's violation of the Lanham Act was question of
fact and subject to clearly erroneous standard of review.
Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117.

**[4] Trade Regulation** ⬤⟳**680.1**
382k680.1 Most Cited Cases
(Formerly 382k680)

Where hockey league and member teams could not have
made emblem manufacturer the sole authorized
manufacturer of emblems since another company was an
authorized manufacturer of embroidered emblems depicting
team symbols, damages award for emblem manufacturer's
usurpation of right to manufacture and distribute three-inch
emblems should not have been based on amount
manufacturer had offered to be named sole authorized
manufacturer but should have been based on amount it
offered for three-year nonexclusive license to manufacture
and sell emblems through retail outlets, thus rendering it
liable for $20,000 actual damages under the Lanham Act.
Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117.

**[5] Trade Regulation** ⬤⟳**680.1**
382k680.1 Most Cited Cases
(Formerly 382k680)

Usurpation by emblem manufacturer, which had offered
$15,000 for three-year nonexclusive license to manufacture
and sell three-inch emblems, of right to manufacture and
retail emblems larger than three inches caused additional
injury to hockey league and teams, and thus since value of
right to make and sell large emblems was at least as
valuable as right to market small ones, usurpation of right,
which was a nonexclusive one because of another
company's license, rendered manufacturer liable for $20,000
for its four-year infringement of right to manufacture and
sell emblems larger than three inches to league and teams
under the Lanham Act. Lanham Trade-Mark Act, § 35, 15

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

597 F.2d 71
202 U.S.P.Q. 536
(Cite as: 597 F.2d 71)

U.S.C.A. § 1117.

**[6] Trade Regulation ☞683**
382k683 Most Cited Cases

Award of increased damages, based on emblem
manufacturer's violation of the Lanham Act through
unauthorized sales of embroidered cloth emblems that were
substantial duplications of artistic symbols used to designate
individual league teams, could not be upheld on basis of
findings of the trial court, which seemingly doubled
damages because manufacturer violated injunction and
failed to comply with its obligation to answer pretrial
discovery completely, but which might have been justified
in increasing damages based on manufacturer's alleged
withholding or misrepresenting available sales records.
Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117.

**[7] Trade Regulation ☞683**
382k683 Most Cited Cases

Discretion given by the Lanham Act to impose additional
damages if circumstances of trademark infringement case
warrant additional relief is to be exercised by the trial court
and not by the Court of Appeals even if it were to infer
findings justifying increased damages. Lanham Trade-Mark
Act, § 35, 15 U.S.C.A. § 1117.

**[8] Trade Regulation ☞682**
382k682 Most Cited Cases

Hockey league and member teams were not entitled to
attorney fees in suit alleging unauthorized manufacture and
sale of embroidered cloth emblems, which were substantial
duplications of artistic symbols used to designate individual
league teams, under the Lanham Act as then applicable.
Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117.
*73 William D. Harris, Charles S. Cotropia, J. Manuel
Hoppenstein, Dallas, Tex., for defendant-appellant
cross-appellee.

Ernest E. Figari, Jr., Dallas, Tex., Anthony L. Fletcher, New
York City, for plaintiffs-appellees cross-appellants.

Appeals from the United States District Court for the
Northern District of Texas.

Before JONES, CLARK, and GEE, Circuit Judges.

GEE, Circuit Judge:

Before us once again is this important litigation concerning
unauthorized manufacture and sale of embroidered cloth
emblems, which were substantial duplications of artistic
symbols used to designate the individual member teams of

the National Hockey League (NHL).[FN1] After an appeal
of the liability issues, we held that defendant's conduct
violated the Lanham Act [FN2] in that it constituted
trademark infringement under 15 U.S.C. s 1114 [FN3] and
false designation of origin of goods or false description by
means of symbols under 15 U.S.C. s 1125.[FN4] We
remanded the case to the *74 district court for a
determination of damages, and this appeal is from that
proceeding. The facts surrounding this controversy are set
out in some detail in our earlier opinion, [FN5] and we shall
repeat only those necessary to this appeal.

FN1. By the outset of the litigation in 1972, the
NHL and twelve of its member teams had secured
federal registration of their team symbols as service
marks for ice hockey entertainment services.

FN2. 15 U.S.C. ss 1051-1127.

FN3. 15 U.S.C. s 1114 provides in pertinent part:
(1) Any person who shall, without the consent of
the registrant
(a) use in commerce any reproduction, counterfeit,
copy, or colorable imitation of a registered mark in
connection with the sale, offering for sale,
distribution, or advertising of any goods or services
on or in connection with which such use is likely to
cause confusion, or to cause mistake, or to deceive;
or
(b) reproduce, counterfeit, copy, or colorably
imitate a registered mark and apply such
reproduction, counterfeit, copy, or colorable
imitation to labels, signs, prints, packages,
wrappers, receptacles or advertisements intended to
be used in commerce upon or in connection with
the sale, offering for sale, distribution, or
advertising of goods or services on or in
connection with which such use is likely to cause
confusion, or to cause mistake, or to deceive
shall be liable in a civil action by the registrant for
the remedies hereinafter provided. Under
subsection (b) of this section, the registrant shall
not be entitled to recover profits or damages unless
the acts have been committed with knowledge that
such imitation is intended to be used to cause
confusion, or to cause mistake, or to deceive.

FN4. 15 U.S.C. s 1125 provides in pertinent part:
(a) Any person who shall affix, apply, or annex, or
use in connection with any goods or services, or
any container or containers for goods, a false
designation of origin, or any false description or
representation, including words or other symbols
tending falsely to describe or represent the same,
and shall cause such goods or services to enter into

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

597 F.2d 71                                                          Page 3
202 U.S.P.Q. 536
(Cite as: 597 F.2d 71)

commerce, and any (such) person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

FN5. Boston Professional Hockey Association v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004 (5th Cir.), Cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

Defendant Dallas Cap & Emblem Manufacturing, Inc. (Dallas Cap) is in the business of making and selling embroidered cloth emblems. In 1968, and again in June of 1971, Dallas Cap sought authority from National Hockey League Services, Inc. (NHLS), the exclusive licensing agent of plaintiffs, to manufacture and distribute embroidered emblems representing the insignia of the various NHL teams. Although its attempts to obtain a license from NHLS were unsuccessful, defendant in 1972 began to manufacture and to sell the emblems through retail outlets without authority to do so. An action by plaintiffs NHL and thirteen of its member teams resulted in denial of all relief sought under the above-mentioned provisions of the Lanham Act, but the court granted limited injunctive relief for common-law unfair competition, prohibiting the defendant from selling the emblems without including a statement disclaiming that the emblems were authorized by the plaintiffs. This court reversed the denial of Lanham Act relief and remanded the case.[FN6]

FN6. This court also affirmed the lower court's finding of unfair competition but held that the disclaimer ordered by the lower court would not remedy the illegal confusion. 510 F.2d at 1013.

On remand the district court held a hearing to determine damages and found that Dallas Cap had usurped the right to manufacture and sell embroidered emblems depicting NHL team insignia. To determine the value of this right, the court used a letter written to NHLS by Dallas Cap and concluded that the latter offered $25,000 for a three-year exclusive license to manufacture and distribute three-inch emblems. Defendant's infringement was for four years, and the court calculated the prorated worth of the right to be $33,000. A like sum was added as damages for defendant's four-year unauthorized manufacture of emblems larger than three inches, and the total damage amount of $66,000 was doubled because of bad faith by Dallas Cap. Plaintiffs were

also awarded $5,200 as defendant's profits attributable to the infringement. Thus, the plaintiffs' total recovery was $137,200; Dallas Cap appeals only the award of $132,000 as damages.

[1][2] Recovery for trademark infringement under the Lanham Act may include defendant's profits, any damages sustained by the plaintiff, and costs of the action.[FN7] *75 Dallas Cap does not challenge the award of $5,200 profits in this case but argues vigorously that no damages were proved. We disagree. Plaintiffs offered evidence tending to show that defendant's unauthorized sales of the emblems diverted sales from plaintiffs and that the poor quality of defendant's reproductions harmed plaintiffs' business reputations. They did not, however, attempt to quantify these traditional elements of damages for trademark infringement. But plaintiffs did prove another element of damages. A trademark owner may recover for "all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts . . .." Obear-Nester Glass Co. v. United Drug Co., 149 F.2d 671 (8th Cir.), Cert. denied, 326 U.S. 761, 66 S.Ct. 141, 90 L.Ed. 458 (1945). We recognized, in our earlier decision in this litigation, that through extensive use these plaintiffs "acquired a property right in their marks which extends to the reproduction and sale of those marks as embroidered patches for wearing apparel." Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing, Inc., 510 F.2d at 1014. This property right is protected against infringement by the Lanham Act. Id. Thus, when Dallas Cap usurped the right to manufacture and sell plaintiffs' marks as embroidered emblems through retail outlets, it caused economic injury to plaintiffs' business interests. For the period defendant was infringing, plaintiffs were deprived of the economic benefits they normally would have received by licensing the use of their marks in connection with the sale of cloth patches. Simply stated, Dallas Cap misappropriated a valuable right belonging to plaintiffs and did not pay for it. The remaining question is whether the lower court properly calculated the damage caused by defendant's usurpation.

FN7. 15 U.S.C. s 1117. The version applicable to this suit provided:
When a violation of any right of the registrant of a mark registered in the Patent Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

597 F.2d 71
202 U.S.P.Q. 536
(Cite as: 597 F.2d 71)

Page 4

required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

[3] The calculation of damages below was based on a letter [FN8] dated June 17, 1971, in which Dallas Cap sought to obtain a license from NHLS. The trial court found that defendant offered $25,000 for a three-year exclusive license and found that the value of the usurped right to sell the emblems prorated for the four-year infringement period was $33,000. The amount of *76 damages the trial court found to have been suffered by plaintiffs is a question of fact and is subject to the clearly erroneous standard of review. Neal v. United States, 562 F.2d 338 (5th Cir. 1977). Because we hold that these calculations were based on a clearly erroneous finding of fact, the total award is also clearly erroneous and must be reduced.

FN8. June 17, 1971
National Hockey League
2 Pennsylvania Plaza
New York City, New York
Attn: Mr. Don Ruck:
Dear Mr. Ruck:
I appreciated the opportunity to speak with you by telephone today and the chance to discuss the National Hockey League emblems. Outlined below is our proposal:
1. Manufacture and distribute Hockey Emblems nationally through our present Distributors, College Book Stores, Department Stores, Airports, Sporting Goods Stores, Gift Shops, and Sports Stadiums. 2. We are ready to start manufacturing and distributing the first week of July.
3. We will sell the emblems both bulk packaged and individually packaged, as per the enclosed samples.
4. All emblems sold in the Novelty Program would be 3 emblems that would be guaranteed by the American Institute of Laundering to be completely washable. At all times we would guarantee the workmanship and quality of all emblems involved in this program.
5. On the basis of a three year contract for distribution of these Hockey emblems we will

guarantee payment of $15,000 for the full three years of the contract. We would pay 10% Royalty against the guarantee on all emblems sold and would pay the Royalty quarterly or whichever way is satisfactory to National Hockey League. All sales would be recorded by computer for instant examination.
6. If we were authorized to be exclusive manufacturer of all National Hockey League emblems sold for the period of three years, we would guarantee $25,000 and would pay 10% Royalty against the guarantee on all emblems sold. This would make us the sole authorized manufacturer of National Hockey League emblems and entitle us to the league's protection against any other manufacturer who might infringe on these rights.
7. As we discussed, the license would run for three years with an additional three, one-year renewable options.
If you have any questions, please do not hesitate to call on me. Looking forward to hearing from you in the very near future.
P.S. As an indication, I called just one of our Distributors and he told me that his starting order would be between 30,000 and 50,000 if we get the license to make them.

[4] Dallas Cap, in paragraph 6 of its letter to NHLS, sought to be named sole authorized manufacturer of NHL emblems for three years, and for this authority $25,000 was offered. But in relying on this paragraph to calculate the value of the usurped right, the court below found that Dallas Cap misappropriated an exclusive right to manufacture and sell the emblems. This is clearly erroneous. Plaintiff could not have made Dallas Cap sole authorized manufacturer of emblems because Lion Brothers Company was an authorized manufacturer of embroidered emblems depicting plaintiffs' team symbols. No exclusive license could have been granted to Dallas Cap, and although the court was correct in its finding that Dallas Cap usurped a right to manufacture and distribute the emblems, its finding that the right was an exclusive one is clearly erroneous. Therefore, the award of $33,000 based on this finding is also clearly erroneous.

The court should have based its damage award on paragraph 5 of the June 1971 letter. In that paragraph defendant offered to pay $15,000 for a three-year nonexclusive license to manufacture and sell the emblems through retail outlets. This was the right wrongfully taken by Dallas Cap, and the value it placed on that right was a proper measure of damages caused by the usurpation. Based upon a $15,000 offer for a three-year contract, Dallas Cap's four-year infringement of the right to manufacture and sell three-inch

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

597 F.2d 71
202 U.S.P.Q. 536
(Cite as: 597 F.2d 71)

Page 5

emblems damaged plaintiffs in the amount of $20,000.

[5] The trial court correctly awarded additional damages for Dallas Cap's usurpation of the right to manufacture and sell larger emblems. The June 1971 letter plainly contemplated that Dallas Cap would manufacture and distribute nationally three-inch emblems; paragraph 4 unambiguously states that "(a)ll emblems sold in the Novelty Program would be 3 emblems . . . ." The $15,000 offer in paragraph 5 was for "distribution of these Hockey emblems," and defendant concedes that the paragraph 5 offer was restricted to the three-inch emblems.[FN9] Therefore, defendant's usurpation of the right to manufacture and retail emblems larger than three inches caused additional harm to plaintiffs. The court below properly, if perhaps somewhat conservatively, [FN10] found that the value of the right to make and sell large emblems was at least as valuable as the right to market the small ones and included an equivalent sum in its calculation of damages. We agree with this reasoning, but because this calculation also was based upon the usurpation of an exclusive license, we hold that the additional amount awarded is clearly erroneous. The right to manufacture and sell large emblems was also a nonexclusive one because of Lion Brothers' license from plaintiffs, and the worth of this right must be calculated on that basis. If it was at least as valuable as the right to produce and market small emblems, this additional nonexclusive right would also be worth $15,000 for three years. Dallas Cap's four-year infringement of the right to manufacture and sell emblems larger than three inches damaged plaintiffs in the amount of $20,000. Therefore, actual damages in the total amount of $40,000 were suffered by plaintiffs as a result of defendant's infringement.

> FN9. We believe the lower court necessarily inferred that the reference to "all emblems sold" in paragraphs 5 and 6 meant only the emblems that were the subject of the letter the three-inch emblems. We think this inference to be the correct one, although, in light of defendant's concession in its brief that the $15,000 offer related only to the small emblems, the point is not crucial to our decision.

> FN10. Defendant's accountant testified that the profit margin on the large emblems was fifteen times greater than that on the three-inch ones.

*77 [6] Section 35 of the Lanham Act [FN11] gives the trial judge discretion to award any amount in excess of actual damages, not to exceed three times that amount, according to the circumstances of the case. The court below exercised this discretion, doubling the actual damages because of defendant's "bad faith." As examples of this bad faith, the court found that Dallas Cap had violated the spirit of an

injunction against selling the emblems without an appropriate disclaimer,[FN12] had failed to disclose in discovery sales of large emblems, and also had failed to disclose in discovery complete sales records of the small emblems. Because we are unable to give meaningful review to this award of increased damages, we must remand for further findings.

> FN11. 15 U.S.C. s 1117.

> FN12. The first disclaimer Dallas Cap placed on the emblems stated that they were "not authorized by the NHL or its members." But "NHL" was placed in the center of the circular disclaimer in much larger letters than the other words. A later disclaimer replaced "NHL" with "National Hockey League" in letters of the same size as the rest of the inscription. All disclaimers, however, were affixed to the back of the emblems. They could not be seen unless the emblems were displayed face down an unlikely possibility. Some of the three-inch emblems were sold in sealed packs; their disclaimers could be seen only if the packs were opened and the emblems turned over. The lower court found that the size of the letters "NHL" and the location of the disclaimer were examples of bad faith.

Damage awards in excess of actual damages found have been upheld in Lanham Act cases involving "deliberate and fraudulent infringement," Deering. Milliken & Co. v. Gilbert, 269 F.2d 191 (2d Cir. 1959), or conduct described as "fraudulent" and "wilful and calculated to trade upon the plaintiff's good will." H. A. Friend & Co. v. Friend & Co., 276 F.Supp. 707 (C.D.Cal.1967), Aff'd, 416 F.2d 526 (9th Cir. 1969). Cert. denied, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970). We note also that the statutory language, which allows discretion to increase actual damages found "according to the circumstances of the case," appears sufficiently broad to encompass other situations. See Donsco, Inc. v. Casper Corp., 587 F.2d 602 (3d Cir. 1978). We decline, however, to speculate on the variety of possible circumstances that might justify increased damages in other cases. We hold only that increased damages cannot be upheld on the basis of the findings made below.

We do not question the accuracy of the findings made by the trial court; we are simply unable to determine from them whether on the facts of this case increased damages should be considered an abuse of discretion, as defendant argues. The trial court seemingly doubled damages because Dallas Cap violated an injunction imposed by the court and also failed to comply with its obligation to answer pretrial discovery completely. These are examples of conduct for which other, appropriate sanctions were readily available.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

We would be reluctant to approve increased damages intended solely as punishment for conduct unrelated to the trademark infringement or to the actual damages caused by it. On the other hand, we might agree that increased damages may be justified by defendant's withholding or misrepresenting available sales records, which would have the effect of making much more difficult, if not impossible, plaintiffs' proof of damages or profits. Certainly, an infringer should not be allowed to limit a trademark owner to injunctive relief by "stonewalling" the question of infringing sales. The trial court did not so find, however, and we are unable to ascertain from the written findings whether the incomplete answers were merely attributable to poor recordkeeping practices. Dallas Cap argues on appeal that all records in its possession were made available to plaintiffs' accountant, and the broad, general conclusion that Dallas Cap acted in bad faith cannot be properly reviewed without more specific findings.

[7] Plaintiffs argue that defendant's deliberate taking of manufacturing rights after being denied a license was willful trademark infringement, but the trial court made no such finding in discussing either that specific conduct or defendant's conduct *78 subsequent to the first trial. We express no opinion whether Dallas Cap was a willful trademark infringer, either by virtue of its reproduction and sale of the emblems or by virtue of its violation of the injunction. Neither will we infer a finding so as to uphold the increased damage award on the basis of nondisclosure of sales records. We are not to engage in appellate factfinding. Moreover, even if we were to infer findings to justify increased damages, the discretion given by the Lanham Act to impose additional damages if the circumstances of the case warrant additional relief is to be exercised by the trial court and not by us. Therefore, we must remand for the trial judge to exercise her discretion in this regard.

[8] Attorneys' fees were requested by plaintiffs but were correctly denied by the court below. Under the version of the Lanham Act applicable to this suit, attorney fees were not recoverable. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). [FN13] The rule in this country has long been that attorney fees are not ordinarily recoverable in the absence of a statute or an enforceable contract providing for their recovery. Id. at 717, 87 S.Ct. 1404. Neither is present here, and plaintiffs' arguments for an exception to the rule are unpersuasive.

FN13. The statute was amended by Congress in 1975 and now allows recovery of attorney fees in "exceptional cases." This action was commenced in 1972, however, and the amendment does not apply to it. 15 U.S.C. s 1117. See Five Platters, Inc. v. Purdie, 419 F.Supp. 372 (D.Md.1976).

Accordingly, and summarizing, we hold:

1. The findings that the separate rights usurped by Dallas Cap were each worth $33,000 are clearly erroneous.

2. Actual damages in the amount of $40,000 were proved by plaintiffs $20,000 attributable to Dallas Cap's usurpation of the nonexclusive right to manufacture and sell three-inch emblems, and an equivalent sum attributable to its usurpation of an identical right involving larger emblems.

3. The doubling of damages cannot be upheld upon the basis relied on by the trial judge. Her discretion to do or not to do so must be re-exercised on a proper basis.

4. The denial of attorney fees is AFFIRMED.

5. To the above extent, the judgment is VACATED and REMANDED for appropriate findings.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.

597 F.2d 71, 202 U.S.P.Q. 536

END OF DOCUMENT



# EXHIBIT / ATTACHMENT

____  19 _____

(To be scanned in place of tab)

469 S.E.2d 712

(Cite as: 220 Ga.App. 278, 469 S.E.2d 712)

Page 1

Court of Appeals of Georgia.

BUDGET RENT-A-CAR OF ATLANTA, INC.
v.
WEBB.

No. A95A2496.

Feb. 20, 1996.

Automobile rental company brought action asserting claims of breach of contract and negligence against motorist who had rented automobile, which was damaged in accident which occurred after motorist fell asleep while driving. The Richmond Civil Court, Allen, J., denied company's motion for judgment n.o.v., and company appealed. The Court of Appeals, Blackburn, J., held that: (1) admission by motorist that he had entered into rental agreement under which automobile was required to be returned in good condition, and undisputed fact that automobile was involved in accident, were sufficient to establish breach, and (2) motorist was negligent as matter of law.

Reversed and remanded.

West Headnotes

[1] Contracts ⬅324(1)
95k324(1) Most Cited Cases

Action at law lies for breach of contract, and damages are given as compensation for injuries sustained as result of breach.

[2] Contracts ⬅326
95k326 Most Cited Cases

Elements of right to recover for breach of contract are breach and resultant damages to party who has right to complain about contract being broken.

[3] Appeal and Error ⬅934(1)
30k934(1) Most Cited Cases

In determining whether trial court erred by denying motion for judgment n.o.v., reviewing court must view and resolve evidence and any doubt or ambiguity in favor of verdict.

[4] Judgment ⬅199(3.2)
228k199(3.2) Most Cited Cases

[4] Judgment ⬅199(3.11)
228k199(3.11) Most Cited Cases

[4] Trial ⬅141
388k141 Most Cited Cases

[4] Trial ⬅178
388k178 Most Cited Cases

Directed verdict or judgment n.o.v. is not proper unless there is no conflict in evidence as to any material issue and evidence introduced, with all reasonable deductions therefrom, demands certain verdict.

[5] Pleading ⬅36(3)
302k36(3) Most Cited Cases

Admission by individual in answer to complaint brought by automobile rental company seeking to recover for breach of contract based on damage to rented automobile that he and automobile rental company had entered into agreement for rental of automobile constituted judicial admission which individual was not permitted to deny. O.C.G.A. § 24-3-30.

[6] Automobiles ⬅390
48k390 Most Cited Cases

Judicial admission by individual that he had entered into agreement with automobile rental company, under which automobile was required to be returned in good condition, and undisputed fact that automobile was involved in accident and was not returned in good condition were sufficient to establish breach of contract on part of individual.

[7] Negligence ⬅1693
272k1693 Most Cited Cases
 (Formerly 272k136(14))

Questions of negligence are ordinarily matters for resolution by jury.

[8] Automobiles ⬅242(1)
48Ak242(1) Most Cited Cases

[8] Automobiles ⬅245(35)
48Ak245(35) Most Cited Cases

While questions of negligence are ordinarily matters for resolution by jury, where evidence is undisputed that driver has fallen asleep at wheel and wreck results therefrom, driver bears burden of showing that he was not negligent, and when driver fails to meet this burden, he is negligent as matter of law.

[9] Automobiles ⬅157
48Ak157 Most Cited Cases

[9] Automobiles ⬅245(35)
48Ak245(35) Most Cited Cases

Motorist who had rented automobile and who had fallen

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

asleep while driving automobile, resulting in wreck, was negligent as matter of law and was liable for damage to automobile.

**713 *281 Fulcher, Hagler, Reed, Hanks & Harper, Scott W. Kelly, Augusta, for appellant.

Charles C. Mayers, Augusta, for appellee.

*278 BLACKBURN, Judge.

Budget Rent-a-Car of Atlanta, Inc. (Budget) brought the underlying *279 action against Lance Webb to recover damages to its rental vehicle caused by Webb's negligent operation of the vehicle and violation of the "Use Restrictions" of their rental agreement. At the close of evidence, the trial court denied Budget's motion for directed verdict and the jury returned a defendant's verdict. The trial court denied Budget's motion for judgment n.o.v., and this appeal followed.

Webb traveled to Georgia on behalf of his employer Lumber Systems, Inc. (Lumber). The credit card which Webb used in the transaction was in the name of "Lance N. Webb" with the name "Lumber Systems Inc." immediately under Webb's name. In defendant's amended answer however, he admitted that he and plaintiff had entered into the subject rental agreement and that it provided that the "vehicle will not be used or operated by anyone ... [w]ho is not capable of safely driving the vehicle due to ... drowsiness." Defendant was listed as the "Renter" on the agreement and the agreement required that the renter return the vehicle in the same good operating condition.

On the night of the wreck, Webb got home from work around 6:00 or 7:00 p.m. and drove alone to Augusta to have dinner. During this trip Webb, while driving at 65 mph, fell asleep and wrecked the vehicle which was ultimately returned to Budget in a damaged condition. Budget's expert testified that the fair market value of the vehicle prior to the wreck was $12,163 and that the fair market value of the wrecked vehicle was $2,000. On the second attempt, they were able to sell the wrecked vehicle at public auction for $2,000. Defendant has never compensated plaintiff for damages to the involved vehicle.

Webb argues that his employer, Lumber, is a co-obligor of any obligation and plaintiff's failure to name Lumber as a party is fatal to its claim. He further argues that he was acting as the agent for Lumber, within the scope of his employment at all times relevant to this action and was not personally liable under the agreement.

1. Budget contends that the trial court erred by denying its motion for directed verdict and its motion for judgment n.o.v. in that the undisputed evidence showed that Webb

had breached the rental agreement and was personally liable for such breach.

[1][2] "A contract is an agreement between two or more parties for the doing or not doing of some specified thing." OCGA § 13-1-1. "[A]n action at law lies for breach of a contract and that damages are given as compensation for the injuries sustained. The elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken." (Citations omitted.) Graham Bros. Constr. Co. v. C.W. Matthews Contracting Co., 159 Ga.App. 546, 550, 284 S.E.2d 282 (1981). It is uncontroverted in the record that Webb rented a 1990 *280 Chrysler LeBaron from Budget pursuant to a valid, written rental agreement and thereafter wrecked it after falling asleep at the wheel while driving alone on Interstate 20. As a result of the wreck, the car was damaged and sold for salvage.

[3][4] " 'In determining whether the trial court erred by denying [plaintiff's] ... motion for judgment n.o.v., this court must view and resolve the evidence and any doubt or ambiguity in favor of the verdict. "A directed verdict (and judgment n.o.v.) is not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom demands a certain verdict." ' " (Citations omitted.) Parks v. Howard, 197 Ga.App. 405, 407, 398 S.E.2d 308 (1990).

[5][6] Webb's admission that he and plaintiff had entered into the rental agreement, contained in his answer, constitutes a **714 judicial admission, which he is not permitted to deny. OCGA § 24-3-30; State Hwy. Dept. v. Lumpkin, 222 Ga. 727, 152 S.E.2d 557 (1966). In view of the contractual requirement that Webb was to return the vehicle in the same good condition and the undisputed fact that he did not, it was error for the trial court to deny Budget's motion for judgment n.o.v. as to Webb's liability for damages arising from a breach of the rental agreement.

2. Budget further contends that the trial court erred in failing to grant its motion for directed verdict and motion for judgment n.o.v. based on the undisputed evidence that Webb negligently damaged Budget's vehicle.

[7][8][9] Questions of negligence are ordinarily matters for resolution by a jury. Where the evidence is undisputed however, that a driver has fallen asleep at the wheel and a wreck results therefrom, the driver bears the burden of showing that he was not negligent in damaging the vehicle. When he fails to meet this burden, the driver is negligent as a matter of law. Blunt v. Spears, 93 Ga.App. 623, 92 S.E.2d 573 (1956), rev'd on other grounds, Southern Bell Tel. etc. Co. v. Spears, 212 Ga. 537, 93 S.E.2d 659 (1956); Ga. Power Co. v. Murray, 57 Ga.App. 141, 194 S.E. 403 (1937). In view of the unrefuted evidence that the wreck resulted

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

469 S.E.2d 712                                                                   Page 3
(Cite as: 220 Ga.App. 278, 469 S.E.2d 712)

from Webb falling asleep while driving, and his failure to make any showing that he was not negligent, the trial court erred in failing to grant Budget's motion for judgment n.o.v. as to Webb's liability to Budget for damages to the rental vehicle based upon his negligent conduct in causing the wreck.

The question of the amount of damages to which Budget is entitled must be resolved by a jury in view of the arguably conflicting evidence on this issue. The judgment of the court is hereby reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed and case remanded.*

McMURRAY, P.J., and *281 ANDREWS, J., concur.

469 S.E.2d 712, 220 Ga.App. 278

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

## 20

**(To be scanned in place of tab)**

139 F.3d 1396
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Page 1

# H

Briefs and Other Related Documents

United States Court of Appeals,
Eleventh Circuit.

CAMP CREEK HOSPITALITY INNS, INC. d.b.a.
Sheraton Inn Atlanta Airport,
Plaintiff-Appellant,
v.
SHERATON FRANCHISE CORPORATION, ITT
Sheraton Reservations Corporation, Sheraton
Savannah Corporation, and ITT Sheraton Corporation,
Defendants-Appellees.

No. 95-8960.

April 30, 1998.

Franchisee brought action against franchisor and related companies, alleging that establishment of competing business in same airport market violated franchisor's duties to franchisee. The United States District Court for the Northern District of Georgia, No. 1:93-cv-1868-ODE, Orinda D. Evans, J., granted summary judgment for defendants. Franchisee appealed. On petitions for rehearing, the Court of Appeals, Birch, Circuit Judge, held that: (1) material issue of fact as to whether franchisor violated implied duty of good faith and fair dealing in establishing competing business precluded summary judgment for defendants; (2) material issue of fact as to whether franchisee received full amount of credit to which it was entitled as result of error by franchisor's reservations operation precluded summary judgment on billing error claim; (3) franchisee could not recover for tortious interference with contract and business relations; (4) franchisor could not be held liable for violating Massachusetts Unfair Trade Practices Act; (5) material issues of fact precluded summary judgment on franchisee's misappropriation of trade secret claim; and (6) franchisee was not entitled to recovery under Lanham Act and Georgia Deceptive Trade Practices Act.

Affirmed in part, reversed in part, and remanded.

Opinion, 130 F.3d 1009, vacated.

West Headnotes

[1] Federal Courts ☞766
170Bk766 Most Cited Cases

Review by Court of Appeals of district court's grant of summary judgment is plenary, but Court applies same legal standards that bound district court.

[2] Federal Civil Procedure ☞2492
170Ak2492 Most Cited Cases
Material issue of fact as to whether franchisor violated implied duty of good faith and fair dealing, under Massachusetts law, when it acquired and operated hotel in same vicinity as franchisee's inn precluded summary judgment for franchisor on franchisee's breach of duty claim.

[3] Contracts ☞168
95k168 Most Cited Cases

Massachusetts implies covenant of good faith and fair dealing in all contracts.

[4] Contracts ☞168
95k168 Most Cited Cases

Under Massachusetts law, implied covenant of good faith and fair dealing requires parties to contracts to deal honestly and in good faith in performance and enforcement of their agreements, and to refrain from impairing other party's right to receive fruits of contract.

[5] Contracts ☞168
95k168 Most Cited Cases
Under Massachusetts law, covenant of good faith may not be used to rewrite or override express terms of contract.

[6] Federal Civil Procedure ☞2492
170Ak2492 Most Cited Cases

Evidence that franchisee submitted to show damages was sufficient to defeat franchisor's summary judgment motion on franchisee's claim for breach of implied duty of good faith and fair dealing; evidence included affidavits of two experts and franchise's general manager which described trends present in applicable market both before and after franchisor began operating competing business in same vicinity, and which presented credible theories and measures of damages attributable to additional intra-brand competition associated with new business' entry to market.

[7] Contracts ☞312(1)
95k312(1) Most Cited Cases

Franchisor could not be held liable, under Massachusetts law, to inn franchisee for alleged violation of implied covenant of good faith and fair conduct, based on its decision to require franchisee to drop airport designation from its name, given franchisee's failure to link any damages it suffered as result of franchisor's conduct concerning name.

[8] Contracts ☞275
95k275 Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

139 F.3d 1396    Case 1:01-cv-00313-TWT    Document 233    Filed 02/02/04    Page 82 of 363
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Page 2

Under Massachusetts law, party to agreement may not use its contractual discretion in bad faith.

**[9] Contracts ⬅322(3)**
95k322(3) Most Cited Cases

Franchisor could not be held liable for breach of covenant of good faith and fair dealing, under Massachusetts law, based on allegation that its reservation agents systematically favored franchisor's new operation over competing franchisee's operation when fielding customer calls, given franchisee's failure to provide any evidence or theory connecting damages to claim, and franchisor's evidence demonstrating that number of reservations obtained for franchisee increased in every year after franchisor's operation opened.

**[10] Evidence ⬅150**
157k150 Most Cited Cases

**[10] Evidence ⬅317(2)**
157k317(2) Most Cited Cases

Franchisee's 289 test calls to franchisor's reservation system, conducted to show that franchisor's agents operating system favored franchisor's competing business, did not violate rule against hearsay, even though they did not constitute anything approaching scientific survey. Fed.Rules Evid.Rule 801(c), (d)(2)(D), 28 U.S.C.A.

**[11] Contracts ⬅321(2)**
95k321(2) Most Cited Cases

**[11] Evidence ⬅571(10)**
157k571(10) Most Cited Cases

Franchisor could not be held liable to franchisee, under theory of breach of implied covenant of good faith and fair dealing, based on claims that franchisor's reservation operations improperly supplied confidential, competitively sensitive information about franchisee's operations to franchisor's competing business, given franchisee's failure to show evidence of damages suffered as result of breach; expert's conclusory statement that competing business' use of information damaged franchisee's operation was insufficient to permit jury to distinguish between losses suffered from breach as opposed to those due simply to increase in intra-brand competition.

**[12] Federal Civil Procedure ⬅2492**
170Ak2492 Most Cited Cases

Material issue of fact as to whether franchisee received full amount of credit to which it was entitled as result of error by franchisor's reservations operation precluded summary judgment for franchisor on billing error claim.

**[13] Contracts ⬅322(3)**
95k322(3) Most Cited Cases

Franchisee could not recover from franchisor for interruption of its reservations services where franchisor presented evidence that it stopped making reservations due to computer software problem, parties' contract contained indemnity clause providing that franchisor could not be held liable for system interruptions, and franchisee failed to present alternative, actionable theory for interruption.

**[14] Torts ⬅16**
379k16 Most Cited Cases

Under Georgia law, operation of competing business within same vicinity as franchisee's business by companies related to franchisor was subject to competitive privilege, and thus was not tortious interference with contract under Georgia law; franchise agreements made clear that franchisor and franchisee were not engaged in partnership to pursue business in market at issue, and no evidence showed unique circumstances indicating that parties intended to create confidential or fiduciary relationship.

**[15] Torts ⬅12**
379k12 Most Cited Cases

Under Georgia law, neither parties to agreements with franchisee nor parent company of those parties, which had interest in contracts and was bound by duties implied thereunder, could tortiously interfere with those contracts.

**[16] Trade Regulation ⬅862.1**
382k862.1 Most Cited Cases

Franchisor was not liable to franchisee for unfair competition under Georgia law, based on its alleged abuse and exploitation of confidential relationship, given absence of evidence of unique circumstances supporting proposition that parties intended to create confidential or fiduciary relationship.

**[17] Torts ⬅10(3)**
379k10(3) Most Cited Cases

Evidence that franchisor's competing hotel operation offered to meet or beat franchisee's rates when guests with reservations at franchisee's facility mistakenly arrived at its door did not support franchisee's claim for tortious interference with its business relations with guests.

**[18] Torts ⬅10(1)**
379k10(1) Most Cited Cases

To establish claim for tortious interference with business relations, Georgia law requires plaintiff to offer evidence

139 F.3d 1396

46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387

(Cite as: 139 F.3d 1396)

that defendant acted improperly and that those acts induced breach of contract or prompted third party to discontinue or fail to enter anticipated business relationship.

**[19] Torts ⊙⟶10(3)**
379k10(3) Most Cited Cases

Given absence of evidence that franchisee's guests cancelled their reservations due to alleged wrongful activity of franchisor and its related companies in support of franchisor's competing business, including omission of airport designation from franchisee's operation in national advertising and reservation system, bias in reservation system, and misuse of franchisee's confidential information, franchisee could not establish claim under Georgia law for tortious interference with its business relations with its guests based on such activities.

**[20] Torts ⊙⟶15**
379k15 Most Cited Cases

Franchisee could not recover for tortious interference with prospective business relations, under Georgia law, based on claim that hotel franchisor's improper conduct cost franchisee guests who otherwise would have stayed at franchisee's facility, given franchisee's failure to identify causal connection between alleged tortious activity and interruption of any particular business relationship by presenting evidence to distinguish between guests who chose not to stay at franchisee's facility due to franchisor's misconduct and those who chose not to stay at franchisee's facility for other reasons.

**[21] Torts ⊙⟶12**
379k12 Most Cited Cases

Under Georgia law, plaintiff claiming tortious interference with prospective business relationships need not identify particular disrupted contracts to recover.

**[22] Trade Regulation ⊙⟶862.1**
382k862.1 Most Cited Cases

Franchisor could not be held liable for violating Massachusetts Unfair Trade Practices Act, which applied only to cases in which challenged practices occurred primarily and substantially within Massachusetts, given that, although acts complained of might have been contemplated at franchisor's Boston headquarters, acts occurred outside Massachusetts and complainant felt "sting" of any deception outside Massachusetts. M.G.L.A. c. 93A, § 11.

**[23] Trade Regulation ⊙⟶864**
382k864 Most Cited Cases

As party seeking to rely on statute providing that

Massachusetts Unfair Trade Practices Act applied only to cases involving practices occurring primarily and substantially within Massachusetts, franchisor bore burden of establishing that its conduct fell outside Act's reach. M.G.L.A. c. 93A, § 11.

**[24] Federal Civil Procedure ⊙⟶2515**
170Ak2515 Most Cited Cases

Material issues of fact as to whether confidential information that franchisee disclosed to franchisor was trade secret and whether franchisor misappropriated that information precluded summary judgment for franchisor on franchisee's misappropriation of trade secret claim under Georgia law. O.C.G.A. §§ 10-1-761(1, 2, 4), 10-1-763.

**[25] Torts ⊙⟶10(5)**
379k10(5) Most Cited Cases
or

To support claim for misappropriation of trade secrets under Georgia law, plaintiff must show that (1) it had trade secret and (2) opposing party misappropriated trade secret. O.C.G.A. §§ 10-1-761, 10-1-763.

**[26] Torts ⊙⟶28**
379k28 Most Cited Cases

Whether particular type of information constitutes trade secret under Georgia law is question of fact. O.C.G.A. § 10-1-761(4).

**[27] Torts ⊙⟶10(5)**
379k10(5) Most Cited Cases

Not all confidential information rises to level of trade secret under Georgia law. O.C.G.A. § 10-1-761(4).

**[28] Trade Regulation ⊙⟶862.1**
382k862.1 Most Cited Cases
Franchisor's competing hotel was franchise property located in vicinity of Atlanta airport, and therefore its use of franchise name and airport was literally accurate, precluding franchisee's recovery, under Lanham Act and Georgia Deceptive Trade Practices Act, on claims based on competing hotel's use of such terms. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a); O.C.G.A. § 10-1-372.

**[29] Trade Regulation ⊙⟶544**
382k544 Most Cited Cases

Licensee may not sue its licensor for trademark infringement.

**[30] Trade Regulation ⊙⟶331**
382k331 Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

139 F.3d 1396
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
**(Cite as: 139 F.3d 1396)**

[31] Trade Regulation ☜404
382k404 Most Cited Cases
Franchisee failed to establish claim that franchisor's competing hotel engaged in "reverse passing off," in violation of Lanham Act, given absence of evidence showing that competing hotel sold franchisee's product. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

[32] Implied and Constructive Contracts ☜55
205Hk55 Most Cited Cases

Franchisee could not recover from franchisor on grounds that franchisor unjustly enriched itself by competing with franchisee in particular market; existence of legal contract precluded recovery for unjust enrichment.

[33] Implied and Constructive Contracts ☜55
205Hk55 Most Cited Cases

Recovery on theory of unjust enrichment is only available when, as a matter of fact, there is no legal contract.

[34] Federal Courts ☜914
170Bk914 Most Cited Cases
Reversal of grant of summary judgment on plaintiff's *request for permanent injunctive relief under Georgia law* was required due to district court's erroneous application of standard governing temporary injunctions. O.C.G.A. § 9-5-1.
*1399 Robert A. Bartlett, Stefan E. Ritter, Hicks, Maloof & Campbell, Atlanta, GA, for Plaintiff-Appellant.

Patricia B. Cunningham, John Howard Fleming, Sarah Blakemore Estes, Sutherland, Asbill & Brennan, Atlanta, GA, for Defendants-Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before BIRCH and CARNES, Circuit Judges, and MICHAEL [FN*], Senior District Judge.

> FN* Honorable James Michael, Senior U.S. District Court Judge for the Western District of Virginia, sitting by designation.

ON PETITIONS FOR REHEARING

BIRCH, Circuit Judge:

Defendant-appellee's petition for rehearing is denied. Plaintiff-Appellant's petition for rehearing is granted. Our

opinion entered December 11, 1997 and published at 130 F.3d 1009 is vacated. The following opinion is entered in lieu thereof: [FN1]

> FN1. On petition for rehearing, appellant Camp Creek argues that our earlier opinion overlooked evidence in support of their claims for tortious interference with contract. We agree, but note that our oversight does not affect the outcome of the case.

*1400 INTRODUCTION

Camp Creek Hospitality Inns, Inc. ("Camp Creek") appeals the district court's grant of summary judgment in favor of Sheraton Franchise Corporation, ITT Sheraton Reservations Corporation, Sheraton Savannah Corporation, and the ITT Sheraton Corporation (collectively "Sheraton"), [FN2] arguing that genuine issues of material fact remain with respect to each of its claims. Camp Creek also appeals the district court's decision to dismiss its motion to compel discovery as moot. We affirm in part and reverse in part.

> FN2. Sheraton Franchise Corporation ("Sheraton Franchise"), ITT Sheraton Reservations Corporation ("Sheraton Reservations"), and Sheraton Savannah Corporation ("Sheraton Savannah"), are affiliated with or wholly-owned subsidiaries of the ITT Sheraton Corporation ("ITT Sheraton").

[1] Our review of the district court's grant of summary judgment is plenary, but we apply the same legal standards that bound the district court. *See Barfield v. Brierton,* 883 F.2d 923, 933-34 (11th Cir.1989). The purpose of a motion for summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A dispute over an issue of material fact is genuine if the evidence would permit a reasonable jury to return a verdict for the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In reviewing the district court's grant of summary judgment we must review the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. *See Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992). If, however, the evidence of a genuine issue of material fact is "merely colorable" or of insignificant probative value, summary judgment is appropriate. *See Liberty Lobby, Inc.,* 477 U.S. at 249-50, 106 S.Ct. at 2511.

BACKGROUND
In September 1990, Camp Creek entered a series of

139 F.3d 1396
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

agreements with Sheraton that authorized Camp Creek to establish and operate a Sheraton Inn franchise (the "Inn") approximately 3.5 miles west of the Atlanta airport. Camp Creek entered into a License Agreement with Sheraton Franchise that permitted Camp Creek to operate its property under the Sheraton name in exchange for the payment of various franchise royalties. The License Agreement required Camp Creek to enter a separate contract with Sheraton Reservations that permitted the Inn to participate in Sheraton's nationwide reservations system (the "Reservatron system") for the payment of additional associated fees. Camp Creek's participation in this system allowed Sheraton's agents to accept reservations on the Inn's behalf using occupation and pricing data that Camp Creek supplied to Sheraton Reservations.

Camp Creek was not the only Sheraton property in the vicinity of the Atlanta airport in 1990; the Sheraton Hotel Atlanta Airport (the "SHAA"), another franchisee, already served that market. Although Sheraton distinguishes between inns (mid-price properties) and hotels (higher-end properties) within its own system, Sheraton's concerns about potential customer confusion led to some disagreement over the Inn's name. Camp Creek, which wanted to confirm its presence near the airport in the minds of potential guests, sought a name that would include an "Atlanta Airport" designator. The License Agreement, however, gave Sheraton Franchise control over the name and, to avoid confusion among Sheraton customers, the parties agreed upon the "Sheraton Inn Hartsfield-West, Atlanta Airport." Although there is evidence to support Sheraton's contention that Camp Creek initially was happy with this designation, by early 1992 Camp Creek had begun to ask permission to change its name to "Sheraton Inn Atlanta Airport," based on its contention that travelers did not associate "Hartsfield-West" with the airport. Sheraton Franchise agreed to the change in the Inn's name with the express reservation that the decision was subject to reconsideration should the change create customer confusion.

In 1992, Camp Creek experienced two problems in connection with its participation in the Sheraton Reservatron system. First, *1401 Sheraton's representatives failed to book reservations for the Inn over a period of time because an error led them to believe the Inn was fully booked. Sheraton Reservations claimed that the problem was rooted in the computer software but refused to provide compensation or further explanation for the problem. At approximately the same time, Camp Creek received erroneous charges for reservations that, the parties later discovered, were due to confusion in the American Airlines SABRE reservations system. A stern warning from Sheraton Reservations prompted Camp Creek to pay the charges and pursue a refund. After encountering delays and intransigence from Sheraton, Camp Creek eventually recovered some credit for the billing error.

In March 1992, Sheraton began to consider acquiring a hotel property, then operating under the Hyatt flag, in the vicinity of the Atlanta Airport. Sheraton's interest was apparently sparked by Hyatt's willingness to sell the property at a substantial discount. Various members of ITT Sheraton's staff evaluated the proposal, both at their corporate headquarters in Boston, Massachusetts and in Atlanta, where they traveled to study competitive properties. The evidence, viewed in the light most favorable to Camp Creek, shows that ITT Sheraton's representatives did not visit the Inn to evaluate whether the new hotel would compete against the Inn; similarly, ITT Sheraton's internal evaluations of the project did not seriously consider the competitive harm that might befall the Inn if the property converted to the Sheraton flag. The appellees maintain that they never viewed the Hyatt property as a threat to the Inn because Sheraton expected the property's connection to the Georgia International Convention Center to attract predominately group business.

The evidence also suggests that at least one of the ITT Sheraton employees working on the Hyatt acquisition may have viewed the Inn and the SHAA as potential obstacles to the project's success. David Proch-Wilson, who was primarily responsible for the acquisition, prepared a series of documents that indicated a desire, first, to eject both franchises from the Sheraton system, alternatively, to convert the SHAA to an Inn if it elected to remain a Sheraton franchise, and finally, to require Camp Creek to change the Inn's name back to "Sheraton Inn Hartsfield-West." Indeed, in February 1993, Sheraton Franchise informed Camp Creek that the Inn's name would be changed to "Sheraton Inn Hartsfield-West," citing customer confusion between the two Sheraton franchises already in the area. In the same month, Sheraton Franchise offered the SHAA the opportunity to reclassify itself as an Inn in the Sheraton system.

Camp Creek immediately protested the change in its name. In correspondence to Sheraton Franchise, Camp Creek demanded evidence of customer confusion and offered to work with Sheraton to resolve any other factors giving rise to confusion. Camp Creek maintained that guests did not associate the "Hartsfield-West" designator with the Atlanta Airport and that the change would threaten its business. Although the evidence on this point is in some dispute, Camp Creek apparently did not change the Inn's name on its signs and shuttle vans and continued to answer the phone using the Atlanta Airport designator. Nevertheless, the Inn's name did change in the Reservatron system and in Sheraton's nationwide advertising. Sheraton Franchise never provided documentation of specific instances of customer confusion and in April 1994 agreed to permit the Inn's name

139 F.3d 1396
Case 1:01-cv-00313-TWT   Document 233   Filed 02/02/04   Page 86 of 363
46 U.S.P.Q.2d 1677, 11 Fla L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Page 6

to revert to "Sheraton Inn Atlanta Airport."

Meanwhile, in April 1993, ITT Sheraton consummated its acquisition project by purchasing the Hyatt property. Sheraton Savannah became the owner of the hotel and began operating it under the name "Sheraton Gateway Hotel, Atlanta Airport" (the "Gateway") on May 1, 1993. The record suggests that the presence of a third Sheraton property in the Atlanta Airport market caused some customer confusion and that Camp Creek suffered some decrease in the growth of its business, particularly in its higher-end business. Although the parties cannot agree on the extent of the problems, Camp Creek presented evidence that suggests a number of guests who had reservations at the Inn actually stayed at the Gateway at rates equivalent to or lower than the Inn's rates, *1402 and often at rates below the Gateway's "walk-in" rate.

Although ITT Sheraton had expected the Gateway to be profitable almost immediately, it soon became clear that the Gateway would not live up to projections. Tom Faust, the manager of the Gateway, blamed at least part of the Gateway's poor performance on competition from the Sheraton franchises, particularly the SHAA, and he proposed that Sheraton eliminate both franchises. The evidence also shows that Faust, who had previously been responsible for Sheraton Reservations, had access to confidential, competitively sensitive information from the Reservatron system concerning the franchises, and that he used this information to support his argument for ejecting the franchises from the Sheraton system. Sheraton, however, never adopted Faust's proposal.

The evidence, construed in Camp Creek's favor, shows that the Gateway could have made use of this confidential information to compete against the Inn. Moreover, an analysis of the Gateway's actual performance shows that the two properties do compete for customers in a number of market segments. Sheraton denies that Faust made any competitive use of the Inn's confidential information and maintains that, although the Gateway did offer lower prices for a time, it did so only to attract first-time customers who might return at higher prices.

Camp Creek has also presented evidence that suggests Sheraton has taken actions to favor the Gateway, Sheraton's own property, over the Inn. Although Sheraton maintains that its Reservations software displays the properties in the Atlanta Airport market in a random fashion and that its agents have no means by which to distinguish franchises from corporate hotels, Camp Creek has presented evidence of almost 300 test calls that suggest the agents disproportionately list the Gateway as the first choice to callers inquiring about reservations. Camp Creek also has presented evidence that Sheraton's nationwide advertising

favored the Gateway over both the SHAA and the Inn.

Finally, Sheraton's evidence shows that the Inn's overall economic performance has continued to improve since the Gateway opened. Camp Creek's experts, however, have suggested that the Inn experienced abnormally high no-show and cancellation rates, that the Inn has not grown at the rate projected, and that it has failed to achieve a reasonably desirable mix of business, so that even though occupancy rates have remained high, the Inn would have been substantially more profitable had the Gateway never entered the market as a Sheraton property.

## DISCUSSION

As an initial matter, we note that Camp Creek's amended complaint sets forth a myriad of statutory and common law claims under Massachusetts, Georgia, and federal law based on the common nucleus of facts described above. Although the complaint and the record in this case are complicated and voluminous, Camp Creek's allegations boil down to the basic proposition that the defendants, by establishing and operating a competing Sheraton hotel in the Atlanta Airport market, violated one or more of the duties (sounding in contract, tort, or both) that a franchisor owes to its franchisee. We examine these broad contentions before addressing Camp Creek's more discrete claims for relief.

### I. The Implied Covenant of Good Faith and Fair Dealing (Counts I, II and X-A)

Camp Creek claims that, although Sheraton's conduct may not have contradicted the express terms of the License Agreement or Reservations Agreement, Sheraton nonetheless violated the covenant of good faith and fair dealing that is implicit in every contract under Massachusetts law. First, Camp Creek argues that Sheraton's decision to establish and operate the Gateway in the Atlanta Airport market breached this implied covenant. Second, Camp Creek submits that even if Massachusetts law does not prohibit a franchisor's encroachment relative to the facts of this case, [FN3] a number of acts incident *1403 to Sheraton's competition with Camp Creek constitute independent breaches of the implied covenant of good faith. We address each claim in turn.

FN3. We adopt the term "encroachment" only as it has evolved in the cases and academic commentary discussing the issues before us. Our use of that term is not intended to attribute impropriety (or the lack thereof) to the defendants' actions in this case.

### A. Sheraton's Establishment of the Gateway Hotel (Count I)

[2] As the License Agreement contains no covenant not to compete and does not grant the Inn an exclusive territory,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

139 F.3d 1396                                                         Page 7
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Camp Creek does not contend that Sheraton violated any express term of the License Agreement by establishing and operating the Gateway Hotel. Instead, Camp Creek relies on the implied covenant of good faith and fair dealing and argues that, by establishing the Gateway in such proximity to the Inn, Sheraton denied Camp Creek the fruits of the contract. [FN4] Sheraton replies that it did not deny Camp Creek any benefit under the contract and argues that the implied covenant, as applied by Massachusetts courts, may not be employed to rewrite the express terms of a contract.

> FN4. Although Camp Creek only entered into the License Agreement with Sheraton Franchise, it is clear from the contract and the nature of the relationship, that Sheraton and its affiliates are contemplated in the contract and incurred rights and liabilities under that agreement. *See e.g.,* License Agreement ¶ 1.

[3][4][5] We note that Massachusetts does imply a covenant of good faith and fair dealing in all contracts. *See Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1256 (1977) (recognizing good faith and fair dealing as "pervasive requirements" in Massachusetts law.) This covenant requires parties to contracts to deal honestly and in good faith in the performance and enforcement of their agreements, *see Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 606 N.E.2d 908, 914 (1993), and to refrain from impairing the other party's right to receive the fruits of the contract, *see Larson v. Larson*, 37 Mass.App.Ct. 106, 636 N.E.2d 1365, 1368 (1994) (quoting *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 583 N.E.2d 806, 820 (1991)). The covenant of good faith, however, may not be used to rewrite or override the express terms of a contract. *See e.g., Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 408 N.E.2d 1370 (1980) (rejecting a franchisee's challenge to its termination pursuant to the express terms of the franchise agreement).

Although the parties have brought a great deal of persuasive authority to our attention, they have cited no Massachusetts case that applies the covenant of good faith to facts similar to those present here. The great weight of authority on applying the implied covenant of good faith and fair dealing to cases of encroachment converges around two fairly simple propositions: (1) when the parties include contract language on the issue of competing franchises the implied covenant will not defeat those terms; [FN5] and (2) when there is no such language the franchisor may not capitalize upon the franchisee's business in bad faith. [FN6] *See Piantes v. Pepperidge Farm, Inc.*, 875 F.Supp. 929, 937-40 (D.Mass.1995) (describing the trends and collecting cases).

> FN5. *See, e.g., Cook v. Little Caesar Enterprises, Inc.*, 972 F.Supp. 400, 409 (E.D.Mich.1997)

(franchisor did not engage in bad faith by locating another franchise outside the one mile "exclusive territory" granted to the franchisee in the contract); *Payne v. McDonald's Corp.*, 957 F.Supp. 749, 754-60 (D.Md.1997) (no bad faith when the license agreement clearly and unambiguously stated that franchisee can expect no exclusive territory) (collecting similar cases).

> FN6. The seminal case in this line is *Scheck v. Burger King Corp.*, in which the district court, applying Florida law, held that language in the franchise agreement that specifically denied the franchisee "any area, market or territorial rights" did not "imply a wholly different right to Burger King-the right to open other proximate franchises at will regardless of their effect on the Plaintiff's operations." 756 F.Supp. 543, 549 (S.D.Fla.1991) ("*Scheck I* "). The district court found that whether the franchisor had breached the implied covenant by granting another franchise in close proximity to the plaintiff's restaurant was a question of fact for the jury. *See Scheck v. Burger King Corp.*, 798 F.Supp. 692, 696 (S.D.Fla.1992) ("*Scheck II* "). As Sheraton points out, the *Scheck* cases have been criticized, ignored, and distinguished in a number of subsequent opinions. *See e.g., Barnes v. Burger King Corp.*, 932 F.Supp. 1420, 1437-38 (S.D.Fla.1996) (rejecting the *Scheck* court's reading of the franchise agreement). *But see In re Vylene Enterprises, Inc.*, 90 F.3d 1472, 1477 (9th Cir.1996) (applying the *Scheck* reasoning to a franchise contract silent on the issue of exclusive territory).

With these broad propositions in place, we turn to the contract in this case. Although **\*1404** the License Agreement appears to provide some guidance with respect to the parties' intentions on this issue, the contract, as executed, says nothing about whether or where Sheraton could establish a competing hotel. Paragraph four of the License Agreement and Schedule B, reproduced below, limit Sheraton Franchise's right to grant additional licenses, but only within the site of the Inn. [FN7] This language makes it clear that Camp Creek had no contractual right to expect the Sheraton Franchise to refrain from licensing the Sheraton name to additional franchises beyond the site of the Inn. *Cf. Quality Inns Int'l, Inc. v. Dollar Inns of Amer., Inc.*, [1992-93 Transf. Binder] Bus. Franchise Guide (CCH) ¶ 10,007 at 23,184 (finding that a non-exclusive franchise agreement implies the possibility of other *franchises* ). By the express terms of the contract, therefore, Sheraton could have authorized a competing franchise directly across the street from the Inn, and Camp Creek would have little recourse. *See Piantes*, 875 F.Supp. at 937-40 (relying on

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

express language in a contract to reject a claim based on the implied covenant of good faith under Massachusetts law); *Shawmut Bank, N.A. v. Wayman*, 34 Mass.App.Ct. 20, 606 N.E.2d 925, 928 (1993) (rejecting a claim based on the implied covenant of good faith when the plaintiff had expressly waived the protections at issue); *see also Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297-98 (5th Cir.1997) (rejecting a franchisee's claim that the implied covenant of good faith prevents the franchisor from permitting competition expressly contemplated in the franchise agreement).

FN7. The License Agreement, as executed, provides:
This license is personal to the Licensee and is restricted to the operation of the Inn on the location specified ..., and is to be construed to permit only such activities as would normally be incident to the operation of a Sheraton Inn. So long as this Agreement is in effect, the Licensor shall not grant any other license authorizing the use of the name "Sheraton" for hotels, motels or inns located within the licensed area described in Schedule B hereto attached.
Schedule B to the License Agreement states: "LICENSED AREA[:] Site Only."

Sheraton, however, did not establish such a franchise in this case; instead, it purchased and operated the Gateway on its own behalf. Although the standard form license agreement Sheraton used in its negotiations with Camp Creek contains language addressing Sheraton's ability to compete against the franchisee, the parties deleted that language from their contract. [FN8] Although the parties contest the reason for the deletion, the fact remains that the fully integrated License Agreement [FN9] is not ambiguous; it is simply silent on the issue of whether or where Sheraton and its affiliates can establish properties that compete against the Inn. Sheraton's argument that the site-only term dictates the outcome of this case, therefore, is unavailing. Nor will we accept either party's invitation to imply such language into the contract to decide the issue.

FN8. The deleted provision of the License Agreement stated:
The absolute and unrestricted right however is reserved to Sheraton or any subsidiary or affiliate of Sheraton to own, lease, manage, operate, or otherwise be interested in any inn, motel or hotel of any kind in said licensed area operated under the name "Sheraton" or otherwise, either exclusively for its own account or in conjunction with others.... The rights of Sheraton or an affiliate to operate in the restricted area as above set forth may be exercised regardless of any competitive effect on

the Licensee.
We note that had the parties retained this provision in paragraph four of the contract, by Sheraton's own argument, it, too, would have been limited to the site of the Inn as described in Schedule B.

FN9. Paragraph nineteen of the License Agreement contains the following merger clause: "There are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement...."

As a result, we must determine whether the implied covenant of good faith and fair dealing, as interpreted by Massachusetts courts, permits the Sheraton to establish its own hotel in the same vicinity as the Inn. The facts of this situation present neither of the extremes that the parties alluded to in their briefs or at oral argument. There can be no doubt, for example, that had Sheraton established its own hotel in Chattanooga, Tennessee, summary judgment would have been appropriate because no reasonable trier of fact could have found that Sheraton had violated its obligation of good faith to Camp *1405 Creek. Conversely, we do not face a circumstance in which Sheraton chose to establish its competing hotel directly across the street from Camp Creek's Inn. Moreover, this case does not lend itself to an easy resolution under the Massachusetts cases that hold against plaintiffs who argue that the implied covenant requires the defendant to protect the plaintiff's interests beyond any measure of commercial reason. *See Zapatha*, 408 N.E.2d at 1378 (reversing judgment for plaintiff based on the implied covenant of good faith when there was no evidence that the defendant "failed to observe reasonable commercial standards of fair dealing in the trade"). [FN10] This case presents a different situation, one in which reasonable people could differ over whether Sheraton's conduct, given all the facts and circumstances, violated the duty of good faith and fair dealing. [FN11] *See In re Vylene*, 90 F.3d at 1476. As a result, summary judgment is inappropriate. [FN12]

FN10. In *Waltham Prof., Inc. v. Nutri/System, Inc.*, [1985-86 Transf. Binder] Bus. Franchise Guide (CCH) ¶ 8479, at 15,917 (D.Mass.1985), for example, the franchisee unsuccessfully argued that the implied duty of good faith required the franchisor to extend funds to replace the contribution of a recently defunct franchise to a joint-advertising fund so that the other franchisees would not have to increase their contributions. Similarly, in *Coraccio v. Lowell Five Cents Sav. Bank*, 415 Mass. 145, 612 N.E.2d 650, 655 (1993), the court dismissed a claim that the covenant of good faith, implied in a mortgage contract, required a bank to refrain from granting the plaintiff's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

139 F.3d 1396
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Page 9

husband a second mortgage on property they owned as tenants by the entirety. No reasonable trier of fact could have found a violation of good faith in either case.

FN11. We note that the parties have presented a great deal of conflicting evidence on Sheraton's intentions toward the Inn, which they argue supports the presence or absence of bad faith. Camp Creek's evidence concerning a number of specific "bad acts" supports an inference of bad faith that is sufficient to withstand Sheraton's motion for summary judgment. *See infra* Part I(B).

FN12. This is not to say, however, that Sheraton can never avoid a trial on the issue of its good faith when it seeks to open a new hotel near any of its franchisees; Sheraton need only include (or refrain from limiting and deleting) clear language reserving its right to compete against its franchisees in its License Agreements.

[6] Sheraton further urges, that regardless of whether a reasonable jury could find a violation of their duty to Camp Creek, summary judgment is nevertheless appropriate because Camp Creek has failed to show damages. In support of this argument, Sheraton emphasizes that the Inn has been more profitable every year since the Gateway opened. Camp Creek, however, has presented evidence of damages through the affidavits of two experts and the Inn's General Manager. These affidavits describe a number of trends present in the market for hotel rooms in the Atlanta area, both before and after Sheraton began operating the Gateway, and present credible theories and measures of damages attributable to the additional intra-brand competition associated with the Gateway's entry to the market. We hold that Camp Creek's evidence is sufficient to withstand Sheraton's motion for summary judgment on this claim.

B. Sheraton's Specific "Bad Acts" and the Implied Covenant of Good Faith (Count II)

In addition to the broad allegation that Sheraton breached its implied duty of good faith by competing against the Inn, Camp Creek makes specific additional claims based on discrete incidents that occurred in connection with that competition. None of these claims standing alone, however, survive scrutiny because Camp Creek has failed to present evidence of damages connected to these bad acts. As we discuss below, although many of the acts in question may be probative on the issue of Sheraton's good or bad faith in connection with Count I of the complaint, these acts, even considered in tandem, do not give rise to a claim for breach of the implied duty of good faith.

1. The Name Game

[7][8] The district court granted summary judgment on Camp Creek's claim that Sheraton's decision to require the Inn to drop the "Atlanta Airport" designation from its name violated the implied covenant of good faith and fair conduct. Paragraph five of the License Agreement expressly gave Sheraton the right to approve or disapprove of the Inn's name. Moreover, as Sheraton points out, when it initially gave the Inn permission to change its name to the "Sheraton *1406 Inn Atlanta Airport" in 1992, it reserved the right to reconsider that change should any customer confusion arise. As we noted above, however, a party to an agreement may not use its contractual discretion in bad faith. *See Anthony's Pier Four*, 583 N.E.2d at 820-21 (finding a violation of good faith when the defendant used its contractual discretion to exact financial concessions from the other party).

Nevertheless, we must affirm the district court's decision on this particular claim because Camp Creek has failed to link any damages to Sheraton's conduct regarding the Inn's name. Although Camp Creek's experts have provided general allegations of lost business, they have not made any attempt to isolate the damages that Camp Creek suffered as a result of the name change from the damages the Inn sustained from additional competition in its market. Camp Creek's evidence on this claim, therefore, while probative on the issue of Sheraton's intent and any bad faith, cannot sustain an independent claim for breach of the implied covenant. [FN13]

FN13. Camp Creek has presented evidence that shows that David Proch- Wilson, the Sheraton employee in charge of acquiring the Gateway Hotel, first sought to eject both the Inn and the Hotel from the Sheraton system and then, on December 8, 1992, suggested that Sheraton could solve its concerns about the Inn by changing its name; on January 26, 1993, Proch- Wilson requested the Inn be notified of such a change. Although Sheraton claims its decision on February 2, 1993, to require the Inn to drop "Atlanta Airport" from its name was motivated by customer confusion regarding the preexisting "Sheraton Hotel Atlanta Airport" and has presented evidence that Proch-Wilson had no influence over the decision, Camp Creek has raised issues of material fact regarding Sheraton's intentions.

2. Playing Favorites

[9][10] Camp Creek maintains that Sheraton Reservations committed a number of breaches of both the express terms of the Reservation Agreement and the covenant of good faith and fair dealing implied in that contract. Camp Creek argues that it has presented evidence to show that Sheraton

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

139 F.3d 1396

Page 10

46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387

(Cite as: 139 F.3d 1396)

Reservations agents systematically favored the Gateway Hotel over the Inn when fielding customer calls. Although no provision of the Reservations Agreement specifically addresses this issue, it is clear that the conduct Camp Creek has alleged would deprive the Inn of the benefits of the contract (i.e. reservations) and therefore breach the covenant of good faith inherent in that agreement. Again, however, we affirm the district court's decision to grant summary judgment on this claim because Camp Creek has failed to provide any evidence or theory to connect any damages to this particular claim. Sheraton, on the other hand, has presented evidence to demonstrate that the number of reservations the Inn received through the Reservatron system actually increased in every year after the Gateway opened. As a result, Camp Creek's claim for a breach of the implied covenant must fail. [FN14]

> FN14. Once again, Camp Creek should be able to use its evidence of favoritism on remand to attempt to demonstrate Sheraton's alleged bad faith. Although Camp Creek's 289 test-calls do not constitute anything approaching a scientific survey, we note that, contrary to the district court's opinion, it does not violate the rule against hearsay. *See* Fed.R.Evid. 801(c) (defining hearsay as testimony offered for the truth of the matter asserted); Fed.R.Evid. 801(d)(2)(D) (excluding statements made by an authorized agent from the definition of hearsay).

### 3. Misuse of Confidential Information

[11] Next, we consider Camp Creek's claim that Sheraton Reservations improperly supplied confidential, competitively sensitive information about the Inn's reservations and pricing structure to the Gateway. The evidence shows that Tom Faust, manager of the Gateway, had access to such confidential information regarding the Inn, in breach of Sheraton's own procedures. Although Sheraton admits that Faust improperly used the information to propose the Inn's elimination from the Atlanta Airport market, Sheraton contends that Faust's proposal fell on deaf ears and that, as a result, Camp Creek can show neither prejudice nor damage from this breach of confidentiality. As Camp Creek has failed to contradict Sheraton with evidence of damages it suffered in connection with Faust's proposal, we affirm the district court's grant of summary judgment. Similarly, Camp Creek has failed to provide sufficient *1407 evidence of damages with respect to its allegation that the Gateway used this misappropriated information to restructure its own rates to compete against the Inn. Although Camp Creek points to a conclusory statement from one of its experts to the effect that the Gateway's use of the information damaged the Inn, *see* Berman Aff. at ¶ 31, no reasonable jury could distinguish, on the sole basis of

this evidence, between losses the Inn suffered because of the improper use of its confidential information and those due to the simple increase in intra-brand competition. *See Liberty Lobby, Inc.,* 477 U.S. at 249-50, 106 S.Ct. at 2511 (summary judgment appropriate when non-movant's evidence is "merely colorable"). Accordingly, we affirm the district court's grant of summary judgment in favor of Sheraton on this issue. [FN15]

> FN15. This is not to say that Camp Creek may not present its evidence on this issue at trial, as it is plainly probative on the issue of whether Sheraton acted in bad faith towards its franchisee.

### C. Billing Disputes (Count X-A)

[12] Next, we consider Camp Creek's claim that Sheraton Reservations breached the Reservations Agreement by over-billing the Inn in connection with reservations made by American Airlines' SABRE reservations system. The parties do not contest the error, nor do they dispute that Sheraton Reservations eventually corrected the problem once Camp Creek brought the matter to its attention. What remains in dispute, however, is whether the Inn received the full amount of credit to which it was entitled. Camp Creek presents deposition testimony of the Inn's general manager to the effect that Sheraton Reservations should have credited the Inn approximately $1,800 more than it received. *See* I Sunderji Dep. at 202-03. As material facts appear to be in dispute on this issue, Camp Creek has presented evidence sufficient to survive summary judgment.

[13] No issue of material fact, however, remains on Camp Creek's claim that its reservations service was interrupted for a period of time. Sheraton Reservations has presented evidence that it stopped making reservations for the Inn due to a computer software problem. Although Camp Creek denies this explanation, it has presented no alternative, actionable theory for the interruption. As the district court correctly noted, paragraph seven of the Reservations Agreement contains an express indemnity provision stating that neither Sheraton Reservations nor any of its parent or affiliated companies may be held liable for "THE INTERRUPTION OR MALFUNCTIONING OF THE SYSTEM, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY." This provision establishes that Camp Creek waived any and all claims to recover damages for an interruption in the Sheraton Reservations system. As Camp Creek has not rebutted Sheraton's argument with any evidence or theory that would permit recovery, we affirm the district court's grant of summary judgment on this issue. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356 (holding that once the movant makes a sufficient showing, the non-movant "must do more than simply show that there is some metaphysical doubt as

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

139 F.3d 1396
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Page 11

to the material facts.").

II. Tortious Interference with Contract and Business
Relations (Count III)

Camp Creek also claims that Sheraton tortiously interfered
with its contracts with guests and its business relations. The
parties agree that Georgia law governs Camp Creek's claims
for tortious interference. Camp Creek claims that the
defendants interfered with (1) Camp Creek's License
Agreement and Reservations Agreement; (2) the Inn's
contracts with its customers; and (3) the Inn's prospective
customer relationships.

Camp Creek's allegations of tortious interference with
contract and business relationships state two independent
but related claims. *See Renden, Inc. v. Liberty Real Estate
Ltd. Partnership III,* 213 Ga.App. 333, 444 S.E.2d 814, 817
(1994). The claims share the following key elements:
> (1) improper action or wrongful conduct by the defendant
> without privilege; (2) the defendant acted purposely and
> with malice with the intent to injure; (3) the defendant
> induced a breach of contractual obligations or caused a
> party or third-parties to discontinue or fail to enter into an
> anticipated *1408 business relationship with the plaintiff;
> and (4) the defendant's tortious conduct proximately
> caused damage to the plaintiff.
*Disaster Services Inc. v. ERC Partnership,* 228 Ga.App.
739, 492 S.E.2d 526 (1997); *see also Sweeney v. Athens
Reg'l Med. Ctr.,* 709 F.Supp. 1563, 1577-78 (M.D.Ga.1989)
(stating the elements of tortious interference with contract);
*Hayes v. Irwin,* 541 F.Supp. 397, 429 (N.D.Ga.1982)
(stating the elements of tortious interference with business
relationships).

A. The License and Reservations Agreements

[14][15] First, we address Camp Creek's claim that ITT
Sheraton and the Sheraton Savannah tortiously interfered
with the License Agreement and Reservations Agreement.
A review of Camp Creek's allegations and the evidence
reveals that only Sheraton Savannah's role as the owner of
the Gateway Hotel and its competition against the Inn can
support a claim for tortious interference with contract under
Georgia law. [FN16] We must decide, therefore, whether
Sheraton Savannah's competition in the Atlanta Airport
market constitutes a tort, independent of the parties'
contractual obligations.

> FN16. Camp Creek's evidence of misuse of
> confidential information, an improper change in the
> Inn's name, and favoritism in the Reservatron
> system implicates Sheraton Franchise, Sheraton
> Reservations, and ITT Sheraton. Sheraton
> Franchise and Sheraton Reservations, as parties to
> the License and Reservation Agreements, cannot

tortiously interfere with those contracts. *See
SunAmerica Fin. v. 260 Peachtree St.,* 202 Ga.App.
790, 415 S.E.2d 677, 684 (1992)(collecting cases).
Moreover, since we have already held that ITT
Sheraton was interested in these contracts and was
bound by duties implied thereunder, *see supra* note
4, we cannot now disassociate ITT Sheraton from
the agreements for purposes of the foregoing
analysis. ITT Sheraton, therefore, is not a stranger
to the contracts, and Georgia law precludes a
finding of tortious interference with the License
and Reservations Agreements. *Id.*

[16] At the outset, it is worth noting that simple competition
for guests between hotels ordinarily does not give rise to an
actionable tort claim. *See Hayes,* 541 F.Supp. at 430
(describing the competitive privilege). Camp Creek would
have no basis to complain, for example, if the Marriott
Corporation established a hotel in the Atlanta Airport area
and began competing with the Inn for customers. Camp
Creek argues that its franchise relationship with Sheraton
requires a different result in this case, citing *Hayes* for the
proposition that once two entities have agreed to pursue
business together they may not then tortiously interfere with
each other's pursuit of that business. *See also DeLong
Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d
1499, 1518-19 (11th Cir.1989) (privilege defense
unavailable where interference is achieved by violating a
confidential relationship). The *Hayes* court did indeed reject
the invocation of the competitive privilege in a case where
one of the principals in a two-person partnership contacted
his partner's clients in an attempt to discredit him and
deprive him of their business. *See Hayes,* 541 F.Supp. at
430-31. A franchise relationship, however, is
distinguishable from the partnership at issue in the *Hayes*
case. *See Capital Ford Truck Sales, Inc. v. Ford Motor Co.,*
819 F.Supp. 1555, 1579 (N.D.Ga.1992) (collecting cases
that find no fiduciary relationship between franchisor and
franchisee). The agreements establishing the franchise
relationship in this case make it very clear that Camp Creek
is only one of a vast number of hotels in the Sheraton
system and that Sheraton and Camp Creek are not engaged
in a partnership to pursue business in the Atlanta Airport
market. [FN17] Moreover, Camp Creek has failed to
provide any evidence of unique circumstances that might
support the proposition that the parties intended to create a
confidential or fiduciary relationship. [FN18] *See Allen v
Hub Cap Heaven, Inc.,* 225 Ga.App. 533, 484 S.E.2d 259,
264 (1997) (standard franchise relationship does not present
a fiduciary relationship); *Kienel v. Lanier,* 190 Ga.App. 201,
378 S.E.2d 359, 361 (1989) (no fiduciary relationship where
parties' agreement provided for the pursuit of separate
business objectives). Although we have held that a
reasonable jury could find *1409 that Sheraton's
competition against Camp Creek violated the contractual

139 F.3d 1396
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

obligations between the parties, we decline to convert such a claim into an independent claim for tort. We hold that Sheraton's choice to compete against the Inn was subject to the competitive privilege and was not "improper" or "wrongful" in the sense used in Georgia's cases on tortious interference with contract. We affirm the district court's grant of summary judgment on this issue.

> FN17. In fact, paragraph eight of the License Agreement expressly disclaims any such partnership.

> FN18. This conclusion also disposes of Camp Creek's claim for unfair competition under Georgia common law (Count V), which depends on the argument that Sheraton abused and exploited a confidential relationship between the parties.

B. Customer Contracts and Relationships

[17] Second, we consider Camp Creek's allegation that Sheraton interfered with the Inn's contracts and prospective business relationships with its customers. In support of this claim, Camp Creek offers testimony to the effect that almost 300 guests with reservations at the Inn actually stayed at the Gateway. Camp Creek claims that these guests boarded the wrong Sheraton shuttle van at the Atlanta Airport and, when they arrived at the wrong hotel, the Gateway knowingly misappropriated a large percentage of these guests by offering them rates below the Inn's reservation rates and below the Gateway's "walk in" rate.

[18][19] As noted above, Georgia law requires a plaintiff to offer evidence that the defendant acted improperly and that those acts induced a breach of contract or prompted a third party to discontinue or fail to enter an anticipated business relationship. [FN19] See McDaniel v. Green, 156 Ga.App. 549, 275 S.E.2d 124, 126-27 (1980) (requiring a causal connection between the improper act and the interrupted relationship). Although Camp Creek has presented evidence that Sheraton engaged in a host of improper actions, none of those actions relate to the misappropriation of these (or any other) customers with reservations. Indeed, given that these customers initially made reservations at the Inn, the evidence suggests that any omission of the Atlanta Airport designator from the Inn's name in Sheraton's national advertising and the Reservatron system, [FN20] any bias in the Reservatron system, and any misuse of the Inn's confidential information to restructure the Gateway's rates had no impact whatsoever. The evidence, construed in Camp Creek's favor, merely shows that the Gateway offered to meet or beat the Inn's rates when these guests arrived at their door. As Camp Creek has presented no evidence that suggests these guests canceled their reservations at the Inn because of the Gateway's alleged wrongful activity, we affirm the district court's grant of summary judgment on this issue.

> FN19 It is by no means clear that the reservations at issue constitute a contract under Georgia law. See Brown v. Hilton Hotels Corp., 133 Ga.App. 286, 211 S.E.2d 125, 127 (1974) (permitting a guest to sue for breach of contract when the hotel refused to honor a prepaid reservation). We need not reach the question in this case.

> FN20. Camp Creek admits that it never actually changed the appearance of its vans to comply with Sheraton's demand that it change the Inn's name. As a result, the only way Sheraton could have confused these 300 customers at the airport was by using its own name in connection with the Gateway.

[20][21] Camp Creek's remaining evidence of tortious interference supports only the general contention that Sheraton's improper conduct cost Camp Creek guests who might have otherwise stayed at the Inn. Although a plaintiff claiming tortious interference with prospective business relationships need not identify particular disrupted contracts to recover, Camp Creek has presented no evidence to distinguish between guests who chose not to stay at the Inn as a result of Sheraton's bad acts and those who simply rejected the Inn because the Gateway presented a more attractive (or simply an additional) choice. Camp Creek's failure to identify a causal connection between Sheraton's tortious activity and the interruption of any particular business relationship requires us to affirm the district court's grant of summary judgment. See Hayes. 541 F.Supp. at 429 ("plaintiff must demonstrate that absent the interference, those relations were reasonably likely to develop in fact."); McDaniel, 275 S.E.2d at 126-27.

III. The Massachusetts Unfair Trade Practices Act (Count IV)

[22][23] Next, we address Camp Creek's claim that the defendants violated the Massachusetts Unfair Trade Practices Act. See Mass. Gen. Laws ch. 93A (the "Massachusetts Act"). As the district court correctly observed, that statute applies only to cases in *1410 which "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth [of Massachusetts]." Id. § 11. Sheraton, as the party seeking to rely on this provision, bears the burden of establishing that its conduct falls outside the Massachusetts Act's reach. Id. [FN21]

> FN21. Camp Creek's suggestion that Sheraton should not be heard to complain about the application of the Massachusetts Act because it

139 F.3d 1396
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Page 13

requires its franchisees to sign agreements governed by Massachusetts law is also unpersuasive. *See e.g., Popkin v. National Benefit Life Ins. Co.,* 711 F.Supp. 1194, 1200 (S.D.N.Y.1989) (dismissing a contractual choice of law argument as irrelevant to this inquiry).

To determine whether the conduct in a particular case took place "primarily and substantially" within Massachusetts, the courts have examined: (1) where the defendant committed the deceptive or unfair acts; (2) where the plaintiff was deceived and acted upon the defendant's unfair acts; and (3) where the plaintiff suffered losses caused by the defendant's unfair acts. *See Play Time, Inc. v. LDDS Metromedia Communications Inc.,* 123 F.3d 23, 33 (1st Cir.1997). In the present case, the second and third prongs of the test favor Sheraton, because Camp Creek felt the "sting" of any deception in Atlanta, Georgia. *See Clinton Hosp. Ass'n v. Corson Group, Inc.,* 907 F.2d 1260, 1266 (1st Cir.1990) (applying *Bushkin Assoc., Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662 (1985)).

Camp Creek, therefore, relies on the first prong of the analysis and argues that the appellees acted in Massachusetts because Sheraton made all the plans and decisions at issue at its corporate headquarters in Boston. Camp Creek's argument, however, overlooks the fact that, although Sheraton's contemplation of these acts may have taken place in Massachusetts, the acts themselves took place outside the Commonwealth. [FN22] Moreover, the proposition that Camp Creek advances would require the application of the Massachusetts Act in every case involving a Massachusetts defendant, a proposition the courts have rejected. *See Clinton Hosp.,* 907 F.2d at 1266 (rejecting bright line rules); *Healthco Int'l, Inc. v. A-dec, Inc.,* No. 87-0235-S (D.Mass. Apr. 17, 1989) (reading *Bushkin* to reject the argument that the Massachusetts Act applies to every defendant resident in Massachusetts). We therefore affirm the district court's grant of summary judgment on this issue. [FN23]

> FN22. The acts Camp Creek cites include the name change (nationwide), misuse of confidential information (Atlanta), misleading advertisements (nationwide), and preferential treatment in the Reservation system (nationwide).

> FN23. Our application of this express limitation found in the Act renders unnecessary any determination of whether a Georgia court, applying Georgia principles of conflicts of law, would apply the Massachusetts Act at all. *See Klaxon Co v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) (holding that a federal court hearing a diversity case applies the

conflicts of law rules of the state in which it sits).

IV. Georgia Trade Secrets Act (Count X)

[24] Camp Creek also asserts that Sheraton misappropriated confidential information regarding the Inn in violation of the Georgia Trade Secrets Act ("GTSA"). *See* O.C.G.A. § 10-1-760 et seq. The record shows that Tom Faust, the manager of the Gateway Hotel, improperly came into possession of information concerning the Inn's occupancy levels, average daily rates, discounting policies, rate levels, long term contracts, marketing plans, and operating expenses. Camp Creek also presented evidence that Faust used this information to propose the Inn's ejection from the Sheraton system and that he may have used it to compete against the Inn for customers.

[25][26] To support a claim for misappropriation of trade secrets, Camp Creek must show that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret. *See generally, DeGiorgio v. Megabyte Int'l, Inc.,* 266 Ga. 539, 468 S.E.2d 367 (1996) (applying O.C.G.A. §§ 10-1-761, 763). Georgia defines trade secrets broadly to include non-technical and financial data that derives economic value from not being generally known and is the subject of reasonable efforts to maintain its secrecy. *Id.* § 10-1-761(4). [FN24] Whether a particular type of information *1411 constitutes a trade secret is a question of fact. *See Salsbury Lab. v. Merieux Lab.,* 908 F.2d 706, 712 (11th Cir.1990) (citing *Wilson v. Barton & Ludwig,* 163 Ga.App. 721, 296 S.E.2d 74, 78 (1982)). Our review of the record reveals that Camp Creek has provided evidence upon which a reasonable jury could find that the information in this case meets Georgia's statutory definition of a trade secret.

> FN24. The Georgia Trade Secrets Act provides in pertinent part:
> "Trade secret" means information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
> O.C.G.A. § 10-1-761(4). We note that although the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

139 F.3d 1396                                                           Page 14
46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387
(Cite as: 139 F.3d 1396)

Georgia State Legislature amended this provision in July 1996, the amended language plays no part in our decision. *Compare AmeriGas Propane L.P. v. T-Bo Propane, Inc.,* 972 F.Supp. 685, 697-98 (S.D.Ga.1997) (discussing the amendment and its intended effect).

First, Camp Creek has presented expert testimony suggesting that this information is closely guarded in the hotel industry, that a competitor could not easily derive the information through other means, and that a competitor could make use of such information to the detriment of the owner. *See* Berman Aff. ¶ 29. This evidence shows that the information is valuable and not of the type any intelligent competitor could have compiled by legitimate alternative means.

[27] Second, although Camp Creek did provide the information to Sheraton, it provided that information pursuant to the Reservation Agreement and on the apparently mutual understanding that it would be kept confidential. *See* Sunderji Aff. Exh. C (Sheraton representative's letter noting that information would be "kept in strict confidentiality"). [FN25] To the extent Camp Creek disclosed this type of information elsewhere, it did so on the express condition that it would not be made public except as part of aggregate industry statistics, untraceable to the individual Inn. Whether Camp Creek's efforts to keep the information secret in this case were "reasonable under the circumstances" presents a question for the trier of fact. *Cf. Avnet, Inc. v. Wyle Lab. Inc.,* 263 Ga. 615, 437 S.E.2d 302, 303-04 (1993) (comparing and analyzing different measures taken to secure secrecy of confidential information).

> FN25. We are cognizant of the fact that not all confidential information rises to the level of a trade secret. *See TDS Healthcare Sys. Corp. v. Humana Hosp. Ill., Inc.,* 880 F.Supp. 1572, 1584 (N.D.Ga.1995). Nevertheless, Camp Creek's evidence on this point is more than sufficient to survive Sheraton's motion for summary judgment.

Camp Creek's evidence would also support a finding that Sheraton misappropriated the information from Camp Creek. [FN26] A defendant misappropriates a trade secret by knowingly acquiring it through improper means. *See* O.C.G.A. § 10-1-761(2). The GTSA provides that:

> FN26. The GTSA provides the following definition of misappropriation in pertinent part:
> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person

who:
> ...
> (ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
> ....
> (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;....
> O.C.G.A. § 10-1-761(2).

"Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship *or other duty to maintain secrecy or limit use* .... *Id.* § 10-1-761(1) (emphasis added). Although we have already held that Camp Creek has failed to show that a confidential relationship existed between the parties, the evidence shows that Camp Creek provided the data in question to Sheraton Reservations **\*1412** with the understanding that its use would be limited and that it would be kept confidential. Sheraton contends that it came into possession of the information by legitimate means, either compiling the data itself or receiving it pursuant to the Reservations Agreement. Although this may accurately describe Sheraton Reservations' initial receipt of the information, Sheraton has all but admitted that the Gateway's possession and use of the data, as one of Camp Creek's competitors, was improper and in violation of Sheraton's own policies. *See e.g.,* III Johnson Dep. at 380 (discussing procedures); I Faust Dep. at 220-25 (discussing the Gateway's acquisition and use of the Inn's confidential information). As the GTSA includes the diversion of information acquired under legitimate circumstances within its definition of misappropriation, *see* O.C.G.A. §§ 10-1-761(1), 10-1-761(2)(B)(ii)(II) & (III), Camp Creek has presented evidence which would allow a reasonable jury to find in its favor on this claim.

Although Camp Creek has presented evidence that the defendants made some competitive use of the information, Sheraton maintains that Camp Creek has failed to provide evidence of damages on its trade secret claim. As we have already noted, Camp Creek's generalized evidence on damages does not isolate losses directly attributable to any particular misuse of confidential information. *See supra* Part I(B)(3). Nevertheless, the GTSA expressly provides for the award of a reasonable royalty in the event that the plaintiff cannot prove damages or unjust enrichment by a preponderance of the evidence. *See* O.C.G.A. § 10-1-763(a). Moreover, the district court may determine that injunctive relief is appropriate to the extent that the Gateway continues to make use of Camp Creek's confidential information to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1031 (1985) (quoting *Restatement of Restitution* § 1 (1937)); *Regional Pacesetters, Inc. v. Halpern Enter., Inc.*, 165 Ga.App. 777, 300 S.E.2d 180, 184-5 (1983). Camp Creek asserts that the facts in this case support its argument that the Gateway unjustly enriched itself by competing with the Inn for business in the Atlanta Airport market. As previously discussed, Camp Creek may recover damages from the defendants to the extent that a jury determines that the Gateway's competition constitutes a breach of the defendants' implied contractual duties. Recovery on a theory of unjust enrichment, however, is only available "when as a matter of fact there is no legal contract." *See Regional Pacesetters*, 165 Ga.App. 777, 300 S.E.2d 180, 185 (1983). As a result, the district court properly granted summary judgment to the defendants.

### 2. Injunctive Relief (Count VIII)

[34] The district court seems to have misconceived Camp Creek's claim for an injunction pursuant to Georgia law, *see* O.C.G.A. § 9-5-1, as a demand for a preliminary injunction. Consequently, regardless of whether the district court's observation that Fed.R.Civ.P. 65 precludes Camp Creek's application for an injunction under state law is correct, [FN29] the district court erred by applying the standards governing temporary injunctions. In view of the fact that Camp Creek's petition is for a permanent injunction, to be decided at the conclusion of a trial on the merits, the district court's reliance on plaintiff's likelihood of success on the merits is misplaced. We therefore reverse the district court's grant of summary judgment in Sheraton's favor on this issue.

FN29. We note that the district court's conclusion in this regard is unsupported by citation, but we decline to address the matter further.

**\*1414** 3. Attorney's Fees, Punitive Damages, and Discovery Matters
(Count XI)

The district court's resolution of Camp Creek's claims for attorneys' fees, punitive damages, and its motion to compel discovery depend, at least to some degree, on the conclusion that Sheraton was entitled to summary judgment on all of Camp Creek's substantive claims. Our determination that Camp Creek has set forth evidence sufficient to present to a jury on its contract and GTSA claims requires us to vacate the district court's denial of these prayers for relief and remand for reconsideration of Count XI in light of our opinion.

### CONCLUSION

As we noted at the outset of this opinion, Camp Creek's long and interwoven claims for relief reduce to the basic proposition that Sheraton violated a variety of duties it owed to its franchisee. Upon careful consideration of the arguments, we reverse the district court's order granting summary judgment in Sheraton's favor with respect to Camp Creek's claims for: (1) breach of the implied covenant of good faith and fair dealing under Massachusetts law in connection with Sheraton's establishment and operation of the Gateway Hotel; (2) reimbursement from Sheraton in connection with the American Airlines SABRE reservation system billing error; (3) violation of the GTSA; (4) injunctive relief; and (5) attorneys' fees and punitive damages (Counts I, X-A, X, VIII & XI). We also vacate the district court's denial of Camp Creek's motions to compel discovery. We affirm the district court's decision with regard to Camp Creek's claims for: (1) breach of the implied covenant of good faith and fair dealing in connection with Sheraton's individual bad acts; (2) damages caused by the interruption of service from Sheraton's Reservation system; (3) tortious interference with contracts and business relationships; (4) violation of the Massachusetts Unfair Trade Practices Act; (5) Unfair Competition; (6) the Lanham Act; (7) the Georgia Unfair Trade Practices Act; and (8) Unjust Enrichment (Counts II, X-A, III, IV, V, VI, VII & IX). Accordingly, we AFFIRM in part, REVERSE in part, and REMAND this case to the district court for further proceedings consistent with this opinion.

139 F.3d 1396, 46 U.S.P.Q.2d 1677, 11 Fla. L. Weekly Fed. C 1387

Briefs and Other Related Documents (Back to top)

• 1996 WL 33423530 (Appellate Brief) Reply Brief of Appellant Camp Creek Hospitality Inns, Inc. d/b/a Sheraton Inn Atlanta Airport (Jan. 26, 1996)

• 1996 WL 33423529 (Appellate Brief) Brief of Appellees (Jan. 10, 1996)

• 1995 WL 17019936 (Appellate Brief) Brief of Appellant Camp Creek Hospitality Inns, Inc. d/b/a Sheraton Inn Atlanta Airport (Nov. 28, 1995)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

## 21

(To be scanned in place of tab)



743 F.2d 1508
224 U.S.P.Q. 552
(Cite as: 743 F.2d 1508)

Page 1

United States Court of Appeals,
Eleventh Circuit.

CONAGRA, INC., a corporation, Plaintiff-Appellant,
v.
Robert C. SINGLETON, an individual, d/b/a SINGLETON
SHRIMP BOATS, Singleton
Shrimp Boats, Inc., a corporation, Defendants-Appellees.

No. 83-3037.

Oct. 11, 1984.

Successor in interest in shrimp processing business brought action against predecessor's son alleging trademark infringement based on son's use of family name in business that was unrelated but similar to business father had established and which also used family name. The United States District Court for the Middle District of Florida, William J. Castagna, J., granted successor partial relief and fashioned injunction prohibiting son from using labels that were copies from product labels belonging to plaintiff, and plaintiff appealed. The Court of Appeals, R. Lanier Anderson, III, Circuit Judge, held that: (1) family surname had acquired secondary meaning as designation of father's shrimp processing business, and therefore, successor acquired trademark in name which it could assert against alleged infringing use; (2) likelihood of confusion existed between plaintiff and defendant's marks; (3) father did not abandon mark; and (4) doctrine of laches was not available to son in connection with the sale of processed shrimp.

Reversed and remanded with instructions.

West Headnotes

[1] Trade Regulation ⟜870(2)
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In order to merit injunctive relief under section of Lanham Act prohibiting false designation of origin, plaintiff must show that it has trademark rights in mark or name at issue and that defendant adopted mark or name that was same, or confusingly similar to plaintiff's mark, such that there was likelihood of confusion for consumers as to proper origin of goods created by defendant's use of name in his trade. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

[2] Trade Regulation ⟜870(2)
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Use of another's unregistered, that is, common-law

trademark can constitute violation of section of Lanham Act prohibiting false designation or origin where alleged unregistered trademarks used by plaintiff are so associated with its goods that use of same or similar marks by another company constitutes false representation that its goods came from same source. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

[3] Trade Regulation ⟜34
382k34 Most Cited Cases

Where alleged trademark was surname, trademark laws protected plaintiff's right to exclusive use of name only to extent that name had acquired secondary meaning. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

[4] Trade Regulation ⟜10
382k10 Most Cited Cases

Factors to consider in determining whether surname has acquired secondary meaning entitling it to trademark protection are: length and manner of its use; nature and extent of advertising and promotion; efforts made by plaintiff to promote conscious connection in public's mind between name and plaintiff's product or business; and extent to which public actually identifies name with plaintiff's product or venture.

[5] Trade Regulation ⟜587
382k587 Most Cited Cases

Secondary meaning of surname and its clear identification with shrimp packing business was established, where surname on virtually all of its seafood products for over 25 years, had expended over $400,000 annually in worldwide markets in its promotion of name, promotional efforts were consciously directed at establishing surname trademark in its relationship to business, and prior to acquisition of business by current owner, market surveys revealed that surname was strongly identified with products of business; thus, when current owner acquired business, it acquired trademark rights in name which it could assert against allegedly infringing users.

[6] Trade Regulation ⟜870(2)
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Likelihood of confusion for purposes of section of Lanham Act prohibiting false destination of origin is determined by analysis of number of factors, including strength of plaintiff's mark; similarity between plaintiff's mark and allegedly infringing mark; similarity between products and services offered by plaintiff and defendant; similarity of advertising methods, defendant's intent, and proof of actual

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

743 F.2d 1508
224 U.S.P.Q. 552
(Cite as: 743 F.2d 1508)

Page 2

confusion. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[7] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Defendant adopted business name confusingly similar to plaintiff's trademark, where most distinctive aspect of defendant's business name was his surname, which was identical to plaintiff's mark, and customers and people in seafood trade actually confused defendant's business with that of plaintiff. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[8] Trade Regulation ☞73**
382k73 Most Cited Cases

Acquiescence in use of trade name is analogous to implied license to use name which generally can be revoked at will of licensor.

**[9] Equity ☞67**
150k67 Most Cited Cases

**[9] Equity ☞84**
150k84 Most Cited Cases

Laches is equitable doctrine committed to sound discretion of district court and it depends on careful balancing of several factors.

**[10] Trade Regulation ☞585**
382k585 Most Cited Cases

Defense of abandonment of trademark is one requiring strict proof.

**[11] Trade Regulation ☞73**
382k73 Most Cited Cases

Permitted infringement on mark holder's exclusive rights for some period of time does not constitute nonuse of marks sufficient to support abandonment of trademark.

**[12] Trade Regulation ☞73**
382k73 Most Cited Cases

Where trademark holder's predecessor in interest evidenced no intent to abandon mark, but rather, used mark continuously and widely for 25 years preceding litigation, trademark was not abandoned even though trademark was family name and predecessor in interest had allowed his son's use of family name in unrelated but similar business.

**[13] Equity ☞72(1)**
150k72(1) Most Cited Cases

Laches defense requires proof of three elements: delay in asserting right or claims; that delay was not excusable; and that delay caused defendant undue prejudice.

**[14] Trade Regulation ☞385.1**
382k385.1 Most Cited Cases
(Formerly 382k385)

Court determining whether doctrine of laches estops plaintiff from asserting its rights to trademark must consider public's interest in trademark as definite designation of single source of goods.

**[15] Trade Regulation ☞386**
382k386 Most Cited Cases

Laches defense was not available in trademark infringement action based on son's use of family name in sale of processed shrimp, where father had established similar business, family name was trademark of father's business, and father did not become aware of son's direct competition in processed shrimp market until after lawsuit began.
**\*1510** Thomas T. Steele, Tampa, Fla., for plaintiff-appellant.

Jeffrey L. Myers, Largo, Fla., for defendants-appellees.

Appeal from the United States District Court for the Middle District of Florida.

Before HILL and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

R. LANIER ANDERSON, III, Circuit Judge:

This case presents a somewhat unique issue regarding a son's right to use a family name in a business that is unrelated, but similar to the business his father had established. Conagra, Inc. appeals from the district court's ruling on its claim to enjoin the defendants, Singleton Shrimp Boats, Inc. and Robert C. Singleton, [FN1] from using the Singleton name in the shrimp trade. Conagra, as a successor in interest to the trademark rights of Singleton Packing Corporation, brought the instant action under § 43(a) of the Lanham Act (15 U.S.C. § 1125), Florida's common law of unfair competition and Fla.Stat. § 495.151, which prohibits unfair competition and dilution of an established trade name. The district court granted Conagra partial relief and fashioned an injunction prohibiting the defendants from using labels that were copied from the product labels belonging to Singleton Packing. On this appeal, we consider whether the court's remedy was adequate protection for Conagra's trademark rights in light of the evidence adduced at trial.

FN1. We will hereinafter primarily refer to the individual defendant, Robert C. Singleton, in discussing the actions of or positions asserted collectively by both defendants.

## I. FACTS

Henry C. Singleton, Sr. began selling shrimp over 25 years ago in Tampa, Florida. The business was incorporated as Singleton Packing Corp., which through the years has engaged in procuring, packing, and processing shrimp. Although Singleton Packing sells some unprocessed and unlabeled products to a variety of customers, its primary product line consists of processed seafood products, which it markets either directly to large food service customers or through independent food brokers around the world. In the years preceding this litigation, Singleton Packing achieved annual sales of over $100,000,000 and was spending $400,000 a year on advertising and promotion. It ranks as the largest packer-processor of shrimp in the *1511 United States. With the exception of its sales of fresh or unprocessed shrimp, all of Singleton Packing's products are distributed with labels prominently displaying the Singleton name.

Conagra, through a subsidiary corporation, acquired the operating assets and business of Singleton Packing from Henry C. Singleton on January 9, 1981. Under the purchase contract, Singleton transferred to Conagra all rights, title, and interest in and to any trademarks, trade names, and good will associated with Singleton Packing.

Singleton Shrimp Boats is a Florida corporation, organized in 1978 with its principal place of business in Pinellas County, Florida, across the Bay from Singleton Packing's headquarters in Tampa. Robert C. Singleton, the individual defendant, is a founder, chief executive, and principal owner of Singleton Shrimp Boats. Robert C. Singleton is also the son of Henry C. Singleton, the founder of Singleton Packing and Conagra's predecessor in interest in that corporation. Singleton Shrimp Boats is engaged in the wholesale and retail marketing of fresh and processed shrimp products in Florida. At the time this litigation began, Singleton Shrimp Boats had annual sales in the area of $2,000,000 a year.

Conagra filed the instant lawsuit in June of 1981, after it had failed to negotiate a settlement regarding the defendant's continued use of the Singleton name. Conagra claimed that the Singleton name, although not registered as a trademark, had acquired secondary meaning among consumers of seafood products, and thus was entitled to protection under the trademark laws. Because the defendants were subsequent users of the name, Conagra sought to prohibit the defendant's prominent display of the name in connection with Singleton Shrimp Boats' business.

Robert C. Singleton defended primarily on the grounds that Henry C. Singleton and Singleton Packing had acquiesced in his use of the Singleton name in connection with his business. He argued to the district court that he had been selling fresh shrimp and shrimp products since 1972, first from a retail outlet under the name Singleton Seafood Center, and later through the defendant corporation. As further proof of acquiescence, Robert C. Singleton argued that his father knew of his activities in the shrimp business and, rather than objecting to his use of the Singleton name, had encouraged the son's business by selling shrimp to Singleton Shrimp Boats under a steadily increasing line of credit.

The district court held that the defendant could continue to use the Singleton name in the shrimp trade. The court first found that the name had not acquired secondary meaning to consumers. Alternatively, it found that Singleton Packing Company had acquiesced in Robert C. Singleton's use of the name in the shrimp trade. Finally, with respect to the labels which Robert C. Singleton admitted copying from Singleton Packing, the district court found that the defendant's use of the copied labels created a likelihood of confusion, and the court enjoined the defendant from using those labels on the processed shrimp products of Singleton Shrimp Boats.

## II. INTRODUCTION

The defendant has not cross-appealed the district court's judgment enjoining use of the copied labels. Thus, we consider only Conagra's claim that the district court's refusal to enjoin the defendant's use of the Singleton name failed to adequately protect Conagra's right to exclusive use of that name in the shrimp trade. Conagra argues that the district court's findings--(1) that the Singleton name had not acquired secondary meaning, and (2) that Singleton Packing had acquiesced in the defendant's use of the name--were clearly erroneous.

We first evaluate the secondary meaning issue and determine that the district court's finding on this issue was contrary to the strong evidence in the record. We further conclude that Conagra established facts that entitled it to greater protection for its exclusive use of the Singleton name than was afforded by the district court's order.

*1512 We next consider the affirmative defense of acquiescence. Because the district court did not specify findings relating to either of the two doctrines argued by the defendant, abandonment or laches leading to equitable estoppel, we look at those doctrines. We conclude that the defendant presented insufficient evidence to carry the burden on the abandonment issue. We also conclude that the laches defense cannot support the defendant's continued use of the Singleton name in connection with the sale of processed shrimp. However, the defendant may have

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

743 F.2d 1508
224 U.S.P.Q. 552
(Cite as: 743 F.2d 1508)

Page 4

established a laches defense with regard to his use of the Singleton name in connection with the sales of fresh shrimp, and therefore we remand to the district court for further proceedings on this aspect of the laches defense. Accordingly, we leave it to the district court to fashion an appropriate remedy, consistent with its finding on the laches issue, and affording greater protection to Conagra's trademark rights in the Singleton name than was granted in the court's previous order.

## III. DISCUSSION

A. *Conagra Has An Interest in the Singleton Name that Entitles it to Protection Under the Trademark Laws*

[1] Our cases have established two elements that Conagra had to prove to merit injunctive relief under § 43(a) of the Lanham Act: [FN2] (1) that it has trademark rights in the mark or name at issue—*i.e.*, Singleton, *see, e.g., Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir.1984); and (2) that the defendant adopted a mark or name that was the same, or confusingly similar to the plaintiff's mark, such that there was a likelihood of confusion for consumers as to the proper origin of the goods created by the defendant's use of the Singleton name in his trade. *See, e.g., id.* at 1547; *Jellibeans, Inc. v. Georgia Skating Clubs, Inc.*, 716 F.2d at 839-46; *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 981 (11th Cir.1983). [FN3]

FN2. Section 43(a) provides in pertinent part: Any person who shall fix, apply, or annex, to any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols intending to falsely describe or represent the same ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin ... or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
15 U.S.C. § 1125(a). In essence, Conagra's claim in this litigation is that the defendant's use of the Singleton name in the shrimp business is a false designation of the origin of the defendant's goods because consumers would be led to believe either that the defendant's products were produced by Singleton Packing, or that Singleton Shrimp Boats and Singleton Packing were somehow affiliated. As such, Conagra states a claim similar to those previously recognized as falling within the scope of § 43(a). *See, e.g., Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833 (11th Cir.1983); *cf. Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1163 (11th Cir.1982)

(discussing standards for recovery under § 32(1)(a) of the Lanham Act, a provision closely analogous to § 43(a)). For purposes of this opinion, we draw no distinction between the cases relying upon § 43(a), which applies to unregistered but protectable marks, and § 32(a), which applies to registered marks. *See Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d at 839 n. 14.

FN3. Because of the similarity between Conagra's claim under the Lanham Act and its state common law and statutory claims, *see Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir.1982); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), and because we find for Conagra on its Lanham Act claim, we do not address the state law claims separately.

*1. Conagra's Right to the Singleton Name*

[2][3] With respect to the first element, Conagra's right to the exclusive use of the Singleton name in the shrimp trade, there is no dispute that Conagra purchased the full trademark rights to the name that belonged to Henry C. Singleton and Singleton Packing, whatever those rights might be. Although the Singleton name was not registered, the use of another's unregistered, *i.e.*, common law, trademark "can constitute a violation of [§ 43(a) ] where ... 'the alleged unregistered trademarks used by **1513** the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a [false] representation that its goods came from the same source.' " *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.1975) [FN4] (quoting *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 147 (2d Cir.1956)), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Because Singleton is a surname, the trademark laws protect Singleton Packing's (and thus Conagra's) right to exclusive use of the name only to the extent that the name has acquired "secondary meaning." *See Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981) (the trademark laws require proof of secondary meaning when the trademark is not sufficiently distinctive to identify the product as tied to a specific producer, as in the case of a family surname; in such cases the courts require a showing that the public identifies the name with the producer as the source of the product). [FN5] The district court's ruling, that the Singleton name had not acquired secondary meaning, is a finding of fact that we evaluate under the clearly erroneous standard. *See Brooks Shoe Mfg., Inc. v. Suave Shoe Corp.*, 716 F.2d 854, 860 (11th Cir.1983); Fed.R.Civ.P. 52.

743 F.2d 1508
224 U.S.P.Q. 552
(Cite as: 743 F.2d 1508)

Page 5

FN4. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

FN5. As noted in *Original Appalachian Art Works, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 831 n. 14 (11th Cir.1982), *Chevron Chemical* is not binding authority in this circuit because it was decided by a Unit A panel of the former Fifth Circuit after October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc); *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982). Nevertheless, *Chevron Chemical* is persuasive authority because it relies directly on former Fifth Circuit cases which are binding precedent on this court.

[4] The factors to consider in determining whether a name such as Singleton has acquired secondary meaning are: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product or venture. *See Brooks Shoe Mfg., Inc. v. Suave Shoe Corp.*, 716 F.2d at 860; *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 477-78 (5th Cir.1974).

[5] In the instant case, the secondary meaning of the Singleton name and its clear identification with Singleton Packing was hardly in dispute. [FN6] The first three factors supporting a finding of secondary meaning were clearly set forth in the record. Singleton Packing has prominently displayed the Singleton name on virtually all of its seafood products for over 25 years. It expended over $400,000 annually in worldwide markets in its promotion of the name. According to the current president of Singleton Packing, the promotional efforts were consciously directed at establishing the Singleton mark and its relationship to Singleton Packing's business. As an example, Conagra introduced a promotional film, which tied the Singleton name to the group of seafood products that Singleton Packing marketed. The film, which emphasized the extensive efforts at quality control developed by Singleton Packing, had been widely displayed to brokers and retailers in the seafood business for over three years preceding the instant litigation.

FN6. Indeed, in his opening remarks to the court below, counsel for the defendant stated that "the name Singleton did, in fact, obtain a secondary meaning." Trial Transcript at 21. We note this

statement not as a binding concession by the defendants, *cf. Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 n. 9 (5th Cir.1980), but rather to emphasize that defense counsel correctly perceived the strength of the plaintiff's proof on this issue.

Finally, on the fourth and most telling factor, there was ample evidence that Singleton Packing had achieved the recognition for the Singleton name that it had sought. A representative of Conagra testified *1514 that prior to the acquisition of Singleton Packing, market surveys revealed that the Singleton name was strongly identified with products of Singleton Packing. An independent broker testified that he merely had to mention the Singleton name and customers knew that he was speaking of Singleton Packing. Henry C. Singleton testified that the Singleton name had achieved wide recognition in the industry by 1970. Even the individual defendant, Robert C. Singleton, referred to Singleton Packing as "Singleton" and testified that the name was recognized in the industry as referring to his father's company.

By this uncontradicted evidence at trial, it is clear that the Singleton name had acquired secondary meaning as the designation of the business of Singleton Packing. The district court was clearly erroneous in finding to the contrary. Thus, when Conagra acquired Singleton Packing, it acquired trademark rights in the Singleton name, which it could assert against allegedly infringing users.

2. *Likelihood of Confusion*

We now turn to a consideration of the defendant's use of the name to determine whether it caused a likelihood of confusion, such that Conagra was entitled to enjoin the defendant's continued use of the name in connection with the shrimp trade. The district court, because of its findings on the secondary meaning issue, did not have occasion to consider the likelihood of confusion question in the context of the defendant's general use of the name. [FN7] Because likelihood of confusion is a fact question, *see Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d at 840 & n. 16, we ordinarily would remand for findings on this issue. In the instant case, however, the plaintiff's proof on this issue was so strong that any finding other than one of likely confusion would be clearly erroneous. Therefore, we decide the issue.

FN7. The district court did find a likelihood of confusion in the limited area of the defendant's use of the copied labels.

[6] Likelihood of confusion for purposes of § 43(a) of the Lanham Act is determined by analysis of a number of factors, including: (1) the strength of the plaintiff's mark; (2)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods, *i.e.*, retail outlets or customers; (5) the similarity of advertising methods; (6) the defendant's intent, *e.g.*, does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) the most persuasive factor on likely confusion is proof of actual confusion. *See, e.g., Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d at 739-46. We find that the similarity between the Singleton mark and the defendant's business name, Singleton Shrimp Boats, and, most persuasively, the proof that Conagra offered on actual confusion compelled a fact finding of likely confusion. [FN8]

> FN8. The remaining factors, although not as overwhelmingly established in the record, do not undermine our conclusion that a finding of likely confusion was compelled, and we do not address these factors separately.

a. *Similarity of the Marks*

[7] The distinctive aspect of the defendant's business name, Singleton Shrimp Boats, is the name Singleton, which of course is identical to the plaintiff's mark. *See, e.g., Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165-66 (11th Cir.1982) (the business name "Safeway Discount Center" or "Drugs" was found to infringe the trade name "Safeway; " the words "Discount Center" or "Discount Drugs" were found to be merely descriptive). The Singleton name is set out, apart from the words "Shrimp Boats," on all of the defendant's trucks, signs, media advertising, and business cards. We have no trouble concluding that the defendant has adopted a business name confusingly similar to the plaintiff's mark. *Cf.* *1515Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d at 841-42 (trade names "Jellibeans" and "Lollipops" were found to be confusingly similar); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975-76 (11th Cir.1983) (upholding lower court's finding that names "Memory Stub" and "Entry Stub" were found to be confusingly similar). [FN9]

> FN9. With regard to the defendant's adoption of a nondescriptive name, such as Singleton, we note that the defendant's action generally would support a finding of intent to trade on the reputation of the plaintiff's business. *See, e.g., Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288 (S.D.N.Y.1972). In the instant case, however, Robert C. Singleton was using his own name in the shrimp trade. In such a case, the courts are less likely to find intentional infringement. An individual generally

will be given some opportunity to use his own name and establish a reputation for that name, even in the face of a prior user's trademark rights in the name, so long as the person using the name distinguishes his business and use of the name from the business owning the trademark rights. *See, e.g., Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 735-36 (2d Cir.1978). It appears from the record that Robert C. Singleton did make some attempt to disassociate Singleton Shrimp Boats from his father's business and develop a reputation in the shrimp trade independent from Singleton Packing. Thus, although some facts in the case point to an intent on the part of Singleton Shrimp Boats to ride on the coattails of Singleton Packing, *i.e.*, copying the Singleton Packing labels, the evidence was not alone so strong that the district court would have been compelled to find that the defendant intended to infringe on the Singleton mark. Contrary to Conagra's assertion on appeal, the evidence on intent was not strong enough, *by itself*, to compel a finding of likely confusion. However, even without proof of intent, the evidence on the similarity of the marks and the proof of actual confusion was strong enough to compel such a finding.

b. *Actual Confusion*

The most persuasive proof of likely confusion in the instant case was Conagra's proof of actual confusion. *See Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d at 1166-67. In response to interrogatories propounded by Conagra, the defendant reported numerous instances where people, sometimes customers, assumed that defendant's business was affiliated with, or actually was, Singleton Packing. [FN10] In addition, Conagra introduced evidence that it received inquiries from its distributors about competing direct sales of Singleton products to restaurants and retailers; Singleton Packing made no such direct sales, but Singleton Shrimp Boats did. In short, Conagra established that customers and people in the seafood trade actually confused the defendant's business with that of the plaintiff.

> FN10. Singleton Shrimp Boats received calls from customers complaining about shrimp purchased from a grocery chain that sold the products of Singleton Packing, not Singleton Shrimp Boats. Suppliers would often call Singleton Shrimp Boats attempting to sell them products under the assumption that Singleton Shrimp Boats was in fact Singleton Packing. Prospective employees had contacted Singleton Shrimp Boats in response to "help wanted" ads placed by Singleton Packing

743 F.2d 1508
224 U.S.P.Q. 552
**(Cite as: 743 F.2d 1508)**

Page 7

Corporation. Customers had made comments to the *defendant* that "Conagra had bought out" the defendant's business, when in fact Conagra purchased Singleton Packing. Finally, the defendant had received invoices billing him for purchases that had been made by Singleton Packing.

Conagra's proof of actual confusion resulting from the defendant's use of a confusingly similar mark was such strong evidence of likely confusion that the district court could not have reasonably found otherwise. Conagra thus established in the lower court that it had a trademark right to the Singleton name, which preceded the defendant's use of that name, and that the defendant's use of the name led to a likelihood of confusion. Absent any justification for the defendant's infringing use by way of some affirmative defense, Conagra was entitled to protection under § 43(a) of the Lanham Act against the defendant's infringing use. [FN11]

> FN11. This is not to say that Robert C. Singleton must be totally foreclosed from use of his proper surname in the shrimp business. Thus far we have considered only the defendant's actual use of that name, *i.e.*, the prominent display of the Singleton name accompanied only by the descriptive words "Shrimp Boats." We have found this use to be infringing. However, as we have noted, *see supra* note 9, the courts have been reluctant to absolutely prohibit an individual from using his proper name in connection with a business. The important *consideration in this context is whether the defendant can use the name in a fashion that will not lead to likely confusion with the plaintiff's business,* for which the plaintiff has exclusive right to use the Singleton trade name. We do not decide whether the defendant's use of his *full* name, Robert C. Singleton, or use of the Singleton name with some disclaimer disavowing any affiliation with *Singleton Packing, would lead to likely* confusion. The district court is free to consider this issue on remand.

***1516** B. *Acquiescence*

The defendant raises the affirmative defense of acquiescence. The district court, as an alternative to its finding of no secondary meaning, found that Conagra's predecessors in interest to the name, Henry C. Singleton and Singleton Packing, had authorized the *defendant's use of the* name in the shrimp trade and that this authorization precluded Conagra from terminating that use. Conagra does not deny that Henry C. Singleton was aware of and did not object to his son's shrimp businesses using the Singleton

name. Conagra further concedes that Singleton Packing was a significant supplier of fresh shrimp to Robert C. Singleton's various businesses. Conagra, however, argues that these facts did not support a ruling that Singleton Packing is now unable to prevent the defendant's continued use of the Singleton trademark.

[8][9] A finding of acquiescence, as such, in the defendant's use of the name, was not sufficient to foreclose Conagra's rights to terminate that use. Acquiescence alone is analogous to an implied license to use the name. *Cf. Menendez v. Holt,* 128 U.S. 514, 524, 9 S.Ct. 143, 145, 32 L.Ed. 526 (1888) ( "where consent by the owner to use of his trademark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.' "). An implied license is generally terminable at the will of the licensor. *Id. See also, University of Pittsburgh v. Champion Products, Inc.,* 686 F.2d 1040, 1045 (3d Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *PGA v. Bankers' Life & Casualty Co.,* 514 F.2d 665, 670 (5th Cir.1975) (once licensee's right to use the mark is terminated, any subsequent use constitutes infringement). To continue in its use of the Singleton name subsequent to the mark holder's desire to terminate that use, the defendant bore the burden of establishing one of the affirmative defenses of either *abandonment or laches leading to equitable estoppel.* See 3 R. Callman, *The Law of Unfair Competition, Trademarks and Monopolies* § 79.1 (1982). We examine each of these doctrines *seriatim.* [FN12]

> FN12. As we have noted, *the district court made no* specific findings on either abandonment or laches, although it did grant relief on the defendant's acquiescence claim. We assume *arguendo* that abandonment is a fact issue, and we analyze the record to determine whether a finding of abandonment would be clearly erroneous. Laches is an equitable doctrine committed to the sound discretion of the district court and it depends on the careful balancing of several factors. *Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 477-79 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). *We thus consider the laches defense by analyzing the underlying factors under the clearly erroneous standard, and assuming arguendo that the lower court exercised its discretion in affording the defendant relief on this claim.*

1. *Abandonment*

[10][11][12] The defense of abandonment is one for which we require strict proof. *See Citibank, N.A. v. Citibanc*

743 F.2d 1508
224 U.S.P.Q. 552
(Cite as: 743 F.2d 1508)

*Group, Inc.,* 724 F.2d at 1545. Under this doctrine:
    Defendants must show that the plaintiff actually
    abandoned the use of the mark, and, also, that the plaintiff
    intended to abandon the mark.

*Id.; see also Saxlehner v. Eisner & Mendelson Co.,* 179 U.S.
19, 31, 21 S.Ct. 7, 11, 45 L.Ed. 60 (1900). Permitted
infringement on the mark holder's exclusive rights for some
period of time does not constitute nonuse of the mark
sufficient to support an abandonment. *See United States
Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 139 (3d
Cir.1981). Furthermore, the plaintiff's predecessor in the
instant case, Singleton Packing, evidenced no intent to
abandon the mark; it used the mark continuously and widely
over the 25 years preceding the litigation. The doctrine of
abandonment *1517 generally applies only when the
plaintiff mark holder relinquishes his exclusive rights to the
world, not merely to a single user, *see Dawn Donut Co. v.
Hart's Food Stores, Inc.,* 267 F.2d 358, 363 (2d Cir.1959)
(abandonment occurs only when mark holder fails to use its
mark anywhere in the nation) [FN13] ; the latter case is
more appropriately classified as a license. *See Menendez v.
Holt,* 128 U.S. at 524, 9 S.Ct. at 145. A finding that Henry
C. Singleton and Singleton Packing, as Conagra's
predecessors, abandoned the mark would have been clearly
erroneous in light of the evidence at trial.

> FN13. We discuss a narrow exception to this
> general rule *infra* at note 15, and find that
> exception inapplicable in the instant case.

### 2. Laches Leading to Estoppel

[13][14] The question of laches, which can lead to estoppel
of the plaintiff's exclusive claim to use the mark, creates a
much closer issue on the facts of this case. The laches
defense requires proof of three elements: (1) a delay in
asserting a right or claim; (2) that the delay was not
excusable; and (3) that the delay caused the defendant undue
prejudice. [FN14] *Environmental Defense Fund v.
Alexander,* 614 F.2d 474, 478 (5th Cir.), *cert. denied,* 449
U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). The test for
laches or estoppel is flexible, requiring a careful
examination of both the delay and the prejudice caused by
that delay. *See Citibank, N.A. v. Citibanc Group, Inc.,* 724
F.2d at 1546. [FN15] In addition, a court determining
whether the doctrine of laches estops the plaintiff from
asserting its rights also must consider the public's interest in
the trademark as a definite designation of a single source of
the goods. Thus, although a defendant suffers some
prejudice, the public interest in avoiding confusion might
outweigh that prejudice. *See James Burrough Ltd. v. Sign of
the Beefeater, Inc.,* 572 F.2d 574, 578 (7th Cir.1978).

> FN14. With regard to the prejudice factor, a
> defendant's intent to wrongfully infringe on the

plaintiff's mark undermines the weight to be given
this factor. *See University of Pittsburgh v.
Champion Products, Inc.,* 686 F.2d 1040, 1044 n.
14 (3d Cir.1982).

FN15. In *University of Pittsburgh v. Champion
Products, Inc.,* the court noted that the laches
defense actually consists of two classes of cases:
one in which the plaintiff's delay has been so
outrageous, unreasonable, or unexcusable as to
constitute virtual abandonment, and a second, more
common class of cases, in which the delay is not so
unreasonable and the defendant must show the type
of prejudice leading to estoppel. 686 F.2d at
1044-45. The instant case falls into this second
class of cases and thus the list of factors set forth
above properly govern the analysis of this defense.

To properly consider the laches defense in the instant case,
we must separate the two aspects of the defendant's
business. We conclude that laches defense cannot support
the defendant's continued use of the Singleton name in
connection with the sale of processed shrimp. A contrary
finding by the district court would have been an abuse of
discretion. The defendant's continued use of the name in
connection with the sale of fresh shrimp, however, requires
a remand to the district court for more detailed
consideration of the laches defense.

[15] With regard to the defendant's use of the Singleton
mark in the sale of processed shrimp, there was complete
justification for the delay; in effect, there was no
acquiescence. The father did not become aware of the
defendant's direct competition in the processed shrimp
market until after this lawsuit began. Thus, the evidence in
the case does not support a finding that Singleton Packing
inexcusably delayed in asserting its exclusive right to the
Singleton mark as it related to the defendant's sale of
processed shrimp. *See supra* note 12 (facts underlying
laches defense reviewed under clearly erroneous standard).
Because one of the requisite elements of the defense was not
met, a finding of laches with respect to processed shrimp
would be an abuse of discretion.

The defendant's use of the Singleton name for his sales of
fresh shrimp presents a more difficult question. The facts
governing *1518 the lower court's discretion on this issue
are not clearly apparent from the record and we are unable
to determine whether application of the laches doctrine to
this aspect of the defendant's business would constitute an
abuse of discretion.

The defendant's father was aware of his son's use and
prominent display of the Singleton name in various shrimp
businesses for over 10 years. The corporate defendant,
Singleton Shrimp Boats, began operations in 1978. Thus, it

3 F.2d 1508
4 U.S.P.Q. 552
Cite as: 743 F.2d 1508)

can properly be said that the father delayed in asserting his exclusive rights to the name. [FN16] This delay was accompanied by encouragement in the form of sales to the defendant by Singleton Packing on an established line of credit. See, e.g., *Ambrosia Chocolate Co. v. Ambrosia Cake Bakery*, 165 F.2d 693, 695 (4th Cir.1947) (sales of raw materials by the plaintiff mark holder to the defendant infringer deemed relevant to the defendant's permissive use of the mark). In addition, with regard to fresh shrimp sales, no justification for the delay appears in the record.

> FN16. The proof at trial showed that the defendant's use of the Singleton name was not continuous over the 10-year period. Singleton Seafood Center, which the individual defendant operated from 1972 to 1977, was a distinct business from Singleton Shrimp Boats in its operation, location, and facilities. For over 6 months after Singleton Seafood Center ceased operation, Robert C. Singleton was not engaged in the shrimp trade. The court on remand must decide whether there was sufficient connection between the two businesses to support a finding that Singleton Shrimp Boats, a business formed in 1978, can assert the prior existence of Singleton Seafood Center in support of its continued right to use the Singleton name.

With regard to the prejudice issue, the record shows that Robert C. Singleton and Singleton Shrimp Boats spent $120,000 from 1978 until 1981 advertising the business. All of the advertising clearly and prominently displayed the Singleton name. However, we cannot determine from the record how much of that advertising was directly related to fresh shrimp sales, rather than the nonconsensual use of the Singleton name on copied labels or advertising related to processed shrimp products, which could not properly be considered in evaluating the defendant's prejudice. There is little evidence in the record on which we could base a conclusion regarding the detriment the defendant would suffer from a change in name. Moreover, the case before us lacks any factfindings regarding the issue of the defendant's intent in using the Singleton name in his fresh shrimp business. *See supra* note 14.

Finally, although the evidence in the record clearly showed likely confusion stemming from the defendant's use of the Singleton name, we cannot determine whether this confusion would persist if that use was limited to fresh shrimp sales, and whether public confusion from such use would outweigh the prejudice to the defendant.

Careful consideration of these factors, the possible need for additional evidence, the finding of facts on the elements of the laches defense, and the sound exercise of discretion

based on the facts are matters best left to the district court on remand.

## IV. CONCLUSION

We have concluded that Conagra possesses trademark rights in the name "Singleton," because that name has acquired secondary meaning among consumers. The district court's finding to the contrary was clearly erroneous. We have further concluded, based primarily on the evidence of actual confusion, that the defendant's use of the Singleton name in connection with Singleton Shrimp Boats infringes on Conagra's trademark rights to that name and causes likely confusion.

With regard to the acquiescence defense, we have determined that a finding of abandonment would be clearly erroneous on these facts. We have further determined that the laches defense cannot apply to authorize the defendant's continued use of the Singleton name in connection with his sales of processed shrimp. The laches defense may apply, however, to permit the defendant's continued use of the Singleton name in connection with fresh shrimp sales. We therefore remand to the district court *1519 for purposes of determining whether, upon balancing the factors we have discussed and any additional evidence the court may wish to consider, the defendant sufficiently established a laches defense that estops Conagra from preventing his use of the Singleton name in connection with the sale of fresh shrimp.

We also leave to the district court's determination the proper scope of injunctive relief, consistent with its finding on the laches issue and our holding that the defendants may not use the Singleton trademark in connection with sales of processed shrimp. In molding its injunctive order, the district court is free on remand to consider whether the defendant might be able to continue using his surname, both in connection with fresh and processed shrimp, but in a fashion not likely to cause confusion with Singleton Packing's exclusive rights to that name. *See supra* notes 9 and 11.

The case is REVERSED and REMANDED with instructions.

743 F.2d 1508, 224 U.S.P.Q. 552

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

691 F.Supp. 1347
10 U.S.P.Q.2d 1108
(Cite as: 691 F.Supp. 1347)

**C**

United States District Court,
S.D. Florida.

COTTON GINNY, LIMITED, a Canadian corporation,
Plaintiff,
v.
COTTON GIN, INC. and Cotton Gin Kids, Inc.,
Defendants.

**No. 86-2399-CIV.**

Jan. 28, 1988.

Canadian manufacturer brought action against competitor alleging trademark infringement and competitor counterclaimed asserting trademark infringement. The District Court, Marcus, J., held that: (1) genuine issues of material fact as to whether conduct of manufacturer established county as part of his own natural expansion or area of market penetration precluded summary judgment; (2) genuine issue of material fact as to whether mark "Cotton Ginny" acquired secondary meaning precluded summary judgment; and (3) competitor failed to establish that manufacturer abandoned mark.

Ordered accordingly.

West Headnotes
**[1] Trade Regulation ☞63**
382k63 Most Cited Cases

**[1] Trade Regulation ☞151**
382k151 Most Cited Cases

Trademark is acquired through appropriation and use and need not be registered under Lanham Trade-Mark Act in order to be protected against infringement; appropriation and use of mark itself establishes one's exclusive right to its utilization. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[2] Trade Regulation ☞258**
382k258 Most Cited Cases

Fact that plaintiff eventually registered its trademark does not extend its rights and entitle it to exclusive use if did not establish priority of use. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[3] Trade Regulation ☞95**
382k95 Most Cited Cases
Trademark is acquired only within those markets where mark has been used and its meaning becomes known.

**[4] Trade Regulation ☞95**

382k95 Most Cited Cases

In order for licensor to take advantage of licensee's use of trademark, for purposes of establishing expanded market, licensor must take reasonable measures to detect and prevent misleading uses of the trademark; licensor must police and inspect licensee's operation to guarantee quality of product introduced to public.

**[5] Trade Regulation ☞584.1**
382k584.1 Most Cited Cases
(Formerly 382k584)

Evidence that licensor sold licensee goods manufactured by licensor under their quality control procedures and that representatives of licensor visited licensee's store and inspected operations was sufficient to establish that licensee's use of trademark "Cotton Ginny" inured to benefit of licensor and established their use of mark in county in which licensee did business for purpose of determining ownership of trademark.

**[6] Trade Regulation ☞95**
382k95 Most Cited Cases

Marketing activity of licensee may expand territory in which trademark is used beyond that identified in written agreement.

**[7] Trade Regulation ☞112**
382k112 Most Cited Cases

While use by licensee may inure to benefit of owner of trademark for purpose of establishing trademark, licensee, itself, retains no independent right in trademark.

**[8] Trade Regulation ☞95**
382k95 Most Cited Cases

Conduct of licensee is effective in establishing appropriation and use of trademark because effectively supervised licensee may establish perception by customers in relationship between quality of product and its identifying mark, and therefore, so long as relationship between parties fully maintains quality of product, then logical extension of that theory is that a licensee, through sales, advertising, or *other marketing activity may expand, geographically, the* recognition of the licensor's trademark.

**[9] Trade Regulation ☞95**
382k95 Most Cited Cases

As licensee has no proprietary interest in trademark, its success in marketing product cannot create ownership interest in mark, in favor of licensee, outside of licensing territory.

**[10] Trade Regulation ☞95**
382k95 Most Cited Cases

Expanded influence of trademark created by efforts of licensee inure to benefit of licensor.

**[11] Trade Regulation ☞722**
382k722 Most Cited Cases
Genuine issues of material fact as to whether conduct of manufacturer established that county in which licensee distributed manufacturer's product was part of zone of natural expansion or area of market penetration for manufacturer's "Cotton Ginny" trademark precluded summary judgment in action brought by manufacturer contending that competitor's unauthorized use of mark "Cotton Gin" and imitation of tradedress violated trademark laws. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[12] Trade Regulation ☞722**
382k722 Most Cited Cases

Genuine issue of material fact as to whether counties comprised one sales market for purpose of establishing manufacturer's claim of prior use of trademark "Cotton Ginny" in market precluded summary judgment for manufacturer in action brought against competitor for unauthorized use of mark and imitation of tradedress in violation of trademark laws. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[13] Trade Regulation ☞13**
382k13 Most Cited Cases
Where product name chosen emphasizes qualities of article--descriptive mark-- such names must acquire secondary meaning in order to be registered or otherwise protected under common law.

**[14] Trade Regulation ☞25**
382k25 Most Cited Cases

Term "Cotton Ginny" used by manufacturer of cotton sportswear was descriptive term, rather than suggestive term, under Lanham Trade-Mark Act and thus mark was protectable trade name only if it acquired secondary meaning. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[15] Trade Regulation ☞722**
382k722 Most Cited Cases

Genuine issues of material fact as to whether mark "Cotton Ginny" acquired secondary meaning so as to be entitled to trademark protection precluded summary judgement in action brought by manufacturer against competitor for trademark infringement. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[16] Trade Regulation ☞69.1**
382k69.1 Most Cited Cases
(Formerly 382k69)

**[16] Trade Regulation ☞71**
382k71 Most Cited Cases

**[16] Trade Regulation ☞585**
382k585 Most Cited Cases

In order to utilize abandonment defense, defendant must demonstrate both nonuse of trademark and intent to abandon it; abandonment being in nature of forfeiture must be strictly proved. Lanham Trade-Mark Act, § 45(a), 15 U.S.C.A. § 1127(a).

**[17] Trade Regulation ☞585**
382k585 Most Cited Cases

Competitor's mere assertion that manufacturer's mark "Cotton Ginny" was not used in Florida during a two and one-half-year period could not establish "non- use" prong of abandonment test and thus competitor failed to make out prima facie case of abandonment and claim of abandonment could not form basis for competitor's right to use mark "Cotton Gin.".

**Trade Regulation ☞736**
382k736 Most Cited Cases

Cotton Gin.

**Trade Regulation ☞736**
382k736 Most Cited Cases

Cotton Ginny.
*1349 Harley S. Tropin, Miami, Fla., for plaintiff.

Allen P. Reed, P.A., Miami, Fla., for defendants.

ORDER

MARCUS, District Judge.

THIS CAUSE has come before the Court pursuant to cross-motions for summary judgment brought by the Plaintiff, Cotton Ginny, Ltd. ("Cotton Ginny") and the Defendants, Cotton Gin, Inc., and Cotton Gin Kids, Inc. (collectively "Cotton Gin"). Plaintiff contends that the Defendants' unauthorized use of the mark "Cotton Gin" and imitation of Cotton Ginny trade dress constitute violations of sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a) (1982), as well as § 495.151 of the Florida Statutes and common law rights. Defendants have counterclaimed asserting that Plaintiff has infringed their

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

F.Supp. 1347
U.S.P.Q.2d 1108
ite as: 691 F.Supp. 1347)

ights under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as state, Fla.Sta.Ann. § 495.151 (West 1972), and common law. The motions for summary judgment are addressed only to the issue of liability for trademark infringement. The parties agree that "Cotton Gin" is confusingly similar to "Cotton Ginny." Because we find that there are genuine issues of material fact as to a number of issues in this matter, the motions for summary judgment must be denied.

In sum, summary judgment is inappropriate in this case because Plaintiff has failed to demonstrate that Broward, Palm Beach and Dade Counties represent a single market in which their trademark was appropriated and used. Moreover, a question of material fact remains as to whether Dade County was an area of natural expansion for the Plaintiff at the time Mikron marketed their product. Further, there are questions of material fact as to the acquisition of secondary meaning of the Plaintiff's trademark during that period. Finally, Defendants are not entitled to the defense of judgment as they failed to establish the defense of abandonment.

Plaintiff is a Canadian corporation which has, since 1979, been engaged in the design, manufacture and distribution of cotton sportswear which is identified by the mark "Cotton Ginny." Originally, the Cotton *1350 Ginny retail outlets operated only in Canada. Subsequently, the corporation expanded its operations into the United States. In October 1981, a former Cotton Ginny employee, Rhonda Gianacce, opened a retail outlet in Pompano Beach, Broward County, Florida, which sold the Cotton Ginny product. Gianacce and her husband, Michael Gianacce, were the sole owners of Mikron, Inc. ("Mikron"). Cotton Ginny and Mikron entered into an agreement on June 25, 1981 which provided, *inter alia,*

WHEREAS Cotton [Ginny] is the owner of the trade mark and trade name Cotton Ginny and the good will associated therewith and under which name Cotton [Ginny] has sportswear manufactured for it for distribution to its own and other retail stores.

AND WHEREAS it is the desire of the parties hereto that the retailer [Mikron] acquire the exclusive right to operate retail stores in Palm Beach County in the State of Florida, hereinafter referred to as the territory, under the name of Cotton Ginny and to sell sportswear under that name supplied to it by Cotton [Ginny].

NOW THEREFORE in consideration of the mutual premises [sic] and covenants herein contained, the parties hereto agree as follows:

1. Cotton [Ginny] hereby agrees to give the retailer exclusive right and licence to operate retail stores in the territory under the name of Cotton Ginny.

2. Cotton [Ginny] agrees to sell to the retailer and only to the retailer in the territory any merchandise presently or

from time time [sic] sold by Cotton [Ginny] under the label Cotton Ginny.

[Memorandum in Support of Plaintiff's Motion for Summary Judgment and In Opposition to Defendants' Summary Judgment Motion, Exhibit A]. Mikron then registered "Cotton Ginny" under the Florida fictitious name statute in November 1981. Fla.Sta.Ann. § 865.09 (West 1976). Pursuant to the terms of this Agreement, Mikron paid $13,000 in licensing fees to Cotton Ginny and purchased from it goods valued at over $100,000. [Gianacce Affidavit at ¶ 5]. Cotton Ginny executives inspected the Pompano Beach store on several occasions. [*Id.* at ¶ 6].

In June of 1982, Defendants opened their store in Miami, Dade County, Florida, selling cotton sportswear. Cotton Gin, Inc., was incorporated in Florida on June 23, 1983. The Defendants' store has operated continuously since June 1982. Cotton Gin Kids, Inc. was incorporated on June 20, 1986.

The Cotton Ginny outlet in Pompano Beach closed in January 1984, when Rhonda Gianacce returned to live in Canada. Upon the closing of this store, Cotton Ginny was without an outlet in Florida. Apparently, sometime in 1985 or 1986, Cotton Ginny began to own and operate retail stores in the United States and eventually opened a store in Dade County in December 1986. Further, Cotton Ginny obtained federal registrations for their service mark (No. 1,380,842) on April 30, 1,333,796) and trademark (No. 1985 and April 27, 1986 respectively. The question before the Court on these motions for summary judgment is which party has superior rights to the mark.

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

It may be entered only where there is *no genuine issue* of material fact. Moreover, the moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In applying this standard, the Eleventh Circuit has explained:

In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to *1351 the party opposing the motion. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. [*Environmental Defense Fund v.*] *Marsh,* 651 F.2d [983] at 991 All reasonable doubts about the facts should

be resolved in favor of the non-movant. *Casey Enterprises v. Am. Hardware Mutual Ins. Co.,* 655 F.2d 598, 602 (5th Cir.1981). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Marsh,* 651 F.2d at 991; *Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.,* 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronics [Techniques, Inc. v. Wackenhut],* 669 F.2d [1026] at 1031; *Croley v. Matson Navigation Co.,* 434 F.2d 73, 75 (5th Cir.1970).

Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. at 160, 90 S.Ct. at 1609-10; *Marsh,* 651 F.2d at 991. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg,* 370 F.2d 605, 611-12 (5th Cir.1967). *See Dalke v. Upjohn Co.,* 555 F.2d 245, 248-49 (9th Cir.1977).

*Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368-69 (11th Cir.1982); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502 (11th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

The United States Supreme Court has recently provided significant additional guidance as to the evidentiary standard which trial courts should apply in ruling on a motion for summary judgment:

> [The summary judgment] standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U.S. 476, 479-80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court in *Anderson* further stated that "[t]he mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* 106 S.Ct. at 2512. In determining whether this evidentiary threshold has been met, the trial

court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Id.* at 2513. If the non-movant in a summary judgment action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *Id.*

In another recent case, the Supreme Court has declared that a non-moving party's failure to prove an essential element of a claim renders all factual disputes as to that claim immaterial and requires the granting of summary judgment:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will *bear* the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of *1352 law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986) (emphasis added). Considering the present motions under this standard, we must conclude that summary judgment in favor of either party is inappropriate.

[1][2] It is axiomatic that a trademark [FN1] is acquired through appropriation and use. *See, e.g., United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *Shelia's Shine Products, Inc. v. Shelia Shine, Inc.,* 486 F.2d 114, 122 (5th Cir.1973); *Selchow & Righter Co. v. Goldex Corp.,* 612 F.Supp. 19, 24 (S.D.Fla.1985); 3 Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 19.01 (4th ed. 1983). The mark need not be registered under the Lanham Act, 15 U.S.C. § 1051, *et seq.,* in order to be protected against infringement. The appropriation and use of the mark itself establishes one's exclusive right to its utilization. *See Pedi-Care, Inc. v. Pedi-A-Care Nursing, Inc.,* 656 F.Supp. 449 (D.N.J.1987). However, the "rights to a mark ... accrue from prior use ... to the one who first uses the marks in connection with a particular line of business." *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 819 (1st Cir.1987) (citations omitted). The fact that Cotton Ginny eventually registered its mark does not expand its rights and entitle it to exclusive use if it did not establish priority of use. *See Terry v. International Dairy Queen, Inc.,* 554 F.Supp. 1088, 1096 (N.D.Ind.1983) (

691 F.Supp. 1347
10 U.S.P.Q.2d 1108
(Cite as: 691 F.Supp. 1347)

Page 5

*citing Faciane v. Starner, 230 F.2d 732 (5th Cir.1956).*

FN1. "The term 'trade-mark' includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (1982 & Supp. II 1984).

"An essential element of a claim of trademark infringement is a likelihood of confusion among prospective purchasers of plaintiff's products and services caused by defendant's use of plaintiff's marks." *Wheeler*, 814 F.2d at 816 (citation omitted). In the present case, the parties have agreed that the similarity in names is confusing to customers and prospective customers. [Status Report, Section III]. Accordingly, we are left, on these motions, only to resolve whether there exists an issue of material fact as to which party first acquired the trademark through its use.

[3] The basic facts of this case are undisputed. Cotton Ginny began using its mark in Canada in 1979. Obviously, their use predates the use by Defendants. However, a trademark is acquired only within those markets where the mark has been used and its meaning become known. *Hanover Star Milling Co.*, 240 U.S. at 415-16, 36 S.Ct. at 361; *see also Spartan Food Systems, Inc. v. HFS Corp.*, 813 F.2d 1279, 1282-84 (4th Cir.1987). Since the Cotton Ginny goods were not sold in Florida prior to 1981, there can be no claim that the Plaintiff had established a protectable mark anywhere in Florida until the licensing agreement with Mikron became operative in 1981.

Plaintiff's claim to prior use in South Florida is based solely on its licensing agreement with Mikron. "A trademark owner may extend the territory in which he has the right to exclusive use of his trademark, either by expanding his own operations, or he may introduce his trademark and create a demand for his variety of goods in new territory, by licenses subject to his control." *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 409 (5th Cir.1962) (citations omitted). *See also Turner v. HMH Publishing Co.*, 380 F.2d 224, 229 (5th Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967); *Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.*, 537 F.Supp. 587, 593 (D.P.R.1982); *1353 Pneutek, Inc. v. Scherr*, 211 U.S.P.Q. (BNA) 824, 833 (T.T.A.B.1981). Plaintiff maintains that its use in Canada and elsewhere of "Cotton Ginny" established their ownership of the trademark, and that the use of the term in conjunction with the sale of products by Mikron in Florida inured to the benefit of Cotton Ginny.

[4][5] In order for the licensor to take advantage of the

licensee's use of the mark, the licensor must take "reasonable measures to detect and prevent misleading uses of [the] trademark...." *Jordan K. Rand, Ltd.*, 537 F.Supp. at 592 (citations omitted). The licensor must police and inspect the licensee's operation to guarantee the quality of the product introduced to the public. *Pneutek, Inc.*, 211 U.S.P.Q. at 833 (citing *The National Lampoon, Inc. v. American Broadcasting Companies, Inc.*, 376 F.Supp. 733, 1343, 182 U.S.P.Q. (BNA) 24, 26 (S.D.N.Y.), *aff'd*, 497 F.2d 182 U.S.P.Q. (BNA) 6 (2d Cir.1974) (per curiam)); *see also General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105 (2d Cir.1986); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368 (5th Cir.1977). Here, the adequacy of Plaintiff's control over Mikron's operation is apparent. Cotton Ginny sold Mikron goods manufactured by the Plaintiff under their quality control procedures. Moreover, representatives of Cotton Ginny visited the Pompano Beach store and inspected the operation. Defendants have not submitted any evidence which controverts the satisfactory nature of this control. *See Celotex Corp.*, 106 S.Ct. at 2552-53. Under these facts, the use by Mikron of the mark "Cotton Ginny," must be viewed as having inured to the benefit of the Plaintiff and established their use of the mark in Broward County during 1981.

[6] Thus, when Cotton Gin began began their operation in Dade County in June 1982, Cotton Ginny had already used the mark in Broward County. However, as discussed *infra*, Defendants dispute the claim that "Cotton Ginny" was a protectable trademark at that time because the term had not acquired secondary meaning in the relevant market. Questions exist as to the extent of the sales market in which Mikron actually used the Cotton Ginny mark. Under *Hanover Star Milling Co.*, *supra*, and *United Drug Co.*, *supra*, "common law [trademark] rights are restricted to the locality where the mark is used and to the area of probable expansion." *Spartan Food Systems, Inc.*, 813 F.2d at 1282. Application of this rule here presents a threefold problem: first, whether given the evidence submitted pursuant to these motions for summary judgment, there exists an issue of material fact as to the parameters of the locality in which Cotton Ginny used the mark and its area of probable expansion; second, whether a licensee may expand the territory in which a trademark is used and protected; and third, whether a licensee, whose operation under the specific terms of the licensing agreement is confined to a specific territory, may expand the use and protection of the trademark outside that territory. We conclude that while the marketing activity of a licensee may expand the territory in which the mark is used beyond that identified in the written agreement, the evidence extant is insufficient for purposes of the present motions to determine the size of the market in which the Cotton Ginny mark was actually used.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

691 F.Supp. 1347
10 U.S.P.Q.2d 1108
(Cite as: 691 F.Supp. 1347)

Page 6

The determination of whether Broward and Dade counties represent a single market or distinct markets is of fundamental importance to the disposition of this case. The Fourth Circuit Court of Appeals has recently considered the criteria relevant to the measurement of the geographic market in which the mark is protected. *Id.* at 1282-84. There, the court noted that the area of probable expansion may be measured by examining either the owner of the trademark's "zone of natural expansion," *id.* at 1283 (*citing Weiner King Inc. v. Wiener King Corp.*, 615 F.2d 512, 523 (C.C.P.A.1980)), or the mark's potential for "market penetration." *Id.* (*citing Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398-99 (3d Cir.), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985)). In applying these tests to the present case, we must determine whether the conduct of both the Plaintiff and the licensee may be considered. *1354 Of course, the activities of the Plaintiff, as owner of the mark, are of vital importance in establishing the relevant geographic market. However, the question remains as to whether the licensee may expand, as well as establish, the area in which a mark is protected.

[7][8][9][10] Initially, we note that while the use by a licensee may inure to the benefit of the owner for purposes of establishing the mark, the licensee, itself, retains no independent right in the mark. *Jordan K. Rand, Ltd.*, 537 F.Supp. at 593; *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*, 654 F.Supp. 1095, 1100 (D.N.H 1987). The conduct of a licensee is effective in establishing the appropriation and use of a mark because an effectively supervised licensee may establish the perception by consumers in the relationship between the quality of the product and its identifying mark. Therefore, so long as the relationship between the parties fully maintains the quality of the product, then the logical extension of that theory is that a licensee, through sales, advertising, or other marketing activity may expand, geographically, the recognition of the licensor's mark. The success of this relationship could expand the reputation of the product beyond that originally contemplated by the parties to the licensing agreement. Since the licensee has no proprietary interest in the mark, its success in marketing the product obviously cannot create an ownership interest in the mark, in favor of the licensee, outside of the "licensing territory." Further, the recognition and association of the trademark with the product in a wide geographic area cannot be without any effect on the mark. Accordingly, the expanded influence of a trademark created by the efforts of the licensee must inure to the benefit of the licensor.

This conclusion does not resolve the question before us, however. The Agreement between Plaintiff and Mikron gave Mikron the "exclusive right to operate stores in Palm Beach County." Whether that restriction limited, in any

way, the licensee's ability to establish prior use of the mark in Dade County, the site of the Cotton Gin store, now becomes the focus of our inquiry. At this step in the analysis, we consider whether the Plaintiff, pursuant to the licensing agreement maintained sufficient control over Mikron outside of Palm Beach County so as to insure the quality of the product, and whether the agreement actually relinquished their exclusive rights to "Cotton Ginny" outside of that county. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1517 (11th Cir.1984) (when mark holder relinquishes exclusive rights to a single user, that is appropriately classified as a license). The Plaintiff's uncontroverted evidence established the sufficiency of the quality control over Mikron. The facts that must be considered in determining whether Cotton Ginny relinquished its exclusive rights to the mark outside of Palm Beach County dovetail with those that must be considered in the context of the geographic boundaries of the ownership rights--that is, whether the relationship between Cotton Ginny and Mikron actually created a licensing arrangement for a geographic area which is larger than Palm Beach County.

The facts relevant to this inquiry are these: First, Pompano Beach is located in Broward, not Palm Beach County. Second, Mikron advertised its product in Dade County, and customers from that area did travel to Pompano Beach to buy the Plaintiff's product. By establishing a store, outside the territory explicitly established in the licensing agreement, Plaintiff's acquiesced in the use of their mark by Mikron in an area larger than that specifically identified in the licensing agreement. Accordingly, the effect of the licensee's conduct may not be limited to merely establishing use of the trademark in Broward or Palm Beach counties. Mikron's activities must be be considered in conjunction with the conduct of the Plaintiff in determining whether Dade County was in the Plaintiff's area of probable expansion during 1981-1984.

[11] The Fourth Circuit in *Spartan Food Systems, Inc., supra*, outlined the *1355 standards that have been applied in determining the scope of geographic expansion.

> Courts that follow the "zone of natural expansion" theory have applied the following five-part test: "the party's (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion; and, where applicable (5) possible market penetration by means of products brought in from other areas."

*Id.* at 1283 (citations omitted). Under the "market penetration" theory, courts have considered:

> "(1) the volume of sales of the trademarked product; (2) the growth trends ... in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product

691 F.Supp. 1347
10 U.S.P.Q.2d 1108
(Cite as: 691 F.Supp. 1347)

advertising in the area." *Natural Footwear*, 760 F.2d at 1398-99.

*Id.* Applying these standards we find that there are issues of material fact as to whether the conduct of Cotton Ginny and Mikron established that Dade County is part of the "zone of natural expansion" or area of "market penetration" for the "Cotton Ginny" trademark.

Based upon the evidence submitted, the only business activity by the Plaintiff or Mikron in Dade County prior to June 1982 was the advertising and other marketing activities by Mikron. However, "[a]dvertising alone cannot establish common law rights." *Id.* at 1283 (citing *Wrist-Rocket Manufacturing Co. v. Saunders Archery Co.*, 578 F.2d 727, 732 (8th Cir.1978)). Also, Mikron experienced no expansion, although the affidavit of Gianacce indicates that expansion was contemplated. Cotton Ginny, itself, had experienced expansion only in Canada at that time. Moreover, the record does not suggest that during the period of operation either Mikron or Cotton Ginny exerted dominance over the contiguous area of Broward and Dade Counties. The evidence submitted by the Plaintiff does not definitively demonstrate that Dade County was within Cotton Ginny's zone of natural expansion. In fact, the evidence does not necessarily indicate that during the relevant period Cotton Ginny intended expansion beyond this one store in Pompano Beach.

The market penetration theory also does not support Plaintiff's contention that its product had become associated with its mark in Dade County. Plaintiff has not established the volume of sales, growth trends, or the amount of product advertising in the area. Plaintiff does submit that 30% of Mikron's customers were from Dade County. However, this assertion, by itself, does not meet the requirements for "market penetration."

[12] Evidence which demonstrates Dade and Broward counties comprise one sales market may tend to establish Plaintiff's claim of prior use. Should Plaintiff establish this proposition, then the sales outlet in Pompano Beach may be viewed as establishing the use of the Cotton Ginny mark in the Dade/Broward market. However, such conclusive evidence has not been submitted. Therefore, considering that these counties may in fact constitute distinct markets, the record evidence is insufficient to sustain a finding that, as a matter of law, Dade County was part of Cotton Ginny's area of probable expansion prior to the Defendants' use of the mark in Dade County. If Defendants' use of the mark in Dade County represents prior use in a remote market then even the subsequent registration of the mark by Cotton Ginny could not divest Cotton Gin of the right to use the mark in Dade County. *See Weiner King, Inc.*, 615 F.2d at 522.

[13] An additional reason suggests that summary judgment would be inappropriate here. Defendants contend that the Plaintiff's use of the mark failed to establish secondary meaning and therefore did not create a priority of use in favor of Cotton Ginny. Where the product name chosen "emphasizes the qualities of an article--a descriptive mark ... [t]hese ... are initially invalid and unregistrable trademarks." 3 Callman *The Law of Unfair Competition, Trademarks and Monopolies,* § 19.25 at 78. Such names must acquire "secondary meaning" in order to be registered **1356 or otherwise protected under the common law. *American Television and Communications Corp. v. American Communications and Television, Inc.,* 810 F.2d 1546, 1549 (11th Cir.1987).

"In order to establish secondary meaning the plaintiff must show that the primary significance of the term in the minds of the consumer public is not the product but the producer." [*The Vision Center v. Opticks, Inc.,* 596 F.2d 111, 118 (5th Cir.1979) ], *quoting Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). If the corporate name denotes to the consumer or purchaser "a single thing coming from a single source," then it has acquired secondary meaning. *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.,* 494 F.2d 3, 12 (5th Cir.1974). The answer depends upon (1) the length and manner of its use; (2) the nature and extent of advertising, promotion and sales; (3) the plaintiff's efforts to promote a conscious connection in the public's mind between the name and the plaintiff's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product or venture. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir.1984).

*Id.*

[14] The acquisition of secondary meaning in this case is relevant only if "Cotton Ginny" is considered a descriptive term. "A descriptive term identifies a characteristic or quality of an article or service, and may become a protectable trade name only if it acquires secondary meaning." *Id.* at 1548. If "Cotton Ginny" were determined to be a suggestive term which "suggests, rather than describes, a characteristic of the consumer in order to be understood as descriptive," *Id.* at 1549, then secondary meaning need not be established in order for the mark to be protected. Here, we must conclude that the term "Cotton Ginny" is a descriptive term. Certainly, "Cotton" describes a quality of the goods--that is, they are made out of cotton--and standing alone would be a generic term. [FN2] On the other hand, "Ginny," itself, is merely suggestive. The words used together must be considered a descriptive term, as they readily identify a characteristic of the product.

FN2. "A generic name suggests the basic nature of the article or service. Most courts hold that a generic term is incapable of achieving trade name protection.... An arbitrary or fanciful name bears no relationship to the product or service and is ... protectable without proof of secondary meaning." *American Television and Communications Corp.*, 810 F.2d at 1548, 1549 (citation omitted).

[15] Defendants maintain that since Plaintiff's trade name had not established secondary meaning when utilized prior to June 1982, then its use cannot be viewed as prior to Defendants' so as to oust their common law rights in Dade County. See *A.J. Canfield Co. v. Concord Beverage Co.*, 629 F.Supp. 200, 210 (E.D.Pa.1985) ("Secondary meaning cannot exist in a market that plaintiff has not penetrated, by the time the defendant begins its use of the mark in question."), *aff'd sub nom. A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir.1986). The "Cotton Ginny" mark may have acquired secondary meaning by the time of its reintroduction into Florida. However, "[t]he existence of secondary meaning is a question of fact," *American Television and Communications Corp.*, 810 F.2d at 1549 (citations omitted), and this record contains no evidence that "Cotton Ginny" acquired secondary meaning while being used by Mikron.

[16] Finally, the Defendants assert that they are entitled to summary judgment because they claim that, assuming *arguendo* the Plaintiff established the trade mark "Cotton Ginny" in South Florida during the period of 1981 through January 1984, it abandoned any rights it may have acquired because it did not reintroduce the mark into the market until two and one-half years later. By the time of reintroduction, Defendants had been using the name "Cotton Gin" for over four years. In support of this contention, Cotton Gin cites 15 U.S.C. § 1127(a) (1982 & Supp. II 1984) which states, *inter alia*,

A mark shall be deemed to be "abandoned"--

*1357 (a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

In order to utilize the abandonment defense, Defendants must demonstrate *both* non-use of the trademark and an intent to abandon it. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 138-39 (3d Cir.1981) (*cited with approval in Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir.1984). Moreover, "abandonment, being in the nature of a forfeiture must be strictly proved." *Id.* at 139 (citation omitted).

[17] In the present case, Defendants have failed to establish either of the prerequisites for a defense of abandonment.

Cotton Gin has asserted that Plaintiff did not use the mark in Florida during a two and one-half year period. However, "[c]onsistent and proper use of those marks elsewhere in the United States defeats any claim of non-use." *Id.* (citations omitted). While the record evidence does not establish the nature in which the mark was used during that period, the mere assertion that it was not used in Florida during that period cannot establish the "no-use" prong of the abandonment defense. Therefore, upon this record, Defendants have not made out a *prima facie* claim of abandonment.

Further, Defendants have submitted no evidence which would tend to prove that the Plaintiff intended to abandon the mark. The mere fact that Cotton Ginny had no outlet in Florida for a period of approximately two and one-half years does not indicate an intent to abandon. "If the proponent of a mark stops using it but demonstrates an intent to keep the mark alive for use in resumed business, the mark retains 'residual' goodwill and thus continues to enjoy trademark protection, as long as it retains its significance as an indication of the origin of the goods or services." *Pan American World Airways, Inc. v. Panamerican School of Travel, Inc.*, 648 F.Supp. 1026, 1031 (S.D.N.Y.) (citation omitted), *aff'd*, 810 F.2d 1160 (2d Cir.1986); *see also Miller Brewing Co. v. Oland's Breweries [1971] Ltd.*, 548 F.2d 349, 351-52 (C.C.P.A.1976) ("abandonment does not result from a mere temporary withdrawal from the market caused by outside causes.") (*citing Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31, 21 S.Ct. 7, 11, 45 L.Ed. 60 (1900)); *cf. Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 101-02 (5th Cir.1983). For the purposes of the instant summary judgment motions, the claim of abandonment cannot form the basis for Defendants' right to use the mark "Cotton Gin."

Because we have found that there exist questions of material fact necessary for the resolution of this matter, it is

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment is hereby DENIED. It is further

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment is hereby DENIED.

691 F.Supp. 1347, 10 U.S.P.Q.2d 1108

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

23

**(To be scanned in place of tab)**

## A. Definition

A contract is an agreement between two or more parties for the doing or not doing of some specified thing.

O.C.G.A. §13-1-1

## B. Essentials

To constitute a lawful contract there must be parties able to contract, a consideration for the contract, the agreement of the parties to the terms of the contract, and a lawful subject matter.

O.C.G.A. §13-3-1

### 1. Consideration

A consideration is valid if any person who promised is entitled to a benefit, or any harm is done to one who receives the promise.

(Considerations are distinguished into good and valuable. A good consideration is such as is founded on natural duty and affection, or on a strong moral obligation. A valuable consideration is founded on money, or something convertible into money, or having a value in money. Marriage is also a valuable consideration.)

O.C.G.A. §§13-3-41; 13-3-42

(Note: See O.C.G.A. §13-3-44, Promissory Estoppel.)

62



# EXHIBIT / ATTACHMENT

## 24

(To be scanned in place of tab)

17. **Apportionment of Damages**

Where a case is filed against more than one person for injury to person or property and the plaintiff is, to some degree, responsible for the injury or damages claimed, the jury, in its determination of the total amount of damages to be awarded, if any, may apportion its award of damages among the persons who are liable and whose degree of fault is greater than that of the injured party.  If apportioned by the jury as provided in this charge, damages shall be the responsibility of the person, or persons against whom they are awarded, only, and shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution from another defendant.

O.C.G.A. §51-12-33

(Note:  This code section does not affect venue provisions regarding joint actions and applies only to causes of action arising on or after July 1, 1987.)

B. **Contracts**

1. **Damages; Generally; Agreement; Nominal Damages**

a) **Generally**

Damages are given as compensation for injury sustained.

Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from the breach, and such as the parties contemplated when the contract was made, as the probable result of the breach.

O.C.G.A. §§13-6-1; 13-6-2; 13-6-7

### b) Agreement

If the parties agree, in their contract, on the damages for a breach, they are said to be liquidated, and unless the agreement violates some principle of law, the parties are bound by it.

O.C.G.A. §13-6-7

### c) Nominal Damages

In every case of breach of contract, the party not breaching it has a right to damages. But, if there has been no actual damage, the plaintiff can recover nominal damages which will carry the costs.

O.C.G.A. §§13-6-6; 13-6-12

## 2. Attorney's Fees (Expenses of Litigation); Generally; Notes, Provisions in; Exemplary Damages

### a) Generally

The expenses of litigation are not generally allowed as a part of the damages. But, if the defendant has acted in bad faith or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, you may allow them. You should determine from the evidence the attorney's fees (or other expense) if any, as will be allowed.

O.C.G.A. §13-6-11

### b) Notes, Provisions in

(Note: The statute on this is O.C.G.A. §13-1-11. As the liability or non-liability will usually be a matter of law, the same is omitted as a jury charge.)

### c) Exemplary Damages

Unless otherwise provided by law, exemplary damages can never be allowed in cases arising on contracts.

O.C.G.A. §13-6-10

93

7/91

### 3. Remote or Consequential Damages in Contract Actions

Remote or consequential damages are not allowed whenever they cannot be traced solely to the breach of the contract, or unless they are capable of exact computation, such as the profits which are the immediate fruit of the contract and are independent of any collateral enterprises entered into in contemplation of the contract.

O.C.G.A. §13-6-8

### 4. Interest

The amount of damages at the date of breach of contract may be increased by the addition of legal interest from that time until the time of recovery.

All liquidated demands, where by agreement or otherwise the sum to be paid is fixed and certain, bear interest from the time the party shall become liable and bound to pay them; if payable on demand, they bear interest from the time of the demand. In case of promissory notes payable on demand, the law presumes a demand instantly and gives interest from date.

O.C.G.A. §§13-6-13; 7-4-15

### 5. Warranty, Breach of; Land; Personalty

#### a) Land

Upon a breach of covenant of warranty of title to land, the damages should be the purchase money with interest from the time of sale, unless the jury should think, under the circumstances of the case, that the use of the premises was equal to the interest on the money, and that an equitable setoff should be allowed. If valuable improvements have been made, the interest should be allowed.

O.C.G.A. §44-5-66

94



# EXHIBIT / ATTACHMENT

## 25

**(To be scanned in place of tab)**

373 S.E.2d 749
50 Ed. Law Rep. 234
(Cite as: 258 Ga. 720, 373 S.E.2d 749)

Page 1

▷

Supreme Court of Georgia.

CRAWFORD W. LONG MEMORIAL HOSPITAL OF
EMORY UNIVERSITY
v.
YERBY et al.

No. 45682.

Nov. 30, 1988.

University hospital named as defendant in medical malpractice case moved to disqualify plaintiff's attorney on ground of conflict of interest. The Fulton State Court, John Bruner, J., denied motion. The Court of Appeals, Benham, J., 186 Ga.App. 407, 367 S.E.2d 245, affirmed. On certiorari review, the Supreme Court, Marshall, C.J., held that attorney was disqualified from representing client who charged hospital with negligent medical care where conduct complained of occurred during time attorney represented hospital in defending against other negligent care claims.

Reversed.

Clarke, P.J., concurred and filed opinion in which Smith, J., joined.

West Headnotes
[1] Attorney and Client ⬡21
45k21 Most Cited Cases

Lawyer is disqualified from representing party against former client in matter that is "substantially related" to lawyer's prior representation.

[2] Attorney and Client ⬡21.5(1)
45k21.5(1) Most Cited Cases

Attorney was disqualified from representing client who charged hospital with negligent medical care where conduct complained of occurred during time attorney represented hospital in defending against other negligent care claims; regardless of whether client's claim was "substantially related" to any claims attorney had defended on behalf of hospital, representation of client created impermissible appearance of impropriety. Code of Prof.Resp., Canon 9.

**750 *722 Lokey & Bowden, Gerald F. Handley, Scott Graham, Long, Weinberg, Ansley & Wheeler, J.M. Hudgins IV, Atlanta, Sidney F. Wheeler for Crawford W. Long Memorial Hosp. of Emory University.

Michael T. Bennett, Bennett, Williams & Henry, H.A. Stephen, Jr., Chambers, Marbry, McClelland & Brooks, Hunter S. Allen, Jr., Allen & Ballard, Wade K. Copeland,

Webb, Carlock, Copeland, Semlar & Stair, Atlanta, for Patricia H. Yerby, et al.

*720 MARSHALL, Chief Justice.

During a five-year period preceding July, 1986, Bennett, an attorney, defended Crawford Long Hospital in eighteen malpractice complaints, for which he was compensated by the hospital's insurer. Seventeen of these cases involved personal injuries alleged to be the result of negligent medical care, and at least six involved allegations of negligence regarding improper surgical procedures and postoperative care.

In 1984, while Bennett was representing the hospital in defense *721 of malpractice claims, Yerby underwent back surgery at the hospital, and he died on the same day. In 1986, Bennett ceased representing the hospital, and later that year filed a complaint *against* the hospital on behalf of Yerby's widow. The complaint charged that the hospital and one of its employees "failed to exercise the requisite degree of care and skill required."

The hospital filed a motion to disqualify Bennett from representing Yerby. The motion was denied in the trial court and the denial was affirmed in the Court of Appeals. *Crawford W. Long Memorial Hospital of Emory University v. Yerby,* 186 Ga.App. 407, 367 S.E.2d 245 (1988). We granted certiorari.

[1] 1. Both parties rely upon the long-standing rule that a lawyer is disqualified from representing a party against a former client in a matter that is "substantially related" to the lawyer's prior representation. *Tilley v. King,* 190 Ga. 421, 9 S.E.2d 670 (1940). See also *Summerlin v. Johnson,* 176 Ga.App. 336, 335 S.E.2d 879 (1985). [FN1]

> FN1. The rule applied in these cases has been altered to some degree.
> A lawyer shall not represent a client whose interests are adverse to the interests of a former client of the lawyer in any matter substantially related to the matter in which the lawyer represented the former client unless he has obtained written consent of the former client after full disclosure. A violation of this standard may be punished by disbarment. [Standard 69, Rules and Regulations of the State Bar of Georgia.]
> Of course, a lawyer may not disclose confidences or secrets of the former client, nor use them adversely to that client.

[2] 2. The circumstances of this case create a separate, though related, problem. Bennett has undertaken to represent a client who charged the hospital with negligent

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

373 S.E.2d 749
50 Ed. Law Rep. 234
**(Cite as: 258 Ga. 720, 373 S.E.2d 749)**

Page 2

medical care. The conduct complained of occurred during the time that Bennett was providing continuing legal representation to the hospital in defending against several claims that charged the hospital with negligent medical care.

Lawyers in similar circumstances (i.e., an ongoing relationship with the hospital in defending medical-malpractice claims) of necessity would acquire a wide range of knowledge concerning the nature of medical care provided by the hospital. That would include knowledge (imparted to the lawyer by the client) of practices, policies, procedures, reporting requirements, and of ongoing or recurring problems--all as they pertained during this very period of time.

**\*\*751** 3. Bennett had acquired similar knowledge of (and from) his client as a result of representation that was ongoing *at the time* of Yerby's death. That representation, of course, related to claims charging the hospital with negligent medical care. In this case, we need not determine whether the medical-malpractice claim that Bennett has brought *against* the hospital is "substantially related" to any of the eighteen medical-malpractice claims that he had defended *on behalf \*722 of* the hospital. The circumstance of representing a client against a former client in an action that is of the same general subject matter, and grows out of an event that occurred *during the time* of such representation, creates an impermissible appearance of impropriety. It is therefore prohibited by the Canons of Ethics. [FN2] For this reason, the motion to disqualify should have been granted.

> FN2. "A lawyer should avoid even the appearance of professional impropriety." Code of Professional Responsibility, Canon 9.
> The holding of this case is limited to representation involving the *same general subject matter*. A lawyer in circumstances similar to those of this case ordinarily would have acquired no special knowledge in malpractice cases that would work disqualification in cases of a different general subject matter, e.g., adverse representation involving contractual disputes, real-property matters, and unrelated tort claims would not contravene the rule.

JUDGMENT REVERSED.

All the Justices concur.

CLARKE, Presiding Justice, concurring.

I concur in the judgment, and in doing so I emphasize that the opinion limits the mandate of disqualification to those cases in which the lawyer was actively representing the party in matters involving the same general subject when the events giving rise to the case in question occurred.

I am authorized to state that Justice SMITH joins me in this concurrence.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



EXHIBIT /ATTACHMENT

26

(To be scanned in place of tab)

304 F.3d 1167                                                                                                                     Page 1
53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
(Cite as: 304 F.3d 1167)

# H

Briefs and Other Related Documents

United States Court of Appeals,
Eleventh Circuit.

CUMULUS MEDIA, INC., Plaintiff-Appellee,
v.
CLEAR CHANNEL COMMUNICATIONS, INC.,
Defendant-Appellant.

**Nos. 01-16189, 01-16647.**

Sept. 6, 2002.

Radio station sued competitor for trademark infringement. The United States District Court for the Northern District of Florida, No. 01-00441-CV-4-SPM, Stephan P. Mickle, J., held for plaintiff, and defendant appealed. The Court of Appeals, Marcus, Circuit Judge, held that: (1) finding that plaintiff had not abandoned mark was not clearly erroneous; (2) defendant was not entitled to second evidentiary hearing prior to entry of preliminary injunction; and (3) preliminary injunction was not overly broad.

Affirmed.

West Headnotes

**[1] Federal Courts ⬤━862**
170Bk862 Most Cited Cases

District court's factual findings on motion for preliminary injunction will not be disturbed on appeal unless clearly erroneous.

**[2] Federal Courts ⬤━776**
170Bk776 Most Cited Cases

**[2] Federal Courts ⬤━815**
170Bk815 Most Cited Cases

Generally, grant or denial of preliminary injunction is reviewed for abuse of discretion; *de novo* review applies, however, if district court has erred in its apprehension or application of law.

**[3] Trade Regulation ⬤━70**
382k70 Most Cited Cases

Finding that radio station did not abandon "The Breeze" as protectable trade name when it changed its name to "Star 98," and thus that local competitor's identification of itself as "The Breeze" thirteen months later, in effort to trade off of preexisting public awareness of name, was infringing, was not clearly erroneous; station continued to actively use name on promotional materials, business cards and sign at its broadcasting station. Lanham Trade- Mark Act, §§ 43(a), 45, as amended, 15 U.S.C.A. §§ 1125(a), 1127.

**[4] Trade Regulation ⬤━71**
382k71 Most Cited Cases

If trademark holder stops using mark with intent not to resume its use, mark is deemed "abandoned" and it falls into public domain, where it is free for all to use. Lanham Trade-Mark Act, § 45, as amended, 15 U.S.C.A. § 1127.

**[5] Trade Regulation ⬤━585**
382k585 Most Cited Cases

Trademark infringement defendant asserting abandonment defense faces "stringent," "heavy," or "strict" burden of proof. Lanham Trade-Mark Act, § 45, as amended, 15 U.S.C.A. § 1127.

**[6] Evidence ⬤━584(1)**
157k584(1) Most Cited Cases

"Prima facie showing" simply means evidence of such nature as is sufficient to establish fact and which, if unrebutted, remains sufficient for that purpose.

**[7] Trade Regulation ⬤━574**
382k574 Most Cited Cases

**[7] Trade Regulation ⬤━576**
382k576 Most Cited Cases

Once trademark infringement defendant establishes prima facie case of abandonment, *burden of production* then shifts to mark holder *to demonstrate* that circumstances do not justify inference of intent not to resume use; ultimate burden of persuasion, however, always remains with defendant. Lanham Trade-Mark Act, § 45, as amended, 15 U.S.C.A. § 1127; Fed.Rules Evid.Rule 301, 28 U.S.C.A.

**[8] Trade Regulation ⬤━585**
382k585 Most Cited Cases

Public announcement of trade name change does not alone serve to make prima facie showing of abandonment; infringement defendant must also introduce evidence of nonuse. Lanham Trade-Mark Act, § 45, as amended, 15 U.S.C.A. § 1127.

**[9] Injunction ⬤━152**
212k152 Most Cited Cases

Evidentiary hearing is required for entry of preliminary injunction only where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

304 F.3d 1167                                                                                                          Page 2
53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
(Cite as: 304 F.3d 1167)

[10] Injunction ⟨⟩152
212k152 Most Cited Cases

Necessity of holding evidentiary hearing before entry of preliminary injunction lies within sound discretion of district court where there is no disagreement as to raw facts but parties dispute inferences to be drawn from those facts; court must strike balance between goals of speed and practicality on the one hand, and accuracy and fairness on the other.

[11] Trade Regulation ⟨⟩624
382k624 Most Cited Cases

Failure to grant trademark infringement defendant second evidentiary hearing before entry of preliminary injunction was not abuse of discretion; there was no showing that new evidence had not been available during pendency of motion.

[12] Trade Regulation ⟨⟩628
382k628 Most Cited Cases

Preliminary injunction against trademark infringer was not overly broad merely because it deprived infringer of opportunity to take curative steps.
*1168 Sylvia H. Walbolt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Saint Petersburg, FL, W. Douglas Hall, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Frederick Townsend Hawkes, Carlton Fields, Tallahassee, FL, for Defendant-Appellant.

James W. Dabney, Pennie & Edmonds, New York City, Claude R. Walker, Tallahassee, FL, for Plaintiff-Appellee.

Appeals from the United States District Court for the Northern District of Florida.

Before BIRCH and MARCUS, Circuit Judges, and FULLAM [FN*], District Judge.

FN* Honorable John P. Fullam, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

MARCUS, Circuit Judge:

Clear Channel Communications, Inc. ("Clear Channel") appeals from the district court's entry of a preliminary injunction in this trademark infringement suit. At issue is whether Clear Channel has infringed the rights of Cumulus Media, Inc. ("CMI") by identifying its Tallahassee, Florida radio station by the name "The Breeze." While Clear Channel asserts *1169 that CMI has abandoned its rights in the name, the district court found otherwise and preliminarily enjoined Clear Channel from using "The

Breeze" to identify its radio station. After thorough review, we can find no error in the entry of the preliminary injunction and accordingly affirm.

I.

The facts relevant to this appeal are straightforward. The parties own and operate competing radio stations in the Tallahassee, Florida market: CMI operates WBZE-FM at 98.9 on the FM dial and Clear Channel operates WTLY-FM at 107.1.

In January 1994, CMI began using the name "The Breeze," along with a distinctive logo and trading style incorporating the name, to identify WBZE. Between 1994 and September 2000, CMI used "The Breeze" in many forms of advertising and promotion for WBZE radio broadcasts, including radio and television advertising, outdoor signage, business cards, cups, mugs, license plates, t-shirts, post-it notes, and stickers. From 1998 to 2000 alone, CMI spent more than a million dollars in the advertising and promotion of "The Breeze."

In September 2000, CMI began identifying WBZE on the air as "Star 98" instead of "The Breeze" and announced the change through on-air advertisements. At the same time, CMI altered its music programming from "mainstream adult contemporary," which targets listeners twenty-four to fifty-four years old, to "hot contemporary," which targets a slightly younger demographic of eighteen to forty-nine year olds. Other aspects of WBZE's programming, such as its call- in shows, remained unchanged.

After the change, "The Breeze" name continued to appear on some WBZE materials, including, inter alia, a large outdoor sign at WBZE's headquarters, where listeners come to collect promotional awards, business cards used by WBZE management and sales representatives, and promotional materials such as cups and license plate holders. Third parties also apparently maintained a continuing association of "The Breeze" with WBZE. As recently as September 2001, a full year after WBZE's name change and a mere month before this suit commenced, the Arbitron rating agency, which measures radio audience market share, continued to credit WBZE if a listener reported listening to "The Breeze" in Tallahassee.

On October 8, 2001, approximately thirteen months after CMI's name change, Clear Channel changed WTLY's on-air name from "The Mix" to "The Breeze" and adopted a logo nearly identical to WBZE's "The Breeze" logo. Clear Channel, which spent more than $25,000 to promote WTLY as "The Breeze," announced the name change with on-air advertisements making statements such as "It's back ... and it's now at 107.1 FM--The Breeze" and "The Breeze has blown up the dial." One advertisement announced that

WTLY has completed the most comprehensive radio research study in the history of Tallahassee ... and you told us you want The Breeze back ... so we did exactly what you wanted .... The Breeze is back and on the air at 107.1 FM." WTLY uses a mainstream adult contemporary format, apparently similar to the one used by WBZE before its format change. The district court found that WTLY and WBZE appeal to substantially the same listeners (even after WBZE's format change) and seek to generate revenue from the same advertisers in the same geographic market.

CMI quickly learned of Clear Channel's use of "The Breeze." On October 12, four days after Clear Channel began identifying *1170 WTLY as "The Breeze," CMI filed a complaint in the district court against Clear Channel for trademark infringement and unfair competition in violation of § 43(a) of the Trademark Act of 1946 (Lanham Act), 15 U.S.C. § 1125(a); the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 ("FDUTPA"); and Florida common law. On the same day, CMI forwarded a courtesy copy of the complaint to Clear Channel along with a cease and desist demand.

Six days later, on October 18, CMI filed a motion for a preliminary injunction. On October 24, the district court conducted a hearing on the motion, during which it received evidence from both parties. CMI submitted evidence aimed at showing its continuing use of "The Breeze." This evidence included cups, license plates, bumper stickers and other advertising items featuring "The Breeze" name; the business cards of WBZE managers showing "The Breeze" logo; and pictures of the large billboard outside the WBZE office depicting "The Breeze" logo. CMI also submitted an audio recording of an on-air conversation, recorded October 22, 2001, between the WBZE operations manager and an anonymous caller, who evinced confusion over WTLY's use of "The Breeze." Clear Channel submitted evidence as well, largely in the form of affidavits from its own employees stating their belief that CMI had changed WBZE's name from "The Breeze" to "Star 98."

On November 1, the district court issued its order. It found that CMI had made continuous, commercial use of "The Breeze" rather than abandoning it, and thus had continuing rights in the name under both FDUTPA and the Lanham Act. It also found that Clear Channel had changed WTLY's name to "The Breeze" to divert audience market share from WBZE to WTLY and to trade off of preexisting public awareness of "The Breeze." It thus found that Clear Channel's use of "The Breeze" had been calculated to mislead substantial numbers of Tallahassee radio listeners into believing that WTLY's "The Breeze" was a continuation of (or somehow affiliated with) WBZE's "The Breeze." The district court further found that Clear Channel's use of the name had in fact confused Tallahassee

radio listeners. Based on these findings, the district court concluded that CMI would likely succeed on its infringement and unfair competition claims. After further concluding that the balance of hardships and the public interest tipped in CMI's favor, the district court entered a preliminary injunction restraining Clear Channel from using "The Breeze" to identify WTLY or any WTLY broadcasts and from using or displaying any imitation of the trading style of WBZE's "The Breeze."

Immediately after the district court issued its preliminary injunction order, Clear Channel filed a notice of appeal, which is the basis of Appeal No. 01-16189, and moved the district court for a stay pending appeal. On November 2, the district court denied the stay motion.

On November 6, Clear Channel filed a motion for modification of the injunction, arguing that it was overbroad because it prevented Clear Channel from making any use of "The Breeze" name, even "curative uses" designed to dispel confusion, such as identifying WTLY as "The Breeze 107.1" or "The New Breeze." Clear Channel also moved for a second hearing to submit testimony and other evidence, arguing that it had not been provided sufficient time to prepare for the hearing held on October 24. On November 20, the district court denied these motions and Clear Channel filed a second notice of appeal from these denials, which is the basis of Appeal No. *1171 01-16647. We have consolidated Clear Channel's two appeals.

II.

A.

Clear Channel's sole argument in the district court was that CMI is not entitled to a preliminary injunction because it has abandoned "The Breeze" as a protectable trade name. [FN1] The district court rejected Clear Channel's abandonment argument, finding that CMI had continued to make "continuing commercial use" of "The Breeze" even after the September 2000 name change. Clear Channel contends on appeal that the district court erred as a matter of law because it continued to impose upon Clear Channel a "strict burden of proof" after Clear Channel established what it believes to be a prima facie case of abandonment. Leaving this burden on its shoulders, Clear Channel contends, contravenes our holding in E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports. Inc., 756 F.2d 1525 (11th Cir.1985). After careful review, we find no legal error in the district court's analysis.

FN1. During the October 24 hearing, Clear Channel's counsel conceded that "if they [CMI] were still using The Breeze, they could stop us. I wouldn't be up here arguing to the contrary." Clear Channel's position is that, because CMI has abandoned "The Breeze," it cannot succeed on the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

304 F.3d 1167

53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
(Cite as: 304 F.3d 1167)

Page 4

merits of its infringement claim. Clear Channel raised no argument in the district court regarding the other three prongs of the familiar preliminary injunction standard and does not challenge the district court's findings under them on appeal. *See CBS Broad., Inc. v. EchoStar Communications Corp.*, 265 F.3d 1193, 1200 (11th Cir.2001) (to merit preliminary injunctive relief, movant must show that: (1) it has substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless injunction issues; (3) threatened injury to movant outweighs possible injury injunction may cause opposing party; and (4) injunction would not disserve public interest) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc)).

[1] We begin our review by noting how deferential it is. Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record. *See Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir.1984) (per curiam) ("[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts ....") (quoting *Gray Line Motor Tours, Inc. v. City of New Orleans*, 498 F.2d 293, 296 (5th Cir.1974)). As is usually the case, the trial court is in a far better position than this Court to evaluate that evidence, and we will not disturb its factual findings unless they are clearly erroneous. *See CBS Broad.*, 265 F.3d at 1200; *E. Remy Martin*, 756 F.2d at 1529 ("Factual findings ... will be reversed only if clearly erroneous").

[2] The expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection. Those judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them. *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1547 (11th Cir.1987) ("We review the district court's order only for an abuse of discretion; '[t]he trial judge's ability to formulate a decree tailored to deal with the violations existent in each case is normally superior to that of any reviewing court, due to his familiarity with [the] testimony and exhibits.' ") (alterations in original) (quoting *1172United States v. Loew's, Inc.*, 371 U.S. 38, 52, 83 S.Ct. 97, 105-06, 9 L.Ed.2d 11 (1962)); *Revette*, 740 F.2d at 893 ("The district court's decision will not be reversed unless there is a clear abuse of discretion. This Court will not review the intrinsic merits of the case.") (citations and quotations omitted); *Gray Line*, 498 F.2d at 296 (noting that whether to grant a preliminary injunction "requir[es] a delicate balancing of the

probabilities of ultimate success ... with the consequences of immediate irreparable injury.... Weighing these considerations is the responsibility of the district judge....").

Ordinarily, a district court's legal conclusions alone are subject to our de novo review. *See CBS Broad.*, 265 F.3d at 1200; *E. Remy Martin*, 756 F.2d at 1529 ("[I]f the trial court has misapplied the law, then this court must review and correct the error without deference to that court's determination regarding the legal issue."). Only if we find that the district court has erred in its apprehension or application of the law will we subject the entirety of a preliminary injunction order to plenary review. *See E. Remy Martin*, 756 F.2d at 1529 ("If the lower court has misapplied the law, its conclusions are subject to our broad review.").

[3] The district court found that CMI is likely to prevail on its claims because it has protectable rights in the name "The Breeze" and Clear Channel has used the name in a deceptive manner likely to mislead Tallahassee radio listeners. [FN2] We agree. CMI has clearly made use of "The Breeze" in commerce, [FN3] the name itself is at least suggestive (and perhaps arbitrary or fanciful) and thus protectable under § 43(a) without a showing of secondary meaning, [FN4] and we find no fault in the district court's conclusion that Clear Channel's use of that name is likely to cause confusion-- indeed, has already caused confusion--among Tallahassee radio listeners. [FN5]

FN2. We focus only on federal law, because our analysis of CMI's Lanham Act claim renders unnecessary any consideration of CMI's FDUTPA claims at this stage of the case. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir.2001) ("[W]e may affirm [the district court's] judgment 'on any ground that finds support in the record.' ") (quoting *Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957)); *see also AmBrit*, 812 F.2d at 1535 n. 6 ("[B]ecause of our disposition of the federal claims, we need not review the district court's handling of the state law claims."). The two elements CMI must prove under § 43(a) are that it has rights in "The Breeze" name and that those rights have been violated by a confusingly similar use of the name by Clear Channel. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir.1984).

FN3. While it appears that CMI has not registered "The Breeze" and thus cannot proceed under § 32 of the Lanham Act, 15 U.S.C. § 1114, it nonetheless may proceed under § 43(a), 15 U.S.C. § 1125, if it has made use of the mark in commerce. *See Montgomery v. Noga*, 168 F.3d

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

304 F.3d 1167
53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
(Cite as: 304 F.3d 1167)

1282, 1297 n. 24 (11th Cir.1999) ("It is well settled ... that registration is not a prerequisite to an action under section 43(a).") (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992)); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n. 5 (11th Cir.2001) (" 'In the absence of registration, rights to a mark traditionally have depended on the very same elements that are now included in the statutory definition: the bona fide use of a mark in commerce that was not made merely to reserve a mark for later exploitation.' ") (quoting *Allard Enters., Inc. v. Advanced Programming Res., Inc.* 146 F.3d 350, 357 (6th Cir.1998)).

FN4. *See Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559-60 (11th Cir.1991) (inherently distinctive marks--which include arbitrary or fanciful marks and suggestive marks--are protectable under the Lanham Act without a showing of secondary meaning).

FN5. Likelihood of confusion is a finding of fact subject only to clear error review. *See E. Remy Martin*, 756 F.2d at 1529 ("In this circuit, a determination of likelihood of confusion ... is a matter of fact that we may overturn only if clearly erroneous.") (citing *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1163 (11th Cir.1982)). To determine likelihood of confusion, a court looks to seven factors: "(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales method; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion." *Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir.2000). "The most persuasive evidence in assessing the likelihood of confusion is proof of actual confusion." *Id.* The district court here found that "[t]he likelihood of confusion factors weigh in Plaintiff's favor. Specifically, WBZE continued to be known as 'The Breeze' in the Tallahassee area. Defendant has adopted the same name and a strikingly similar mark for WTLY. WBZE and WTLY are directly competing stations, in the same geographic area, offering similar music formats directed to substantially the same audience. Defendant adopted the name 'The Breeze' and copied

Plaintiff's trading style to increase its ratings and profit from false public association of Defendant's radio broadcasting services with the services offered by Plaintiff. There has also been actual confusion." On the evidence presented to the district court at the preliminary injunction hearing, these conclusions are not clearly erroneous.

**\*1173** Clear Channel does not challenge these conclusions, but instead asserts the affirmative defense of abandonment, by which a defendant may demonstrate that a trademark plaintiff no longer holds the rights to a mark. Abandonment is trademark law's way of recognizing that "[t]rademark rights flow from use." *AmBrit*, 812 F.2d at 1550; *see also Defiance Button Machine Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir.1985) ("A trademark or trade name ... represents the reputation developed by its owner for the nature and quality of goods or services sold by him ....") (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924)) (other citations omitted).

[4] If a mark holder stops using a mark with an intent not to resume its use, the mark is deemed abandoned and "falls into the public domain and is free for all to use.... Abandonment paves the way for future possession and property in any other person." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:1 (4th ed.2001); *see also Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 411 (9th Cir.1996) ("Rather than countenancing the 'removal' or retirement of the abandoned mark from commercial speech, trademark law allows it to be used by another."); *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir.1994) ("When a mark is abandoned, it returns to the public domain, and is appropriable anew...."). Thus, a defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff.

Under the Lanham Act, a protectable mark or name is considered abandoned if "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. [FN6] A putative trademark infringer **\*1174** thus must prove two separate elements to interpose the defense of abandonment successfully: that the plaintiff has ceased using the mark in dispute, [FN7] and that he has done so with an intent not to resume its use. *See Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir.1984); *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 535 (4th Cir.2000) ("[A] party claiming that a mark has been abandoned must show 'non-use of the name by the legal owner and no intent by that person or entity to resume use in the reasonably foreseeable future.' ") (quoting *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 850 (2d Cir.1992)).

304 F.3d 1167                                                                                    Page 6
53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
(Cite as: 304 F.3d 1167)

FN6. The definition of abandonment given in §
1127 reads in full:
A mark shall be deemed to be "abandoned" if
either of the following occurs:
(1) When its use has been discontinued with intent
not to resume such use. Intent not to resume may
be inferred from circumstances. Nonuse for 3
consecutive years shall be prima facie evidence of
abandonment. "Use" of a mark means the bona fide
use of such mark made in the ordinary course of
trade, and not made merely to reserve a right in a
mark.
(2) When any course of conduct of the owner,
including acts of omission as well as commission,
causes the mark to become the generic name for
the goods or services on or in connection with
which it is used or otherwise to lose its significance
as a mark. Purchaser motivation shall not be a test
for determining abandonment under this paragraph.
15 U.S.C. § 1127.

FN7. "Use" as contemplated by the definition of
abandonment in 15 U.S.C. § 1127 requires more
than mere token use: " 'Use' of a mark means the
bona fide use of such mark made merely to reserve a
right in a mark."

Because proving the subjective intent of a trademark holder
may prove burdensome for a defendant, *see Saratoga Vichy
Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980)
("intent is always a subjective matter of inference"), the
Lanham Act provides two aids for demonstrating intent.
First, it provides that "[i]ntent not to resume may be inferred
from circumstances." 15 U.S.C. § 1127; *see also Vitaline
Corp. v. Gen. Mills, Inc.,* 891 F.2d 273, 275 (Fed.Cir.1989)
("Although abandonment requires both non-use and intent
not to resume use of the mark, the element of intent can be
established inferentially by the same facts that establish
non-use."). Second, it allows a showing of three years of
consecutive nonuse to create a rebuttable presumption of
intent not to resume use: "[n]onuse for 3 consecutive years
shall be prima facie evidence of abandonment." 15 U.S.C. §
1127. [FN8]

FN8. Prior to January 1, 1996, nonuse for two
consecutive years was prima facie evidence of an
intent not to resume use. Pursuant to the Uruguay
Round Agreements Act, § 45 of the Lanham Act,
15 U.S.C § 1127, was amended, effective January
1, 1996, to require evidence of nonuse for three
consecutive years to establish a prima facie case of
abandonment. *See* Uruguay Round Agreements
Act, Pub.L. No. 103-465, § 521, 108 Stat. 4809,
4981-82 (1994).

The district court rejected Clear Channel's abandonment
defense, specifically finding that
   [c]onsiderable good will accrued to Plaintiff as a result of
   Plaintiff's promotion of "The Breeze." Plaintiff has kept
   up this association with "The Breeze" and the good will
   by using "The Breeze" logo on business cards and the
   sign at its broadcasting studio. Plaintiff's continuing
   commercial use of "The Breeze" goes beyond mere token
   use, thus going against a finding of abandonment.
On the basis of these factual findings, and noting that
"Defendant bears a strict burden of proof," the district court
concluded that Clear Channel was "not likely to succeed on
the merits of its abandonment defense." [FN9]
Abandonment is a finding of fact we review only for clear
error, *see On-Line Careline, Inc. v. America Online, Inc.,*
229 F.3d 1080, 1087 (Fed.Cir.2000) ( "Abandonment is a
question of fact."); *1175 *Rivard v. Linville,* 133 F.3d 1446,
1449 (Fed.Cir.1998) (same), and we cannot say the district
court's finding is clearly erroneous on the preliminary record
before us. [FN10]

   FN9. The district court also rejected Clear
   Channel's abandonment defense to CMI's
   FDUTPA claims: "Defendant's affirmative defense
   of 'abandonment' gives it no license to mislead
   consumers in the State of Florida in violation of the
   FDUTPA."

   FN10. Admittedly, evidence of CMI's use of "The
   Breeze" after WBZE's September 2000 name
   change was limited, consisting largely of a logo on
   a billboard, some business cards, and a few
   promotional materials, but it was sufficient to
   enable the trial court to reject Clear Channel's
   abandonment defense. This does not foreclose the
   possibility that, on a full record, the court may find
   that these items are simply vestigial holdovers from
   CMI's "Breeze" regime, evincing merely a
   haphazard transition to use of the "Star 98" name
   rather than an intent to continue using "The
   Breeze." But for our purposes today, the district
   court, after reviewing the evidence determined that
   these items were not merely vestigial and were
   instead part of CMI's active use of "The Breeze."
   The district court did not commit clear error in
   making this finding of fact.

Thus, were the district court's factfinding regarding
abandonment the only concern pressed by Clear Channel,
we could quickly put the issue to rest. But it is not. Hoping
to circumvent the deferential standard of review afforded
factual findings, Clear Channel asserts that the district court
committed legal error in its allocation of the burden of proof
on its abandonment defense. Clear Channel contends that
rather than placing on it "a strict burden of proof," the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

...3d 1167
...d.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986

as: 304 F.3d 1167)

...trict court should have shifted the burden of proof to CMI ...cause Clear Channel had established a prima facie case of ...bandonment. Failure to do so, Clear Channel urges, ...eviates from the legal framework we set forth in *E. Remy Martin* for allocating evidentiary burdens where a prima facie abandonment case has been established. We are unpersuaded.

[5] First, we note that the burden a defendant bears on the affirmative defense of abandonment *is*, in fact, "strict." *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir.1984); *Citibank*, 724 F.2d at 1545. Because a finding of abandonment works an involuntary forfeiture of rights, [FN11] federal courts uniformly agree that defendants asserting an abandonment defense face a "stringent," "heavy," or "strict burden of proof." *See e.g. Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486 (5th Cir.1992) ( "stringent standard of proof"); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1031, 213 U.S.P.Q. 185, 191 (C.C.P.A.1982) ("heavy burden"); *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, 14 U.S.P.Q.2d 1497, 1501 (D.Md 1989) ("Because abandonment constitutes a forfeiture of a property interest, both non-use and intent not to resume use must be strictly proved.") *aff'd* 13 U.S.P.Q.2d 2025 (4th Cir.1990). [FN12]

FN11. If it were a voluntary forfeiture, there would be no litigation. *See Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed.Cir.1990) ("In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest.").

FN12. There is disagreement about what this "strict burden" is. The Federal Circuit has held that it is nothing more than a talismanic phrase, requiring merely the preponderance of the evidence required to prevail on other civil issues. *See, e.g. Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1024 (Fed.Cir.1989) ("[W]e are unable to discern from the legislative history of the Lanham Act any intention by Congress to raise the burden of proof for ... abandonment above the normal civil burden of a preponderance of the evidence."). Other courts have held that it requires proof by clear and convincing evidence. *See, e.g. Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.Supp.2d 247, 268, (S.D.N.Y.2002) ("Because it constitutes a forfeiture of a property right, abandonment of a mark must be proven by clear and convincing evidence, and statutory aid to such proof must be narrowly construed.") (citations omitted); *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 191 F.Supp.2d 343, 349 (S.D.N.Y.2001)("A defense of

abandonment must be proven by clear and convincing evidence.") (citations omitted); *see generally* McCarthy, *supra*, § 17:12 ("Since abandonment results in a forfeiture of rights, the courts are reluctant to find an abandonment. ... [E]vidence of the elements of abandonment must be clear and convincing."). We have not had occasion to give detailed meaning to the term "strict burden," and need not do so now, because the outcome of this case is plainly the same whether we define a "strict burden" as requiring "clear and convincing evidence" or only a "preponderance of the evidence."

*1176 [6][7] Second, Clear Channel has misapprehended our holding in *E. Remy Martin*. In *E. Remy Martin*, we held that once a defendant establishes a case of prima facie abandonment, "[t]he *burden of proof* then shift[s] to [the mark holder] to *demonstrate* that circumstances d[o] not justify the inference of intent not to resume use." 756 F.2d at 1532 (emphases added). [FN13] We did not specify in *E. Remy Martin*, nor have we since, *what burden of proof* shifts to the mark holder upon a prima facie showing of abandonment--the burden of production or the burden of persuasion. [FN14] "The burden of proof typically has two elements: the burden of producing evidence and the burden of persuading the fact finder." *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 339 (5th Cir.1980). [FN15] Our choice of language in *E. Remy Martin*--"burden of proof ... to demonstrate"-- can be read as requiring either production or persuasion. *Accord Cerveceria Centroamericana, S.A. v. Cerveceria Indus. Inc.*, 892 F.2d 1021, 1025 (Fed.Cir.1989) (noting that "burden to demonstrate" can be read either as burden of production or as burden of ultimate persuasion). Relying on *E. Remy Martin* in *AmBrit*, we held that a prima facie abandonment case shifts to a mark holder "the burden ... *to establish* its intent to resume use," *AmBrit*, 812 F.2d at 1550 (emphasis added), but "establish" no more clearly corresponds to "produce" or "persuade" than does "demonstrate."

FN13. A prima facie showing simply means "evidence of such nature as is sufficient to establish a fact and which, if unrebutted, remains sufficient for that purpose." *Hiram Walker & Sons. Inc. v. Kirk Line, R.B. Kirkconnell & Bro., Ltd.*, 963 F.2d 327, 331 n. 5 (11th Cir.1992) (quoting *Miller v. Norvell*, 775 F.2d 1572, 1574 (11th Cir.1985)); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981) ("The phrase ' prima facie case' ... describe[s] the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue.").

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

304 F.2d 1167
53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
(Cite as: 304 F.3d 1167)

FN14. It was unnecessary to resolve this question on the specific facts of *E. Remy Martin*, because we found that the mark holder could not even meet a burden of production, let alone a burden of persuasion. *See* 756 F.2d at 1532-33.

FN15. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

The legislative history of the Lanham Act is similarly equivocal about what burden shifts to a mark holder once a prima facie showing of abandonment has been made. [FN16] Every federal court that has considered the question, however, has determined that a prima facie case of abandonment shifts only the burden of *production*, while leaving the ultimate burden of *persuasion* always with the defendant. *See, e.g., On-Line Careline*, 229 F.3d at 1087 ("Establishing a prima facie case eliminates *1177 the challenger's burden to establish the intent element of abandonment as an initial part of [his] case, creating a rebuttable presumption that the trademark owner has abandoned the mark without intent to resume use. The burden then shifts to the trademark owner to produce evidence that he either used the mark during the statutory period or intended to resume use. *The burden of persuasion, however, always remains with the petitioner to prove abandonment by a preponderance of the evidence.*") (alteration in original) (citations and quotations omitted and emphasis added); *Emergency One*, 228 F.3d at 536 ("Proof of three consecutive years of non-use thus creates a presumption--a mandatory inference of intent not to resume use. Once the presumption is triggered, the legal owner of the mark has the burden of producing evidence of either actual use during the relevant period or intent to resume use. *The ultimate burden of proof (by a preponderance of the evidence) remains always on the challenger.*") (citations omitted and emphasis added); *Rivard*, 133 F.3d at 1449; *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 938 (7th Cir.1989) ( "However, in contradiction to defendant's contention that the plaintiff must also bear the burden of persuasion on this affirmative defense, the owner of the trademark need only produce evidence to rebut the presumption while *the ultimate burden of persuasion rests on the defendant.*") (emphasis added); *Societe de Developments et D'Innovations des Marches Agricoles et Alimentaires-Sodima-Union de Cooperatives Agricoles v. Int'l Yogurt Co.*, 662 F.Supp. 839, 845 (D.Or.1987); *see also Abdul-Jabbar*, 85 F.3d at 411 n. 4 ("[I]n ... the Ninth, Second and Seventh [circuits], prima facie abandonment creates only a rebuttable presumption of abandonment.").

FN16. *See Cerveceria Centroamericana*, 892 F.2d

at 1025 n. 4 (citing *Trade-marks: Hearings on H.R. 82 Before the House Comm. on Patents*, 78th Cong. 24 (1944) ("The bill provides that discontinuance of use for 2 consecutive years shall be prima facie abandonment. It would shift the burden to the registrant.") (testimony of Daphne Robert, Esq.)).

We agree with the Federal Circuit, *see Cerveceria Centroamericana*, 892 F.2d at 1026. that, given the lack of evidence of Congress's clear intent to the contrary, this approach better comports with Rule 301 of the Federal Rules of Evidence, which provides that

In all civil actions and proceedings *not otherwise provided for by Act of Congress* or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence or to rebut or meet the presumption, *but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion*, which remains throughout the trial upon the party upon whom it was originally cast.

Fed R. Evid. 301 (emphases added). Accordingly, we hold that the ultimate burden of persuasion on the issue of abandonment remains with the defendant, and we can discern nothing to the contrary in *E. Remy Martin*.

[8] In short, the district court was correct to leave the ultimate burden of proof--and a "strict" one at that--with Clear Channel. *See Conagra*, 743 F.2d at 1516; *Citibank*, 724 F.2d at 1545. On this preliminary record, then, the very most Clear Channel can say is that it met its burden of production on abandonment, and thereby shifted the burden of going forward to CMI. Even if the burden of production did shift, however, CMI plainly met it by introducing evidence of its continued use of "The Breeze"--the business cards, the billboard, and the promotional materials. Weighing all of the evidence submitted by *both* sides, the district court made the critical factual finding that CMI had not abandoned "The Breeze." We can find no legal error in the district court's analysis, nor can we say that its factfinding *1178 was clearly erroneous. [FN17]

FN17. Clear Channel also argues that CMI's public announcement of its name change alone establishes a prima facie case of abandonment. While such an announcement is the type of circumstance from which intent not to resume use may be inferred, *see* McCarthy, *supra*, § 17:11 ("An intent not to resume use might be explicitly stated in advertising, as where a company advertises that 'We Are Changing Our Name from ALPHA to ZETA. Don't Call Us ALPHA any more.' "); *Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 585 F.Supp. 17, 22 (S.D.Iowa 1982); *Emergency One*, 228 F.3d at 540, it does not alone

304 F.3d 1167
53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
(Cite as: 304 F.3d 1167)

Page 9

serve to make a prima facie showing of abandonment. A defendant must also introduce evidence of nonuse.

B.

[9][10] Clear Channel's second argument on appeal is that the district court abused its discretion by failing to hold a *second* hearing *after* issuing the preliminary injunction so that it could introduce additional evidence. An evidentiary hearing is required for entry of a preliminary injunction only "where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue." *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1312 (11th Cir.1998) (citing *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.,* 887 F.2d 1535, 1538 (11th Cir.1989)) (other citations omitted). In this case, there is "little dispute as to raw facts," *id.* at 1313 (quoting *Jackson v. Fair,* 846 F.2d 811, 819 (1st Cir.1988)); that is, both parties agree that the billboard outside of CMI's offices, CMI's business cards, and some of CMI's promotional materials continue to bear "The Breeze" name and logo after WBZE's name change. There is, however, "much [dispute] as to the inferences" to be drawn from these raw facts. *Id.* (quoting *Jackson,* 846 F.2d at 819). In such a situation, we have adopted an "approach to determine whether an evidentiary hearing is necessary that 'leave[s] the balancing between speed and practicality versus accuracy and fairness to the sound discretion of the district court.' " *Id.* (alteration in original) (quoting *Jackson,* 846 F.2d at 819).

[11] Here, the district court held an evidentiary hearing and allowed the parties the opportunity to submit supplemental evidence after the hearing before issuing the injunction. Nevertheless, Clear Channel contends that, because it was unable to find and prepare witnesses in time for the first hearing, the district court should be compelled to give it another bite at the apple. But "where a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion." *Mays v. U.S. Postal Serv.,* 122 F.3d 43, 46 (11th Cir.1997). Clear Channel has made no such showing. Accordingly, we cannot say that the district court abused its discretion by denying Clear Channel a second hearing.

C.

[12] Clear Channel's third and final argument on appeal is that the district court's injunction is overbroad because it prohibits Clear Channel from making any use of "The Breeze," even what it dubs "curative uses" designed to dispel confusion Clear Channel may create by its on-air identification of WTLY as "The Breeze." While a preliminary injunction must be "narrowly tailored to fit specific legal violations, because the district court should not impose unnecessary burdens on lawful activity," *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 299 (2d Cir.1999) (citations and punctuation omitted), the district **\*1179** court was under no obligation to permit Clear Channel to use "The Breeze" as it seeks to do and we cannot say it erred in failing to do so. Curative steps are sometimes required when a new user wants to use a mark that has been abandoned but is still associated by the public with its former holder. [FN18] In such a case, the preventive measures are a condition on the *use* of the mark by the new user. A court need not permit curative steps to an *infringer* treading upon the protectable rights of a current user. Even if the uses of "The Breeze" for which Clear Channel seeks permission--such as identifying WTLY as "The Breeze 107.1" or "The New Breeze"--would not infringe CMI's rights in the name, the district court was well within the bounds of its discretion to deny Clear Channel those uses. "An injunction can be therapeutic as well as protective. In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *AmBrit,* 812 F.2d at 1548 (quoting *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 390 (5th Cir.1977)); *see also Indianapolis Colts,* 34 F.3d at 416 (finding argument analogous to Clear Channel's "baffl[ing]"); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 705 (5th Cir. Unit A Oct.23, 1981) ("[A] competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a *safe* distance away from the margin line--even if that requirement involves a handicap as compared with those who have not disqualified themselves.") (emphasis added) (quoting *Broderick & Bascom Rope Co. v. Manoff,* 41 F.2d 353, 354 (6th Cir.1930)). The district court was thus well within the bounds of its discretion in shaping the contours of the injunction and we will not second guess its judgment.

> FN18. *See* Restatement (Third) of Unfair Competition § 30 cmt. a (1990) ("A designation that has been abandoned ... may for a time retain its significance as an indication of association with the former user. During the period of residual significance, use of the designation by another is likely to be perceived by prospective purchasers as an indication of association with the former user. Unless the subsequent user adequately distinguishes its use of the designation from the use by the original owner, the subsequent use is likely to deceive prospective purchasers with respect to the source or sponsorship of the goods or services."); McCarthy, *supra,* § 17:2 ("[B]ecause their subsequent use of the abandoned mark may

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

304 F.3d 1167                                                                                              Page 10
53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986
**(Cite as: 304 F.3d 1167)**

well evoke a continuing association with the prior user, those who make subsequent use may be required to take reasonable precautions to prevent confusion.").

AFFIRMED.

304 F.3d 1167, 53 Fed.R.Serv.3d 823, 64 U.S.P.Q.2d 1353, 15 Fla. L. Weekly Fed. C 986

Briefs and Other Related Documents (Back to top)

• 2002 WL 32102005 (Appellate Brief) Initial Brief of Appellant, Clear Channel Communications, Inc. (Apr. 08, 2002)

• 2002 WL 32102006 (Appellate Brief) Reply Brief of Appellant, Clear Channel Communications, Inc. (Feb. 04, 2002)

• 2002 WL 32102004 (Appellate Brief) Brief of Plaintiff-Appellee Cumulus Media, Inc. (Jan. 22, 2002)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT



27

(To be scanned in place of tab)

213 F.Supp.2d 247
(Cite as: 213 F.Supp.2d 247)

Page 1

# H

United States District Court,
S.D. New York.

EMMPRESA CUBANA DEL TABACO, d.b.a.
Cubatabaco, Plaintiff,
v.
CULBRO CORPORATION and General Cigar Co., Inc.,
Defendants.

No. 97 CIV. 8399(RWS).

June 26, 2002.

Cuban cigar manufacturer challenged American manufacturer's rights in "COHIBA" trademark. On cross motions for summary judgment, the District Court, Sweet, J., held that: (1) defendant abandoned mark for period of time; (2) fact issue existed as to whether defendant intentionally infringed upon plaintiff's mark; (3) plaintiff's suit was not bared by acquiescence, estoppel or laches; (4) plaintiff could not assert infringement claims under General Inter-American Convention for Trade Mark and Commercial Protection (IAC) or International Convention for the Protection of Industrial Property (Paris Convention); and (5) fact issue existed as to whether plaintiff's mark was well-known in United States at time defendant registered it.

Motions granted in part and denied in part.

West Headnotes

**[1] Trade Regulation ☞375.1**
382k375.1 Most Cited Cases

Party in court proceeding cannot assert equitable defenses, such as acquiescence, estoppel or laches, against cancellation claim asserted on ground trademark had been abandoned or was improperly obtained. Lanham Trade-Mark Act, § 14(3), 15 U.S.C.A. § 1064(3).

**[2] Trade Regulation ☞74**
382k74 Most Cited Cases

Determination that trademark has been abandoned defeats alleged owner's claim of priority.

**[3] Trade Regulation ☞75**
382k75 Most Cited Cases

Because it constitutes forfeiture of property right, abandonment of trademark must be proven by clear and convincing evidence, and statutory aid to such proof must be narrowly construed. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[4] Trade Regulation ☞133.1**
382k133.1 Most Cited Cases

Amendment of statute governing determinations of trademark abandonment, increasing period of nonuse sufficient to constitute prima facie case of abandonment from two years to three years, was not retroactively applicable. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[5] Trade Regulation ☞70**
382k70 Most Cited Cases

Elements of claim for trademark abandonment are: (1) non-use and (2) intent not to resume use. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[6] Trade Regulation ☞75**
382k75 Most Cited Cases

Where presumption of trademark abandonment has been established by nonuse for statutory period, trademark owner has burden of demonstrating that circumstances do not justify inference of intent not to resume use. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[7] Trade Regulation ☞75**
382k75 Most Cited Cases

Bare assertion of possible future use of trademark is not enough to prove intent to resume use, for purpose of rebutting presumption of abandonment arising from nonuse for statutory period; mark owner must come forward with objective, hard evidence of actual concrete plans to resume use in reasonably foreseeable future when conditions requiring suspension abate. Lanham Trade- Mark Act, § 45, 15 U.S.C.A. § 1127.

**[8] Trade Regulation ☞71**
382k71 Most Cited Cases

Cigar manufacturer's nonuse of trademark for five year period constituted abandonment, absent evidence to support manufacturer's claim that mark was withdrawn in order to plan for its future introduction on new product; resumption of mark's use was merely as new label for existing product. Lanham TradeMark Act, § 45, 15 U.S.C.A. § 1127.

**[9] Trade Regulation ☞71**
382k71 Most Cited Cases

Cigar manufacturer's mere intent not to abandon trademark during five-year period of non-use was insufficient to rebut statutory presumption of abandonment; manufacturer had to show concrete plans to resume use in reasonably foreseeable future. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**[10] Trade Regulation ⊱70**
382k70 Most Cited Cases

Trademark "warehousing," which is impermissible, occurs when one hoards mark for future use without concrete intent *to use it in future.* Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[11] Trade Regulation ⊱71**
382k71 Most Cited Cases

Neither trademark owner's consideration of trade dress issues, nor its sending of cease and desist letter to potential *infringer, were sufficient to rebut presumption of* abandonment arising from nonuse of mark for statutory period; actions were minor activities that fail to establish any intent to resume use of mark in reasonably foreseeable future. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[12] Trade Regulation ⊱75**
382k75 Most Cited Cases

To refute allegation of trademark abandonment, contesting party must proffer more than conclusory testimony or affidavits.

**[13] Equity ⊱65(1)**
150k65(1) Most Cited Cases

*Under doctrine of "unclean hands," court may decline to* exercise its equitable powers in favor of party whose unconscionable act has immediate and necessary relation to matter he seeks in respect of matter in litigation.

**[14] Trade Regulation ⊱76**
382k76 Most Cited Cases

*Although doctrine of "unclean hands" will prevent* application of equitable defenses in trademark infringement case, any purposeful delay on part of plaintiff in order to take advantage of alleged infringer's use of mark will vitiate this rule.

**[15] Trade Regulation ⊱76**
382k76 Most Cited Cases

Intentional infringement acts as bar to assertion of laches defense against infringement suit seeking injunctive relief.

**[16] Trade Regulation ⊱76**
382k76 Most Cited Cases

Issue of material fact as to whether American cigar manufacturer intentionally infringed upon Cuban manufacturer's trademark precluded summary judgment on American manufacturer's assertion that Cuban

manufacturer's infringement claim was barred by laches.

**[17] Trade Regulation ⊱76**
382k76 Most Cited Cases

Cuban cigar manufacturer's three or four year delay in filing trademark infringement suit was not sufficiently significant or purposeful to preclude it from asserting that defendant's unclean hands precluded it from asserting laches defense; there was no evidence that suit was delayed in order to take advantage of defendant's marketing efforts.

**[18] Trade Regulation ⊱76**
382k76 Most Cited Cases

Where trademark infringement plaintiff presents strong showing of likelihood of confusion, equitable defenses, such *as laches or acquiescence,* will not bar its claims for injunctive relief, although they may preclude recovery of damages.

**[19] Trade Regulation ⊱334.1**
382k334.1 Most Cited Cases

Although existence of direct competition between brands is factor to be considered in determining whether there is likelihood of confusion, trademark infringement can be found even if plaintiff's mark is not registered in United States and its product is not sold in United States. Lanham *Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).*

**[20] Trade Regulation ⊱333**
382k333 Most Cited Cases

**[20] Trade Regulation ⊱334.1**
382k334.1 Most Cited Cases

**[20] Trade Regulation ⊱340.1**
382k340.1 Most Cited Cases

**[20] Trade Regulation ⊱363.1**
382k363.1 Most Cited Cases

Factors court considers when determining likelihood of confusion, and hence trademark infringement, are: (1) strength of plaintiff's mark; (2) similarity of plaintiff's and defendant's marks; (3) competitive proximity of services; (4) likelihood that plaintiff will bridge gap and offer service like defendant's; (5) actual confusion; (6) good faith on defendant's part; (7) quality of defendant's service; and (8) sophistication of buyers. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[21] Trade Regulation ⊱722**
382k722 Most Cited Cases

Issue of material fact as to whether American cigar manufacturer's trademark was likely to cause consumer confusion with Cuban manufacturer's mark precluded summary judgment on American manufacturer's assertion that Cuban manufacturer's infringement claim was barred by laches.

**[22] Trade Regulation ⬿76**
382k76 Most Cited Cases

Affirmative defense of acquiescence is available to trademark infringement defendant only when trademark owner, by affirmative word or deed, had previously conveyed its consent.

**[23] Trade Regulation ⬿389**
382k389 Most Cited Cases

To assert equitable estoppel, trademark infringement defendant must show that: (1) plaintiff's misleading communication, with plaintiff's knowledge of true facts, prompted defendant to infer that plaintiff would not enforce its rights against defendant; (2) defendant relied on that conduct; and (3) defendant would be prejudiced if plaintiff were allowed to bring suit.

**[24] Trade Regulation ⬿76**
382k76 Most Cited Cases

**[24] Trade Regulation ⬿389**
382k389 Most Cited Cases

Cuban cigar manufacturer's trademark infringement claim against American manufacturer was not barred by acquiescence or estoppel; Cuban manufacturer's alleged failure to contest American manufacturer's ownership claims occurred prior to its learning that American manufacturer intended to make significant commercial use of mark.

**[25] Estoppel ⬿95**
156k95 Most Cited Cases

Silence may constitute cause for equitable estoppel if duty to speak exists.

**[26] Trade Regulation ⬿385.1**
382k385.1 Most Cited Cases

To assert equitable defense of laches, trademark infringement defendant must show that plaintiff had knowledge of defendant's use of its marks and that plaintiff inexcusably delayed in taking action with respect thereto.

**[27] Trade Regulation ⬿385.1**
382k385.1 Most Cited Cases

Presumption of laches arises in trademark action when plaintiff does not bring suit within statute of limitations period applicable to state-law fraud claims.

**[28] Trade Regulation ⬿387**
382k387 Most Cited Cases

Cuban cigar manufacturer's delay of up to three years in bringing infringement claim against American manufacturer was excusable, and thus did not constitute laches; during period of delay, defendant was not advertising accused product and was only selling insignificant numbers of it through two retailers.

**[29] Trade Regulation ⬿137**
382k137 Most Cited Cases

Cuban cigar manufacturer's unfair competition claim under General Inter- American Convention for Trade Mark and Commercial Protection (IAC) had to be pursued through suit under Lanham Act provision governing implementation of trademark treaties. Lanham Trade-Mark Act, § 44(b, h), 15 U.S.C.A. § 1126(b, h).

**[30] Trade Regulation ⬿137**
382k137 Most Cited Cases

Lanham Act's incorporation of unfair competition provisions of General Inter- American Convention for Trade Mark and Commercial Protection (IAC) did not include IAC provisions permitting refusal or cancellation of registrations of marks that are similar to well-known marks registered in other member countries. Lanham Trade-Mark Act, § 44(b, h), 15 U.S.C.A. § 1126(b, h).

**[31] Trade Regulation ⬿540.1**
382k540.1 Most Cited Cases

Cuban cigar manufacturer's unfair competition claim under International Convention for the Protection of Industrial Property (Paris Convention) had to be pursued through suit under Lanham Act provision governing implementation of trademark treaties. Lanham Trade-Mark Act, § 44(b, h), 15 U.S.C.A. § 1126(b, h).

**[32] Trade Regulation ⬿137**
382k137 Most Cited Cases

Lanham Act's incorporation of unfair competition provisions of International Convention for the Protection of Industrial Property (Paris Convention) did not include Paris Convention provision permitting refusal or cancellation of registrations of marks that are similar to well-known marks registered in other member countries. Lanham Trade-Mark Act, § 44(b, h), 15 U.S.C.A. § 1126(b, h).

213 F.Supp.2d 247
(Cite as: 213 F.Supp.2d 247)

Page 4

**[33] Trade Regulation ⚖️464.1**
382k464.1 Most Cited Cases

**[33] Trade Regulation ⚖️469**
382k469 Most Cited Cases

New York common law unfair competition claim requires showing of: (1) likelihood of confusion and (2) bad faith.

**[34] Federal Civil Procedure ⚖️2493**
170Ak2493 Most Cited Cases

Issue of material fact as to whether cigar manufacturer's Cuban trademark was well-known in United States at time competitor registered it precluded summary judgment on manufacturer's New York common law unfair competition claim.

**[35] Trade Regulation ⚖️366**
382k366 Most Cited Cases

Elements of trademark dilution claim are: (1) senior mark must be famous; (2) it must be distinctive; (3) junior use must be commercial use in commerce; (4) it must begin after senior mark has become famous; and (5) it must cause dilution of distinctive quality of senior mark. Lanham Trade-Mark Act, § 43(c), 15 U.S.C.A. § 1125(c).

**[36] Trade Regulation ⚖️366**
382k366 Most Cited Cases

Federal registration is no defense to charge of dilution under federal Anti- Dilution Act. Lanham Trade-Mark Act, § 43(c), 15 U.S.C.A. § 1125(c).

**[37] Trade Regulation ⚖️722**
382k722 Most Cited Cases

Issue of material fact as to whether Cuban cigar manufacturer's trademark was well-known, and thus "owned" by it in United States at time mark was registered by American manufacturer precluded summary judgment on Cuban manufacturer's dilution claim. Lanham Trade-Mark Act, § 43(c), 15 U.S.C.A. § 1125(c).

**Trade Regulation ⚖️736**
382k736 Most Cited Cases

COHIBA.
**\*251** Rabinowitz, Boudin, Standard, Krinsky & Lieberman by Michael Krinsky, David B. Goldstein, New York City, Winston & Strawn by Kevin Walsh, Steve Young, New York City, for Plaintiff.

Latham & Watkins by John J. Kirby, Jr., Marcellus Williamson, Elena C. Nonnan, New York City, for

Defendants.

*OPINION*

SWEET, District Judge.

Defendants General Cigar Holdings, Inc. (the legal successor in interest to named defendant Culbro Corporation) and General Cigar Co. Inc. (collectively "General Cigar") have moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the complaint of plaintiff Emmpresa Cubana del Tabaco d.b.a. Cubatabaco ("Cubatabaco") on the basis of estoppel, acquiescence, and laches due to Cubatabaco's alleged long delay in challenging General Cigar's use and registrations of the COHIBA trademark. Cubatabaco has moved (1) to strike General Cigar's affirmative defenses of estoppel, acquiescence, and laches; and (2) for partial summary judgment on its claims of abandonment and under Articles 7 and 8 of the General Inter-American Convention for Trademark and Commercial Protection ("IAC" or "Inter-American Convention"), Article 6bis of the Paris Convention for the Protection of Industrial Property ("Paris Convention"), New York common law, and the Trademark Dilution Act.

For the following reasons, these motions are denied in part and granted in part.

***Parties***

Cubatabaco is a company organized under the laws of Cuba with its principal place of business in Havana, Cuba. Directly, and through its licensee, Habanos, S.A., Cubatabaco exports tobacco products from Cuba throughout the world, excluding the United States because of the current trade embargo. It was established by the Cuban government as an independent entity with its own assets and administration and is subject to the jurisdiction of a Cuban ministry.

Culbro has been merged into and is survived by General Cigar Holdings, Inc. General Cigar Holdings is a Delaware corporation with its principal place of business in the county of New York and functions as a holding company for General Cigar Co. Inc.

**\*252** General Cigar Co. is a Delaware corporation with its principal place of business in Bloomfield, Connecticut. General Cigar Co. is in the business of manufacturing, marketing, advertising and distributing tobacco.

General Cigar and its predecessors in interest have been major U.S. manufacturers and distributors of cigars for more than a century.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247                                                    Page 5
(Cite as: 213 F.Supp.2d 247)

### Prior Proceedings

Cubatabaco filed its complaint on November 12, 1997, alleging that Cubatabaco possessed a COHIBA mark for its cigars that was "well-known" in the United States at the relevant time, and that General Cigar's efforts to exploit and trade upon Cubatabaco's COHIBA mark in order to generate profits on the sale of its own cigars entitled Cubatabaco to relief under the Paris Convention, Arts. 6bis and 10bis; the Inter-American Convention, Arts. 7, 8, 20 and 21; section 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(c)(1) and 1125(a); and New York State law.

On December 11, 1997, the parties in settlement discussions entered into a written agreement that, *inter alia,* (1) the actions of both parties in this court and in the U.S. Patent and Trademark Office ("PTO") are "stopped"; (2) "the time spent during the negotiation will not be used by any of the parties to the detriment of the other, in case there is no [settlement] agreement;" and (3) "use of General Cigar's COHIBA trademark as from the signing of this Contract will not be used in detriment of Cubatabaco if agreement is not reached." The parties reported this agreement to the Court on December 16, 1997, and, at their request, all proceedings were stayed, including discovery, until litigation was renewed in February 2000.

By order dated December 5, 2000, Counts V (Article 22 of TRIPS), VI (Article 10 of the Paris Convention), VIII (false representation of origin in violation of Section 43(a) of the Lanham Act) and IX (deceptive advertising in violation of Section 43(a) of the Lanham Act) were dismissed with prejudice in light of the decision in *Havana Club Holding S.A. v. Galleon S.A.,* 203 F.3d 116, 124 (2d Cir.2000).

General Cigar filed the instant motion for summary judgment on the basis of its equitable defenses on November 29, 2001. On January 29, 2002, Cubatabaco filed its motions for summary judgment to dismiss General Cigar's equitable defenses and for summary judgment on its claims under Articles 7 and 8 of the IAC; Article 6bis of the Paris Convention; the Federal Trademark Dilution Act; and New York common law. The motions were heard on March 13, 2002, and were considered fully submitted at that time.

### Facts

The following facts are taken from the parties' Rule 56.1 statements [FN1] and, as required, are construed in the light most favorable to the non-movant, as applicable. They do not constitute findings of fact by the Court.

> FN1. General Cigar submitted one Rule 56.1 Statement and responses to Cubatabaco's two Rule 56.1 Statements; Cubatabaco submitted two Rule 56.1 Statements and one response to General

Cigar's Rule 56.1 statement. The statements have been compiled due to the similarities in facts alleged and the interrelationship of the three motions to which they relate.

### I. *The Cuban COHIBA*

In 1969, Cubatabaco filed an application to register the "COHIBA" mark in Cuba. By 1970, cigars branded with Cubatabaco's COHIBA trademark were being produced at the El Laguito factory in Havana. The *253 cigar box and band bore a distinctive design developed for the COHIBA cigar as well as the COHIBA trademark. The registration issued on May 31, 1972.

Throughout the 1970's, Cuban COHIBA cigars were commercially available and sold in Cuba at Havana's main hotels, upscale restaurants and two retail outlets. From 1970 to 1975, Cubatabaco claims that annual sales at the two retail outlets in Havana averaged approximately 100,000 cigars and increased to approximately 180,000 cigars per year by 1975. In addition, since at least 1970, COHIBA cigars had been sold to the Cuban Council of State, which includes the office of the Cuban President and to another Cuban state enterprise which in turn sold the cigars to Cuban Ministries and other government institutions. [FN2] Cubatabaco claims that the total volume of sales grew from approximately 350,000 to 375,000 per year from 1970 to 1975 to approximately 550,000 to 600,000 per year from 1975 to 1980. There are no records of these sales, however, as Cubatabaco has a policy of destroying its sales and production records after five years.

> FN2. General Cigar contests the characterization that cigars obtained and given away by Fidel Castro, other governmental officials and entities were sales by Cubatabaco.

On November 15, 1977, *Forbes* magazine published an article on the impact of Cuban cigars on the U.S. industry that noted that Cubatabaco was developing a Cohiba cigar. General Cigar's principal executives read this article.

By January 1978, Cubatabaco had made application to register COHIBA in 17 countries, including most of the Western European countries. [FN3] The applied-for registrations issued in due course. Cubatabaco did not, however, sell COHIBA cigars outside of Cuba until 1982.

> FN3. The countries were: Great Britain, Ireland, Belgium, the Netherlands, Luxembourg, Spain, France, Denmark, Portugal, Australia, Egypt, South Africa, Argentina, Mexico, Switzerland, Venezuela, Colombia, and Italy. Cubatabaco has by now registered the mark in more than 115 countries total.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247

(Cite as: 213 F.Supp.2d 247)

Page 7

General Cigar first learned of the name "COHIBA" in the late 1970's. General Cigar executives had read the *Forbes* article discussed above. In addition, a December 1977 internal memorandum refers to COHIBA as "sold in Cuba/brand in Cuba" and "Castro's brand cigars." [FN5]

FN5. The words came from handwritten notations on an internal memoranda, and the handwriting was never identified. General Cigar claims that this writing cannot establish that it knew that Cubatabaco was using the COHIBA mark or selling COHIBA cigars prior to General Cigar's first use or application to register the COHIBA mark.

In February 1978, General Cigar employee Oscar Boruchin ("Boruchin") discussed the COHIBA brand with Edgar Cullman Jr. ("Cullman"), chairman of Culbro. Boruchin purportedly had learned of COHIBA from a friend who visited Cuba on behalf of the State Department during the Carter Administration and was given COHIBA cigars in Cuba by "the highest echelons of government."

On March 13, 1978, General Cigar filed an application to register "Cohiba," with a claimed first use date of on or before February 13, 1978. Before or after pursuing this application, General Cigar did not request counsel to conduct a trademark search in Cuba or internationally, which would have disclosed the Cuban registrations. There is evidence to suggest that such a search would not have been industry practice in these circumstances. [FN6]

FN6. While other U.S. law firms could and did conduct international trademark searches at the time, General Cigar cites the testimony of a U.S. trademark lawyer retained by Cubatabaco who stated that he has never conducted a trademark search in Cuba for a party who did not intend to use or register the mark in Cuba. Moreover, he stated that he generally does not conduct any foreign trademark searches for clients who want to use the mark in the United States only.

It is a disputed issue as to whether the COHIBA name was well-known at this time. Boruchin testified that he told Cullman that "[n]obody knew the brand," and it was "not on the market," "didn't mean anything to anybody," and was "just given to visitors, diplomats." Cubatabaco states, however, COHIBA cigars were well-known in the United States cigar industry and among the public because of the two magazine articles mentioning COHIBA. Further, numerous United States journalists, business executives, and others knew of the brand from seeing it on sale in retail outlets and hotels in Havana, from receiving it as gifts in Cuba and at receptions in the United States, and by word of mouth.

On July 25, 1978, the U.S. Patent and Trademark Office ("PTO") asked General Cigar "whether the term COHIBA has any meaning or significance in the relevant trade or industry." General Cigar answered in the negative.

On March 20, 1979, the PTO, in another Office Action, noted, "Cohiba is a geographical tobacco growing region of Cuba," and stated that the COHIBA application would be refused as either geographically descriptive or misdescriptive, depending on whether the goods were from Cohiba. In a September 14, 1979 response, General Cigar asserted that COHIBA was "wholly arbitrary" and "fanciful and arbitrary," which Cubatabaco claims General Cigar clearly knew to be false.

On November 4, 1980, General Cigar's COHIBA application was published in the *256 Trademark Office Official Gazette for opposition purposes. Neither Cubatabaco nor any other entity opposed General Cigar's COHIBA application. General Cigar obtained United States registration for the COHIBA mark, Registration 1,147,309, on February 17, 1981. [FN7]

FN7. Whether the trademark was legitimately obtained is a matter of dispute. Cubatabaco claims that General Cigar's incomplete, misleading and false responses to the PTO's queries were certain to mislead the PTO from a full and proper consideration of the matter, including that the Cuban brand was protected from registration or use in the United States under the Inter-American Convention.

### III. *The Growth of Parallel Brands as a Result of the Cuban Revolution and Cuban Embargo*

General Cigar alleges that COHIBA represents another example of a "parallel brand" that resulted from the Cuban Revolution and the subsequent embargo.

On January 1, 1959, Fidel Castro seized control of the Cuban government. The new government seized privately-owned cigar manufacturers on September 15, 1960. Some of the ousted Cuban cigar owners reestablished their businesses abroad using the trademarks their families had owned before the government seizure.

In 1963, the U.S. government imposed an embargo on trade with Cuba, prohibiting anyone subject to the jurisdiction of the U.S. from transporting, importing or otherwise dealing in or engaging in any transaction with respect to merchandise "of Cuban origin." 31 C.F.R. §§ 515.101 *et seq.* (1999) (the "Embargo").

Although the embargo prevented Cuban entities such as Cubatabaco from selling cigars and other Cuban products in

213 F.Supp.2d 247                                                                                    Page 8
(Cite as: 213 F.Supp.2d 247)

the United States, it did not prevent them from registering or protecting trademarks, trade dress and other intellectual property in the United States. In fact, Cubatabaco has aggressively protected its intellectual property in the United States. [FN8]

> FN8. Cubatabaco employed lawyers in the United States, filed U.S. trademark applications and arranged for specific investigations into filings in the U.S. Patent and Trademark Office. It also protected its trademarks around the world. In the 1990's, it had 8,000 registrations worldwide. It has registered COHIBA in approximately 115 countries.

In a series of cases in the 1960's and early 1970's (the "Menendez litigation"), U.S. courts upheld rights of the former owners of Cuban cigar trademarks in the United States against claims of the Cuban government and governmental entities. The courts determined that the owners of the expropriated Cuban cigar companies retained ownership of the pre-expropriation common law trademark rights obtained by their pre-expropriation sale of cigars in the United States under those trademarks and the appurtenant good will. The courts so ruled on the ground that the United States would not give extraterritorial effect to takings without compensation and hence would not give legal effect to the Cuban expropriations of the cigar companies as applied to trademark registrations and common law rights existing in the United States at that time. *F. Palicio y Compania, S.A. v. Brush & Bloch*, 256 F.Supp. 481 (S.D.N.Y.1966), *aff'd* 375 F.2d 1011 (2d Cir.1967); *Menendez v. Faber, Coe & Gregg*, 345 F.Supp. 527 (S.D.N.Y.1972), *aff'd in part and rev'd in part sub nom. Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir.1973), *cert. granted as to certain questions*, 416 U.S. 981, 94 S.Ct. 2382, 40 L.Ed.2d 758 (May 13, 1974); *reargued* Jan. 19, 1975; *rev'd in part and cert. controverted in part sub. nom. Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

Over time, U.S. cigar manufacturers, including General Cigar, purchased some of **\*257** the U.S. trademark registrations and rights from the families who fled Cuba. As a result of the upholding of the ousted Cuban owners' U.S. trademark rights, "parallel brands" developed, *i.e.*, the Cuban government sells a Cuban cigar in Cuba and other parts of the world under the same apparent trademark as an unrelated company that sells a non-Cuban cigar in the U.S. It is not the same trademark, however, as the U.S. cigars are sold under trademarks which the owners had registered and used in the United States for the sale of their cigars prior to the expropriation of the Cuban cigar companies.

COHIBA's situation is different from those of the brands in the *Menendez* litigation, as the COHIBA brand was not originally a privately owned company prior to the Revolution and embargo, nor was it sold in the United States prior to that time. COHIBA therefore did not involve an expropriated owner seeking to use its U.S. trademark while the Cuban government continued to use the Cuban and other trademarks. It is true, however, that the Cuban COHIBA is sold around the world and in Cuba, while cigars under the same apparent mark are sold in the United States by a different, unrelated entity.

**IV.  *Sales of General Cigar's COHIBA-Branded Cigars From 1978 to 1997***

From 1978 to 1997, General Cigar sold three different pre-existing cigars--the White Owl, the Canario D'Oro, and the Temple Hall--as a "COHIBA cigar" by placing a COHIBA label on the cigars.

**A.  *1978-1982: COHIBA-Branded "White Owl" Cigars***

Beginning in 1978, General Cigar shipped 1,000 or fewer COHIBA-branded cigars per year. [FN9] The cigars were White Owl "stock" machine-made cigars that were shipped along with other White Owl cigars (or other "seconds") labeled with as many as 32 other different brands as part of a "trademark maintenance program."

> FN9. This figure is based on the invoices still in existence twenty years after the periodic shipments were made. General Cigar claims that more shipments were likely made, but the records thereof have not been located. General Cigar has not posited estimates of what it believes constitute the actual figures.

The cigars were irregularly and sporadically shipped to two retailers who, by pre-arrangement, were given a full credit back on the nominal payment they made to General Cigar. Two boxes of 50 cigars of each of the 33 brands were simultaneously shipped in identical cardboard boxes, with stick-on labels affixed to two boxes for each of the 33 different brands. These shipments were not sent out when "seconds" were not available.

The cardboard boxes with the different labels, including "COHIBA," were sold in the same cartons they were in with a sign stating the price per box. If the two boxes with the COHIBA label were at the bottom of the box, they would not have been visible to the consumer.

General Cigar sold the following amounts of COHIBA-branded White Owl cigars during this period:

1978:    650

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247
(Cite as: 213 F.Supp.2d 247)

Page 9

1979:   600

1980:   1,000

1981:   700

1982:   200 (single shipment on April 15, 1982)

## B. *1982-1987: COHIBA-Branded "Canario D'Oro" Cigar*

Beginning in November 1982, General Cigar placed the COHIBA brand on its *258 pre-existing Canario D'Oro premium cigar. The COHIBA-branded Canario D'Oro was packaged in a clear plastic canister with a price between that of a high-end premium cigar and a "bundled" cigar. General Cigar's sole promotion of the brand consisted of in-store advertising materials.

On June 23, 1986, General Cigar filed a sworn "Declaration Under Sections 8 and 15 of the Trademark Act of 1946" for its COHIBA registration, in which it attached a "specimen showing the mark as currently used" (the packaging in which the Canario D'Oro was sold as of November 1982). As part of the requirement to establish incontestability under Section 15, General Cigar declared that "the mark shown therein has been in continuous use in interstate commerce for five consecutive years from February 17, 1981 to the present."

On November 3, 1986, the PTO granted "incontestability status" to General Cigar's COHIBA mark.

Sales of the COHIBA-branded Canario D'Oro ceased sometime in 1987.

General Cigar sold the following amounts of COHIBA-branded Canario D'Oro cigars during this period:

1982:   90,000 (Nov. and Dec. only)

1983:   323,000

1984:   118,000

1985:   70,000

1986:   5,000

1987:   3,000 [FN10]

FN10. Cubatabaco disputes that figure but accepts it for purposes of the summary judgment motion.

## C. *Period of No Sales from 1987 to 1992*

General Cigar itself [FN11] made no sales under the COHIBA name for at least five years, from sometime in 1987 until November 20, 1992.

FN11. General Cigar claims that COHIBA cigars nonetheless stayed on store shelves and were sold during that time due to the shelf-life of cigars and the depressed cigar market of the late 1980's and early 1990's.

It is disputed whether during this time period General Cigar abandoned its earlier registration of COHIBA or merely stopped selling a lower-quality version in order to make plans for a higher priced, "super-premium" [FN12] version.

FN12. "Super-premium" is a pricing range.

General Cigar claims that it decided to convert COHIBA from a "bundled" cigar into a premium cigar that would be sold in wooden boxes and used as one of General Cigar's principal brands, and that it stopped shipping the non-premium cigars from 1986 to 1992 to develop the premium brand of COHIBA. Cubatabaco alleges, however, that General Cigar did not begin working with an outside consultant to develop the premium COHIBA until September 1992, six years later.

It is undisputed that the following events occurred during this time period.

In April 1989, General Cigar sought to use the word mark "COHIBA" in conjunction with the identical copying of the Cuban COHIBA trade dress. Counsel advised in July 1989 that the trade dress was already registered, and based on this legal advice, General Cigar determined not to use the identical trade dress.

On November 9, 1990, General Cigar sent a cease and desist letter, asserting that the use of the name "COHOBA" for cigars infringed on General Cigar's "considerable rights in [its 1981 COHIBA] registration."

*259 In December 1991, General Cigar again considered using an element of the Cuban COHIBA trade dress, the so-called "Indian Head" design. Outside counsel advised against it, and in-house counsel informed the marketing department that "We are out of luck on the use of the Indian Head design." The outside counsel in April 1989 and December 1991, advised General Cigar that either non-use or mere token use of a mark was insufficient to sustain rights and would constitute abandonment.

## D. *1992-1997: The COHIBA-Branded "Temple Hall" Cigar*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247                                                    Page 10
(Cite as: 213 F.Supp.2d 247)

On September 1, 1992, the premiere issue of *Cigar Aficionado* was published, with a distribution of 115,000 copies [FN13] and display at 453 cigar outlets. The premier issue was introduced to the trade on August 27, 1992, at a breakfast held by *Cigar Aficionado* at the annual convention of the Retailer Tobacco Dealers of America ("RTDA"), the principal retailers' association. Complimentary copies of the premier issue were distributed to the 300 to 400 attendees.

> FN13. That number is equal to 25% of all premium cigar smokers. The magazine was the first to be aimed at premium cigar smokers.

The issue featured the Cuban COHIBA in a six-page cover story about "Cuba's Best Cigar," entitled "The legend of Cohiba: Cigar Lovers Everywhere Dream of Cuba's Finest Cigar." [FN14] On September 21, 1992, *Newsweek* ran an article on *Cigar Aficionado's* launch, noting that COHIBA was the initial winner of the magazine's first "blind tastings" feature, and that the first issue had featured ads for premium products such as Glenlivet single-malt scotch, Louis Vuitton luggage "and, of course, COHIBA cigars." [FN15] Cubatabaco claims that General Cigar decided in the fall of 1992 to sell a new product under the COHIBA name "to somehow capitalize on the success of the Cuban brand and especially at this point in time the good ratings that it got, the notoriety that it got from *Cigar Aficionado*." General Cigar states that it had always intended to resume use of the COHIBA mark.

> FN14. The article called the Cuban COHIBA, "perhaps the world's finest smoke," and "legendary to most cigar aficionados." In its rating of cigars, the magazine gave COHIBA Robusto and Esplendido scores of 96 and 98 out of a possible 100. The premier issue made other positive references to the Cuban COHIBA.

> FN15. Prior to 1992, COHIBA was referenced 46 times in articles dating from as early as 1977 and stretching over the fifteen-year period.

In September 1992, defendants began to work with an outside graphic designer, Cliff Bachner ("Bachner") on the trade dress of the new COHIBA. John Rano, General Cigar's head of marketing, instructed Bachner to make "exactly same" copies of the Cuban COHIBA trade dress. Bachner did as instructed, but General Cigar states that it never used those prototypes in commerce. [FN16] Milstein, who was Assistant General Counsel for General Cigar at that time, testified in deposition that General Cigar wanted to use a label as near as possible to the Cuban COHIBA "for the same reason they wanted to use it in '89 and again in '91," that is "they wanted to somehow capitalize on the success of the Cuban brand, and especially at this point in time the good ratings that it got, the notoriety that it got

from *Cigar Aficionado*." Milstein Dep. at 284.

> FN16. Cubatabaco claims, however, that General Cigar utilized the same typeface as it and placed the mark in the same location on the cigar box (the lower right hand corner), beginning in November 1992. It claims that General Cigar did this in order to better exploit the Cuban COHIBA's name and to suggest strongly that the product was a variety of, and affiliated with, the Cuban COHIBA.

**\*260** In the first week of November 1992, Ron Milstein, General Cigar's then Assistant General Counsel ("Milstein"), and Alfons Mayer, General Cigar's Vice President for Tobacco ("Mayer"), traveled to Havana, Cuba, at the invitation of Cubatabaco to attend an international conference in Havana for the 500th anniversary of the European discovery of tobacco, which included the launch of a new line of COHIBA cigars, "Siglo (Century) 1492." In a private meeting, Mayer informed Padron of General Cigar's interest in entering into a broad and exclusive partnership with Cubatabaco for the United States territory upon the embargo's end, which would replicate the 51/49 partnership for distribution of Cuban cigars that Cubatabaco had created in the rest of the world. COHIBA was not mentioned during the meeting. Milstein wrote of the meeting:

> We met with Mr. Padron for 1 hour over breakfast. The talk was of the Consolidated sale rumor. We got no more information. Mr. Padron made it very clear that trademarks are not important. He said Havana will sell cigars no matter what name they have. Any companies that have marks (this was directed to G.C.) would have to sell (give) the marks back to Cubatabaco and get distributorship rights only, or else Cubatabaco will sell the cigars under a new name.

While at the conference, Milstein was introduced to Adargelio Garrido, a Cubatabaco attorney ("Garrido"). Milstein did not speak Spanish and Garrido, a native Spanish speaker, had not studied English at the time. General Cigar claims that a conversation took place between the two men. The evidence of this meeting is a memorandum Milstein wrote two weeks after the meeting. [FN17] Milstein wrote that Garrido "acknowledged that we owned the name in the U.S. and that we would be free to sell a cigar under that name there." Milstein's memorandum also indicated that Garrido stated that Cubatabaco would object to any use General Cigar made of the trade dress associated with Cubatabaco's COHIBA cigars. Cubatabaco raises several objections to this evidence. [FN18]

> FN17. Milstein and Mayer both also testified in depositions as to the meeting and that Garrido indicated that General Cigar owned the COHIBA

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247                                                           Page 11
(Cite as: 213 F.Supp.2d 247)

word mark in the United States.

> FN18. First, it claims that the memorandum is
> inadmissible hearsay because Milstein has no
> independent recollection of the event and did not
> write the memorandum until two weeks after the
> alleged conversation took place. It also disputes
> that the conversation could have even or ever did
> take place. Garrido, a native Spanish speaker,
> testified that he "did not have a conversation, it was
> just an introduction." Further, Mayer testified that
> Milstein met with a Cubatabaco lawyer while
> walking down a corridor at the conference center,
> while Milstein testified that he thought he met
> Garrido at the Cohiba Siglo launch party. Finally,
> Cubatabaco also states that Garrido had not, and
> could not be reasonably viewed as having, the
> authority or apparent authority to make the
> statements attributable to him.

In November 1992, General Cigar began to sell a COHIBA
cigar again by relabeling its pre-existing "Temple Hall"
cigar. This COHIBA was a medium- priced cigar. General
Cigar made no reference to its earlier "COHIBA" product,
and the trade dress was completely different. The cigars
were sold only at Alfred Dunhill of London, an upscale
retailer ("Dunhill"), and Mike's Cigars, a Florida retailer,
wholesaler, and mail-order distributor. In 1992, General
Cigar sold through Dunhill only. General Cigar engaged in
no advertising or promotion of the COHIBA-branded
Temple Hall cigar from 1992 to 1997.

Prior to this time, General Cigar knew of the Cuban
COHIBA's sale, use, registration and employment in Cuba.

In the fall of 1992, General Cigar requested that its outside
counsel provide a *261 legal opinion regarding its rights to
the COHIBA name and use of the Cuban COHIBA trade
dress. On December 2, 1992, Morgan & Finnegan advised
General Cigar that Cubatabaco's registrations of the trade
dress would probably not support an action by Cubatabaco
against General Cigar for use of its trade dress. Instead, it
warned that use of the Cubatabaco trade dress could
increase the potential for Cubatabaco's being able to show
likelihood of confusion regarding the COHIBA mark based
upon its "prior existing reputation for the Cuban COHIBA
mark." Further, use of the trade dress "would lend support to
an argument that General Cigar was acting in bad faith, i.e.
with an intention to mislead the public into confusing
General Cigar's product with Cubatabaco's" and could
expose General Cigar to liability. Morgan & Finnegan
advised General Cigar to obtain Cubatabaco's written
confirmation of General Cigar's right to use the COHIBA
word mark and that it would be prudent not to launch the
product even without the trade dress elements of

Cubatabaco's product before obtaining that confirmation. It
also advised General Cigar to file a new U.S. trademark
application coinciding with the new launch of the COHIBA
product. This new registration "would not be vulnerable to
any claims of earlier abandonment [FN19] which may be
asserted against the existing registration."

> FN19. General Cigar states that counsel who
> prepared this opinion was unaware that General
> Cigar had sold hundreds of thousands of COHIBAs
> during the 1980's.

On December 30, 1992, General Cigar filed an application
to register COHIBA, purportedly to protect the appearance
of the mark in bold, capital letters. Cubatabaco claims that
General Cigar filed the application because it had
abandoned its 1981 registration.

In a January 13, 1993 memo to the top executives of
General Cigar, the assistant general counsel Milstein laid
out General Cigar's strategy "to exploit the popularity,
familiarity, brand recognition and overall success of the
Cuban Cohiba." Milstein also stated General Cigar's desire
to use "the familiar trade dress of the Cuban Cohiba."

In the spring of 1993, General Cigar's advertising agency
developed a campaign for the new, premium COHIBA.
They first phase of the "strategy" was to "[e]xploit the
Cohiba name, with its reputation as one of the world's finest
cigars amongst cigar smokers, to build a brand image for the
U.S. Product." [FN20] In mid-1993, General Cigar
instructed the advertising agency to stop working on the
COHIBA campaign, and no more work was done until
March 1997.

> FN20. General Cigar contests this to the extent it
> suggests that General Cigar sought to exploit the
> fame of the COHIBA *mark.*

Also in the spring of 1993, General Cigar's graphic designer
developed trade dress designs similar, but not identical, to
the Cuban trade dress, based on instructions for "further
exploration," "in terms of color, typography and graphics,"
of the "original [Fall 1992] comps" which "came from the
Cuban Cohiba." These plans, too, were put on hold from
mid-1993 until March 1997. During the time period from
mid-1993 to March 1997, General Cigar claims that it was
in the process of developing the blend to use in the
"super-premium" COHIBA. Cubatabaco contests this,
stating that General Cigar's practice was to develop blends
and then name them. [FN21]

> FN21. It claims that the product given the
> COHIBA name was developed as part of a process
> of simultaneously developing and naming several
> different blends, and that General Cigar was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247                                                          Page 12
(Cite as: 213 F.Supp.2d 247)

always in the process of developing new and better cigars. General Cigar claims that it also selected brand names and then developed blends for use with the brand names, and that COHIBA is an example of where it did that.

**\*262** In a December 1993 interview with Padron, which appeared in the Spring 1994 edition of *Cigar Aficionado,* the following exchange purportedly took place:

CA: If the embargo ended tomorrow or two to five years from now, have you thought through how it would happen and what the scenario would be? You have problems with certain brands as far as trademark issues, and with other brands you do not have a problem. Have you thought how you would introduce your brands to the American market?

Pedron: First there is going to be a fight. We have not been able to have the brand name in the United States because of the embargo. It was forced by [the United States]. It was not decided on our side.... But we are not going to fight in order to get our cigars into the United States. As we always say, a Habano [cigar] is a Habano [cigar]. With a name of Marvin or Padron or Meyer or whatever goes on the cigar, it is a Habano. So, we are going to let everybody know that we are here, and this is a Habano. We are not going to fight with somebody else because he owns the brand name of Cohiba or Montecristo in America. We have been living without that for a long time.

Cubatabaco objects to this statement for the same reasons it objects to Padron's earlier interview excerpts.

In January 1994, Cubatabaco received a box of General Cigar's COHIBA- branded Temple Hall cigars. Along with the box, Cubatabaco received a note stating that the box was not sold as a "regular item" and that it was being produced by General Cigar only for purposes of its trademark registration. [FN22] At the time Cubatabaco believed that General Cigar was not making stable or continuous use of the COHIBA trademark in the United States. Cubatabaco's counsel did not learn of the box until some time later.

> FN22. The note read in full: "This Box of Cohiba is produced by General Cigar for trademark registration purposes in the U.S.A. only. This is not to be sold as a regular item. That is why you only see the name Cohiba. The cigar is __ Tom." The back of the box bore a stamp, "Dunhill by Alfred Dunhill of London, Inc. Handmade in Santiago Republica Dominicana 42K Beverly Hills."

On April 12, 1994, General Cigar's application to register COHIBA in a block letter format was published for opposition. No entity challenged General Cigar's application to register COHIBA in block letter format at that time.

On June 2, 1994, Cubatabaco first learned of General Cigar's application to register COHIBA in block-letter format after the time to file an opposition had expired. Sometime after that, Cubatabaco engaged and communicated with its United States attorneys (plaintiff's counsel Rabinowitz, Boudin, Standard, Krinsky & Lieberman ("Rabinowitz, Boudin")) with respect to contesting General Cigar's rights to the COHIBA mark. {FN23]

> FN23. Cubatabaco claims that it dropped the matter after the interview with Cullman, discussed below, was published.

The Autumn 1994 issue of *Cigar Aficionado* quoted Cullman as stating that General Cigar (1) was "sitting on" its COHIBA rights with "no big plans at the moment," despite, in the interviewer's words, the fact that COHIBA "is widely regarded as the No. 1 brand produced in Cuba"; and (2) would "like to work something out with" Cuba regarding COHIBA when the embargo was lifted.

In 1995, the PTO granted General Cigar's application to register the COHIBA mark.

**\*263** In the September 1996 issue of *Cigar Aficionado,* Cullman announced that General Cigar "had a plan to come out with Cohiba" "within the next two years."

Cubatabaco had decided in the summer of 1996 to commence proceedings against General Cigar and on November 19, 1996, Garrido instructed Rabinowitz, Boudin to do so.

General Cigar sold the following amounts of the COHIBA-branded Temple Hall cigars, constituting less than 0.05% of General Cigar's annual premium cigar sales, from 1992 to 1996:

1992:   5,600 (November and December only)

1993:   50,000

1994:   49,000

1995:   101,000

1996:   96,000

### V. *Cubatabaco Submits Cancellation Petition*

On January 15, 1997, Cubatabaco applied to register the COHIBA mark and filed a Petition for Cancellation with the PTO. On May 28, 1997, Cullman contacted Francisco

Linares, president of Habanos, S.A., a marketing arm of Cubatabaco, to propose a settlement meeting. As noted earlier, the instant lawsuit was filed on November 12, 1998.

General Cigar claims that it has been prejudiced because Cubatabaco waited until 1997 to file this petition.

First, it claims it had taken a number of actions to protect its rights in the COHIBA mark. Cubatabaco alleges that the bulk occurred after Cubatabaco filed its cancellation petition in January 1997. General Cigar:
• *filed two lawsuits for infringement of General Cigar's COHIBA trademark*, both of which resulted favorably for General Cigar. *General Cigar Co. v. G.D.M. Inc.*, 988 F.Supp. 647 (S.D.N.Y.1997); Case No. 98 Civ. 8174 (S.D.N.Y.).%N24%N

    FN24. The lawsuits were filed after January 1997.

• assisted the Customs service to prevent importation of counterfeit COHIBAs; [FN25] communicated with importers of detained or seized goods.

    FN25. General Cigar presents as evidence five letters; *four are dated after January 1997.*

• participated in one action before the PTO to prevent the registration of a mark, "CAOBA," similar to its COHIBA registration. [FN26]

    FN26. The action took place in 1997.

• obtained or supported actions by criminal law enforcement authorities against sellers of unauthorized COHIBA cigars and related products.
• hired private investigators to investigate infringers and their activities, to submit related affidavits in support of search and seizure warrants and to review seized merchandise and related records bearing the COHIBA mark, all at General Cigar's expense.
• sent at least two [FN27] "cease and desist" letters to infringing users of the COHIBA trademark.

    FN27. It claims to have sent "numerous" of such letters, but the evidence presented reveals only two such letters. One was dated *after Cubatabaco filed the cancellation petition.*

• spent $1.5 million in enforcement activities.

General Cigar also alleges that it has been prejudiced by Cubatabaco's delay in bringing this suit because witnesses have died or are elderly and ill and unable to testify. These witnesses are:
*264 • Frank Fina, Sr., a General Cigar employee for 45 years and Vice President of Manufacturing, has died;

• John McLoughlin, a Sales Administrator at General Cigar's corporate offices, is hospitalized and cannot testify in this action;
• Gregory Atkinson, an attorney at Morgan & Finnegan who worked on the COHIBA matter for General Cigar, has died;
• James Siegel, the attorney who filed the U.S. BEHIQUE registration on behalf of Cubatabaco, has died;
• Henry Whitehall, Vice President and Secretary of Culbro Corporation from 1946 until 1987, who signed the 1978 registration and the Section 8 and 15 declaration, has died;
• Robert Lilienfield, a former Vice President of General Cigar until 1998 and who was in charge of premium cigars, is ill and cannot testify in this action;
• Nicholas Freeman, a go-between between General Cigar and Cubatabaco with regard to their respective trade rights in the COHIBA trade dress, has died;
• Amy Lineberger, Manager of Marketing Research at General Cigar from November 1996 until June 1998, has died.

According to Cubatabaco, General Cigar has not been prejudiced by the unavailability of these witnesses because General Cigar failed to identify the materiality of their testimony and failed to specify in many instances that the witnesses were unable for deposition after Cubatabaco filed the cancellation petition. Further, General Cigar has deposed more than 35 other persons, and Cubatabaco contends that they are more central to this matter than those witnesses identified by General Cigar. [FN28]

    FN28. General Cigar has deposed twenty-nine of its own present and former employees, including CEOs, Presidents, heads of marketing and sales, the trademark custodian, two in-house and four outside attorneys, numerous personnel directly *involved in the 1982, 1992, and 1997 launches*, and the graphic designer.

In addition, General Cigar claims that it has been prejudiced as many witnesses do not recall the events in question because they took place so many years ago. Cubatabaco argues, however, that General Cigar has failed to identify any material factual question affected by loss of memory.

General Cigar also notes that all files related to Cubatabaco maintained by Lackenbach Siegel were destroyed in a flood caused by Hurricane Floyd in 1999.

## VI. *General Cigar Introduces Super-Premium COHIBA*

In August 1997, General Cigar introduced the super-premium COHIBA cigar at the RTDA Convention. No sales were made to the public at this time.

In September 1997, General Cigar launched its new product with an "unprecedented" advertising and promotional campaign costing more than $2 million. The product was promoted nationwide through broad channels of premium retail trade. Cubatabaco claims that the product launched in September 1997 intentionally adopted a trade dress "as near as possible" to the Cuban COHIBA and that it is confusingly similar.

*Cigar Aficionado* and its affiliated publication, *Cigar Insider*, rate cigars. They typically give ratings of 90 or better to a few select brands in each category of cigars. The super-premium General Cigar COHIBA has received a 90 rating or better, but has not received it consistently.

The following sales of the super-premium COHIBA occurred:

1997:   509,000  (August to December only)

1998:   858,000

1999:   985,000

*265 The following summarizes the approximate annual sales of the various versions of the COHIBA-branded cigars:

> FN29. As discussed earlier, Cubatabaco disputes the figure.

White Owl

| | |
|---|---|
| 1978: | 650 |
| 1979: | 600 |
| 1980: | 1,000 |
| 1981: | 700 |
| 1982: | 200 (single shipment on April 15, 1982) |

Canario D'Oro

| | |
|---|---|
| 1982: | 90,000 |
| 1983: | 323,000 |
| 1984: | 118,000 |
| 1985: | 70,000 |

| | |
|---|---|
| 1986: | 5,000 |
| 1987: | 3,000  [FN29] |

FN29. As discussed earlier, Cubatabaco disputes the figure.

| | |
|---|---|
| 1988: | 0 |
| 1989: | 0 |
| 1990: | 0 |
| 1991: | 0 |

Temple Hall

| | |
|---|---|
| 1992: | 5,600 (Nov. and Dec. only) |
| 1993: | 50,000 |
| 1994: | 49,000 |
| 1995: | 101,000 |
| 1996: | 96,000 |

Original COHIBA blend

| | |
|---|---|
| 1997: | 509,000 (Aug. to Dec. only) |
| 1998: | 858,000 |
| 1999: | 985,000 |

### DISCUSSION

**I. Jurisdiction**

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C. § 1121(a) for claims arising out of alleged violations of Sections 38, 43(a) and (c), and 44(b) and (h) of the Lanham Act, 15 U.S.C. §§ 1120, 1125(a) and (c) and 1126(b) and (h).

**II. Venue**

Venue is appropriate in this district under 28 U.S.C. § 1391.

**III. Standard for Summary Judgment**

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

admissions on file, together with affidavits ... show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060-61 (2d Cir.1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *\*266Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs-Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002).

**IV. *Abandonment***

As part of its Count XI, Cubatabaco seeks the cancellation of General Cigar's 1981 COHIBA registration because of alleged abandonment. Cubatabaco has moved for summary judgment on this claim based on General Cigar's inaction from 1987 to 1992.

It is necessary to determine whether abandonment has occurred at the outset as this determination may affect the analysis of whether General Cigar's equitable defenses apply. Whether acquiescence, estoppel, and laches result from the period between 1984 and 1997 presents a much different question than whether they apply to the period between 1992 and 1997.

**A. *Equitable Defenses Do Not Apply to Claims of Abandonment***

[1] As an initial matter, General Cigar's equitable defenses do not apply to Cubatabaco's claims that the 1981 registration was abandoned. [FN30]

> FN30. For the same reasons discussed herein, nor can they apply to Cubatabaco's claims that the 1981 registration and 1986 incontestability declaration were obtained fraudulently. These fraud claims are not addressed because of the determination, *infra,* that the mark was abandoned between 1987 and 1992.

There is no question that in actions before the PTO, equitable defenses such as the ones General Cigar asserts here are unavailing against cancellation claims based on abandonment. The only question is whether that rule also applies when the cancellation proceeding is brought before a court.

The Lanham Act provides that a petition to cancel a

trademark registration may be filed "at any time" if, *inter alia,* the registered mark has been abandoned. 15 U.S.C. § 1064(3) [FN31]. Based on the "at any time" language, [FN32] the PTO's Trademark Trial and Appeal Board has ruled in cancellation hearings that equitable defenses are not available against claims of abandonment in cancellation of trademark registration cases. *Treadwell's Drifters Inc. v. Marshak,* 1990 WL 354600, 18 U.S.P.Q.2d 1318, 1320 (Trademark Tr. & App. Bd.1990) ("[E]quitable defenses are not available against the claims of abandonment ... because it is in the public **\*267** interest to remove abandoned registrations from the register...."); *Bausch & Lomb, Inc. v. Leupold & Stevens Inc.,* 1986 WL 83320, 1 U.S.P.Q.2d 1497, 1499 (Trademark Tr. & App. Bd.1986) (citing cases); *Southwire Co. v. Kaiser Aluminum & Chem. Corp.,* 1977 WL 22597, 196 U.S.P.Q. 566, 573 (Trademark Tr. & App. Bd.1977); *see also* McCarthy, *Trademarks and Unfair Competition,* § 20:11, 1045 (2d ed. 1984) ["McCarthy"].

> FN31. That provision states, in pertinent part:
> A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who believes that he is or will be damaged ...:
> (3)
> At any time if the registered mark becomes the generic name for the goods or services, or a portion therefore, ... or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 4 [15 U.S.C. § 1054] or of subsection (a), (b), or (c) or section 2 [15 U.S.C § 1052] ... or contrary to similar prohibitory provisions of such prior Acts ... or if the registered mark is being used by or with the permission of the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used.
> 15 U.S.C. § 1064.

> FN32. Two other subsections provide a narrow five-year window for filing a cancellation petition. § 1064(1) and (2). The "at any time" language is therefore a significant difference and suggests the legislative intent to provide a limitless opportunity to challenge registrations based on the provisions of § 1064(3).
> Further, the fact that § 1069 permits the application of the equitable principles of laches, estoppel and acquiescence in *inter partes* proceedings does not alter this conclusion, as that section states that such principles may be considered and applied "where applicable." The principles are not applicable where the Lanham Act specifically carves out an exception to them.

The Fourth Circuit has held that the limits placed on PTO cancellation proceedings also apply to court proceedings. *Shakespeare Co. v. Silstar Corp. of America, Inc.*, 9 F.3d 1091, 1098 (4th Cir.1993) (citing Siegrun D. Kane, *Trademark Law* 281 (2d ed.1991)). That means that the language in Section 1064 and its express license to file for cancellation on particular grounds "at any time" is applicable here. Therefore, parties in a court proceeding cannot assert equitable defenses against cancellation claims asserted on the basis of abandonment or other enumerated grounds in § 1064 that allow filing "at any time." *Baniel v. Guild*, 2000 WL 1349254, at *5 (N.D.Ill. Sept. 19, 2000). As the *Baniel* court recognized, the policy reasons that the PTO bars equitable defenses against cancellation proceedings involving abandoned marks apply equally whether the case is before that body or a federal court. 2000 WL 1349254, at *5.

General Cigar posits that this rule contravenes the rationale behind equitable defenses, *i.e.* that parties should not sleep on their rights while a competitor develops good will in a disputed mark. Congress, in drafting the Lanham Act, clearly showed its preference between these two conflicting policies: keeping the registry clear of abandoned marks is more important than preventing entities from sleeping on their rights.

General Cigar cites a number of case that do not involve cancellation proceedings and Section 1064's statutory language permitting filing "at any time" and thus are not applicable. [FN33] General Cigar presents only two seemingly contradictory cases that involve a cancellation proceeding. In both *Oreck Corp. v. Thomson Consumer Elecs. Inc.*, 796 F.Supp. 1152, 1161 (S.D.Ind.1992) (dismissing trademark cancellation claim on the basis of fraudulent procurement [FN34] due to laches) and *Joint Stock Soc'y v. UDV N. America Inc.*, 53 F.Supp.2d 692, 721-22 (D.Del.1999) (granting defendant's motion for summary judgment dismissing, *inter alia,* a trademark cancellation claim on the basis of laches), however, the courts either ignored or refused to apply the language of Section 1064. Because it is held that this Court is bound by the language of that section, these cases are inapposite.

FN33. *E.g., Odetics Inc. v. Storage Tech. Corp.*, 14 F.Supp.2d 800 (E.D.Va.1998) (patent); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir.1999) (false advertising and false promotion); *M & T Chems. Inc. v. IBM Corp.*, 403 F.Supp. 1145, 1150 (S.D.N.Y.1975) (patent).

FN34. Section 1064 also includes registrations obtained by fraud in its umbrella.

**B. *General Cigar Abandoned the COHIBA Mark Between 1987 and 1992***

[2][3] A determination that a mark has been abandoned defeats the alleged owner's claim of priority:

Once abandoned, the mark reverts back to the public domain whereupon it may be appropriated by anyone who adopts the mark for his or her own use. Hence a party that is found to have abandoned its mark is deprived of any claim to priority in the mark before the date of abandonment and may regain rights in the mark only through subsequent use after the time of an abandonment. *268 *General Cigar Co. v. G.D.M., Inc.*, 988 F.Supp. 647, 658 (S.D.N.Y.1997) ("*G.D.M.*") (citing *Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F.Supp. 1339, 1355 (E.D.N.Y.1994) (citing *Manhattan Indus. Inc. v. Sweater Bee by Banff Ltd.*, 627 F.2d 628, 630 (2d Cir.1980)).) Because it constitutes a forfeiture of a property right, abandonment of a mark must be proven by clear and convincing evidence, and statutory aid to such proof must be narrowly construed. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980); *see also G.D.M.*, 988 F.Supp. at 658.

[4] The determination of abandonment is governed by Section 1127 of the Lanham act, which states, in pertinent part:

A mark shall be deemed to be "abandoned"
(1) when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
15 U.S.C. § 1127 (1993). [FN35]

FN35. The statutory period of nonuse sufficient to constitute a prima facie case of abandonment was increased from two years to three years by the Uruguay Round Agreements Act, Pub.L. No. 103-465, § 521. 108 Stat. 4809, 4981-82 (1994). The amendment was effective January 1, 1996--the conduct at issue occurred--and the amendment does not expressly call for retroactive application. Therefore, the statute as it was in effect from 1987 to 1992 controls. *Landgraf v. USI Film Products,* 511 U.S. 244, 280 (1994); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored by law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires the result."); *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) ("[W]here the congressional intent is clear, it governs.").

[5] The Second Circuit has found two elements necessary to find abandonment: (1) non-use and (2) intent not to resume use. *Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850

(2d Cir.1992) (citing Silverman v. CBS, Inc., 870 F.2d 40, 45 (2d Cir.1989)).

[6] The party claiming abandonment bears the burden of proof as to both elements. However, where the statutory presumption of abandonment has been established by nonuse for more than two consecutive years, the trademark owner must demonstrate that circumstances do not justify the inference of an intent not to resume use. Exxon Corp. v. Humble Exploration Co., 695 F.2d 96, 99 (5th Cir.1983). This presumption "eliminates the challenger's burden to establish the intent element of abandonment as an initial part of its case." Imperial Tobacco Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1579 (Fed.Cir.1990); see Emergency One, Inc. v. American FireEagle, Ltd., 228 F.3d 531, 536 (4th Cir.2000) ("Once the presumption is triggered, the legal owner of the mark has the burden of producing evidence of either actual use during the relevant period or intent to resume use."). [FN36]

> FN36. The presumption "is no more than a rebuttable presumption." Saratoga Vichy Spring, 625 F.2d at 1044. The presumption shifts the burden of production, but the ultimate burden of proof remains with the challenger. On-Line Careline, Inc. v. America Online, Inc., 229 F.3d 1080, 1087 (Fed.Cir.2000).

[7] Defendants must come forward with objective, hard evidence of actual "concrete plans to resume use" in the "reasonably foreseeable future when the conditions requiring suspension abate." Silverman, 870 F.2d at 46; see also Rivard v. Linville, 133 F.3d 1446, 1449 (Fed.Cir.1998) ("To prove excusable nonuse, the registrant must produce evidence showing that, under his particular circumstances, his activities are those that a reasonable *269 businessman, who had a bona fide intent to use the mark in United States commerce, would have taken."). "A bare assertion of possible future use is not enough" to prove an intent to resume use. Silverman, 870 F.2d at 47; see also Imperial Tobacco, 899 F.2d at 1581 ("In every contested abandonment case, the respondent denies an intention to abandon its mark.... [O]ne must, however, proffer more than conclusory testimony or affidavits."); Rivard, 133 F.3d at 1449 ("A registrant's proclamations of his intent to resume or commence use in United States commerce during the period of nonuse are awarded little, if any weight.").

This is not the first time that this Court has addressed the issue of whether General Cigar abandoned its rights to the COHIBA mark. The issue was discussed at some length in a different case brought by General Cigar:

> General Cigar does not dispute that no sales of COHIBA cigars took place from 1988 through 1991. Instead, it explains this hiatus resulted from the "restaging" of its

COHIBA cigars. The restaging consisted of the switch from the plastic cylindrical package to wooden box, the second registration of the trademark, and commencement of the tobacconist partnership with Dunhill and Mike's Cigars.
Even if General Cigar had not come forward with evidence of an intent to resume use during the 1988 through 1991 hiatus, General Cigar established rights to the mark by filing the second trademark registration in 1992, and conducting sales from 1992 to the present.

G.D.M., 988 F.Supp. at 659 (granting preliminary injunction as General Cigar was likely to prevail on its claim of trademark infringement). Cubatabaco states that this holding is not determinative because the "restaging" cited is not supported by the record in this case. In any case, the issue facing the Court in G.D.M. was not whether General Cigar had proved that it had not abandoned its rights to the COHIBA mark, but whether it was likely to prevail on its claim of trademark infringement. This case is at a different procedural posture and more discovery has taken place. In addition, in G.D.M., the determination of whether abandonment had occurred did not affect the ultimate resolution because of General Cigar's second registration.

[8] It is undisputed for the purposes of this motion that General Cigar did not have any commercial use of the COHIBA mark from sometime in 1987 to November 20, 1992--a period of five years. This establishes a presumption of abandonment that General Cigar may rebut by showing valid reasons for nonuse and by proving intent to resume use. The ultimate burden remains with Cubatabaco, however.

General Cigar places primary emphasis on its argument that it withdrew the mark from 1987 to 1992 because of the slump in the cigar market and used the time to plan for a new COHIBA cigar. These constitute reasonable business explanations. E.g., Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393 (9th Cir.1985) (no abandonment where temporary cessation of use caused by changing or depressed market conditions); Keebler Co. v. Nabisco Brands, Inc. (N.D.Ill. May 19, 1992) (no abandonment where introduced evidence of tests, plans, and investments of funds in development of new products). However, the claims of "restaging" are belied by the fact that the "new" COHIBA cigar introduced in 1992 was nothing more than an existing General Cigar, the Temple Hall, with a COHIBA label on it. Even the new label was created in the fall of 1992, after the launch of Cigar Aficionado with its cover story on the Cuban COHIBA. If General Cigar truly spent five years engaged *270 in ruminating over complex marketing strategies, it apparently did not implement the results. E.g., Imperial Tobacco, 899 F.2d at 1582 (development of "marketing strategy" for five years did not excuse non-use because "when Imperial finally made sales of [its]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247
**(Cite as: 213 F.Supp.2d 247)**

cigarettes, there was no implementation of a complex marketing strategy to introduce them").

[9][10] In addition, a reasonable business explanation for stopping selling the cigar is insufficient in the absence of a showing of an intention to resume use in the "reasonably foreseeable future." *Silverman,* 870 F.2d at 47. [FN37] To demonstrate its intent to resume use, General Cigar points to the fact that during the period of nonuse--which coincided with a slump in the cigar market--it prepared a list of 29 marks that it intended to abandon, and that COHIBA was not on the list. The mere fact that General Cigar did not intend to abandon the brand is insufficient as a matter of law. *Silverman,* 870 F.2d at 46 (intent not to resume use is intent not to resume use in foreseeable future, rather than never to resume use at all); *Stetson,* 955 F.2d at 850 ("The 'intent to abandon' language [used by the district court] directly contradicts *Silverman's* specific rejection" of that standard). General Cigar must have intended to do more than merely "warehouse" the mark until it was useful again. [FN38] It does not in its memorandum produce any other "concrete plans" to resume use.

> FN37. General Cigar's cases do not in any way suggest that a reasonable business explanation--in the absence of an intent to resume use--is alone sufficient. For instance, in *Miller Brewing Co. v. Oland's Breweries Ltd.,* 548 F.2d 349, 352 (Cust. & Pat.App.1976), the court found the five years of non-use did not constitute abandonment where the plaintiff used the time to modernize equipment and address increased demands outside the United States. During that five-year period, however, Miller revealed its intention to resume use by continuing to advertise beer in the United States and by renewing its license in the United States. Similarly, in *Kardex Sys., Inc. v. Sistemco N.V.,* 583 F.Supp. 803, 814- 15 (D.Me.1984), it was held that abandonment had not occurred despite more than three years' non-use, because the plaintiff produced the product on demand, rather than for inventory, continued to provide service for the units already sold, and carried an inventory of parts required for repair purposes. The continuing actions of the parties in these two cases evidence their intents to resume use.

> FN38. Warehousing, which is impermissible, occurs when one hoards a mark for future use without concrete intent to use it in the future. *Exxon Corp. v. Humble Exploration Co.,* 592 F.Supp. 1226 (D.C.Tex.1984); *I.H.T. Corp. v. Saffir Pub. Corp.,* 444 F.Supp. 185, 189 (S.D.N.Y.1978) (twelve years of non-use coupled with no contemplated revival of the paper or future

plans for use of the mark beyond an abstract desire to resume use at some indefinite time in the future, strongly suggested abandonment); *Procter & Gamble Co. v. Johnson & Johnson, Inc.,* 485 F.Supp. 1185, 1204-08 (S.D.N.Y.1979) (Leval, J.) (condemning voluntary "minor brands" warehousing program).

[11] The only other actions that General Cigar undertook with respect to the COHIBA mark from 1987 to 1992 can only be described as minor activities that fail to establish any intent to resume use of the mark in the reasonably foreseeable future. *Silverman,* 870 F.2d at 47 (intent to resume use could not be proven by "minor activities" such as "challenging infringing uses brought to its attention"); *Rivard,* 133 F.3d at 1449 (finding no intent to resume use where between 1986 and 1991, Rivard "made sporadic trips to the United States, cursory investigations of potential sites for salons, and half- hearted attempts to initiate the business relationships necessary to open a salon"). A minor activity is one that "do[es] not sufficiently rekindle the public's identification of the mark with the proprietor, which is the essential condition for trademark protection." *Silverman,* 870 F.2d at 48. In mid- 1989 and the *271 end of 1991, General Cigar discussed the use of trade dress similar or identical to the Cuban COHIBA trade dress. General Cigar decided not to follow through with this plan based on advice of counsel. These two activities are insufficient. E.g., *Imperial Tobacco,* 899 F.2d at 1582- 83 (plaintiff's desire to use the "trade dress similar to that of [defendant]" and its concerns over possible litigation that would arise did not overcome presumption of abandonment). On November 9, 1990, General Cigar wrote a cease and desist letter, asserting that the name "COHOBA" for cigars "infringed on General Cigar's considerable rights in its registration." This single letter too is insufficient to raise a material issue of fact as to intent to resume use. *Silverman,* 870 F.2d at 47 (intent to resume use could not be proven by "minor activities" such as "challenging infringing uses brought to its attention").

[12] Finally, the testimony of Cullman and others that General Cigar intended to resume use of the COHIBA mark is insufficient in light of the lack of any supporting evidence. To refute an allegation of abandonment, the contesting party must "proffer more than conclusory testimony or affidavits." *Imperial Tobacco,* 899 F.2d at 1581, *see also Cerveceria Centroamericana, S.A. v. Cerveceria India Inc.,* 892 F.2d 1021, (Fed.Cir.1989) ("vague" testimony regarding intent to resume given "little to no weight").

For these reasons, Cubatabaco's motion for summary judgment on the ground of abandonment is granted. Therefore, the 1981 registration and 1986 incontestability

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

declaration are cancelled due to abandonment. All claims relating to the 1981 registration and 1986 incontestability declaration are dismissed. The only outstanding claims are those addressing the 1992 new use and 1995 registration.

## V. General Cigar's Equitable Defenses

General Cigar has moved for summary judgment on the basis of its equitable defenses of acquiescence, estoppel and laches. Cubatabaco has moved separately to dismiss these equitable defenses.

### A. Whether General Cigar is Barred From Raising Its Equitable Defenses

As an initial matter, Cubatabaco alleges that General Cigar is barred from raising equitable affirmative defenses on a number of different grounds and moves to dismiss them on these grounds. [FN39] It claims that General Cigar may not take advantage of equitable defenses because it engaged in fraud in filings with the PTO and intentionally infringed upon the trademark. Further, it claims that equitable defenses may not apply because the potential for likelihood of confusion is great.

> FN39. As discussed above in Part IV.A., General Cigar may not use the equitable defenses against Cubatabaco's cancellation claims based on abandonment and fraud.

### 1. False and Fraudulent Filings

[13][14] Other courts in this district have applied the doctrine of "unclean hands" [FN40] to prevent the application of equitable defenses in trademark infringement cases. *Nat'l Baseball Hall of Fame and Museum, Inc. v. All Sports Promotions, Inc.*, 58 U.S.P.Q.2d 1114, 2001 WL 196755, at *11 (S.D.N.Y.2001) (evidence of unclean hands precluded summary judgment on acquiescence defense in *272 trademark infringement case); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F.Supp. 969, 972 (S.D.N.Y.1992) (unclean hands of defendant in trademark dispute prevented application of defense of laches); *see also AccuScan Inc. v. Xerox Corp.*, 1998 WL 60991, at *5 n. 4 (S.D.N.Y.1998) (disputed issues of material fact precluded summary judgment on the defense of laches in patent infringement case). As discussed below, however, any purposeful delay on the part of the plaintiff in order to take advantage of the alleged infringer's use of the mark will vitiate this rule.

> FN40. Under the doctrine of "unclean hands," a court "may decline to exercise its equitable powers in favor of a party whose unconscionable act ... has immediate and necessary relation to the matter he seeks in respect of the matter in litigation."

*Aris-Isotoner Gloves*, 792 F.Supp. at 972 (internal citations omitted).

Cubatabaco alleges that General Cigar made fraudulent statements to the PTO in its 1978 registration and in its 1986 incontestability declaration. Both of these occurred prior to General Cigar's new use in 1992, and therefore this claim is no longer applicable due to the determination that General Cigar abandoned its claims until that new use in 1992.

### 2. Intentional Infringement

[15] The Second Circuit has held that intentional infringement acts as a bar to the assertion of a laches defense against an infringement suit seeking injunctive relief. *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000) ("Intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in the balancing of the equities...."); *see also Harlequin Ent., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir.1981) (laches does not bar injunctive relief if intentional infringement); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1344 (2d Cir.1975) (same); *but see Odetics Inc. v. Storage Technology Corp.*, 14 F.Supp.2d 800 (E.D.Va.1998) (concluding that infringer of patent could raise a laches claim even though it was found to have willfully infringed patent in question).

"While an infringer claiming laches need not be in total ignorance of another's mark, it must be able to demonstrate the absence of any intent to confuse and deceive the public." *Cuban Cigar Brands N.V. v. Upmann Intern.*, 457 F.Supp. 1090, 1098-99 (S.D.N.Y.1978). McCarthy has identified two reasons underlying this rule: "(1) Such intent proves a clear case of infringement. In such a clear case, the right of customers not to be confused prevails over plaintiff's slowness in suing. (2) A deliberate infringer cannot establish the traditional elements of estoppel: that is, good faith reliance on the plaintiff's failure to file suit promptly." McCarthy, *supra*, § 31:9, at 31-27.

[16] Cubatabaco alleges that General Cigar intentionally infringed upon its trademark. At the time of the 1995 registration (begun in 1992), Cubatabaco itself had not registered the COHIBA trademark in the United States. However, Cubatabaco might have had a right to the mark if COHIBA was a well-known mark in the United States prior to General Cigar's first new use of the mark in 1992. As discussed, *infra*, this question presents an issue of material fact.

Even if General Cigar knew that Cubatabaco planned someday to use and register the COHIBA mark in the

United States, that is insufficient to support a finding of intentional infringement if Cubatabaco did not already have a right to the COHIBA mark. *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 504 (7th Cir.1992) (party may register mark it knows another entity intends to use because "intent to use a mark creates no rights a competitor is bound to respect"); *Reflange Inc. v. R-Con Int'l,* 1990 WL 354565, 17 U.S.P.Q.2d 1125, 1130-31 (Trademark Tr. & App. Bd.1990) ("the law pertaining to registration of trademarks does not regulate all aspects of business morality, and adopting *273 of a mark with knowledge of another's intent to use does not give rise to cognizable equities").

[17] A few courts have held that equitable defenses may, nonetheless, bar a plaintiff's suit for intentional infringement where there is significant and purposeful delay. *E.g. Joint Stock Society,* 53 F.Supp.2d at 721-22 (citing cases). These cases stand for the proposition that where the infringee makes an unconscionable transgression--purposefully sitting by to take advantage of the infringer's work--it cannot seek the court's protection. [FN41] The question is not merely whether the infringee knew of the infringing mark, but whether it purposefully did not act in order to enjoy the fruits of the infringee's labor. First, the delay at issue here, as a result of General Cigar's abandonment, is a handful of years--hardly a significant delay. There is no evidence that Cubatabaco delayed bringing suit in order to somehow take advantage of General Cigar's efforts. Cubatabaco has consistently been selling and promoting its COHIBA cigars around the world since 1982, and in Cuba since the 1970's. Further, until the fall of 1997, months after the cancellation petition was filed, sales of General Cigar's COHIBA never rose above 0.05% of its annual sales and was not even in the same "super-premium" category as the Cuban COHIBA.

> FN41. As Judge Learned Hand wrote:
> Even in 1930 when for the first time it really began to be injured, [plaintiff] did nothing: not a word of protest, or a gesture of complaint, escaped it for six years more; and still the milk business [of defendant] kept increasing. What equity it can have the hardihood now to assert; how can it expect us to stifle a competition which with complete complaisance, and even with active encouragement, it has allowed for years to grow like the mustard tree; why we should destroy a huge business built up with its connivance and consent; this we find it impossible to understand.
> *Dwinell-Wright Co. v. White House Milk Co.,* 132 F.2d 822 (2d Cir.1943).

Therefore, because a material issue of fact exists as to whether intentional infringement occurred, and because Cubatabaco did not unconscionably and purposefully use the delay, General Cigar may not prevail on its equitable

defenses in summary judgment, because it may not be permitted to raise them at all.

## 3. Likelihood of Confusion

[18] Where a plaintiff presents a strong showing of likelihood of confusion, equitable defenses will not bar its claims. McCarthy, *supra,* § 31.10, at 31-332 (2001) ("A court will tolerate delay if plaintiff proves a strong case that customers are likely to be confused."); *id.* at § 31:41, at 31-86 ("[A] strong showing of likelihood of confusion can trump even a proven case of acquiescence....").

Unlike most other kinds of litigation between private parties, trademark litigation is profoundly affected by considerations of public interest. Thus, when the likelihood of confusion is not "reasonably in doubt," laches and acquiescence are not available to bar relief. *American Auto. Ass'n v. AAA Ins. Agency Inc.,* 618 F.Supp. 787 (D.C.Tex.1985). In such cases, even a lengthy delay in bringing suit will not bar injunctive relief to protect the public from confusion, although it may bar recovery of damages. *Id.* (citing *McLean v. Fleming,* 96 U.S. 245, 253, 6 Otto 245, 24 L.Ed. 828 (1877); *Menendez v. Holt,* 128 U.S. 514, 523-24, 9 S.Ct. 143, 32 L.Ed. 526 (1888)).

[19] General Cigar challenges the application of this doctrine where, as here, it is the senior user of the mark in the United States, and Cubatabaco is not even permitted to sell its COHIBA cigars in the United States. However, it is not necessary that Cubatabaco's mark be registered *274 in the United States nor that its product be able to be sold in the United States for the doctrine of likelihood of confusion to apply. *E.g. The Sports Authority Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 963 (2d Cir.1996) ("direct competition between the products is not a prerequisite to relief") (quotations omitted); *Maison Prunier v. Prunier's Restaurant & Cafe Inc.,* 159 Misc. 551, 288 N.Y.S. 529, 532-33 (1936) ("actual competition" not essential); *Vaudable v. Montmartre Inc.,* 20 Misc.2d 757, 193 N.Y.S.2d 332, 335 (N.Y.Sup.Ct.1959) (no sales in United States); *Fund of Funds Ltd. v. First American Fund of Funds Inc.,* 274 F.Supp. 517, 524 (S.D.N.Y.1967) (mutual funds could not legally be sold in United States or to American citizens). Whether direct competition exists between the two brands is, however, a factor to be considered in determining whether there is a likelihood of confusion, as discussed, *infra.*

[20] To determine the likelihood of confusion posed by a challenged use, courts in this Circuit are guided by the eight factors articulated by the Honorable Henry J. Friendly in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961). These factors are: (1) the strength of the plaintiff's mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the competitive proximity of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

213 F.Supp.2d 247
(Cite as: 213 F.Supp.2d 247)

services; (4) the likelihood that plaintiff will "bridge the gap" and offer a service like defendant's; (5) actual confusion; (6) good faith on the defendant's part; (7) the quality of defendant's service; and (8) the sophistication of buyers. *Id.; see also Estee Lauder Inc. v. The Gap Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997); *The Sports Authority*, 89 F.3d at 960.

Cubatabaco primarily points to two of the factors, the similarity of the marks and actual consumer confusion. The two marks at issue are identical ("COHIBA") and are used for the same product, cigars. Consumer confusion in such a situation is "inevitable." *Pappan Ent. Inc. v. Hardee's Food Sys. Inc.*, 143 F.3d 800, 804 (3d Cir.1998) ("where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable"); *Metro Traffic Control Inc. v. Shadow Network Inc.*, 104 F.3d 336, 339 (Fed.Cir.1997) ("confusion was 'so likely that it is virtually inevitable because the parties are using the identical marks for the identical services' " (citation omitted)); *Patsy's Brand, Inc. v. I.O.B. Realty Inc.*, 58 U.S.P.Q.2d 1048, 2001 WL 170672, at *12 (S.D.N.Y.2001) ("the use of the same name and very similar labels on the same product must invariably cause consumer confusion"); *Cullman Ventures Inc. v. Columbian Art Works Inc.*, 717 F.Supp. 96, 127 (S.D.N.Y.1989) ("the products are more than confusingly similar--they are virtually identical--and thus consumer confusion is inevitable") (*citing Mushroom Makers Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47-48 (2d Cir.1978)).

Cubatabaco cites several market research studies showing such confusion. In addition, Cubatabaco points out that General Cigar has launched the "Cohiba Extra Vigoroso" with a trade dress that eliminates what Cullman had claimed was one of the principal methods adopted by General Cigar to guard against consumer confusion--"clearly marking" the box and cigar to show that the cigar was made in the Dominican Republic.

The other factors raise material issues of fact. Whether General Cigar acted in good faith in adopting the mark is a genuine issue of material fact. Documents pre-dating the 1995 registration suggest that General Cigar did in fact intend to capitalize on the Cuban COHIBA's reputation. The timing of the new use and second registration of the COHIBA mark--shortly after the premier issue of *Cigar Aficionado* *275 and its laudatory treatment of the Cuban COHIBA--also support this interpretation. Yet, General Cigar first applied to register the mark in 1978, prior to the Cuban COHIBA's launch on the international market. While it has now been determined that it abandoned its rights to the mark, General Cigar might not have recognized that.

In addition, it is a disputed issue as to the quality of General Cigar's COHIBA cigars. Although its latest incarnation of

COHIBA has received several high evaluations from *Cigar Aficionado*, those rankings are not consistently as high as those of the Cuban COHIBA. The Cuban COHIBA has the reputation as the best cigar in Cuba and, perhaps, the world--a reputation that General Cigar's COHIBA has not surpassed according to the evidence presented here.

The likelihood of Cubatabaco "bridging the gap" and entering the U.S. cigar market is dependent upon whether the political tide will shift to bring an end to the Cuban embargo. However, the end of the embargo appears more likely now than in the past, [FN42] and in such event, as the interviews with Padron reveal, Cubatabaco will almost definitely bridge the gap. Further, although at this time Cubatabaco may not itself sell its cigars in the United States, the embargo does not prevent a Cubatabaco-*sponsored* cigar from being sold in the United States under certain circumstances. [FN43]

> FN42. The political tides appear to be turning, most recently with Former President Jimmy Carter's visit to Cuba. *E.g.*, Mike Williams et al., Carter trip's effect won't be overnight, Atlanta Journal-Const., at A14, 2002 WL 3723090 (May 19, 2002) ("Carter's visit could boost the growing movement in Congress to end the Cuban embargo...."); Rafael Lorente, Calls for Free Trade with Cuba Get Louder, Orlando Sentinel, at A1 (May 5, 2002) ("Momentum is building to end the United States' embargo against Cuba...."). *See also* Mark D. Nielsen, Cohiba: Not Just Another Name, Not Just Another Stoogie: Does General Cigar Own a Valid Trademark for the name "Cohiba" in the United States?, 21 Loy.L.A. Int'l & Comp.L.J. 633, 637 (August 1999) (discussing why "the United States may soon reconsider the continued enforcement of the Cuban embargo").

> FN43. Cubatabaco points out that a Dominican Republic company with 24% Cubatabaco ownership and with Cubatabaco providing quality control and technical advice could sell a "Cohiba" cigar made with non-Cuban ingredients in the United States. 31 C.F.R. §§ 515.204, 515.302-.303.

Finally, it is controverted as to whether purchasers of COHIBA cigars are sophisticated. While purchasers of fine cigars tend to be knowledgeable and would realize that Cuban COHIBAs are not legally available in this country, Cubatabaco has presented market research to suggest that buyers who would be influenced by the "Cuba mystique" are not sophisticated purchasers. Therefore, a person who would buy a COHIBA because of its "mystique" may not understand that the General Cigar COHIBA is not

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

sponsored by or related to the Cuban COHIBA.

[21] Cubatabaco's claim of likelihood of confusion is therefore not brought into "reasonable doubt" for the purposes of this motion. This finding further supports the determination that General Cigar should not be able to employ its equitable defenses to dispose of Cubatabaco's claims on summary judgment until these factual issues are resolved.

Because there exists a genuine issue of material fact as to whether General .Cigar may even raise its equitable defenses, its motion for summary judgment on those defenses must be denied. This ruling does not, however, forestall Cubatabaco's motion to dismiss these defenses.

**\*276 B. *General Cigar Cannot Establish the Equitable Defenses as a Matter of Law***

Cubatabaco claims that General Cigar has failed to establish the elements of acquiescence, estoppel, and laches.

**1. *Acquiescence and Estoppel***

The affirmative defenses of acquiescence ("estoppel by acquiescence") and equitable estoppel are closely related.

[22] The defense of acquiescence "is available when a plaintiff has responded to a defendant's actions with implicit or explicit assurances upon which the defendant relied." *H.G. Shopping Centers, L.P. v. Birney*, 59 U.S.P.Q.2d 1109, 1115 (S.D.Tex.2000) (*citing Elvis Presley Enterprises Inc. v. Capece*. 141 F.3d 188, 206 (5th Cir.1998)). Acquiescence is used "only in those cases where the trademark owner, by affirmative word or deed" conveys its consent to another. McCarthy, *supra*, § 31.41, at 31-85; *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*. 433 F.2d 686, 704 (2d Cir.1970) ("As distinguished from laches, acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant."). Whether the claim of acquiescence is sufficient to bar relief "depends upon consideration of the circumstances of each particular case and a balancing of interests and equities of the parties." *Carl Zeiss*. 433 F.2d at 704; *Tri-Star Pictures Inc. v. Leisure Time Productions B.V.*, 17 F.3d 38, 44 (2d Cir.1994); *Saratoga Vichy Spring*. 625 F.2d at 1040; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1036, 1043 (Fed.Cir.1992) (en banc).

[23] Similarly, to assert equitable estoppel, a defendant must show that (1) plaintiff's misleading communication, with plaintiff's knowledge of the true facts, prompted the defendant to infer that the plaintiff would not enforce its

rights against the defendant; (2) the defendant relied on that conduct; and (3) the defendant would be prejudiced if the plaintiff were allowed to bring suit. *H.G. Shopping Centers*, 2000 WL 33538621, 59 U.S.P.Q.2d at 1115.

Acquiescence focuses on the plaintiff's "response" to defendant's infringing actions. That means any "response" that would constitute acquiescence must come after Cubatabaco was aware of General Cigar's new use of the COHIBA mark. At the earliest, Cubatabaco learned in January 1994 that General Cigar was using the COHIBA mark when it received a delivery of COHIBA cigars that explicitly stated they were being sent only for the purposes of trademark registration.

Similarly, equitable estoppel requires a misleading communication with plaintiff's knowledge of the true facts. Therefore, the inquiry again must begin with Cubatabaco's awareness that General Cigar was intending to use and register the COHIBA mark. Cubatabaco suggests that it was only recently aware of the "true facts." It points to a 1994 interview with Cullman in which he said that General Cigar did not intend to use the COHIBA mark in the immediate future. However, at least for the purposes of this motion, Cubatabaco should have known, upon receiving the box of cigars sent for the purposes of trademark registration, that General Cigar was pursuing the mark. Therefore, the inquiry begins with Cubatabaco's actions after January 1994.

[24] General Cigar cites (1) Cubatabaco's 1996 registration of the COHIBA trade dress in the United States; (2) statements made by Cubatabaco's director, Padron, in two articles in *Cigar Aficionado;* and (3) Cubatabaco's failure to contest \*277 General Cigar's apparent ownership of the COHIBA mark from 1994 to 1997.

General Cigar claims that Cubatabaco's registration of the COHIBA trade dress in 1996, without any challenge to General Cigar's existing registration of the COHIBA mark, communicated to the world at large and to General Cigar that Cubatabaco acknowledged General Cigar's U.S. ownership of the COHIBA mark. Cubatabaco is persuasive in arguing that its efforts to protect its designs from what it considered further attempts by General Cigar to misappropriate them may not as a matter of law constitute grounds for acquiescence or estoppel.

The two Padron interviews took place prior to January 1994. [FN44] The interviews were therefore not a "response" to General Cigar's actions and cannot constitute acquiescence. Further, the interviews were not made with the true knowledge of the facts—that General Cigar was pursuing a new registration for the COHIBA mark. Therefore, General Cigar may not rely on the interviews to show conduct supporting its acquiescence and estoppel claims.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN44. The later interview took place in December 1993 and was printed in early 1994. The printing date does not change the fact that Padron was not responding to General Cigar's actions and did not have knowledge of the true facts. In any case, the quoted excerpt does not support a claim of acquiescence or estoppel. The very first line of the excerpt from Padron states: "[T]here is going to be a fight." That statement is later contradicted by Padron's almost immediate statement that "we are not going to fight in order to get our cigars into the United States." In light of this confusion, General Cigar could not have relied on the statement, "we are not going to fight...."

[25] Finally, silence may constitute cause for equitable estoppel if a duty to speak exists. *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706. 725-26 (2d Cir.2001). A duty to speak may arise if the party's silence will mislead the infringer into believing that an infringement claim will not be asserted. *General Elec. Capital Corp. v. Eva Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir.1994) ("Silence in the face of an explicit contrary assumption by an innocent party may constitute a concealment of facts or a false representation for estoppel purposes."); *Forest Laboratories Inc. v. Abbott Laboratories*, 96 Civ. 159-A. 1999 WL 33299123, at * 22 (W.D.N.Y. June 23, 1999) (holding party was estopped by silence).

Cubatabaco's silence lasted from January 1994 until, at the latest, January 1997, when Cubatabaco filed its cancellation petition. *Elvis Presley Enterprises Inc. v. Capece*, 141 F.3d 188. 205 (5th Cir.1998) ("Any acts after receiving a cease and desist letter are at defendant's own risk.") (*citing Conan Properties Inc. v. Conans Pizza Inc.*, 752 F.2d 145, 151-52 (5th Cir.1985); *Piper Aircraft Corp. v. Wag-Aero Inc.*, 741 F.2d 925 (7th Cir.1984) (period of alleged laches ended when defendant received letter from plaintiff objecting to defendant's use of the Piper name in catalog). *See also* Restatement (Third) of Unfair Competition 31. at 320-21 (1995). Moreover, in January 1994, Cubatabaco received a box of the COHIBA-branded Temple Hall cigars with a note stating that the box was not sold as a regular item and that it was being produced by General Cigar solely for the purposes of its trademark registration. The COHIBA-branded Temple Hall cigars were not advertised and were only sold through two tobacconists. In light of these facts, Cubatabaco did not as a matter of law have a duty to speak. [FN45]

FN45. By contrast, it would be a different matter if Cubatabaco had remained silent for up to three years after the launch of General Cigar's super-premium COHIBA. In that case, General Cigar had spent millions of dollars in advertising

and sold approximately 509,000 COHIBAs from August to December of 1997 alone, and close to one million COHIBAs per year in the following years. In such a situation a clear duty to speak would arise. That same duty is not present here, however.

*278 General Cigar has failed to establish evidence of any acts, conduct or omission on the part of Cubatabaco on which it could rely. Therefore, its affirmative defenses of acquiescence and estoppel are dismissed.

## 2. Laches

[26] Laches requires defendants to show "[t]hat plaintiff had knowledge of the defendant's use of its marks [and] that plaintiff inexcusably delayed in taking action with respect thereto." *Cuban Cigar Brands*. 457 F.Supp. at 1096 (internal citations omitted); *see also Saratoga Vichy Spring*, 625 F.2d at 1040.

[27] A presumption of laches arises in a trademark action when the plaintiff does not bring suit within the six-year statute of limitations applicable to state-law fraud in New York. *Conopco Inc. v. Campbell Soup Co.*. 95 F.3d 187. 191-92 (2d Cir.1996); *see also Ameritech Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 963 (6th Cir.1987) ("There is a strong presumption that plaintiff's delay ... is reasonable so long as the analogous statute of limitations has not elapsed."). Further, this six-year period does not run until plaintiffs discover or should have discovered the facts that create the cause of action. *Carell v. Shubert Org. Inc.*. 104 F.Supp.2d 236, 260 (S.D.N.Y.2000) (citing N.Y. CPLR § 213(8)); *see also Harley-Davidson, Inc. v. O'Connell*, 13 F.Supp.2d 271, 279 (N.D.N.Y.1998). Cubatabaco discovered the new use in January 1994 at the earliest. Further, it filed a cancellation petition three years later, in January 1997. Therefore, the presumption does not arise here because the period of delay is, at most, three years.

[28] Even if the statute of limitations has not run, the laches defense may still be applicable. *Peyser v. Searle Blatt & Co.*, 2000 WL 1071804, at *5 (S.D.N.Y. Aug. 2, 2000). In such a situation, however, there is no presumption of laches and the burden remains on the defendants to prove the defense. *Conopco*, 95 F.3d at 191. A delay of up to three years does not constitute the "inexcusable delay" in the particular circumstances presented here. As discussed earlier, from January 1994 to January 1997, General Cigar was selling an existing cigar with a COHIBA label attached to it. There was no advertising, and cigars were sold only through the two retailers. Sales constituted a mere half a percent of General Cigar's annual sales of premium cigars at that time. In light of these factors, it was not inexcusable that Cubatabaco did not act until up to three years after

discovery of the new use.

Because Cubatabaco did not unreasonably delay, General Cigar's laches claim is dismissed.

## VI. *Cubatabaco's Motion for Partial Summary Judgment*

Cubatabaco has moved for partial summary judgment on its Article 7 and 8 claims under the IAC, Article 6-bis claim under the Paris Convention, New York common law claim, and claim under the Federal Trademark Dilution Act ("FTDA"). General Cigar opposes summary judgment on these claims as well as others not addressed in Cubatabaco's motion for summary judgment. [FN46]

> FN46. General Cigar also discusses the merits of Cubatabaco's claims regarding (1) Section 10-bis of the Paris Convention (Count II); (2) Article 20 of the IAC (Count IV); (3) trademark infringement under Section 43(a) of the Lanham Act (Count VII); and (4) state law dilution claims (Count XII). These arguments will not be addressed as they are not before the Court and should be the subject of a separate motion for summary judgment on the merits by General Cigar if it so chooses.

## *279 A. Cubatabaco's Treaty Claims

As an initial matter, General Cigar argues that Cubatabaco cannot rely on the IAC and Paris Convention because the provisions on which it relies do not have the force of law in the United States. It asserts that the treaties are not self-executing and therefore must be executed by legislation, *i.e.* the Lanham Act, and that the Lanham Act does not encompass the substantive provisions on which Cubatabaco relies for this summary judgment motion.

### 1. *Inter-American Convention*

Both Cuba and the United States are parties to the IAC. The treaty remains in force between the United States and Cuba notwithstanding the embargo on trade between the two countries. *U.S. Dep't of State, Treaties in Force* 393 (2000). Thus, the IAC, along with the Paris Convention, governs trademark relations between the two countries.

This Circuit has recently addressed the issue of whether the Inter-American Convention provides additional substantive rights other than those available under the Lanham Act. *Havana Club Holding S.A. v. Galleon S.A.*, 203 F.3d 116, 124 (2d Cir. 2000).

In *Havana Club*, a Cuban rum producer, Havana Club, brought an action against an American rum producer, Bacardi, alleging trademark infringement and false designation of origin. Before the Cuban revolution, Havana

Club rum was produced by a private corporation owned principally by the Arechabala family and was shipped to the United States. After the revolution, the Cuban government seized the assets of the corporation. The resulting Cuban rum company registered the Havana Club trademark with Cuban authorities in 1974 and with the United States in 1976. The United States registration was revoked in 1997. Also in 1997, the Bacardi Rum company purchased the rights of the Arechabala family to, *inter alia,* the Havana Club trademark.

Looking to legislative history, the Court held that the IAC was self-executing, but that, regardless, Congress incorporated rights under the IAC into Section 44 of the Lanham Act. Therefore, Cubatabaco "must assert its rights under the IAC pursuant to section 44(b) of the Lanham Act." *Id.* at 128.

Section 44(b) provides:
> Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this Act.

15 U.S.C. § 1126(b). Cubatabaco is therefore "entitled to the benefits" of Section 44 "under the conditions expressed herein to the extent necessary to give effect to any provision of such convention...."

Havana Club filed a claim, *inter alia,* to enjoin Bacardi from selling rum labeled Havana Club under Section 44(b) and (h) of the Lanham Act and Chapter III of the IAC. The Court held that Section 44(h) [FN47] of the Lanham Act only reaches substantive *280 provisions of the IAC that are "related to the repression of unfair competition." 203 F.3d at 135 n. 19. One of Havana Club's Section 44(h) claims sought to apply the substantive provisions of Article 23, concerning "Repression of False Indications of Geographical Origin or Source". The Court held that it could "not rely on this provision in asserting its section 44(h) claim, however, because the IAC does not treat rights under article 23 as rights related to the repression of unfair competition." 203 F.3d at 135 n. 19.

> FN47. Section 44(h) provides:
> Any person designated in subsection (b) of this *section is entitled to the benefits and subject to the* provisions of this chapter shall be entitled to effective protection against unfair competition, and

213 F.Supp.2d 247                                                                              Page 25
(Cite as: 213 F.Supp.2d 247)

the remedies provided by this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

[29] The Court did not clarify which sections of the IAC concern "rights related to the repression of unfair competition." However, Chapter IV of the IAC (Articles 20, 21 and 22) is explicitly labeled "Repression of Unfair Competition." Further, the Court appeared to accept that Section 44(h) at the very least embraces the substantive provisions of one of the articles in Chapter IV, Article 21(c). [FN48] From this, it may be surmised that Chapter IV concerns "rights related to the repression of unfair competition and that Section 44(h) incorporates the *substantive provisions of Articles 20, 21, and 22.*" [FN49]

> FN48. Havana Club also asserted a claim under Article 21(c). Article 21(c) expressly states that it will be enforceable only if the conduct it proscribes is not "effectively dealt with" in domestic law. The Court concluded that the plaintiff failed to state a viable claim as it "amounts to little more than the reassertion of its section 43(a) claim because article 21(c) of the IAC prohibits a subset of the conduct already effectively prohibited under American law by *section 43(a).*" *Id.* at 134-35. Therefore, the Court appeared to except that Section 44(h) encompassed the terms of Article 21(c).

> FN49. Although *Cubatabaco has not moved for summary judgment on these grounds, it has stated claims under Articles 20 and 21 of the IAC. These provisions therefore have the force of law under Section 44(h).*

Cubatabaco has moved for summary judgment on its claims under Article 7 [FN50] and 8 [FN51] of the IAC. In order for Section *281 44(h) to reach these provisions, they must involve "rights related to the repression of unfair competition." Articles 7 and 8 may be found in Chapter II of the IAC, labeled "Trademark Protection." *Cubatabaco* argues that Articles 7 and 8 involve the repression of unfair competition and quotes a Second Circuit opinion from 1953 that states that "infringement is itself a form of 'unfair competition.' " *American Automobile Ass'n v. Spiegel,* 205 F.2d 771, 774 (2d Cir.1953) (Hand, J.); *see also* H.R.Rep. 79-1333, 79th Cong., 2d Sess., at 4 (1946) ("[T]here is no essential difference between trade-mark infringement and unfair competition. Unfair competition is the genus of which trade-mark infringement is one of the species.").

> FN50. *Article 7 provides:*
> Any owner of mark protected in one of the Contracting States in accordance with its domestic law, who may know that some other person is

using or applying to register or deposit an interfering mark in any other of the Contracting States, shall have the right to oppose such use, registration or deposit and shall have the right to employ all legal means, procedure or recourse provided in the country in which such interfering mark is being used or where its registration or deposit is being sought, and upon proof that the *person who is using such mark, or applying to* register or deposit it, had knowledge of the existence and continuous use in any of the Contracting States of the mark on which opposition is based upon goods of the same class the opposer may claim for himself the preferential right to use such mark in the country where the opposition is made or priority to register or deposit it in such country, upon compliance with the requirements established by the domestic legislation in such country and by this Convention.

> FN51. Article 8 provides, in pertinent part:
> When the owner of a mark seeks the registration or deposit of the mark in a Contracting States other than that of origin of the mark and such registration or deposit is refused because of the previous registration or deposit of an interfering mark, he shall have the right to apply for and obtain the cancellation or annulment of the interfering mark upon proving, in accordance with the legal procedure of the country in which cancellation is *sought, the stipulations in Paragraph (a) and [ (b) ]:*
> (a) That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit which he seeks to cancel; and
> (b) That the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration, or deposit in any of the Contracting States of the mark for the specific goods with which said interfering mark is applied, prior to adoption and use thereof or prior *to the filing of the application or deposit of the mark.*

Based on this logic, however, it would appear that all provisions of the IAC would be encompassed by Section 44(h). While a neat argument, it is undermined by the *Havana Club* ruling. Cubatabaco cites one portion of *Havana Club* to support this contention, noting that the Court held that the IAC's protection against a United States trademark infringing upon a foreign trade name--a provision it describes as "parallel" to Articles 7 and 8--was incorporated by Section 44. 203 F.3d at 128. It is true that it *is incorporated by Section 44, but by subsection (g) of that section, rather than subsection (h), under which Cubatabaco*

has made its claims. *Id.* Section 44(g) provides that owners of foreign trade names may seek protection against infringement even in the absence of registration. [FN52] Therefore, the parallel provision required an explicit statement from Congress that no registration was required. Moreover, the *Havana Club* Court rejected claims that Section 44(h) encompassed Article 23 of the IAC, which involves the repression of false indications of geographical origin. That provision also generally protects against unfair competition in the form of persons falsely labeling their goods to the detriment of those who are actually selling goods from a particular location.

FN52. Section 44(g) provides: "Trade names or commercial names of persons described in subsection (b) of this section shall be protected without the obligation of filing or registration whether or not they form parts of marks."

[30] In essence, Cubatabaco has invoked Articles 7 and 8 of the IAC to obtain the right of ownership of the COHIBA mark without registering its COHIBA trademark in the manner that United States law requires. As General Cigar points out, this result would directly undermine the Congressional purpose of encouraging registration in order to provide notice to other users who may have interest in the mark. *See In re Int'l Flavors & Fragrances*, 183 F.3d 1361, 1367 (Fed.Cir.1999) ("Entrepreneurs, for example, who plan to promote and to sell a new product under a fanciful mark, should be able to rely on a search of the trademark registry"); *Bongrain Int'l Corp. v. Delice de France*, 811 F.2d 1479, 1485 (Fed.Cir.1987) ("One of the policies sought to be implemented by the Act was to encourage the presence on the register of trademarks of as many as possible of the marks in actual use so that they are available for search purposes.").

Cubatabaco retorts to this policy argument that Articles 7 and 8 support the Congressional policy, as they both entail the eventual registration of the foreign mark and cancellation of the mark registered in the United States. This argument ignores the fact that for some variable number of years, the foreign mark has not been registered. It also ignores the fact that Congress has specifically carved out how owners of trademarks registered in other countries may obtain a U.S. registration. Under Section 44(d), a party that *282 has applied for, but not yet received, a registration in a signatory nation may file a U.S. application within six months of filing its foreign application. If and when the foreign registration issues and if the trademark otherwise qualifies for registration under U.S. law, a U.S. registration will issue, with U.S. priority rights retroactive to the date upon which the foreign application was filed. Therefore, if the party fails to file within six months of its registration, or if someone else has used the mark in the United States prior

to the foreign registration, the first U.S. user will have priority rights in the mark.

Under Section 44(e), a foreign party that has already registered its mark in a convention nation may submit a certified copy of that registration to the U.S. PTO at any time. A U.S. registration then will issue, if the mark otherwise qualifies for registration under U.S. law, but without special priority rights. Therefore, if someone else begins to use the mark in U.S. commerce before the foreign party submits a certified copy of the foreign registration to the U.S. PTO, the first U.S. user will have priority in the mark.

If Cubatabaco were correct, the claimant of a U.S. trademark right based on foreign registration would be better off not registering its mark, since it would not have to incur the expense of registration and maintenance fees, and would not have to maintain its registration through use in the United States or the filing of papers to establish excusable non-use. Further, the owner of the prior foreign registration could benefit by waiting until the owner of the United States mark had established a good reputation for the mark and taking advantage of these efforts. While it is true that owners of trademarks registered outside the United States are entitled to protection, Congress has decided in the Lanham Act that they are not entitled to the kind of sword/shield defense that Cubatabaco seeks.

Such result would also contradict provisions of the IAC which contemplate that foreign parties should act to secure and maintain their rights. *E.g.* IAC, Art. 2 (person who desires to obtain a trademark protection must apply for protection); Art. 3 (contemplating compliance with "formal provisions of domestic law" for registration); Art. 10 (period of registration shall be fixed by state).

In light of the foregoing, Articles 7 and 8 of the IAC are not "related to the repression of unfair competition" and are not within the ambit of Section 44(h). Therefore, Cubatabaco's claims under Articles 7 and 8 of the IAC are dismissed.

**2. The Paris Convention**

Both Cuba and the United States are parties to the Paris Convention. [FN53]

FN53. The United States first became a party on May 30, 1887, and Cuba on November 17, 1904. *See* World Intellectual Property Organization, Intellectual Property Protection Treaties, at http:// www.wipo.org/treaties/ip/paris/ (last visited June 19, 2002).

There is a divergence in authority as to whether the Paris Convention is self- executing. *Compare Vanity Fair Mills,*

*Inc. v. T. Eaton Co.,* 234 F.2d 633, 640-44 (2d Cir.1956) (in dictum: Paris Convention is self-executing), *cert. denied* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); *Davidoff Extension S.A. v. Davidoff Int'l Inc.,* 1983 WL 203, 221 U.S.P.Q. (BNA) 465, 467 (S.D.Fla.1983) (relying solely on *Vanity Fair* in holding that Paris Convention is self-executing) *with In re Compagnie Generale Maritime,* 993 F.2d 841, 856 & n. 18 (Fed.Cir.1993) (Nies, J., dissenting) (Paris Convention is not self-executing); *L'Aiglon Apparel, Inc. v. Lana Lobell Inc.,* 214 F.2d 649 (3d Cir.1954) (same) (cited approvingly in **\*283***BP Chemicals Ltd v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 259 n. 1 (3d Cir.2000)); *Ortman v. Stanray Corp.,* 371 F.2d 154, 157 (7th Cir.1967) (same); *Int'l Cafe, S.A.L. v. Hard Rock Cafe (U.S.A.), Inc.,* 252 F.3d 1274, 1277 n. 5 (11th Cir.2001) (same). [FN54]

> FN54. Most recently, an unpublished decision of the Trademark Trial and Appeal Board also concluded that the Paris Convention is not self-executing. *Int'l Finance Corp. v. Bravo Co.,* Opp. Nos. 111, 276; 111, 760 (T.T.A.B. June 5, 2002) (collecting cases); *see also Scotch Whisky Assoc. v. United States Distilled Products Co.,* 1989 WL 274412, 13 U.S.P.Q.2d 1711, 1713 (Trademark Tr. & App. Bd.1989) (concluding that Paris Convention is not self-executing).

[31] There is no need to determine whether *Vanity Fair* is still controlling as to this issue, however, because of the *Havana Club* ruling. As discussed above, the Second Circuit determined that the rights under the IAC, although self-executing, nonetheless could be asserted through Section 44(b) of the Lanham Act. 203 F.3d at 128. The Court reached this conclusion because of the original text of Section 44(b), which specifically incorporated the treaty rights of

> [p]ersons who are nationals of, domiciled in, or have a bona fide and effective business or commercial establishment in any foreign country, which is a party to (1) the International Convention for the Protection of Industrial Property [the Paris Convention] ... or (2) the General Inter-American Conventional for Trade Mark and Commercial Protection [the IAC] ... or (3) any other convention or treaty relating to trade-marks, trade or commercial names, or the repression of unfair competition to which the United States is a party....

*Id.* (citing Trademark Act of 1946, ch. 540, § 44(b), 60 Stat. 427, 442). The Court ruled that even though the IAC was self-executing, because of this language, the plaintiff must assert its rights under the IAC pursuant to Section 44(b) of the Lanham Act. *Id.* Similarly, because the Paris Convention is included in the original language, even if it were self-executing, Cubatabaco would have to assert its rights under the Paris Convention pursuant to Section 44(b)

of the Lanham Act.

[32] Cubatabaco has asserted its Article 6-bis claim pursuant to Section 44(h). As discussed above, Section 44(h) will only encompass Article 6-bis if Article 6-bis concerns "rights related to the repression of unfair competition." *Havana Club,* 203 F.3d at 135 n. 19. Article 6-bis, similar to Articles 7 and 8 of the IAC, permits the refusal or cancellation of registrations of marks that are similar to well-known marks registered in other member countries. [FN55] A different provision, Article 10-bis, explicitly addresses the provision of "effective protective against unfair competition." Article 10-bis. [FN56] There is no **\*284** such similar language in Article 6-bis. Therefore, for the reasons stated above, Cubatabaco cannot rely on Section 44(h) to encompass the substantive provisions of Article 6-bis and its claims based on this provision must be dismissed. [FN57]

> FN55. Article 6-bis states:
> 1) The countries of the Union undertake, ex officio if their legislation so permits, or at the request of an interested party, to refuse or to cancel the registration, and to prohibit the use, of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well known in that country as being already the mark of a person entitled to the benefits of this Convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well- known mark or an imitation liable to create confusion therewith.
> (2) A period of at least five years from the date of registration shall be allowed for requesting the cancellation of such a mark. The countries of the Union may provide for a period within which the prohibition of use must be requested.
> (3) No time limit shall be fixed for requesting the cancellation or the prohibition of the use of marks registered or used in bad faith.

> FN56. Article 10-bis provides:
> (1) The countries of the Union are bound to assure to nationals of such countries effective protection against unfair competition. (2) Any act of competition contrary to honest practices in industrial or commercial matters constitutes an act of unfair competition. (3) The following in particular shall be prohibited: 1. all acts of such a nature as to create confusion by any means whatever with the establishment, the goods, or the industrial or commercial activities, of a competitor;

2. false allegations in the course of trade of such a nature as to discredit the establishment, the goods, or the industrial or commercial activities, of a competitor; 3. indications or allegations the use of which in the course of trade is liable to mislead the public as to the nature, the manufacturing process, the characteristics, the suitability for their purpose, or the quantity, of the goods.

FN57. Cubatabaco has asserted a claim under Article 10-bis as well, which presumably would not face the same difficulty. However, Cubatabaco has not moved for summary judgment on its Article 10-bis claim and its merits--as well as General Cigar's arguments regarding it--will not be addressed at this time.

**B. *State Common Law Claim***

Cubatabaco seeks summary judgment under the "New York common law" in the same section in which it discusses Article 6-bis of the Paris Convention. Cubatabaco fails to assert whether it refers to one or both of its New York common law claims and further fails to explicate the elements of either claim. The complaint contains two such claims: (1) misappropriation and (2) unfair competition. Complaint, ¶¶ 72-74 (unfair competition under state and common law); 78-81 (common law misappropriation).

The first claim, misappropriation, has been called "the essence of unfair competition," *Forschner Group. Inc. v. Arrow Trading Co.*, 124 F.3d 402, 408 (2d Cir.1997). On the basis of this description, at least one district court has dismissed a common law misappropriation claim. *Something Old. Something New, Inc. v. QFC, Inc.*, 1999 WL 1125063, at *13 (S.D.N.Y. Dec. 8, 1999) (*citing Forschner* and dismissing misappropriation claim as it was considered part of unfair competition claim). Because the parties have not briefed the subject and because it is not even clear whether the misappropriation claim is at issue, the claim will not be dismissed at this time. However, Cubatabaco has failed to establish it should as a matter of law succeed on this claim.

[33] New York common law unfair competition requires a showing of (1) likelihood of confusion and (2) bad faith. *Saratoga Vichy Spring*, 625 F.2d at 1044; *see also Lane Capital Mgmt., Inc. v. Lane Capital Mgmt. Inc.*, 15 F.Supp.2d 389, 400 (S.D.N.Y.1998) (noting that record "does not establish with clarity that defendant acted in bad faith, an essential element of unfair competition"); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir.1997) ("Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent."). In discussing its

New York common law claim, Cubatabaco does not address either prong, nor refer to any section of its brief that does. As discussed earlier, however, Cubatabaco did raise the issue of likelihood of confusion in another section, and a question of fact remains as to whether likelihood of confusion will result.

General Cigar challenges this claim because it is the registered user of the COHIBA mark in the United States. A Central District of California court faced an analogous situation in *285Grupo Gigante S.A. v. Dallo & Co.*, 119 F.Supp.2d 1083, 1089 (C.D.Cal.2000). The defendants, owners of a grocery store who had registered their mark with the state, claimed that the state registration made the common law well-known mark doctrine unavailable. The court rejected this argument, reasoning that a foreign mark must be protected if it was well-known in the United States prior to the party's obtaining rights to the mark through the state process. *Id.* at 1089-92 ("If a mark used only on products or services sold abroad is so famous that its reputation is known in the United States, then that mark should be legally recognized in the United States." (quoting McCarthy, *supra*, § 29:4, at 29-9)).

Although the *Grupo Gigante* case involved state rather than federal registration, the difference is not dispositive. After all, federal registration is only *prima facie* evidence of ownership, rather than a deed to the mark. Lanham Act, Section 33. Therefore, Cubatabaco might have prior rights to the COHIBA mark if it was well-known prior to General Cigar's first use of the mark in 1992.

[34] An issue of material fact exists as to whether the Cuban COHIBA was well-known by November 1992. The Cuban COHIBA was recognized in *Cigar Aficionado* to be "perhaps the world's finest smoke." It had been selling around the world for ten years, and had been mentioned in several different magazine articles in the United States. Moreover, within the particular niche market of the cigar industry, the Cuban COHIBA was renown.

General Cigar also recognized the renown of the Cuban COHIBA. Milstein testified that in 1989, 1991 and October 1992, General Cigar wanted to use a label as near as possible to the Cuban COHIBA "to somehow capitalize on the success of the Cuban brand, and especially [in October 1992] the good ratings that it got, the notoriety that it got from *Cigar Aficionado*." Milstein Dep. at 284. Milstein wrote a memorandum echoing similar thoughts in January 1993, concerning General Cigar's strategy "to exploit the popularity, familiarity, brand recognition and overall success of the Cuban Cohiba." Further, in the spring of 1993, General Cigar's advertising agency developed a campaign, the first phase of which was to "[e]xploit the Cohiba name, with its reputation as one of the world's finest

213 F.Supp.2d 247
**(Cite as: 213 F.Supp.2d 247)**

cigars amongst cigar smokers, to build a brand image for the U.S. Product."

Cubatabaco has thereby raised a material issue of fact as to whether the Cuban COHIBA was "so famous that its reputation [was] known in the United States" and thus "should be legally recognized in the United States." *Grupo Gigante,* 119 F.Supp.2d at 1089. Therefore, while summary judgment may not be granted on this count, nor can the unfair competition claim be dismissed.

### C. Federal Trademark Dilution Act

Cubatabaco moves for partial summary judgment on Count XII, [FN58] alleging infringement of the Federal Trademark Dilution Act of 1995 ("FTDA"), 15 U.S.C. § 1125(c)(1).

> FN58. Cubatabaco has not moved on the parallel state law claim in Count XII. N.Y.Gen.Bus.Law. § 360-1. However, in a footnote, General Cigar alleges that Section 43(c)(3) of the Lanham Act bars this claim because of General Cigar's valid registration of the COHIBA mark. Def.'s Opp.Mem. at 28 n. 21. This subject will not be addressed as that claim is not at issue and, in any case, one of Cubatabaco's claims is that the 1995 registration should be cancelled. Until the issue is raised as to whether the 1995 registration is valid, General Cigar cannot rely on Section 43(c)(3) to dismiss the state law claim.

The FTDA provides that the "owner of a famous mark shall be entitled, subject to the principles of equity ... to an injunction against another person's commercial *286 use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). "Dilution" for purposes of the FTDA is "the lessening of the capacity of a famous mark to identify and distinguish goods and services, regardless of the presence or absence of (1) competition between the owner of the famous mark and the other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.

[35] The Second Circuit has summarized the five elements needed to establish unlawful dilution under the FTDA: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco Inc. v. PF Brands, Inc.,* 191 F.3d 208, 215 (2d Cir.1999).

#### 1. General Cigar's Registration is Not a Defense

[36] General Cigar's primary contention is that its ownership

of the COHIBA mark in the United States provides a defense to this claim. However, "federal registration is no defense to a charge of dilution under the federal Anti-dilution Act." McCarthy, *supra,* at § 24:90, at 24-150. Such could not be the case, as dilution itself provides a ground for cancellation of a registration. 15 U.S.C. § 1052.

#### 2. There is a Material Issue of Fact as to Whether Cubatabaco Owns the COHIBA mark in the United States

[37] The FTDA requires that the plaintiff be the "owner" of the mark. General Cigar argues that Cubatabaco is not the "owner" of the COHIBA mark in the United States because it did not register the mark with the PTO. This argument ignores that one need not have registered the mark to "own" it. [FN59]

> FN59. General Cigar's argument is further undercut by the language of the FTDA, which states that a court may, but shall, look to whether the mark was registered in determining whether it was distinctive or famous. 15 U.S.C. § 1125(c)(1)(H). The drafters could easily have required registration by using the replacing "may" with "shall."

As discussed above, under the "well-known marks" doctrine, a party with a well-known mark at the time another party starts to use the mark has priority over the party using the mark. In *Gigante,* discussed above, the defendants argued that the plaintiff, who had not registered the mark in California or through the U.S.P.T.O., could not make a dilution claim under the FTDA "because they do not own the mark." *Gigante,* at 1098 n. 10. There was no question that plaintiff had registered and owned the mark in Mexico. However, the court did not look to the plaintiff's ownership in Mexico, but instead rejected the defendants' argument because the Court had determined that the *Gigante* mark was a well-known mark prior to defendants' first use, and therefore the plaintiffs owned the U.S. rights to the mark. *Id.* at 1089.

As discussed above, there is an issue of material fact as to whether Cubatabaco was the Cuban COHIBA was a "well-known" mark in 1992 and thus "owns" the rights to the COHIBA mark in the United States. Therefore, summary judgment may not be granted on this ground.

### CONCLUSION

For the foregoing reasons, Cubatabaco's Count I (Article 6-bis of the Paris Convention) and III (Article 7 and 8 of the IAC) are dismissed. Cubatabaco's motions for summary judgment on its claim of abandonment (Count XI) and to dismiss General Cigar's equitable defenses are granted. *287 General Cigar's motion for summary judgment on the basis

of its equitable defenses are denied. In light of the December 5, 2000, Order and the above opinion, Cubatabaco's cause of action is now limited to (1) Count II (Article 10-bis of the Paris Convention); (2) Count IV (Articles 20 and 21 of the IAC); (3) Count VII (Trademark Infringement Under Section 43(a) of the Lanham Act); (4) Count X (state and common law unfair competition); (5) Count XI (cancellation of the 1995 registration); (6) Count XII (dilution under state and federal law); and (7) XIII (common law misappropriation).

A pretrial conference will be held in September 2002 on a date convenient to counsel to schedule any further proceedings.

It is so ordered.

213 F.Supp.2d 247

END OF DOCUMENT



# EXHIBIT / ATTACHMENT

## 28

**(To be scanned in place of tab)**

765 F.Supp. 724                                                                                       Page 1
(Cite as: 765 F.Supp. 724)

**C**

United States District Court,
N.D. Georgia,
Atlanta Division.

ENERGY FOUR, INC., Plaintiff,
v.
DORNIER MEDICAL SYSTEMS, INC., Defendant.

Civ. A. No. 1:90-CV-1287-JOF.

Feb. 27, 1991.

A company which distributed replacement electrodes for lithotripsy machines, which used shock waves to fragment kidney stones, brought action against competitor seeking injunction to prevent competitor from making false and misleading statements about its products, and competitor counterclaimed seeking same relief. The District Court, Forrester, J., held that both company and its competitor were entitled to preliminary injunction prohibiting each other from making false and misleading statements about their products.

Ordered accordingly.

West Headnotes

[1] Trade Regulation ☞423.1
382k423.1 Most Cited Cases
(Formerly 382k423)

To prevail on a Lanham Act claim that defendant has made false or misleading representations in commercial advertising or promotion, plaintiff must show that representations were false or misleading and actually or likely deceptive, that they had material effect on buying decisions, that they were made in connection with interstate commerce, and that they were actually or likely injurious to plaintiffs. Lanham Trade-Mark Act, §§ 1 et seq., 43(a), as amended, 15 U.S.C.A. §§ 1051 et seq., 1125(a).

[2] Trade Regulation ☞423.1
382k423.1 Most Cited Cases
(Formerly 382k423)

Person engages in deceptive trade practice within meaning of Georgia Uniform Deceptive Trade Practices Act if he causes likelihood of confusion or misunderstanding or makes misrepresentations concerning approval or certification of product or engages in other conduct similarly creating likelihood of confusion or misunderstanding, even absent actual confusion or misunderstanding. O.C.G.A. §§ 10-1-372(a)(2, 5, 7, 8, 12), 10-1-373(b).

[3] Trade Regulation ☞620
382k620 Most Cited Cases

Under Georgia Uniform Deceptive Trade Practices Act, no proof of monetary damages, lost profits, or intent to deceive is required for party to be entitled to injunctive relief. O.C.G.A. § 10-1-373(a).

[4] Trade Regulation ☞620
382k620 Most Cited Cases

Plaintiffs asserting state law claims under versions of Uniform Trade Deceptive Practices Act must still establish prerequisites for preliminary injunction in order to be entitled to relief. O.C.G.A. §§ 10-1-372(a)(2, 5, 7, 8, 12), 10-1-373(b).

[5] Trade Regulation ☞422
382k422 Most Cited Cases

Mere failure to disclose is not actionable under Lanham Act unless representations are affirmatively misleading, partially correct, or untrue as result of failure to disclose material fact, although plaintiff need not establish intent to deceive. Lanham Trade-Mark Act, § 34(a), as amended, 15 U.S.C.A. § 1116(a); O.C.G.A. § 10-1-373(a).

[6] Trade Regulation ☞422
382k422 Most Cited Cases

For Lanham Act purposes, if representations are actually false, court does not have to determine whether representations are likely to create confusion; false claims are presumed to be material for purposes of granting relief. Lanham Trade-Mark Act, § 34(a), as amended, 15 U.S.C.A. § 1116(a); O.C.G.A. § 10-1-373(a).

[7] Trade Regulation ☞573.1
382k573.1 Most Cited Cases
(Formerly 382k573)

If misleading misrepresentation as to product is literally true, plaintiff alleging Lanham Act violation has burden of persuading court that persons to whom advertising or promotion is addressed would receive false impression about product. Lanham Trade-Mark Act, § 34(a), as amended, 15 U.S.C.A. § 1116(a); O.C.G.A. § 10-1-373(a).

[8] Trade Regulation ☞571.1
382k571.1 Most Cited Cases
(Formerly 382k571)

[8] Trade Regulation ☞596
382k596 Most Cited Cases

If allegedly misleading statement is literally true, plaintiff

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

765 F.Supp. 724                                                                    Page 2
(Cite as: 765 F.Supp. 724)

must prove actual deception by preponderance of evidence and must show how consumers actually do react, not merely how they might react, in order to recover money damages; if representations are not literally false, requisite causation and likelihood of injury are generally not presumed but must be demonstrated.

**[9] Trade Regulation ☞619**
382k619 Most Cited Cases

District courts have jurisdiction to enter preliminary injunctions under Lanham Act on showing of substantial likelihood that movant will succeed on merits, that movant will suffer irreparable harm unless injunction issues, that potential injury outweighs possible harm to opposing party, and that injunction would not be adverse to public interest. Lanham Trade-Mark Act, § 34(a), as amended, 15 U.S.C.A. § 1116(a); O.C.G.A. § 10-1-373(a).

**[10] Trade Regulation ☞422**
382k422 Most Cited Cases

To succeed on merits of Lanham Act claim, plaintiff must show that representations by defendant are false or misleading by tending to create confusion; it is not enough to show that representation is facially ambiguous or unsubstantiated. Lanham Trade-Mark Act, § 34(a), as amended, 15 U.S.C.A. § 1116(a); O.C.G.A. § 10-1-373(a).

**[11] Trade Regulation ☞620**
382k620 Most Cited Cases

Company that distributed replacement electrode for lithotripsy machines, which use shock waves to fragment kidney stones, and competitor which sold refurbished electrodes were each entitled to preliminary injunction prohibiting the other from making false and misleading statements about the products; company made unsubstantiated claims that there had been catastrophic failure of refurbished electrodes, and competitor made number of apparently untrue assertions that FDA had approved its refurbished electrodes. Lanham Trade-Mark Act, § 34(a), as amended, 15 U.S.C.A. § 1116(a); O.C.G.A. § 10-1-373(a).

**[12] Trade Regulation ☞620**
382k620 Most Cited Cases

Consumer deception, by its very nature, is against public interest, for purposes of determining entitlement to preliminary injunction.

**[13] Constitutional Law ☞90.2**
92k90.2 Most Cited Cases

**[13] Constitutional Law ☞90.3**

92k90.3 Most Cited Cases

While commercial speech is entitled to some protection, deceptive or misleading advertising is subject to restraint and may be prohibited entirely. U.S.C.A. Const.Amend. 1.

**[14] Trade Regulation ☞646**
382k646 Most Cited Cases

District court has broad powers in equity to direct parties who have engaged in unfair competition to take affirmative steps to eliminate possible consumer confusion.

*726 Lowell Steven Fine, Jane Fugate Thorpe, Lawrence Brannen Domenico, Alembik, Fine & Callner, William E. Sumner, Sumner & Hewes, John Allen Howard, David Kiser Whatley, Williston Carpenter White Fortson & White, Atlanta, Ga., for plaintiffs.

Richard C. Mitchell, William M. Ragland, Jr., Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., George R. Kucik, John M. Packman, Randall J. Boe, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendants.

ORDER

FORRESTER, District Judge.

This matter is before the court after a consolidated hearing on both parties' motions for preliminary injunction. Plaintiff/counterclaim defendant Energy Four, Inc. and defendant/counterclaim plaintiff Dornier Medical Systems, Inc., each ask the court to enjoin the other from making false and misleading statements that allegedly violate the Lanham Act, 15 U.S.C. § 1116(a), and the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-373(a). Plaintiff's motion for sanctions is also before the court.

I. FINDINGS OF FACT

Plaintiff Energy Four, Inc. (Energy Four) and Dornier Medical Systems, Inc. (Dornier) are both Georgia corporations. Dornier's parent company, Dornier Medizintechnik GmbH, manufactures lithotripsy machines which are medical devices that use shock waves to fragment kidney stones. The shock waves are produced by electrodes which must be replaced after a certain number of shocks, generally after each patient treatment. Dornier's parent company also manufactures replacement electrodes for its lithotripsy machines. Dornier distributes machines and replacement electrodes manufactured by its parent. Energy Four competes with Dornier by refurbishing used electrodes at a cost less than the price of new replacement electrodes. Energy Four is the nation's largest supplier of electrode refurbishing services. There are approximately 250 lithotripsy machines currently being used in the United States. All Dornier lithotripsy machine users are potential

765 F.Supp. 724
**(Cite as: 765 F.Supp. 724)**

Page 3

customers of Energy Four.

*727 The Food and Drug Administration regulates the sale of lithotripsy machines and electrodes in the United States by requiring vendors to submit a Pre-Market Approval Application (PMA). The first electrodes sold by Dornier in the United States were approved for marketing with a 700-shock life rating at a setting of 18 kilovolts of electricity. Later versions of the Dornier electrode were approved for marketing in the United States with rated shock lives of 1100, 1500, and 2,000 shocks. The FDA approved a PMA Supplement allowing Dornier to market its electrodes for 1500 shocks when used in the range of 14 to 20 kilovolts in 1987.

The electrode approved for sale in the United States by Dornier as a 1500 shock electrode was, at least for some period, simultaneously marketed as a 2,000 shock electrode outside of the United States. In March of 1989 Dornier changed the tolerance range for the hardness coefficient of the electrode tips. Coefficients equal to or greater than 680 kilopons per square millimeter were previously acceptable. The new electrodes were manufactured with a tolerance range of 680 to 790 kilopons per square millimeter. The court was unable to determine, on the basis of evidence produced at the hearing, whether the tips of any old 1500 shock electrodes exceeded the new upper limit. Apparently, the other electrode specifications were unchanged.

There was conflicting evidence as to when Dornier began marketing 1500 shock electrodes that were produced under the new tolerance range. Defendant's own witnesses gave contradictory testimony concerning the length of time involved. It is undisputed that the only change made in the then rated 1500 shock electrode, when Dornier began marketing it for a 2,000 shock life in February of 1990, was the color of the plastic locking ring. All electrodes marketed for 2,000 shocks in the United States were manufactured with a blue plastic locking ring.

Both the old 1500 shock electrodes and the new 1500 shock electrodes produced under the stricter hardness coefficient controls were manufactured with a white plastic locking ring. Consequently, it may be impossible to distinguish between the old and new 1500 shock electrodes by visual inspection. Because Energy Four destroys the Dornier label during the refurbishing process, it is difficult for the end user to determine when the refurbished electrode was originally manufactured.

Dornier requested approval for the increased number of shocks per service life by submitting Supplement No. 22 to Pre-Market Application Number P840008, dated May 3, 1989. The supplement identifies "improved steel production techniques which allow better control of the hardness coefficients" of the electrode tips as a modification in the electrode producing a higher number of shocks per service life. No other modifications in the electrode itself are identified.

The PMA does not identify the tolerance range for the hardness coefficient. The specification sheets produced by Dornier for the 2,000 shock electrode (S2000/18) and 1500 shock electrode (S1500/18) are identical. Neither specifies the hardness coefficient range. However, the FDA approval for marketing at 2,000 shocks was based on demonstrations of extended shock life produced by electrodes manufactured under the new tolerance ranges.

On August 26, 1987 Jeffrey S. Mesquita, now president of Energy Four, wrote the FDA regarding the development of a process to refurbish Dornier electrodes. The FDA informed Mesquita that,

As long as your refurbishing operation brings the electrodes back to the original specifications that were approved in the Pre-Market Approval Application and you do not take actual title to them, we would not require the registration of your refurbishing operation nor would we require your firm to submit a pre-market notification or seek pre-market approval for its operation. If, however, your firm changes the specifications of the electrodes either on its own behalf or upon the request of the owner of the electrode then the above decision would have to be reconsidered.

*728 In a letter dated August 21, 1990, the FDA stated,
From what we have been able to determine at this time, Energy Four does not acquire ownership of the lithotripter electrodes they refurbish, and therefore is exempt from our current policy.

The FDA conducted an on-site inspection of Energy Four's facilities sometime in the spring of 1990. As of yet, the FDA has not issued any inspection report, notice of deficiency, or any finding that Energy Four was in compliance with the Food, Drug and Cosmetic Act.

As competition between Dornier and electrode refurbishers intensified during 1989 and early 1990, Dornier began an intensive campaign to discourage its customers from using the refurbished electrodes. These efforts were aggressively countered by Energy Four. Users of Dornier lithotripter machines were bombarded by information from both parties containing conflicting information regarding both new Dornier electrodes and Dornier electrodes refurbished by Energy Four. Dornier questioned the safety and reliability of refurbished electrodes, emphasizing that refurbished electrodes had not been tested or "approved" by the FDA. Energy Four told customers that Dornier had misled them about differences between the S1500/18 and the S2000/18 electrodes and promised that it could refurbish S1500/18 electrodes for a 2,000 shock life. Energy Four consistently

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

represented that it refurbished electrodes to the exact specifications used by Dornier and approved by the FDA.

The parties presented conflicting evidence regarding the character of Energy Four's claims of FDA approval. Plaintiff presented evidence that most if not all of the letters sent to potential customers regarding FDA approval included a copy of the FDA letters stating that Energy Four was exempt from FDA registration and PMA requirements. Defendant produced evidence that Energy Four represented that the FDA had found it to be in full and complete compliance with the Food, Drug and Cosmetic Act.

In early 1990 Dornier distributed a brochure entitled "Customer Report: Refurbished Electrodes" that, *inter alia,* made reference to a "catastrophic failure" of a refurbished electrode. The distribution of this brochure to all of Dornier's customers provided the impetus for this lawsuit. Additionally, in a February 12, 1990 letter to the Hospital Corporation of America, Dornier's national accounts sales manager stated that the catastrophic failure had occurred in Texas, and had resulted in an "implosion and significant equipment damage." Defendant has admitted the falsity of this statement.

Defendant did present evidence that a problem occurred while an Energy Four refurbished electrode was being used at a lithotripsy site in Texas. No patient injury or equipment damage resulted from that incident. Defendant's own witnesses gave conflicting testimony as to whether the electrode actually "came apart" and whether the positioning ring came off during use or after the electrode was removed from a lithotripsy machine.

The Dornier brochure linked the alleged catastrophic failure to the use of glue to bond the position ring of the electrode in the refurbishing process. The brochure stated,

Almost all electrode refurbishers break off the electrode's plastic positioning ring in order to machine the electrode's inner and outer conductor tips. When the plastic positioning ring is removed, a positive mechanical lock is destroyed. The plastic positioning ring can no longer be mechanically locked into place, but must then be *glued* back into place. This modification to Dornier's electrode design is a serious safety and performance concern, since the glue bonding process can permit ring slippage and corresponding uncontrolled movement of F1 and F2. Recently, one mobile lithotripsy service reported the catastrophic failure of a refurbished electrode--where the ring slipped completely off the electrode during use.

Until 1987, the positioning rings of all Dornier electrodes were similarly glue *729 bonded to the electrode. At that time, Dornier learned of some cases of ring slippage and movement of F2. Dornier then voluntarily recalled its electrodes and developed the current design which uses

the *positive mechanical lock* [emphasis in original].
It is true that Dornier initiated an exchange program after receiving reports of ring slippage on smooth-bodied electrodes. It is also true that the FDA subsequently *ordered* a recall of all Dornier electrodes in 1987.

The electrodes currently produced by Dornier's parent and distributed by Dornier are manufactured with three mechanical locks which are designed to prevent ring slippage. Two of these locks prevent the ring from slipping backwards toward the generator of the lithotripsy machine. The brochure refers to the locking mechanism designed to prevent the ring from slipping forward on the electrode. The rear slippage locks are not affected by the refurbishing process. Energy Four does break the mechanical forward slippage lock to remove the positioning ring for the refurbishing process. After refurbishing, Energy Four uses a tap to cut grooves five-thousandths of an inch deep in the body of the electrode. Energy Four then cuts grooves in the interior of the positioning ring designed to interlock with the grooves in the body of the electrode. The gaps between the interlocking grooves are filled with a cyano acrylate glue. Thus, the refurbished electrode is not completely "similar" to the electrode subject to the FDA recall. Those electrodes had a smooth-bodied design. None of the three locking mechanisms currently used by Dornier were incorporated in their design. As noted above, two of these mechanisms are unaffected by the refurbishing process.

The parties' respective expert witnesses gave conflicting testimony as to the relative effectiveness of Energy Four's modifications to prevent ring slippage after refurbishing. The court found that the opinions given by the experts were not based on scientifically reliable studies. Because of the court's severe misgivings about the size and integrity of the samples of electrodes tested by the experts, the court was unable to draw factual conclusions from their reports and testimony.

There was absolutely no evidence produced at the hearing by Dornier Medical Systems, Inc. that there has ever been a catastrophic failure of an Energy Four refurbished electrode, as that term is ordinarily understood, contrary to assertions made by Dornier in the brochure and in communications with its customers. The evidence showed only two or three instances of a failure of the glue bond on Energy Four refurbished electrodes. There was no evidence adduced at the hearing that any patient has been harmed on account of having been treated with an Energy Four refurbished electrode, nor was there any evidence adduced that any generator or other part of a lithotripsy machine has been damaged seriously on account of the use of Energy Four refurbished electrodes.

At the hearing, Dornier argued that the court should take

judicial notice of the definition of "catastrophic failure" in the MCGRAW-HILL DICTIONARY OF ENGINEERING (1984), the MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (4th Edition 1989), and the MODERN DICTIONARY OF ELECTRONICS (6th Edition, 1989). These dictionaries define catastrophic failure as "a sudden failure without warning, as opposed to degradation failure" and as "failure whose occurrence can prevent the satisfactory performance of an entire assembly or system." Dornier has cited a number of cases where the courts have taken notice of these definitions.

Energy Four produced evidence in the form of testimony by William J. Casarella, an Energy Four stockholder, and Patrick T. Hunter, II, a consultant retained by Energy Four, that catastrophic failure was generally understood in the relevant medical community to mean a failure resulting in serious equipment damage or patient injury. Three other witnesses not associated with Energy Four corroborated Casarella and Hunter's testimony. Dornier presented no evidence that the dictionary definitions *730 reflected a common understanding among targeted consumers.

The court took judicial notice only of the fact that the dictionaries offered contained the definitions urged by Dornier. The court declined to adopt them as controlling. The court is of the opinion that Dornier's representations are actionable falsehoods even under the proffered definition. The alleged incidents of refurbished electrode failure did not involve sudden or systemic failure.

A number of consumers of electrodes for lithotripsy machines have never used Energy Four refurbished electrodes, or electrodes refurbished by any other company, either out of natural caution or on account of limited and unsophisticated on-premises tests, or on account of perceived technical difficulties in actual operation. The court notes, however, that since beginning operations, Energy Four, Inc. has refurbished between 15,000 and 20,000 electrodes, the vast majority of which seemed to have been used by consumers without even anecdotal evidence of clinical catastrophic failure.

## II. APPLICABLE LAW

### A. Lanham Act

[1] Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

1) is likely to cause confusion, or to cause mistake, or to deceive as to the ... sponsorship, or approval of his or her goods, services, ... or

2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, ... of his or her or another person's goods ... shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

To prevail on a Lanham Act claim that a defendant has made false or misleading representations in commercial advertising or promotion, a plaintiff must show that the representations were false, or misleading and actually or likely deceptive; that they were material in effect on buying decisions; that they were made in connection with interstate commerce; [FN1] and that they were actually or likely injurious to plaintiffs. Alpo Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 964 (D.C.Cir.1990); United States Healthcare v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 923-24 (3rd Cir.1990); American Home Products Corp. v. Johnson & Johnson, 577 F.2d 160, 165-66 (2nd Cir.1978). As amended, the Act provides a cause of action for false or misleading descriptions and representations by a defendant concerning either plaintiff's or defendant's products.

FN1. Neither party disputes that the allegedly false and misleading representations were made in the realm of interstate commerce.

### B. Georgia Uniform Deceptive Trade Practices Act

[2][3] A person engages in a deceptive trade practice within the meaning of the Georgia Uniform Deceptive Trade Practices Act when he "causes likelihood of confusion or of misunderstanding" or makes misrepresentations concerning approval or certification of a product, misrepresents the standard, quality or grade of a product, disparages the goods of another by false or misleading representations of fact, or engages in other conduct similarly creating a likelihood of confusion or misunderstanding. O.C.G.A. § 10-1-372(a)(2, 5, 7, 8, 12). A party need not demonstrate actual confusion or misunderstanding to prevail under the Act. O.C.G.A. § 10-1-373(b). The Act authorizes injunctive relief for a person likely to be damaged by a deceptive trade practice "under the principles of equity and on terms the court considers reasonable." O.C.G.A. § 10-1-373(a). No proof of monetary damages, lost profits, or intent to deceive *731 is required. Id. The remedy provided by the Act is limited to injunctive relief but is cumulative with other statutory and common law remedies. O.C.G.A. § 10-1-373(c); Lauria v. Ford Motor Co., 169 Ga.App. 203, 206-207, 312 S.E.2d 190 (1983); Diedrich v. Miller & Meier & Assocs., 254 Ga. 734, 736, 334 S.E.2d 308 (1985).

[4] The Uniform Deceptive Trade Practices Act involves the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

same dispositive questions as the Federal Lanham Act. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 839 (11th Cir.1983), quoted in *Original Appalachian Artworks, Inc. v. Schlaifer Nance & Co., Inc.*, 679 F.Supp. 1564, 1578 (N.D.Ga.1987) (holding that a failure to establish the predicate falsity under the Lanham Act forecloses claims for violation of the Uniform Deceptive Trade Practices Act). Plaintiffs asserting state law claims under versions of the Uniform Trade Deceptive Practices Act must still establish the prerequisites for a preliminary injunction. *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F.Supp. 1031, 1033 (N.D.Ga.1986), citing *Dallas Cowboy Cheerleaders v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir.1979) and *Scientific Applications, Inc. v. Energy Conservation Corp. of America*, 436 F.Supp. 354, 357 (N.D.Ga.1977). Thus, the court's analysis under the Lanham Act will dispose of the state law issues.

*C. Analysis of a Lanham Act Claim*

A court must first determine whether a representation is either false or misleading. *United States Healthcare*, 898 F.2d at 922; *Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1110 (D.N.J.1987). The court begins by examining the message defendant's representations convey. *United States Healthcare*, 898 F.2d at 922 (citing *Plough, Inc. v. Johnson & Johnson Baby Prods. Co.*, 532 F.Supp. 714, 717 (D.Del.1982). A court must initially consider a statement's literal meaning and then determine whether it conveys to the target audience any implied message beyond that meaning. *Avis Rent A Car System v. Hertz Corp.*, 782 F.2d 381, 385-86 (2nd Cir.1986); *American Home Products v. Johnson & Johnson*, 577 F.2d at 165. The message may be clear on its face, but context is usually important. *United States Healthcare*, 898 F.2d at 922. [FN2]

> FN2. Context is particularly important where the targeted consumers are a well-informed and sophisticated audience because such an audience is less likely to be misled. *Sandoz Pharmaceuticals Corp. v. Richardson- Vicks, Inc.*, 902 F.2d 222, 229 (3rd Cir.1990) (citing *Plough, Inc. v. Johnson & Johnson Baby Prods. Co.*, 532 F.Supp. at 717.

[5] A mere failure to disclose is not actionable under the Lanham Act unless representations made are "affirmatively misleading, partially incorrect, or untrue as a result of [a] failure to disclose a material fact." *United States Healthcare*, 898 F.2d at 921 (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 27:7(B) (2nd Ed.1989)). A plaintiff need not establish an intent to deceive. *United States Healthcare*, 898 F.2d at 922; *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3rd Cir.1958).

1. Actually False Claims

[6] When representations are actually false, a court does not have to determine whether the representations are likely to create confusion. *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222 (3rd Cir.1990). Furthermore, actually false claims are presumed material. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 272 (2nd Cir 1987). Relief can be granted without reference to the reaction of consumers. *Id.* (citing *American Brands, Inc. v. R. J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356 (S.D.N.Y.1976)). *See also Camel Hair & Cashmere Inst. v. Associated Dry Goods Corp.*, 799 F.2d 6, 15 (1st Cir.1986); *Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 977 (2nd Cir.1988).

2. Misleading Claims

[7][8] The statute embraces false impressions, innuendo, and ambiguous suggestions. *732Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d at 975; *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272 (2nd Cir.1981). When such a representation is literally true, a plaintiff has the burden of persuading the court that the persons to whom the advertising or promotion is addressed would receive a false impression about a product. *United States Healthcare*, 898 F.2d at 922; *Toro Co. v. Textron, Inc.*, 499 F.Supp. 241, 253 n. 23 (D.Del.1980) (quoting 1 R. Callman, *Unfair Competition, Trademarks and Monopolies.* § 19.2(b)(2) 3rd Ed. (1979 Suppl.). He must do more than show that the defendant has failed to offer persuasive evidence in support of the truth of defendant's representations. *Procter & Gamble Co v. Chesebrough-Pond's, Inc*, 747 F.2d 114, 119 (7th Cir.1984). A plaintiff is relieved of the burden of producing evidence of a tendency to mislead only when plaintiff can prove the challenged statements are actually false. *Id.* [FN3]

> FN3. When a statement is literally true but allegedly misleading, to recover money damages, plaintiff must *prove* actual deception by a preponderance of the evidence, showing how consumers actually do react, not merely how they might react. *Sandoz Pharmaceuticals*, 902 F.2d at 228- 229. Public reaction is the starting point of inquiry--the court's own reaction "is at best not determinative and at worst irrelevant." *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d at 165.
> When representations are not literally false, the requisite causation and likelihood of injury generally are not presumed but must be demonstrated. *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316 (2d Cir.1982); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

F.2d 186, 189-90 (2d Cir.1980). Materiality or causation is established by showing that the allegedly false or misleading representation is likely to influence purchasing decisions. *Toro Co.*, 499 F.Supp. at 251. *United States Healthcare*, 898 F.2d at 922. This does not mean that a plaintiff's "mere subjective belief that he is likely to be injured" will support a Lanham Act cause of action. *Johnson & Johnson v. Carter- Wallace, Inc.*, 631 F.2d at 190. A plaintiff must present evidence to provide a reasonable basis for believing that injury is likely. *Id.; Vidal Sassoon, Inc. v. Bristol-Meyers Co.*, 661 F.2d at 278. Market studies showing that a defendant's representations do in fact mislead targeted consumers can also supply a causative link to a plaintiff's potential lost sales. *Coca-Cola Co.*, 690 F.2d at 316-17. If the parties are competitors, once a plaintiff has shown that a representation is false or has a tendency to mislead, the likelihood of irreparable injury can be presumed. *McNeilab, Inc. v. American Home Products, Inc.*, 848 F.2d 34, 38 (2nd Cir.1988). Survey research is not required, as a matter of law, to support a state or federal agency's finding that an advertisement is misleading. *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 40 (D.C.Cir.1985). When the possibility of consumer deception is self-evident, the state need not produce consumer surveys to establish a tendency to mislead. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652, 105 S.Ct. 2265, 2282, 85 L.Ed.2d 652 (1985) (citing *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391-92, 85 S.Ct. 1035, 1046-47, 13 L.Ed.2d 904 (1964). However, a private plaintiff under the Lanham Act is not entitled to the deference given a determination by the state or the FTC as an administrative agency. *Sandoz Pharmaceuticals*, 902 F.2d at 228.

## III. PRELIMINARY INJUNCTION STANDARD

[9] Under the Lanham Act, the district courts have jurisdiction to enter a preliminary injunction. *U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir.1982); *Vidal Sassoon v. Bristol-Myers Co.*, 661 F.2d 272 (2nd Cir.1981). A movant is entitled to a preliminary injunction only when that party clearly shows,

1) A substantial likelihood that it will succeed on the merits;
2) That it will suffer irreparable harm unless the injunction issues;
3) That the potential injury outweighs possible harm to the opposing party; and
4) That the injunction would not be adverse to the public

interest.
*Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154, 159 (11th Cir.1990); *Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir.1987). *See also Second Earth Enterprises, Inc. v. Allstar Product Marketing Co.*, 717 F.Supp. 302 (E.D.Pa.1989) (trade dress case under Lanham Act).

### A. The Merits

[10] To succeed on the merits it is not enough to show that the representation is facially ambiguous or unsubstantiated--a plaintiff must show that the representations are (1) false or (2) mislead by tending to create confusion. *Sandoz Pharmaceuticals Corp.*, 902 F.2d at 229; ***733**PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d at 271- 72; *Procter & Gamble Co. v. Chesebrough-Pond's, Inc.*, 747 F.2d at 119; *Toro Co. v. Textron, Inc.*, 499 F.Supp. at 251.

### 1. Statements Allegedly False

[11] *Energy Four* is likely to prevail on its claim that Dornier's statements concerning a "catastrophic failure" of an *Energy Four* refurbished electrode were false representations constituting a violation of the Lanham Act. These representations were made in several contexts, including a letter from Michael Whittenberg to Ben Cheney at Hospital Corporation of America, dated February 12, 1990, stating that a catastrophic failure of a refurbished electrode occurred in Texas and resulted in an implosion and significant equipment damage. They also include statements in Dornier's "Customer Report" brochure concerning a report of a catastrophic failure of a refurbished electrode.

The court finds that Dornier is substantially likely to prevail on its claim that Energy Four's representations concerning FDA approval of refurbished electrodes constituted a violation of the Lanham Act. The following specific representations are substantially likely to be proven false:

1) That Energy Four refurbishes used Dornier electrodes according to the requirements of the Food and Drug Administration.
2) That Energy Four underwent an FDA inspection and was found to be fully in compliance with the Food, Drug and Cosmetic Act.
3) That Energy Four's refurbished electrodes have FDA approval.
4) That with 100% surety, the Dornier 1500 and 2,000 electrodes are the same except for labeling, packaging and the color of the positioning ring.
6) That Dornier has supplied Energy Four with Dornier's ever-changing working specifications.
5) That Energy Four possesses written verification that the Dornier 1500 and 2,000 electrodes are identical and that a Dornier service executive and senior marketing

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

executive have confirmed to Energy Four and some current customers that these electrodes are the same.

6) That it is prudent for lithotripter operators to use their current stores of Dornier 1500 shock rated electrodes to the new 2,000 shock specifications and to refurbish these electrodes with Energy Four for use at the newly approved specification of 2,000 shocks.

Energy Four's claims regarding the lack of physical differences between Dornier's 1500 and 2000 shock electrode may not have been fully substantiated by Energy Four, but Dornier failed to show that these claims were actually false. Likewise, the court could not say that Energy Four's claims that it gave precise attention to Dornier's PMA specifications were substantially likely to be proven false. The PMA specifications and Dornier's published specifications, which Energy Four did possess, did not identify the coefficient of hardness tolerance range that Dornier maintains distinguishes its 2000 shock electrode from earlier versions. Dornier's claims regarding the safety risk of glue-bonded refurbished electrodes were also unsubstantiated, but Energy Four did not carry its burden of showing these claims substantially likely to be proven false.

### 2. Claims Allegedly Misleading

Statements not actually false may still be actionable as misleading. When the representations are allegedly misleading, rather than false, "the statute demands only proof that the plaintiff provide a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d at 190. Unfortunately, the case law does not establish a minimum standard of proof for a tendency to mislead. Circumstantial evidence may be sufficient for injunctive relief. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d at 271. A showing that a small but "not insubstantial number of consumers were clearly misled" may also be sufficient. *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d at 317.

**\*734** While it was unnecessary to examine consumer reaction to representations the court found to be actually false, *PPX Enterprises*, 818 F.2d at 272, such an inquiry was necessary to determine whether the parties were likely to prevail on their claim that the remaining representations were misleading. Evidence of consumer reaction usually consists of surveys and market research, but other reliable evidence may be given substantial weight. *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d at 167. *See, e.g., American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. at 1357 (expert testimony, if not frivolous, may be considered). Neither party produced such evidence sufficient for the court to conclude that it was substantially likely to establish at trial that the representations, other than

those identified above as likely to be proven false, had a "tendency to mislead." The court expresses no opinion as to how the trier of fact will dispose of these additional claims.

### B. *Irreparable Harm*

Proof of falsity is sufficient to sustain a finding of irreparable injury for purposes of a preliminary injunction. *Tambrands, Inc. v. Warner-Lambert Co.*, 673 F.Supp. 1190 (S.D.N.Y.1987). Once a plaintiff has shown that the defendant's representations are false or tend to mislead the public so as to affect their purchasing decision, the likelihood of injury can be demonstrated by showing that the parties are competitors. *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d at 190. When an advertisement makes a misleading comparison to a specifically identified competing product, the value of the competing product is necessarily diminished in the mind of the consumer and irreparable injury may be presumed. *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2nd Cir.1988) (defendant falsely implied that Advil was as safe as Tylenol in all respects). Misleading comparative claims deprive a plaintiff of a legitimate competitive advantage and reduce a consumer's incentive to purchase the plaintiff's product. *Id.* Given the intense and direct competition between the parties, it is clear that the court may presume that any false or misleading statements made by either party will injure the other.

Beyond these inferences of irreparable harm, plaintiff produced evidence that since publication of the brochure, Energy Four sales have declined by over fifty percent. Energy Four claims that this decrease in sales has forced the company to lay off over one-half of its production staff, that the cost of this lawsuit has exhausted all of Energy Four's capital, and that Energy Four is in "imminent danger" of being forced out of business. Dornier produced no evidence that a preliminary injunction would possibly harm Dornier more than any potential injury to Energy Four.

Because both parties sought only equitable relief at the hearing, neither party needed to demonstrate that potential customers were actually deceived by the challenged representations. Given the limited number of potential customers, evidence that a small number of customers were actually deceived is more probative than it might be in other cases.

Dornier has challenged Energy Four's characterization of Energy Four's decline in sales. The challenge is immaterial. A plaintiff who can prove actual lost sales is entitled to an injunction even though the decline in his sales is mostly attributable to factors other than his competitor's allegedly false or misleading representations. *Coca-Cola*, 690 F.2d at 316. Because detailed proof of individual lost sales goes to the issue of damages, it is not a prerequisite for equitable

relief. *Id.; Parkway Baking*, 255 F.2d at 648. A plaintiff "need not even point to an actual loss or diversion of sales." *Johnson & Johnson v. Carter-Wallace*, 631 F.2d at 190-91. Thus, when a plaintiff seeks an injunction, as opposed to money damages, he "need not quantify the losses actually borne." *Id.* at 189. The court notes that Dornier failed to introduce probative evidence of any decline in its own sales.

### C. Other Factors

[12] Consumer deception, by its very nature, is against the public interest. **735** *Teledyne Indus., Inc. v. Windmere Prods. Inc.*, 433 F.Supp. 710, 740-741 (S.D.Fla.1977); *S K & F Co. v. Premo Pharmaceutical Labs.*, 625 F.2d 1055, 1067 (3rd Cir.1980). Finally, it is clear to the court that issuing a preliminary injunction to prevent the further dissemination of claims likely to be shown false or misleading at trial will not impose an unfair hardship on either party, and if there is any risk of potential harm, it is shared by both parties.

### IV. CONCLUSIONS OF LAW

Dornier Medical Systems, Inc., and its employees, agents and representatives are ENJOINED from making further statements or representations concerning an alleged catastrophic failure of a refurbished electrode. Dornier and its employees, agents and representatives are further ENJOINED from distributing the "Customer Report: Refurbished Electrodes" brochure containing statements about an alleged catastrophic failure.

Dornier is also entitled to a preliminary injunction. Energy Four, Inc. and its employees, agents and representatives are ENJOINED from continuing to make, communicate, or distribute the representations found likely to be proven false.

### V. FIRST AMENDMENT CONCERNS

[13] Dornier argues that it should not be enjoined from making statements concerning the catastrophic failure of an Energy Four electrode because these statements are entitled to first amendment protection. Dornier's statements are not entitled to first amendment protection because they are untrue. While commercial speech is entitled to some protection, deceptive or misleading advertising disserves the aims of the first amendment. *In re R. M. J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982). Misleading advertising is subject to restraint, and false advertising may be prohibited entirely. *Id.; FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d at 43. Dornier's argument is without merit.

### VI. NOTICE TO CUSTOMERS

[14] A district court has broad powers in equity to direct parties who have engaged in unfair competition to take affirmative steps to eliminate possible consumer confusion. *Alpo Pet Foods, Inc. v. Ralston Purina Co.*, 720 F.Supp. 194 (D.D.C.1989) (both parties required to issue corrective releases), *rev'd on other grounds*, 913 F.2d 958 (D.C.Cir.1990); *Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1269-70 (5th Cir.1971); *Upjohn Co. v. Riahome Corp.*, 641 F.Supp. 1209, 1226 (D.Del.1986). Because of the intense and direct competition between the parties, the public health concerns involved, and the conclusion that both parties are entitled to injunctive relief, the court determines that issuance of a corrective release is justified. After supplemental briefing by the parties, the court DIRECTS that the notice attached to this order as Appendix A be distributed to all Energy Four and Dornier customers, the cost to be shared equally by the parties.

### VII. PLAINTIFF'S MOTION FOR SANCTIONS

On September 12, 1990, the day of the hearing on the cross motions for preliminary injunction, plaintiff moved the court for sanctions for defendant's failure to comply with discovery ordered by Magistrate Judge Strother. Plaintiff asked the court to sanction defendant by prohibiting defendant from presenting his counterclaim and motion or injunctive relief until it complied with the magistrate's order. Plaintiff raised this issue at the opening of the hearing but the court declined to hear the matter at that time and instructed plaintiff to seek a hearing before Magistrate Judge Strother if plaintiff wanted a ruling on the issue before the hearing on the preliminary injunction motions. Plaintiff elected to proceed with the hearing.

Defendant argues that the court should deny plaintiff's motion for sanctions as moot, claiming that plaintiff withdrew the motion by electing to proceed with the preliminary injunction hearing. Plaintiff denies that its motion was withdrawn and **736** again asks the court to prohibit defendant from proceeding on defendant's counterclaim and motion for permanent injunctive relief until defendant complies with the magistrate's discovery order.

As indicated at the hearing for preliminary injunction, the court believes that plaintiff's motion should be referred to Magistrate Judge Strother. The Clerk of Court is DIRECTED to submit plaintiff's motion for sanctions to Magistrate Judge Strother to determine whether defendant has complied with the magistrate's discovery order and what sanctions, if any, are appropriate.

### VIII. CONCLUSION

Plaintiff's motion for preliminary injunction is GRANTED. Defendant's motion for preliminary injunction is

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

GRANTED. The parties are INSTRUCTED to share the cost of distributing the corrective notice contained in this order to all users of lithotripsy machines capable of using Dornier electrodes. Plaintiff's motion for sanctions is REFERRED to Magistrate Judge Strother.

SO ORDERED.

APPENDIX A
Notice to Operators of Lithotripsy Machines in the United States sent pursuant
to an Order of the United States District Court for the Northern District of
Georgia by Dornier Medical Systems, Inc., and Energy Four, Inc.

Energy Four, Inc. filed suit against Dornier Medical Systems, Inc. in the United States District Court for the Northern District of Georgia, contending that Dornier Medical Systems, Inc. had circulated materially false and/or misleading information concerning Energy Four's refurbished electrodes. Dornier Medical Systems, Inc. counterclaimed, contending that Energy Four, Inc. had circulated materially false and/or misleading statements concerning its own products and concerning certain facts regarding Dornier Medical Systems, Inc.'s electrodes. An evidentiary hearing was held before the court on cross motions for preliminary injunctions during September of 1990. After considering the motions, the court ordered the parties to send this notification to all operators of lithotripsy machines in this country which can utilize Dornier Medical Systems, Inc.'s electrodes.

I.

There was absolutely no evidence adduced at the hearing by Dornier Medical Systems, Inc. that there has ever been a catastrophic failure of an Energy Four refurbished electrode, as that term is ordinarily understood, contrary to assertions made by Dornier Medical Systems in a brochure circulated during the spring of 1990.

It was said in the brochure circulated by Dornier Medical Systems that there had been a catastrophic failure due to problems with the positioning ring on a refurbished electrode. On that subject the evidence showed only two or three instances of a failure of the glue bond on Energy Four refurbished electrodes but no patient injury or damage to equipment occurred on account of these failures.

The parties' respective expert witnesses gave conflicting testimony as to the relative effectiveness of Energy Four's modifications to prevent ring slippage after refurbishing. The court found that the opinions given by the experts were not based on scientifically reliable studies. The court found the experts to be well qualified, but, because of its severe

misgivings about the size and integrity of the samples of electrodes tested, the court was unable to draw factual conclusions from their studies.

There was absolutely no evidence adduced at the hearing that any patient has been harmed on account of having been treated with an Energy Four refurbished electrode, nor was any evidence adduced that any generator or other part of a lithotripsy machine has been seriously damaged on account of the use of Energy Four refurbished electrodes.

*737 II.

At the hearing, both sides produced testimony of experts supporting or rebutting the functional interchangeability of new Dornier electrodes with Energy Four electrodes as well as the differences and similarities between the old Dornier 1500 shock electrodes and the new Dornier 2,000 shock electrodes. Here too, because of the court's severe misgivings about the size and integrity of the sample of electrodes that were tested, the court was unable to resolve these disputes at the hearing.

III.

The court found that Energy Four, Inc. had made a number of assertions that the Food and Drug Administration (FDA) had "approved" its refurbished electrodes. This appeared to be materially untrue.

In fact, an FDA employee told Energy Four that its refurbishing services do not require FDA approval, provided that Energy Four does not take title to the electrodes it refurbishes and, further, provided that it returns the electrodes to the original Dornier specifications approved by the FDA. The FDA has not actually determined that Energy Four returns electrodes to the approved specifications. Accordingly, the FDA has expressed no view on the efficacy, quality or safety of Energy Four electrodes, either positively or negatively. The FDA has conducted an on-premises investigation of Energy Four's operations but as of this date has issued no report concerning the inspection.

IV.

Energy Four, Inc. represented to the market that Dornier 1500 shock electrodes could be refurbished and used in conformance with FDA approval for 2,000 shocks at 18kv. In fact, these electrodes were being used outside the United States for that number of shocks. Old Dornier 1500 electrodes, however, were never approved by the FDA for 2,000 shocks, contrary to the representations of Energy Four, Inc. Dornier electrodes with blue positioning rings meet the FDA specifications for 2,000 shocks and may lawfully be refurbished for that number of shocks if the refurbished electrode meets the approved specifications.

While some white ring 1500 shock electrodes were manufactured to the same specifications, they were approved for sale only at a 1500 shock life. Whether or not there is a real difference between the 1500 and 2,000 shock electrodes, there is a legal difference. An Energy Four refurbished electrode is exempt from the FDA's application and approval requirements only when it is refurbished to the specifications and shock life approved for that electrode.

## V.

A number of consumers of electrodes for lithotripsy machines have never used Energy Four refurbished electrodes or electrodes refurbished by any other company, either out of natural caution, or on account of limited on-premises testing, or on account of possible technical difficulties in the actual operation. The court noted, however, that since its beginning, Energy Four, Inc., has refurbished between 15,000 and 20,000 electrodes, the vast majority of which seem to have been used by consumers without even anecdotal evidence of clinical catastrophic failure.

## VI.

THE COURT EXPRESSES NO OPINION ON THE RELATIVE MERITS OF NEW AND REFURBISHED ELECTRODES OR ON WHETHER OR NOT IT WOULD BE WITHIN THE STANDARD OF CARE PREVAILING IN YOUR COMMUNITIES TO USE REFURBISHED ELECTRODES. IT ONLY DIRECTED THAT THIS NOTICE BE SENT SO THAT CERTAIN REPRESENTATIONS MIGHT BE CORRECTED AND SO THAT THE CONSUMING PUBLIC MIGHT HAVE SOME RELIABLE INDICATION CONCERNING THE EVIDENCE ADDUCED AT THE HEARING ON THE MOTIONS FOR PRELIMINARY INJUNCTION.

765 F.Supp. 724

END OF DOCUMENT



# EXHIBIT / ATTACHMENT

### 29

(To be scanned in place of tab)

109 F.3d 1070
42 U.S.P.Q.2d 1417
**(Cite as: 109 F.3d 1070)**

Page 1

▷

Briefs and Other Related Documents

United States Court of Appeals,
Fifth Circuit.

EXXON CORPORATION, Plaintiff-Appellee,
v.
OXXFORD CLOTHES, INC. and Oxxford Clothes XX,
Inc., Defendants-Appellants.

**Nos. 96-20398, 96-20520.**

April 10, 1997.
Rehearing and Suggestion for Rehearing
En Banc Denied May 14, 1997.

Oil company brought action against clothing manufacturer, alleging that clothing manufacturer's trademark diluted oil company's trademark in violation of Texas law. Clothing manufacturer raised affirmative defense of naked licensing and filed state law dilution counterclaim. The United States District Court for the Southern District of Texas, John D. Rainey, J., entered judgment dismissing affirmative defense and state law dilution counterclaim, and clothing manufacturer appealed. The Court of Appeals, Garwood, Circuit Judge, held that: (1) oil company's "phase out" agreements with users of similar marks was not naked licensing that resulted in abandonment of its marks; (2) dilution counterclaim was barred by laches; and (3) even if counterclaim was not barred by laches, manufacturer's allegation regarding tarnishment caused by oil company's alleged reputation for greed and environmental destruction did not state dilution claim under Texas law.

Affirmed.

West Headnotes

**[1] Trade Regulation ☞108.1**
382k108.1 Most Cited Cases

"Naked license" is trademark licensor's grant of permission to use its mark without attendant provisions to protect quality of goods or services provided under licensed mark.

**[2] Trade Regulation ☞73**
382k73 Most Cited Cases

Trademark owner's failure to exercise appropriate control and supervision over its licensees may result in abandonment of trademark protection for licensed mark.
**[3] Trade Regulation ☞75**
382k75 Most Cited Cases

Because naked licensing is generally ultimately relevant only to establish unintentional trademark abandonment which results in loss of trademark rights against the world, burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent.

**[4] Trade Regulation ☞108.1**
382k108.1 Most Cited Cases

"License" to use a mark is transfer of limited rights, less than whole interest which might have been transferred.

**[5] Trade Regulation ☞109**
382k109 Most Cited Cases

Essential inquiry in trademark case in determining whether agreement is license is whether, under cover of agreement claimed to be license, licensee has engaged in acts which would infringe licensor's mark but for permission granted in license.

**[6] Trade Regulation ☞109**
382k109 Most Cited Cases

Courts will not find existence of trademark license when authorization of trademark use is structured in such way as to avoid misleading or confusing consumer as to origin and/or nature of respective parties' goods.

**[7] Trade Regulation ☞704**
382k704 Most Cited Cases

Determining whether particular agreement risks possibility of allowing infringing use of mark, i.e., use that creates likelihood of consumer confusion, is ordinarily factual inquiry.

**[8] Estoppel ☞68(2)**
156k68(2) Most Cited Cases

Doctrine of judicial estoppel was inapplicable in trademark case with regard to allegations made by trademark holder in course of prior trademark litigation, absent showing that any of those allegations were accepted as true by courts in prior litigation.

**[9] Trade Regulation ☞73**
382k73 Most Cited Cases

If trademark has not ceased to function as indicator of origin, there is no reason to believe that public will be misled; under such circumstances, neither express declaration of Congress' intent in Lanham Act provision defining abandonment nor corollary policy considerations which underlie doctrine of naked licensing warrant finding that trademark owner has forfeited his or her rights in mark.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

109 F 3d 1070                                                              Page 2
42 U.S P.Q.2d 1417
**(Cite as: 109 F.3d 1070)**

Lanham Trade-Mark Act, § 45(2), as amended. 15 U.S.C A.
§ 1127(2).

**[10] Trade Regulation ☞73**
382k73 Most Cited Cases

Abandonment due to naked licensing is involuntary
because, unlike abandonment through nonuse, intent to
abandon mark is expressly not required to prove
abandonment under Lanham Act provision defining
abandonment through course of conduct. Lanham
Trade-Mark Act, § 45(2), as amended, 15 U.S.C.A. §
1127(2).

**[11] Trade Regulation ☞70**
382k70 Most Cited Cases

Trademark owner's failure to pursue potential infringers
does not in and of itself establish that mark has lost its
significance as indicator of origin. Lanham Trade-Mark Act,
§ 45, as amended, 15 U.S.C.A. § 1127.

**[12] Trade Regulation ☞73**
382k73 Most Cited Cases

**[12] Trade Regulation ☞377**
382k377 Most Cited Cases

Trademark owner's failure to pursue potential infringers is
largely relevant only in regard to strength of mark; absent
ultimate showing of loss of trade significance, naked
licensing is not available as defense against infringement
suit brought by that trademark owner. Lanham Trade-Mark
Act, § 45, as amended, 15 U.S.C.A. § 1127(2).

**[13] Trade Regulation ☞75**
382k75 Most Cited Cases

Presumption of loss of trademark significance did not arise
because trademark holder, in course of diligently protecting
its mark, entered into "phase out" agreements with users of
similar marks, designed to preserve distinctiveness and
strength of holder's mark. Lanham Trade-Mark Act, § 45, as
amended, 15 U.S.C.A. § 1127(2).

**[14] Trade Regulation ☞75**
382k75 Most Cited Cases

Even if trademark holder's "phase out" agreements with
users of similar marks amounted to naked licensing, holder's
mark was not abandoned, absent evidence that registered
marks lost their distinctiveness as indicators of origin as
result of such agreements. Lanham Trade-Mark Act, § 45,
as amended, 15 U.S.C.A. § 1127(2).

**[15] Trade Regulation ☞366**

382k366 Most Cited Cases

Owner of distinctive mark may obtain relief under Texas
antidilution statute if there is likelihood of dilution due to
blurring, diminution in uniqueness and individuality of
mark, or tarnishment, injury resulting from another's use of
mark in manner that tarnishes or appropriates goodwill and
reputation associated with plaintiff's mark. V.T.C.A., Bus.
& C. § 16.29.

**[16] Trade Regulation ☞385.1**
382k385.1 Most Cited Cases

Clothing manufacturer's trademark dilution claim against oil
company, based on tarnishment caused by oil company's
alleged reputation for greed and environmental
destructiveness, was barred by laches; clothing
manufacturer knew of oil company's alleged reputation for
over 20 years before bringing suit, despite availability of
state antidilution statute, and oil company, relying on
federal registration of its mark and its strict policing of
similar marks, accrued tremendous investment cost and
resultant goodwill in challenged marks during that time.

**[17] Equity ☞67**
150k67 Most Cited Cases

Under Texas law, two elements of laches are: unreasonable
delay by one having legal or equitable rights in asserting
them; and good faith change of position by another to his or
her detriment because of delay.

**[18] Equity ☞71(2)**
150k71(2) Most Cited Cases

Because laches is equitable doctrine, courts typically look at
interim between time plaintiff obtained actual constructive
knowledge from asserted invasion of its rights and time suit
was filed in determining whether plaintiff's delay in
bringing suit was reasonable.

**[19] Trade Regulation ☞563**
382k563 Most Cited Cases

Clothing manufacturer's allegation that oil company's
reputation for greed and environmental destruction, coupled
with similarities between oil company's mark and
manufacturer's mark, tarnished manufacturer's mark, was
insufficient to state trademark dilution claim under Texas
law, absent allegation that some manner of deficiency or
unsavoriness inured to products or services sold under oil
company's registered marks or that oil company had
infringed or attempted to benefit from clothing
manufacturer's marks. V.T.C.A., Bus. & C. § 16.29.
**\*1072** Appeals from the United States District Court for the
Southern District of Texas.

109 F.3d 1070
42 U.S.P.Q.2d 1417
(Cite as: 109 F.3d 1070)

Page 3

William Charles Slusser, Richard S. Siluk, Claudia Wilson Frost, Joan Alison Juban, Baker & Botts, Houston, TX, for Exxon Corp.

Alex A. Alston, Jr., Terryl Kimbrell Rushing, Alston, Rutherford & Van Slyke, Jackson, MS, Thomas Clower Harvey, Jr., Nashville, TN, Steve W. Rosenblatt, Rosenblatt & Redano, Houston, TX, for Oxxford Clothes, Inc. and Clothes XX, Inc.

Before KING, GARWOOD and PARKER, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants Oxxford Clothes, Inc., and Oxxford Clothes XX, Inc. (Oxxford), appeal the district court's judgment dismissing Oxxford's affirmative defense of naked licensing and Oxxford's state law dilution counterclaim in this trademark dispute with plaintiff-appellee Exxon Corporation (Exxon). We affirm.

**Facts and Proceedings Below**

Both the "Exxon" mark and the complementary stylized interlocking "XX" symbol have been used by Exxon since the early 1970's, both marks receiving federal registration in 1972. In 1949, Oxxford federally registered as a trademark the name "Oxxford," written in the romanized alphabet but not including any stylized or interlocking "XX" design.

*1073 For more than two decades Exxon has aggressively protected its mark from infringement and/or dilution by seeking out and negotiating with other companies using marks similar to its own. In lieu of conclusive litigation, many of these companies opted to enter "phase out" agreements with Exxon in which the other company agreed that after existing stores of stationary, advertising materials, and products bearing the offending mark were exhausted, use of that mark would be discontinued. These phase out periods allowed the potentially infringing or diluting companies time to develop and implement a new mark. The phase out agreements did not contain any quality control mechanisms ensuring the quality of goods or services offered under the offending mark during the phase out period. [FN1]

> FN1. Phase out agreements orchestrated by Exxon during the 1970s did give Exxon quality control rights over the alleged infringer or diluter's products. Later phase out agreements, however, did not give Exxon such rights. It is these later agreements on which Oxxford's naked licensing defense is based. There are some fourteen of these later agreements. One of these has a three-year phase out period. All the rest are shorter, the next

longest period being one year, which is provided for in four of these agreements; one has a ten-month period; two have six months; the remainder are three months or less. Five of these agreements settle litigation then actually pending.

In 1993, Oxxford began using a trademark featuring an interlocking "XX" design virtually identical to that long previously registered by Exxon. Exxon filed suit against Oxxford [FN2] in October of 1994, complaining that Oxxford's use of the interlocking "XX" design infringed its federally-registered trademark, diluted Exxon's mark, and otherwise constituted an unfair business practice. Exxon amended its complaint twice, ultimately dropping all but its Texas law dilution claim. [FN3]

> FN2. Exxon initially filed suit against Oxxford Clothes, Inc. In December of 1994, two months after this suit was filed, the assets of Oxxford Clothes, Inc., were purchased through a foreclosure sale by another corporation, John F. McDonough, Inc., a wholly-owned subsidiary of Tom James Company. John F. McDonough, Inc., subsequently changed its name to Oxxford Clothes XX, Inc. Oxxford Clothes XX, Inc., was added to this lawsuit in its capacity as successor-in-interest to Oxxford Clothes, Inc., pursuant to Fed. R. Civ. Pro. 25(c).

> FN3. Jurisdiction over Exxon's final complaint was founded on diversity.

In response to Exxon's second amendment of its complaint, Oxxford filed an amended answer raising a bevy of affirmative defenses, prime among these being an assertion that Exxon's phase out agreements with other allegedly infringing and diluting companies constituted "naked licenses." The gist of Oxxford's argument was that these agreements, insofar as they authorized third parties to continue to use infringing or diluting marks with Exxon's knowledge and approval, were "licenses"; and, because these "licenses" contained no quality control provision, they were "naked licenses" which, under prevailing law, could lead to forfeiture of Exxon's rights in its licensed marks.

On May 31, 1995, Oxxford filed a counterclaim alleging that, under Texas law, Exxon's use of its trade name, "Exxon" (without regard to the interlocking "XX" design), had diluted or tarnished its name and registered mark, "Oxxford." The basis of Oxxford's claim was a purported ease of association between "Exxon" and "Oxxford" which might lead aspects of Exxon's alleged corporate reputation for general greed and environmental destructiveness to be negatively attributed to Oxxford. The requested relief was that Exxon be enjoined from using its registered marks.

109 F.3d 1070
42 U.S.P.Q.2d 1417
(Cite as: 109 F.3d 1070)

Both parties filed a plethora of motions, the pertinent ones for purposes of this appeal being cross-motions for summary judgment on Oxxford's affirmative defenses, motions by Exxon to dismiss Oxxford's dilution counterclaim and to strike portions of that counterclaim, and a motion for partial summary judgment by Oxxford challenging Exxon's laches defense to its counterclaim.

On March 18, 1996, the district court entered a memorandum opinion and order in which, *inter alia,* it granted Exxon summary judgment on Oxxford's affirmative defense of naked licensing. The district court concluded that Exxon's phase out agreements were not licenses because, contrary to Oxxford's assertion that the agreements permitted *1074 third parties to continue misleading uses of Exxon's mark, the phase out agreements were in fact an appropriate mechanism for halting such activities, *i.e.*, legal settlements which ultimately secured Exxon's rights in its marks while avoiding the time and expense associated with trademark litigation. The district court also opined that the allegedly infringing and/or diluting companies which were party to these phase out agreements would have had no interest in being associated with Exxon and thus no reason to consent to such the quality control provisions; therefore, imposing such a condition would have led these third parties to balk at entering the phase out agreements, limiting the utility of these devices in the resolution of trademark disputes. Finally, noting that the failure to prosecute or pursue infringers or diluters does not necessarily result in forfeiture of the trademark holder's exclusive rights in the mark, the district court posited that "[i]t would be anomalous for the Court to find facts supporting abandonment because Exxon has a strong enforcement program."

The district court also rendered summary judgment in Exxon's favor on Oxxford's tarnishment-dilution counterclaim. The district court rested its ruling on three separate determinations: 1) "Oxxford" is not a distinctive mark; 2) Oxxford failed to show that its mark had been used in an "unwholesome context" by Exxon; and 3) because Oxxford knew of the similarity between the marks for over twenty years and failed to act, the counterclaim is barred by laches. Based on the dismissal of Oxxford's counterclaim, the district court also granted Exxon's motion to strike those allegations in Oxxford's counterclaim impugning Exxon's reputation.

The district court entered an order certifying the dismissal of Oxxford's counterclaim as a partial final judgment under Federal Rule of Civil Procedure 54(b). The district court also certified the order dismissing Oxxford's affirmative defenses for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). [FN4] Oxxford timely noticed an appeal from the Rule 54(b) judgment, and also petitioned this Court for

interlocutory appeal under section 1292(b). Permission to pursue an interlocutory appeal was granted, and both appeals were docketed and later consolidated for purposes of oral argument and final disposition.

> FN4. The district court initially certified the order dismissing Oxxford's affirmative defenses as a partial final judgment under Rule 54(b). Oxxford noticed an appeal from that judgment, which was docketed in this Court under No. 96-20397 and has been dismissed for lack of appellate jurisdiction in a separate opinion issued this date. Nonetheless, we consider here all issues fairly presented by the district court's order of dismissal pursuant to section 1292(b). *Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996).

## Discussion

Oxxford appeals the district court's grant of summary judgment rejecting its affirmative defense of naked licensing and its tarnishment-dilution counterclaim. [FN5] Accordingly, the admissible evidence proffered by Exxon "must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of [Oxxford's claim and defense]." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (citations omitted) (internal quotation marks omitted). If Exxon meets this burden, then Oxxford is compelled to go beyond its pleadings and designate, by competent summary judgment evidence, specific facts which demonstrate genuine triable issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324-325, 106 S.Ct. 2548, 2553-2554, 91 L.Ed.2d 265 (1986). This formula does not vary where Exxon is the plaintiff challenging Oxxford's affirmative defense; because Oxxford bears the ultimate burden of persuasion at trial on its naked licensing defense, it must (provided Exxon has met its summary judgment burden) present admissible evidence legally sufficient to sustain a finding favorable to Oxxford on each element of that defense. *1075 *Crescent Towing & Salvage Co. v. M/V Anax,* 40 F.3d 741, 744 (5th Cir.1994). In reviewing the district court's judgment, we consider the record *de novo. Wittorf v. Shell Oil Co.,* 37 F.3d 1151, 1154 (5th Cir.1994).

> FN5. The district court's memorandum opinion and order embrace a large number of issues; Oxxford has chosen to brief only two, the dismissal of its affirmative defense of naked licensing and its dilution counterclaim. All other issues, not raised or briefed on appeal, are waived. *Cavallini v. State Farm Mut. Auto Ins. Co.,* 44 F.3d 256, 260 n. 9 (5th Cir.1995).

I. Naked Licensing Defense

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

109 F.3d 1070
42 U.S.P.Q.2d 1417
(Cite as: 109 F.3d 1070)

[1][2][3] We consider first Oxxford's claim that the district court erred in granting Exxon summary judgment on Oxxford's affirmative defense of naked licensing. |FN6] A naked license is a trademark licensor's grant of permission to use its mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark. *Moore Business Forms. Inc. v. Ryu.* 960 F.2d 486, 489 (5th Cir.1992); *Taco Cabana Intern.. Inc. v. Two Pesos. Inc..* 932 F.2d 1113. 1121 (5th Cir.1991), *aff'd,* 505 U.S. 763. 112 S.Ct. 2753. 120 L.Ed.2d 615 (1992). A trademark owner's failure to exercise appropriate control and supervision over its licensees *may* result in an abandonment of trademark protection for the licensed mark. *Id. See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena.* 293 F.Supp. 892, 918 (S.D.N.Y.1968) ("a 'naked' license *may* be the basis for an *inference* of abandonment where the licensor maintains no control over the quality of goods made by the licensee") (emphasis added; citation omitted), *aff'd as modified,* 433 F.2d 686 (2nd Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). Because naked licensing is generally ultimately relevant only to establish an unintentional trademark abandonment which results in a loss of trademark rights against the world, [FN7] the burden of proof faced by third *1076 parties attempting to show abandonment through naked licensing is stringent. *Moore Business Forms,* 960 F.2d at 489; *Taco Cabana Intern.. Inc.,* 932 F.2d at 1113. 1121; *American Foods, Inc. v. Golden Flake. Inc..* 312 F.2d 619 (5th Cir.1963).

> FN6. Both parties in briefing this issue have relied exclusively upon jurisprudence articulating the parameters of the naked licensing defense in the context of a federal trademark infringement claim, forgetting, apparently, that the only claim alleged by Exxon which remains extant is its state law dilution claim. No court construing Texas law has ever discussed, much less applied, the naked licensing defense in a trademark dispute. Furthermore, we have been unable to locate any cases construing federal trademark law which recognize naked licensing as a defense against a *dilution* (as opposed to an *infringement*) claim, perhaps because a federal cause of action for trademark dilution was apparently not available until the Lanham Act was amended to include one in 1996. *See* 15 U.S.C. § 1125(c), *added by* Pub.L. 104-98, § 3(a) (1996); *Community Federal Savings & Loan Assoc. v. Orondorff,* 678 F.2d 1034, 1036 n. 7 (11th Cir.1982) (no independent cause of action for dilution under federal trademark law); *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 658 (2d Cir.1979) (same). This situation is complicated further by the fact that Texas common law does not recognize a cause of action for dilution and the statutory cause of action, upon

which both parties rely, has not been decisively interpreted by any Texas court. Tex. Com. & Bus.Code § 16.29, *added by* Acts 1989, 71st Leg., ch. 932, § 1; *Suniland Furniture Co. v. Sunnyland Wholesale Furniture Co..* 235 S.W.2d 674, 676-677 (Tex.Civ.App.--Dallas 1950, error refused) (Texas common law does not recognize cause of action for trademark dilution). We also observe that there exists some incongruity between the naked licensing defense, which like much of federal trademark law is intended to protect the consumer from confusion by ensuring the licensed mark's continuing role as an indicator of origin, and dilution, which is concerned with preserving the integrity and vitality of the mark irrespective of consumer confusion.

Despite these difficulties, our review of the record and briefs convinces us that by addressing the issue as framed by the parties we may fairly adjudicate this case. Furthermore, we have previously found that, in considering a *res nova* issue under Texas trademark law, *Erie* requires this Court to decide the issue as a Texas court would, namely by adhering "to the general common law principles that other courts have uniformly applied." *Association of Co-Operative Members, Inc. v. Farmland Industries, Inc.,* 684 F.2d 1134, 1140 (5th Cir.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983), *citing Blue Bell, Inc. v. Farah Manufacturing Co..* 508 F.2d 1260, 1264 (5th Cir.1975). In thus construing Texas trademark law, both this Court and Texas courts have relied upon relevant jurisprudence from other, primarily federal, jurisdictions and relevant treatises. *See, e.g., Blue Bell.* 508 F.2d at 1264-1267; *Texas A & M University System v. University Book Store, Inc.,* 683 S.W.2d 140, 144 (Tex.App.--Waco 1984). Thus, given the lacunae in Texas trademark law regarding the points raised in this appeal, we consider the question presented in light of general *federal* trademark law, with recourse to the abundant federal jurisprudence and treatise materials available on the issue. In doing so, we assume *arguendo,* for purposes of this appeal only, the debatable proposition that the naked licensing defense may be raised against a dilution claim brought under the Texas statute.

> FN7. There is an exception to this proposition. The licensee in a purported naked license may also invoke the naked licensing defense as a form of estoppel. *See, e.g., Sheila's Shine Products, Inc. v. Sheila Shine, Inc..* 486 F.2d 114, 123-124 (5th Cir.1973) ("[f]ailure to exercise such control and supervision for a significant period of time may

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

109 F.3d 1070
42 U.S.P.Q.2d 1417
(Cite as: 109 F.3d 1070)

Page 6

estop the trademark owner from challenging the use of the mark and business which the licensee has developed during the period of such unsupervised use") (citations omitted); *Health Industries v. European Health Spas,* 489 F.Supp. 860, 868 (D.S.D.1980) (discussing claim that reciprocity agreement with trademark owner's employee is sufficient to estop trademark owner from contesting defendant's use of that mark). Oxxford, however, was not a party to (and does not hold under any party to) the phase out agreements at issue in this case; thus, its defense is not a personal defense of acquiescence or estoppel, but is rather a claim that Exxon has abandoned its mark and thereby forfeited all its rights in that mark. 4 Thomas J. McCarthy, Trademarks and Unfair Competition, § 31:41-46 (4th ed.1996); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039, 1046 (4th Cir.1984) ("[w]hile abandonment results in a loss of rights as against the whole world, ... acquiescence is a personal defense which merely results in a loss of rights as against one defendant") (citation omitted).

We reject Oxxford's argument that, this single, here-inapplicable exception aside, naked licensing has any presently relevant ultimate significance apart from its relevance in showing unintentional abandonment.

Oxxford's appeal raises two central questions in relation to its naked licensing defense: 1) were the phase out agreements between Exxon and the third parties "licenses," and 2) did these agreements result in an abandonment of Exxon's mark? We address these questions in turn.

[4][5] "[A] license to use a mark ... is a transfer of limited rights, less than the whole interest which might have been transferred." *Acme Valve & Fittings Co. v. Wayne,* 386 F.Supp. 1162, 1165 (S.D.Tex., Houston Div., 1974) (citations omitted). Even if the parties intend no formal licensing agreement, "[i]n some circumstances ... the entire course of conduct between a ... trademark owner and an accused infringer may create an implied license." *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995), *cert. denied,* 516 U.S. 1174, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996). *See also Colt Industries, Inc. v. Fidelco Pump & Compressor Corp.,* 844 F.2d 117, 119-120 (3rd Cir.1988). The essential inquiry is whether, under cover of the agreement claimed to be a license, "the licensee is engaging in acts which would infringe the licensor's mark but for the permission granted in the license." 2 McCarthy, § 18:79, P. 18-128.

[6] However, not all agreements authorizing use of a protected mark may be categorized as "licenses." As noted

above, the essential inquiry is whether the right granted by the subject agreement permits an *infringing* use of the license. For example, some agreements which allow another party use of the subject mark constitute "consent-to-use" agreements and not licenses. *See, e.g., Moore,* 960 F.2d at 489; *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619, 623-624 (5th Cir.1963). Such a consensual agreement "[i]s not an attempt to transfer or license the use of a trademark ... but fixes and defines the existing trademark of each ... [so] that confusion and infringement may be prevented." *Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co.,* 63 F. 438, 441 (7th Cir.1894). Thus, we will not find the existence of a trademark license when an authorization of trademark use is structured in such a way as to avoid misleading or confusing consumers as to the origin and/or nature of the respective parties' goods. 2 McCarthy, § 18:79-81 (4th ed.1996); *In re Mastic Inc.,* 829 F.2d 1114, 1116-1118 (Fed.Cir.1987); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692-693 (2d Cir.1972); *Croton Watch Co. v. Laughlin,* 208 F.2d 93, 96- 97 (2d Cir.1953); *Oreck Corp. v. Thomson Consumer Electronics, Inc.,* 796 F.Supp. 1152, 1157 n. 8 (S.D.Ind.1992).

[7] Determining whether or not a particular agreement risks the possibility of allowing an infringing use of the mark, *i.e.,* a use that creates a likelihood of consumer confusion, is, like the entirety of Oxxford's abandonment claim, ordinarily a factual inquiry. *Moore Business Forms,* 960 F.2d at 489; *Artcraft Novelties Corp. v. Baxter Lane Co. of Amarillo,* 685 F.2d 988, 992 (5th Cir.1982). As the Federal Circuit has put it,

**\*1077** "One must look at all of the surrounding circumstances ... to determine if the consent reflects the reality of no likelihood of confusion in the marketplace.... For example, the parties may prefer the simplicity of a consent to the encumbrances of a valid trademark license. However, if the goods of the parties are likely to be attributed to the same source because of the use of the same or a similar mark, a license (not merely a consent) is necessary to cure the conflict. *See* 1 J. McCarthy, *Trademarks and Unfair Competition* § 18:25, at 866 (2d ed.1984)." *In re Mastic,* 829 F.2d at 1116- 1117.

Accordingly, if the goods or services of the concerned third parties were not ones which it is likely the public would confuse with those offered by Exxon, the phase out agreements are not licenses but rather some other, perhaps innominate, genre of trademark agreement. [FN8]

> FN8. This emphasis on the likelihood of consumer confusion dovetails with the policy considerations giving rise to the naked licensing defense. *See Taco Cabana,* 932 F.2d at 1121 ("[t]he purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality

109 F.3d 1070
42 U.S.P.Q.2d 1417
**(Cite as: 109 F.3d 1070)**

Page 7

standards under the same mark or dress") (citation omitted); *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 140 (3d Cir.1981) (finding fact that licensees did not offer "a lower quality of service" dispositive of naked licensing claim); *Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 1992 WL 156560, *6 (S.D.N.Y.1992) ("[i]n the context of uncontrolled licensing, the concern is not with the quality of the goods in the abstract; rather, the concern is that when one or more licensees produce and distribute goods under the licensor's trademark ... they may produce and distribute goods of differing qualities, thereby confusing or deceiving consumers"); *Engineered Mechanical Services, Inc. v. Applied Mechanical Technology, Inc.,* 584 F.Supp. 1149, 1159 (M.D.La.1984) (naked licensing claim cannot stand when "[d]efendants have offered no evidence that complaints have been made about the quality of the work performed" by the licensee).

[8] The district court did not make any determination regarding the likelihood of consumer confusion presented by Exxon's phase out agreements. Accordingly, we elect to assume, *arguendo only,* that these agreements constituted "licenses" in a technical sense. [FN9] This does not give us pause, however, since the question whether the third-party phase out agreements are "licenses" is merely, given the current posture of this case, a prelude to the ultimate question presented *1078 by Oxxford's appeal, *i.e.,* whether the summary judgment evidence adduced would be adequate to support a finding that Exxon's course of action resulted in abandonment of its trademarks.

> FN9. Courts have construed a variety of agreements and relationships entered into for a range of reasons, including the cessation or forbearance of litigation, to be trademark licenses subject to the naked licensing defense. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1289- 1290 (9th Cir.1992) (settlement agreement); *Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1579-1580 (Fed.Cir.1984) (lease); *United States Jaycees,* 639 F.2d at 139 n. 7 (affiliated organizations); *Professional Golfers Ass'n v. Bankers L. & C. Co.,* 514 F.2d 665, 668-669 (5th Cir.1975) (settlement and lease); *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 123 (5th Cir.1973) (purchase agreement); *Express, Inc. v Sears, Roebuck & Co.,* 840 F.Supp. 502, 509-510 (S.D.Ohio 1993) (settlement agreements); *Engineered Mechanical Services, Inc.,* 584 F.Supp. at 1158-1159; *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 929 (S.D.N.Y.1983) (covenant not to

sue), *aff'd,* 746 F.2d 112 (2d Cir.1984); *Hodge Chile Co. v. KNA Food Distributors, Inc.,* 575 F.Supp. 210, 213 (E.D.Mo.1983) (settlement agreement), *aff'd,* 741 F.2d 1086 (8th Cir.1984); *Acme Valve & Fittings,* 386 F.Supp. at 1165-1166 (purchase order form); *Naclox, Inc. v. Lee,* 231 U.S.P.Q. 395, 399 (T.T.A.B.1986) (release on promissory note). We find these cases distinguishable from that now before us on two grounds. First, the agreements in these cases expressly granted use of the protected mark, while Exxon's phase out agreements concern marks that are merely (allegedly) similar to its registered marks and do not involve an attempt by Exxon to exploit its mark for purposes of pecuniary gain. Second, none of these cases discuss agreements entered into for the purpose of permanently terminating the putative licensee's offending use of the subject mark, and coordinately none of the agreements discussed in these cases fix a termination date for the licensee's use of the mark. This first point of distinguishment addresses the existence *vel non* of a license, while the second point is perhaps more appropriately considered in resolving the ultimate question of whether Exxon's actions, however denominated, led to an abandonment of its rights in its mark(s).

Oxxford also suggests that Exxon, by virtue of allegations made in the course of the abortive litigation which preceded a number of the phase out agreements, is judicially estopped from denying that the parties to those phase out agreements were engaged in an "infringing use" of Exxon's mark. Assuming, *arguendo only,* the potential viability of such a contention in an appropriate case, the record here does not reveal that any of these allegations were accepted as true by the respective courts; accordingly, the doctrine of judicial estoppel is inapplicable. *U.S. for Use of American Bank v. CIT Constr., Inc. of Texas,* 944 F.2d 253, 259 (5th Cir.1991).

The naked licensing defense has traditionally been used in the context of infringement claims brought by the trademark owner; and, this case began in such a mode. *See, however,* note 6, *supra.* Federal law statutorily limits the defenses which may be invoked against a claim brought under the Lanham Act by the owner of an incontestable mark, as Exxon is, to the eight categories of affirmative defenses set out in subsections (1)-(8) of 15 U.S.C. § 1115(b). *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 195-196, 105 S.Ct. 658, 662, 83 L.Ed.2d 582; *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). Accordingly, we turn our attention to the Lanham

109 F.3d 1070
42 U.S.P.Q.2d 1417
**(Cite as: 109 F.3d 1070)**

Page 8

Act, the font of federal trademark law, to ascertain the scope and limits of Oxxford's naked licensing defense. [FN10]

> FN10. Unlike patents and copyrights, there is no specific constitutional provision making the regulation of trademarks a federal concern, and the first constitutional federal trademark act, passed pursuant to the Commerce Clause, was not enacted until 1905. 1 McCarthy, § 5.3. *See also Trade-Mark Cases,* 100 U.S. 82, 25 L.Ed. 550 (1879). The doctrine of "naked licensing" predated the passage of the Lanham Act, which took effect in 1947, and evolved in the pre-*Erie* world where federal common law provided the rule of decision in diversity cases. *See E.I. DuPont De Nemours & Co. v. Celanese Corp.,* 35 C.C.P.A. 1061, 167 F.2d 484, 489 (1948) (listing cases). *See also Dawn Donut v. Hart's Food Stores,* 267 F.2d 358, 366-367 (2d Cir.1959) (discussing divergent strains of naked licensing jurisprudence antedating passage of Lanham Act). Be that as it may, we are concerned with the applicability of the naked licensing defense as it is defined under current federal law. Given the absence of a specific federal constitutional concern with the law of trademarks, that law is indisputably statutory. *See generally O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). Accordingly, it is the language of the Lanham Act which under the circumstances of this appeal (see note 6, *supra* ) decides the questions presented.

Oxxford's naked licensing defense, which as we have noted has ultimate relevance only to "abandonment," is authorized by 15 U.S.C. § 1115(b)(2). [FN11] *See Stanfield v. Osborne Indus., Inc.,* 52 F.3d 867, 871 (10th Cir.), *cert. denied,* 516 U.S. 920, 116 S.Ct. 314, 133 L.Ed.2d 217 (1995); *Ditri v. Coldwell Banker,* 954 F.2d 869, 873 (3d Cir.1992); *General Motors Corp.,* 786 F.2d at 110; *Oberlin v. Marlin American Corp.,* 596 F.2d 1322, 1327 (7th Cir.1979); *Haymaker Sports, Inc. v. Turian,* 581 F.2d 257, 261 (C.C.P.A.1978); *Dawn Donut,* 267 F.2d at 366-367; *Schieffelin & Co.,* 1992 WL 156560, *5; *E.I. DuPont De Nemours,* 167 F.2d at 489-490; *Bonda's Veevoederfabriek, Provimi, B.V. v. Provimi, Inc.,* 425 F.Supp. 1034, 1037-1038 (E.D.Wis.1977). 15 U.S.C. § 1127, the definitional section of the Lanham Act, defines "abandonment" as follows:

> FN11. Both Oxxford and Exxon point to subsection 1115(b)(3) as the or a basis for Oxxford's naked licensing defense. This subsection provides a defense to an infringement claim if "the registered mark is being used ... so as to misrepresent the source of the goods or services on or in connection with which the mark is used." A

review of the jurisprudence construing this defense reveals that it is a defense of "unclean hands," only applicable when the origin or source of goods distributed under the subject mark is misrepresented. *See General Motors Corp. v. Gibson Chemical & Oil,* 786 F.2d 105, 110 (2d Cir.1986); *Induct-O-Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 366 (6th Cir.1984); *Adjusters International. Inc. v. Public Adjusters Intern., Inc.,* 1996 WL 492905, *14 (N.D.N.Y.1996); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y.1994). Further, acquiescence, estoppel, and the other equitable defenses listed in subsection (b)(8) are personal defenses, based upon the trademark owner's conduct *vis-a-vis* the defendant, and thus also do not speak to the wholesale loss of rights in the mark remarked upon by naked licensing jurisprudence. *See* note 7, *supra.* Oxxford has not made any showing which would sustain a subsection 1115(b)(3) defense to Exxon's action against it.

A mark shall be deemed to be "abandoned" if either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.

**\*1079** (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The definition of "abandonment" set forth in subpart (2) (formerly subpart (b)) is the specific statutory explication of unintentional abandonment, including abandonment due to naked licensing. [FN12] *Sweetheart Plastics,* 743 F.2d at 1047-48; *United States Jaycees,* 639 F.2d at 139; *A.T. Cross Co.,* 470 F.2d at 693; *Heaton Distributing Co. v. Union Tank Car Co.,* 387 F.2d 477, 484 (8th Cir.1967); *Schieffelin & Co.,* 1992 WL 156560, *5; *Engineered Mechanical Services,* 584 F.Supp. at 1158.

> FN12. A number of courts have also cited to section 1055, often in tandem with section 1127, as statutory authority for the naked licensing defense. *Visa, U.S.A., Inc. v. Birmingham Trust Nat. Bank,* 696 F.2d 1371, 1377 n. 4 (Fed.Cir.1982), *cert. denied,* 464 U.S. 826, 104 S.Ct. 98, 78 L.Ed.2d 104

109 F.3d 1070
42 U.S.P.Q.2d 1417
Page 9
(Cite as: 109 F.3d 1070)

(1983); *Oberlin v. Marlin American Corp.*, 596 F.2d at 1327 n. 4; *Sterling Drug, Inc. v. Lincoln Laboratories, Inc.*, 322 F.2d 968, 972 (7th Cir.1963); *Dawn Donut*, 267 F.2d at 366-367; *Georgia Carpet Sales, Inc. v. SLS Corp.*, 789 F.Supp. 244, 246 (N.D.Ill.1992); *Ungar v. Dunkin' Donuts of America, Inc.*, 68 F.R.D. 65, 116 (E.D.Pa.1975), *rev'd on other grounds*, 531 F.2d 1211 (3rd Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). This provision reads in pertinent part as follows:

**§ 1055. Use by related companies affecting validity and registration**

Where a registered mark ... is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant ... and such use shall not affect the validity of such mark or of its registration, *provided such mark is not used to deceive the public.* (Emphasis added).

The term "related companies" is defined in section 1127 as follows:

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

*See also Health Industries*, 489 F.Supp. at 868 (equating quality control and mandate that public not be deceived). Section 1055 authorizes a trademark owner to license its mark "but only where the licensees of the service mark are related companies, i.e. where the owner of the service mark controls the licensees as to the nature and quality of the goods or services in connection with which the mark is used." *Reddy Communications v. Environmental Action*, 477 F.Supp. 936, 944 (D.D.C.1979) (citations omitted) (internal quotation marks omitted).

Section 1055 does not of itself establish a naked licensing defense. So far as here relevant, its effect is merely to reflect conditions under which certain conduct is not *per se* precluded from consideration, as supportive, to the extent that it may logically do so in a given setting, of a determination that there has been abandonment as defined in section 1127(2).

[9] The language of subsection 1127(2) reflects that to prove "abandonment" the alleged infringer must show that, due to acts or omissions of the trademark owner, the incontestable mark has lost "its significance as a mark." *See Defiance Button Mach. Co. v. C & C Metal Products*, 759 F.2d 1053, 1061-1062 (2d Cir.) (concluding that section 1127(2) was intended to apply only when the subject mark ceased to be an indicator of origin), *cert. denied*, 474 U.S. 844, 106 S.Ct.

131, 88 L.Ed.2d 108 (1985); *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 766 n. 13 (C.C.P.A.1982) ("[f]rom the legislative history it is evident that abandonment under part (b) [subsection 1127(2) ] was principally intended to encompass acts of omission or commission by the registrant which resulted in the mark becoming a generic term") (citation omitted). This statutory directive reflects the policy considerations which underlie the naked licensing defense: "[i]f a trademark owner allows licensees to depart from his quality standards, the public will be misled, and the trademark will cease to have utility as an informational device ... [a] trademark- owner who allows this to occur loses his right to use the mark." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir.1977). Conversely, if a trademark has not ceased to function as an indicator of origin there is no reason to believe that the public will be misled; under these circumstances, neither the express declaration of Congress's intent in subsection 1127(2) nor the corollary policy considerations which underlie the doctrine of naked licensing warrant a finding that the *1080 trademark owner has forfeited his rights in the mark.

[10][11][12][13] Oxxford, pointing to recent precedent in this Circuit indicating that naked licensing results in an "involuntary trademark abandonment," posits that when a defendant proves that the trademark owner has licensed its mark without any quality control provisions the courts should *presume* a loss of significance. *See Moore Business Forms*, 960 F.2d at 489; *Taco Cabana International*, 932 F.2d at 1121. We disagree. Abandonment due to naked licensing is "involuntary" because, unlike abandonment through non-use, referred to in subsection 1127(1), an intent to abandon the mark is expressly not required to prove abandonment under subsection 1127(2). *See* 2 McCarthy, § 18:48; *Conagra, Inc. v. Singleton*, 743 F.2d 1508 (11th Cir.1984); *Engineered Mechanical Services*, 584 F.Supp. at 1158. In addition, a trademark owner's failure to pursue potential infringers does not in and of itself establish that the mark has lost its significance as an indicator of origin. *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1180 (11th Cir.1994) (per curiam affirmance incorporating district court's memorandum opinion via appendix); *Sweetheart Plastics, Inc.*, 743 F.2d at 1047-1048; *Wallpaper Mfrs., Ltd.*, 680 F.2d at 761-766; *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d at 139-140. Instead, such a dereliction on the part of the trademark owner is largely relevant only in regard to the "strength" of the mark; absent an ultimate showing of loss of trade significance, subsection 1127(2) (and the incorporated doctrine of naked licensing) is not available as a defense against an infringement suit brought by that trademark owner. *See* 2 McCarthy, § 17:17. We, like the district court, would find it wholly anomalous to *presume* a loss of trademark significance merely because Exxon, in the course of diligently *protecting* its mark,

109 F.3d 1070
42 U.S.P.Q.2d 1417
(Cite as: 109 F.3d 1070)

entered into agreements designed to preserve the distinctiveness and strength of that mark. We decline Oxxford's invitation to judicially manufacture a presumption of loss of trademark significance under the facts of this case given that had Exxon simply ignored the prior threats to its marks no such presumption would obtain. [FN13]

> FN13. The alternative to the phase out agreements latent in Oxxford's argument is that Exxon either ignore or immediately and relentlessly litigate with all perceived infringers. Unless Exxon were able to perfunctorily obtain preliminary injunctions against these parties, one must wonder whether, given the delays which are part of conventional civil litigation between entrenched corporate opponents, any resultant consumer confusion might well be abated more rapidly than under the phase out agreements. We further observe that a number of treatises and cases either explicitly or implicitly recognize that such agreements are often an appropriate manner in which to resolve trademark disputes. See, e.g., Siegrun D. Kane, *Trademark Law 200* (2d ed.1991); *Minnesota Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1244 (8th Cir.1994); *Home Shopping Network, Inc. v. Happy Mind, Inc.*, 931 F.2d 886, 1991 WL 68834 (4th Cir.1991) (unpublished disposition); *Oreck Corp. v. U.S. Floor Systems, Inc.*, 803 F.2d 166, 168 (5th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

[14] With the applicable legal standard clarified, we turn to the record before us. Exxon, commensurate with its burden under Rule 56, directed the district court's attention to Oxxford's failure to meaningfully address what is an essential component of its third-party naked licensing defense, i.e., a loss of trademark significance in Exxon's mark(s). Even were we to construe Oxxford's pleadings to allege the unlikely proposition that Exxon's registered marks, due to these third-party phase out agreements, have lost their distinctiveness as indicators of origin, Oxxford has offered absolutely no evidence to substantiate such a claim. Accordingly, we affirm the district court's ruling because Oxxford has failed to adduce evidence sufficient to allow a reasonable factfinder to conclude that Exxon has abandoned its marks.

## II. Tarnishment-Dilution Counterclaim

We turn next to the district court's dismissal of Oxxford's tarnishment- dilution counterclaim. Oxxford's counterclaim, like Exxon's remaining claim, seeks relief under section 16.29 of the Texas Business and Commerce Code:

**§ 16.29. Injury to Business Reputation or Trade Name or Mark**

A person may bring an action to enjoin an act likely to injure a business reputation **\*1081** or to dilute the distinctive quality of a mark registered under ... Title 15, U.S.C .... regardless of whether there is competition between the parties or confusion as to the source of goods or services.

The Texas statute, like that of twenty-five other states, including California, Illinois, and New York, is based upon language contained in Section 12 of the 1964 United States Trademark Association Model State Trademark Bill. 3 McCarthy, § 24:80, P. 24-125. As one court has already noted, the Texas statute tracks in particular the language of the New York dilution statute, New York Gen.Bus.L. § 368-d. *See Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1563 n. 46 (S.D.Tex.1996). Accordingly, owing to the dearth of case law interpreting section 16.29, we remain mindful of the general law of dilution, that body of common principles which has evolved in those jurisdictions possessing statutes derived from the USTA's model bill, in construing the Texas statute.

[15] Under section 16.29, a plaintiff may seek an injunction to remedy ongoing dilution of a protected trademark even if it is not in business competition with the defendant(s) and irrespective of the existence *vel non* of any likelihood of consumer confusion. The owner of a distinctive mark [FN14] may obtain relief under an anti-dilution statute if there is a "likelihood of dilution" due to 1) "blurring," a diminution in the uniqueness and individuality of the mark, or 2) "tarnishment," an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the plaintiff's mark. [FN15] 3 McCarthy. §§ 24:67-69; *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965-966 (2d Cir.1996). Oxxford does not claim that Exxon's activities have "blurred" its "Oxxford" mark; rather, the only issue raised by Oxxford's pleadings and brief is a claim of dilution by tarnishment due to the purported link between the "Oxxford" mark **\*1082** and Exxon's alleged corporate reputation of greed and environmental destructiveness. *Pebble Beach Co.*, 942 F.Supp. at 1565-1567.

> FN14. "It is clear that anti-dilution statutes ... are designed to protect only strong, well-recognized marks." *Accuride International, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1539 (9th Cir.1989) (citations omitted). *See also Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 42 (2d Cir.1994) (to prevail on dilution claim under New York law "a plaintiff must prove, first, that its trademark either is of truly distinctive quality or has acquired secondary meaning") (citation omitted). Our disposition of this case renders unnecessary a consideration of Oxxford's contention that the district court erred in finding that "Oxxford" was

109 F.3d 1070
42 U.S.P.Q.2d 1417
(Cite as: 109 F.3d 1070)

not a distinctive mark. *See, however, Service Merchandise Co. v. Service Jewelry Stores, Inc.,* 737 F.Supp. 983 (S.D.Tex.1990) (applying Texas dilution statute court finds that existence of 226 registered service marks beginning with "service" and fact that 37 jewelers nationwide use "service" in their trade name does not render mark "Service Merchandise" weak). Nor do we have cause to discuss the district court's finding that Oxxford failed to make a "threshold showing of some mental association between the protected mark and the alleged diluter." *Fruit of the Loom, Inc. v. Girouard,* 994 F.2d 1359, 1363 (9th Cir.1993). *See also* 3 McCarthy, § 24:70; *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 31 (1st Cir.) (association between L.L.Bean catalogue and "L.L. Beam's Back-to- School Sex Catalogue" tarnished former's business reputation), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (movie "Debbie Does Dallas" found to tarnish business reputation of Dallas Cowboy Cheerleaders). Both *L.L. Bean* and *Dallas Cowboys Cheerleaders, Inc.* involved a situation in which the complaining party's "trademark is used without authorization in a context which diminishes the positive association of the mark." *L.L. Bean,* 811 F.2d at 31. There is no claim here that Exxon makes any use of Oxxford's trademark. Moreover, in these cases the offending party was attempting to benefit---- albeit by way of parody----from the plaintiff's mark and its public recognition. Nothing of the kind is asserted here.

FN15. Some courts have found a third manner in which "likelihood of dilution" may be proven under certain state statutes, namely an injury to the value of the mark caused by actual or potential consumer confusion. *See Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1489 (10th Cir.1987); *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 30 (1st Cir.), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). *See also Deere & Co.,* 41 F.3d at 44 ("[b]ut the blurring/tarnishment dichotomy does not necessarily represent the full range of uses that can dilute a mark under New York law") (citations omitted). The Texas statute we consider, while it expressly declares that consumer confusion is not a prerequisite to the cause of action it creates, does not clearly indicate whether a cause of action premised upon actual or potential consumer confusion alone falls under its aegis. *See* 3 McCarthy, § 24:70 (discussing differences between

dilution and likelihood of confusion standard). Our resolution of this case does not require us to answer this question, and thus we merely note it in passing.

[16][17][18] We consider first Oxxford's contention that the district court erred by finding its claim barred by laches. [FN16] Under Texas law the two elements of laches are "(1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay." *Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d 76, 80 (Tex.1989). [FN17] *See also Gulf, Colorado & Santa Fe Ry. Co. v. McBride,* 159 Tex. 442, 322 S.W.2d 492, 500 (1958) (laches results from "an unreasonable delay which has worked injury to another person") (citations omitted). Because laches is an equitable doctrine, courts typically look at the interval between the time plaintiff obtained actual or constructive knowledge of the asserted invasion of its rights and the time suit was filed in determining whether a plaintiff's delay in bringing suit was unreasonable. *Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1161 (5th Cir.1982) (construing Texas law); *City of Houston v. Muse,* 788 S.W.2d 419, 422 (Tex.App.--Houston [1st Dist.] 1990).

FN16. Exxon claims that the material facts relevant to laches are undisputed and therefore review is more properly conducted under an abuse of discretion standard. *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 707 (5th Cir.1994). Given the summary judgment context below, we review the record *de novo* to determine what facts material to the laches issue are not subject to genuine dispute; based on those facts, we review the district court's lache's ruling under an abuse of discretion standard. *Id.*

FN17. Some Texas courts have also noted, albeit usually in the context of laches asserted within the statutory limitations period, that as a general rule laches is inappropriate when the controversy is one governed by a statute of limitations. *See, e.g., Stevens v. State Farm Fire & Cas. Co.,* 929 S.W.2d 665, 672 (Tex.App.--Texarkana 1996). Although not briefed by the parties, it seems probable that Texas' four year statute of limitations could apply in this case. Tex. Civ. Prac. & Rem.Code § 16.004; *First Nat. Bank of Eagle Pass v. Levine,* 721 S.W.2d 287 (Tex.1986). Texas courts have also held, however, that in actions like that Oxxford asserts here, seeking injunctive relief for ongoing harm to a trademark, the continuous tort doctrine halts the running of the statute of limitations. *Thompson v. Thompson Air Conditioning & Heating, Inc.,* 884 S.W.2d 555, 560-561 (Tex.App.--Texarkana 1994) (common law trade

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

109 F.3d 1070
42 U.S.P.Q.2d 1417
(Cite as: 109 F.3d 1070)

Page 12

name infringement action not barred by statute of limitations). In such a circumstance, consideration of the equitable laches of doctrine is appropriate. *Id.*

Oxxford claims that its cause of action did not accrue until it suffered "reputational injury," in this case "at the moment that Exxon's reputation became unsavory enough to affect Oxxford." Oxxford, relying upon the affidavit of one of its corporate officers, contends that its cause of action did not accrue until the Exxon Valdez verdict and attendant public outcry in late 1994. Noting that it could not have sued Exxon under section 16.29 prior to 1989, when the Texas statute was enacted, Oxxford concludes that Exxon's laches defense should fail because it cannot fix a time certain upon which Oxxford became aware of the existence of an actionable dilution claim.

The record reflects, without dispute, assertions by Oxxford executives as early as 1972 that the mark "Exxon" could possibly influence the distinctiveness and corollary goodwill of their "Oxxford" mark. [FN18] In addition, Oxxford's final pleadings relate actions of Exxon stretching back to 1973 in an attempt to establish its tarnishment cause of action, declaring that "[a]s early as 1973, the Exxon name stood for greed and dishonesty." The bulk of Oxxford's allegations dwell upon Exxon's activities in the late 1970s through the Exxon Valdez incident in 1989, only reaching the 1994 Valdez verdict by way of conclusion. Oxxford failed to bring its claim in the six years preceding this lawsuit, after the Texas cause of action became available. Moreover, Illinois, where Oxxford was headquartered in 1972 and still has its principal place of business, has had an anti-dilution statute since 1956. Ill. Stat. ch. 765, § 1035/15.

> FN18. Exxon contends, and Oxxford does not dispute, that Oxxford Clothes XX, Inc., is bound by the knowledge of its predecessor-in-interest, Oxford Clothes, Inc. *See* note 2, *supra; Vincent Murphy Chevrolet Co., Inc. v. United States,* 766 F.2d 449, 451 (10th Cir.1985); *Charvet S.A. v. Dominique France, Inc.* 568 F.Supp. 470, 474 (S.D.N.Y.1983), *aff'd,* 736 F.2d 846 (2d Cir.1984).

**\*1083** Under these uncontroverted facts, the district court did not abuse its discretion in concluding there had been an unreasonable delay in bringing suit, thus satisfying the first prong of Texas' laches inquiry. Regarding the second prong of this test, the record is undisputed that Exxon, relying upon the federal registration of its marks and its strict policing of similar marks, accrued tremendous investment costs and resultant goodwill in the challenged marks while Oxxford remained quiescent. Given this record, we affirm the ruling of the district court that Oxxford's claim is barred by laches.

[19] We further observe that even were Oxxford's claim not barred by laches, it would plainly be an exercise in futility to remand the counterclaim, because Oxxford's pleadings do not state a cause of action under Texas' dilution statute. [FN19] Oxxford observes in its brief to this Court that it has long "enjoyed an outstanding reputation as a hand-made men's suit manufacturer" and "in the American apparel market, Oxxford has remained ... the epitome of quality in U.S.-made men's business clothing." Oxxford's brief goes on to state that "[t]he essence of Oxxford's counterclaim is that ... Exxon's destruction of the environment and other corrupt business practices have lowered its esteem in the public's eye to the point that its reputation, coupled with the association of its mark with Oxxford's, is tarnishing the reputation of Oxxford." The Texas statute, however, affords a plaintiff a remedy only for those "acts" which threaten dilution of a valid trademark. [FN20] We must perforce consider which "acts" give rise to a colorable dilution by tarnishment claim under the Texas statute. *See* 3 McCarthy, §§ 24:104-107 (discussing different modes of tarnishment, including parody and competitive advertising, and listing cases); *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 507 (2d Cir.1996) (same); *Anheuser-Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 777 (8th Cir.1994) (same); *Jordache Enterprises, Inc.,* 828 F.2d at 1490 (same).

> FN19. It is well-established that this Court may affirm a summary judgment on any grounds supporting such a ruling which are manifest in the record. *Rizzo v. Children's World Learning Centers, Inc.,* 84 F.3d 758, 762 (5th Cir.1996). This includes grounds which have been rejected or not addressed by the district court. *Kiser v. Garrett,* 67 F.3d 1166 (5th Cir.1995). Although Exxon did not file a motion to dismiss Oxxford's counterclaim under Fed. R. Civ. Proc. 12(b)(6), the insufficiency of the anti-dilution claim was broached in Exxon's summary judgment pleadings, was explicitly renewed in its brief to this Court, and involves only a question of law.

> FN20. The Texas statute, like the model bill, states that in addition to enjoining trademark dilution a plaintiff may enjoin acts likely to injure business reputation. It is unclear whether this language creates a separate cause of action or merely expresses the "tarnishment" prong of the typical dilution cause of action. "While the statute speaks in terms of protecting against two distinct harms--injury to business reputation and dilution of a mark's distinctive quality--the first harm has consistently been deemed subsumed into the second." *Plasticolor Molded Products v. Ford Motor Co.,* 713 F.Supp. 1329, 1342

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(C.D.Cal.1989) (citation omitted), *vacated on other grounds,* 767 F.Supp. 1036 (C.D.Cal.1991). *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Texas already recognizes a common law cause of action for business disparagement, the elements of which are publication of disparaging words, falsity, malice, lack of privilege, and special damages. *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987) (citations omitted). Obviously, no such cause of action is asserted, or even sought to be asserted, here.

Oxxford seeks, through the vehicle of section 16.29 and a flimsy, attenuated assertion that there is an ease of association between the marks "Oxxford" and "Exxon," to hold Exxon responsible for all activities and events within the last twenty-five years falling under its corporate aegis and resulting in general negative publicity for the corporation. Such an approach ignores the distinction between the use of the appellation "Exxon" as a device of corporate identity and its use as a *trade* name or *trademark, i.e.,* as an indicator of origin and/or quality of particular goods and services. The "acts" which comprise the basis of Oxxford's claim, such as the Exxon Valdez spill and resulting jury verdict, bear no relationship to the quality or reputation of the products sold or services provided under cover of Exxon's marks (or to the quality or reputation of products sold or services provided under Oxxford's marks).

*1084 What Oxxford seeks by its counterclaim is to enjoin Exxon from using Exxon's registered marks. Section 16.29 is, at least in most respects, a garden variety dilution statute and we have uncovered no authority even suggesting that a dilution by tarnishment claim brought under such a statute which seeks to *enjoin* the defendant's *use of its mark* can be premised upon matters wholly unrelated to the defendant's use of the allegedly diluting mark *as a trademark* (or to any use of or attempt to benefit from plaintiff's trademark). [FN21] Under Oxxford's theory, rights in an otherwise established, valid, and registered trademark which continue to nonconfusingly reflect to the public the origin and quality of the goods in connection with which it is used, may be lost merely because the mark's owner has incurred a bad public reputation in respect to matters unrelated to the quality of its products. In fine, the trademark owner has a property right in his mark, but only so long as he personally is not unpopular with the general public. We reject this highly unorthodox view of trademark law. Therefore, even if we assume *arguendo* that Oxxford is a sufficiently strong mark to warrant protection under the Texas statute and that "Exxon" and "Oxxford" are similar enough to allow the public to make some attenuated subliminal association between the products and services offered under the two

marks, we nonetheless conclude that Oxxford's allegations, because they do not assert that some manner of deficiency or unsavoriness inures to the products or services sold under Exxon's registered marks or that Exxon has infringed or attempted to benefit from Oxxford's marks, do not state a cause of action under Tex.Bus. & Comm.Code § 16.29.

FN21. Oxxford relies upon several cases in which courts have found that uses of a similar mark which undermine the quality assurance of the plaintiff's mark can result in tarnishment. *See Tiffany & Co. v. Boston Club, Inc.,* 231 F.Supp. 836, 844 (D.Mass.1964); *Steinway & Sons v. Robert Demars & Friends,* 210 U.S.P.Q. 954, 964 (C.D.Cal.1981). In *Tiffany & Co.,* a New York retail store of that name brought an infringement and dilution claim against a Boston Corporation which was using "Tiffany" in the name of its restaurant and lounge. In *Steinway & Sons,* the owners of the prestigious Steinway (piano) mark claimed that the maker of the "Stein-way clip-on beer handles" was diluting their mark. Both of these cases concern the negative associations which developed out of the defendant's use of trademarks similar to those of the plaintiff on products which were markedly less ornate, sophisticated, or elegant than the plaintiff's products. These cases, which involve the *defendant's use of an allegedly similar mark on its products in commerce,* merely reiterate the proposition we propound above.

The district court did not err in dismissing Oxxford's counterclaim. [FN22]

FN22. We need not reach Exxon's contentions that Oxxford's asserted cause of action necessitates a retroactive application of the anti-dilution statute contrary to the legislature's intent and is in any case forbidden by the Texas and federal constitutions.

### Conclusion

The district court did not err by rejecting Oxxford's defenses or by dismissing Oxxford's counterclaim, and those rulings are AFFIRMED.

109 F.3d 1070, 42 U.S.P.Q.2d 1417

Briefs and Other Related Documents (Back to top)

• 1996 WL 33425544 (Appellate Brief) Brief of Appellee Exxon Corporation (Sep. 17, 1996)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

## 30

(To be scanned in place of tab)

493 F.Supp. 1025                                                                    Page 1
212 U.S.P.Q. 208
(Cite as: 493 F.Supp. 1025)



United States District Court, N. D. Texas, Dallas Division.

HOLIDAY INNS, INC.
v.
AIRPORT HOLIDAY CORPORATION and Tex-Mex Inn
Operating Company, Inc.

Civ. A. No. 3-76-0738-C.

July 23, 1980.

Motel corporation brought trademark infringement action against owner and manager of motel who, after manager was terminated as licensee of plaintiff, continued to use plaintiff's marks or similar marks. After defendants were found liable for infringement and unfair competition, the District Court, William M. Taylor, Jr., J., held that: (1) plaintiff was entitled to percentage of defendants' profits attributable to their infringement and unfair competition; (2) plaintiff was entitled to percentage of royalty fee which would have been payable by manager attributable to percentage of room sales to potential patrons of plaintiff's licensees seeing defendants' motel with the infringing and unfair use of plaintiff's marks; and (3) both profits and damages awarded to plaintiff were to be trebled due to defendants' flagrant and willful conduct.

Judgment accordingly.

West Headnotes

[1] Trade Regulation ⬅➡673
382k673 Most Cited Cases

In action brought by motel corporation against owner and manager of a motel for trademark infringement arising from defendants' use of plaintiff's service- marked sign in unaltered form or with a few insignificant changes and use of a similar trade name after plaintiff terminated manager as a licensee, plaintiff was entitled to percentage of defendants' profits attributable to their infringement and unfair competition. Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117.

[2] Trade Regulation ⬅➡680.1
382k680.1 Most Cited Cases
(Formerly 382k680)

In action brought by motel corporation against owner and manager of a motel for trademark infringement arising from defendants' use of plaintiff's service- marked sign in unaltered form or with a few insignificant changes and use of a similar trade name after plaintiff terminated manager as a licensee, plaintiff was entitled to percentage of total

royalty fee which would have been payable by motel manager attributable to potential patrons of plaintiff's licensees seeing defendants' motel with the infringing and unfair use of plaintiff's marks, and royalty fees set in defendants' license agreement were not measure of damages since they had lost their license. Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117.

[3] Trade Regulation ⬅➡683
382k683 Most Cited Cases

Motel owner and manager, which infringed upon and unfairly used motel corporation's marks after the corporation terminated manager as licensee, were liable for treble damages assessed in corporation's trademark infringement suit where they did not undertake to use the marks innocently, but used such marks in flagrant disregard of corporation's rights. Lanham Trade-Mark Act, § 35, 15 U.S.C.A. § 1117.

*1026 E. Eldridge Goins, Jr., Goins & Underkofler, Dallas, Tex., James L. Kurtz, Washington, D. C., for plaintiff.

C. Terry Hagin, Blankenship & Potts, Dallas, Tex., for defendants.

MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

This action was brought for trademark infringement under the Lanham Act, 15 U.S.C. s 1051 et seq. This Court has jurisdiction of this controversy and these parties because of 28 U.S.C. s 1338. Defendants were found liable to Plaintiff for infringement and unfair competition in an order granting a partial summary judgment on December 19, 1978. That order also enjoined Defendants from infringing Plaintiff's servicemarks and from competing unfairly with Plaintiff. That injunction will, of course, be continued upon entry of final judgment.

The only issues remaining are those arising under Section 35 of the Lanham Act, 15 U.S.C. s 1117.[FN1] Four principal questions as to monetary recovery must be answered at the present time. They are:

> FN1. Section 35 provides:
> "When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this Chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title and to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

493 F.Supp. 1025
212 U.S.P.Q. 208
**(Cite as: 493 F.Supp. 1025)**

Page 2

assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party."

(1) What profits of Defendants is Plaintiff entitled to?

(2) What damages has Plaintiff suffered?

(3) Should those profits be increased or decreased and should the damages be multiplied? and,

(4) Is this an exceptional case?

Defendant Airport Holiday Corporation is the owner of a motel facility at 7800 Lemmon Avenue, Dallas, Texas. Defendant Tex-Mex Inn Operating Company, Inc. ("Tex-Mex") operates the motel for Airport Holiday Corporation. From March 26, 1956 until February 28, 1975, Tex-Mex was a licensee of Plaintiff. This license entitled *1027 Tex-Mex to use, among other things, Plaintiff's servicemarks for Plaintiff's name, Holiday Inn, and its Great Sign which is used at the 1400 motels in this country.

On February 28, 1975, Plaintiff terminated Tex-Mex as a licensee. After that date, Defendants used the name Holiday Hotel until at least the date of trial. Defendants paid no royalties to Plaintiff after the termination for the use of Plaintiff's servicemarks.

Defendants used the servicemarked Great Sign in unaltered form until June 5, 1975. A few changes in its appearance were made then, but they were not significant. The Great Sign was finally removed from Defendants' premises on January 1, 1979.

Defendants also used a sign on a pole facing a street running beside the motel which had on its face the words "Holiday Inn" in a script form identical to that which is covered by a servicemark owned by Plaintiff. This sign was used for approximately 14 months after February 28, 1975.

As would be expected, the agreement between Plaintiff and

Tex-Mex provided that upon termination,

". . . (A)ll rights of Licensee hereunder shall thereupon terminate, and Licensee shall immediately thereafter cease to use, by advertising or otherwise, directly or indirectly, the said System, or any parts thereof; and without limiting the generality of the foregoing, the Licensee shall cease to use, and shall withdraw from use, the words "Holiday Inn" or any combination of words similar thereto or suggestive thereof, the trade names, trade marks, service marks, color schemes and patterns, slogans, designs, signs, emblems, of the System or in any wise similar hereto or suggestive thereof; and the Licensee shall withdraw from use, all signs, furniture, furnishings, advertising matter, stationery, forms, or any other articles which display the words "Holiday Inn", the trade names, trade marks, service marks, color schemes or patterns, slogans, designs, signs, or emblem of the System, or identified with the System, or similar thereto, or suggestive thereof; and Licensee agrees, upon any such termination, to cease and refrain from holding Licensee out to the public in any way as a member of the System, or as a Licensee or operator of a "Holiday Inn" and to distinguish Licensee's inns thereafter so clearly from those of the Licensor, and from those within the System, as to avoid all possibility of any confusion by the public. Licensee agrees that the Licensor shall be entitled to injunctive and equitable relief for any violation of this Part Sixth of this agreement, and Licensee agrees to pay all costs and expenses, including reasonable attorney's fees, incurred by Licensor in enforcing this Part Sixth of this agreement, or any other part of this agreement, as a result of Licensee's violation of, or default in performing, this Part Sixth, or any other part, of this agreement.

Plaintiff requested in its February 28, 1975, letter terminating the license agreement that Tex-Mex remove all indicia pertaining to Plaintiff and its servicemarks. Defendants did not, and Plaintiff sent another letter on March 12, 1975, demanding the same. As the result of Defendant's non-compliance, Plaintiff filed this civil action on May 26, 1976.

Defendants had the Great Sign repaired and light bulbs replaced after the license was terminated. This clearly shows that it was used, and used day and night. After this Court entered its injunction, Defendants had the Great Sign covered with a large plastic bag at the approximate cost of $1,000.

[1] Mr. Randuk, Tex-Mex's general manager of the motel since February 28, 1975, testified that when he took over the operation of the motel it was a failing business. He further testified that in order to bring in business immediately he crossed Lemmon Avenue to Love Field Airport and beat on doors in order to get weekly business. He was successful

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

and managed to bring in sufficient revenue to keep the doors open, and, after a period of time, to make a profit. He testified that 70% of the *1028 business of the motel was weekly and only 30% was transient business. This weekly trade was due to Mr. Randuk's personal efforts to obtain such business. It was not due to any potential patron of a Holiday Inn seeing either of the two signs or reading the name of the motel, Holiday Hotel. Therefore, only 30% of Defendants' profits are attributable to their infringement and unfair competition.

The parties have stipulated that the total profits of the motel for the period of March 1, 1975 to January 1, 1979, were $38,215. Thirty per cent of $38,215 is $11,464.50, the profits obtained due to the infringement and unfair competition.

[2] The Fifth Circuit ruled in Boston Professional Hockey Ass'n. v. Dallas Cap Mfg.,[FN2] that royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks. Plaintiff charges what it terms a royalty fee and an advertising fee for the use of its marks. From March 1, 1975 to December 31, 1977, the royalty fee was fifteen cents per room per night or three per cent of room sales, whichever was higher. In 1978, the royalty fee was four per cent. The advertising fee during the period from March 1, 1975 to December 31, 1978, was one per cent of room sales. Defendants' room sales were:

FN2. 597 F.2d 71 (5th Cir. 1979).

```
3/1/75 to 12/31/75   $219,199
1/1/76 to 12/31/76    325,109
1/1/77 to 12/31/77    409,600
1/1/78 to 12/31/78    547,551
```

The total royalty fee payable by Tex-Mex for these years would have been $54,320. The advertising fee would have been $15,015.

Defendants contend that the royalty fee set in their license agreement should be the measure of damages. But they had lost their license and should respond in damages at the going rate in the market place. So the $54,320 is figured at the rate of four per cent for the year 1978, not the three per cent specified in their termination contract.

But Plaintiff is not entitled to the entire $69,335 ($54,320 ☞ $15,015) as damages. Seventy per cent of room sales were due to Mr. Randuk's efforts and only thirty per cent due to potential patrons of Plaintiff's licensees seeing Defendants' motel with the infringing and unfair use of Plaintiff's marks. Therefore Plaintiff's damages are thirty per cent of $69,335 or $20,800.50.

[3] The third question set out above must be answered yes. The profits should be increased and the damages should be multiplied. Defendants did not undertake to use Plaintiff's marks innocently. They knew that Plaintiff had marks for the Great Sign, the name Holiday Inn and the script rendering of Holiday Inn that appeared on the subsidiary sign. Indeed, the subsidiary sign bore upon its face the symbol (R) indicating the registration of the Holiday Inn mark. This is flagrant disregard of the rights of Plaintiff. Full knowledge of the proprietary nature of a mark and the infringement and misuse of the mark is the height of flagrancy and willful conduct for which a maximum award should be made. Therefore, both the profits ($11,464.50) and damages ($20,800.50) will be trebled for a total award in the amount of $96,795.00.

Beyond this is the provision of the 1956 licensing agreement in which Tex-Mex agreed to stop using the marks upon the termination of the agreement. The violation of this agreement over a substantial period of time (that only ended upon order of this Court) is the exceptional circumstances for which Congress intended attorneys fees to be awarded. Plaintiff will be given the opportunity to offer proper proof of its attorneys' fees and judgment will then be entered accordingly.

493 F.Supp. 1025, 212 U.S.P.Q. 208

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





# EXHIBIT / ATTACHMENT

21

(To be scanned in place of tab)

892 F.2d 1512
13 U.S.P.Q.2d 1808
(Cite as: 892 F.2d 1512)

Page 1



United States Court of Appeals,
Eleventh Circuit.

HOWARD JOHNSON COMPANY, INC., Howard Johnson
Franchise Systems, Inc., Howard
Johnson Restaurant Franchise, Inc., Plaintiffs-Appellees,
v.
Amir KHIMANI, Maralak, Ltd., Torbay Holding, Inc.,
Defendants-Appellants.

No. 87-3874.

Jan. 29, 1990.

Former franchisees appealed from order of the United States
District Court for the Middle District of Florida, No.
86-1079-CIV-T-17(c), Elizabeth A. Kovachevich, J., which
held them in contempt for violation of preliminary
injunction against trademark infringement. The Court of
Appeals, Kravitch, Circuit Judge, held that: (1) evidence
sustained finding of contempt, and (2) court properly used
Lanham Act as a guide in structuring civil contempt
sanction.

Affirmed.

West Headnotes

[1] Contempt ☞66(1)
93k66(1) Most Cited Cases

Court reviewing contempt citation could rely on deposition
testimony of one witness to support district court's finding
of contempt, even though that testimony was not filed until
several months after the contempt order, where it was filed
in response to motion to amend civil contempt order and the
court did not issue its final judgment of contempt until a
later time.

[2] Contempt ☞66(2)
93k66(2) Most Cited Cases

Finding of civil contempt is generally not reviewable on
interlocutory appeal; if the contempt penalties imposed are
conditional or subject to modification, they are not
reviewable on appeal.

[3] Trade Regulation ☞656
382k656 Most Cited Cases

Court could review civil contempt order which incorporated
previous orders for contempt, sanctions, and fees where
there were no contingencies or conditions which would
permit the contemnors to modify or purge themselves of the
sanctions and, regardless of the outcome of the underlying

trademark infringement case, they would be bound by the
contempt judgment.

[4] Contempt ☞20
93k20 Most Cited Cases

Focus of court's inquiry in civil contempt proceeding is not
on the subjective beliefs or intent of the alleged contemnors
in complying with the court order, but whether in fact their
conduct complied with the order at issue.

[5] Contempt ☞20
93k20 Most Cited Cases

Conduct that evinces substantial but not complete
compliance with court order may be excused in contempt
proceeding if it was made as part of a good-faith effort at
compliance.

[6] Trade Regulation ☞655
382k655 Most Cited Cases
Finding that former franchisees were in violation of
preliminary injunction against use of colorable imitation of
franchisor's trademark or otherwise diluting the trade name
or service marks was supported by photographic evidence of
new signs and logo used by franchisees.

[7] Trade Regulation ☞655
382k655 Most Cited Cases

Finding that former franchisees had not made substantial
good-faith effort at compliance with temporary injunction
against use of colorable imitation trademark, and thus could
be held in contempt, was supported by evidence that they
engaged in the process of compliance slowly and
grudgingly.

[8] Trade Regulation ☞654.1
382k654.1 Most Cited Cases
 (Formerly 382k654)

Evidence demonstrated that former franchisees were
responsible for violation of preliminary injunction against
use of colorable imitations of franchisor's trademark, even
though the property had been subleased to another.
[9] Trade Regulation ☞657
382k657 Most Cited Cases

District court properly used Lanham Act to guide its
structuring of civil contempt sanction for violation of
preliminary injunction against former franchisees' use of
colorable imitations of franchisor's trademarks. Lanham
Trade-Mark Act, §§ 1 et seq., 35, as amended, 15 U.S.C.A.
§§ 1051 et seq., 1117.

[10] Trade Regulation ☞657

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

892 F.2d 1512
13 U.S.P.Q.2d 1808
(Cite as: 892 F.2d 1512)

382k657 Most Cited Cases

It was proper for court to determine actual damages suffered by franchisor as the result of former franchisees' contempt of preliminary injunction against use of colorable imitation of franchisor's trademarks by calculating the amount of royalty payments which franchisor would have received during the period that the former franchisees were diluting or using a colorable imitation of its trademark if franchisees had had a genuine franchise.

**[11] Trade Regulation ☞657**
382k657 Most Cited Cases

District court had power to award profits of franchisees during period that they were in contempt of preliminary injunction against use of colorable imitation of franchisor's trademark as part of the civil contempt sanction.

**[12] Trade Regulation ☞657**
382k657 Most Cited Cases

Court did not abuse its discretion in awarding profits received by former franchisees during period of contempt of preliminary injunction against use of colorable imitation of franchisor's trademark on a theory of unjust enrichment where former franchisees had injured the franchisor by imitating its trademark without compensation and enriched themselves by tapping the reputation and good will of the franchisor.

**[13] Federal Courts ☞614**
170Bk614 Most Cited Cases

Failure of a party to raise a theory of relief before the trial court generally precludes that party from arguing the theory on appeal.
**\*1513** David L. Evans, Ava K. Doppelt, Herbert L. Allen, Neal J. Blaher, Orlando, Fla., for defendants-appellants.

Frank R. Jakes, Tampa, Fla., for plaintiffs-appellees.

Appeal from the United States District Court for the Middle District of Florida.

**\*1514** Before KRAVITCH, Circuit Judge, HENDERSON and HILL, Senior Circuit Judges. [FN*]

FN* *See* Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

KRAVITCH, Circuit Judge:

Defendants Torbay Holding, Inc. (Torbay), its wholly owned subsidiary Maralak, Ltd., and its principal

shareholder Amir Khimani (referred to collectively as Maralak), appeal the district court's finding of civil contempt and imposition of sanctions in a trademark infringement action brought by plaintiffs Howard Johnson Co., Inc., Howard Johnson Franchise Systems, Inc., and Howard Johnson Restaurant Franchises, Inc. (referred to collectively as Howard Johnson). Because we conclude that the district court did not abuse its discretion in holding the defendants in civil contempt and imposing sanctions, we affirm.

FACTS

On February 6, 1984, Maralak and Howard Johnson entered into a franchise agreement respecting the operation of three Howard Johnson motor lodges and restaurants in St. Petersburg, Cocoa, and Melbourne, Florida. After the expiration of the agreement on February 6, 1986, the defendants continued to hold out these properties as authorized Howard Johnson franchises. On July 25, 1986, Howard Johnson filed the present trademark infringement suit and sought a preliminary injunction to halt Maralak's conduct. On August 4, 1986, the court granted Howard Johnson's motion and enjoined the defendants from using the words "HOWARD JOHNSON" or "HOWARD JOHNSON'S" or the Howard Johnson quality stripe design service mark or the orange roof and blue cupola design service mark, or "any colorable imitations of these trade names and federally- registered servicemarks" in connection with the operation, promotion, and sale of services of defendants' St. Petersburg, Cocoa, and Melbourne, Florida motor lodges and restaurants. Additionally, the defendants were prohibited from engaging in any advertising or sales practices that in any way diluted or disparaged these service marks and trade names. The district court's preliminary injunction was subsequently affirmed by this court. *Howard Johnson Co. v. Khimani,* 819 F.2d 1148 (11th Cir.1987) (mem.).

The defendants' efforts at compliance were dilatory and grudging. At least through August 17, 1986, the defendants' facilities continued to hold themselves out to the public as Howard Johnson franchises. All of the exterior signs identified the facilities as Howard Johnson motor lodges and restaurants and the buildings each had the distinctive Howard Johnson orange roof and blue cupola. The lobbies, restaurants, and guest rooms were all replete with articles bearing the Howard Johnson logo. Additionally, the personnel at these locations continued to refer to their facilities as Howard Johnson when speaking to patrons. Substantial compliance was not achieved until the eve of a September 5, 1986, contempt hearing.

Howard Johnson filed a second motion for contempt on November 6, 1986, after it discovered that the plastic

892 F.2d 1512
13 U.S.P.Q.2d 1808                                                                    Page 3
**(Cite as: 892 F.2d 1512)**

coverings used by the defendants to block out the signs at the Melbourne and Cocoa locations had blown off and had not been replaced. The plaintiffs also noticed that two billboards advertising the Cocoa facility still retained the orange "roofline" logo of Howard Johnson. The trial court denied the plaintiffs' motion for contempt after the defendants removed the signs and obscured the "roofline" logo from the billboards three days prior to the second contempt hearing.

[1] The third motion for contempt, which is the subject of this appeal, was filed by Howard Johnson on April 21, 1987, after discovering that the defendants had begun operating their Cocoa and Melbourne motor lodges and restaurants under the name "H.J. Inns." The trial court had testimony from Azim Visram, the general manager of the Cocoa and Melbourne facilities, concerning a November 1986 meeting between Visram, Khimani, and Khimani's son Ariff, who was president of defendant *1515 Torbay Holding. [FN1] Visram testified that at this meeting, "it was decided that we would get a name that would be close to Howard Johnson's name, yet it would not infringe on their name...." Visram later affirmed that "the idea was to get as close to Howard Johnson as you could without infringing." Visram testified that during or shortly after this meeting, the Khimanis, with the final approval of defendant Amir Khimani, decided to rename the facilities "H.J. Inns."

> FN1. The defendants erroneously contend that this court cannot rely on the deposition testimony of Visram to support the district court's grant of civil contempt because that testimony was not filed in the district court until October 20, 1987, several months after the May 14, 1987, civil contempt order. Defendants neglect to mention that this deposition was filed by plaintiffs in response to the defendants' motion to amend the court's civil contempt order. The court rejected the defendants' motion to strike the testimony as irrelevant and did not issue a final judgment of civil contempt until November 27, 1987--the same day it denied the defendants' motion for rehearing and reconsideration of the sanction order and over a month after the deposition had been filed in the district court.

Pursuant to Amir Khimani's decision to rename the facilities, "H.J. Inns" was painted in white lettering against a dark blue background on the former Howard Johnson sign at the Cocoa lodge. Previously, the sign had displayed "HOWARD JOHNSON'S" in white letters on a light blue background. The name "H.J. Inns" was also placed with removable black plastic letters on the marquee sign at the Melbourne lodge. Additionally, the employees at both locations answered their phones and identified the facilities

to the public as "H.J. Inns."

The trial court found that the defendants' operation of the Melbourne and Cocoa facilities under the name "H.J. Inns" and the "H.J. Inns" signs constituted a violation of the court's preliminary injunction. It therefore granted the plaintiffs' third motion for civil contempt and, in a subsequent hearing, imposed compensatory damages, costs, and attorneys' fees in the amount of $234,475.15. On appeal, the defendants challenge both the district court's finding of contempt and the amount of sanctions.

## JURISDICTION

As a preliminary matter, the appellees assert that this court lacks jurisdiction to hear Maralak's appeal because it is allegedly based upon a non- final interlocutory order of civil contempt. Appellees rely on the Supreme Court's holding in *Fox v. Capital Co.*, "that except in connection with an appeal from a final judgment or decree, a party to a suit may not review upon appeal an order fining or imprisoning him for the commission of a civil contempt." 299 U.S. 105, 107, 57 S.Ct. 57, 58, 81 L.Ed. 67 (1936); *see Doyle v. London Guarantee & Accident Co.*, 204 U.S. 599, 27 S.Ct. 313, 314, 51 L.Ed. 641 (1907); *Rosenfeldt v. Comprehensive Accounting Service Corp.*, 514 F.2d 607, 613 n. 9 (7th Cir.1975).

[2] Appellees are correct that a finding of civil contempt is generally not reviewable on interlocutory appeal. *Fox*, 299 U.S. at 107, 57 S.Ct. at 58; *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 976 (11th Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986). However, there are several exceptions to this principle. Most significant is the distinction this court has drawn

> between orders imposing a fine or penalty for contempt which may be avoided by the party purging himself of the contempt by complying with the order, and those in which a fine or penalty is imposed within a time certain that may not be avoided by some other form of compliance. The former is not appealable in an interlocutory action; the latter may be taken on appeal immediately.

*Combs*, 785 F.2d at 976; *Drummond Co. v. District 20, United Mine Workers of America*, 598 F.2d 381, 384 (5th Cir.1979). [FN2] If the contempt penalties imposed are conditional or subject to modification, then they are not reviewable on appeal. *1516Combs*, 785 F.2d at 976; *Drummond*, 598 F.2d at 384.

> FN2. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting the case law of the former Fifth Circuit developed before October 1, 1981, as precedent for this circuit).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

892 F.2d 1512
13 U.S.P.Q.2d 1808
(Cite as: 892 F.2d 1512)

[3] The final judgment of civil contempt entered by the district court on November 27, 1987, and incorporating the previous orders for contempt, sanctions, and fees is a final, non-conditional judgment ripe for immediate appeal. There is no contingency or condition which could permit the appellants to modify or purge themselves of the sanctions imposed by the judgment of contempt. Regardless of the outcome of the underlying trademark infringement case, the defendants will be bound by the contempt judgment. Because this appeal is the defendants' only opportunity to alter their obligations under the judgment of contempt, it has the requisite finality for appellate review.

## FINDING OF CONTEMPT

[4][5] In a civil contempt proceeding, the petitioning party bears the burden of establishing by "clear and convincing" proof that the underlying order was violated. *Newman v. Graddick,* 740 F.2d 1513, 1525 (11th Cir.1984); *Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1213 (S.D.Fla.1986). However, once the moving party makes a prima facie showing that the court order was violated, the burden of production shifts to the alleged contemnor to show a "present inability to comply that goes 'beyond a mere assertion of inability....' " *Combs,* 785 F.2d at 984 (quoting *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984); *see United States v. McAnlis,* 721 F.2d 334, 337 (11th Cir.1983), *cert. denied,* 467 U.S. 1227, 104 S.Ct. 2681, 81 L.Ed.2d 877 (1984). Therefore, the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue. *Jim Walter Resources, Inc. v. Int'l Union, United Mine Workers of America,* 609 F.2d 165, 168 (5th Cir.1980). Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance. *Newman,* 740 F.2d at 1524.

The district court's judgment of civil contempt will be affirmed unless we find that the court abused its discretion. *Afro-American Patrolmen's League v. City of Atlanta,* 817 F.2d 719, 723 (11th Cir.1987); *Sizzler Family Steak Houses v. Western Sizzlin' Steak House, Inc.,* 793 F.2d 1529, 1534 n. 4 (11th Cir.1986). Thus, if the evidence is such that a reasonable person could find a clear and convincing violation of the preliminary injunction, we must affirm the contempt ruling of the district court. *See Deitchman v. E.R. Squibb & Sons,* 740 F.2d 556, 563-64 (7th Cir.1984).

[6] Maralak contends that the court abused its discretion in finding it in civil contempt for violating the preliminary injunction because the court lacked sufficient facts upon which to base a decision, the name "H.J. Inns" was not a colorable imitation of any Howard Johnson trade or service

marks, and, in any event, it was not responsible for the violative behavior. The district court properly rejected these arguments.

The district court's preliminary injunction prohibited the defendants from using "any colorable imitation" or otherwise diluting the Howard Johnson trade name or service marks in connection with the operation of the St. Petersburg, Cocoa, and Melbourne, Florida facilities. The record before the court provided an ample basis for finding the defendants' conduct violative of the injunction by clear and convincing evidence. Specifically, the court had photographic evidence of the H.J. Inns signs at the Cocoa and Melbourne lodges and the old Howard Johnson signs that they replaced. The Cocoa H.J. Inns sign was painted in the same color lettering against a similarly colored background on the same sign that had once said "Howard Johnson's." Although the Melbourne sign was not visually similar to the previous Howard Johnson sign, the name itself is similar enough to "Howard Johnson" that a reasonable person could find it to be a colorable imitation. *Cf. Holiday Inns v. Alberding,* *1517683 F.2d 931, 932-33 & n. 1 (5th Cir.1982) (defendant's sign, retaining color and shape of former franchise sign, essentially identical to former sign despite name change from "Holiday Inn" to "Holiday Hotel"); *see also Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 842 (11th Cir.1983) (roller skating rink name "Lollipops visually similar to Jellibeans" because each is a similar sounding candy name used to designate a roller rink); *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 994 (7th Cir.1989) (initials, in the trademark context, do not differ significantly from the words they represent). This interpretation is supported by evidence that Howard Johnson uses the "HJ" mark at several motor lodges in Florida and that it has a federally registered "HJH" service mark for hotel services.

The court's finding that "H.J. Inns" was a colorable imitation of or diluted Howard Johnson trade and service marks is strengthened by the fact that the consuming public was likely to confuse the two marks because they created the same general impression and had been used in the same context. *See Jellibeans,* 716 F.2d at 842; *Holiday Inns,* 683 F.2d at 933; *Hart Schaffner & Marx v. Alexander's Department Stores,* 341 F.2d 101, 102 (2d Cir.1965). Aside from the intrinsic similarity of the names and design, the same facilities with the same signs had previously operated as Howard Johnson franchises, thereby greatly increasing the possibility that consumers would interpret "H.J. Inns" as designating a Howard Johnson establishment. *See, e.g., Holiday Inns v. Airport Holiday Corp.,* 493 F.Supp. 1025, 1028 (N.D.Tex.1980), *aff'd sub nom Holiday Inn v. Alberding,* 683 F.2d 931 (5th Cir.1982) (considering whether former franchise's imitation of hotel name misled and lured potential franchise patrons). [FN3] The danger of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

892 F.2d 1512
13 U.S.P.Q.2d 1808
(Cite as: 892 F.2d 1512)

such confusion was exacerbated by the existence during the period of contempt of a Howard Johnson advertising campaign having the theme "We're turning Howard Johnson upside down." Customers who were aware of these advertisements could perceive the slight alteration in name as consistent with the theme of making substantial changes in the operation of the franchise.

> FN3. Similarly, in *Clayton v. Howard Johnson Franchise Systems, Inc.*, a district court found the use of "HJ" in the name of a motor lodge to be "the colorable imitation of 'Howard Johnson's' and ... likely to cause confusion." No. 87-569-Civ-Orl-19, slip op. at 12 (M.D.Fla. July 27, 1988). The court also found "HJ" confusingly similar to "HJH." *Id.* at 17; *see also Howard Johnson Co. v. Ho-Jo Campsites, Inc.*, 273 F.Supp. 447 (M.D.Fla.1967) (use of "Ho-Jo" likely to cause public to believe there is a connection between Howard Johnson and defendant's campsites).

Furthermore, the legal posture of this case places a heavier burden upon the defendants of avoiding a colorable imitation of or diluting Howard Johnson trade and service marks than upon a party not already preliminarily enjoined from engaging in such activity. The former Fifth Circuit explained that

> where the appellants have been found guilty of infringing the trade-mark rights of others, they should thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction. They must do more than see how close they can come with safety to that which they are enjoined from doing.

*Eskay Drugs v. Smith, Kline & French Laboratories*, 188 F.2d 430, 432 (5th Cir.1951); *see Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1432 (7th Cir.1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986) (district courts in trademark cases "possess[ ] substantial discretion to decide how close is too close, once an infringer has committed a contempt of the original injunction"); *World's Finest Chocolate, Inc. v. World Candies, Inc.*, 409 F.Supp. 840, 844 (N.D.Ill.1976), *aff'd*, 559 F.2d 1226 (7th Cir.1977) ("It is well established that the protection of a trademark requires that a party once convicted of infringement ... should keep a safe distance from the margin line between compliance with the order and a violation.").

[7] The court also did not abuse its discretion in rejecting the defendants' contention that, because they had made a substantial *1518 good faith effort at compliance with the court's order, a finding of contempt was inappropriate. To the contrary, the record indicates that the defendants

engaged in the process of compliance slowly and grudgingly, prompting three motions for civil contempt from Howard Johnson. This is not the case of a lodge or restaurant owner using his or her own initials to name an establishment, unaware that a similar trademarked name was being used by another facility. Rather, there was evidence before the court that the defendants deliberately sought a name that "would be close to Howard Johnson's name, yet ... not infringe." The defendants also were aware that other Howard Johnson lodges used the initials "HJ" to identify themselves. In fact, Amir Khimani described the use of the initials "HJ" in franchise manuals as "Howard Johnson's in short form." The court's finding that the defendants' use of the H.J. Inns name violated the preliminary injunction is well supported by the evidence and does not approach an abuse of discretion.

[8] The defendants seek to absolve themselves of responsibility for violating the court's injunction by attributing the name change decision to other corporate entities. The defendants note that while Maralak owned the facilities at issue, the Melbourne and Cocoa locations were subleased to and operated by Aly Investments, Inc. (Aly). The defendants urge that the adoption of the H.J. Inns appellation was attributable to Aly rather than themselves. The court below questioned the purported control of the facilities by Aly and found that the name change was made with Khimani's knowledge and agreement. We agree.

Closer scrutiny of the relationship between the defendants and Aly belies the assertion that the defendants lacked either control of the facilities or responsibility for violating the injunction. *Cf. Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1553 (9th Cir.1989) (finding "substantial and continuing connection" between infringing acts of parent and subsidiary) The evidence shows that Khimani's sons, who are corporate officers of defendant Torbay, are also officers and directors in Aly and own 66% of the company. Furthermore, the defendants concede that Khimani instructed Aly to chose a new name for the Cocoa and Melbourne lodges. Khimani subsequently examined the H.J. sign and testified that he was fully aware of the name change. In fact, Visram, the president of Aly testified that the decision to name the facilities H.J. Inns was made by Khimani and his son and that he subsequently changed the name at their direction.

Even accepting the defendants' contention that they lacked control over the facilities while they were subleased to Aly, the defendants concede that in January 1987, the properties were reconveyed to Maralak. Rather than using this opportunity to remedy any potential violation of the court's order, Maralak left the signs intact and conveyed the Cocoa property to a new sublessee *along with an assignment of the non-exclusive right to use the name H.J. Inns.* A month

92 F.2d 1512
3 U.S.P.Q.2d 1808
Cite as: 892 F.2d 1512)

later, Maralak exhibited its control of the Melbourne property by having the H.J. Inns sign removed. [FN4] The district court had ample evidence to support its finding that the defendants were responsible for the violating the preliminary injunction.

FN4. Maralak took down the removable H.J. Inns lettering on the Melbourne marquee sign at the request of Howard Johnson for a possible future conducting negotiations for a possible future franchise agreement. Maralak, by its own admission, did not remove the painted Cocoa sign because of the expense.

## SANCTIONS

The district court awarded Howard Johnson $218,555.48 in compensatory sanctions for the defendants' civil contempt. The award of compensatory sanctions was based on the amount of royalties Howard Johnson would have received during this period from the Melbourne and Cocoa lodges ($9,727.66) multiplied by a factor of 1.5 due to "the flagrant and deliberate nature of the [d]efendants' continuing infringement," *1519 for a total of $14,591.49. [FN5] In addition to the lost royalties, the award of compensatory sanctions included $203,963.99 in profits earned by the defendants during the period of contempt under a theory of unjust enrichment or, alternatively, an application of the Lanham Act. 15 U.S.C. § 1117(a) (1982 & Supp.1989). The court also awarded the plaintiffs $15,919.67 for attorneys fees and costs incurred in connection with the contempt proceedings.

FN5. Based on the terms of Howard Johnson franchise agreements, the royalty fees were calculated at a rate of 1.5% of gross restaurant sales and 5% of lodge gross revenues. The court declined to assess the 1% marketing contribution normally paid by Howard Johnson franchises because it did not constitute a royalty fee.

The defendants raise numerous objections to the district court's award of sanctions. First, they argue that the court lacked sufficient evidence of actual pecuniary loss suffered by Howard Johnson to support an award of compensatory damages based on franchise royalties. Essentially, defendants urge that the award of royalties was improper because Maralak was not using any of the services and benefits provided by the franchise, including participation in the Howard Johnson national reservation network.

District courts have broad discretion in fashioning civil contempt sanctions. United States v. United Mine Workers of America, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701-02, 91 L.Ed. 884 (1947); Sizzler Family Steak Houses, 793 F.2d at 1536 n. 8. Here, the trial court referred to the remedies

provided in section 35 of the Lanham Act as guidance for determining the appropriate measure of damages for violating an injunction in a trademark infringement case. Under the Lanham Act, a plaintiff whose trademark rights have been violated is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). The Lanham Act also gives the court the discretion to treble the actual damage award and raise or lower the profit award as necessary to compensate the plaintiff. Id.

[9] The district court's use of the Lanham Act to guide its structuring of the civil contempt sanction was reasonable and within its discretion. See, e.g., Rickard v. Auto Publisher, Inc., 735 F.2d 450, 458-59 & n. 37 (11th Cir.1984) (suggesting that Lanham Act could be followed in determining contempt sanctions in trademark infringement case); W.E. Bassett Co. v. Revlon, Inc., 305 F.Supp. 581, 594 (S.D.N.Y.1969) (following Lanham Act in imposing contempt sanction for violation of preliminary injunction), aff'd in part, rev'd in part, 435 F.2d 656 (2d Cir.1970) (reversing only the district court's denial of profit damages). Although we do not hold that a district court should impose Lanham Act remedies in a civil contempt action involving trademark misuse, we find that here the court's use of the act to provide a framework for determining the compensatory civil contempt award was not an abuse of discretion.

Reference to the Lanham Act was reasonable given the confluence of the trademark infringement subject matter of the statute and this case. Additionally, both the Lanham Act and the civil contempt sanction share a common underlying compensatory goal. Cf. Lanham Act § 35, 15 U.S.C. § 1117 (award "shall constitute compensation and not a penalty"); Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 719, 87 S.Ct. 1404, 1407-08, 18 L.Ed.2d 475 (1967) (referring to Lanham Act's provision for profit, damage, and cost awards as compensatory relief) with Lyman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 452-53, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932) (civil contempt awards must be compensatory, not punitive); Rickard, 735 F.2d at 459 (same).

[10] The district court determined Howard Johnson's actual damages by calculating the amount of royalty payments it would have received during the period that the defendants were diluting or using a colorable imitation of its trademark had the defendants been a genuine Howard Johnson franchise. The use of lost royalties to determine the actual damages incurred by *1520 a victim of trademark misuse is well established in this court. See Ramada Inns v. Gradsden Motel Co., 804 F.2d 1562, 1565 (11th Cir.1986); Boston Professional Hockey Ass'n v. Dallas Cup & Emblem Mfg., 597 F.2d 71, 76 (5th Cir.1979); Holiday Inns, 493 F.Supp. at 1028; see also Bandag, Inc. v. Al Bolser's Tire Stores,

892 F.2d 1512
13 U.S.P.Q.2d 1808
(Cite as: 892 F.2d 1512)

Page 7

*Inc.*, 750 F.2d 903, 920 (Fed.Cir.1984) (royalties normally received for the use of a trademark may be an appropriate measure for damages when they bear a rational relationship to the rights appropriated). In both *Ramada Inns* and *Holiday Inns*, hold-over licensees who continued to use the licensor's trademarks on their lodges after the termination of the licenses were assessed sanctions based on lost royalty payments. *See Ramada Inns,* 804 F.2d at 1563; *Holiday Inns,* 683 F.2d at 932-33. *Holiday Inns,* in particular, presents factual circumstances remarkably similar to the present case because it involved a motel that used a colorable imitation of its former licensor's name, "Holiday Inns," by operating under the name "Holiday Hotel." *See Holiday Inns,* 683 F.2d at 932-33.

Maralak urges us to distinguish these cases because it did not enjoy all of the benefits of a Howard Johnson franchise, such as participation in the national reservation network and a listing in the Howard Johnson directory. This argument fails because neither of the defendants in *Ramada Inns* and *Holiday Inns* were shown to have received all of the benefits of an authorized franchisee. *See Ramada Inns,* 804 F.2d at 1563 (decision based on infringer's use of signs and graphics); *Holiday Inns,* 493 F.Supp. at 1027 (decision based on infringer's use of sign). [FN6] Moreover, by imitating Howard Johnson's name, the defendants took advantage of perhaps the most significant benefit of the Howard Johnson franchise. Customers selecting lodging in an unknown facility of a familiar franchise are likely to impute the characteristics of the franchise, including its general reputation, to the specific inn. When an unaffiliated lodge imitates a franchise name, it is exploiting the goodwill of that chain. *See University of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1545 (11th Cir.1985) (defendant imitated school bulldog mark to capitalize on popularity of football program); *Jellibeans,* 716 F.2d at 843 (affirming district court's finding that defendant chose similar roller rink name to confuse public and capitalize on plaintiff's reputation); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 977 (11th Cir.1983) (only plausible explanation for attempt to adopt a mark as close to plaintiff's as "legally" permissible is to "cash in" on plaintiff's goodwill); *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 704 (5th Cir. Unit A 1981) (same), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). Likewise, any unfavorable reaction of the imitator's patrons are likely to be attributed to the franchise as a whole and diminish its reputation. *See Ramada Inns,* 804 F.2d at 1564-66 (affirming damage award that compensated for Ramada Inns' lost reputation while hold-over franchisee was operating hotel poorly); *Boston Professional Hockey Ass'n,* 597 F.2d at 75 (affirming damage award that compensated in part for injury to plaintiff's reputation caused by poor imitation of product). It was, therefore, not an abuse of discretion for the district

court to use lost royalty payments to replicate the actual damages suffered by Howard Johnson. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (where plaintiff's injury "is of such a nature as to preclude the ascertainment of the amount of damages with certainty ... it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."); *1521Ramada Inns v. Gadsden Motel Co.,* 804 F.2d 1562, 1565 (11th Cir.1986) (same). [FN7]

> FN6. In fact, if these cases are to be distinguished at all it is because Maralak, unlike the defendants in *Ramada Inns* and *Holiday Inns,* was not merely a former lodge licensee who had been enjoined from violating a franchise trademark. Rather, Maralak took the additional step of violating a court injunction and further injured the plaintiffs' trademark. This conduct likewise justifies the district court's finding that "the flagrant and deliberate nature of Defendants' continuing infringement" warrants the use of the 1.5 actual damage multiplier.

> FN7. Additionally, it seems reasonable to interpret the district court's refusal to include the 1% marketing contribution fee in the royalty damage award as a reflection of the fact that the defendants did not gain all of the advantages of the franchise. Arguably, even an award of such damages might have been appropriate because the defendants' locations at former Howard Johnson franchises and use of a similar name are likely to have misled customers enticed by Howard Johnson advertising campaigns into staying at the unaffiliated imitating facilities.

[11] Maralak also objects to the district court's award of the profits generated by the Melbourne and Cocoa facilities during the period they were in contempt of the court's injunction. The defendants do not seriously challenge the discretion of a district court to award profits as part of a civil contempt sanction. Indeed, the Supreme Court has held that profits may be included as part of compensatory relief despite the absence of a showing of pecuniary loss. *Leman,* 284 U.S. at 456-57, 52 S.Ct. at 241-42. [FN8] The Second Circuit has even reversed a district court's refusal to consider profits as part of a compensatory contempt sanction. *See Oral-B Laboratories v. Mi-Lor Corp.,* 810 F.2d 20, 25-26 (2d Cir.1987); *W.E. Bassett Co.,* 435 F.2d at 664. Rather, the defendants contend that the court abused its discretion in awarding profits because such an award is only appropriate where the plaintiff sustains provable damage from the infringement, the defendant's conduct is a deliberate and willful violation, the infringer is unjustly

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

enriched, and the sanction is necessary for future deterrence.

> FN8. In *Holiday Inns,* the Fifth Circuit approved a district court's imposition of both profits and royalty damages in a trademark infringement case. 683 F.2d at 933-35, *aff'g,* 493 F.Supp. 1025 (N.D.Tex.1980). Likewise, in *Maltina Corp. v. Cawy Bottling Co.,* a district court awarded plaintiffs both the defendant's profits and damages to reputation and goodwill as part of a sanction for the defendant's violation of an injunction in a trademark infringement action. 613 F.2d 582, 583 (5th Cir.1980). The old Fifth Circuit did not question the propriety of awarding both profits and damages, but reversed the award of damages because the record was "wholly devoid of support for [the $35,000 damage] figure." *Id.* at 585-87. In contrast the judge below based the damage award on readily ascertainable royalty figures which were a reasonable reflection of the injury to reputation and goodwill suffered by Howard Johnson.

[12] The defendants' proposition is erroneous. First, the cases relied upon by the defendants to derive a series of prerequisites for an award of profits are in the context of trademark infringement cases rather than civil contempt actions. In the civil contempt context the district court's discretion in imposing non-coercive sanctions is particularly broad and only limited by the requirement that they be compensatory. *See Leman,* 284 U.S. at 452-53, 52 S.Ct. at 240; *Rickard,* 735 F.2d at 459. Second, even in trademark infringement cases, the factors warranting profit awards are stated in the disjunctive. *Maltina,* 613 F.2d at 585; *W.E. Bassett Co.,* 435 F.2d at 664. Therefore, a court could base a profit award upon a finding of any one of these factors. Finally, to the extent that an examination of these factors may assist the determination of whether the district judge abused her discretion in incorporating profits as part of the civil contempt sanction, the evidence provides ample justification for the award. [FN9]

> FN9. For instance, the district court was not clearly erroneous in finding the defendants' conduct flagrant and deliberate. Likewise, the conduct of the defendants in persisting in a violation of Howard Johnson's trademark after they were preliminarily enjoined from doing so adds a specific deterrent value to the sanction while also providing a general deterrent to conduct evincing trademark infringement. Most significantly, the court did not abuse its discretion in awarding profits under a theory of unjust enrichment based on the evidence before it. *See Manhattan Industries v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5-7 (2d Cir.1989). During the period of contempt the

defendants both injured Howard Johnson by imitating its trademark without compensation and enriched themselves by tapping the reputation and good will of Howard Johnson through this imitation. The district court's royalty award remedies the defendants' colorable imitation of the plaintiff's trademark without compensation while the profit award remedies the impermissible gains made by the defendants' exploitation of the Howard Johnson mark through its imitation.

***1522** [13] Because the district court's finding of contempt and imposition of sanctions was within its discretion and the defendants' remaining arguments are meritless, [FN10] the district court's final judgment of civil contempt is AFFIRMED.

> FN10. For the first time on appeal, defendants contend that the award of profits as to the Cocoa facilities was improper because those profits were purportedly realized by the defendants' sub-lessee rather than themselves. The failure of a party to raise a theory of relief before the trial court generally precludes that party from arguing the theory on appeal. *Singleton v. Wulff,* 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877- 78, 49 L.Ed.2d 826 (1976); *Denis v. Liberty Mutual Insurance Co.,* 791 F.2d 846, 848-49 (11th Cir.1986); *Lumpkin v. Ricketts,* 551 F.2d 680, 682 n. 3 (5th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 316 (1977). We decline to exercise our discretion to consider this argument because its resolution would inappropriately require this court to make factual findings. *See Denis,* 791 F.2d at 849; *see also Holiday Inns,* 683 F.2d at 934-35 (rejecting argument that defendant airport never received profits from trademark infringing inn because "[a]t no time before or during the trial on damages ... did Airport claim that it had not received profits earned by the hotel that it admittedly owned").

892 F.2d 1512, 13 U.S.P.Q.2d 1808

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

## 32

)

716 F.2d 833
222 U.S.P.Q. 10
(Cite as: 716 F.2d 833)

Page 1

▷

United States Court of Appeals,
Eleventh Circuit.

JELLIBEANS, INCORPORATED, a Georgia Corporation,
Plaintiff-Appellee, Cross-
Appellant,
v.
SKATING CLUBS OF GEORGIA, INC., a Georgia
Corporation, Defendant-Appellant,
Cross-Appellee.

No. 81-7637.

Oct. 3, 1983.

Plaintiff, owner of roller rink designated as "Jellibeans,"
brought action for false designation of origin under Lanham
Act, deceptive trade practice, and unfair competition against
defendant, which had opened similar roller rink designated
as "Lollipops." The United States District Court for the
Northern District of Georgia, Newell Edenfield, J., enjoined
defendant from using name "Lollipops" for its rink, and
defendant appealed. The Court of Appeals, Tjoflat, Circuit
Judge, held that: (1) plaintiff used its mark in interstate
commerce sufficiently to invoke court's jurisdiction; (2)
likelihood of confusion between marks was question of fact;
(3) evidence supported finding that there was likelihood of
confusion between service marks designating roller rinks,
and thus, defendant was properly held liable for false
designation of origin, deceptive trade practice, and unfair
competition; and (4) in absence of malice or fraud, plaintiff
was not entitled to attorney fees.

Affirmed.

West Headnotes

**[1] Federal Courts ⬚⇒214.1**
170Bk214.1 Most Cited Cases
(Formerly 170Bk214)

Statutory grant of jurisdiction to federal courts conferred by
Lanham Act may not exceed constitutional limitations on
power of Congress to regulate service marks, and reaches
and is coincident with constitutional boundary embodied in
commerce clause; thus, as purely intrastate disputes do not
fall within commerce clause, they are not subject to Lanham
Act's regulation. Lanham Trade-Mark Act, §§ 39, 43, 43(a),
45, 15 U.S.C.A. §§ 1121, 1125, 1125(a), 1127; U.S.C.A.
Const. Art. 1, § 8, cl. 3.

**[2] Federal Courts ⬚⇒215**
170Bk215 Most Cited Cases

Where roller rink drew patrons from area that was within 60
miles of Atlanta and included parts of Alabama, received
some out-of-state convention business, and received some
free publicity in national magazines, rink used its service
mark in interstate commerce sufficiently to invoke
jurisdiction of federal courts, by virtue of Lanham Act, over
its action alleging false designation of origin and deceptive
trade practices. Lanham Trade-Mark Act, §§ 39, 43, 43(a),
45, 15 U.S.C.A. §§ 1121, 1125, 1125(a), 1127; U.S.C.A.
Const. Art. 1, § 8, cl. 3.

**[3] Trade Regulation ⬚⇒27**
382k27 Most Cited Cases

**[3] Trade Regulation ⬚⇒331**
382k331 Most Cited Cases

A "service mark" is form of property and has property rights
associated with it, and determining whether infringement of
such property right has taken place is but obverse of
determining whether service mark owner's property right
extends into given area. Lanham Trade-Mark Act, § 43, 15
U.S.C.A. § 1125.

**[4] Trade Regulation ⬚⇒704**
382k704 Most Cited Cases

**[4] Trade Regulation ⬚⇒726**
382k726 Most Cited Cases

**[4] Trade Regulation ⬚⇒870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act,
question of whether or not offending mark is likely to cause
confusion with plaintiff's service mark is question of fact
which Court of Appeals can set aside only if clearly
erroneous. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. §
1125(a).

**[5] Trade Regulation ⬚⇒407**
382k407 Most Cited Cases

**[5] Trade Regulation ⬚⇒870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act,
district court should not determine whether likelihood of
confusion exists between marks by merely computing
whether majority of subsidiary facts indicates that such
likelihood exists; rather, district court must evaluate weight
to be accorded individual subsidiary facts and then make its
ultimate fact decision. Lanham Trade-Mark Act, § 43(a), 15
U.S.C.A. § 1125(a).

716 F.2d 833                                                           Page 2
222 U.S.P.Q. 10
(Cite as: 716 F.2d 833)

**[6] Trade Regulation ☞727**
382k727 Most Cited Cases

**[6] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Court of Appeals can reverse district court's determination of likelihood of confusion in false designation of origin action only if, after reviewing all evidence, it is left with definite and firm conviction that mistake has been committed by district court in finding ultimate-fact issue; such decision can be reached by determining that district court clearly erred in finding one or more of subsidiary facts, or by determining that findings of subsidiary facts were proper, but nonetheless ultimate-fact issue was erroneously decided. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[7] Trade Regulation ☞407**
382k407 Most Cited Cases

**[7] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Implicit in "likelihood of confusion" standard relevant in action for false designation of origin under Lanham Act is balancing between confusion created by putatively offending service mark and burden placed on its owner to find mark which can convey information to public about nature of his service. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[8] Trade Regulation ☞582**
382k582 Most Cited Cases

**[8] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, evidence that roller rink was only one in country which used candy name supported finding that service mark "Jellibeans" was very distinctive mark entitled to broad protection. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[9] Trade Regulation ☞590**
382k590 Most Cited Cases

**[9] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, findings that service marks "Jellibeans" and "Lollipops,"

used to designate roller rinks, were visually and aurally similar and that two names evoked same general impression were not clearly erroneous. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[10] Trade Regulation ☞582**
382k582 Most Cited Cases

**[10] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, evidence supported finding that both plaintiff's and defendant's businesses were skating rinks with clientele primarily composed of teenagers and young adults. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[11] Trade Regulation ☞588**
382k588 Most Cited Cases

**[11] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, evidence supported finding that advertising used by defendant's roller rink designated as "Lollipops" was substantially similar to advertising used by plaintiff in promoting its roller rink designated as "Jellibeans." Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[12] Trade Regulation ☞595**
382k595 Most Cited Cases

**[12] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, evidence that defendant was aware of plaintiff's roller rink designated as "Jellibeans," and that defendant's choice of name "Lollipops" for its roller rink differed from its prior practice, supported finding that defendant selected its service mark "Lollipops" with intent of confusing consumers with plaintiff's successful mark "Jellibeans." Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[13] Trade Regulation ☞596**
382k596 Most Cited Cases

**[13] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act,

716 F.2d 833
222 U.S.P.Q. 10
**(Cite as: 716 F.2d 833)**

Page 3

evidence in form of three witnesses' testimony and survey evidence supported finding that there was actual confusion between plaintiff's service mark "Jellibeans" and defendant's mark "Lollipops," both of which were used to designate roller rinks. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[14] Trade Regulation ☞578**
382k578 Most Cited Cases

**[14] Trade Regulation ☞596**
382k596 Most Cited Cases

**[14] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Alleged technical deficiencies in survey presented by plaintiff in action for false designation of origin under Lanham Act to establish that people were confused between its service mark and that of defendant affected survey's weight, and not its admissibility. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[15] Trade Regulation ☞596**
382k596 Most Cited Cases

**[15] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, quantum of evidence needed to show actual confusion between plaintiff's and defendant's respective service marks is relatively small. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[16] Trade Regulation ☞596**
382k596 Most Cited Cases

**[16] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, evidence of distinctiveness of plaintiff's mark "Jellibeans" for its roller rink, similarity between such mark and defendant's designation "Lollipops" for similar rink, and actual confusion between marks, supported finding that defendant's mark "Lollipops" was likely to be confused with "Jellibeans," and thus, defendant's choice of mark constituted false designation of origin, deceptive trade practice, and unfair competition. Lanham Trade-Mark Act, §§ 35, 43(a), 15 U.S.C.A. §§ 1117, 1125(a); Ga.Code, § 106-703(b).

**[17] Trade Regulation ☞595**
382k595 Most Cited Cases

**[17] Trade Regulation ☞729**
382k729 Most Cited Cases

**[17] Trade Regulation ☞870(2)**
382k870(2) Most Cited Cases
(Formerly 382k870.1)

In action for false designation of origin under Lanham Act, evidence supported finding that defendant's use of mark similar to plaintiff's to designate its roller rink was not malicious, fraudulent, deliberate, or willful, but was rather honest attempt lawfully to copy successful mark, and thus, trial court did not abuse its discretion in failing to award attorney fees to prevailing plaintiff. Lanham Trade-Mark Act, §§ 35, 43(a), 15 U.S.C.A. §§ 1117, 1125(a).

*835 Jones, Bird & Howell, Kevin E. Grady, Atlanta, Ga., for defendant- appellant, cross-appellee.

Haas, Holland, Lipshutz, Levison & Gibert, William R. King, Atlanta, Ga., Caesar, Rivise, Bernstein & Cohen, Ltd., Stanley H. Cohen, Philadelphia, Pa., for plaintiff-appellee, cross-appellant.

Appeals from the United States District Court for the Northern District of Georgia.

Before RONEY, TJOFLAT and FAY, Circuit Judges.

TJOFLAT, Circuit Judge:

Skating Clubs of Georgia, Inc. appeals from a district court order enjoining it from using "Lollipops" as a name for one of its roller skating rinks because that name is too easily confused by consumers with the service mark [FN1] used by Jellibeans, Inc. to identify its roller rink, "Jellibeans." Jellibeans, Inc. cross-appeals the district court's denial of attorney fees. We affirm on both points.

> FN1. A service mark is any word, name, symbol, device, or any combination thereof, or titles, character names and other distinctive features of radio or television programs "used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." 15 U.S.C. § 1127 (1976).

I.

In November 1979, Jellibeans, Inc. opened a roller rink in Atlanta, Georgia, named "Jellibeans." It advertised Jellibeans extensively, spending over $50,000 in November and December alone, and over $100,000 during the first year of the rink's operation. Jellibeans, Inc. spent most of

716 F.2d 833
222 U.S.P.Q. 10
(Cite as: 716 F.2d 833)

this money on radio advertisements, and the rest on newspaper advertisements and local promotional activities. Jellibeans, Inc.'s extensive advertising, and its use of a candy name for its rink, were unique among Atlanta roller rinks. The rink was a success from the outset.

Skating Clubs of Georgia, Inc., operates six roller rinks in the Atlanta area. Skating Clubs established its first rink in 1959, another in 1971, two in 1973, and a fifth rink in 1975. It called each of these rinks *836 "Skating Clubs" and named them after the communities in which they were located, e.g., South Cobb Skating Club. In early 1980, a few months after Jellibeans opened, Skating Clubs decided to build its sixth rink. It purchased land for this new rink approximately 8-9 miles from Jellibeans and immediately began construction. It placed a sign on the site announcing the future opening of "Lollipops Disco Roller Rink." The sign also stated, in small print, that Skating Clubs owned the rink. Skating Clubs later replaced this sign with one that omitted the word "Disco" from the name of the rink, and stated in much larger letters that Skating Clubs owned Lollipops, and that Albert Couey owned Skating Clubs.

Several patients and a business acquaintance of Dr. Ronald Feinman, a principal shareholder of Jellibeans, Inc., saw the Lollipops sign. [FN2] They thought the name Lollipops was very similar to the name Jellibeans and therefore called Dr. Feinman to inquire whether he was opening a new rink. Dr. Feinman replied that he was not. He later became concerned that others, especially Jellibeans' present and future customers, might also become confused by the similarity of the names and thus referred the matter to Jellibeans, Inc.'s counsel. Counsel concluded that Skating Clubs' use of the name Lollipops infringed upon the company's service mark, Jellibeans. Accordingly, on May 15, 1980, counsel requested that Skating Clubs stop using the name Lollipops. Skating Clubs replied that its use of the name did not infringe on Jellibeans, Inc.'s service mark and therefore refused to comply with the request.

FN2. It is not clear from the record whether these persons saw the first or second Lollipops sign.

On September 26, 1980, Jellibeans, Inc. brought a four-count complaint in the district court alleging that Skating Clubs' use of the name Lollipops: (1) constituted a false description or representation of Skating Clubs' services, in violation of the Lanham Act, 15 U.S.C. § 1125(a) (1976); [FN3] (2) infringed Jellibeans, Inc.'s service mark in violation of Georgia trademark law, 106 Ga.Code Ann. § 111; [FN4] (3) constituted a deceptive trade practice in violation of the Georgia Uniform Deceptive Trade Practices Act, 106 Ga.Code Ann. § 702; [FN5] and (4) constituted unfair competition under the common *837 law of Georgia. [FN6] Jellibeans, Inc. sought a declaratory

judgment that Skating Clubs' conduct was unlawful as alleged, and an injunction. It also sought attorney fees under 15 U.S.C. § 1117 (1976) and 106 Ga.Code Ann. 703(b). [FN7] Skating Clubs denied these allegations, and the case proceeded to trial.

FN3. Title 15 U.S.C. § 1125(a) provides:
Any person who shall affix, apply, or annex, or use in connection with any ... services, ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such ... services to enter into commerce, and any person who shall with knowledge of the falsity of such ... description or representation cause or procure the same to be ... used in commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation.

FN4. Title 106 Ga.Code Ann. § 111 provides:
[A]ny person who shall:
(a) Use, without the consent of the registrant any ... colorable imitation of a ... service mark registered under this Chapter in connection with the sale, offering for sale, or advertising of any ... services on or in connection with which such use is likely to cause confusion or mistake ... or
(b) ... colorably imitate any such ... service mark and apply such ... colorable imitation to ... signs ... or advertisements intended to be used upon or in connection with the sale or other distribution in this State of such ... services; shall be liable to a civil action by the owner of such registered ... service mark for any or all of the remedies provided in section 106-112 ....

FN5. Title 106 Ga.Code Ann. § 702(a) provides:
A person engages in a deceptive trade practice when, in the course of his business ... he:
(1) Passes off ... services as those of another;
(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of ... services;
(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

* * *

(5) Represents that ... services have sponsorship, approval ... that they do not have ...

* * *

(12) Engages in any other conduct which similarly

716 F.2d 833
222 U.S.P.Q. 10
**(Cite as: 716 F.2d 833)**

Page 5

creates a likelihood of confusion or of misunderstanding.

FN6. Georgia statutory law specifically preserves the common law claim of unfair competition. Title 106 Ga.Code Ann. § 113 provides: "Nothing herein shall adversely affect the rights or the enforcement of rights in ... service marks, acquired in good faith at any time at common law." Title 106 Ga.Code Ann. § 702(c) provides: "This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State."

FN7. Title 15 U.S.C. § 1117 provides in pertinent part: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." See *infra* text part IV. Title 106 Ga.Code Ann. § 703(b) provides in pertinent part: "The court (in its discretion) may award attorney's fees to the prevailing party if ... the party charged with a deceptive trade practice has wilfully engaged in the trade practice knowing it to be deceptive."

At trial, Jellibeans, Inc. called two patients and a business acquaintance of Dr. Feinman to testify. They stated that they saw Lollipops' sign, believed that Jellibeans, Inc. was opening a new rink because of the similarity of the names, and called Dr. Feinman to inquire whether he was opening a new rink. Jellibeans, Inc. also produced a survey that showed 96% of those interviewed had heard of Jellibeans and 48% of them believed that the Lollipops rink was related to it. Skating Clubs objected to the introduction of this survey in evidence, contending that it was so flawed that it lacked probative value. [FN8] The court admitted the survey, however, ruling that the deficiencies impacted the weight to be accorded the survey and not its admissibility, a ruling Skating Clubs challenges on appeal.

FN8. For more information on the survey and its alleged deficiencies, see *infra* note 24.

In its defense, Skating Clubs presented the testimony of owner, Albert Couey, and his nephew Jerry Taylor, who brokered the sale of the real estate where Lollipops was being built and who served as Skating Clubs' insurance agent. Both Couey and Taylor testified that Taylor suggested the name Lollipops. Both denied that they had considered the similarity of the names Lollipops and Jellibeans. They admitted, however, that they had been aware of Jellibeans. Couey testified that the original sign announcing the construction of Lollipops stood only two days before it was burned by a fire of unknown origin. He testified that Skating Clubs replaced it with an identical sign, except for the word "Disco" which was omitted from the name of the rink. Jellibeans, Inc. materially impeached this testimony, however, by introducing pictures of the two

signs that showed the substantial differences between the two, particularly with regard to the ownership of the rink. Finally, Couey testified that he promoted, and would in the future promote, the Lollipops rink only by circulating brochures to local schools and PTA's, giving luncheons and teas for community groups, and newspaper advertisements. [FN9] He stated that he had promoted his other rinks in this manner and intended to do the same with Lollipops.

FN9. At the time of trial, Skating Clubs had not begun advertising Lollipops extensively because the rink was still under construction.

On May 15, 1981, the district court rendered its decision. It dismissed the state law trademark infringement count because Jellibeans, Inc. had not registered its service mark in Georgia. [FN10] The court then held that Jellibeans, Inc.'s claims under the Lanham Act, the Georgia Uniform Deceptive Trade Practices Act, and the Georgia law of unfair competition turned on the same question--whether rollerskaters, the purchasers of Jellibeans' and Lollipops' services, were likely to confuse Lollipops *838 with Jellibeans. [FN11] The court found that rollerskaters were likely to confuse the two. It therefore declared Skating Clubs' use of the name Lollipops unlawful and permanently enjoined its further use. The court denied Jellibeans, Inc.'s request for attorney fees under 15 U.S.C. § 1117, however, holding that Skating Clubs did not possess the type of intent that warranted a fee award. It did not rule on Jellibeans, Inc.'s request for attorney fees under 106 Ga.Code Ann. § 703(b).

FN10. See *supra* note 4. Skating Clubs does not appeal this ruling. The court also noted that federal registration of the service mark is not a prerequisite for bringing a Lanham Act claim under 15 U.S.C. § 1125(a). See *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg.*, 510 F.2d 1004, 1010 (5th Cir.1975), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

FN11. To prevail on these claims, of course, Jellibeans, Inc. also had to allege and prove other elements. Skating Clubs does not appeal the district court's rulings on any of these other elements and therefore we do not discuss them.

Skating Clubs appeals. It contends that the district court was clearly erroneous in finding that rollerskaters are likely to confuse Lollipops with Jellibeans. [FN12] Jellibeans, Inc. cross-appealing, contends that the district court abused its discretion in denying it attorney fees under 15 U.S.C. § 1117. Jellibeans, Inc. does not question, however, the district court's failure to rule on its right to attorney fees under 106 Ga.Code Ann. § 703(b).

716 F.2d 833
222 U.S.P.Q. 10
(Cite as: 716 F.2d 833)

Page 6

FN12. Skating Clubs also argues that the association of a candy name with a roller rink is a marketing concept that is not protected by the Lanham Act. This argument does not merit textual discussion. That the name Jellibeans is a valid service mark, albeit unregistered, cannot be disputed. That the district court did no more than enjoin Skating Clubs' continued use of a name confusingly similar to that mark also cannot be disputed. Thus, in issuing the injunction, the district court merely protected a valid service mark and in no other way affected Skating Clubs' marketing of its rink.

II.

[1] We note subject matter jurisdiction in this case. Jurisdiction of Jellibeans, Inc.'s Lanham Act claim is conferred by the Lanham Act itself, 15 U.S.C. § 1121. [FN13] This statutory grant of jurisdiction, however, may not exceed the constitutional limitations on the power of Congress to regulate service marks; rather, it reaches and is coincident with the constitutional boundary embodied in the commerce clause. The Lanham Act proscribes the false description or representation of services that "enter into commerce." 15 U.S.C. § 1125(a). The use of "[t]he word 'commerce' [in the Act] means all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. This grant of jurisdiction has been construed to be "at least as broad as the definition of commerce employed in any other federal statute." *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1356 n. 3 (11th Cir.1983); *Bulova Watch Co. v. Steele*, 194 F.2d 567, 570 n. 11 (5th Cir.1952), *aff'd*, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952). Nonetheless, purely intrastate disputes do not fall within the commerce clause and therefore are not subject to the Lanham Act's regulation. *Iding v. Anaston*, 266 F.Supp. 1015, 1019 (N.D.Ill.1967).

FN13. Title 15 U.S.C. § 1121 provides:
The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States shall have appellate jurisdiction, of all actions arising under [the Lanham Act], without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties.
Jurisdiction of Jellibeans' claim existed in the district court for the unfair competition count under 28 U.S.C. § 1338(b), and for the two Georgia statutory counts under the doctrine of pendent jurisdiction as diversity is lacking (both parties being Georgia corporations).

[2] We are, accordingly, required to determine in this case

whether: (1) the district court's finding of fact as to the amount of interstate contact can be accepted as not clearly erroneous; and (2) whether as a matter of law the interstate contacts are sufficient to satisfy the jurisdictional requirements of the Lanham Act, 15 U.S.C. §§ 1121, 1125. The district court found that Jellibeans drew patrons from an area that was within 60 miles of Atlanta, and included parts of Alabama, as well as receiving some out-of-state convention business. In addition, the trial court found that Jellibeans received some free publicity in national magazines. None of the evidence *839 on which these conclusions were based was rebutted at trial. Therefore, we accept the district court's findings as not clearly erroneous. These facts establish that Jellibeans used its mark in interstate commerce sufficiently to invoke the court's jurisdiction. There was no requirement that Skating Clubs' business be shown to be interstate as well. " '[I]n commerce' ... does not mean that an infringer is immune from prosecution under the statute so long as he keeps his infringement entirely within the confines of a state." *Coca-Cola Co. v. Stewart*, 621 F.2d 287, 290 (8th Cir.1980); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 488 (5th Cir.1971).

III.
A.

The district court held that the Georgia deceptive trade practices and unfair competition counts involved the same dispositive question as the federal Lanham Act count. This is a question of state law that the parties do not challenge on appeal. Therefore, we treat this holding as correct [FN14] and merely determine whether the district court properly decided the Lanham Act count. If we determine that the district court decided the Lanham Act count properly, we will also affirm its decision on the Georgia deceptive trade practices and unfair competition counts.

FN14. We note parenthetically that *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), appears to support the district court's ruling.

B.

[3] The law of trademark and service mark infringement is part of "the rather swampy area of unfair competition." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966 (11th Cir.1983) (quoting *B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1258 (5th Cir.1971) (Goldberg, J.)). A service mark is a form of property and has property rights associated with it. The definition of the property right, where it begins and ends, is the correlative of the question of whether a given act infringes on the property right. Determining whether an infringement has taken place is but

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the obverse of determining whether the service mark owner's property right extends into a given area. The property right entailed in a service mark has an amorphous, multi-dimensional character that is subject to change with circumstances. The factual setting surrounding the mark, including how it is created, where it is located, and how it is putatively infringed is crucial to determining whether such infringement has taken place. There is no simple, or for that matter complicated, test by which the question of infringement is resolved.

The test for a service mark infringement under 15 U.S.C. § 1125 has often been expressed as whether or not the offending mark is "likely to cause confusion." [FN15] *Harland*, 711 F.2d at 961; *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1013 (5th Cir.1975), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Thus the dispositive issue in the court below was whether the rollerskaters--the purchasers of Jellibeans' and Lollipops' services--are likely to confuse Lollipops' services as being rendered, authorized, sponsored, or endorsed by Jellibeans.

FN15. There is a superficial distinction between this "likely to confuse" test and the test in registered trademark cases under 15 U.S.C. § 1114 in which the offending mark must be "likely to cause confusion, or to cause mistake, or to deceive." As applied, however, the case law does not reveal a meaningful distinction between these tests. *See, e.g., Amstar*, 615 F.2d at 258-59.

[4] The standard of review applicable to the district court's finding of a likelihood of confusion is dependent upon whether this is a question of law, or of fact, or a hybrid embodying both. This circuit has held that it is a question of fact, *Harland*, 711 F.2d at 972-973, and can be set aside only if clearly *840 erroneous. *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1163 (11th Cir.1982); *Amstar*, 615 F.2d at 257-58; *see also* Fed.R.Civ.P. 52(a). [FN16]

FN16. There is some older authority within this circuit for the contrary proposition that "likelihood of confusion" is a mixed law and fact question. *See, e.g., B.H. Bunn*, 451 F.2d at 1261. This proposition is adhered to by a number of the circuit courts; *see, e.g., Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir.1963) *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963) (ultimate issue of likelihood of confusion is a question of law); *Sears, Roebuck & Co. v. Johnson*, 219 F.2d 590, 591 (3rd Cir 1955); *Millworth Converting Corp. v. Slifka*, 276 F.2d 443, 445-46 (2nd Cir.1960); *McCormick & Co. v. B. Manischewitz Co.*, 206 F.2d 744 (6th Cir.1953); *California Fruit Growers Exch. v. Sunkist Baking Co.*, 166 F.2d 971, 973 (7th Cir 1947). The recent cases in this circuit are in accord that this is a question of fact. We adopt this view.

[5] The "likely to confuse" test is not as unidimensional as its appellation would imply. While there are no subparts to this test in the sense of necessary and sufficient conditions there are a number of factors which may bear on the question of likelihood of confusion. In *Safeway*, this court enunciated a number of such factors: (1) How distinctive is the plaintiff's mark? Do consumers strongly identify plaintiff's service mark with his services? This is important because the more distinctive the plaintiff's mark, the stronger it is considered, and the more protection it is accorded from confusingly similar marks; (2) How similar are the designs of the plaintiff's and defendant's marks? Obviously, the greater the similarity, the greater the likelihood that purchasers will confuse the plaintiff's and defendant's services. This principle also applies to subsidiary facts 3, 4, and 5; (3) How similar are the services the plaintiff's and defendant's marks represent; (4) How similar are the plaintiff's and defendant's retail outlets and their customers; (5) How similar is the advertising of plaintiff and defendant and their use; (6) Whether the defendant intended that purchasers would confuse his service mark with the plaintiff's mark; and (7) Whether people were actually confused by the similarity of the marks. *See Safeway*, 675 F.2d at 1164 (and cases cited therein). The court evaluates and weighs these subsidiary findings to determine, as a matter of fact, whether consumers are likely to confuse the defendant's services with the plaintiff's services. [FN17]

FN17. We note that the district court should not determine whether a likelihood of confusion exists by merely computing whether a majority of the subsidiary facts indicates that such a likelihood exists. Rather, the district court must evaluate the weight to be accorded the individual subsidiary facts and then make its ultimate fact decision. *Cf. Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45-46 (5th Cir.1975) ("While proof of actual confusion is not required to sustain a claim of infringement, the view of this court is that it is the best evidence of likelihood of confusion.").

[6] Since it is undisputed that the district court identified this analysis as the correct standard for deciding Jellibeans' Lanham Act claim, our function on review is merely to determine whether the district court properly applied this

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

d 833
.S.P.Q. 10
as: 716 F.2d 833)

ual analysis. More specifically, we must determine ether the district court was clearly erroneous in finding subsidiary facts listed above, and in finding the ultimate ct--whether consumers are likely to confuse Lollipops ith Jellibeans. *See id.* at 1164 n. 5; *see Exxon Corp. v. exas Motor Exchange,* 628 F.2d 500, 506 (5th Cir.1980); *rmstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 501-02 (5th Cir.1979), *cert. denied,* 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979). We can reverse the district court's decision only if after reviewing all the evidence, we has been committed," *Safeway,* 675 at 1164, *quoting United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948), by the district court in finding the ultimate fact issue. We can reach this decision in two ways. First, we can determine that the court clearly erred in finding one or more of the subsidiary facts, and that this mistake caused it clearly to err in its decision on the ultimate fact issue. In addition, we can determine that the district court did not *841 clearly err in its findings on any of the subsidiary facts, but nonetheless clearly erred in its decision on the ultimate fact issue. We now examine the evidence to determine whether the district court clearly erred in either of these ways.

[7] With regard to how distinctive a mark Jellibeans is, the court noted that Jellibeans is an arbitrary mark, [FN18] the type of service mark that is generally considered to be inherently distinctive. [FN19] *See Sun Banks v. Sun Federal Savings & Loan,* 651 F.2d 311, 315 (5th Cir.1981). The court also noted that Jellibeans is the only roller rink in the United States using that mark or a similar candy name. [FN20] Finally, the court found that because of Jellibeans, Inc.'s extensive advertising, the service mark Jellibeans was readily identifiable by the relevant market of young skaters in the Atlanta area. Based on these facts, the district court found the Jellibeans was a strong and distinctive service mark "entitled to broad protection in this geographic market as applied to another roller skating rink."

FN18. Trademarks and service marks can be categorized as: (1) descriptive or generic, i.e., the mark describes the product or service itself; (2) suggestive, i.e., the mark describes or suggests a characteristic of the product or service; (3) arbitrary, i.e., the mark is a word in common use, but applied to a product or service unrelated to its meaning, so that the word neither describes nor suggests the product or service; and (4) coined, i.e., the mark is a word devised or invented for the purpose of identifying the product or service. *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 611 n. 2 (7th Cir.1965).

FN19. The great weight given to the category into which a mark falls (see *supra* note 18) and the relationship between the strength of a mark and its categorization tends to undercut the assertion that the standard for infringement is "likelihood of confusion." If a mark is generic or descriptive it is considered inherently weak, on the other hand, if it is arbitrary or coined it is considered inherently strong. Thus by this reasoning, the first person to use the name "Roller Rink" has a less distinctive mark than the first person to name a roller rink "Jellibeans." This assertion defies reason. A mark that is not only unique but conveys important information about the service offered is clearly more valuable than one that does not *ceteris paribus.* Thus, the unwillingness of the law to protect the use of generic terms in service marks (see, e.g., *Harland, supra,* 711 F.2d at 975 (anyone may use a generic word)) must have its explanation elsewhere.

The obvious reason for giving less protection to generic terms in a service mark than to arbitrary terms is that to do otherwise would place an unreasonable burden on third parties. To exclude other providers of a good or service from the right to use generic terms once they have been appropriated by a provider of the good, would quickly result in a situation in which businesses were struggling to convey information about their business in their mark but without using any words that described their business, because those words would already be protected in the service mark of another firm. In such a world, there would be almost no possibility of confusing one firm's service mark with another. Unfortunately the public would also be receiving very little information about the nature of a business' service from its mark.

Therefore it seems that the true legal standard is not simply the "likelihood of confusion" but rather the "likelihood of unreasonable confusion." "Reasonable" confusion is generated by the legitimate efforts of a business to convey vital information to the public about the basic nature of one's business, and to invite comparison with one's competitors. Thus implicit in the legal standard is a balancing between the confusion created between the putatively offending service mark and the burden placed on its owner to find a mark which can convey information to the public about the nature of his service.

FN20. The fact that other local businesses used the same mark to identify unrelated products, the district court properly held, did not dilute the

716 F.2d 833
222 U.S.P.Q. 10
**(Cite as: 716 F.2d 833)**

strength of Jellibeans, Inc.'s mark. *See Safeway.* 675 F.2d at 1165.

[8] We have no difficulty upholding this finding. Jellibeans clearly is an arbitrary mark as applied to roller rinks. Survey evidence introduced by Jellibeans, Inc. showed that 96% of those interviewed had heard of Jellibeans, indicating strong recognition of the mark. Finally, there is ample evidence in the record that Jellibeans is the only roller rink in the United States using a candy name. In light of this evidence, we hold that the district court's finding that Jellibeans is a very distinctive mark entitled to broad protection is not clearly erroneous.

[9] The second subsidiary fact that the district court examined is the similarity between *842 the design of Jellibeans, Inc.'s service mark, and the design of Skating Clubs' service mark. This fact, the court held, is determined by considering the overall impression created by the marks. *See Amstar,* 615 F.2d at 260-61; *Armstrong Cork Co.,* 597 F.2d at 502. The district court found a visual and aural similarity to exist between these two marks. The court found Lollipops visually similar to Jellibeans because Skating Clubs spelled it with an "i" rather than a "y"--an equally acceptable spelling--and used the plural form. In finding an aural similarity the court noted that each name has three syllables, with an "l" sound dividing the first and second syllables, and an "c" sound dividing the second and third syllables, and that each name ends in a plural "s." The court found this aural similarity most important because both rinks advertised primarily either by word of mouth or radio. Finally, the court found that the names create a similar general impression because each is a similar sounding candy name used to signify a roller rink. Based on these considerations, the district court found that Lollipops and Jellibeans possess similar designs.

After examining the names visually and aurally, we are not left with the definite and firm conviction that the district court made a mistake in finding them similar. Moreover, we cannot say that the district court erred in finding that the two names evoke the same general impression. [FN21] Therefore, we uphold the district court's finding that the two marks are similar in design.

FN21. Skating Clubs cites several cases, *Hancock v. American Steel & Wire Co.,* 203 F.2d 737, 739, 40 Cust. & Pat.App. 931 (1953); *American Technical Industries, Inc. v. General Foam Plastics Corp.,* 200 U.S.P.Q. 244, 246-47 (S.D.N.Y.1978); *General Foods Corp. v. Borden, Inc.,* 191 U.S.P.Q. 674 (N.D.Ill.1976), to support its argument that the district court was clearly erroneous in finding the marks create the same general impression. The first two of these cases, *Hancock* and *American*

*Technical,* involved marks that were synonyms, while *General Foods* involved marks spelled almost identically. Skating Clubs argues from these cases that the district court must find the marks synonymous or almost identically spelled before it can find a similar general impression. We disagree. Neither these cases, nor any other examined by this court state that, as a matter of law, a court can find that two marks convey the same general impression only if they are synonyms or spelled similarly. Rather, the cases state merely that this matter is a question of fact to be determined in each individual case, and reviewed under the clearly erroneous standard.

[10] We also uphold the district court's findings on the third and fourth subsidiary facts. The district court was not clearly erroneous in finding that both Jellibeans and Lollipops are skating rinks with a clientele primarily composed of teenagers and young adults. Even if, as Skating Clubs alleges, the rinks differ physically and attract patrons of different ages, we find sufficient overlap in their services and clientele to uphold the district court's findings. *See Safeway Stores,* 675 F.2d at 1166.

[11] The fifth fact the district court examined is the similarity of the advertising used by Jellibeans, Inc. and Skating Clubs. The court found that Jellibeans, Inc. primarily uses radio advertising, supplemented with school and charitable promotions. The court found that Skating Clubs uses, or will use, similar forms of advertising. More specifically, it accepted Skating Clubs' claim that it advertised, and would advertise, [FN22] Lollipops by "neighborhood publications, personal contacts with PTA's and church groups, and fund-raising promotional activities." It rejected Skating Clubs' claim that it would eschew radio advertising, noting that "advertising habits can change at will. Lollipops will be defendant's largest and most elaborate roller skating rink and it is not unreasonable to imagine that defendant may employ more extensive advertising for it than it does for its other rinks...." Even if Skating Clubs would not use radio advertising, however, the court determined the Skating Clubs' use of school and charitable promotions was sufficiently similar to Jellibeans, Inc.'s local promotions to find a *843 similarity in the advertising used by the parties.

FN22. See *supra* note 10.

We cannot say that the district court was clearly erroneous in making this finding. The evidence of Jellibeans, Inc.'s advertising practices, which include school and charitable promotions, is uncontradicted. Skating Clubs' use, and intent to use these forms of advertising is also uncontradicted. The only evidence that Lollipops' advertising practices would

differ from Jellibeans' is Albert Couey's testimony that Lollipops would not use radio advertising, which the district court rejected. Determining the credibility of this testimony is a task solely within the province of the trial court, which had the opportunity to hear the witness and view his demeanor while testifying. We do not think the trial court's finding on the credibility or lack thereof to be accorded this testimony is clearly erroneous. *See United States v. Reddoch,* 467 F.2d 897, 898 (5th Cir.1972). Given Couey's other testimony about the content of the two Lollipops signs, which Jellibeans, Inc. materially impeached, we are not left with the definite and firm conviction that the trial court erred in disbelieving Mr. Couey's testimony about Lollipops' advertising. Given this conclusion, we also cannot find that the trial court erred in finding that the parties advertise similarly.

[12] The district court next examined Skating Clubs' intent, and found that Skating Clubs selected its service mark, Lollipops, with the intent of confusing consumers with Jellibeans, Inc.'s successful mark, Jellibeans. The court based this conclusion solely on circumstantial evidence, rejecting Couey's and Taylor's denials that they had selected the name Lollipops with no intent of benefitting from its similarity to Jellibeans. Intent, as the district court noted, must often be proved by circumstantial evidence. Certainly the record in this case--which includes testimony that Skating Clubs' other rinks were called "skating clubs" and named after their geographic location, and that both Couey and Taylor knew of Jellibeans and its success when naming Lollipops--provides sufficient evidence to support a finding that Skating Clubs intended to confuse rollerskaters when it adopted the name Lollipops. Moreover, the court also had more than adequate evidence to disbelieve Couey's and Taylor's denials of improper intent. As stated *supra,* Jellibeans, Inc. materially impeached Couey's testimony by showing the substantial differences in the Lollipops' signs that Couey described as identical. Jellibeans, Inc. also impeached Taylor's testimony by showing his business and familial relationship with Couey. Given this evidence, we cannot hold that the district court clearly erred in finding that Skating Clubs intended to capitalize on Jellibeans' reputation when it named its new rink Lollipops. [FN23]

> FN23. It is possible that Couey's intent was to invite comparison between his skating rink and Jellibeans, or to convey the same imagery and symbolic message in his service mark. Neither intent is to be condemned and if actualized would not therefore be illegal. Both of these efforts can be realized by choosing a service mark close to "Jellibeans." In doing so, however, even if Couey's intent was innocent and he realized his purpose he ran the risk of creating a likelihood of unreasonable confusion in the minds of the public which would

have inured to his benefit and to the detriment of "Jellibeans" and the public. Thus, while intent is of some probative value, particularly if a bad intent is shown, it is neither a necessary nor sufficient condition for determining the ultimate legal fact of the "likelihood of confusion."

[13] The final fact the district court examined is whether people were actually confused by the similarity of the marks. The court found that such confusion between the marks did exist. It based this finding on two types of evidence: first, the testimony of two patients and one business acquaintance of Dr. Feinman, one of Jellibeans, Inc.'s major stockholders, that they saw the Lollipops sign, thought that Feinman's corporation was opening a new rink, and inquired of or congratulated him on the new rink; second, a survey introduced by Jellibeans, Inc. that showed 48% of those interviewed believed that Lollipops was connected to Jellibeans. The court placed minimal weight on the survey evidence, finding it "seriously flawed," but found that it, taken together with the witnesses' *844 testimony and in the absence of any countervailing proof, was sufficient to show actual confusion. Skating Clubs contends that this finding is clearly erroneous, arguing that the testimony of only three witnesses is insufficient to prove actual confusion and that the survey is so flawed that it is inadmissible. We cannot agree.

Skating Clubs cites *Sun Banks v. Sun Federal Savings & Loan,* 651 F.2d 311 (5th Cir.1981), and *Amstar,* 615 F.2d 252, to support its argument that three reports of actual confusion are insufficient to support a finding of actual confusion. In *Sun Banks,* the court held that nineteen reports of actual confusion over a three-year period were insufficient to establish a finding of actual confusion. Similarly, in *Amstar* the court held that three instances over a fifteen-year period were insufficient proof of actual confusion. Skating Clubs argues that if the evidence offered in those cases was insufficient, the evidence in this case is also insufficient. We disagree.

Skating Clubs' argument presumes that the reviewing court should review the evidence on some sort of absolute scale, rather than examining the evidence in light of the circumstances of the particular case. It is this latter mode of analysis, however, that *Sun Banks* and *Amstar* prescribe. In both of those cases, the court specifically qualified its insufficiency finding to the facts of the case. In *Sun Banks,* for instance, the court stated that the nineteen incidents were insignificant given the extent of the parties' advertising and the number of transactions they handled during the three-year period. In *Amstar,* the court likewise found that the three instances of actual confusion over fifteen years were insufficient given the parties' extensive advertising. Thus, *Sun Banks* and *Amstar* emphasized that in

determining the sufficiency of the evidence to prove actual confusion, a court should examine the totality of the circumstances to determine how likely instances of actual confusion would be reported. This examination may include consideration of the time period in question and how extensively the product is advertised or made known to the public, see *Sun Banks*, 651 F.2d 311; *Amstar*, 615 F.2d 252, as well as the type of confusion that exists and who suffers the confusion. See *Armstrong Cork Co.*, 597 F.2d 496; *Holiday Inns, Inc. v. Holiday Out*, 481 F.2d 445 (5th Cir.1973).

Considering the testimony of the three witnesses in this manner, we have no difficulty according it probative value. When the witnesses saw the Lollipops sign, it had been up only a short time and was Skating Clubs' only advertisement. Therefore, few reports of actual confusion could be expected. *Cf.* 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 80.6 (3rd ed. 1969) ("when equitable relief [from the defendant's use of a confusingly similar service mark] is sought with due promptitude, the use of defendant's mark will have been of such duration that, even if actual confusion has occurred, proof thereof is virtually unattainable."). Moreover, the reports of confusion that do exist appear genuine, given that the three witnesses independently and on their own initiative contacted Dr. Feinman to inquire about the new rink. Thus, this testimony alone might be sufficient to support a finding of actual confusion. We need not decide this question, though, because the record also contains survey evidence on this issue.

[14] Skating Clubs argues, however, that the district court should not have admitted this survey evidence because of its alleged technical deficiencies: (1) poor sampling; (2) inexperienced interviewers; (3) poorly designed questions; and (4) other errors in execution. These alleged technical deficiencies affect the survey's weight, however, and not its admissibility. See *Exxon Corp. v. Texas Motor Exchange*, 628 F.2d 500, 507 (5th Cir.1980); *Amstar*, 615 F.2d at 264; *Holiday Inns, Inc.*, 481 F.2d at 447 ("the district court properly admitted the survey evidence in this case, leaving the format of the questions and the manner of conducting the survey for consideration as to the weight of the evidence."); *see also C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1055 n. 10 (5th Cir.1981) (court excluded survey evidence because **\*845** irrelevant, but noted that "[i]f the inadequacies in the survey had been technical, such as the format of the question or the manner in which it was the survey [sic] was taken, those shortcomings would have borne on the weight of the evidence, not its admissibility.") Therefore, the district court properly admitted the survey evidence, however flawed.

[15] The question before us then is one of weight--whether

this survey evidence combined with the testimony of the three witnesses sufficiently supports a finding of actual confusion. In answering this question, we note that the quantum of evidence needed to show actual confusion is relatively small. *Safeway Stores*, 675 F.2d at 1167; *Roto Rooter Corp. v. O'Neal*, 513 F.2d 44, 47 (5th Cir.1975); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971). We believe that the evidence in this case satisfies this minimal requirement. As stated *supra*, the testimony of the witnesses is probative of actual confusion. Notwithstanding its technical deficiencies, the survey evidence is also probative. [FN24] Whether either type of evidence **\*846** would be sufficient alone to support a finding of actual confusion, we need not decide. It is enough that when this evidence is combined, and absent any countervailing evidence, we cannot say that we are left with the firm and definite conviction that the district court clearly erred in finding that actual confusion exists between the names.

> FN24. Two hundred fourteen persons, aged approximately 12 to 24 and who had rollerskated in the last year, were interviewed at six shopping centers located near Jellibeans and Lollipops. They were told that a new roller rink named Lollipops would be opening soon and then asked whether they thought the Lollipops rink may be connected with any other rink. Forty-eight percent of those interviewed believed that Lollipops was connected to Jellibeans because of the similarity of the names. We find this level of responses probative of actual confusion between the names.
> The technical deficiencies alleged by Skating Clubs merely reduced the weight of this evidence. For instance, the fact that the survey interviews occurred only at six shopping centers and involved only roller skaters aged 12 to 24 may not provide a truly representative survey sample. It may be that the rollerskating universe is not limited to this age group and does not frequent these shopping centers. Even if this is so, the survey does provide some indication of the substantial confusion experienced by this segment of the population--which Jellibeans, Inc., claims primarily composes its clientele and which Skating Clubs has not contradicted. Therefore, notwithstanding this alleged deficiency, the survey is still probative.
> Similarly, the fact that the three interviewers may have been inexperienced does not wholly destroy the probativeness of the survey. These interviewers were college seniors majoring in marketing with top marks in their survey course. Moreover, they were given 90 minutes of instruction on how to conduct the survey. Finally, the interview itself merely required the interviewer to read the

questionnaire to the interviewee and properly record his answer. This task does not appear beyond the competence of the "inexperienced" interviewers. Skating Clubs also argues that because four of the 214 questionnaires unexplainedly have an unknown person's initials on them, there must have been a fourth untrained interviewer. Even if this is true, it does not trouble us. The remaining 210 properly recorded questionnaires still remain probative. The allegation that the survey questions may have been poorly designed also does not totally destroy the probativeness of the survey. Although the survey could have included pictures of Lollipops' and Jellibeans' logos, we believe that a comparison of the names alone deserves some weight. Skating Clubs disagrees, arguing that "word association" surveys are entitled to no weight. Skating Clubs cites *Amstar*, 615 F.2d 252, and *Holiday Inns, Inc.*, 481 F.2d 445, to support this argument. Skating Clubs, however, reads these cases too broadly.

In *Holiday Inns, Inc.*, the Holiday Inns hotel company claimed that the name Holiday Out, when used by a campground company, was too easily confused with its service mark. To prove actual confusion, Holiday Inns introduced a survey that recorded people's responses when shown a placard bearing the words "Holiday Out" and asked what other company it brought to mind. The *Holiday Inns, Inc.* court held that this survey merited little weight "because the format failed to account for the number of responses attributable to the word 'Holiday' as distinguished from the service mark Holiday Out." 481 F.2d at 448. Thus, the *Holiday Inns, Inc.* court did not hold that all word association surveys are without weight. Rather, it held that if a service mark contains a word that independently may be associated with other names, the survey should distinguish between the confusion caused by the word, and the confusion caused by the mark that contains the word. If this distinction is not made, the survey is accorded little weight.

In *Amstar*, that is exactly what happened. There the Amstar Corporation claimed that the "Domino's Pizza" was too easily confused with its service mark, "Domino Sugar." In its survey, Amstar Corporation showed persons the Domino's Pizza mark and asked if it brought anything else to mind; it did not try to account for the number of responses attributable to the word "Domino's." For that reason, inter alia, the *Amstar* court gave little weight to the survey.

Thus, the mere fact that a survey involves a word association test does not mean that it deserves little

weight. As long as no words in the mark blur the results of the test, the survey merits some weight. Since the marks involved in this case contain no such words, the survey is entitled to some weight.

Certain alleged errors in the execution of the survey also do not destroy the survey's probativeness. Skating Clubs alleges that the expert who conducted the survey, Doctor Edward W. Cundiff, did not (1) pretest the questionnaire to determine if the questions were confusing; (2) validate the survey by calling several interviewees and verifying their responses; and (3) initially compute the results correctly. However, Dr. Cundiff stated that he pretested the questionnaire by asking two teaching colleagues to fill them out; he felt further pretesting was unnecessary given the simplicity of the questionnaire. Dr. Cundiff also stated that he validated the survey by: (1) secretly observing the interviewers while they conducted some of the interviews; (2) asking the interviewers after the interviews whether they followed his instructions; and (3) randomly phoning several interviewees to confirm that they were interviewed; he did not attempt to confirm their answers because people often rethink their answers after the interview and offer different ones. Lastly, Dr. Cundiff stated that he recomputed the survey results accurately prior to trial. These uncontradicted statements by Dr. Cundiff show that certain safeguards existed to ensure the proper execution of the survey. Dr. Cundiff might have used better safeguards, as Skating Clubs alleges, but the ones he used are nevertheless sufficient to allow one to accord some weight to the survey results.

Finally, we emphasize that we do not decide today precisely how much weight should be given the survey results. We only uphold the district court's decision that the survey's technical deficiencies do not strip it of all probative value.

[16] Having found the seven subsidiary findings not clearly erroneous, we now must determine whether the district court's evaluation of these findings and its decision on the ultimate fact question--whether roller skaters are likely to confuse Lollipops with Jellibeans--is clearly erroneous. We hold that it is not. Jellibeans, Inc.'s service mark is distinctive and is entitled to broad protection; there is a great similarity between Lollipops' and Jellibeans' designs, services, retail outlets and purchasers, and advertising; and Skating Clubs intended to use these similarities to confuse others, which it did. Weighing these factors together, we conclude that there is a strong likelihood that roller skaters will confuse Lollipops with Jellibeans. We therefore affirm the district court's decision that Skating Clubs violated

716 F.2d 833
222 U.S.P.Q. 10
**(Cite as: 716 F.2d 833)**

Page 13

section 1125 of the Lanham Act. Accordingly, we also affirm the district court's decision that Skating Clubs violated the Georgia Uniform Deceptive Trade Practices Act and engaged in unfair competition under Georgia common law.

### IV.

[17] Jellibeans, Inc. cross appeals the district court's denial of its claim for attorney fees. Having found that Skating Clubs intentionally adopted a mark confusingly similar to its own mark, Jellibeans, Inc. argues that the district court should have awarded it counsel fees. We disagree.

Under the Lanham Act, a district court may award attorney fees to the prevailing party "in exceptional cases." 15 U.S.C. § 1117 (1976). "Exceptional cases" are those that involve "acts which the courts have characterized as malicious, fraudulent, deliberate, and willful." S.Rep. No. 93-1400, 93rd Cong. 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin.News 7132, 7136. See *Safeway Stores*, 675 F.2d at 1169; *Vermont Castings, Inc. v. Evans Products Co.*, No. 79-265 (D.Vt. Dec. 23, 1981); *Clairol, Inc. v. Save-Way Industries, Inc.*, 210 U.S.P.Q. 459 (S.D.Fla.1980); *O'Brien International, Inc. v. Mitch*, 209 U.S.P.Q. 212 (N.D.Cal.1980); *Salton, Inc. v. Cornwall Corp.*, 477 F.Supp. 975, 992 (D.N.J.1979); *RCA Records v. Kory Records, Inc.*, 197 U.S.P.Q. 908 (E.D.N.Y.1978). Even if the court determines the case to be exceptional, the decision to award attorney fees is still within the court's discretion. See ***847** *Safeway Stores*, 675 F.2d at 1169; *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 608 (3d Cir.1978). Thus, we can reverse the district court's denial of attorney fees only by holding that this is an exceptional case and that the district court abused its discretion in not awarding fees. We do not so hold.

The district court denied Jellibeans, Inc. attorney fees because it found that Skating Clubs' "intent amounted more to imitation of a successful mark in order to engender similar good will than to actual conversion of the mark." This statement is a finding by the district court that Skating Clubs' infringement of Jellibeans, Inc.'s mark was not malicious, fraudulent, deliberate, or willful, but rather an honest attempt lawfully to copy a successful mark, which unfortunately for Skating Clubs proved unlawful. We cannot say that the district court erred in this finding. Moreover, even if we could hold that the court erred in this finding, we certainly could not hold that the district court abused its discretion in denying the fees in this case. We, therefore, affirm the district court's denial of attorney fees.

AFFIRMED.

716 F.2d 833, 222 U.S.P.Q. 10

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

## 33

**(To be scanned in place of tab)**

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
**(Cite as: 549 F.2d 368)**

Page 1

United States Court of Appeals,
Fifth Circuit.

KENTUCKY FRIED CHICKEN CORPORATION,
Plaintiff-Appellee,
v.
DIVERSIFIED PACKAGING CORPORATION et al.,
Defendants-Appellants.

**No. 74-3060.**

March 25, 1977.

Fast-food franchisor brought suit against packaging corporation and container corporation for an injunction restraining trademark infringement and unfair competition and defendants filed counterclaims under the Sherman Act, asserting that the franchise agreements constituted an illegal tying arrangement. The United States District Court for the Southern District of Florida, Charles B. Fulton, Chief Judge, 376 F.Supp. 1136, rendered judgment for the franchisor and defendants appealed. The Court of Appeals, Goldberg, Circuit Judge, held that the franchise agreements, which provided that the franchisees would purchase certain supplies only from sources approved by the franchisor, did not constitute a tying arrangement; that such approved source agreements were not per se violations of the Sherman Act; that the agreements did not contravene the rule of reason; and that the district court's findings that the defendants engaged in unfair competition and trademark infringement were not clearly erroneous.

Affirmed.

West Headnotes

**[1] Monopolies €══12(1.10)**
265k12(1.10) Most Cited Cases

Arrangement runs afoul of Sherman Act only if its restraint on trade is unreasonable. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[2] Monopolies €══17.5(7)**
265k17.5(7) Most Cited Cases
(Formerly 265k17(2.5))

Tying arrangements are illegal per se. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[3] Monopolies €══17.5(2)**
265k17.5(2) Most Cited Cases
(Formerly 265k17(2.5))

Tying arrangement is generally defined as arrangement under which seller agrees to sell one product only on condition that buyer also purchase second product. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[4] Monopolies €══17.5(2)**
265k17.5(2) Most Cited Cases
(Formerly 265k17(2.5))

Principal evils of tying arrangements are that they may foreclose tying party's competitors from segment of tied product market, and they may deprive tie's victims of advantages of shopping around. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[5] Monopolies €══17.5(7)**
265k17.5(7) Most Cited Cases
(Formerly 265k17(2.5))

Tying arrangement falls within category of per se tying violations only if seller has sufficient economic power with respect to tying product appreciably to restrain free competition in market for tied product and only if not insubstantial amount of interstate commerce is affected. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[6] Monopolies €══17.5(8)**
265k17.5(8) Most Cited Cases
(Formerly 265k17(2.5))

When franchisor conditions sale of franchise on buyer's agreement to buy additional products from franchisor, law of tying comes into play; and in order to establish per se violation of antitrust law, tying claimant need only demonstrate requisite economic power and not insubstantial effect on commerce. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[7] Monopolies €══17.5(8)**
265k17.5(8) Most Cited Cases
(Formerly 265k17(2.5))

Franchisor who requires franchisees to use trademarked supplies does not escape impact of tying principles to any extent, but franchisor's right to prevent others from selling supplies bearing its trademarks must yield to antitrust laws' command to open tied market to competitors. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[8] Monopolies €══28(1.5)**
265k28(1.5) Most Cited Cases

**[8] Monopolies €══28(7.1)**
265k28(7.1) Most Cited Cases

On antitrust complaint that franchise agreement constitutes

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

illegal tying arrangement, franchisor is free to demonstrate that tie constitutes necessary device for controlling quality of end product sold to consuming public, but as part of that defense, franchisor must establish that tie constitutes method of maintaining quality that imposes least burden on commerce and, if there are less burdensome alternatives, franchisor is obligated to employ them rather than the tie. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[9] Monopolies ⬥17.5(8)**
265k17.5(8) Most Cited Cases
(Formerly 265k17(2.5))
Franchise agreement whereby franchisees agreed to purchase supplies from franchisor-approved sources, nine of ten of which had no connection with franchisor, and from which franchisor received no commissions and which provided that franchisees could recommend additional suppliers for approval, which could not be unreasonably withheld by franchisor, did not constitute tying arrangement, was not illegal per se, and did not violate rule of reason. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[10] Monopolies ⬥17.5(8)**
265k17.5(8) Most Cited Cases
(Formerly 265k17(2.5))

Tying need not be reduced to writing to come within per se proscription of antitrust law, but tied claimant establishes tie when it proves that franchisor makes practice of coercing franchisees into purchasing supplies or other products from franchisor. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[11] Monopolies ⬥28(7.1)**
265k28(7.1) Most Cited Cases

Demonstrating existence of tying arrangement is part of claimant's case-in- chief. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[12] Federal Courts ⬥850.1**
170Bk850.1 Most Cited Cases
(Formerly 170Bk850)

District court's findings of fact are reviewed only to determine whether they are clearly erroneous. Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.

**[13] Monopolies ⬥17.5(2)**
265k17.5(2) Most Cited Cases
(Formerly 265k17(2.5))

When victim of alleged tying arrangement is not required to buy single unit of tied product from tying party or from any source in which tying party has interest or on whose sales tying party earns commission, arrangement does not constitute tie. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[14] Monopolies ⬥17.5(8)**
265k17.5(8) Most Cited Cases
(Formerly 265k17(2.5))

Franchise agreements whereby franchisees agreed to purchase supplies only from sources approved by franchisor are not per se violations of Sherman Act. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[15] Monopolies ⬥28(7.1)**
265k28(7.1) Most Cited Cases

Antitrust claimant who unsuccessfully seeks to establish per se violation may nonetheless prevail by showing that its adversary's conduct unreasonably restrains competition and burden of proving unreasonable effects rests with antitrust plaintiff. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[16] Monopolies ⬥17.5(8)**
265k17.5(8) Most Cited Cases
(Formerly 265k17(2.5))

Even if franchisor's conduct adversely affects competition, conduct does not contravene rule of reason if it is designed to control quality of franchisee's product and if gain in quality is more beneficial than attendant detriment to competition. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[17] Monopolies ⬥28(8)**
265k28(8) Most Cited Cases

In determining whether franchisor's conduct unreasonably restrains competition or is legitimate quality control device, presence of less burdensome alternatives for controlling quality is factor to be considered, but it is not necessary determinative. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**[18] Trade Regulation ⬥404**
382k404 Most Cited Cases

Unfair competition is common-law tort that occurs when one business entity palms off its products as those of another.

**[19] Trade Regulation ⬥407**
382k407 Most Cited Cases

In determining existence of unfair competition, determinative question is whether defendant's practices are likely to mislead customers into believing that product emanates from or has been endorsed by claimant; and claimant need not demonstrate that any customer has suffered actual confusion, but test is likelihood of confusion.

**[20] Trade Regulation ⬥706**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q 649, 1977-1 Trade Cases P 61.339
(Cite as: 549 F.2d 368)

Page 3

382k706 Most Cited Cases

In determining existence of unfair competition, likelihood of confusion is finding of fact.

**[21] Federal Courts €══754.1**
170Bk754.1 Most Cited Cases
(Formerly 170Bk754)

When district court labors under misapprehension concerning governing legal norms, "clearly erroneous" standard of review no longer circumscribes appellate review. Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.

**[22] Trade Regulation €══726**
382k726 Most Cited Cases

In an action for unfair competition, when district court considers digit that, as matter of law, should not be counted against defendant, court's findings lose shield of "clearly erroneous" standard of review. Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.

**[23] Trade Regulation €══702**
382k702 Most Cited Cases

In assessing unfair competition, court can and often should look to behavior that would be perfectly legitimate standing alone and should consider all circumstances; and argument that particular conduct was legal and can be explained in completely innocent manner ordinarily affects only weight to be assigned conduct in reaching unfair competition balance.

**[24] Trade Regulation €══726**
382k726 Most Cited Cases

In action by fast-food franchisor against packaging corporation and container corporation, alleging that defendants' distribution of containers and accouterments for the franchisor's fried chicken created likelihood of confusion, district court's finding that defendant engaged in unfair competition was not clearly erroneous, despite district court's consideration of several digits which it should have disregarded. Fed.Rules Civ.Proc. rule 52, 28 U.S.C.A.

**[25] Trade Regulation €══408**
382k408 Most Cited Cases

Intent to mislead is relevant, though not essential, to finding of unfair competition.

**[26] Trade Regulation €══407**
382k407 Most Cited Cases

When franchisor legitimately requires franchisees to

purchase from approved sources, unfair competition holding can be based on likelihood of confusion with respect to whether product's source has been approved.

**[27] Trade Regulation €══407**
382k407 Most Cited Cases

Unfair competition plaintiff succeeds by establishing likelihood of confusion, and actual confusion is not necessary.

**[28] Trade Regulation €══110**
382k110 Most Cited Cases

Trademark licensors have duty to oversee quality of licensee's products.

**[29] Trade Regulation €══584.1**
382k584.1 Most Cited Cases
(Formerly 382k584)

In trademark infringement action brought by fast-food franchisor against packaging corporation and container corporation which distributed certain supplies to franchisees without franchisor's approval, defendant failed to establish that franchisor had allowed its trademark licensees to depart from its quality standards.

**[30] Trade Regulation €══251**
382k251 Most Cited Cases

Fried chicken franchisor's trademark registration could also apply to cartons in which chicken was packaged, and eating utensils, napkins, and towelettes included in carton.

**[31] Trade Regulation €══66.1**
382k66.1 Most Cited Cases
(Formerly 382k66)

First use of trademarks on particular products established common-law trademarks.

**[32] Trade Regulation €══334.1**
382k334.1 Most Cited Cases
(Formerly 382k334)

Trademark infringement occurs only when use sought to be enjoined is likely to confuse purchasers with respect to such things as product's source, its endorsement by trademark holder, or its connection with holder.

**[33] Trade Regulation €══336**
382k336 Most Cited Cases

In trademark infringement action, issue of likelihood of confusion is analyzed in terms of product's typical buyer.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
**(Cite as: 549 F.2d 368)**

**[34] Trade Regulation ⬅️334.1**
382k334.1 Most Cited Cases
(Formerly 382k334)

Where suppliers of products to fast-food franchisees engaged in elaborate scheme to mislead franchisees into believing that they were connected with or approved by franchisor, including use of franchisor's trademarks, when, in fact franchisor did not approve their products, there was likelihood of confusion and trademark infringement.

**[35] Trade Regulation ⬅️334.1**
382k334.1 Most Cited Cases
(Formerly 382k334)

When confusion exists, trademark infringement exists regardless of whether use of marks, standing alone, would have created confusion.

**[36] Injunction ⬅️189**
212k189 Most Cited Cases

In fashioning relief against party who has transgressed governing legal standards, court of equity is free to proscribe activities that, standing alone, would have been unassailable.

**[37] Federal Civil Procedure ⬅️2351**
170Ak2351 Most Cited Cases

Unexcused failure to produce relevant evidence at original trial can be sufficient, without more, to warrant denial of motion for new trial on ground of newly discovered evidence. Fed.Rules Civ.Proc. rule 60(b), 28 U.S.C.A.

**[38] Federal Civil Procedure ⬅️2353**
170Ak2353 Most Cited Cases

In action by fast-food franchisor against packaging corporation and container corporation for trademark infringement and unfair competition, defendants were not entitled to new trial on ground of newly discovered evidence where defendants were unable to explain failure to present evidence at trial and evidence, even if presented at trial, would not have been sufficient to invalidate franchisor's trademarks and thereby provide defense. Fed.Rules Civ.Proc. rule 60(b), 28 U.S.C.A.

**[39] Federal Civil Procedure ⬅️1742(1)**
170Ak1742(1) Most Cited Cases
(Formerly 170Ak1742, 170Ak3)

Federal court must dismiss case over which it has no jurisdiction whenever jurisdictional defect appears.

**[40] Federal Courts ⬅️95**

170Bk95 Most Cited Cases
(Formerly 170Bk292(1), 170Bk292(4))

**[40] Federal Courts ⬅️214.1**
170Bk214.1 Most Cited Cases
(Formerly 170Bk214)

**[40] Federal Courts ⬅️217**
170Bk217 Most Cited Cases

Federal district court had jurisdiction over action alleging trademark infringement and unfair competition and counterclaim alleging violation of Sherman Act; and assertion that venue was improper did not affect that jurisdiction and was untimely where first asserted on appeal. 28 U.S.C.A. §§ 1331, 1332, 1337, 1338(a); Fed.Rules Civ.Proc. rule 12(h), 28 U.S.C.A.; Lanham Trade-Mark Act, § 39, 15 U.S.C.A. § 1121.

**[41] Federal Courts ⬅️95**
170Bk95 Most Cited Cases
(Formerly 106k276(1))

Unlike jurisdiction, venue challenges are waived if not properly asserted. Fed.Rules Civ.Proc. rule 12(h), 28 U.S.C.A.

**[42] Federal Civil Procedure ⬅️848**
170Ak848 Most Cited Cases

In action by fast-food franchisor against packaging corporation and container corporation seeking injunction restraining trademark infringement and unfair competition, in which defendant filed counterclaim seeking treble damages and injunction under Sherman Act for alleged illegal tying arrangement, district court did not abuse its discretion in allowing franchisor to amend its reply to counterclaim to assert quality control as affirmative defense, where amendment was filed 54 days prior to trial. Fed.Rules Civ.Proc. rule 15(a), 28 U.S.C.A.
**\*372** Burton H. Shostak, Lloyd A. Palans, St. Louis, Mo., Edward F. O'Herin, Malden, Mo., Philip de V. Claverie, New Orleans, La., for defendants- appellants.

William I. Dunaj, Miami, Fla., Robert R. Feagin, III, Tallahassee, Fla., for plaintiff-appellee.

Appeals from the United States District Court for the Southern District of Florida.

Before BROWN, Chief Judge, and JONES and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
**(Cite as: 549 F.2d 368)**

This case presents us with something mundane, something novel, and something bizarre. The mundane includes commercial law issues now well delimited by precedent. The novel aspects of the case center on intriguing and difficult interrelationships between trademark and antitrust concepts. And the bizarre element is the facially implausible some might say unappetizing contention that the man whose chicken is "finger-lickin' good" has unclean hands.

Kentucky Fried Chicken Corporation, a franchisor of fast-food restaurants, brought this action claiming that defendants were infringing its trademarks and engaging in unfair competition by their manner of selling boxes and other supplies to Kentucky Fried franchisees. Defendants placed Kentucky Fried's trademarks on the supplies without Kentucky Fried's consent, and they allegedly misled franchisees with respect to the supplies' source and quality. Defendants counterclaimed, asserting that Kentucky Fried's franchise agreements, which required franchisees to buy supplies from approved sources, constituted an illegal tying arrangement. The district court, in a penetrating opinion reprinted at 376 F.Supp. 1136 (S.D.Fla.1974), ruled in Kentucky Fried's favor on every issue and enjoined defendants' activities. Although some of the issues are not without difficulty, and although we find that franchisors must walk a narrow path when including in their franchise agreements clauses requiring franchisees to buy supplies from approved sources, we affirm.

I. Facts

Colonel Harland Sanders founded the Kentucky Fried Chicken business in the early 1950s. The Colonel prepared chicken in accordance with his own secret recipe, and among the Colonel's achievements has been to convince much of the American public that his product bears a close resemblance to the southern fried chicken that preceded peanuts as the south's most famous cuisine. The Colonel no longer owns the business, having transferred it in five different segments. The plaintiff, Kentucky Fried Chicken Corporation, now conducts the business in 47 states, and four unrelated entities conduct the business in the other three states.[FN1]

> FN1. Kentucky Fried Chicken Corporation, the plaintiff, must be distinguished from Kentucky Fried Chicken of Florida, Inc., an unrelated corporation that owns the Florida rights to the trademarks in question. We use "Kentucky Fried" to refer only to the plaintiff.

Although Kentucky Fried owns some retail stores, its primary manner of conducting *373 business, and the one of importance here, is franchising local outlets for its product. The franchise agreements require franchisees to purchase various supplies and equipment from Kentucky Fried or

from sources it approves in writing. The agreements provide that such approval "shall not be unreasonably withheld." Before purchasing supplies from a source not previously approved, a franchisee must submit a written request for approval, and Kentucky Fried may require that samples from the supplier be submitted for testing. Of crucial importance is the fact that Kentucky Fried has never refused a request to approve a supplier.

The supplies that are subject to the approved-source requirement include those around which this litigation revolves: three sizes of carry-out chicken boxes, napkins, towelettes, and plastic eating utensils technically known as "sporks." [FN2] Kentucky Fried sells these items to its franchisees, but under the franchise agreement the franchisees may also purchase any or all of these supplies from other approved sources. There are nine independent approved sources of cartons and a tenth that is a subsidiary of Kentucky Fried.

> FN2. Sporks are spoons with short tines forming the end of the bowl.

The specifications for these supplies require, among other things, that they bear various combinations of Kentucky Fried's trademarks. The marks, now widely known to the American public, include (1) "it's finger-lickin' good," (2) "Colonel Sanders' Recipe," (3) the portrait of Harland Sanders, (4) "Kentucky Fried Chicken," and (5) "Colonel Sanders' Recipe, Kentucky Fried Chicken." [FN3]

> FN3. As detailed in the district court's opinion, 376 F.Supp. at 1140, the marks are registered both as trademarks and as service marks. See 15 U.S.C. s 1127. For convenience we refer to them as trademarks. The same infringement standards apply to both. See Boston Professional Hockey Assoc., Inc. v. Dallas Cap & Emblem Mfg., Inc., 510 F.2d 1004, 1009 (5th Cir. 1975), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

Upon its formation in 1972, defendant Diversified Container Corporation (Container) began using Kentucky Fried's marks without its consent.[FN4] Container used the marks on chicken cartons, napkins and towelettes that it advertised and sold to Kentucky Fried franchisees.[FN5] Unlike other suppliers who sought and received approval, Container never requested that Kentucky Fried approve it as a source of these products, and in important respects Container's products failed to meet Kentucky Fried's specifications. [FN6]

> FN4. The other defendant is Diversified Packaging Corporation (Packaging). Sanford Gubernik organized and is president of both Container and Packaging. At an earlier time Packaging used

549 F.2d 368.                                                                          Page 6
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

Kentucky Fried's marks on napkins and towelettes. At the time of trial, however, Packaging was allegedly defunct, although it had not been dissolved. Container and Packaging advance identical arguments on this appeal; their separate circumstances do not affect the issues. For convenience, we confine our discussion to Container.

FN5. Container president Sanford Gubernik contended as a witness that Container sold trademarked cartons but did not sell napkins or towelettes. Gubernik contended that Portion Control Corporation (Portion), another company he organized and of which he was president, sold the napkins and towelettes, albeit with Container's assistance. Container advertised the products and received orders, although Portion filled the orders and accepted payment. Container and Portion occupied the same premises and had the same staffs. Portion is not a party to this lawsuit. For convenience we refer to Container as the source of all these products.

FN6. Container's cartons utilized thinner cardboard than the approved product, thus making them less easy to keep closed properly and less resistant to leaking grease (or, as Kentucky Fried prefers to say, leaking "shortening"). Container's napkins were much smaller than the approved product and were made from a less satisfactory grade of paper.

Container garnered buyers for its low-quality imitations of Kentucky Fried's supplies *374 by making inaccurate and misleading statements. Container's advertisements invited franchisees to "buy direct and save" and represented that Container's products met "all standards." Container affixed Kentucky Fried's trademarks to the shipping boxes in which it delivered chicken cartons to franchisees. And when asked by franchisees whether Container was an "approved supplier" of cartons, Container employees evaded the question and said that Container sold "approved boxes."

Kentucky Fried brought this suit to enjoin Container's activities, relying upon the related theories of unfair competition and trademark infringement. Kentucky Fried did not seek damages.[FN7] Defendants counterclaimed seeking treble damages for purported antitrust violations. The case was tried to the court, which resolved all claims in Kentucky Fried's favor. The court's findings of fact are incorporated in its memorandum opinion. See 376 F.Supp. 1136. The court entered an appropriate injunction.

FN7. Kentucky Fried's original complaint sought damages, but Kentucky Fried abandoned the claim before trial.

On this appeal the central issues are whether the district court correctly held defendants liable on the unfair competition and trademark infringement theories and whether the court correctly held that Kentucky Fried's franchise arrangements were not shown to violate the antitrust laws. We must also address defendants' contentions that the district court should have granted a new trial on the basis of evidence allegedly discovered after trial, that the district court lacked subject matter jurisdiction, and that the district court erred in allowing Kentucky Fried to amend its reply to defendants' counterclaim. We find a kernel of truth in all Kentucky Fried's contentions and therefore affirm.

II. Antitrust

Container's antitrust counterclaim forces us to confront three contentions: (1) that Kentucky Fried's conduct constitutes a tie-in and thus a per se antitrust violation, (2) that if Kentucky Fried's approved-source requirement is not a tie it should nonetheless be held to constitute a new category of per se offense, and (3) that in any event Kentucky Fried's arrangement contravenes the rule of reason. We reject each contention of the triad.

[1] Container's primary contention is that Kentucky Fried has established a tying arrangement in violation of s 1 of the Sherman Act, 15 U.S.C. s 1. That section prohibits "every contract, combination . . . or conspiracy in restraint of trade or commerce." For the most part an arrangement runs afoul of the s 1 mandate only if its restraint on trade is unreasonable. See, e. g., Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). A s 1 plaintiff must therefore generally establish the anticompetitive impact of the conduct it challenges. Certain categories of business arrangements, however, exhibit a high likelihood of anticompetitive impact and offer virtually no prospect at all of enhancing competition. With respect to such arrangements, antitrust plaintiffs need not demonstrate unreasonableness; the conduct constitutes a per se violation of the Sherman Act.

[2] Tying arrangements comprise one such category of behavior that is illegal per se. See, e. g., Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Miller v. Granados, 529 F.2d 393 (5th Cir. 1976).

The per se label indicates that a plaintiff need not demonstrate that the effects of the tie are unreasonable. Indeed, not only is the plaintiff relieved from establishing that the effects are unreasonable, but in addition the defendant is not free to demonstrate *375 that the effects are

549 F.2d 368.                                                         Page 7
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61.339
(Cite as: 549 F.2d 368)

reasonable or even affirmatively desirable. The competitive impact of the arrangement simply is not an issue for trial. Unless a defendant can establish certain narrow affirmative defenses, a finding that the defendant's conduct falls within the category of per se tying arrangements disposes of the case in the plaintiff's favor.

[3] Here, as elsewhere, however, the per se label can sometimes prove misleading. Per se analysis is susceptible to the unwarranted inference that a plaintiff prevails in a tying case merely by finding some way to characterize the defendant's conduct as a tie. A tie can be generally defined as an arrangement under which a seller agrees to sell one product (the "tying product") only on the condition that the buyer also purchase a second product (the "tied product"). See Northern Pacific, supra, 356 U.S. at 5-6, 78 S.Ct. 514. To bring a defendant's conduct within the category of ties that are per se violations of the Sherman Act, however, a plaintiff must go beyond some colorable characterization of the arrangement as fitting this rough definition.

[4] A plaintiff must show that the challenged arrangement is in fact a tie: that two separate products are involved and that, in addition to complying with the literal terms of the imprecise definition, the seller's behavior follows the general pattern found unacceptable in the earlier tying cases. To measure an arrangement against that general pattern we must take into account the principal evils of tie-ins: they may foreclose the tying party's competitors from a segment of the tied product market, and they may deprive the tie's victims of the advantages of shopping around. See Northern Pacific.supra, 356 U.S. at 6, 78 S.Ct. 514.

[5] Furthermore, an arrangement falls within the category of per se tying violations only if the seller has sufficient economic power with respect to the tying product appreciably to restrain free competition in the market for the tied product and only if a "not insubstantial" amount of interstate commerce is affected. See, e. g., Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Northern Pacific, supra ; Carpa, Inc. v. Ward Foods, Inc., 536 F.2d 39 (5th Cir. 1976).

The problem in the case at bar is to determine whether Kentucky Fried's arrangement is in fact a tie i. e., whether its behavior follows the general pattern found unacceptable in earlier tying cases. We begin with an analysis of tying in the context of franchise operations. The issue has taken on considerable significance in recent years; franchising has increased while tying strictures have grown tighter.

In the commonly recurring situation, the tying product is the franchise itself, and the tied products may be such things as the equipment the franchisee will use to conduct the business, the ingredients of the goods the franchisee will

ultimately sell to consumers, or the supplies the franchisee will distribute to the public in connection with the main product. As an original matter it is less than self-evident that such arrangements should be treated as garden-variety tie-ins, to be analyzed in accordance with the same tying principles developed in other contexts. Unlike that of the tying party in a prototypal tying case, a franchisor's own success may depend in large measure on the success of the tie's "victim", the franchisee. The franchisor will succeed only by establishing a favorable reputation among the consuming public, and in building that reputation the franchisor must depend largely on the quality of the franchisee's performance. A franchisor will rarely have an opportunity to explain to a dissatisfied customer that the fault was only that of the particular franchisee. The franchisor may therefore have legitimate as well as illegitimate reasons for restraining the franchisee's choices in the tied product market. The tie may have a benevolent or malevolent loop. Although in the archetypal case "(t)ying arrangements serve hardly any purpose beyond the suppression of competition", *376Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), in the franchising context ties may well serve acceptable purposes.

[6][7] Nevertheless, tying principles are fully applicable to franchise sales. See Carpa, Inc. v. Ward Foods, Inc., 536 F.2d 39 (5th Cir. 1976); Warriner Hermetics, Inc. v. Copeland Refrigerator Corp., 463 F.2d 1002 (5th Cir. 1972); cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972); Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971). As these cases make clear, when a franchisor conditions the sale of a franchise on the buyer's agreement to buy additional products from the franchisor, the law of tying comes into play. In order to establish a per se violation, the tying claimant need only demonstrate the requisite economic power and "not insubstantial" effect on commerce. Moreover, a franchisor who requires franchisees to use trademarked supplies does not escape the impact of tying principles to any extent. The franchisor's right to prevent others from selling supplies bearing its trademarks must yield to the antitrust laws' command to open the tied market to competitors. See Chicken Delight, supra, 448 F.2d at 52; cf. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 599, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

[8] Despite this relatively low threshold for invoking the per se doctrine, however, the franchisor retains a potentially significant defense one designed to accommodate the franchisor's interests in the franchisee's performance. The franchisor is free to demonstrate that the tie constitutes a necessary device for controlling the quality of the end product sold to the consuming public. See Carpa, supra, 536 F.2d at 46-47; Warriner Hermetics, supra, 463 F.2d at 1016; cf. Dehydrating Process Co. v. A.O. Smith Corp., 292 F.2d

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
**(Cite as: 549 F.2d 368)**

Page 8

653 (1st Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961) (not in franchising context); United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (same). *Product protection through tying can have a legal legitimacy. As part of this defense, however, the franchisor must establish that the tie constitutes the method of maintaining quality that imposes the least burden on commerce. If there are less burdensome alternatives, a franchisor is obligated to employ them rather than the tie.* See Carpa. supra. 536 F.2d at 47; Warriner Hermetics. supra, 463 F.2d at 1016; cf. Copper Liquor, Inc. v. Adolph Coors Co.. 506 F.2d 934 (5th Cir. 1975) (not in tying context). *The burden of proof on this issue rests with the franchisor seeking to justify the tie, and the burden is a heavy one.* The defense

> fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. . . .
> The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied.

Standard Oil Co. v. United States. 337 U.S. 293, 306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949).

[9] With this background we turn to Container's claim that *Kentucky Fried's arrangement constitutes a tie. The legal tightrope upon which we walk is very taut.* Kentucky Fried does not expressly require franchisees to purchase from it the allegedly tied products. Instead, the franchise agreements permit franchisees to purchase the supplies from any source Kentucky Fried approves in writing. At the time of trial there were ten approved sources for cartons, only one of which was an affiliate of Kentucky Fried.[FN8] *Franchisees were free* **\*377** *to recommend additional suppliers for approval, and the franchise agreement mandated that Kentucky Fried's approval "not be unreasonably withheld."*

> FN8. There were six approved manufacturers of cartons, four of which sold Kentucky Fried the cartons it resold to franchisees and two of which sold only directly to franchisees. Five of the six *bore no relationship to Kentucky Fried, and Kentucky Fried had no stake in their sales.* The sixth, Mid-Continent Corporation, is a subsidiary of Kentucky Fried.
> In addition, there were four approved suppliers who did not manufacture cartons but rather purchased them from one or more of the six approved manufacturers. These four middle level suppliers were not Kentucky Fried subsidiaries or related companies, but they were franchisees. The

record does not indicate whether Kentucky Fried *earned royalties based on these franchisees' distributions of cartons.*

The difference between this arrangement and a traditional tie is readily apparent. Here the franchise agreement does not require franchisees to take the "tied" product (supplies) from Kentucky Fried in order to obtain the "tying" product (the franchise). Franchisees need not purchase a single unit of the supplies in question from Kentucky Fried; they can take their entire requirements from other sources. Container, however, argues that the effect of the agreement is the same as a traditional tie because Kentucky Fried coerces franchisees into purchasing from it the supplies in question.

[10] We agree with Container that if such coercion were proved, the per se doctrine would apply. A tie need not be reduced to writing to come within the per se proscription. A tie claimant establishes a tie when it proves *that a franchisor makes a practice of coercing franchisees into purchasing supplies or other products from the franchisor.* See Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1326-31 (5th Cir. 1976). In such cases sale of the franchise is, as a practical matter, conditioned upon sale of the tied supplies. The claimant then need only establish the tying prerequisites sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of affected commerce in the tied product market. Kentucky Fried concedes that these prerequisites are satisfied here.

[11][12] Kentucky Fried denies, however, that Container succeeded in proving that franchisees were coerced into taking their supplies from Kentucky Fried. The burden of proof on this issue rests on Container; demonstrating the existence of a tie is part of the claimant's case in chief. See Response of Carolina, Inc. v. Leasco, Inc., supra, 537 F.2d at 1328. The district court resolved the question against Container, concluding that Kentucky Fried had not coerced its franchisees in this regard. Coercion is a question of fact, and we therefore review the district court's conclusion only to determine whether it is clearly erroneous. See Fed.R.Civ.P. 52.

Our review of the record convinces us that Container has not only failed to demonstrate clear error but has also failed to adduce any support at all for its allegation of coercion. Coercion can be circumstantially established; it need not be an instrument under seal or proven with sound and music. Coercion cannot, however, be merely conjured. It is neither a fantasy nor a figment. It is a fact that must be established, whether inferentially or deductively.

A fundamental distinction must be drawn between coercing franchisees to purchase from Kentucky Fried and coercing

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

Page 9

franchisees to purchase from approved sources. The record is barren of any suggestion that Kentucky Fried engaged in the former type of coercion to any extent at all.[FN9] Thus Kentucky Fried left franchisees free to purchase the purportedly "tied" products from sources other than Kentucky Fried, sources in which Kentucky Fried had no interest and on whose sales Kentucky Fried earned no commission.[FN10]

FN9. Container's evidence addressed only the latter type of coercion: coercion to purchase from approved sources. Such evidence was unnecessary; the franchise agreements explicitly required as much, clearly establishing sufficient coercion in this respect. But coercion to purchase from approved sources does not establish a tie. To demonstrate a tie, Container must show coercion to purchase from Kentucky Fried itself, or at least from a firm in whose sales Kentucky Fried has a financial stake.

FN10. We reject any suggestion that the disparity in economic power between Kentucky Fried and its franchisees renders the situation so inherently coercive that we must hold clearly erroneous the district court's finding of no coercion.
Our situation is unlike that of the "TBA" cases, in which national oil companies received commissions from manufacturers of tires, batteries and accessories on sales to the oil companies' local licensees. See FTC v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968); Atlantic Refining Co. v. FTC, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); Shell Oil Co. v. FTC, 360 F.2d 470 (5th Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). In Texaco, for example, Texaco encouraged its licensee service stations to stock the TBA of Goodrich, and Goodrich paid Texaco a 10% commission on sales to local Texaco stations. Coercion was relevant to the inquiry whether Texaco was engaged in an unfair method of competition in violation of s 5 of the Federal Trade Commission Act, 15 U.S.C. s 45. The Court upheld the FTC's determination that coercion was present, relying in part on the inherent coercion in the relationship between a local licensee and a national company holding life or death authority over license renewal and gasoline supplies. See 393 U.S. at 229, 89 S.Ct. 429.
Here, unlike in the TBA cases, the finder of fact found no coercion, and there was absolutely no demonstration of actual coercion. Moreover, the level of coercion implicit in the relationship between Kentucky Fried and its franchisees may be much lower than in the analogous TBA situation. Franchisees are not dependent upon Kentucky Fried for their supply of chicken, and the record does not indicate that franchisees are periodically reviewed with an eye to discontinuing some licenses, as was the case in Texaco.
These differences preclude the TBA cases' discussion of inherent coercion from controlling this case. If we found coercion solely on the basis of the franchisor-franchisee relationship, the result would be that an illegal tie would occur whenever a franchisor engaged in the business of selling supplies to franchisees. Kentucky Fried would have to discontinue altogether the sale of supplies. The law of tying requires no such unreasonable result. Absent a more persuasive showing of coercion, no tie exists in a market where the franchisor is only one of several suppliers from whom franchisees may buy.

*378 We conclude that this arrangement simply does not constitute a tie. A monolithic tie may bring down the wrath of per se guilt, but not every use of string tangles with the antitrust laws. The principal evils of tie-ins are the foreclosure of competitors in the tied market and the denial to buyers of the advantages of shopping around. See Northern Pacific Railway Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Kentucky Fried's system, at least on its face, presents neither of these evils in anything like the degree associated with tie-ins.

Competitors in the supplies market are not foreclosed from reaching a single potential buyer. Such competitors are subject to the approval requirement, but the record contains no showing that the approval requirement has had the effect in practice of foreclosing competitors in the supplies market. Kentucky Fried's uncontradicted assertion is that it has never withheld approval from a single supplier who requested it. We might speculate that a new entrant's arrival might be delayed, but nothing in this record demonstrates that the delay would be substantial, and Container does not aver that the perceived onerousness of this delay prevented it from seeking approval. This record shows no closure of competition; it was an invitational affair. The rope hung loosely. It was not a noose.

Turning to the second principal evil presented by tie-ins, we find that it, too, is lacking. The franchisees retain the option to shop around. The option is limited to approved suppliers, but there are ten such suppliers of cartons, and franchisees are free to nominate additional suppliers whenever they can be found. There is no allegation that Kentucky Fried exerts any influence over the terms at which its competitors sell to franchisees, and there has been no showing that the competing suppliers have combined to reduce the benefits

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
**(Cite as: 549 F.2d 368)**

of competition to the franchisees. Franchisees might fare better if fifty or a hundred suppliers competed for their business, but a market with ten suppliers and unrestrained entry surely poses a far different problem than the market available to the victim of a traditional tie: one supplier and no entry.

[13] We conclude that the tie-in's second principal evil, like the first, is not present in the approved-source system disclosed by this record. When the victim of an alleged tie-in is not required to buy a single unit of the tied product from the tying party or from any source in which the tying party **\*379** has an interest or on whose sales the tying party earns a commission, the arrangement simply does not constitute a tie. Kentucky Fried has not imposed a tie-in.

That the arrangement is not a tie does not, of course, prevent per se treatment; tying is not the only per se antitrust violation. We deem it inappropriate, however, to add approved-source requirements to the list of per se violations. When business arrangements exhibit consistently adverse competitive effects or are totally without redeeming virtue, per se treatment is desirable. Proving the adverse consequences in particular circumstances may prove difficult and, at any rate, will consume valuable court time. The chance that anticompetitive effects will go undetected and the cost in judicial resources make the prudent course to condemn all arrangements in a given category rather than to attempt to sort the harmful from the harmless. See, e. g., Northern Pacific, supra, 356 U.S. at 5, 78 S.Ct. 514.

[14] We are not prepared to say, however, that approved-source requirements are so universally devoid of redeeming virtue that they warrant per se treatment. As we noted in developing the background law of franchise tying, ties themselves are not as completely objectionable in the franchise context as in the contexts in which tying law originally developed. Moreover, franchise arrangements may sometimes create better competitive markets than would otherwise exist. A system under which an independent franchisee's choices are somewhat restricted may nevertheless prove superior to a system in which retail outlets are owned by the national firm. If, for example, Kentucky Fried had chosen not to franchise local outlets but rather to own them outright, the antitrust laws would leave it relatively free to supply the individual stores solely through the national office. Competition at the national level for Kentucky Fried's supplies business would continue, just as competition to sell Kentucky Fried the supplies it will in turn sell to franchisees is currently unencumbered. But competition at the local level would be as nonexistent under a system of national ownership of local stores as it would be under a franchise system utilizing explicit ties.

These principles are insufficient to take franchise tying out

of the per se arena. The existence of the quality defense assures that if a tie is ever truly essential to maintenance of the franchise method of conducting business, the tie will be permissible. To be sure, cases will undoubtedly occur in which ties, while in no sense essential to retention of a franchise arrangement, will prove beneficial to or convenient for the franchisor, and in such cases we could speculate that the somewhat harsh treatment of ties might induce a company to opt for national ownership rather than franchising. We can safely assume, however, that for the most part the application of tying principles to franchise operations will not affect a business's decision whether to engage in franchising.

When we turn from tying to approved-source requirements, however, the situation is somewhat different. The threat that franchisors will abandon franchising does not affect us, but the potential pro-competitive effects of franchising lead us to proceed cautiously lest we unduly shackle franchisors without achieving discernible competitive benefits. We must encourage business ingenuity so long as it is not competitively stifling. We deal here not with tie-ins, whose adverse effects and lack of redeeming virtue are by now quite familiar, but instead with approved-source requirements. When we become more familiar with large-scale franchising and with approved-source requirements, we may discern that the latter are wholly unnecessary to the former. Indeed, we may one day learn that approved-source requirements are consistently hurtful of competition or that sorting the anti-competitive provisions from the innocuous ones is a task too elusive or time consuming to warrant the effort. It will be time enough, however, to declare such requirements to be per se violations when that day arrives. It is enough to decide today's cases today and leave future **\*380** cases to the wisdom and experience of future years. Economic decisions derive from contemporary economic analysis.

The Supreme Court adopted this cautious approach when first confronted with vertical territorial restrictions, saying

We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. . . . We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack . . . any redeeming virtue" (Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)) and therefore should be classified as per se violations of the Sherman Act.

White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). We think we should likewise adopt that prudent course here. We are unable at this time to declare approved-source provisions per se violations.

49 F.2d 368.
93 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
Cite as: 549 F.2d 368)

[15] Our conclusion is that Kentucky Fried has not committed a per se antitrust violation: it has not established a de facto tie through coercive tactics, and its approved-source provision is not a per se violation. Container's attack on Kentucky Fried's arrangement is not yet exhausted, however, for the rule of reason remains. An antitrust claimant who unsuccessfully seeks to establish a per se violation may nonetheless prevail by showing that its adversary's conduct unreasonably restrains competition. See Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 499- 500, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). The burden of proving unreasonable effects rests with the antitrust plaintiff.

In the case at bar Container has failed to carry this burden. First, Container has not demonstrated that Kentucky Fried's arrangement adversely affects competition. Indeed, Container has presented no evidence at all of the actual competitive effect of Kentucky Fried's system. Antitrust claims need not be established by euclidean proof, but they cannot be merely fantasized. For all that appears in this record, competition among suppliers of the franchisees is as open and vigorous as it would be under a system in which Kentucky Fried exerted no control at all over franchisees. Kentucky Fried has excluded not a single supplier from the market; it has narrowed the negotiations between franchisees and their suppliers in not a single respect. [FN11] The approved-source provision is hardly a boon to competition, but on this record we can only conclude that this approved-source requirement is as innocuous as any could be. Unless we were willing to condemn all approved-source requirements, we could not condemn this one. We have refused, however, to make such provisions per se violations, and Container's failure to adduce evidence of this provision's adverse impact therefore defeats its claim.

FN11. Kentucky Fried has, of course, set standards that the products must meet, but as a franchisor whose reputation depends largely on its franchisees' performance Kentucky Fried is certainly entitled to insist upon conformance with such reasonable standards. We do not understand Container to contend otherwise. Nor does Container challenge the reasonableness of the standards Kentucky Fried set.

[16] Moreover, Container's proof is deficient in another respect. Even if a franchisor's conduct adversely affects competition, the conduct does not contravene the rule of reason if it is designed to control the quality of a franchisee's product and if the gain in quality is more beneficial than the attendant detriment to competition.

Here, Kentucky Fried seeks to justify its approved-source requirement as a device for controlling quality. Kentucky

Fried's argument possesses a substantial measure of intuitive appeal. A customer dissatisfied with one Kentucky Fried outlet is unlikely to limit his or her adverse reaction to the particular outlet; instead, the adverse reaction will likely be directed to all Kentucky Fried stores. The quality of a franchisee's product thus undoubtedly affects Kentucky Fried's reputation and its future success. *381 Moreover, this phenomenon is not limited to the quality of the chicken itself. Finger- lickin' good chicken alone does not a satisfied customer make. Kentucky Fried has a legitimate interest in whether cartons are so thin that the grease leaks through or heat readily escapes, in whether the packet of utensils given a carry-out customer contains everything it should and in whether the towelette contains a liquid that will adequately perform the Herculean task of removing Augean refuse from the customer's face and hands.

Kentucky Fried contends that by approving sources only if they comply with minimum standards, it ensures that various supplies will not be of such poor quality that customers will be alienated. Container strongly counters that the quality control program is a sham, but aside from its own vociferous lamentations Container marshals no support for its contention.

[17] In this respect it is important to note that Container bears the burden of proof; we are now analyzing quality control as an element of Container's claim that the approved-source provision is an unreasonable restraint of trade. We must emphasize the distinction between quality control as an affirmative defense to a per se tying violation with the defendant bearing the burden of proof and having to establish that the tie-in is the least burdensome method for effectively controlling quality and quality control as a factor in determining whether the defendant's conduct accords with the rule of reason. We deal here with the latter situation. Kentucky Fried's reliance on the quality control rationale therefore is not necessarily misplaced solely because less burdensome alternatives for controlling quality are available. The presence of such alternatives is a factor to be considered in the reasonableness analysis, but it is not necessarily the decisive factor. [FN12] Container has failed to establish that Kentucky Fried's system is not a reasonable means of controlling quality. Kentucky Fried must not be compelled to subject its chicken to the vagaries of unsuitable packaging.

FN12. This record does not enable us to determine whether Kentucky Fried could control quality in ways having less potential for anticompetitive abuse. Manufacturers and franchisees alike may profit by ignoring Kentucky Fried's product specifications. Individual franchisees, after all, may increase profits by utilizing inferior supplies while continuing to attract customers because of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

reputation established and maintained by other franchisees who conform to the quality standards. Kentucky Fried may therefore find it necessary not only to announce product specifications but also to police the observance of the standards. Furthermore, controlling quality at the franchise level may be impractical for this company with 3800 local outlets. It may thus be reasonable, as the district court concluded, for Kentucky Fried to control quality at the manufacturer level.

We find troublesome the record's scanty references to on-site inspections; depending upon the scope of such inspections, there may be significant potential for anticompetitive abuse. The record, however, does not indicate that abuse is present here.

We therefore conclude that Container has not prevailed on its rule-of-reason contention, both because it has failed to demonstrate adverse competitive impacts and because it has failed to show that Kentucky Fried's system is not a reasonable method for achieving quality control. The district court correctly held for Kentucky Fried with respect to Container's antitrust counterclaim. This knot was not conceived as a loophole in our antitrust statutes.

III. Unfair Competition

We turn now to Kentucky Fried's claims for affirmative relief against Container's activities. The district court held for Kentucky Fried on the basis of both unfair competition and trademark infringement, and parts of the injunction respond to each theory. We therefore find it necessary to address each contention.[FN13]

> FN13. The district court also held for Kentucky Fried on the basis of Lanham Act s 43(a), 15 U.S.C. s 1125(a). The section creates a federal cause of action for certain types of conduct, irrespective of whether that conduct also contravenes state unfair competition standards. See Alum- A-Fold Shutter Corp. v. Folding Shutter Corp., 441 F.2d 556 (5th Cir. 1971); cf. Bangor Punta Operations. Inc. v. Universal Marine Co., 543 F.2d 1107 (5th Cir. 1976). We affirm the district court on the basis of the unfair competition and trademark infringement claims and find it unnecessary to reach the s 43(a) contention.

*382 [18][19] The first theory upon which Kentucky Fried relies is unfair competition. Unfair competition is a common law tort that occurs when one business entity "palms off" its products as those of another. See, e. g., Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc., 510 F.2d 1004 (5th Cir. 1975), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); B.H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d

1254 (5th Cir. 1971). The determinative question is whether the tortfeasor's practices are likely to mislead customers into believing that the product emanates from or has been endorsed by the claimant. A claimant need not demonstrate that any customers have suffered actual confusion; the test is likelihood of confusion. See, e. g., World Carpets. Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir. 1971). [FN14]

> FN14. In numerous cases we have routinely accepted these principles without pausing to analyze choice of law issues. See, e. g., Aloe Creme Laboratories, Inc. v. Estee Lauder, Inc., 533 F.2d 256 (5th Cir. 1976); Volkswagenwerk Aktiengesellschaft v. Rickard, 492 F.2d 474 (5th Cir. 1974). In other decisions we have assumed that unfair competition is governed by state law. See, e. g., PGA v. Bankers Life & Casualty Co., 514 F.2d 665 (5th Cir. 1975); Chemical Corp. of America v. Anheuser- Busch, Inc., 306 F.2d 433, 436 (5th Cir. 1962), cert. denied, 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963). If we were to accept that premise, we would face the task of choosing among the unfair competition law of at least the 47 states in which Kentucky Fried does business. We would presumably follow the choice of law rules of Florida, the forum state. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Alternatively, we could hold that the field of business competition is already so well marked by federal trademark, copyright, patent and antitrust statutes that unfair competition should be governed by federal common law. That approach carries a practical attractiveness, especially in cases such as this where the activities in question have national scope and choosing among the law of numerous states is difficult. At least in the context of this case, however, we find these issues intriguing but unimportant. Both sides accept the general principles of unfair competition set forth above, and in no respect does the choice of law affect the analysis. We therefore follow our decision in American Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 14-15 (5th Cir. 1974) and decline to resolve the choice of law issue.

Determining likelihood of confusion entails findings of fact at two distinct levels. The first level consists of the primary activities of the alleged tortfeasor. Did the alleged tortfeasor use the plaintiff's name? Did it use pictures of the plaintiff's products in its advertisements? Did it evade potential customers' inquiries with respect to its connection with the plaintiff? Such questions require findings of fact; to clarify the analytical process we have referred to these primary

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

findings as "digits". See B. H. Bunn Co. v. AAA Replacement Parts, 451 F.2d 1254 (5th Cir. 1971). Our review of these findings is of course circumscribed by the "clearly erroneous" standard. See Fed.R.Civ.P. 52(a). To be clearly erroneous a finding of fact must leave us with the "definite and firm conviction that a mistake has been committed." B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1260 (5th Cir. 1971), quoting Chaney v. City of Galveston. 368 F.2d 774. 776 (5th Cir. 1966).

In the case at bar the district court compiled an impressive array of fourteen separate findings of fact, or digits, that contributed to its unfair competition holding. These digits provide the proper background for addressing Container's arguments, and we therefore set them forth here:

(1) The Defendants' cartons bear displays of the Plaintiff's trademarks, trade name and trade dress colors, but the Defendants' cartons do not have the Defendants' own name printed on them.

(2) The Defendants' advertisements are printed in Plaintiff's red and white striped trade dress and colors.

(3) The Defendants' envelopes for its advertisements and brochures are printed in Plaintiff's red and white striped trade dress and colors.

*383 (4) The Defendants' envelopes and advertisements contain elaborate displays of the Plaintiff's trademarks on them.

(5) The Defendants' envelopes, advertisements and products do not contain any notice that the Defendants are not authorized by or a part of KFC Corp.

(6) . . . contains the statements "take advantage of your option to buy direct and save", "Save 50 cents per case on KFC boxes that meet exact specifications and quality of the boxes you are now buying", and "BUY DIRECT AND SAVE."

(7) . . . of Defendants' advertisements, states: "Meets all standards."

(8) . . . of Defendants' advertisements, states: "Buy KFC boxes direct and save $1.00 more."

(9) . . . one of the Defendants' envelopes, states: "Now buy direct and save $2.00/M on KFC boxes."

(10) The Defendant's invoices . . . describe the Defendants' products for which invoices are sent to purchasers as "KFC dinner boxes", and "KFC snack boxes.".

(11) The Defendants' food cartons are packed and shipped to purchasers in shipping cases that also bear the Plaintiff's trademarks and service marks.

(12) The shipping cases in which the Defendants' cartons are packed and shipped bear the part numbers, No. "6015002" and "6014002" on the outside. These part numbers are not exactly the same as Plaintiff's standard part numbers for cartons (including No. 6020041 and 6020051), but Defendants' part numbers are obviously very similar to those used by the Plaintiff. And the

evidence has established that the Defendants do not use these part numbers in invoicing goods. Since the Defendants only sell a total of four products, their use of these seven-digit part numbers appears calculated to mislead.

(13) Defendants' employees, when asked during their telephone solicitations whether Container is one of Plaintiff's "approved suppliers" of cartons, avoid answering and represent to such potential customers that Container sells "approved boxes."

(14) As an additional "digit" in this analysis, the Court finds that Samuel Alpert, president of Folding Cartons, Inc., E. John Tamblyn, Jr., sales manager for Folding Cartons, Inc. and one-half owner of Container, and Sanford Gubernik, president and one-half owner of Container combined and contrived to deceive the Plaintiff as to their association and purposes. The purposes included the omission of Folding Cartons, Inc.'s name or mark from the cartons it manufactured and sold to Defendant Container in order to make it difficult or impossible for the Plaintiff to learn the identity of the manufacturer of the cartons that were being sold by Container. This association resulted in profit to Folding Cartons, Inc. and Container by virtue of their utilization of thinner and cheaper board which did not meet Plaintiff's specifications in their cartons, a fact concealed from Plaintiff. The Court finds that Samuel Alpert, acting for Folding Cartons, Inc., deliberately sold cartons manufactured from thinner board to Container knowing that those cartons did not meet the Plaintiff's thickness specifications. The Court further finds that cartons manufactured from this thinner board were provided by Folding Cartons, Inc. to Container and that Container put these goods into commerce bearing the plaintiff's trademarks both before and after Plaintiff learned of the thinner board's utilization and rejected its use. 376 F.Supp. at 1143-44.

*384 Container does not challenge a single finding as clearly erroneous. Instead, it advances the seemingly remarkable contention that despite these facts it has not been guilty of unfair competition.

[20] To assess Container's argument we must advance to the next level of unfair competition review. As we indicated, the digits comprise only one of the two levels of findings of fact involved in an unfair competition case. The second level is the determination whether the defendant's activities, considered as a whole, evince a likelihood of confusion and therefore constitute unfair competition. Likelihood of confusion is a finding of fact, and once again our review is circumscribed by the "clearly erroneous" standard. See, e. g. Volkswagenwerk Aktiengesellschaft v. Rickard, 492 F.2d 474, 478 (5th Cir. 1974).

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

[21] The district court's conclusion that the digits it listed totaled to a finding of likely confusion cannot be said to be clearly erroneous, and we do not understand Container to assert the contrary. One cannot read the digits set forth above and reach any conclusion other than that Container intended to mislead potential customers and was likely to succeed.

Container, however, invokes the established principle that when a district court labors under a misapprehension concerning the governing legal norms, the "clearly erroneous" standard no longer circumscribes appellate review. See, e. g., Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967). An appellant who relies on this principle must first pinpoint a controlling legal standard that the district court misapplied. Container has articulated its attack somewhat imprecisely; we are not entirely certain which legal standard Container believes the district court misconstrued. The court clearly understood that the determinative issue in an unfair competition case is likelihood of confusion, and it also properly utilized our Bunn analysis to specify the digits on which it relied in assessing likelihood of confusion. The court's statement of the law and its analytical technique were impeccable.

[22] Container's attack is apparently directed to the propriety of utilizing several of the individual digits as factors in the analysis. As we said in Bunn, the question whether a particular digit can properly be taken into account is a question of law. See 451 F.2d at 1263. When a district court considers a digit that, as a matter of law, should not be counted against a defendant, the court's findings lose the shield of the "clearly erroneous" standard.

Container contends that, for several reasons, it was entitled to use Kentucky Fried's trademarks on the supplies it sold to franchisees. The district court, however, listed Container's use of the marks as part of its first digit.

Container's claim of a right to use the Kentucky Fried marks is not frivolous, as our later discussion of trademark infringement will show. The issue need not be resolved in this litigation, however, and we therefore decline to resolve it. We assume for purposes of analyzing the unfair competition claim that Container did have the right to use the Kentucky Fried marks on the products it sold to franchisees.

[23][24] The upshot of this assumption and we reiterate that it is only an assumption is not necessarily that the district court erred when it considered as an unfair competition digit the fact that Container's cartons bore Kentucky Fried's marks and characteristic red and white trade dress. In assessing unfair competition, a court can and often should look to behavior that would be perfectly legitimate standing alone. A court should consider all the circumstances. The

argument that particular conduct was legal and can be explained in a completely innocent manner ordinarily affects only the weight to be assigned the conduct in reaching the unfair competition balance; the propriety of including the conduct as a digit is not affected. Here, however, the district court listed Container's use of Kentucky Fried's marks as the first digit, and the court apparently viewed the use as illegitimate conduct to be weighed heavily rather than as otherwise legal behavior *385 to be counted as a small part of the total circumstances relevant to the unfair competition claim. On the basis of our assumption that the use was legal standing alone, therefore, we conclude that the district court erred as a matter of law in its treatment of this digit.[FN15]

FN15. On the basis of our assumption, the district court may also have erred in its treatment of digits (2), (3), (4), (10) and (14).

Digit (4) that Container's envelopes and advertisements display the marks is a circumstance that could properly be considered. If Container had the right to use the marks on its cartons, however, it may have had the right to display the cartons in its advertisements, and the district court may have unduly weighted the digit. The same is true of digits (2) and (3), both of which involve Container's use of Kentucky Fried's red and white trade dress in connection with advertisements. For purposes of analysis, we exclude digits (2), (3) and (4) from consideration.

Digit (10) involves Container's use of invoices describing its products as "KFC dinner boxes" and "KFC snack boxes." These phrases are reasonable descriptions of the products, although under the circumstances "dinner boxes" or "snack boxes" would certainly be sufficient. The argument that the phrases are merely descriptive should properly be addressed to the weight of the factor rather than to the propriety of considering it at all. Again, however, the district court may have unduly weighted this digit, and we proceed as if digit (10) cannot be considered.

Finally, we exclude digit (14): that Container president Sanford Gubernik conspired with others to sell cartons not meeting Kentucky Fried's standards and to conceal that fact from Kentucky Fried. These facts are only tangentially relevant to the unfair competition claim. The gist of unfair competition is likelihood of confusion; the issue here is whether Container's activities were likely to confuse franchisees concerning the source or approval of the products being sold. Although digit (14) casts little light on the issue whether franchisees were likely to be confused in this respect, it does yield added support for an inference

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

that Container intended to mislead franchisees. In *the spirit of undeserved charity that has guided our* treatment of Container's contentions to this point, however, we also exclude from consideration, for purposes of this analysis, digit (14).

In sum, then, *we are willing to accept solely for the purposes of argument* Container's contention that the district court's analysis failed to follow the governing legal standards. The result, however, is not an automatic rejection of the district court's holding. Rather, the district court's disregard of the governing legal principles strips its likelihood-of-confusion finding of the protection afforded by the clearly erroneous standard.

Digits need not add up to a definitive sum. If among one or *more of the digits we find a likelihood of confusion,* Container's elimination of a digit here and a digit there does not militate against our result. So long as the trial judge was correct in a sufficient number to establish confusion he has satisfied his findings all that need be found to convict Container of legal confusion. Even one digit might be the infinity of unfair competition.

[25][26] Our task is therefore to determine on our own whether the surviving digits add up to unfair competition. We have no difficulty concluding that they do. Container's advertisements invite franchisees to "buy direct;" [FN16] we think it self-evident that the phrase is intended to mislead franchisees into believing that Container is also a supplier of Kentucky Fried or is affiliated in some respect with Kentucky Fried. Intent to mislead is relevant, though not essential, to a finding of unfair competition. See, e. g., Volkswagenwerk Aktiengesellschaft v. Rickard, 492 F.2d 474, 478 (5th Cir. 1974). Moreover, we also think the phrase is likely to achieve the intended confusion. The phrase "buy direct" arguably informs a *potential customer* that the product's source is not Kentucky Fried itself, but the confusion underlying an unfair competition holding need not be confusion with respect to the seller's identity. When a franchisor legitimately requires franchisees to purchase from approved sources, an unfair competition holding can be based on the likelihood of confusion with respect to whether the product's source has been approved.

FN16. See digits (6), (8) and (9).

In addition, Container's cartons do not have its own name printed on them. [FN17] and ***386** *Container's advertisements avoid any notice that its products are not approved by Kentucky Fried.*[FN18] Of even greater significance, Container ships its products in packing boxes that bear Kentucky Fried's trademarks. [FN19] Use of the marks on packing boxes could have no purpose or effect other than to mislead customers. Any doubt on this score vanishes when Container's numbering system is considered.

Container affixes a seven-digit number to each shipping case; the number has no purpose in Container's invoicing system; and remarkably enough the number contains exactly the same digits, albeit rearranged, as does one of Kentucky Fried's standard part numbers for cartons.[FN20] The trial judge found a bonus of digits even assuming that he was wrong with respect to some of them.

FN17. See the second half of digit (1), supra.

FN18. See digit (5).

FN19. See digit (11), supra.

FN20. See digit (12), supra.

[27] Kentucky Fried augmented this showing of Container's confusing tactics by producing evidence that Container had achieved its result. Franchisees were actually misled. An unfair competition plaintiff succeeds by establishing likelihood of confusion; actual confusion is not necessary. When there is evidence of actual confusion, however, it provides persuasive support for an inference that confusion is likely.

> There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.

World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir. 1971).[FN21] Container's contention that the showing of actual confusion was statistically insignificant therefore misses the point. See Roto-Rooter Corp. v. O'Neal, 513 F.2d 44 (5th Cir. 1975). The evidence that some Kentucky Fried franchisees were actually misled reinforces our conclusion that Container's activities created a likelihood of confusion.

FN21. World Carpets confronted the confusion issue in the context of trademark infringement, not unfair competition. The court's analysis, however, is equally applicable in both settings.

In sum, Kentucky Fried has produced *overwhelming proof* that Container's behavior was designed to create confusion, that it was likely to succeed, and that in some instances it actually succeeded. A more solid showing of unfair competition has rarely been assembled. One cannot read this record without concluding that Container poached on Kentucky Fried's chicken coop and did so overtly and avariciously. Container fell just short of costuming its sales force in the garb of the Colonel, goatee and all. We uphold the district court's ruling on this issue.

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
(Cite as: 549 F.2d 368)

Page 16

IV. Trademark Infringement

Kentucky Fried's next theory is trademark infringement. Trademark infringement is a narrower aspect of unfair competition; both turn primarily on the likelihood of customer confusion. See generally B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254 (5th Cir. 1971); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963). Trademark infringement, however, occurs only when the defendant brings about the confusion in a particular manner: by using the plaintiff's name or marks, or marks confusingly similar.

In the case at bar Container has concededly used Kentucky Fried's marks without Kentucky Fried's consent. Nevertheless, Container presents a two- pronged defense to the trademark infringement claim. First, Container contends that Kentucky Fried has forfeited its marks by engaging in unrestrained licensing. Second, Container argues that its use of the marks on supplies rather than chicken is not likely to confuse prospective purchasers. We deal with each contention in turn.

*387 A. Forfeiture

[28] Courts have long imposed upon trademark licensors a duty to oversee the quality of licensees' products. See, e. g., Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403, 409 (5th Cir. 1962). The rationale for this requirement is that marks are treated by purchasers as an indication that the trademark owner is associated with the product. Customers rely upon the owner's reputation when they select the trademarked goods. If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device. A trademark owner who allows this to occur loses its right to use the mark.

[29] Container argues that Kentucky Fried has forfeited its marks by inadequately controlling quality in the 47 states for which it owns the marks [FN22] and by failing to control quality at all in the other three states. With respect to the 47 states in which Kentucky Fried owns the trademarks, however, the record belies Container's assertion that Kentucky Fried's program for controlling quality is a sham.[FN23] Retention of a trademark requires only minimal quality control, for in this context we do not sit to assess the quality of products sold on the open market. We must determine whether Kentucky Fried has abandoned quality control; the consuming public must be the judge of whether the quality control efforts have been ineffectual. We find that Kentucky Fried has sufficiently overseen the operations of its franchisees. Container has failed to carry the heavy burden placed on a party seeking to establish a forfeiture. See American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 625 (5th Cir. 1963).

FN22. Container apparently limits its attack on Kentucky Fried's quality control in the 47 states to the supplies involved in this suit. We do not understand Container to contend that Kentucky Fried has allowed franchisees to sell chicken that is less than finger-lickin' good.

FN23. We find unpersuasive Container's argument that Kentucky Fried's delay in detecting the use of Container's inferior products indicates a lack of quality control. That Container's deviousness succeeded for a time does not preclude Kentucky Fried from taking steps to protect its rights, now that its quality control program has located the culprit.

We also find unpersuasive Container's contention based on Kentucky Fried's lack of any control at all over Kentucky Fried Chicken outlets in the other three states. Kentucky Fried does not own the marks there; Colonel Sanders conveyed the trademark rights to others before selling the remaining business to Kentucky Fried's predecessors. The trademark owners in those three states therefore are not Kentucky Fried's licensees, as Container erroneously contends, but rather concurrent owners. Concurrent ownership of marks in separate geographical territories is clearly permissible. See 15 U.S.C. s 1052(d). Indeed, we have ourselves approved decrees expressly establishing such concurrent usage of identical marks. See American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 625-26 (5th Cir. 1963); Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F.2d 114 (5th Cir. 1973); cf. Dawn Donut Co. v. Hart's Food Stores, 267 F.2d 358 (2nd Cir. 1959). Kentucky Fried Chicken customers in 47 states buy the product of plaintiff Kentucky Fried Chicken Corporation, backed by its reputation. Kentucky Fried Chicken customers in Florida, one of the remaining states, buy the product of the Florida owner, backed by its reputation.[FN24] That many consumers are undoubtedly oblivious to the corporate structures does not undermine the trademark system; Florida customers will associate the trademarks with the Florida product, and national customers will associate the marks with the national product. That an occasional purchaser *388 will travel between geographical districts is not a problem sufficient to justify outlawing concurrent trademark ownership.[FN25]

FN24. This is true despite the fact that plaintiff Kentucky Fried Chicken Corporation owns some retail stores in Florida, all of which are franchisees of the Florida owner. As franchisor, the Florida company controls the quality of and stands behind the products sold by the nationally owned retail outlets, just as it does in the case of any locally owned franchisee.

FN25. At first blush the problem might seem particularly acute when one of the states involved is Florida, which, at least before the great Florida snow fall of 1977, attracted numerous tourists. We are convinced, however, that climatological facts rather than the prospective culinary delights of franchised fast-food restaurants attract tourists to Florida.

We conclude that Kentucky Fried has not forfeited its trademarks through unrestrained licensing. The marks are valid.

B. Likelihood of Confusion

[30] Container's next contention in defense of the trademark claim is that its use of the marks was not likely to mislead potential customers. Preliminarily, we reject Container's formulation of its argument. Container articulates its contention in terms of the trademarked products: Kentucky Fried's marks, says Container, apply only to chicken, not to paper products. We reject this assertion for three reasons.

First, although Kentucky Fried's registration refers only to chicken (and other food products), we believe that closely related products are included as well. We deal here not with Kentucky Fried spaceships or Kentucky Fried writing pens, but with the paper products necessary to the operation of a store that sells Kentucky Fried chicken. As the district court noted, Kentucky Fried could hardly emboss its trademarks upon the chicken itself. There is a symbiotic relationship between Kentucky Fried chicken and its cartons and accoutrements. Under these circumstances we hold that the registration is sufficient to encompass the tangential supplies.

[31] The second reason that Container's argument fails is that Kentucky Fried clearly possesses common law trademarks with respect to the supplies themselves. Kentucky Fried concededly uses the marks on supplies, and it was the first party to do so. It therefore has the common law marks on supplies even if the statutory registration applies only to chicken. Kentucky Fried's cartons may not be "finger-lickin' good," but that is the cartons' trademark nonetheless.

Finally, Container's focus on the trademarked products erroneously assumes that infringement occurs only when the alleged infringer uses the mark on the same category of product with respect to which the trademark owner obtained the mark. We have squarely and repeatedly rejected that position. See PGA v. Bankers Life & Casualty Co., 514 F.2d 665 (5th Cir. 1975); Beef/Eater Restaurants, Inc. v. James Burrough Ltd., 398 F.2d 637 (5th Cir. 1968); Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967). Even if Container were

correct that the Kentucky Fried marks applied only to chicken, therefore, Container's use of the marks on supplies might nonetheless constitute infringement. Container's attempt to limit the products for which Kentucky Fried owns trademarks provides no defense to the infringement claim.

We do believe, however, that the true thrust of Container's contention poses a far more difficult issue. We think Container's position can be reformulated in terms of likelihood of confusion. Container apparently argues that its use of the marks on supplies rather than chicken is not likely to confuse potential customers. We deem this the most difficult aspect of the trademark infringement claim.

[32] Trademark infringement occurs only when the use sought to be enjoined is likely to confuse purchasers with respect to such things as the product's source, its endorsement by the plaintiff, or its connection with the plaintiff. See, e. g., World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 488 (5th Cir. 1971); Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967); Aloe Creme Laboratories, Inc. v. Estee Lauder, Inc., 533 F.2d 256 (5th Cir. 1976). Our cases demonstrate unbroken insistence upon likelihood of confusion, and by doing *389 so they reject any notion that a trademark is an owner's "property" to be protected irrespective of its role in the operation of our markets. See American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 625 (5th Cir. 1963). Trademarks convey to purchasers a variety of information, and when a competitor's use of the same or similar marks interferes with this informational function, trademark infringement is established.

These principles were not altered by our recent decision in Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc., 510 F.2d 1004 (5th Cir. 1975), cert. denied, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). There we held that Dallas Cap infringed Boston Hockey's trademark the team emblem of the Boston Bruins by selling shoulder patches depicting the Bruins' emblem. Acknowledging that the confusion question there was conceptually difficult, we found the confusion requirement satisfied by the "certain knowledge of the buyer that the source and origin of the trademark symbols were in (Boston Hockey)." 510 F.2d at 1012 (emphasis added).

In the case at bar the buyers undoubtedly possess certain knowledge that the source and origin "of the trademark symbols" is in Kentucky Fried. By emphasizing this one phrase from our comprehensive opinion, Boston Hockey could therefore be read to dispose of the confusion issue here.

We decline, however, to adopt that reading. Boston Hockey also reiterated our unbroken insistence on a showing of

549 F.2d 368.

193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339

**(Cite as: 549 F.2d 368)**

confusion, and we believe that our opinion must be read in that context. Under the circumstances there involving sales to the consuming public of products bearing trademarks universally associated with Boston Hockey the fact that the buyers knew the symbols originated with Boston Hockey supported the inescapable inference that many would believe that the product itself originated with or was somehow endorsed by Boston Hockey. Buyers may have had no reason to expect Boston Hockey to possess expertise in manufacturing shoulder patches, but to a Bruins fan the club's endorsement would be much more important than the quality of the stitchery. And Boston Hockey had every right to reap the rewards of its trademark's popularity.

[33] Several factors suggest that the finding of infringement in Boston Hockey need not control here. First, the buyers with whom we deal are not the consuming public but franchisees fully familiar with the corporate configuration underlying the products.[FN26] The inference is therefore much weaker that the buyers will believe that the source of a trademark-bearing product is the same as the source of the mark itself. Second, the strictures of the antitrust laws deprive Kentucky Fried of any right to preserve for itself all the rewards of its trademarks' popularity. As our antitrust discussion makes clear, so long as Kentucky Fried requires franchisees to use supplies bearing the marks, it cannot prevent all competing suppliers from using them; to do so would constitute an illegal tie-in. Finally, we cannot conclude that a seller of boxes bearing Kentucky Fried's marks is necessarily trading on the good name built by Kentucky Fried. Affixing those marks, after all, is utilitarian; the buyer needs boxes that not only hold chicken but advertise its business as well. Under these circumstances we do not believe Boston Hockey equates knowledge of the symbol's source with confusion sufficient to establish trademark infringement, and we deem the confusion issue unresolved by our existing decisions.

FN26. We analyze the confusion issue, of course, in terms of the product's typical buyer. See e. g., Sun-Maid Raisin Growers v. Sunaid Food Products, Inc., 356 F.2d 467, 469 (5th Cir. 1966).

[34][35] We decline, however, to resolve this intriguing and tantalizing confusion issue that would be presented if we dealt with a seller whose only asserted transgression was the use of Kentucky Fried's marks. For here we confront trademark usage in conjunction with an elaborate scheme for misleading franchisees into believing that *390 Container was connected with or approved by Kentucky Fried. We need not recount the facts detailed in our discussion of unfair competition. We reiterate only that they conclusively demonstrate that a likelihood of confusion existed. Container's use of the trademarks was but a part of the larger scheme, and the use of the trademarks contributed

to the confusion. When such confusion exists, trademark infringement exists regardless of whether the use of the marks, standing alone, would have created confusion.[FN27] We therefore hold that Container infringed Kentucky Fried's trademarks.

FN27. In addition, Container's use of the marks on shipping cases presents a much easier case than their use on the supplies themselves. Marks on shipping cases are not utilitarian. This use of the marks, standing alone, would constitute infringement.

[36] We note in this respect that the district court enjoined Container from using the marks, and under the injunction Container would not be free to resume use of the marks even if it discontinued the other tactics upon which we have relied in finding that the trademark usage created a likelihood of confusion. As an original matter such use would present the difficult confusion issue we have reserved. We uphold the injunction in full, however, without finding it necessary to confront the unresolved issue. Even if Container originally would have been entitled to use the marks, we hold that the unqualified injunction against their use is justified by Container's history of improper behavior. An injunction can be therapeutic as well as protective. In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable. See, e. g., United States v. Loew's, Inc., 371 U.S. 38, 53, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) (collecting cases).[FN28] The sweep of equitable discretion is at least this broad.[FN29]

FN28. The district court resolved the issue we have reserved, holding that Container's unconsented use of the marks, standing alone, would have constituted infringement. That court therefore did not address its equitable discretion to the issue whether Container's conduct would warrant an injunction against all use of the marks even if, standing alone, the usage would be legal. We therefore resolve that issue ourselves, though from confident it would reach the same result. We think Container's indefensible conduct clearly calls for strong and effective relief, and we uphold the district court order as written.

FN29. Similarly, the scope of equity is sufficient to support the injunction against Container's use of the marks on supplies other than cartons, even if we accept Container president Sanford Gubernik's contention that Container uses the marks only on cartons. See note 5 supra. In addition, the district

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
**(Cite as: 549 F.2d 368)**

court properly issued an injunction against defendant Packaging, see note 4 supra, despite Packaging's cessation of business. In numerous cases courts have enjoined future violations though the transgressor has purged itself and come to court saying it will never again transgress and become a sinner. See, e. g., United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (injunction held proper despite voluntary cessation of illegal practice).

### V. New Trial

After the district court rendered judgment against it, Container moved for a new trial pursuant to Fed.R.Civ.P. 60(b), citing "new" evidence purportedly establishing fraud on the patent office sufficient to require cancellation of Kentucky Fried's trademark registrations. The district court denied the motion. The issue before us is whether the district court abused its discretion. We hold that it did not.

The "new" evidence consists of an affidavit that a Kentucky Fried official submitted to the patent office when Kentucky Fried sought to delete from its registration the states of Florida, Montana and Utah states for which Colonel Sanders had conveyed the rights to others, and with respect to which Kentucky Fried therefore had no rights to use the marks. The original registration, obtained by the company that sold the business to Kentucky Fried, had erroneously applied to all 50 states, and in reviewing documents when it acquired the business Kentucky Fried discovered the mistake. *391 Container contends that the affidavit impliedly represented that Kentucky Fried did not do business in Florida, whereas in fact Kentucky Fried owned numerous retail stores in Florida, all of which were franchises of the Florida owner of the marks.[FN30]

> FN30. The Florida owner is Kentucky Fried Chicken of Florida, Inc.

[37][38] This evidence is insufficient to warrant a new trial for two reasons. First, Container is unable to explain its failure to raise the issue at trial. Diligent discovery would apparently have unearthed the affidavit. Surely we do not ask too much of a trademark infringement defendant when we require it to decide before trial whether to challenge the trademark and when we expect it to take at least preliminary investigatory steps with respect to that issue. [FN31] Unexcused failure to produce the relevant evidence at the original trial can be sufficient without more to warrant denial of a rule 60(b) motion. See AG Pro, Inc. v. Sakraida, 512 F.2d 141, 143-44 (5th Cir. 1975), rev'd on other grounds, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976).

> FN31. Indeed, in the case at bar Container actually

pleaded fraud on the patent office as an affirmative defense to the trademark infringement claim. Subsequently, however, Container amended its answer to delete the assertion. Container's allegation that it first became aware of the fraud issue upon discovering new evidence after trial is simply false.

In this case, however, there is another reason for denying the motion as well. The new evidence would not have affected the result of the trial. Even accepting Container's assertion that the affidavit contains a tacit misrepresentation, we find no basis for invalidating the registration altogether.[FN32] Moreover, even if Kentucky Fried's registrations were canceled, as first user it would retain common law trademarks. In some circumstances fraud on the patent office might justify eradicating a registrant's common law as well as statutory rights, but Container has failed to allege facts even approaching the level that would be required to support such a result. The possibility that a new trial on this issue would reach a result different than that of the original trial is at best remote, and we therefore uphold the district court's denial of Container's rule 60(b) motion. [FN33]

> FN32. Container bases its argument on the view that the patent office would have disapproved concurrent registration had it known that Kentucky Fried owns Florida retail stores. Concurrent registration is appropriate only when confusion is not likely to result. See 15 U.S.C. s 1052(d). Container argues that confusion results when some Florida stores are controlled by the Florida company while others are controlled by the national company. In fact, however, all Florida stores are controlled by the Florida company. The Florida stores owned by the national company are franchisees of the Florida company. The product of the national company's Florida stores is therefore the Florida company's product to the same extent as is true for any locally owned Florida franchisee. We do not believe the national company's ownership of various Florida stores would prevent concurrent trademark registration, and we certainly do not believe that the supposedly misleading affidavit on this point is sufficiently likely to justify invalidating Kentucky Fried's registration to warrant reversing the district court's discretionary denial of a new trial.

> FN33. We also reject Container's assertion that Kentucky Fried's alleged fraud constitutes "unclean hands" and thus defeats Kentucky Fried's unfair competition claim as well as its trademark infringement claim. That Kentucky Fried's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

549 F.2d 368.
193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339
**(Cite as: 549 F.2d 368)**

Page 20

customers undoubtedly have greasy hands does not affect this issue.

## VI. Jurisdiction

[39] After the submission of briefs on this appeal, Container raised for the first time the issue of the district court's subject matter jurisdiction. The tardiness of Container's assertions does not, of course, prevent us from entertaining them. A federal court must dismiss a case over which it has no jurisdiction whenever the jurisdictional defect appears. See Mansfield, Coldwater & Lake Michigan Railway v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884). We must therefore address the jurisdictional question.

Container's position is premised on the fact that this action was brought in the Southern District of Florida rather than in a federal district court in some other state. *392 Container argues that the district court lacked subject matter jurisdiction because none of the parties reside in Florida and none of the relevant activities occurred in Florida. Indeed, Kentucky Fried does not own the rights to the litigated trademarks in Florida, and parts of the injunction expressly exclude Florida from their operation.

[40][41] These allegations, however, raise no question concerning the court's jurisdiction; at most they affect the court's venue. Several federal statutes clearly establish jurisdiction over this cause. Not only does the complaint state claims arising under federal law, see 28 U.S.C. s 1331; see also 15 U.S.C. s 1121 (jurisdiction over Lanham Act claims); 28 U.S.C. s 1337 (jurisdiction over claims arising under acts regulating commerce or protecting trade and commerce against restraints and monopolies); 28 U.S.C. s 1338(a) (jurisdiction over claims arising under acts relating to trademarks), [FN34] but complete diversity exists between the parties, see 28 U.S.C. s 1332. All of these statutes establish jurisdiction. When these statutes confer subject matter jurisdiction, they do so simultaneously for all federal district courts. The choice among courts is a matter of venue, not jurisdiction. We thus reject Container's jurisdictional challenge. Treating its contention as a venue objection, we reject it as untimely. Unlike jurisdiction, venue challenges are waived if not promptly asserted. See Fed.R.Civ.P. 12(h); cf. Neirbo v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167-68, 60 S.Ct. 153, 84 L.Ed. 167 (1939).

> FN34. Container's contention that the complaint did not allege and Kentucky Fried did not establish an effect on interstate commerce is patently frivolous. Moreover, failure to establish interstate effects would not defeat jurisdiction.

## VII. Amendment to Pleadings

[42] Container's final contention is that the district court erred by allowing Kentucky Fried to amend its reply to Container's counterclaim. Kentucky Fried filed the challenged amendment December 12, 1973, for the first time alleging quality control as an affirmative defense to the tying counterclaim Container had filed August 13, 1973. The trial began February 4, 1974, fifty-four days after Kentucky Fried's amendment.

The federal rules mandate a liberal approach to the amendment of pleadings. See Fed.R.Civ.P. 15(a). We find no abuse of discretion. The record does not indicate that Container was prejudiced by the timing of the amendment.

## VIII. Conclusion

We have held that Kentucky Fried's approved-source requirement, as revealed in this record, is not illegal, and that Kentucky Fried established its right to the district court's injunction. In addressing these knotty problems we have attempted to untangle intersecting strands of antitrust, trademark and unfair competition law. We have concluded that the antitrust laws did not give Container the right to debilitate Kentucky Fried's business. The decision of the district court is AFFIRMED.

549 F.2d 368, 193 U.S.P.Q. 649, 1977-1 Trade Cases P 61,339

END OF DOCUMENT



# EXHIBIT / ATTACHMENT

## 34

(To be scanned in place of tab)

577 S.E.2d 822
3 FCDR 348
(Cite as: 259 Ga.App. 772, 577 S.E.2d 822)

Page 1

**H**

Court of Appeals of Georgia.

LaSONDE
v.
CHASE MORTGAGE COMPANY et al.

No. A02A2135.

Jan. 31, 2003.
Reconsideration Denied Feb. 20, 2003.
Certiorari Dismissed June 2, 2003.

Prospective purchaser brought action against vendor and mortgagee that foreclosed on the property, alleging wrongful interference with contract and abusive litigation on part of mortgagee and seeking specific performance. The Superior Court, Fulton County, Barnes, J., dismissed counts against mortgagee and granted summary judgment on specific performance count. Purchaser appealed. The Court of Appeals, Johnson, P.J., held that: (1) mortgagee was not a "stranger to the contract," and thus could not be liable to purchaser for tortious interference; (2) mortgagee's success in obtaining writ of possession against prospective purchaser precluded abusive litigation claim; and (3) purchaser's failure to give written notice of intent to sue for abusive litigation also precluded that claim.

Affirmed.

West Headnotes

**[1] Torts** 12
379k12 Most Cited Cases

Mortgagee that held note and security deed on property was not a "stranger to the contract" for its sale between prospective vendor, who recently purchased the property from mortgagor, and prospective purchaser, and thus could not be liable to purchaser for tortious interference with contract.

**[2] Torts** 12
379k12 Most Cited Cases

In order to be liable for interference with a contract, a defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract.

**[3] Torts** 12
379k12 Most Cited Cases

One is not a "stranger to the contract," as would make him potentially liable for tortious interference, just because he is not a party to the contract.

**[4] Torts** 12
379k12 Most Cited Cases

A tortious interference claim requires, among other things, wrongful conduct by the defendant without privilege; privilege means legitimate economic interests of the defendant or a legitimate relationship of the defendant to the contract, so that he is not considered a stranger, interloper, or meddler.

**[5] Torts** 12
379k12 Most Cited Cases

A person with a direct economic interest in a contract is not a "stranger to the contract," as would make him potentially liable for tortious interference.

**[6] Torts** 10(1)
379k10(1) Most Cited Cases

**[6] Torts** 12
379k12 Most Cited Cases

Parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships.

**[7] Pretrial Procedure** 624
307Ak624 Most Cited Cases

A motion to dismiss for failure to state a claim should be sustained if the allegations of the complaint reveal, with certainty, that the plaintiff would not be entitled to relief under any state of provable facts asserted in support of the complaint. West's Ga.Code Ann. § 9-11-12(b)(6).

**[8] Malicious Prosecution** 34
249k34 Most Cited Cases

Mortgagee's success in obtaining the writ of possession against prospective purchaser and purchaser's failure to appeal from that judgment precluded purchaser from bringing claim for abusive litigation against mortgagee. West's Ga.Code Ann. § 51-7-82(c).

**[9] Malicious Prosecution** 39
249k39 Most Cited Cases

Failure of prospective purchaser to give written notice to mortgagee that he intended to sue for abusive litigation, arising out of mortgagee's dispossessory action, precluded purchaser from bringing such action. West's Ga.Code Ann. § 51-7-84(a).
**823 *775 Jack LaSonde, pro se.

Stites & Harbison, John C. Porter, Jr., Atlanta, for appellees.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

577 S.E.2d 822
3 FCDR 348
(Cite as: 259 Ga.App. 772, 577 S.E.2d 822)

Page 2

**\*772 JOHNSON, Presiding Judge.**

Jack LaSonde filed a complaint against Chase Mortgage Company f/k/a Chemical Mortgage Company, Chase Manhattan Mortgage Corporation (collectively "Chase Mortgage"), and Wayne McGregor seeking damages and equitable relief claiming Chase Mortgage wrongfully interfered with McGregor's agreement to sell LaSonde real property. LaSonde also claimed that Chase Mortgage is liable for abusive litigation for filing a dispossessory action against him. This is an appeal from the dismissal of two counts of LaSonde's three-count complaint.

The following facts are undisputed: Cleveland Watkins purchased residential real estate with a loan from Chase Mortgage Company f/k/a Chemical Mortgage Company. The promissory note was secured by a security deed assigned to Chase Mortgage. Watkins sold the property to McGregor, and McGregor sought approval from Chase Mortgage to allow him to assume the loan. Chase Mortgage denied McGregor's request.

McGregor then entered into a contract with LaSonde in which LaSonde would lease the property from McGregor with an option to purchase it. LaSonde moved into the residence and, in December 1999, exercised the purchase option and entered into a sales contract with McGregor. McGregor then told LaSonde that the loan on the property was assumable, but that there was a dispute and that Chase Mortgage refused to provide him with payoff information. The loan went into default, and the property was foreclosed upon. Chase Mortgage bought the property at the foreclosure sale and filed a dispossessory action against Watkins and LaSonde. The trial court granted the writ of possession.

A few days later, LaSonde proceeded to close on the purchase of the property with funds he borrowed from another lender. After the loan closed, LaSonde filed the underlying suit.

In Count 1 of the complaint, LaSonde sought relief from Chase Mortgage, claiming it interfered with his sales contract with McGregor by refusing to provide McGregor with payoff information on the **\*773** loan and refusing to accept payments from McGregor. In Count 2, LaSonde alleged Chase Mortgage was liable for abusive litigation because it filed the dispossessory action. In Count 3, LaSonde sought specific performance from all three defendants.

The trial court dismissed Counts 1 and 2 of the complaint, holding there could be no action for tortious interference with contract because Chase Mortgage was not a stranger to the contract between LaSonde and McGregor. At that time, the trial court did not enter judgment on Count 3. LaSonde

filed a direct appeal from the order of dismissal. **\*\*824** but this Court dismissed the appeal. [FN1] Later, the trial court granted summary judgment to Chase Mortgage and McGregor on Count 3 of the complaint, noting that Count 3 had been rendered moot because LaSonde had already received the relief requested in that count. LaSonde now appeals from the order granting summary judgment, which incorporates by reference the earlier order dismissing Counts 1 and 2 of the complaint.

> FN1. Case No. A02A0954, dismissed February 15, 2002.

[1] 1. LaSonde contends the trial court erred in dismissing Count 1 for failure to state a claim upon which relief could be granted. [FN2] There was no error.

> FN2. See OCGA § 9-11-12(b)(6).

[2][3][4][5][6] In order to be liable for interference with a contract, a defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract. [FN3] One is not a stranger to the contract just because he is not a party to the contract. [FN4] A tortious interference claim requires, among other things, wrongful conduct by the defendant without privilege; "privilege" means legitimate economic interests of the defendant or a legitimate relationship of the defendant to the contract, so that he is not considered a stranger, interloper, or meddler. [FN5] A person with a direct economic interest in the contract is not a stranger to the contract. [FN6] Parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships. [FN7]

> FN3. Pruitt Corp. v. Strahley, 270 Ga. 430, 510 S.E.2d 821 (1999).

> FN4. Atlanta Market Center Mgmt. Co. v. McLane, 269 Ga. 604, 608(2), 503 S.E.2d 278 (1998).

> FN5. Disaster Svcs. v. ERC Partnership, 228 Ga.App. 739, 740-741, 492 S.E.2d 526 (1997).

> FN6. Atlanta Market Center Mgmt., supra at 609(2), 503 S.E.2d 278.

> FN7. Pruitt Corp., supra.

It is clear that Chase Mortgage was not a stranger to the sales contract between LaSonde and McGregor. Chase Mortgage held the note and security deed to the property at issue. Indeed, Chase Mortgage was responsible for deciding whether to permit LaSonde or McGregor to assume the loan on the property. Chase Mortgage had a **\*774** direct economic interest in the property which was the subject of

577 S.E.2d 822
3 FCDR 348
(Cite as: 259 Ga.App. 772, 577 S.E.2d 822)

Page 3

the sales contract.

[7] A motion to dismiss for failure to state a claim should be sustained if the allegations of the complaint reveal, with certainty, that the plaintiff would not be entitled to relief under any state of provable facts asserted in support of the complaint. [FN8] Because the complaint reveals with certainty that Chase Mortgage was not a stranger to the sales contract, the trial court properly dismissed LaSonde's claim based on tortious interference with contract. [FN9] We note that the trial court's decision is consistent with the Supreme Court's express desire to limit the number of entities against which a claim of tortious interference with contract may be maintained. [FN10]

> FN8. *Watkins v. Hereth,* 257 Ga.App. 184, 570 S.E.2d 629 (2002).

> FN9. See id.

> FN10. Id.

2. LaSonde argues that the trial court erred in dismissing Count 2 for failure to state a claim upon which relief could be granted. He urges that the trial court's findings, namely that Chase Mortgage succeeded in obtaining a writ of possession and that LaSonde failed to give written notice of his intent to file an action for abusive litigation, were issues of fact. Therefore, he maintains, the issues should have been submitted to a jury. We disagree.

[8] OCGA § 51-7-82(c) provides that it is a complete defense to any claim for abusive litigation that the person against whom the claim is asserted was substantially successful on the issue forming the basis for the claim of abusive litigation in the underlying civil proceeding. Chase Mortgage succeeded in obtaining the writ of possession against LaSonde, and the judgment in that case was not appealed. Chase Mortgage's success precludes**825 LaSonde's recovery for abusive litigation.

[9] Moreover, OCGA § 51-7-84(a) requires that the allegedly injured party give written notice to the other party that he intends to sue for abusive litigation in order to give the potential defendant the opportunity to withdraw the allegedly abusive action or pleading. It is undisputed that no such notice was given to Chase Mortgage. Thus, the trial court properly dismissed Count 2 of the complaint.

*Judgment affirmed.*

BLACKBURN, P.J., and MILLER, J., concur.

577 S.E.2d 822, 259 Ga.App. 772, 3 FCDR 348

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

35

(

## 18.0 PRELIMINARY INSTRUCTION—TRADEMARK

The plaintiff, [*name of plaintiff*], seeks damages against the defendant, [*name of defendant*], for [trademark infringement] [unfair competition]. The defendant denies [infringing the trademark] [unfairly competing] [and] [contends the trademark is invalid]. To help you understand the evidence that will be presented in this case, I will explain some of the legal terms you will hear during this trial.

## DEFINITION OF A TRADEMARK

A trademark is a word, a name, a symbol, a device, or a combination of them that indicates the source of goods. The [owner] [assignee] [licensee] of a trademark has the right to exclude others from using that trademark.

## [HOW A TRADEMARK IS OBTAINED]

[A person acquires the right to exclude others from using a trademark by being the first to use it in the marketplace. Rights in a trademark are obtained only through commercial use of the mark. The owner of a trademark has the right to exclude others unless the trademark has been abandoned.]

## [TRADEMARK INTERESTS]

[The owner of a trademark may transfer, give, or sell to another person the owner's interest in the trademark. This type of [agreement] [gift] is called an assignment, and the person who receives the owner's interest is called an assignee. An assignee has the right to exclude others from using the trademark. To be enforceable, the assignment must be in writing and signed. It must also include the goodwill of the business connected with the trademark.]

[The owner of a trademark may also enter into an agreement that permits another person to use the trademark. This type of agreement is called a license, and the person permitted to use the trademark is called a licensee.]

A trademark [owner] [assignee] [licensee] may enforce the right to exclude others in an action for [infringement] [or] [*insert applicable form of unfair competition from 15 U.S.C. § 1125(a)*].

## [TRADEMARK REGISTRATION]

[Once the owner of a mark has obtained the right to exclude others from using the trademark, the owner may obtain a certificate of registration issued by the United States Patent and Trademark Office. Thereafter, when the owner brings an action for infringement, the owner may rely solely on the registration certificate to prove that the owner has the right to exclude others from using the trademark in connection with the type of goods specified in the certificate.]

## THE PLAINTIFF'S BURDEN OF PROOF

[In this case, the plaintiff, [*name of plaintiff*], contends that the defendant, [*name of defendant*], has infringed the plaintiff's trademark. The plaintiff has the burden of proving by a preponderance of the evidence that the plaintiff is the owner of a valid trademark and that the defendant infringed that trademark. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the defendant infringed the plaintiff's trademark.]

## [DEFENDANT'S BURDEN OF PROOF]

[The defendant contends that [the [registered] trademark is invalid] [,] [the trademark has been abandoned] [or] [*insert other affirmative defense*]. The defendant has the burden of proving by a preponderance of the evidence that [the [registered] trademark] is invalid] [,] [the trademark has been abandoned] [or] [*insert other affirmative defense*].

[Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the [[registered] trademark is invalid] [or] [*insert other affirmative defense*].]

[_____ is a person as that term is used in these instructions.]

## Comment

*See generally* 15 U.S.C. § 1051 *et seq.*

This instruction is tailored to fit a classic trademark infringement case. If the case involves trade dress, trade name, or other unfair competition claims, this instruction will require modification.

Throughout these instructions, wherever the term "trademark" is used, as is appropriate for the facts of the case, a more specific term, such as "service mark," or "collective mark" or "certification mark" may be substituted.

A corporation is a person. *See* Instruction 6.2 (Liability of Corporations–Scope of Authority Not In Issue).

**Further Comments:** *Actual & Intended Use Requirements; Basis for Infringement Allegations.*



# EXHIBIT / ATTACHMENT

## 36

(To be scanned in place of tab)

## 18.1 DEFINITION—TRADEMARK—GENERALLY (15 U.S.C. § 1127)

A trademark is any word, name, symbol, device [, or any combination thereof,] used by a person to identify and distinguish that person's goods from those of others and to indicate the source of the goods [, even if that source is generally unknown].

[A person who uses the trademark of another may be liable for damages.]

### Comment

A trademark is a limited property right in a particular word, phrase or symbol. *See New Kids on the Block v. New America Pub., Inc.*, 971 F.2d 302, 306 (9th Cir.1992).

A trademark identifies the source of goods. *See Brookfield Communications v. West Coast Entertainment*, 174 F.3d 1036, 1051 (9th Cir.1999). But it fails to serve its source-identifying function when the public has never seen it, for instance when registered for an Internet domain name. *Id.* Accordingly, it is not protected until it is used in public in a manner that creates an association among consumers between the mark and the mark's owner. *Id.*

The ability of a trademark to distinguish the source of the goods it marks, not the uniqueness of its color, shape, fragrance, word or sign, entitles it to protection. *See Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164, 166 (1995). Accordingly, if it can sufficiently serve the basic purpose of source identification, "a color may sometimes meet the basic legal requirements for use as a trademark." *Id.*

*See* Instruction 18.2 (Trade Dress) and Instruction 18.3 (Trade Name).

### Adjustment of Instruction for Other Types of Marks

This instruction is a model for any case involving a trademark as defined by the Lanham Act, 15 U.S.C. § 1127. Under the Lanham Act, the term "mark" is often used to define the various types of mark protected by the trademark law, such as trade and service marks, collective trade and service marks, and certification trade and service marks. *New Kids on the Block* , 971 F.2d at 306 . Accordingly, if other types of marks are involved in the case, adjustments to this instruction should be made as follows:

**A. Service Mark Cases**: When a service mark is at issue, substitute the following for the first paragraph of this instruction and substitute the word "service mark" for "trademark" in the second paragraph:

A service mark is any word, name, symbol, device [, or any combination thereof,] used by a person to identify and distinguish such person's services from those of others and to indicate the source of the services [, even if that source is generally unknown]. [Titles, character names, and other distinctive features of radio or television programs may be registered as service marks as well].

"Generally speaking, a service mark is a distinctive mark used in connection with the sale or advertising of services.... " *American Int'l Group v. American Int'l Bank*, 926 F.2d 829, 830 n. 1 (9th Cir.1991).

**B. Collective Trademark Cases:** When a collective trademark is at issue, in lieu of this instruction, insert the following:

A collective trademark is any [word] [name] [symbol] [device] [, or combination thereof,] used by [a cooperative] [an association] [, or other collective group or organization] to identify and distinguish its goods from those of others, and to indicate the source of the goods [, even if that source is generally unknown].

[A person who uses the collective trademark of a [cooperative] [an association] [, or another collective group or organization] may be liable for damages.].

For a description of a collective mark, see *Sebastian Int'l v. Longs Drug Stores*, 53 F.3d 1073, 1077–78 (9th Cir.1995) (Ferguson, J., concurring).

**C. Collective Service mark Cases:** When a collective service mark is at issue, in lieu of this instruction, insert the following:

A collective service mark is any [word] [name] [symbol] [device] [, or combination thereof,] used by [a cooperative] [an association] [, or other collective group or organization] to identify and distinguish its services from those of others, and to indicate the source of the services [, even if that source is generally unknown].

[A person who uses the collective service mark of a [cooperative] [an association] [, or another collective group or organization] may be liable for damages.].

Regarding a collective service mark, see *Robi v. Reed*, 173 F.3d 736, 739–40 (9th Cir.1999) (Musical group members, as collective mark owners of the group's service mark, do not retain the right to use the service mark when they leave the group, where members of the original group continue to use the service mark. The manager of the group, who was in a position to control the quality of its services, retained the right to use the service mark.).

**D. Certification Mark for Goods Cases:** When a certification mark for goods is at issue, in lieu of this instruction, insert the following:

A certification mark for goods is any [word] [name] [symbol] [device] [, or any combination thereof,] which its owner permits others to use to certify [a good's [origin] [material] [mode of manufacture] [quality] [accuracy] [*fill in other certifiable characteristics*]] [that the work or labor on the goods was performed by members of a union or other organization].

[A person who uses the certification mark for goods of a [cooperative] [an

association] [, or another collective group or organization] may be liable for damages.].

**E. Certification Mark for Services Cases:** When a certification mark for services is at issue, in lieu of this instruction, insert the following:

A certification mark for services is any [word] [name] [symbol] [device] [, or any combination thereof,] which its owner permits others to use to certify [a service's [origin] [quality] [accuracy] [*fill in other certifiable characteristics*]] [that a service is performed by members of a union or other organization].

[A person who uses the certification mark of a [cooperative] [an association] [, or another collective group or organization] may be liable for damages.]

**Further Comments**: *Symbolic function of trademarks.*



# EXHIBIT / ATTACHMENT

## 37

(To be scanned in place of tab)

**18.5 INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF—TRADEMARK OR TRADE DRESS—(15 U.S.C. §§ 1114(1) & 1125(A)(1))**

On the plaintiff's claim for trademark infringement, the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence that:

1.    [*describe plaintiff's symbol or term*] is a valid, protectable trademark;

2.    the plaintiff owns [*describe plaintiff's symbol or term*] as a trademark;

3.    the defendant used [*describe symbol or term used by defendant*] [a mark similar to [*describe plaintiff's symbol or term*]] without the consent of the plaintiff in a manner that is likely to cause confusion among ordinary purchasers as to the source of the goods; and

4.    plaintiff was damaged by defendant's infringement.

If you find that each of the elements on which the plaintiff has the burden of proof has been proved, your verdict should be for the plaintiff. If, on the other hand, the plaintiff has failed to prove any of these elements, your verdict should be for the defendant.

### Comment

This instruction sets out the general standard for trademark infringement liability under the Lanham Act. Modify this instruction as necessary in any case involving service marks, trade dress, collective trade or service marks, or certification trade or service marks, by inserting such terms in lieu of the word "trademark" in this instruction. The traditional infringement case involves the defendant palming off the defendant's product as the plaintiff's by using the plaintiff's trademark. However, infringement also occurs from the opposite, where defendant's use of plaintiff's trademark creates the impression that the plaintiff's product is the defendant's.

The statute requires that the mark be either (1) used in commerce or (2) placed on goods intended to be used in commerce. 15 U.S.C. § 1114(1). Because the "commerce" requirement is jurisdictional, that element need not go to the jury.

Where the defendant's infringing action consists of using a mark similar, but not identical to the plaintiff's, particular care should be exercised in the third numbered element of this instruction. *Gracie v. Gracie*, 217 F.3d 1060, 1066–1067 (9th Cir.2000) (when instructing jury to consider if defendant "used" plaintiff's mark, trial court should make it clear jury can consider whether the marks were similar). The second bracketed phrase in the third numbered element of this instruction may be a sufficient specification in most cases involving defendant's use of mark similar, rather than identical, to the plaintiff's.

Consult the following instructions in order to explain the elements identified by this instruction:

Instruction 18.11 (Elements—Ownership—Generally)

Instruction 18.15 (Likelihood of Confusion—Factors—*Sleekcraft* Test)

Instruction 18.6 (Elements—Presumed Validity & Ownership—Registered Marks).

Although 15 U.S.C. § 1114(1) provides protection only to registered marks and 15 U.S.C. § 1125(a)(1) protects against infringement of unregistered and registered marks, trade dress and false advertising, the Ninth Circuit has explained that "[d]espite these differences, the analysis [for infringement] under the two provisions is sometimes identical." *Brookfield Communications, Inc., v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046–1047 n. 8 (9th Cir.1999) (trademark infringement elements under either § 1114 or § 1125(a) involve **a** plaintiff showing 1) that defendant used a mark confusingly similar to 2) a valid, protectable trademark 3) that was owned by the plaintiff.).

**Further Comment**: *Additional Ninth Circuit Cases on Similarity of § 1114 and 1125.*



# EXHIBIT / ATTACHMENT

## 3B

**(To be scanned in place of tab)**

## 18.19 DEFENSES—ABANDONMENT—AFFIRMATIVE DEFENSE—
## DEFENDANT'S BURDEN OF PROOF (15 U.S.C. § 1127)

The [owner] [assignee] [licensee] of a trademark ] cannot exclude others from using the trademark ] if it has been abandoned.

The defendant contends that the trademark ] has become unenforceable because the [owner] [assignee] [licensee] abandoned it. The defendant has the burden of proving abandonment by [clear and convincing] [a preponderance of the] evidence.

The [owner] [assignee] [licensee] of a trademark ] abandons the right to exclusive use of the trademark ] when the [owner] [assignee] [licensee]:

1.  discontinues its use in the ordinary course of trade, intending not to resume using it, or

2.  [acts] [or] [fails to act] so that the trademark's [primary significance] [primary meaning] [principal significance] [principal meaning] to prospective purchasers has become the [product] [service] itself and not the [[producer of the product] [provider of the service]].

## Comment

No Ninth Circuit case clearly describes the standard of proof required to prove abandonment. For instance, *Prudential Ins. Co. v. Gibraltar Financial Corp.*, 694 F.2d 1150, 1156 (9th Cir.1982), *cert. denied*, 463 U.S. 1208 (1983), characterized abandonment as "in the nature of a forfeiture" which "must be strictly proved." Such forfeiture required demonstration by "a high burden of proof." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017 (9th Cir.1985) (citing *Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir.1976), *cert. denied*, 433 U.S. 908 (1977)).

Scholars note that except for the Federal Circuit, "all" courts follow a clear and convincing standard of proof of abandonment. *See* 2 J. Thomas McCarthy, Trademarks and Unfair Competition, § 17.18 (4th ed. 2001). *See also* Fletcher, Anthony L. and David J. Kera, *Annual Review*, 85 Trademark Rep. 607, 724–25 (1995).

Abandonment is defined in 15 U.S.C.§ 1127, paragraph 16. *See also* 2 J. Thomas McCarthy, Trademarks and Unfair Competition, § 17.18 (4th ed. 2001). Evidence of non-use of the mark for three consecutive years is prima facie evidence of abandonment. *See* 15 U.S.C. § 1127; *Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 411–12 (9th Cir.1996) (prima facie showing of abandonment creates only a rebuttable presumption of abandonment).

The defendant has the burden of proving abandonment. Where the defendant proves the necessary consecutive years of non-use, the burden shifts to the plaintiff to go forward with evidence to prove that circumstances do not justify the inference of intent not to resume use. *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 99 (5th Cir.1983).

The abandonment defense has never been applied to a person's name or identity. *See Abdul–Jabbar*, 85 F.3d at 411–12 (declining to stretch the federal law of trademark to encompass such a defense). "A proper name ... cannot be deemed 'abandoned' throughout its

possessor's life despite his failure to use it or to continue to use it, commercially." *Id.*



# EXHIBIT / ATTACHMENT

## 39

(To be scanned in place of tab)

## 18.24 TRADEMARK DAMAGES—DEFENDANT'S PROFITS (15 U.S.C. § 1117(A))

In addition to actual damages, the plaintiff is entitled to any profits earned by the defendant that are attributable to the infringement, which the plaintiff proves by a preponderance of the evidence. You may not, however, include in any award of profits any amount that you took into account in determining actual damages.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of defendant's receipts from using the trademark ] in the sale of a [product]. The plaintiff has the burden of proving a defendant's gross revenue by a preponderance of the evidence.

Expenses are all [operating] [overhead] and production costs incurred in producing the gross revenue. The defendant has the burden of proving the expenses [and the portion of the profit attributable to factors other than use of the infringed trademark ] by a preponderance of the evidence.

Unless you find that a portion of the profit from the sale of the [goods] using the [trademark] [mark] is attributable to factors other than use of the trademark ], you shall find that the total profit is attributable to the infringement.

### Comment

"Recovery of both plaintiff's lost profits and disgorgement of defendant's profits is generally considered a double recovery under the Lanham Act." *Nintendo of America, Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1010 (9th Cir.1994).

Regarding establishing and calculating defendant's profits, see *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405–08 (9th Cir.1993) ("The intent of the infringer is relevant evidence on the issue of awarding profits and damages and the amount;" determining that in order to establish damages under the lost profits method, plaintiff must make prima facie showing of reasonably forecast profits.); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985) (defendant's own statements as to profits provided sufficient basis for calculation of defendant's profits under 15 U.S.C. § 1117(a)). *See also American Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir.1990) (plaintiff entitled to amount of gross sales unless defendant adequately proves amount of costs to be deducted from it); *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir.1986) (court awarded receipts from sales pursuant to 15 U.S.C. § 1117(a)); 5 J. Thomas McCarthy, Trademarks and Unfair Competition § 30.65 (4th ed. 2001) (discussing computation of defendant's profits from infringing sales).

Plaintiff has the burden of proof as to damages. *See Rolex Watch, U.S.A., Inc., v. Michel Co.*, 179 F.3d 704, 712 (9th Cir.1999) (plaintiff carries burden to show with "reasonable certainty" the defendant's gross sales from the infringing activity); *Lindy*

*Pen Co.*, 982 F.2d at 1405–08; *Nintendo of America,* 40 F.3d at 1012 (where infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to the plaintiff).

"[T]he trial court has wide discretion to increase or reduce the amount of profits recoverable by the plaintiff '[i]f the court shall find that the amount of recovery based on profits is either inadequate or excessive ... according to the circumstances of the case.' " *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l*, 951 F.2d 684, 694 (5th Cir.1992)) (quoting 15 U.S.C. § 1117(a)).

An award based on defendant's profits may require proof that the defendant acted willfully or in bad faith. *See, e.g., Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir.), *cert. denied*, 391 U.S. 966 (1968). *But see Adray v. Adry–Mart*, Inc., 76 F.3d 984, 988 (9th Cir.1995) ("An instruction that willful infringement is a prerequisite to an award of defendant's profits may be an error in some circumstances ([such] as when plaintiff seeks the defendant's profits as a measure of [plaintiff's] own damage [citation omitted])").

For examples of costs and deductions that the defendant may raise, see 1a Jerome Gilson, Trademark Protection and Practice § 8.08(3). The defendant may also raise a defense that the purchasers bought goods bearing the infringing mark for reasons other than the appeal of the mark, and that the infringement had no cash value in sales made by the defendant. *Id.* If such a defense is raised, an appropriate instruction should be drafted.

An award of speculative damages is inappropriate. See *McClaran v. Plastic Industries, Inc.*, 97 F.3d 347, 361–62 (9th Cir.1996) (jury finding of lost profits based upon theory that designer would have entered market but for the infringement was too speculative where no one had made a profit on the designed products).



# EXHIBIT / ATTACHMENT

## 40

(To be scanned in place of tab)

§ 104.01                                 GENERAL CIVIL INSTRUCTIONS

has been proved by a preponderance of the evidence, you may
consider the testimony of all of the witnesses, regardless of who
may have called them, and all of the exhibits received in
evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of a claim or
contention by a preponderance of the evidence you should find
against the party making that claim or contention.

Eleventh Circuit Pattern Jury Instructions: Civil Cases. Basic Instruc-
tion No. 6.2 (2000).

## § 104.02  "Clear and Convincing Evidence"—Defined

"Clear and convincing evidence" is evidence that pro-
duces in your mind a firm belief or conviction as to the
matter at issue. Clear and convincing evidence involves a
greater degree of persuasion than is necessary to meet the
preponderance of the evidence standard. This standard does
not require proof to an absolute certainty, since proof to an
absolute certainty is seldom possible in any case.

### NOTES

*In General*

The "clear and convincing" standard of proof is used to protect
particularly important interests in a limited number of civil cases.
Graham, Handbook of Federal Evidence § 3.05 n.5. It has been applied
with respect to claims including fraud, mutual mistake, and the contents
of a lost deed. See, e.g., Cooper v. Mitchell Bros.' Santa Ana Theater, 454
U.S. 90, 92–94, 102 S.Ct. 172, 173–74, 70 L.Ed.2d 262 (1981); Addington
v. Texas, 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979);
Rosenbloom v. Metromedia, 403 U.S. 29, 52, 91 S.Ct. 1811, 1824, 29
L.Ed.2d 296 (1971); In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068,
1075, 25 L.Ed.2d 368 (1970).

*Fifth Circuit*

Clear and convincing evidence is evidence that produces in
your mind a firm belief or conviction as to the matter at issue.
This involves a greater degree of persuasion than is necessary to
meet the preponderance of the evidence standard; however,
proof to an absolute certainty is not required.

Pattern Jury Instructions of the District Judges Association of the Fifth
Circuit, Civil Cases, Instruction No. 2.14 (1999).

142



# EXHIBIT / ATTACHMENT

## 41

**(To be scanned in place of tab)**

CONTRACT ACTIONS                                    § 126.01

### Research References

**West's Key Number Digest**
  Contracts ☞1, 30  46, 353.
**Treatises and Practice Aids**
  Pleading Contract Claim. Wright & Miller, Federal Practice and Procedure. Civil
    2d § 1235
  Parties in Contract Actions. Wright, Miller & Kane, Federal Practice and Proce-
    dure: Civil 2d § 1613
  Summary Judgement in Contract Actions. Wright, Miller & Kane, Federal Prac-
    tice and Procedure: Civil 2d § 2730.1

## A.  GENERALLY

### § 126.01  Elements of Contract Formation

A contract is a promise or set of promises for the breach of which the law gives a remedy or the performance of which the law in some way recognizes a duty. To be binding, a contract must include a manifestation of mutual assent to the terms and conditions of the contract. This is referred to as the "meeting of the minds." There must be a meeting of the minds; there can be no contract if only one party intends to be bound.

Because intent, including intent to be bound, is seldom susceptible to direct proof because it relates to a person's state of mind, the law presumes that a person intends the natural and probable consequences of that person's acts. The meeting of the minds or the mutual manifestation of intent may be made wholly or partly by written or spoken words or by other acts or conduct, and an internal or unexpressed intention not to be bound is ineffective.

In determining whether or not there was any contract, you must decide whether or not there was a meeting of the minds between the parties with respect to the terms of the alleged oral agreement and a present intention to be bound.

### NOTES

*In General*

This instruction is adapted from Woodward & Dickerson, Inc. v. Yoo Hoo Beverage Co., 502 F.Supp. 395 (E.D.Pa.1980), affirmed summarily, 661 F.2d 916 (3d Cir.1981).

A contract is a promise or set of promises for the breach of which the law gives a remedy or the performance of which the law in some way



# EXHIBIT / ATTACHMENT

## 4a

(To be scanned in place of tab)

actual damages to an amount "not exceeding three times" such damages according to the circumstances of the case."[209] Unless the court finds extenuating circumstances, the court must enter judgment for three times such profits or damages, whichever is greater, in the case of any violation of Section 1114(1)(a) that consists of intentionally using a mark or designation, knowing such mark or designation is counterfeit, in connection with the sale, offering for sale or distribution of goods or services.[210]

## A.  GENERALLY

### 159.01  Nature of the Action

This is an action for trademark infringement. Subject to certain defenses, a trademark [owner] [assignee] [licensee] may enforce the right to exclude others in an action for infringement.

A person may acquire the right to exclude others from using a trademark by being the first to use it in the marketplace. Rights in a trademark are obtained only through commercial use of the trademark. The owner of a trademark has the right to exclude others unless the trademark has been abandoned.

In this action, plaintiff _____ seeks damages from defendant _____ for trademark infringement.

Defendant _____ [denies infringing the trademark] [and] [contends the trademark is invalid because [describe reason]].

### NOTES

*General*

The Lanham Act recognizes a cause of action for infringement of a duly registered mark where use of the mark is likely to cause confusion, mistake, or deception. 15 U.S.C.A. § 1114(1). The Lanham Act imposes civil liability for infringement of an unregistered mark

... v. Ralston Purina Co., 913 F.2d ... (D.C.Cir. 1990). Cf. Sands, Taylor ... Quaker Oats Co., 34 F.3d 1340, ... (7th Cir. 1994) (Section 1117(a) is, in ... to protect important public interest, ... penalty imposed must provide suffi- ... deterrent to ensure that guilty party ... engage in further infringing con-

duct). See generally, Punitive or Exemplary Damages as Recoverable for Trademark Infringement or Unfair Competition, 47 A.L.R.2d 1117.

**209.** 15 U.S.C.A. § 1117(a).

**210.** 15 U.S.C.A. § 1117(b).

where the defendant's use has an effect on commerce. 15 U.S.C.A. § 1125.

This instruction is written with trademark infringement in mind. However, it can readily be modified for service marks, collective marks, or certification marks.

The Lanham Act protects both actual and intended use of a trademark. 15 U.S.C.A. § 1051(b). If intended use of a trademark is at issue, these instructions must be adapted to fit the case.

*Ninth Circuit*

### PRELIMINARY INSTRUCTION— TRADEMARK

The plaintiff, _____, seeks damages against the defendant, _____, for [trademark] [mark] infringement. The defendant [denies infringing the [trademark] [mark]] [and] [contends the [trademark] [mark] is invalid]. To help you understand the evidence that will be presented in this case, I will explain some of the legal terms you will hear during this trial.

### DEFINITION OF A [TRADEMARK] [MARK]

A [trademark] [mark] is a word, a name, a symbol, a device, or a combination of them that indicates the source of goods or services. The [owner] [assignee] [licensee] of a [trademark] [mark] has the right to exclude others from using that [trademark] [mark].

### [HOW A [TRADEMARK] [MARK] IS OBTAINED]

A person acquires the right to exclude others from using a [trademark] [mark] by being the first to use it in the marketplace. Rights in a [trademark] [mark] are obtained only through commercial use of the mark. The owner of a [trademark] [mark] has the right to exclude others unless the [trademark] [mark] has been abandoned.

### [TRADEMARK INTERESTS]

[The owner of a [trademark] [mark] may transfer, give or sell to another person the owner's interest in the [trademark] [mark]. This type of [agreement] [gift] is called an assignment, and the person who receives the owner's interest is called an assignee. An assignee has the right to exclude others from using the [trademark] [mark]. To be enforceable, the assignment must be in writing and signed. It must also include the goodwill of the business connected with the mark.]

814

[The owner of a [trademark] [mark] may also enter into an agreement that permits another person to use the [trademark] [mark]. This type of agreement is called a license, and the person permitted to use the [trademark] [mark] is called a licensee.]

A trademark [owner] [assignee] [licensee] may enforce the right to exclude others in an action for [infringement] [or] [insert applicable form of unfair competition from 15 U.S.C.A. § 1125(a)].

### [[TRADEMARK] [MARK] REGISTRATION]

[Once the owner of a mark has obtained the right to exclude others from using the [trademark] [mark], the owner may obtain a certificate of registration issued by the United States Patent and Trademark Office. Thereafter, when the owner brings an action for infringement, the owner may rely solely on the registration certificate to prove that the owner has the right to exclude others from using the [trademark] [mark] in connection with the type of goods or services specified in the certificate.]

### THE PLAINTIFF'S BURDEN OF PROOF

In this case, the plaintiff, _____, contends that the defendant, _____, has infringed plaintiff's [trademark] [mark]. The plaintiff has the burden of proving by a preponderance of the evidence that plaintiff is the owner of a valid [trademark] [mark] and that the defendant infringed that [trademark] [mark]. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the defendant infringed the plaintiff's [trademark] [mark].

### [DEFENDANT'S BURDEN OF PROOF]

[The defendant contends that [the registered [trademark] [mark] is invalid] [,] [the [trademark] [mark] has been abandoned] [or] [insert other affirmative defense]. The defendant has the burden of proving by a preponderance of the evidence that [the registered [trademark] [mark] is invalid] [,] [the [trademark] [mark] has been abandoned] [or] [insert other affirmative defense].]

[Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the [registered [trademark] [mark] is invalid] [or] [insert other affirmative defense].]

815

Comment

See generally 15 U.S.C. § 1051 et seq.

This instruction is tailored to fit a classic trademark infringement case. If the case involves trade dress, trade name, or other unfair competition claims, this instruction will require modification.

The statute now protects both actual and intended use of a trademark. 15 U.S.C. § 1051(b). In a case involving merely intended use of a trademark, these instructions must be tailored to fit the case.

Throughout these instructions, wherever the term "mark" is used, the more specific terms "trademark," "service mark," or "collective mark" may be substituted as appropriate.

A trademark infringement case can be brought under three different causes of action: (1) statutory trademark infringement, (2) common law trademark infringement, and (3) unfair competition.

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.0 (1997).

## § 159.02   Obtaining a Trademark

A person acquires the right to exclude others from using a trademark by being the first to use the trademark in the marketplace. Rights in a trademark are obtained only through commercial use of the trademark. [*The owner of a trademark has the right to exclude others unless the trademark has been abandoned.*]

### NOTES

*In General*

Trademark rights in the United States are grounded in public use, not registration. See 15 U.S.C.A. § 1051(a)(1) (the owner of a trademark used in commerce may request registration of its trademark). See also Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412–13, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916) (exclusive right to trademark grows out of use, not mere adoption). Accord Raxton Corp. v. Anania Associates, Inc., 635 F.2d 924, 926 (1st Cir.1980). Cf. New England Duplicating Co. v. Mendes, 190 F.2d 415, 418 (1st Cir.1951) (actual sales are not required, but public use is); Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1052 (9th Cir.1999) (same); New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1200 (9th Cir.1979) (same). Federal intent-to-use applications require a statement

816



# EXHIBIT / ATTACHMENT

_____ 43 _____

(To be scanned in place of tab)

District Courts of the

N

btain a certificate
atent and Trade-
o prove the right
mark).

District Courts of the

erved

rence to cover all
, service marks,
t is a word, name,
f used to identify
o indicate their

any combina-
ods or services
r in the sale of
in the sale of
k used by a

a certification

rict Courts of the

## § 159.41   Trademark

A trademark is a word, a name, a symbol, a device, or a combination of them indicating the source of goods or services. The [*owner*] [*assignee*] [*licensee*] of a trademark has the right to exclude others from using that trademark subject to certain defenses.

### NOTES

*In General*

See 15 U.S.C.A. § 1127.

*Ninth Circuit*

#### PRELIMINARY INSTRUCTION—TRADEMARK

. . .

#### DEFINITION OF A [TRADEMARK] [MARK]

A [trademark] [mark] is a word, a name, a symbol, a device, or a combination of them that indicates the source of goods or services. The [owner] [assignee] [licensee] of a [trademark] [mark] has the right to exclude others from using that [trademark] [mark].

. . .

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.0 (1997).

#### TRADEMARK—DEFINED
#### (15 U.S.C. § 1127)

A [trademark] [mark] is any [word], [name], [symbol], [device][, or any combination thereof] used by a person to identify and distinguish such person's goods from those of others, and to indicate the source of the goods[, even if that source is generally unknown].

A person who uses the trademark of another may be liable for damages.

[_____ is a person as that term is used in these instructions.]

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.3.2 (1997).

845



# EXHIBIT / ATTACHMENT



44

(To be scanned in place of tab)

In a case brought under the Lanham Act, a signed writing is necessary for an assignment to be valid. 15 U.S.C. § 1060. A signed writing is not required to prove an assignment in a common law trademark infringement claim. McCarthy, supra, § 18:1D.

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.1.3 (1997).

## § 159.48   License

The owner of a trademark may enter into an agreement that permits another person to use the trademark. This type of agreement is called a license, and the person permitted to use the trademark is called a licensee.

### NOTES

*In General*

Trademark licensing is permitted so long as licensor maintains adequate control over nature and quality of goods and services under mark by licensee. Rey v. Lafferty, 990 F.2d 1379, 1393 (1st Cir.), cert. denied, 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993); Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387 (5th Cir.1977); TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876, 885 (7th Cir.1997). A trademark license does not have to be in writing. McCarthy, McCarthy on Trademarks and Unfair Competition 4th ed. § 18:43.

*Ninth Circuit*

PRELIMINARY INSTRUCTIONS—TRADEMARK

. . .

[TRADEMARK INTERESTS]

. . .

[The owner of a [trademark] [mark] may also enter into an agreement that permits another person to use the [trademark] [mark]. This type of agreement is called a license, and the person permitted to use the [trademark] [mark] is called a licensee.]

. . .

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.0 (1997).

### TRADEMARK INTERESTS—LICENSEE

The owner of a [trademark] [mark] may enter into an agreement that permits another person to use the [trademark] [mark]. This type of agreement is called a license, and the person permitted to use the [trademark] [mark] is called a licensee.

A license agreement may include the right to exclude others from using the [trademark] [mark]. A licensee may enforce this right to exclude others in an action for [infringement] [or] [insert applicable form of unfair competition from 15 U.S.C. § 1125(a)].

[Plaintiff is a licensee.]

### Comment

Although assignments must be written under 15 U.S.C. § 1060, a license can be oral.

The owner of a trademark may include the right to sue for trademark infringement in a license of trademark rights. The licensee's right to sue originates from the license and is governed by the terms of the licensing agreement. See DEP Corp. v. Interstate Cigar Co., 622 F.2d 621 (2d Cir.1980) (Because the plaintiff was not the owner of the trademark, it did not have standing to sue under the Lanham Act. Furthermore, any interests the plaintiff had in the matter would be governed by the terms of the licensing agreement.). See also Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154 (1st Cir.1977) (the license granted the licensee "the right to enforce the licensed trademark rights against infringers in the United States").

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.1.4 (1997).

## § 159.49  Preponderance of the Evidence

[Defendant _____ has the burden of establishing the essential elements of certain affirmative defenses. I will explain this later.]

"Establish by a preponderance of the evidence" means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence as, when considered and compared with the evidence opposed to it, has more convincing force, and produces in your minds belief that what is sought to be proved is more likely true than not true. This standard does not require



EXHIBIT / ATTACHMENT



_____ 45 _____

(To be scanned in place of tab)

§ 159.48                    INSTRUCTIONS FOR FEDERAL CIVIL CASES

### TRADEMARK INTERESTS—LICENSEE

The owner of a [trademark] [mark] may enter into an agreement that permits another person to use the [trademark] [mark]. This type of agreement is called a license, and the person permitted to use the [trademark] [mark] is called a licensee.

A license agreement may include the right to exclude others from using the [trademark] [mark]. A licensee may enforce this right to exclude others in an action for [infringement] [or] [insert applicable form of unfair competition from 15 U.S.C. § 1125(a)].

[Plaintiff is a licensee.]

### Comment

Although assignments must be written under 15 U.S.C. § 1060, a license can be oral.

The owner of a trademark may include the right to sue for trademark infringement in a license of trademark rights. The licensee's right to sue originates from the license and is governed by the terms of the licensing agreement. See DEP Corp. v. Interstate Cigar Co., 622 F.2d 621 (2d Cir.1980) (Because the plaintiff was not the owner of the trademark, it did not have standing to sue under the Lanham Act. Furthermore, any interests the plaintiff had in the matter would be governed by the terms of the licensing agreement.). See also Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154 (1st Cir.1977) (the license granted the licensee "the right to enforce the licensed trademark rights against infringers in the United States").

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.1.4 (1997).

## § 159.49   Preponderance of the Evidence

[*Defendant* _____ *has the burden of establishing the essential elements of certain affirmative defenses. I will explain this later.*]

"Establish by a preponderance of the evidence" means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence as, when considered and compared with the evidence opposed to it, has more convincing force, and produces in your minds belief that what is sought to be proved is more likely true than not true. This standard does not require

856

proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

In determining whether any fact in issue has been proved by a preponderance of the evidence you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

[*Plaintiff* _____ *must prove by a preponderance of the evidence that defendant* _____ *infringed plaintiff's patent. If plaintiff* _____ *should fail to establish any essential element of the plaintiff's claim by a preponderance of the evidence, you should find for defendant* _____ *as to that claim.*]

[*Defendant* _____ *must prove by a preponderance of the evidence that [plaintiff's trademark is invalid] [other affirmative defense].*]

### NOTES

*In General*

To demonstrate infringement, the plaintiff must show by a preponderance of the evidence that there is a likelihood that an appreciable number of ordinary prudent purchasers will be misled, or simply confused, as to the source of the goods in question. 15 U.S.C.A. §§ 1114(1), 1125(a). See American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1428 (3d Cir.1994), cert. denied, 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1184 (7th Cir.1989).

See also Chapter 104.

*Ninth Circuit*

PRELIMINARY INSTRUCTIONS—TRADEMARK

. . .

THE PLAINTIFF'S BURDEN OF PROOF

In this case, the plaintiff, _____, contends that the defendant, _____, has infringed plaintiff's [trademark] [mark]. The plaintiff has the burden of proving by a preponderance of the evidence that plaintiff is the owner of a valid [trademark] [mark] and that the defendant infringed that [trademark]

857

[mark]. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the defendant infringed the plaintiff's [trademark] [mark].

. . .

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.0 (1997).

**§§ 159.50 through 159.59 are reserved
for supplementary material.**

# E.  CAUSATION

## § 159.60  Generally

Plaintiff _____ contends that defendant _____ has infringed plaintiff's trademark. Plaintiff _____ has the burden of proving by a preponderance of the evidence that plaintiff _____ is the owner of a valid trademark and that defendant _____ infringed that trademark.

### NOTES

*In General*

See 15 U.S.C.A. §§ 1114 and 1125.

*Ninth Circuit*

#### PRELIMINARY INSTRUCTIONS—TRADEMARK

. . .

#### THE PLAINTIFF'S BURDEN OF PROOF

In this case, the plaintiff, _____, contends that the defendant, _____, has infringed plaintiff's [trademark] [mark]. The plaintiff has the burden of proving by a preponderance of the evidence that plaintiff is the owner of a valid [trademark] [mark] and that the defendant infringed that [trademark] [mark]. Preponderance of the evidence means that you must be persuaded by the evidence that it is more probably true than not true that the defendant infringed the plaintiff's [trademark] [mark].

. . .

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.0 (1997).



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

Ltd. v. Mrs. America Pageants 856 F.2d 1445, 1449 (9th Cir. 1988). However, if an incontestable mark is involved, it may be improper to include paragraphs concerning the descriptive range of the spectrum. Incontestability precludes a challenge to the mark based on an assertion that the mark is not inherently distinctive (e.g., is merely descriptive or misdescriptive, primarily geographically descriptive or misdescriptive, or primarily merely a surname) and lacks secondary meaning.

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.4.8 (1997).

## § 159.63  Secondary Meaning

In this case, plaintiff _____ claims that by [date], it had established the term [term] as a trademark for [product] [sold] [offered for sale] by it.

Defendant _____ contends that the term [term] is merely descriptive of a quality or characteristic of these [product] and it is not distinctive. This is the first question for you to answer: Is the term [term] merely descriptive of a quality or characteristic of the [product]?

If your answer to that question is "no," then you must consider whether the evidence shows that plaintiff _____ used [term] as a trademark for these particular products before [date]. That is, whether plaintiff _____ used [term] to identify plaintiff _____ to the consuming public as the source of the [product].

However, if you decide that [term] is merely descriptive as applied to the [product], then you will consider whether the evidence shows that before [date], plaintiff _____ had so used [term] as to develop a secondary meaning such as to associate that term with plaintiff _____ in the minds of a significant number of the consuming public.

A word or phrase that is merely descriptive can still become a trademark if such a secondary meaning has been developed for it by usage in the marketplace. It is not necessary for plaintiff _____ to prove that all or even a majority of the consuming public understand this secondary meaning. What must be shown by the evidence is that a significant number of the consuming public must have asso-

ciated [*term*] with plaintiff _____ before [*date*]. It is for you to decide how many constitute a significant number.

The date on which a valid trademark is established depends on the strength of the mark in terms of distinctiveness. For example if you determine that [*term*] is descriptive of the qualities or characteristics of [*product*], you must also determine whether that mark ever acquired a secondary meaning in the mind of the consuming public.

If [*term*] for [*product*] is merely descriptive and it did not require a secondary meaning, then defendant _____ could not have a valid trademark for [*term*] for [*product*]. If [*term*] is descriptive but has acquired a secondary meaning, then the date that it became a protected trademark would be the date that such secondary meaning attached, regardless of the date of the first use or the date of registration with the Patent and Trademark Office.

If [*term*] is not merely descriptive of qualities or characteristics of [*product*] but is instead a suggestive word for [*product*], then it became a protected trademark from the time [*term*] was first used in connection with [*product*] to signify the origin of the product even though it was not registered until a later time.

If [*term*] is a coined, fanciful or arbitrary word, then it became a protected trademark from the time [*term*] was first used in connection with [*product*] to signify the origin of the product even though it was not registered until a later time.

### NOTES

*In General*

See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 773, 112 S.Ct. 2753, 2759–60, 120 L.Ed.2d 615 (1992) (suggestive marks are eligible for protection without any proof of secondary meaning since the connection between the mark and the source is presumed; proposition that a secondary meaning must be shown even if the trade dress is a distinctive identifying mark is wrong).

To become generic, the principal significance of the word must be its indication of the nature or class of an article, rather than an indication of its origin. See King–Seeley Thermos Co. v. Aladdin Indus., Inc., 321 F.2d 577, 580 (2d Cir.1963) (mark is not generic merely because it has some significance to the public as an indication of the nature or class of

## § 159.63     INSTRUCTIONS FOR FEDERAL CIVIL CA...

an article; in order to become generic the principal significance of th...
word must be its indication of the nature or class of an article rath...
than an indication of its origin); Glover v. Ampak, Inc., 74 F.3d 57, ...
(4th Cir.1996) (to become generic primary significance of mark must b...
its indication of nature or class of the product or service, rather than ...
indication of source); Helene Curtis Industries v. Church & Dwight Co...
560 F.2d 1325, 1332 (7th Cir.1977), cert. denied, 434 U.S. 1070, 98 S.C...
1252, 55 L.Ed.2d 772 (1978) (same). A mark can become generic throug...
common use by the public. DuPont Cellophane Co. v. Waxed Product...
Co., 85 F.2d 75, 80 (2d Cir.) (A. Hand, J.), cert. denied, 299 U.S. 601, ...
S.Ct. 194, 81 L.Ed. 443 (1936) (expiration of patent for process fo...
manufacturing and drying transparent cellulose film held to have termi...
nated right of holder of patent to exclusive use of name "Cellophane" ...
far as it had become merely descriptive of product); Bayer Co. v. Unite...
Drug Co., 272 F. 505, 509 (S.D.N.Y.1921) (L. Hand, J.) (if buyers of dru...
sold by plaintiff under trade name ("aspirin") understand by name onl...
the kind of good sold, plaintiff is not entitled to prevent use of name b...
others whatever efforts it may have made to get buyers to understan...
name as referring to source of origin). But see Kellogg Co. v. Nationa...
Biscuit Co., 305 U.S. 111, 120, 59 S.Ct. 109, 114, 83 L.Ed. 73 (1938)...
(users of newly generic marks have an obligation to use every reasonable...
means to prevent confusion as to source of products). See also Otokoya...
ma Co. v. Wine of Japan Import, Inc., 175 F.3d 266, 272 (2d Cir.1999)...
(defendant should have been allowed to introduce evidence of meaning...
and usage of "otokoyama" in Japan in support of its claim that mark is...
generic and therefore ineligible for protection as trademark).

Generally, it is a term's meaning to consumers, not to professionals
in the trade, that is the test of genericness and descriptiveness for
ordinary consumer goods. See, e.g. Anheuser-Busch, Inc. v. Stroh Brew-
ery Co., 750 F.2d 631, 638 (8th Cir.1984). See Bayer Co. v. United Drug
Co., 272 F. 505, 509 (S.D.N.Y.1921) (L. Hand, J.) (in holding the term
"aspirin" generic, Judge L. Hand stated: "The single question , as I view
it, in all these cases is merely one of fact: What do buyers understand by
the word for whose use the parties are contending?"). See also Self-
Realization Fellowship Church v. Ananda Church of Self-Realization, 59
F.3d 902, 909–10 (9th Cir.1995) (attestation from person in close associa-
tion and intimate contact with trademark claimant's business does not
reflect views of public purchasers). The question is what does the public
thing the word connotes—the generic name of the product or a mark
indicating merely one source of that product.

The standard most often applied to determine whether a term is
generic is not whether it has some significance to the public as the name
of an article, but whether that is its principal significance. Feather-
combs, Inc. v. Solo Products Corp., 306 F.2d 251, 256 (2d Cir.), cert.
denied, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962); Kellogg Co. v.
Nat'l Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938)

al significance of the
ss of an article rather
t, Inc., 74 F.3d 57, 59
ance of mark must be
service, rather than an
Church & Dwight Co.,
34 U.S. 1070, 98 S.Ct.
come generic through
o. v. Waxed Products
nied, 299 U.S. 601, 57
atent for process for
lm held to have termi-
name "Cellophane" so
); Bayer Co. v. United
, J.) (if buyers of drug
derstand by name only
event use of name by
buyers to understand
Kellogg Co. v. National
t, 83 L.Ed. 73 (1938)
use every reasonable
cts). See also Otokoya-
266, 272 (2d Cir.1999)
evidence of meaning
its claim that mark is
ademark).

, not to professionals
d descriptiveness for
ch, Inc. v. Stroh Brew-
r Co. v. United Drug
(in holding the term
gle question , as I view
buyers understand by
ng?"). See also Self-
f Self-Realization, 59
erson in close associa-
t's business does not
what does the public
ne product or a mark

e whether a term is
he public as the name
significance. Feather-
, 256 (2d Cir.), cert.
1962); Kellogg Co. v.
83 L.Ed. 73 (1938)

("primary significance of the term in the minds of the consuming public is not the product but the producer"). See Dranoff–Perlstein Associates v. Sklar, 967 F.2d 852, 859 (3d Cir.1992) (the jurisprudence of genericness revolves around the primary significance test, which inquires whether the primary significance of a term in the minds of the consuming public is the product or service or the source); Glover v. Ampak, Inc., 74 F.3d 57, 59 (4th Cir.1996) (in order to become generic, principal significance of word must be its indication or the nature or class of an article rather than an indication of its origin); Helene Curtis Industries v. Church & Dwight Co., 560 F.2d 1325, 1332 (7th Cir.1977) (same); Anti-Monopoly, Inc. v. General Mills Fun Group, 684 F.2d 1316, 1319 (9th Cir.1982), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) (word used as a trademark is not generic if the primary significance of the terms in the minds of the consuming public is not the product but the producer).

*Ninth Circuit*

### SECONDARY MEANING—PLAINTIFF'S BURDEN OF PROOF

A [symbol] [term] that is not inherently distinctive is entitled to legal protection only if the [symbol] [term] acquires a secondary meaning that distinguishes the [goods] [services] it represents from the [goods] [services] of another [manufacturer] [merchant] [service provider].

A [symbol] [term] acquires a secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective purchasers is not the [product] [service] itself, but the identification of the [product] [service] with a single source.

You may consider the following when you determine whether [describe symbol or term] has achieved a secondary meaning:

1. whether the people who purchase the [product] [service] that bears the claimed [trademark] [mark] associate the [trademark] [mark] with the [owner] [assignee] [licensee];

2. to what degree and in what manner the [owner] [assignee] [licensee] may have advertised under the claimed [trademark] [mark];

3. whether the [owner] [assignee] [licensee] successfully used this [trademark] [mark] to increase the sales of its [product] [service];

4. the length of time and manner in which the [owner] [assignee] [licensee] used the claimed [trademark] [mark];

5. whether the [owner's] [assignee's] [licensee's] use of the claimed [trademark] [mark] was exclusive;

6. whether the defendant intentionally copied the [owner's] [assignee's] [licensee's] [trademark] [mark];

7. whether the defendant's use of the plaintiff's [trademark] [mark] has led to actual confusion; and

8. any other factors that bear on secondary meaning.

The plaintiff has the burden of proving secondary meaning. The mere fact that the plaintiff is using [describe symbol or term], or that the plaintiff began using it before the defendant, does not mean that the [trademark] [mark] has obtained secondary meaning. There is no particular length of time that a [trademark] [mark] must be used before it obtains a secondary meaning.

### Comment

See 1 Jerome Gilson, Trademark Protection and Practice § 2.09 (1996) (discussing the concept of secondary meaning); Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir. ) ("Evidence of use and advertising over a substantial period of time is enough to establish secondary meaning."), cert. denied, 493 U.S. 872 (1989); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1015 (9th Cir.1985) (discussing factors to be considered in determining whether a secondary meaning has been achieved), cert. denied, 474 U.S. 1059 (1986).

Adray v. Adry–Mart, Inc., 76 F.3d 984, 987 (9th Cir.1995) (failure to list actual confusion among the factors the jury should consider in determining whether the plaintiff had established secondary meaning is error).

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.4.9 (1997).

### §§ 159.64 through 159.69 are reserved for supplementary material.

## F.  DEFENSES

### § 159.70   Generally

Defendant _____ contends that plaintiff's trademark is invalid because [*the trademark has been abandoned*] [*other affirmative defense*].

Defendant _____ has the burden of proving by a preponderance of the evidence that the trademark is invalid



 ATTACHMENT

47

(To be scanned in place of tab)

business into that market which second user has begun to exploit; the confusion involved is not a confusion of goods but a confusion of business inasmuch as deceived customer buys second user's product in belief that it originates with owner who has expanded his business. W.E. Kautenberg Co. v. Ekco Products Co., 251 F.2d 628, 631 (C.C.P.A.1958). Accord Commerce Nat'l Ins. Services, Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir.2000); Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1051 (9th Cir.1999); J. Wiss & Sons v. W.E. Bassett Co., 462 F.2d 567, 569 (C.C.P.A.1972).

## § 159.75   Abandonment

Defendant _____ claims that plaintiff _____ has abandoned the trademark.

The owner of a trademark may be considered to have abandoned its right to exclusive use of that mark if he discontinues its use with an intent not to resume it. Whether or not the use of the mark has been discontinued with the intent not to resume is a fact to be determined by you from all the circumstances in the case.

Non-use of the mark for three consecutive years is presumed to be abandonment.

### NOTES

*In General*

Abandonment of a mark results in a loss of rights as against the whole world. 15 U.S.C.A. §§ 1064(c), 1115(b). See Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1580–81 (Fed.Cir.1990) (none use of trademark was sufficient to find abandonment; finding of intent to abandon not required). Nonuse for three consecutive years is prima facie evidence of abandonment. 15 U.S.C.A. § 1127.

The typical evidence of abandonment is discontinuance of use, though a party may be deemed to have abandoned a valid trademark by permitting such excessive adverse use of a mark that it has lost its significance as an indication of origin. Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 1048 (4th Cir.1984). But see Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 543 (5th Cir.1998) (third-party use is only evidence of strength of mark and is not evidence of abandonment).

Once nonuse of the trademark for more than three years has been proven the burden of production shifts to the registrant to prove intent to resume use of trademark during period of nonuse or valid reasons for nonuse. Star–Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396

877

**§ 159.75**          INSTRUCTIONS FOR FEDERAL CIVIL CASES

(9th Cir.1985); E. Remy Martin & Co. v. Shaw–Ross, Int'l Imports, Inc.,
756 F.2d 1525, 1532 (11th Cir.1985); Cerveceria Centroamericana, S.A.
v. Cerveceria India, Inc., 892 F.2d 1021, 1023 (Fed.Cir.1989). Accord On-
Line Careline, Inc. v. America Online, Inc., 229 F.3d 1080 (Fed.Cir.
2000); West Florida Seafood, Inc. v. Jet Restaurants, Inc., 31 F.3d 1122,
1125 (Fed.Cir.1994).

*Ninth Circuit*

MARK UNENFORCEABILITY—ABANDONMENT—
AFFIRMATIVE DEFENSE—DEFENDANT'S
BURDEN OF PROOF

(15 U.S.C.A. § 1127)

The [owner] [assignee] [licensee] of a [trademark] [mark]
cannot exclude others from using the [trademark] [mark] if it
has been abandoned.

The defendant contends that the [trademark] [mark] has
become unenforceable because the [owner] [assignee] [licensee]
abandoned it. The defendant has the burden of proving aban-
donment by clear and convincing[1] evidence.

The [owner] [assignee] [licensee] of a [trademark] [mark]
abandons the right to exclusive use of the [trademark] [mark]
when the [owner] [assignee] [licensee]:

1. discontinues its use in the ordinary course of trade,
   intending not to resume using it or

2. [acts] [or] [fails to act] so that the trademark's [primary
   significance] [primary meaning] [principal significance]
   [principal meaning] to prospective purchasers has be-
   come the [product] [service] itself and not the [[produc-
   er of the product] [provider of the service]].

[Add appropriate concluding paragraphs from Instructions
5.3, 5.4, or 5.5.]

Comment

McCarthy finds that except for the Federal Circuit, "all"
courts follow a clear and convincing standard of proof of aban-
donment. 2 J. Thomas McCarthy, Trademarks and Unfair Com-
petition, § 17.03(3) (3d ed. 1996); see also Fletcher, Anthony L.
and David J. Kera, Annual Review, 85 The Trademark Reporter
607, 724–25 (1995).

Abandonment is defined by paragraph 16 of 15 U.S.C.
§ 1127. See 2 J. Thomas McCarthy, Trademarks and Unfair
Competition, § 17.06 (3d ed. 1996).

878

s, Int'l Imports, Inc.,
entroamericana, S.A.
Cir.1989). Accord On-
F.3d 1080 (Fed.Cir.
s, Inc., 31 F.3d 1122,

ONMENT—
DANT'S

ademark] [mark]
mark] [mark] if it

ark] [mark] has
ssignee] [licensee]
of proving aban-

ademark] [mark]
rademark] [mark]

course of trade,

mark's [primary
cipal significance]
rchasers has be-
not the [[produc-
ce]].

from Instructions

al Circuit, "all"
of proof of aban-
and Unfair Com-
cher, Anthony L.
demark Reporter

16 of 15 U.S.C.
arks and Unfair

The defendant has the burden of proving abandonment. Where the defendant proves the necessary consecutive years of non-use, the burden shifts to the plaintiff to go forward with evidence to prove that circumstances do not justify the inference of intent not to resume use. Exxon Corp. v. Humble Exploration Co., 695 F.2d 96, 99 (5th Cir.1983).

> 1. No Ninth Circuit case clearly describes the standard of proof required to prove abandonment. For instance, Prudential Ins. Co. v. Gibraltar Financial Corp., 694 F.2d 1150, 1156 (9th Cir.1982), cert. denied, 463 U.S. 1208 (1983), characterized abandonment as "in the nature of a forfeiture" that "must be strictly proved." Such forfeiture required demonstration by "a high burden of proof." Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir.1985) (citing Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East, 542 F.2d 1053, 1059 (9th Cir.1976), cert. denied, 433 U.S. 908 (1977)).

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.5.6 (1997).

## § 159.76  Generic Name

Defendant _____ claims that plaintiff _____'s trademark is invalid because it is a generic name.

No one may own trademark rights to a word or term that is a generic name. A word or term is generic if its [primary significance] [primary meaning] [principal significance] [principal meaning] to the prospective purchasers is the product and not the source of the product.

Words or terms that originally are trademarks may, over time, be adopted by the public as the common name for the product and become generic. If a word or term becomes generic, the owner of the trademark cannot exclude others from using the word or term or recover damages for the use. Examples of words that have lost trademark protection because they became generic names of products they identified include "aspirin," "thermos," and "cellophane."

### NOTES

*In General*

Marks that constitute a common name for a good or service are referred to as "generic." 15 U.S.C.A. 1052(e) ("No trademark...shall be refused registration on the principal register on account of its nature unless it...[c]onsists of a mark which (1) when used on or in connection with the goods of the applicant is merely descriptive...of them, (2) when used or in connection with the goods of the applicant is primarily geographically descriptive of them.... "). See Park 'N Fly, Inc. v. Dollar



# EXHIBIT / ATTACHMENT

48

the tort standard under
used to the plaintiff by the
lly anticipated or contem-
sociated Distributors, Inc.,
s failure to prove a precise
1 finding that the plaintiff

's lost profits. 15 U.S.C.A.
Purina Co., 997 F.2d 949,
1 on the cost of corrective
Vitamin Co., 754 F.2d 738,
ran, Inc., 793 F.2d 1034,
lston Purina Co., 997 F.2d
may be appropriate if it
ppropriated." See Howard
(11th Cir.1990). See also
Cap & Emblem Mfg., 597
sden Motel Co., 804 F.2d
Bolser's Tire Stores, Inc.,

AL DAMAGES

nfringement] [unfair
endant had statutory
gistered [trademark]
ages.

amages by a prepon-
e amount of money
the plaintiff for any
nd was [proximately]
ment of the plain-
hould consider the

utation]

ll, including injury

of the defendant's

being deceived]

[the cost of future corrective advertising reasonably re-
quired to correct any public confusion caused by the infringe-
ment]

[any other factors that bear on plaintiff's actual damages].

When considering prospective costs (e.g., cost of future
advertising; expense of preventing customers from being de-
ceived), you must not over compensate. Accordingly, your award
of such future costs should not exceed the actual damage to the
value of the plaintiff's mark at the time of the infringement by
the defendant.

### Comment

4 J. Thomas McCarthy, Trademarks and Unfair Competi-
tion § 30:27 (3d ed. 1996) (discussing recovery of plaintiff's
actual damages).

1a Jerome Gilson, Trademark Protection and Practice
§ 8.08(2) (1996) (listing examples of recoverable damages).

Thelen Oil Co. v. Fina Oil & Chemical Co., 962 F.2d 821,
823 (8th Cir.1992) (trademark owner entitled to infringer's
profits, costs of the action, and whatever additional damages
trademark owner can prove resulted from infringer's misuse of
trademark).

Adray v. Adry–Mart, Inc., 76 F.3d 984, 989 (9th Cir.1995)
(to avoid the risks of overcompensation in the award of prospec-
tive costs, damage instructions should inform the jury that the
award of prospective costs should not exceed the damage to the
value of the infringed mark).

Defendant may argue that plaintiff's loss in sales may be
caused by other market factors and not as a result of defen-
dant's infringement. If defendant makes such an argument, an
appropriate instruction should be drafted.

See Instructions 7.2, 7.3, and 7.4.

Manual of Model Civil Jury Instructions for the District Courts of the
Ninth Circuit, Instruction No. 15.6.2 (1997).

## § 159.92   Profits

In addition to actual damages, plaintiff _____ is enti-
tled to any profits earned by defendant _____ that are
attributable to the infringement. However, you may not
include in any award of profits any amount that you includ-
ed in determining actual damages.

Expenses are all [*operating*] [*overhead*] and production costs incurred in producing the gross revenue. Defendant _____ has the burden of proving the expenses [*and the portion of the profit attributable to factors other than use of the infringed trademark*] by a preponderance of the evidence.

Unless you find that a portion of the profit from the sale of the [*goods*] using the trademark is attributable to factors other than use of the trademark, you must find that the total profit is attributable to the infringement.

## NOTES

*In General*

Section 1117(a) entitles a markholder to recover the defendant's profits, subject to the principles of equity. 15 U.S.C.A. § 1117(a). See Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 584 (5th Cir.1980). An accounting of a defendant's profits in a trademark infringement action is not automatic and must be granted in light of equitable considerations. Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 131, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947); Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1405 (9th Cir.), cert. denied, 510 U.S. 815, 114 S.Ct. 64, 126 L.Ed.2d 34 (1993); Bishop v. Equinox Int'l Corp., 154 F.3d 1220, 1222 (10th Cir.1998); Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 919 (Fed.Cir.1984).

Relevant factors to be considered in determining whether an award of profits is appropriate include (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted (3) the adequacy of other remedies, (4) unreasonable delay by the plaintiff in asserting the plaintiff's rights, (5) public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off. See Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 554 (5th Cir.1998).

Two circuits have held that a prevailing plaintiff need not prove actual damages in order to be entitled to an accounting. Bishop v. Equinox Int'l Corp. 154 F.3d 1220, 1223 (10th Cir.1998) (finding of actual damages remains an important factor in determining whether an award of profits is appropriate); Burger King Corp. v. Weaver, 169 F.3d 1310, 1321 (11th Cir.1999) (showing of actual damage to obtain an award reflecting an infringer's profits is not required). See also Banff, Ltd. v. Colberts, Inc., 996 F.2d 33, 35 (2d Cir.), cert. denied, 510 U.S. 1010, 114 S.Ct. 599, 126 L.Ed.2d 564 (1993) (willful deceptive conduct necessary for award of profits); Frisch's Restaurants, Inc. v. Elby's Big Boy, 849 F.2d 1012, 1015 (6th Cir.1988) (for a court to order an accounting, bad faith must be shown).

...., and produc...
revenue. Defenda...
e expenses [and t...
rs other than use ...
ance of the evide...

profit from the s...
tributable to facto...
must find that th...
ment.

recover the defendant'...
U.S.C.A. § 1117(a). Se...
, 584 (5th Cir.1980). A...
k infringement action i...
quitable consideration...
125, 131, 67 S.Ct. 11...
3ic Pen Corp., 982 F.2...
315, 114 S.Ct. 64, 1...
., 154 F.3d 1220, 12...
e Stores, Inc., 750 F.2...

ning whether an awar...
efendant had the inten...
been diverted (3) th...
elay by the plaintiff i...
in making the miscon...
alming off. See Pebbl...
Cir.1998).

laintiff need not prov...
accounting. Bishop v...
Cir.1998) (finding o...
etermining whether an...
v. Weaver, 169 F.3...
lamage to obtain an...
uired). See also Banf...
ert. denied, 510 U.S...
ful deceptive conduct
ts, Inc. v. Elby's Bi...
a court to order an...

# TRADEMARK DAMAGES—PROFITS
## (15 U.S.C. § 1117(a))

In addition to actual damages, the plaintiff is entitled to any profits earned by the defendant that are attributable to the infringement. You may not, however, include in any award of profits any amount that you took into account in determining actual damages.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of defendant's receipts from using the [trademark] [mark] in the sale of a [product] [service]. The plaintiff has the burden of proving a defendant's gross revenue by a preponderance of the evidence.

Expenses are all [operating] [overhead] and production costs incurred in producing the gross revenue. The defendant has the burden of proving the expenses [and the portion of the profit attributable to factors other than use of the infringed [trademark] [mark]] by a preponderance of the evidence.

Unless you find that a portion of the profit from the sale of the [goods] [services] using the [trademark] [mark] is attributable to factors other than use of the [trademark] [mark], you shall find that the total profit is attributable to the infringement.

### Comment

"[C]ourts have not awarded both damages based upon plaintiff's lost sales and defendant's profits attributable to sales under the infringing mark.... Recovery of both would be an inappropriate double recovery, inasmuch as recovery of the infringer's profits in all likelihood will compensate for the sales the plaintiff has lost." 1a Jerome Gilson, Trademark Protection and Practice § 8.08(2) (1996).

Century Distilling Co. v. Continental Distilling Corp., 205 F.2d 140, 148–49 (3d Cir.) (trademark owner not permitted double recovery by an award of profits and an assessment of damages for lost sales), cert. denied, 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400 (1953); see also Borg–Warner Corp. v. York–Shipley, Inc., 293 F.2d 88, 95 (7th Cir.) (discussing and analyzing calculation of damages), cert. denied, 368 U.S. 939 (1961).

Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973 (2d Cir.1985) (defendant's own statements as to profits

897

provided sufficient basis for calculation of defendant's profits under 15 U.S.C. § 1117(a)).

Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d 1132, 1135 (9th Cir.1986) (court awarded receipts from sales pursuant to 15 U.S.C. § 1117(a)).

American Honda Motor Co. v. Two Wheel Corp., 918 F.2d 1060, 1063 (2d Cir.1990) (plaintiff entitled to amount of gross sales unless defendant adequately proves amount of costs to be deducted from it).

Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc., 951 F.2d 684, 694 (5th Cir.1992) ("'[T]he trial court has wide discretion to increase or reduce the amount of profits recoverable by the plaintiff '[i]f the court shall find that the amount of recovery based on profits is either inadequate or excessive ... according to the circumstances of the case.' " (quoting 15 U.S.C. § 1117(a))).

4 J. Thomas McCarthy, Trademarks and Unfair Competition § 30:26 (3d ed. 1996) (discussing computation of defendant's profits from infringing sales).

An award based on defendant's profits may require proof that the defendant acted willfully or in bad faith. See, e.g., Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 123 (9th Cir.), cert. denied, 391 U.S. 966 (1968). But see Adray v. Adry–Mart, Inc., 76 F.3d 984, 988 (9th Cir.1995) ("An instruction that willful infringement is a prerequisite to an award of defendant's profits may be an error in some circumstances [such] as when plaintiff seeks the defendant's profits as a measure of [plaintiff's] own damage[ ]").

Gilson, supra, § 8.08(3) (listing examples of costs and deductions that defendant may show). The defendant may also raise a defense that the purchasers bought goods bearing the infringing mark for reasons other than the appeal of the mark, and that the infringement had no cash value in sales made by the defendant. Id. If such a defense is raised, an appropriate instruction should be drafted.

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 15.6.3 (1997).

## § 159.93   Intentional Infringement

If you find that defendant _____ has infringed the plaintiff _____'s trademark, you must also determine whether defendant _____ used the trademark intentionally, knowing it was an infringement.



# EXHIBIT / ATTACHMENT

49

(To be scanned in place of tab)

514 F.2d 665.
186 U.S.P.Q. 447
(Cite as: 514 F.2d 665)

Page 1



United States Court of Appeals,
Fifth Circuit.

PROFESSIONAL GOLFERS ASSOCIATION OF
AMERICA, Plaintiff-Appellee,
v.
BANKERS LIFE & CASUALTY COMPANY,
Defendant-Appellant.

No. 74-2117.

June 13, 1975.

Holder of registered trademark brought suit for trademark infringement and unfair competition against former trademark licensee. The United States District Court for the Southern District of Florida, Peter T. Fay, J., rendered judgment for the trademark registrant, and former licensee appealed. The Court of Appeals, Gewin, Circuit Judge, held that the owner of a collective service mark could license it to nonmembers; that the agreement between the registrant and licensee gave the licensee permission to use the trademark for a limited time; that the licensee competed unfairly with the registrant and infringed the "PGA" trademark; and the district court did not commit prejudicial error in the manner in which it reached its findings of fact and conclusions of law.

Affirmed.

West Headnotes

**[1] Trade Regulation ⚖➡3**
382k3 Most Cited Cases

Collective service mark serves not to identify particular merchandise produced by members but to guarantee quality of service provided by members. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

**[2] Trade Regulation ⚖➡251**
382k251 Most Cited Cases

Once registered, collective service marks are entitled to same protection as other trademarks. Lanham Trade-Mark Act, §§ 3, 4, 45, 15 U.S.C.A. §§ 1053, 1054, 1127.

**[3] Trade Regulation ⚖➡461**
382k461 Most Cited Cases

Lanham Act clearly contemplates that owners of collective marks and service marks receive same treatment as holders of more orthodox trademarks. Lanham Trade-Mark Act, §§ 3, 4, 45, 15 U.S.C.A. §§ 1053, 1054, 1127.

**[4] Trade Regulation ⚖➡108.1**
382k108.1 Most Cited Cases
(Formerly 382k108)

Owner of collective service mark could license nonmembers to use mark under its aegis and subject to proper control. Lanham Trade-Mark Act, §§ 3, 4, 45, 15 U.S.C.A. §§ 1053, 1054, 1127.

**[5] Trade Regulation ⚖➡110**
382k110 Most Cited Cases

Where lease which provided that lessor would have license to use trademark of lessee stated that terms of agreement should terminate at expiration of lease or any extension thereof and stated that lease term was limited to ten years, lessor had right to use trademark only for term of lease.

**[6] Trade Regulation ⚖➡726**
382k726 Most Cited Cases
(Formerly 382k724)

In action for trademark infringement, district court's finding that licensing arrangement was terminated by contract was not clearly erroneous.

**[7] Trade Regulation ⚖➡334.1**
382k334.1 Most Cited Cases
(Formerly 382k334)

**[7] Trade Regulation ⚖➡337**
382k337 Most Cited Cases

Direct competition is not sine qua non of trademark infringement but rather gist of action lies in likelihood of confusion to public.

**[8] Trade Regulation ⚖➡338**
382k338 Most Cited Cases

Falsely suggesting affiliation with trademark owner in manner likely to cause confusion as to source of sponsorship constitutes infringement.

**[9] Trade Regulation ⚖➡338**
382k338 Most Cited Cases

Former trademark licensee cannot mislead public into believing that its affiliation continues once licensing arrangement has ceased, for once contract ends, licensee's right to the mark ends and any subsequent use constitutes infringement.

**[10] Trade Regulation ⚖➡338**
382k338 Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

514 F.2d 665.
186 U.S.P.Q. 447
**(Cite as: 514 F.2d 665)**

Page 2

Where former trademark licensee continued to use trademark "PGA" in promoting its country club and real estate development after license had expired, trademark was infringed.

**[11] Trade Regulation ☞111**
382k111 Most Cited Cases

Trademark licensee is estopped to contest validity of licensor's title during course of licensing arrangement.

**[12] Trade Regulation ☞111**
382k111 Most Cited Cases

After expiration of trademark license, former licensee may challenge licensor's title on facts which arose after contract expired.

**[13] Trade Regulation ☞111**
382k111 Most Cited Cases

In action for trademark infringement against former trademark licensee, licensee was estopped to argue that licensor abandoned mark by not supervising licensee's use of mark to any appreciable extent during period of license.

**[14] Trade Regulation ☞407**
382k407 Most Cited Cases

Likelihood of consumer confusion and passing off one's goods or services as those of another constitutes gravamen of action for unfair competition.

**[15] Trade Regulation ☞463**
382k463 Most Cited Cases

Unfair competition is more broadly conceived tort than trademark infringement and there are some instances where defendant is guilty of competing unfairly without having technically infringed.

**[16] Trade Regulation ☞492.1**
382k492.1 Most Cited Cases
(Formerly 382k492)

Where former licensee of trademark continued to use mark in promoting its country club and real estate development after expiration of license, seeking to pass off its club as affiliated with licensor, former licensee's actions constituted unfair competition.

**[17] Federal Civil Procedure ☞2280**
170Ak2280 Most Cited Cases

Where district court made extensive oral findings of fact and conclusions of law and prevailing party's proposed findings of fact and conclusions of law incorporated court's oral

conclusions as well as some reasoning apparent in court's questions at trial, trial court's verbatim adoption of prevailing party's proposed findings of fact and conclusions of law without opportunity for objections or hearing was not erroneous, particularly where substantially all written objections advanced by losing party had been presented to court at some time during trial.

**[18] Federal Courts ☞850.1**
170Bk850.1 Most Cited Cases
(Formerly 170Bk850, 106k406.3(9))

Court of Appeals will accept district court's factual determinations unless clearly erroneous.
*666 Alan Meltzer, Lake Park, Fla., William T. Kirby, Chicago, Ill., for defendant-appellant.

William J. Dunaj, Miami, Fla., Stephen M. Sacks, William D. Rogers, Washington, D. C., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before GEWIN, BELL and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

The Professional Golfers' Association of America (PGA or the association) brought this suit for trademark infringement and unfair competition against its erstwhile associate in a golf club located at Palm Beach Gardens, Florida. Bankers Life and Casualty Company (Bankers) built the clubhouse and courses that housed the golf association's national headquarters for ten years. The collaboration was never extremely amicable, and final estrangement occurred in February of 1973 when the PGA vacated the premises for good. Bankers refused to remove the initials "PGA" from the title of its golf club after the association's departure. The present lawsuit followed, *667 and the district court found that Bankers had infringed the PGA's mark and competed unfairly with it through continued use of the initials. We find the district court's conclusions of law and fact eminently correct and therefore affirm.

Bankers and the PGA first considered working together in 1961, when the PGA desired more sumptuous headquarters than its abandoned supermarket and Bankers needed a selling ploy for its proposed new city. The parties entered into an agreement whereby Bankers would build two golf courses to PGA specifications and the PGA would construct the clubhouse to be used as its national headquarters. Bankers would have full use of the PGA name in its promotional activities for surrounding real estate development. By 1963, however, it was clear that the PGA lacked the financial resources to construct the proposed

514 F.2d 665.
186 U.S.P.Q. 447
(Cite as: 514 F.2d 665)

clubhouse, so Bankers, through its president McArthur, agreed to build the club as well as the golf courses. The second contract stated that the PGA would repay the cost of constructing the facility, $875,672.

Beset by continued monetary doldrums and a newly elected slate of officers who opposed the Palm Beach Gardens site, the PGA abandoned the partially constructed clubhouse/headquarters later that year. Litigation to force the association to live up to its contractual obligations ensued, and finally resulted in a 1964 settlement agreement that cancelled all prior contracts between the parties. As hereinafter discussed, the PGA agreed to rent space in the clubhouse for ten years, and the entire premises would continue to be known as the PGA National Golf Club. In return for the PGA's continued presence in Palm Beach Gardens, Bankers agreed to cancel the association's debt entirely. By this time the clubhouse had been constructed; permanent concrete buttresses on the outside of the building bore the PGA initials, and the controversial three letters were etched in a continuous horizontal line around the outer windows of the club.

This lukewarm symbiosis continued for eight years until the end of 1972 when Bankers announced the PGA had to vacate the premises immediately. Somewhat al∙ ned at the summary eviction, particularly in view of the winter tournaments and trade show it had scheduled i∙ ∶ early 1973, the PGA finally cajoled Bankers into letting it remain until February 28, 1973. This reconciliation (of sorts) was evidenced by the fourth written agreement between the parties, an amendment to the 1964 instruments.

The PGA exited permanently once the winter tournaments were over, and Bankers thereafter changed the nature of the club. It was no longer open to PGA members whenever they wished to play, but became a private country club with the golf course available only to members and their guests. Bankers did, however, retain the PGA's acronym in renaming its facility the PGA Country Club.

Based on its ownership of the mark "PGA", the association brought this suit against Bankers for infringement, unfair competition, and breach of contract. The several questions presented on appeal are: (1) whether the owner of a collective service mark may license it to non-members, (2) if so, what were the terms of the license agreement between the PGA and Bankers, (3) whether Bankers infringed the PGA's mark or competed unfairly with the association, and (4) whether the district court committed prejudicial error in the manner in which it reached its findings of fact and conclusions of law. We shall treat these issues seriatim.

I. Licensing of Collective Service Mark

As one of seven registrations, the PGA owns a collective service mark in the configuration "PGA." Its application for registration explains that the mark is to be used in connection with golf instruction and entertainment in the nature of golfing exhibitions. Members display the mark in professional golf shops, at tournaments, and for the sale of services generally.

**\*668** [1][2] The Lanham Act defines a collective mark as a "trade-mark or service mark used by the members of a cooperative, an association, or other collective group or organization . . . ." 15 U.S.C. s 1127. A service mark, in turn, "means a mark used in the sale or advertising of services to indentify the services of one person and distinguish them from the services of others." Id. Thus, a collective service mark such as "PGA" serves not to identify particular merchandise produced by members, but to guarantee the quality of service provided by members. Once registered, collective service marks are entitled to the same protection as other trademarks. 15 U.S.C. ss 1053-4; see Boston Professional Hockey Association v. Dallas Cap and Emblem Manufacturing. Inc., 510 F.2d 1004 (5th Cir. 1975).

Bankers contends that the owner of a collective service mark has no authority to license it to anyone except members of the association. In essence it claims that an organization has the power to allow its members who have met certain qualifications to utilize the mark, but that it cannot authorize non- members to employ the mark for any purpose. We, however, are unable to discern any reason, based either in statutory construction or logic, why the licensing of collective service marks should be so limited.

[3][4] First, the Lanham Act clearly contemplates that owners of collective marks and service marks receive the same treatment as holders of more orthodox trademarks. See 15 U.S.C. ss 1053 and 1054, supra. Since merchandise marks have long been the subject of licensing arrangements, see 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies s 78.2 (3d ed. 1969) (hereinafter Callman), the statute itself provides no comfort for Bankers' position. Secondly, though no court has explicitly passed on the question, decisions in other circuits have recognized that owners of collective marks may license non-members to use their marks. In Future Farmers of America v. Romack, 211 F.2d 925 (7th Cir. 1954), the court held that both the national organization and the Texas chapter had the right to authorize a non- member to manufacture seals, emblems, and badges bearing the nationally- approved symbol "FFA." Similarly, the Second Circuit has acknowledged the Boy Scouts' right to license a single company to manufacture its official knives. Adolph Kastor & Bros. v. FTC. 138 F.2d 824 (2d Cir. 1943). Obviously, neither the emblem manufacturer nor the cutlery producer was a member of Future Farmers or the Boy

514 F.2d 665.
186 U.S.P.Q. 447
**(Cite as: 514 F.2d 665)**

Page 4

Scouts. Bankers has asserted no policy in favor of its proposed rule, and this court can perceive none. Hence, we hold that the owner of a collective service mark may license non-members to use the mark under its aegis and subject to proper control.

## II. Terms of License

[5] Bankers' second asserted error concerns the district court's interpretation of the several contracts entered into by the parties. As mentioned above, the 1964 settlement agreement states: "All prior agreements between the said parties . . . shall no longer be of force or effect, the said agreements are hereby cancelled and forever discharged, and the parties to said agreements are relieved of all responsibility thereunder." Despite Bankers' contention that its "perpetual" license stemming from the 1961 contract continued unabated, we believe the documented language demonstrates a definite, unequivocal desire to cancel the 1961 and 1963 contracts. Thus, our analysis begins with a construction of the October 30, 1964 settlement agreement and lease.

The settlement agreement sets out a number of reciprocal duties on the part of the respective parties. During the term of the lease the clubhouse and courses would be known as the "PGA National Golf Club." The PGA agreed to hold a number of official tournaments at the facility each year and to use its efforts to further development of the surrounding real estate. One crucial sentence states, "The terms of this **\*669** agreement shall terminate at the expiration of said lease or any extension thereof." The lease, in turn, contains a provision limiting its term to ten years. Reading the two instruments in conjunction, rudimentary principles of contract law demand the conclusion that under the 1964 agreements Bankers had the right to use the PGA name for only ten years.

[6] The 1964 agreement and lease were expressly modified by amendments dated January 24, 1973, following the notice of eviction. Bankers claims that the circumstances surrounding the drafting of the amendments demonstrate that it had the right to continue using the PGA's collective mark perpetually. The initial draft of the 1973 agreement, as drawn by counsel for the PGA, contained a paragraph stating that Bankers would no longer use the designation "PGA" in reference to its golf club. Upon viewing said provision, the president of Bankers balked, telling his representative at negotiations to burn the agreement, that he refused to give up his "right" to the name. Negotiations between the parties and their respective counsel continued, and the final draft of the fourth agreement contained no reference to use of the name. At trial evidence as to intent of the parties conflicted. The executive secretary of the PGA said they finally reached an impasse and simply agreed to

disagree with reference to Bankers' use of the mark. The president of Bankers and the chairman of the board of its golf club, however, stated that they thought the contract permitted Bankers to use the PGA name as part of their club's title. The trial court found that the parties agreed to disagree, and we are loathe to overturn such a credibility determination as clearly erroneous. There was sufficient evidence to support the trial court's finding.

The 1973 amendments changed the termination date of the earlier agreements from December 31, 1974 to February 28, 1973. Except for such .explicit modifications, the 1964 agreements were to "remain in full force and effect." Since we have earlier held that Bankers' right to the name ended in ten years under the 1964 agreements, the 1973 amendments simply accelerated the date on which Bankers had to cease calling its club the "PGA National Golf Club" or "Home of the PGA."

Though the pertinent agreements at issue do not speak directly of a "license" to use the symbol "PGA," we think the clear import of the contracts bespeaks such an arrangement. The association expressed continued concern over use of the initials, and the 1964 agreement grants Bankers permission to use the designation for a limited time. Moreover, Bankers does not dispute the fact that it was a licensee. We therefore hold that the licensing arrangement between Bankers and the PGA expired February 28, 1973.

## III. Infringement and Unfair Competition

Our examination of the contracts at issue leads us to the third question presented on appeal: whether Bankers' continued use of the triple-lettered configuration "PGA" as part of the club's name infringes upon the association's registered mark. Ancillary to that issue is the question whether Bankers has competed unfairly with the PGA through such activities.

[7][8] Bankers submits that in order to find trademark infringement and/or unfair competition, this court must first determine that the parties compete. The argument assumes that trademark protection extends no further than to prevent a second user from utilizing the name or similar mark for goods or services substantially identical to those produced by the owner of the mark. The law of trademarks, however, is not so ossified, nor its protective scope so niggardly. This court has repeatedly held that direct competition is not the sine qua non of trademark infringement; rather the gist of the action lies in the likelihood of confusion to the public. Roto-Rooter Corp. v. O'Neal, 513 F.2d 44 (5th Cir. 1975); **\*670**Beef Eater Restaurant, Inc. v. James Burrough, Ltd., 398 F.2d 637 (5th Cir. 1968); Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967); Trail Chevrolet, Inc. v. General Motors Corp., 381 F.2d 353

514 F.2d 665.
186 U.S.P.Q. 447
(Cite as: 514 F.2d 665)

Page 5

(5th Cir. 1967); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963). As Judge Clark recently stated for this court in World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 488 (5th Cir. 1971):

> Trademark jurisprudence, however, has long recognized that the lack of competitiveness is not always dispositive of the question of confusion and hence infringement. One such relationship where this is true exists when the sponsor or maker of one business or product might naturally be assumed to be the maker or sponsor of another business or product. The confusion evident in such cases is confusion of the business; the deceived customer buys the infringer's product in the belief that it originates with the trademark owner or that it is in some way affiliated with the owner. When this occurs, the infringer is unjustly trading on the true owner's established reputation. This is the precise wrong trademark legislation seeks to prevent.

Thus, falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement. Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609 (7th Cir. 1965); Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495 (2d Cir. 1962); Volkswagenwerk Aktiengesellschaft v. Tatum, 344 F.Supp. 235 (S.D.Fla.1972); Wyatt Earp Enterprises v. Sackman, 157 F.Supp. 621 (S.D.N.Y.1958). Whether the public is likely to associate potato chips with dinner rolls of the same name, American Foods, Inc. v. Golden Flake, Inc., supra, a real estate business with a grocery chain of the same name, Safeway Stores, Inc. v. Safeway Properties, Inc., supra, or a restaurant with a well- renowned liquor bearing the same title, Beef Eater Restaurant, Inc. v. James Burrough, Ltd., supra, courts will enjoin the usurper's use of the mark.

[9] Here the PGA has demonstrated not only the likelihood of confusion, but some incidents of actual confusion. Members of the association have come to the club in the belief that they were still allowed to play there at any time, and the club has received several telephone calls intended for the golf association. Cf. World Carpets, Inc. v. Dick Littrell's New World Carpets, supra; Safeway Stores, Inc. v. Safeway Properties, Inc., supra. A former licensee cannot mislead the public into believing that its affiliation continues once the licensing arrangement has ceased. Heaton Distributing Co. v. Union Tank Car Co., 387 F.2d 477 (8th Cir. 1967). For once the contract ends, a licensee's right to the mark ends, and any subsequent use constitutes infringement. Callman, supra at 470.

[10] Since its inception in 1916, the PGA has expended considerable effort in promoting the game of golf. Members of the organization have displayed their skill throughout the country. Their success is due, at least in part, to the high

standards the association demands of its professionals. In short, the PGA has established a reputation for consummate skill and excellent entertainment in the world of golf. Bankers long enjoyed the benefit of that reputation while it housed the association's national headquarters. Official tournaments were held in Palm Beach Gardens and PGA officials appeared in advertisements for the residential development. But once the PGA left the premises, Bankers' right to bask in the golfing association's good name ceased. The PGA established that the public would likely continue to associate the club with the organization so long as the facility bore the title "PGA Country Club," or any similar designation containing the three initials.

Though there is no indication in the record that Bankers has maintained the greens or clubhouse in an unsightly fashion, so as to tarnish the PGA's reputation, the association should not have to rely on good faith in the future. "(F)or a reputation, like a face, is the symbol of its possessor and creator and *671 another can use it only as a mask." Yale Electric Corp. v. Robertson, 26 F.2d 972, 974 (2d Cir. 1928) (L. Hand, J.). The quality of a trademark owner's reputation should lie within his own control.

[11][12][13] Having determined that Bankers' activities bear all the earmarks of trademark infringement, we have only to discuss appellant's remaining alternative theory: that the PGA abandoned its mark through "naked licensing", or the failure to properly supervise its licensee's use of the mark. We note, first, that a licensee is estopped to contest the validity of the licensor's title during the course of the licensing arrangement. Heaton Distributing Co. v. Union Tank Car Co., supra; Donald F. Duncan, Inc. v. Royal Tops Manufacturing Co., 343 F.2d 655 (7th Cir. 1965); Pacific Supply Coop v. Farmers Union Central Exchange, Inc., 318 F.2d 894 (9th Cir. 1963); E. F. Prichard Co. v. Consumers Brewing Co., 136 F.2d 512 (6th Cir. 1943). The licensee has, by virtue of the agreement, recognized the holder's ownership. Yet once the license has terminated, the question remains whether the former licensee is forever barred from challenging the holder's valid ownership. Some courts have held that the estoppel expires with the license. Donald F. Duncan, Inc. v. Royal Tops Manufacturing Co., supra; Bucky v. Sebo, 208 F.2d 304 (2d Cir. 1953); Eskimo Pie Corp. v. National Ice Cream Co., 26 F.2d 901 (6th Cir. 1928); Amiesite Asphalt Co. v. Interstate Amiesite Co., 4 F.Supp. 504 (D.Del.1933). Others have refused to allow any subsequent challenges by former licensees. Heaton Distributing Co. v. Union Tank Car Co., supra; E. F. Prichard Co. v. Consumers Brewing Co., supra. We, however, under the facts and in the circumstances here presented, adopt an intermediate view, that suggested by treatise author Rudolf Callman: after expiration of the license, a former trademark licensee may challenge the licensor's title on facts which arose after the contract has

expired. Callman, supra at 454; Medd v. Boyd Wagner, 132 F.Supp. 399 (N.D.Ohio 1955). Thus a licensee affirms his licensor's ownership of the mark by entering into the agreement, but the straightjacket effect does not last interminably. In the present case, however, the facts upon which Bankers relies [FN1] arose during the course of its ten-year agreement with the PGA, so it is estopped to argue abandonment.

FN1. Bankers claims that the PGA did not supervise its use of the mark to any appreciable extent during the period Bankers ran the club. The PGA, on the other hand, asserts that it required Bankers to keep the green and clubhouse in "first class" condition and to employ a golf professional who belonged to the PGA.

[14][15][16] The PGA's pendent unfair competition claim succeeds for many of the reasons supporting its infringement action. Again, likelihood of consumer confusion and passing off one's goods or services as those of another constitute the gravamen of the action. Sun Coast v. Shupe, 52 So.2d 805 (Fla.1951); Feller v. Broward Hurricane Panel Co., 196 So.2d 7 (Fla.App.1967); Stagg Shop of Miami v. Moss, 120 So.2d 39 (Fla.App.1960). Unfair competition, however, is a more broadly conceived tort than its frequent litigation partner, trademark infringement, and there are some instances where a defendant is guilty of competing unfairly without having technically infringed. B. H. Bunn Co. v. AAA Replacement Parts Co., Inc., 451 F.2d 1254 (5th Cir. 1971). For "(t)he law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." American Heritage Life Insurance Co. v. Heritage Life Insurance Co., 494 F.2d 3, 14 (5th Cir. 1974). In the present case, however, the facts underlying both actions coalesce. Bankers sought to "pass off" its club as affiliated with the PGA, thereby trading on the PGA's reputation. Hence its actions violate not only federal, but state law.

*672 IV. Adoption of Findings of Fact and Conclusions of Law

[17] Finally, Bankers complains of the manner in which the trial court reached its ultimate conclusions of law and fact. It asserts the court erroneously adopted appellee's proposed findings of fact and conclusions of law verbatim without opportunity for objections or a hearing. More specifically, Bankers claims that the written finding to the effect that the parties "agreed to disagree" as to continued use of the name in the January 24, 1973 agreement was improper, because unsupported by the court's independent determination.

One crucial factor distinguishes this case from other

decisions in which we have disapproved the uncritical acceptance of the winning party's proposed findings. See, e. g., Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960 (5th Cir. 1975); Williamson-Dickie Mfg. Co. v. Hertex, Inc., 504 F.2d 983 n. 5 (5th Cir. 1974); Railex Corp. v. Speed Check Co., 457 F.2d 1040 (5th Cir. 1972); Louis Dreyfus & Cie. v. Panama Canal Co., 298 F.2d 733 (5th Cir. 1962). The district judge in this case made oral findings of fact and conclusions of law from the bench at the end of trial. In addition, he questioned counsel for Bankers extensively during the course of closing argument, manifesting a commendable knowledge of the phraseology of the several contracts at issue. Following his oral disposition, the court instructed counsel for the PGA to prepare proposed findings in accordance therewith.

The proposed findings incorporated the court's oral conclusions as well as some of the reasoning apparent in its earlier questions. During Bankers' closing argument concerning construction of the final instrument, Judge Fay explicitly asked counsel, "You do not think one alternative would be that they agree to disagree? " [FN2] His oral conclusion that Bankers never enjoyed a license to the name in perpetuity was necessarily based on the assumption, indicated a few minutes before, that the parties had agreed to disagree. The PGA's inclusion of that fact as a finding of the court, therefore, was not improper; it was based on the trial judge's independent credibility choice.

FN2. Record at 185.

The court adopted the PGA's proposals almost immediately, without receipt of opposing counsel's objections. Once them without modifying its earlier judgment. Though this objections were submitted a few days later, the court denied court has recently recommended a hearing procedure for the airing of all possible objections prior to the adoption of proposed findings of fact and conclusions of law, the judgment in the instant case demonstrates conclusions distilled in the "crucible of (the district judge's) conscience." Keystone Plastics, Inc. v. C & P Plastics, Inc., supra. The trial court entered lengthy oral findings. Substantially all written objections later advanced by appellant had been presented to the court at some point during the trial. When the court received appellant's objections, it had the power to amend, modify, or change its findings. We cannot presume the district court did not consider the objections solely because it did not grant them.

[18] Moreover, the scope of appellate review does not change simply because we disapprove the manner in which the district court arrived at its findings of fact and conclusions of law. We are bound by the clearly erroneous rule in reference to factual determinations. Ag Pro, Inc. v. Sakraida, 474 F.2d 167 (5th Cir. 1973). As heretofore

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

514 F.2d 665.
186 U.S.P.Q. 447
**(Cite as: 514 F.2d 665)**

explicated, none of the district court's factual or legal conclusions were erroneous.

We note in closing that the district court's permanent injunction restrains Bankers from using the terms "PGA", "Professional Golfers' Association", or "Professional Golfers' Association of America" in reference to any golf facilities it owns, whether on entrance signs, literature or other forms of advertising. The decree, however, does not require **\*673** Bankers to dismantle any permanent appurtenances to the clubhouse, and Bankers may denominate its club "former home of the PGA" if it wishes. The court's oral findings further state that there is no necessity for changing the real estate plats that refer to "PGA National Golf Club Estates." We believe the trial court has properly exercised its equitable powers in fashioning a decree that is fair and not too burdensome. The judgment of the district court is therefore affirmed.

514 F.2d 665, 186 U.S.P.Q. 447

END OF DOCUMENT



# EXHIBIT / ATTACHMENT



(

804 F.2d 1562
55 USLW 2372, 1 U.S.P.Q.2d 1011
(Cite as: 804 F.2d 1562)

Page 1

H

United States Court of Appeals,
Eleventh Circuit.

RAMADA INNS, INC., Plaintiff-Appellee,
v.
GADSDEN MOTEL COMPANY, a partnership; Conrad O.
Moss; Thomas H. Heatherly and
John T. Murray, Defendants-Appellants.

No. 85-7774.

Dec. 3, 1986.
Rehearing and Rehearing En Banc Denied Jan. 27, 1987.

Action was brought for breach of franchise agreement and
trademark infringement. The United States District Court
for the Northern District of Alabama, No. CV
84-AR-2426-M, William M. Acker, Jr., District Judge,
entered judgment for franchisor and former franchisee
appealed. The Court of Appeals, Hatchett, Circuit Judge,
held that: (1) trademark infringement damages were not
speculative; (2) franchisor was entitled to damages for
trademark infringement in addition to liquidated damages
for breach of franchise agreement; and (3) partner who
alleged he withdrew from franchisee partnership before
trademark infringement occurred was nevertheless liable
where partner did not assert such defense during trial.

Affirmed.

West Headnotes

[1] Trade Regulation ⚖️674
382k674 Most Cited Cases

[1] Trade Regulation ⚖️728.1
382k728.1 Most Cited Cases
(Formerly 382k728)

Damages for trademark infringement may include
defendant's profits, any damages sustained by plaintiff, and
cost of action. Lanham Trade-Mark Act, § 35, 15 U.S.C.A.
§ 1117.

[2] Trade Regulation ⚖️598
382k598 Most Cited Cases

Finding of damages suffered by trademark owner by former
franchisee's continued use of mark was not speculative
where finding was supported by expert testimony
concerning franchise fees lost during infringement period
and unrebutted testimony of costs of replacement licensee
and remedial advertising. Lanham Trade-Mark Act, § 35, 15
U.S.C.A. § 1117.

[3] Trade Regulation ⚖️672
382k672 Most Cited Cases

[3] Trade Regulation ⚖️683
382k683 Most Cited Cases

Franchisor was entitled to damages for trademark
infringement, due to franchisees' holdover after franchise
agreement was terminated, as well as liquidated damages for
breach of franchise agreement, though common elements
were used to calculate both awards, because damages were
awarded for two distinct wrongs. Lanham Trade-Mark Act,
§ 1 et seq., 15 U.S.C.A. § 1051 et seq.

[4] Trade Regulation ⚖️374
382k374 Most Cited Cases

Trademark infringement defendant who claimed he
withdrew from infringing partnership before infringement
occurred was nevertheless liable where defendant failed to
distinguish himself from other partnership defendants at
trial and did not appeal partial summary judgment entered
against all defendants.
*1562 Roy O. McCord, McCord & McCord, Gadsden, Ala.,
for the Partnership.

F. Guthrie Castle, Jr., Borod & Huggins, Memphis, Tenn.,
for Conrad O. Moss, Individually.

Joseph Barry Jones, Bradley, Arant, Rose & White, Linda
Friedman, Thad G. *1563 Long, Birmingham, Ala., for
plaintiff-appellee.

Appeal from the United States District Court for the
Northern District of Alabama.

Before HILL and HATCHETT, Circuit Judges, and
THOMAS [FN*], Senior District Judge.

> FN* Hon. Daniel H. Thomas, Senior U.S. District
> Judge for the Southern District of Alabama, sitting
> by designation.

HATCHETT, Circuit Judge:

This appeal arises out of an action filed by Ramada Inns,
Inc. (Ramada Inns) against Gadsden Motel Company
(Gadsden), a partnership, and partners, Thomas H.
Heatherly, John T. Murray, and Conrad O. Moss (partners)
for trademark infringement and breach of contract. The
district court awarded Ramada Inns substantial damages on
the claims. We affirm.

**Background**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

804 F.2d 1562
55 USLW 2372, 1 U.S.P.Q.2d 1011
(Cite as: 804 F.2d 1562)

Page 2

In August, 1977, the partners purchased a motel in Attalla, Alabama, and entered into a license agreement with Ramada Inns. In 1982, the motel began receiving poor ratings from Ramada Inns inspectors, and Gadsden fell behind in its monthly franchise fee payments. Despite proddings from Ramada Inns, and the initiation of a refurbishing program to upgrade facilities by Gadsden, the motel never met Ramada Inns' operational standards again. On November 17, 1983, Ramada Inns terminated the license agreement citing quality deficiencies and Gadsden's failure to pay past due license fees. Ramada Inns' termination notice directed Gadsden to remove any materials or signs identifying the motel as a Ramada Inn. Inspections on January 6, 1984, and in March, 1984, revealed that Gadsden continued using Ramada Inns' signage and graphics inside and outside the motel.

On September 24, 1984, Ramada Inns brought this action for trademark infringement under the Lanham Trademark Act of 1946, 15 U.S.C. § 1051 et seq. (Lanham Act) and for breach of the franchise agreement. The district court, acting on a motion for partial summary judgment, found Heatherly, Murray, and Moss liable on the trademark infringement claims, awarded Ramada Inns $17,993.24 for past due license fees, and held the liquidated damages clause of the franchise agreement void as a penalty. During the trial, however, the court stated that the liquidated damages issue was open to question.

On September 30, 1985, the district court entered a $255,936.08 judgment for Ramada Inns in addition to the previous award. This judgment included $94,441.08 in liquidated damages, $20,000 in attorney's fees, and trademark infringement damages trebled from $47,165 to $141,995. On October 10, 1985, Moss filed a motion to alter or amend the judgment contending, among other things, that he was not a partner in Gadsden Motel Company when the trademark infringement occurred. His motion was denied. Heatherly, Murray, and Moss all appeal asserting errors in the district court's assessment of damages.

## Discussion

The partners raise a host of issues on appeal, but only three merit discussion: (1) whether the trademark infringement damages were speculative; (2) whether the district court erred in awarding Ramada Inns trademark infringement damages in addition to the liquidated damages; and (3) whether Moss should have been spared trademark infringement liability because he withdrew from the partnership before the infringement took place.

A. Whether the trademark infringement damages were speculative.

The district court awarded Ramada Inns $47,165 in trademark infringement damages based on the testimony of Dr. Robert Robicheaux, then associate professor of marketing at the University of Alabama Graduate School of Business. Dr. Robicheaux arrived at his damage calculation *1564 by adding the following: (1) $23,610 in lost franchise fees for the six-month "hold over" period when Gadsden Motel Company continued to use Ramada Inns' marks; (2) $3,555 interest on the lost franchise fees; (3) $5,000 needed to develop a new franchise in the area; and (4) $15,000 for advertising to restore Ramada Inns' good reputation. The partners contend that the district court should have disregarded Dr. Robicheaux's estimates because they were too speculative. Damages were too uncertain to be awarded, in their view, because Dr. Robicheaux based his estimate of the amount of the lost franchise fees on 1983, instead of 1984. The amount was also uncertain, according to the partners, because Dr. Robicheaux's estimate that it would take $5,000 to attract a new franchise was based solely on a conversation he had with a Ramada Inns official, and because Dr. Robicheaux's estimate that it would take $15,000 in order to restore Ramada Inns' image was based on figures for the entire southeastern area. In rebuttal, Ramada Inns contends that Dr. Robicheaux used 1983 figures because the computation of damages in the form of lost license fees is properly based on the revenues produced by a properly run motel, and that the partners' motel was run better in 1983 than in 1984. Ramada Inns further contends that the partners never objected to Dr. Robicheaux's reliance on his conversation with the Ramada Inns official to arrive at his conclusion that it would take $5,000 to get a new licensee in the area, and that Dr. Robicheaux used an estimate of the cost of remedial advertising based on the entire southeast because it was the "best information available."

[1][2] Under the Lanham Act, damages for trademark infringement may include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action. 15 U.S.C. § 1117. [FN1] The Gadsden Motel Company failed to realize a profit during the period of infringement, thus, the district court's damage award was based on damages sustained by Ramada Inns as a result of the infringement. The partners stress that a trademark infringement award must be based on proof of actual damages and that some evidence of harm arising from the violation must exist. We agree, but the essence of the question presented remains the same. We must decide whether the district court's assessment of the actual damages or harm suffered by Ramada Inns was speculative. We conclude that it was not.

> FN1. The entire provision reads:
> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be

804 F.2d 1562
55 USLW 2372, 1 U.S.P.Q.2d 1011
(Cite as: 804 F.2d 1562)

Page 3

entitled, subject to the provisions of sections 111 and 114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney's fees to the prevailing party.

In arriving at our conclusion, we are guided by well established principles, the first and foremost being that the district court's damage assessment is entitled to deference:

'Great latitude is given the trial judge in awarding damages, and his judgment will not be set aside unless the award is clearly inadequate.' *Drake v. E.I. DuPont de Nemours and Company,* 432 F.2d 276, 279 (5th Cir.1970). This is especially true of an award fashioned pursuant to the Lanham Act which expressly confers upon district judges wide discretion in determining a just amount of *1565 recovery for trademark infringement. *See* 15 U.S.C. § 1117.

*Holiday Inns, Inc. v. Alberding,* 683 F.2d 931 (5th Cir.1982). *See also Burger King v. Mason,* 710 F.2d 1480, 1495 (11th Cir.1983) (15 U.S.C. § 1117 "vests considerable discretion in the district court.") In making a damage assessment, the district court may allow recovery for "all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts." *Boston Professional Hockey v. Dallas Cap,* 597 F.2d 71 (5th Cir.1979) (quoting *Obear-Nester Glass Company v. United Drug Company,* 149 F.2d 671 (8th Cir.), *cert. denied,* 326 U.S. 761, 66 S.Ct. 141, 90 L.Ed. 458 (1945)). Moreover, Lanham Act damages may be awarded even when they are not susceptible to precise calculations:

Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation. *Story Parchment*

*Company v. Paterson Parchment Paper Company,* 282 U.S. 555, 563, 51 S.Ct. 248, at 250, 75 L.Ed. 544 (1931). The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury. *Eastman Kodak Company v. Southern Photo Company,* 273 U.S. 359, 379, 47 S.Ct. 400 [405], 71 L.Ed. 684 (1927).

*Bangor Punta Operations v. Universal Marine Company,* 543 F.2d 1107, 1110- 11 (5th Cir.1976); *Borg-Warner Corporation v. York-Shipley, Inc.,* 293 F.2d 88, 95 (7th Cir.1961) ("damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded.") Under these teachings, the district court's $47,165 damage award cannot be termed "speculative," especially considering that it was based on unrebutted expert testimony.

Moss further contends, however, that the award in this case "imposes a hypothetical franchise contract onto the facts and makes an award for breach thereof," and thus "runs afoul of the rule" established in *St. Charles Manufacturing Company v. Mercer,* 737 F.2d 891 (11th Cir.1983). In *St. Charles,* defendants, developers of a townhome community in Palm Beach, Florida, represented that their homes would contain "St. Charles kitchens" without reaching an agreement with the plaintiff, St. Charles, to do so. The plaintiff brought a trademark infringement action under the Lanham Act and sought to recover the profit they would have made on the sales to the defendants.

We found this an "inappropriate measure of damages under the Act" and affirmed the district court's denial of relief. *St. Charles* is clearly inapposite. Notwithstanding Moss's contention to the contrary, Ramada Inns did not seek to recover profits it would have received had it sold the use of its trademark to Gadsden during the infringement period. Rather, much of Ramada Inns' award represented franchise fees or "royalties" lost during the infringement period. This was entirely proper: "Royalties normally received for the use of a mark are the proper measure of damages for misuse of those marks." *Holiday Inns v. Airport Holiday Corporation,* 493 F.Supp. 1025, 1028 (N.D.Tex.1980) (citing *Boston Professional Hockey Association v. Dallas Cap Manufacturing,* 597 F.2d 71 (5th Cir.1979)).

B. Whether the district court erred in awarding Ramada Inns trademark infringement damages in addition to the liquidated damages.

[3] The partners next contend that the district court erred in awarding Ramada Inns damages under both the liquidated damages clause of the franchise agreement and under the Lanham Act. The partners point out that the purpose of including the liquidated damages in the agreement was to

F.2d 1562
USLW 2372, 1 U.S.P.Q.2d 1011
ite as: 804 F.2d 1562)

ompensate Ramada Inns for lost franchise fees and expenditures to attract a *1566 new franchisee for a period of two years after breach of the franchise agreement. Because some of the trademark infringement award was based upon the same items considered for liquidated damages, the partners claim that Ramada Inns received a "double recovery for a single injury."

In rebuttal, Ramada Inns contends that the partners' argument is meritless because the liquidated damages and trademark infringement damages related to an "entirely separate set of wrongs." In support of this contention, Ramada Inns points out that the liquidated damages were recoverable even in the absence of trademark infringement, and upon the partners' breach of the franchise agreement, they became, like any other infringers, liable for trademark infringement damages. Ramada Inns further contends that it did not receive a double recovery for a single injury because the liquidated damages were only intended to provide compensation for two years of expenses and lost franchise fees after the period of infringement ended.

This issue, one of first impression in our circuit, is problematic. We begin our analysis by examining the parties' contentions. After careful review of the record, we find it indisputable that the trademark infringement damages were calculated in almost the same manner as the liquidated damages. The district court reversed an earlier ruling that the liquidated damages clause of the franchise agreement was void in large part because James Wellbeloved, Ramada Inns' director of franchise administration, testified that the purpose of the liquidated damages clause was to compensate Ramada Inns for lost franchise fees and expenditures to establish a new franchisee upon premature termination of a franchise agreement. Likewise, the bulk of the trademark infringement damages were awarded based on Dr. Robicheaux's testimony that to be made whole for the infringement, Ramada Inns would need a sum to compensate for lost franchise fees and expenditures needed to attract a new franchisee.

Our determination that these two elements—loss of franchise fees and expenditures to establish a new franchisee—were both taken into account in calculating each damage award does not end the analysis. The question next faced is: whether the fact that common elements were used to calculate the two damage awards resulted in Ramada Inns' receiving an impermissible "double recovery."

First, we note that Ramada Inns' observation that damages were awarded for two "set of wrongs" is as irrefutable as the partners' contention that the damage awards included common elements. Liquidated damages were awarded because the partners breached the franchise agreement; trademark infringement damages were awarded because

they held over for six months after the agreement was terminated. The franchise agreement stated clearly that upon termination, Ramada Inns was entitled to liquidated damages. Under the Lanham Act, Ramada Inns was entitled to damages for the partners' impermissible "holding over." After all, "holding over" is no different than unlawfully using the Ramada Inns' marks from the beginning of operations. By committing these two indiscretions, the partners became liable for two damage awards. Since damages are not always given to precise calculation, a possibility always exists that some overlap will occur when separate awards are made to compensate for separate wrongs.

Second, were we to hold that the district court erred in awarding trademark infringement damages, we would undoubtedly subvert the purpose behind the Lanham Act. [FN2] When a trademark infringement action *1567 is established because a franchisee "holds over" as here, and damages are based on the franchisor's losses, royalties normally received by the franchisor and expenditures necessary to establish a new franchisee will constitute substantial elements in the damage award. See Boston Professional Hockey v. Dallas Cap, 597 F.2d 71, 75 (5th Cir.1979). Were we to hold that trademark infringement damages could not be recovered if the franchisor received like damages in a separate action for breach of the franchise agreement, we would provide an incentive for some infringers to "hold over." With the knowledge that they could only be answerable for contractual damages, unscrupulous infringers would "hold over" with impunity.

FN2. Title 15 U.S.C. § 1127 provides in pertinent part:
The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by state, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations. [Emphasis added.]
An action for trademark infringement is, of course, useless in many instances if damages for the infringement are not recoverable.

C. Whether Moss should have been spared trademark infringement liability because he withdrew from the

804 F.2d 1562
55 USLW 2372, 1 U.S.P.Q.2d 1011
**(Cite as: 804 F.2d 1562)**

Page 5

partnership before the infringement occurred.

[4] Moss contends that he is not liable for trademark
infringement damages because he extricated himself from
the partnership before the infringement period began. Moss
points out that in his answer to Ramada Inns' complaint, he
denied that he was a general partner of Gadsden Motel
Company, and he further contends that no evidence was
adduced at trial or for purposes of summary judgment which
indicated that he participated in the trademark infringement.
In response, Ramada Inns contends that Moss's liability was
determined under the district court's August 13, 1985, order
granting partial summary judgment. Because Moss failed to
appeal that order, Ramada Inns claims that this court has no
jurisdiction to consider Moss's claim. Finally, Ramada Inns
asserts that the "agreed summary" in the pretrial order
stipulated that Moss was situated similarly to the other
partners and that Moss failed to claim a different status at
trial.

The district court denied Moss's post-trial motion to
extricate himself from trademark infringement liability
pursuant to Rules 52(b) and 59(e) of the Federal Rules of
Civil Procedure. The district court's order denying Moss's
motion adequately disposes of his arguments on appeal. In
disposing of the motion, the district court stated:

Until the final judgment was entered all defendants were
represented only by one attorney. On May 30, 1985 *all*
defendants admitted owing $17,994.24 to plaintiff. Moss
made no attempt whatsoever to distinguish himself from
the pack, and on August 13, 1985 the court entered partial
summary judgment in favor of plaintiff and against *all*
defendants in the sum of $17,994.24 and made the
judgment appealable under Rule 54(b) Federal Rule of
Civil Procedure. Moss did not take a timely appeal from
that judgment and thus identified himself again with the
other defendants. From the phrasing in Moss's post
judgment motion he seems to claim that he should be
relieved from any obligation even under the partial
summary judgment of August 13, 1985. Obviously his
request comes too late. If he does not now intend to
extricate himself entirely, then his earlier failure to
distinguish himself constituted a confession of a lack of
distinction.

The district court went on to point out that the plural
"defendants" appeared throughout the "agreed summary" of
the July 3, 1985, pretrial order, and that Moss never
attempted to distinguish himself or advance a defense
separate from the other partners. We find Moss's contention
that the pretrial order was ambiguous unpersuasive. If Moss
withdrew from the partnership before the trademark
infringement began, as he contends, he must now pay for his
"want of caution in the proceedings *1568 below." *Holiday
Inns, Inc. v. Alberding,* 683 F.2d 931, 934-35 (5th

**Conclusion**

We have examined the partners' other contentions of error
and find them meritless. We also conclude that the district
court did not abuse its discretion in trebling the damages,
awarding prelitigation interest, and awarding Ramada Inns
$20,000 in attorney's fees. For the foregoing reasons, the
judgment of the district court is affirmed.

AFFIRMED.

804 F.2d 1562, 55 USLW 2372, 1 U.S.P.Q.2d 1011

END OF DOCUMENT



# EXHIBIT / ATTACHMENT

## 5 /

(To be scanned in place of tab)

464 S.E.2d 895
105 Ed. Law Rep. 1286
**(Cite as: 219 Ga.App. 296, 464 S.E.2d 895)**

Page 1

C

Court of Appeals of Georgia.

SAVANNAH COLLEGE OF ART & DESIGN, INC.
v.
SCHOOL OF VISUAL ARTS OF SAVANNAH, INC. et al.

No. A95A1105.

Dec. 4, 1995.

College sued school, its president, and its affiliate alleging tortious interference with college's existing and potential business relationships with students, faculty, staff, accrediting organizations and banks. The Superior Court, Chatham County, Charles B. Mikell, Jr., J., granted partial summary judgment to defendants. College appealed. The Court of Appeals, Beasley, C.J., held that if college can show there was a conspiracy to destroy it by tortious means existing before date defendants joined alleged conspiracy and that these defendants joined conspiracy with knowledge of its existence and purposes, they can be held liable for all torts committed in furtherance of the conspiracy.

Reversed.

West Headnotes

**[1] Conspiracy ☞1.1**
91k1.1 Most Cited Cases

Gravamen of any civil conspiracy claim is not alleged collusion, but tortious conduct committed against plaintiff which proximately causes injury.

**[2] Conspiracy ☞13**
91k13 Most Cited Cases

If college alleging conspiracy can show there was a conspiracy to destroy it by tortious means existing before date defendants joined alleged conspiracy and that these defendants joined conspiracy with knowledge of its existence and purposes, defendants can be held liable for all torts committed in furtherance of conspiracy, or common design, even though those torts were committed before defendants joined alleged conspiracy.

**[3] Conspiracy ☞1.1**
91k1.1 Most Cited Cases

Conspiracy upon which civil action for damages may be founded is combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort.

**[4] Conspiracy ☞4**
91k4 Most Cited Cases

**[4] Conspiracy ☞6**
91k6 Most Cited Cases

In imposing civil liability for conspiracy, conspiracy itself furnishes no cause of action as gist of action, if cause of action exists, is not conspiracy alleged, but tort committed against plaintiff and resulting damage; where act of conspiring is itself legal, means or method of its accomplishment must be illegal.

**[5] Conspiracy ☞3**
91k3 Most Cited Cases

**[5] Conspiracy ☞13**
91k13 Most Cited Cases
Essential element in civil conspiracy is common design and anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much party thereto as if he had been an original member.
**\*\*895** E.J. Hong, Sue Ellen Russell, Brand & Lowell, Ross A. Nabatoff, Brand, Lowell & Ryan, Washington, DC, **\*298** Erwin A. Friedman, Savannah, for appellant.

Savage & Turner, Brent J. Savage, Robert B. Turner, Savannah, for appellees.

**\*\*896 \*296** BEASLEY, Chief Judge.

Savannah College of Art & Design ("SCAD") alleged that 11 defendants, together with 26 persons not named as defendants, entered a conspiracy to take over or destroy SCAD by illegal, wrongful, and tortious means. It seeks to hold defendants jointly and severally liable. See Cook v. Robinson, 216 Ga. 328, 329(2), (4), 116 S.E.2d 742 (1960). See also OCGA § 51-12-30. Specific torts were alleged against various defendants. Among the defendants were the three involved in this appeal; School of Visual Arts, Inc. ("SVA"); Rhodes, SVA's President; and School of Visual Arts of Savannah, Inc., SVA's Georgia affiliate. They were alleged to have tortiously interfered with SCAD's existing and potential business relationships with students, faculty, staff, accrediting organizations, and banks. Georgia allows such a cause of action. See, e.g., St. Mary's Hosp., etc. v. Radiology Professional Corp., 205 Ga.App. 121, 124(2), 421 S.E.2d 731 (1992). SCAD appeals from the grant of partial summary judgment to these three defendants.

The court determined there was evidence from which it could be argued a conspiracy was formed, but no evidence these defendants were involved prior to July 29, 1992, when SVA made its first contacts in Savannah. The court concluded that they could not be held jointly and severally

Page 2

liable for any torts committed by others before that date. SCAD does not dispute the court's factual statement but contends it erred as a matter of law because they were co-conspirators.

[1][2] SCAD recognizes it cannot recover separately for any tort of conspiracy and advances conspiracy as a means to impute liability to all defendants for the acts performed by only one or some. See *Groover v. Brandon,* 200 Ga. 153, 164(3), 36 S.E.2d 84 (1945). "The gravamen of any civil conspiracy claim is not the alleged collusion, but tortious conduct committed against the plaintiff which proximately causes an injury. [Cit.]" *Ray v. Atkins,* 205 Ga.App. 85, 90(3), 421 S.E.2d 317 (1992). SCAD contends that under the conspiracy theory, any defendant who joins it is liable for all acts committed in furtherance of an ongoing conspiracy, even if committed before that defendant joined *297 it.

The defendants urge that the trial court was correct on this point.

[3][4] The law is that " '[a] conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort. Where it is sought to impose civil liability for a conspiracy, the conspiracy of itself furnishes no cause of action. The gist of the action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage. [Cit.] ... [W]here the act of conspiring is itself legal, the means or method of its accomplishment must be illegal.' [Cits.]" *Cook,* supra at 328-329(1), 116 S.E.2d 742. As quoted recently by the Georgia Supreme Court from earlier cases: " 'A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means.' " *U.S. Anchor Mfg. v. Rule Indus.,* 264 Ga. 295, 297(1), 443 S.E.2d 833 (1994).

[5] " ' "The essential element ... is the common design.... And anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto ... as if he had been an original member." [Cit.]' [Cits.]" *Cook,* supra at 330(5), 116 S.E.2d 742. It is this second statement from *Cook* that SCAD relies upon to impute liability for acts committed before July 29, 1992. The statement comports with the general theory of conspiracy law in the United States. See 15A C.J.S. § 19 and *Chemetron Corp. v. Business Funds,* 682 F.2d 1149, 1180 (5th Cir.1982), which refers to this as an "immemorial common-law principle" and cites several cases including *Blackstone Indus. v. Andre,* 232 Ga. 715, 208 S.E.2d 815 (1974).

The principle has been accepted in Georgia for some time.

See *Woodruff v. Hughes,* 2 Ga.App. 361, 365, 58 S.E. 551 (1907). The defendants point out that SCAD cites no Georgia case in which the principle has been specifically applied, only cases in which it is recited, but the courts of this state have **897 often repeated it as part of the law of civil conspiracy in Georgia. See *Blackstone Indus. v. Andre,* supra at 716, 208 S.E.2d 815; *Peoples Loan Co. v. Allen,* 199 Ga. 537, 558(1), 34 S.E.2d 811 (1945); *Grainger v. Jackson,* 122 Ga.App. 123, 128(2), 176 S.E.2d 279 (1970); *Archer v. Gwinnett County,* 110 Ga.App. 442, 447-448(2), 138 S.E.2d 895 (1964); *American Thread Co. v. Rochester,* 82 Ga.App. 873, 884, 62 S.E.2d 602 (1950). Indeed, the Supreme Court stated in *Peoples Loan Co.,* supra at 558-559, 34 S.E.2d 811: "While it is alleged that the original conspiracy was formed in August, 1943, and Peoples Loan Company is not shown to have been incorporated until May 18, 1944, its entrance into the conspiracy after its inception would equally bind it as to any wrongful act done by any one of the conspirators in pursuance of the general design...." This court applied the principle *298 in *Archer,* supra. The rationale is that the latecomer shares in the intended fruit of the conspiracy, the purpose of it, which in this instance is allegedly the takeover of SCAD or its destruction and replacement by SVA. Defendants have not cited any Georgia case which has disapproved the principle or applied one that is contrary, nor have we found one.

*Willson v. Appalachian, etc., Hardware Co.,* 220 Ga. 599(1), 140 S.E.2d 830 (1965), also dealt with a defendant who had joined an ongoing conspiracy. A corporation was formed with the directors' full knowledge that the stated minimum capital of $100,000 had not been paid to the corporation. After incorporation, Willson became a director. Other misrepresentations were made, all of which induced plaintiff supplier to extend credit. Plaintiff sought to hold Willson liable for damages flowing from the act of incorporation in addition to various fraudulent acts later committed. Willson demurred generally to the supplier's suit, arguing on appeal that he could not be held liable for the corporation's debts because he was not one of the persons who organized it and transacted business before the minimum capital stock had been subscribed. *Id.* at 608(1), 140 S.E.2d 830.

After detailing the facts and Willson's argument, the Supreme Court affirmed the demurrer's demise, reciting that one who joins an ongoing conspiracy "knowing of its existence and purpose, ... becomes as much a party thereto as if he had been an original member. [Cit.]" *Willson,* supra at 609(1), 140 S.E.2d 830. As this was the issue Willson presented on appeal, we take the opinion as an acceptance by the Supreme Court of the principle and apply it here as the rule, fortified by the other cases cited above.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

464 S.E.2d 895                                                           Page 3
105 Ed. Law Rep. 1286
**(Cite as: 219 Ga.App. 296, 464 S.E.2d 895)**

If SCAD can show there was a conspiracy to destroy it by tortious means existing before July 29, 1992, and that these defendants joined the conspiracy with knowledge of its existence and purposes, they could be held liable for all torts committed in furtherance of the conspiracy, or the "common design," even though those torts were committed before July 29, 1992.

*Judgment reversed.*

POPE, P.J., and RUFFIN, J., concur.

464 S.E.2d 895, 219 Ga.App. 296, 105 Ed. Law Rep. 1286

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

52

**(To be scanned in place of tab)**

380 F.2d 224
154 U.S.P.Q. 330
**(Cite as: 380 F.2d 224)**

Page 1



United States Court of Appeals, Fifth Circuit.

Othal L. TURNER and On-The-Town, Inc., d/b/a Atlanta's
Playboy Club,
Appellants,
v.
H M H PUBLISHING COMPANY, Inc., et al., Appellees.

No. 24039.

July 10, 1967.

Action to enjoin the use of plaintiffs' trade and service marks by defendants in their operation of a nightclub and restaurant known as 'Atlanta's Playboy Club.' The United States District Court for the Northern District of Georgia, Lewis R. Morgan, J., 222 F.Supp. 145, entered judgment for plaintiffs granting a permanent injunction, and defendants appealed. The Court of Appeals, Ainsworth, Circuit Judge, held that trade and service marks 'Playboy', 'Playboy Club' and 'Playmate', through extensive use and promotion, acquired a secondary meaning of sufficient strength to justify enjoining infringement. It was also held that registry of mark 'Playboy' in connection with operation of nightclub or restaurant was not void on theory that registrant did not operate nightclubs but relied for validity of its marks on operations of such clubs by third-party sublicensees, where registrant fully controlled and dictated nature and quality of goods and services used in connection with the trade and service marks by the several licensees.

Affirmed.

West Headnotes

**[1] Trade Regulation ☞258**
382k258 Most Cited Cases

Under Lanham Act, registration of a trade mark confers only procedural advantages and does not enlarge registrant's rights, for ownership of the trade mark rests on adoption and use, and not on registration. Lanham Trade-Mark Act, §§ 1 et seq., 45, 15 U.S.C.A. §§ 1051 et seq., 1127.

**[2] Trade Regulation ☞251**
382k251 Most Cited Cases

Court would not assume any knowledge on part of purchasing public by mere registrations in patent office, nor would it assume that marks are in continuing use, so as to have any effect on mind of purchasing public merely because they had been so registered. Lanham Trade-Mark Act, §§ 1 et seq., 45, 15 U.S.C.A. § 1051 et seq., 1127.

**[3] Trade Regulation ☞491**
382k491 Most Cited Cases

Trade and service marks "Playboy", "Playboy Club" and "Playmate", through extensive use and promotion, acquired a secondary meaning of sufficient strength to justify enjoining infringement. 28 U.S.C.A. §§ 1332, 1338; Lanham Trade-Mark Act, § 39, 15 U.S.C.A. § 1121.

**[4] Trade Regulation ☞726**
382k726 Most Cited Cases

Contentions of defendants as to weakness or strength, through secondary meaning, of marks involved questions of fact implicit in finding of confusion, and such finding unless clearly erroneous would not be disturbed. 28 U.S.C.A. §§ 1332, 1338; Lanham Trade-Mark Act, § 39, 15 U.S.C.A. § 1121.

**[5] Trade Regulation ☞513**
382k513 Most Cited Cases

Confusion was not precluded between use of trade mark "Playboy" for a magazine and its use by defendant for a nightclub on theory that goods and services of each were noncompeting, where plaintiff publisher also held registered service marks "Playboy Club" for operating private social clubs which feature food, drinks and entertainment and "Playboy" for operation of establishments which feature food, drink, and entertainment. 28 U.S.C.A. §§ 1332, 1338; Lanham Trade-Mark Act, § 39, 15 U.S.C.A. § 1121.

**[6] Trade Regulation ☞513**
382k513 Most Cited Cases

Fact that plaintiffs' mark dealt with a magazine and defendants' with a nightclub was immaterial where the two were intermeshed in the public mind. 28 U.S.C.A. §§ 1332, 1338; Lanham Trade-Mark Act, § 39, 15 U.S.C.A. § 1121.

**[7] Trade Regulation ☞153**
382k153 Most Cited Cases

Registry of mark "Playboy" in connection with operation of nightclub or restaurant was not void on theory that registrant did not operate nightclubs but relied for validity of its marks on operations of such clubs by third-party sublicensees, where registrant fully controlled and dictated nature and quality of goods and services used in connection with the trade and service marks by the several licensees. Lanham Trade-Mark Act, § 5, 15 U.S.C.A. § 1055.

**[8] Trade Regulation ☞63**
382k63 Most Cited Cases

A trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

380 F.2d 224
154 U.S.P.Q. 330
(Cite as: 380 F.2d 224)

Page 2

not have used the mark. Lanham Trade-Mark Act, § 5, 15 U.S.C.A. § 1055.

**Trade Regulation** ☜**736**
382k736 Most Cited Cases

Playmate

**Trade Regulation** ☜**736**
382k736 Most Cited Cases

Playboy

**Trade Regulation** ☜**736**
382k736 Most Cited Cases

Playboy Club
*225 Henry M. Hatcher, Jr., Hatcher, Meyerson, Oxford & Irvin, Atlanta, Ga., for appellants.

David J. Krupp, Chicago, Ill., Hoke Smith, Atlanta, Ga., Devoe, Shadur, Mikva & Plotkin, Chicago, Ill., Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., for appellees. Dressler, Goldsmith, Clement & Gordon, Chicago, Ill., of counsel.

Before COLEMAN and AINSWORTH, Circuit Judges, and CARSWELL, District Judge.

AINSWORTH, Circuit Judge:

HMH Publishing Company, Inc. (HMH) and Playboy Clubs International, Inc. (International), Delaware corporations, both with principal place of business in Chicago, Illinois, as plaintiffs, brought this suit against Othal L. Turner and On-The-Town, Inc., d/b/a Atlanta's Playboy Club, Georgia citizens, defendants, to enjoin the use of plaintiffs' trade and service marks by defendants in their operation of a night club and restaurant known as 'Atlanta's Playboy Club.'

The suit is based on diversity of citizenship (28 U.S.C. § 1332), on 28 U.S.C. § 1338 relating to actions involving trademarks, and on the Lanham Act (15 U.S.C. § 1121). It is alleged that defendants wilfully infringed on trade and service marks of plaintiff HMH, especially in the use of the trademark and service mark 'Atlanta's Playboy Club' and in the use of the marks 'Playboy' and 'Playmate' in the conducting of a night club and restaurant. From a judgment in favor of plaintiffs, granting a permanent injunction against the use of these marks, defendants have appealed.

HMH began the publication of 'Playboy' Magazine in November 1953 and registered the trademark 'Playboy' for a monthly magazine on December 28, 1954 with the United States Patent Office. When defendants began the alleged

unauthorized use of the name 'Atlanta's Playboy Club,' in April 1962, the monthly circulation of Playboy Magazine was 1,310,069 copies and when this case was tried it had reached a monthly circulation of 3,366,000. More than 170,000,000 copies have been sold. Its circulation is both nationwide and international.

Hugh M. Hefner was the organizer of HMH and is the owner of 80 per cent of its stock. He has been its president and one of its directors from the beginning. In 1957, HMH announced the intention to use its trademarks directly in the night club business. In 1959, Hefner and two associates organized*226 Chicago Playboy Club, Inc., which later opened the first club in Chicago. In 1960, the same persons organized plaintiff Playboy Clubs International, Inc. and by agreement with HMH, International was granted an exclusive license, as master licensee, to use the HMH marks, alone or in combination, for the operation of key clubs with standards established and to be established by HMH for quality and conduct to be identified with the key clubs and the HMH marks. International was granted the right to grant sublicenses to others for the purpose of operating such clubs using the marks and subject to the approval of HMH. On February 29, 1960, Chicago Playboy Club, Inc. opened a key club named Playboy Club of Chicago under the licensing agreement described, and on May 6, 1961, a similar licensed club was opened in Florida known as Miami Playboy Club. Subsequently a license was granted to Playboy Club of Louisiana which opened the New Orleans Playboy Club on October 5, 1961. Therefore, in April 1962, when defendants opened their club in Atlanta under the name of 'Atlanta's Playboy Club,' the Chicago, Miami and New Orleans clubs licensed by plaintiffs were already in operation. Subsequently additional clubs have been licensed and opened in New York City, Phoenix, St. Louis, Detroit, Kansas City, Baltimore, Cincinnati, Los Angeles, Atlanta and Jamaica.

The gross receipts of International and the clubs have increased spectacularly from 1960 to 1965. International has promoted the clubs through magazine, newspaper and radio advertising, use of public relations firms, etc., and has spent a total of $5,158,088 in promotion expenses during that period. In addition to holding a registered trademark for Playboy Magazine, HMH also holds service marks for 'The Playboy Club' for operating private social clubs which feature food, drinks and entertainment' registered March 5, 1963; another mark entitled 'Playboy' for 'operation of establishments which feature food, drink and entertainment' registered May 12, 1964. It likewise has registered trademarks for 'Playboy's boy's Playmate of the Month,' featured in the magazine 'Playboy,' registered May 6, 1958 and 'Playmate' for calendars registered September 26, 1961, for perfume registered May 7, 1963, and for bracelets, ankle bracelets, earrings, etc. registered September 29, 1964.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

380 F.2d 224
154 U.S.P.Q. 330
(Cite as: 380 F.2d 224)

There are more than 440,000 members of these clubs residing in all of the states, including Georgia, who hold keys to these clubs for which they have paid $25 to $50 each. The key allows access to any of the clubs in the chain.

Defendant Turner purchased the night club known as 'The Anchorage' in Atlanta in 1958, and operated it through the corporate defendant. In April 1962, the corporate defendant registered the trade names 'Atlanta's Playboy Club' and 'Playmate' in the Clerk's Office of the Superior Court of Fulton County (Atlanta), Georgia. At the time Turner knew of the existence of Playboy Magazine and of the Chicago and Miami Playboy Clubs which had been licensed by International. The name of 'The Anchorage' was changed by defendants to 'Atlanta's Playboy Club' and defendants began to advertise the club in Atlanta newspapers with a picture of a girl dressed in a costume closely resembling the famous bunny costume used by HMH. The advertisement stated 'No membership required.' It was not a key club. One of the rooms in defendants' establishment at another location was called 'The Playmate Lounge.'

We are called upon to decide whether plaintiffs have established that the terms 'Playboy' and 'Playmate' have attained a secondary meaning in connection with their operation of night clubs and restaurants as to justify enjoining defendants' club from using the trade and service marks, where such use adversely affects plaintiffs' activities in interstate commerce. Also, we must decide whether under the Lanham Act (15 U.S.C. §§ 1055 and 1127) the use *227 of the registered marks by plaintiffs' licensees inures to plaintiffs' benefit because such licensees are 'related companies' within the meaning of the Act, by virtue of the fact that the nature and quality of their goods or services are controlled by plaintiffs.

The district Judge, sitting without a jury, rendered his written decision in well-reasoned, detailed findings of fact and conclusions of law. He held that Playboy Magazine had for many years enjoyed wide circulation throughout the United States (including Atlanta and the State of Georgia); that HMH had extensively advertised its trademark 'Playboy' throughout the United States; had advertised and sold in interstate commerce under its trade and service marks 'Playboy' services and consumer items; and that the wide publicizing of the name 'Playboy' through the magazine and through the sale of these items had caused the trademark to be identified by the general public with HMH and is products. He found that in December 1959, HMH began to solicit membership applications for its Chicago Playboy Club which featured food, drink and entertainment; that a controlled license had been granted to International for the exclusive right to use and sublicense the trade and service marks of HMH to identify clubs operated in Chicago and other principal cities in the United States; that great care

had been exercised in the selection of the licensees; and the HMH controlled the nature and quality of the services of the clubs so that the services would be compatible with the nature and quality of the magazine and products of HMH. The district judge held that HMH had taken an active part in promoting the clubs and that the consuming public recognized the clubs and the services of the licensee under the trade and service marks as having been approved and licensed by HMH. He also found that the mark 'Playmate' had been widely publicized by HMH and International. He held that defendant changed the name of 'The Anchorage' to 'Atlanta's Playboy Club' with full knowledge of the existence of the use of the trademark 'Playboy' by HMH, including its use in Playboy Magazine, and with the knowledge of the existence of the Chicago and Miami Playboy Clubs franchised by International. He referred to the newspaper advertisements of defendants with the picture of a girl dressed in a costume closely resembling the bunny costume of HMH. He found that the use of the name 'Atlanta's Playboy Club' was confusingly similar to the names of International's franchisees, Chicago Playboy Club and Miami Playboy Club; that telephone calls had been received by Turner and correspondence by plaintiffs which showed actual confusion by the public as to an affiliation between defendants' operation and those franchised by plaintiffs. The district court concluded that the defendants had wilfully adopted and infringed the trade and service marks of HMH with the intention of passing off their business as one licensed, sponsored, approved or connected with HMH or its nationally known magazine 'Playboy' or with the clubs which it had licensed; that the continued use by defendants of the name 'Atlanta's Playboy Club' would damage the rights of HMH in its marks of 'Playboy' and 'Playmate' because the public is likely to continue to be deceived or confused into believing there is some trade connection between plaintiffs and defendants. Accordingly, the defendants were enjoined from the use of the name 'Atlanta's Playboy Club' or the use of the marks 'Playboy' or 'Playmate.'

We are in agreement with the findings of fact of the district judge which are amply supported by the evidence, and with his conclusions of law.

[1][2][3] Defendants contend that the trademark 'Playboy' is a weak or descriptive term because it is a common word, and because of wide prior usage by other magazines and clubs; that since plaintiffs do not operate a key club but only license such clubs, they exercise no control over them and have no property *228 right in the trademark. Under the Lanham Act (15 U.S.C. § 1051 et seq.), registration of a trademark confers only procedural advantages and does not enlarge the registrant's rights, for ownership of the trademark rests on adoption and use, not on registration. See Faciane v. Starner, 5 Cir., 1956, 230 F.2d 732. However, the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

record is replete with evidence of continuous use of the marks [FN1] by plaintiffs who have built a national and international business reputation and have extensively publicized and promoted their trade and service marks at the cost of millions of dollars. [FN2] The trade and service marks 'Playboy,' 'Playboy Club' and 'Playmate' [FN3] have, through extensive use and promotion of plaintiffs, acquired a secondary meaning of sufficient strength to justify enjoining infringement by defendants. See North American Air. Sys. v. North American Aviation, 9 Cir., 1955, 231 F.2d 205.

FN1. The evidence is impressive that the use was in commerce as defined by Section 45 of the Lanham Act (15 U.S.C. § 1127), despite defendants' contrary argument. For example, at the date of the trial (October 20, 1965), there were 440,000 key holders in all the states, and 13,329 keys had been sold to Georgia residents (as of August 5, 1965). Billing for credit charges at all clubs was from the Chicago headquarters, across state lines. Supervision and control of nature and quality of goods and services were by persons sent from the Chicago office.

FN2. Defendants submitted a number of exhibits of copies of third- party registrations of trademarks of the name 'Playboy' in aid of their argument that the mark 'Playboy' was weak and diluted by wide usage by the public. However, defendants do not contend that their use of the term was prior to that of plaintiffs. We will not assume any knowledge on the part of the purchasing public by mere registrations in the Patent Office, nor will we assume that the marks are in continuing use, so as to have any effect on the mind of the purchasing public merely because they had been so registered. See J. C. Hall Company v. Hallmark Cards, Incorporated, C.C.P.A., 1965, 340 F.2d 960; Application of Helene Curtis Industries, Inc., 1962, 305 F.2d 492, 49 CCPA 1367.

FN3. Admittedly, Turner began use of both terms 'Playboy' was 'Playmate' at the same time. However, plaintiffs withdrew their supplemental pleading which related to the term 'Playmate' only, in order to avoid a continuance of the case. Defendants say, therefore, that the term 'Playmate' was not before the court and its order in this regard is erroneous. This contention disregards the fact that the pleadings which remained and which were originally filed were broad enough to include the term 'Playmate,' and the trial judge so ruled and received evidence as to that term also.

[4] The contentions of the parties as to weakness or strength (through secondary meaning) of the marks involve questions of fact implicit in the trial judge's finding of confusion, [FN4] and such findings unless clearly erroneous should not be disturbed. American Foods, inc. v. Golden Flake, inc., 5 Cir., 1963, 312 F.2d 619.

FN4. The Lanham Act (15 U.S.C. § 1114(1)(a)) provides that a person shall be liable in a civil action who shall, in commerce, use without consent of the registrant any registered mark 'which such use is likely to cause confusion or mistake or to deceive purchasers as to the source or origin of such goods or services.'

[5][6] Defendants argue that there is no evidence of confusion in this case between the use of the trademark 'Playboy' for a magazine, and its use by defendant for a night club; that the goods and services of each are noncompeting and, therefore, that the registered trademark is not entitled to protection. We held, however, in Chemical Corp. of America v. Anheuser- Busch, Inc., 5 Cir., 1962, 306 F.2d 433, 2 A.L.R.3d 739, that 'the concept of competition with respect to the particular product need not exist to warrant actions of this kind.' The argument of defendants ignores the fact that plaintiff HMH, publisher of Playboy Magazine, also holds registered service marks: 'The Playboy Club' for 'operating private social clubs which feature food, drinks and entertainment,' and 'Playboy' for 'operation of establishments which feature food, drink and entertainment.' We agree with the trial court's conclusion that the fact that one mark deals *229 with a magazine and the other with a night club is immaterial since the two are intermeshed in the public mind. To the public Playboy Magazine and the several Playboy Clubs are a single business enterprise. See Esquire, inc. v. Esquire Slipper Manufacturing Co., 1 Cir., 1957, 243 F.2d 540.

[7] Defendants also contend that HMH's registry of the mark 'Playboy' in connection with the operation of a night club or restaurant is void because HMH does not operate night clubs but relies for the validity of its marks on the operations of such clubs by third-party sublicensees. We look the statute for the answer.

Section 5 of the Lanham Act (15 U.S.C. § 1055) provides:

'Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.'

The term 'related company' referred to in Section 5 is defined in Section 45 of the Act (15 U.S.C. § 1127) as

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

380 F.2d 224
154 U.S.P.Q. 330
(Cite as: 380 F.2d 224)

Page 5

follows:

'The term 'related company' means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used.'

Relying on the preceding sections of the Lanham Act, plaintiffs have introduced ample evidence to show that HMH fully controlled and dictated the nature and quality of the goods and services used in connection with the trade and service marks by the several licensees. When a license is granted to a franchisee, it is required to meet standards established by International which in turn are dictated by HMH. These standards relate to decor, design, quantity and quality of food, beverages and entertainment in the clubs. Each club must conform to the standards already established for existing clubs and the agreements with franchisees are made expressly subject to the terms of International's license with HMH. International hires and supervises personnel of all the clubs and the right of supervision is a continuing program.

The clubs are policed by executives of HMH and by two independent services who regularly and periodically visit the clubs and report on the maintenance of standards for food, beverages, services and decor. At HMH's direction International has prepared an operating manual for use in the clubs so each is run in exactly the same manner. All billing of club members for credit charges at the clubs is made from Chicago. HMH's service marks are, therefore, extensively used in commerce. The trial judge found-- and we agree-- that the nature and quality of the services rendered at the key clubs under the trade and service marks were controlled by plaintiff HMH. [FN5]

> FN5. Plaintiffs also point out that the record shows the HMH now owns a controlling stock interest in International and that International now owns all of the stock in the Chicago Club and the other clubs except Boston (where it owns 50%), Baltimore (5%), and St. Louis and Detroit.

[8] In our view, Section 5 of the Lanham Act definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark. See Alligator Company v. Robert Bruce, Inc., E.D.Pa., 1959. 176 F.Supp. 377. [FN6]

> FN6. Plaintiffs Cite In re Joseph Bancroft & Sons Co., 129 U.S.P.Q. 329 (1961) in accord with this view of the law; defendants cite In re C. B. Donald Co., 122 U.S.P.Q. 401 (1959) contra.

We are, therefore, of the opinion that the judgment of the district court was correct, and it is

Affirmed.

380 F.2d 224, 154 U.S.P.Q. 330

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

53

(To be scanned in place of tab)

756 F.2d 1535
225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
(Cite as: 756 F.2d 1535)



United States Court of Appeals,
Eleventh Circuit.

UNIVERSITY OF GEORGIA ATHLETIC
ASSOCIATION, etc., Plaintiff-Appellee,
v.
Bill LAITE, individually and d/b/a Bill Laite Distributing
Co., Defendant-
Appellant.

No. 84-8179.

April 8, 1985.

University of Georgia Athletic Association brought suit against wholesaler of novelty beers, who marketed beer cans portraying an English bulldog, alleging that the cans infringed on the portrayal of an English bulldog chosen by the university as a symbol for its athletic teams. The United States District Court for the Middle District of Georgia, Wilbur D. Owens, Jr., Chief Judge, permanently enjoined wholesaler from marketing or distributing the beer under the challenged label design, and wholesaler appealed. The Court of Appeals, Kravitch, Circuit Judge, held that: (1) proof of secondary meaning is required in an action under section of the Lanham Act pertaining to false designation of origin only when protection is sought for a "descriptive" mark, as opposed to an "arbitrary" or "suggestive" mark; (2) portrayal of English bulldog chosen by university as symbol for its athletic teams was "suggestive," if not "arbitrary," and thus association was not required to prove secondary meaning in order to prevail on Lanham Act claim; (3) even if court below failed to consider some relevant factors in comparing the two bulldog portrayals, such did not constitute an independent basis for reversing court's decision; (4) District Court's conclusion that sale of the beer cans created a "likelihood of confusion" was not clearly erroneous; and (5) fact that cans contained a disclaimer disassociating the beer from the university was insufficient to remedy the illegal confusion.

Affirmed.

West Headnotes

[1] Trade Regulation ☞13
382k13 Most Cited Cases

[1] Trade Regulation ☞24
382k24 Most Cited Cases

[1] Trade Regulation ☞25
382k25 Most Cited Cases

Proof that a trademark possesses "secondary meaning" is required only when protection is sought for "descriptive" marks, as opposed to "arbitrary" or "suggestive" marks.

[2] Trade Regulation ☞11
382k11 Most Cited Cases

[2] Trade Regulation ☞13
382k13 Most Cited Cases

Secondary meaning is not a general prerequisite for trade or service mark protection, but is only a means by which otherwise unprotectable descriptive marks may obtain protection.

[3] Trade Regulation ☞13
382k13 Most Cited Cases

[3] Trade Regulation ☞24
382k24 Most Cited Cases
[3] Trade Regulation ☞32.1
382k32.1 Most Cited Cases
(Formerly 382k32)

Secondary meaning converts a word originally incapable of serving as a mark into a full-fledged trademark; an arbitrary, fanciful, or otherwise distinctive word qualifies as a trademark immediately, because in a particular industry it has no primary meaning to overcome; in the case of words with primary meaning, the reverse is true; such words, be they descriptive or geographical, are initially nonregistrable and unprotectable unless and until they have attained secondary meaning as trademarks.

[4] Trade Regulation ☞870(2)
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Proof that a trademark possesses secondary meaning is required in an action under section of the Lanham Act prohibiting false designation of origin only when protection is sought for a descriptive mark, as opposed to an arbitrary or suggestive mark; disagreeing with *Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

[5] Trade Regulation ☞870(2)
382k870(2) Most Cited Cases
(Formerly 382k870.1)

Portrayal of an English bulldog chosen by university as symbol for its athletic teams was, at best, a "suggestive" mark, if not an "arbitrary" mark, and thus university athletic association was not required to prove secondary meaning in order to prevail on false designation of origin claim. Lanham Trade- Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

756 F.2d 1535                                                                    Page 2
225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
(Cite as: 756 F.2d 1535)

**[6] Trade Regulation ⬅⬅727**
382k727 Most Cited Cases

Even if Court of Appeals were to agree with defendant in trademark infringement action that court below failed to consider some of the factors relevant to determination of a "likelihood of confusion" between two trade or service marks in determining that sale of defendant's product created a "likelihood of confusion," such did not constitute an independent basis for reversing court's decision. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[7] Federal Courts ⬅⬅853**
170Bk853 Most Cited Cases

A district court's factual finding is clearly erroneous when, although there is evidence to support it, reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

**[8] Trade Regulation ⬅⬅870(2)**
382k870(2) Most Cited Cases
 (Formerly 382k870.1)

In action in which University of Georgia Athletic Association alleged that sale of novelty beer cans portraying an English bulldog infringed on "University of Georgia Bulldog" mark chosen as the symbol for university athletic teams, finding of district court that sale of the beer cans created a "likelihood of confusion," in violation of section of Lanham Act prohibiting false designation of origin, was not clearly erroneous. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[9] Trade Regulation ⬅⬅42**
382k42 Most Cited Cases

Fact that many other colleges, junior colleges, and high schools used an English bulldog as an athletic symbol did not significantly diminish strength of university's bulldog mark used as symbol for its athletic teams, where almost all the other schools were geographically remote, used a different color scheme or had names that began with a different letter.

**[10] Trade Regulation ⬅⬅331**
382k331 Most Cited Cases

Even unauthorized third-party uses of a trademark do not necessarily render the mark "weak"; proper inquiry is whether unauthorized third-party uses significantly diminish public's perception that the mark identifies items connected with the owner of the mark.

**[11] Trade Regulation ⬅⬅334.1**
382k334.1 Most Cited Cases

(Formerly 382k334)

**[11] Trade Regulation ⬅⬅870(2)**
382k870(2) Most Cited Cases
 (Formerly 382k870.1)

Rule that the "confusion" between products necessary for an infringement claim need not relate to the origin of the challenged product but may relate to public's knowledge that the trademark originates with the plaintiff applies to claim under section of Lanham Act pertaining to false designation of origin, as well as to claims for infringement of federally registered trademarks. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[12] Trade Regulation ⬅⬅375.1**
382k375.1 Most Cited Cases
 (Formerly 382k375)

Fact that seller of novelty beer can whose portrayal of English bulldog on can infringed on portrayal of English bulldog chosen by university as symbol for its athletic teams placed a disclaimer on the can stating that the beer was not associated with the university was insufficient to remedy the illegal confusion.

**Trade Regulation ⬅⬅736**
382k736 Most Cited Cases

University of Georgia Bulldog
**\*1536** William H. Major, Atlanta, Ga., Lamar W. Sizemore, Jr., Macon, Ga., for defendant-appellant.

Nickolas P. Chilivis, Kenneth G. Menedez, Atlanta, Ga., for plaintiff- appellee.

Appeal from the United States District Court for the Middle District of Georgia.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS [FN*], District Judge.

> FN* Honorable C. Clyde Atkins, U.S. District Judge, Southern District of Florida, sitting by designation.

KRAVITCH, Circuit Judge:

In the fall of 1982, when the fancy of Georgia sports fans turned to thoughts of college football, Bill Laite Distributing Co. **\*1537** ("Laite"), a Macon, Georgia wholesaler of novelty beers, began marketing "Battlin' Bulldog Beer." The beer was sold in red-and-black cans bearing the portrayal of an English bulldog wearing a red sweater emblazoned with a black "G." The bulldog had bloodshot eyes, a football

756 F.2d 1535
225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
(Cite as: 756 F.2d 1535)

Page 3

tucked under its right "arm," and a frothy beer stein in its left "hand."

Laite hoped that the "Battlin' Bulldog" would pile up yardage and score big points in the always-competitive alcoholic beverage market. Unfortunately, however, the pug-faced pooch was thrown for a loss by the University of Georgia Athletic Association, Inc. ("UGAA"), which obtained preliminary and permanent injunctive relief in federal district court based on the "likelihood of confusion" between the "Battlin' Bulldog" and the "University of Georgia Bulldog." Laite now cries "foul," arguing that (1) the "University of Georgia Bulldog" is not a valid trade or service mark worthy of protection, (2) the district court used the wrong factors in comparing the "Battlin' Bulldog" with the "University of Georgia Bulldog," and (3) the court's conclusion that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion" is clearly erroneous. After viewing a "replay" of the proceedings below, we conclude that no error was committed and affirm the judgment of the district court in all respects.

I. BACKGROUND

The University of Georgia's athletic teams have long used the nickname, "Bulldogs." [FN1] In 1981, UGAA registered with the State of Georgia certain service marks incorporating the word "bulldog" or the portrayal of an English bulldog. One such service mark depicts an English bulldog wearing a sweater with a "G" emblazoned on it. See Office of Secretary of State, State of Georgia, Service Mark, File Reference No. S-4673 (application filed September 21, 1981; registration dated November 25, 1981). Another service mark depicts the word "BULLDOGS" in projecting block letters. See id. at No. S-4667 (application filed September 21, 1981; registration dated November 25, 1981). These marks were registered for use in connection with "services related to sports activities." UGAA also applied for federal registration of the marks. [FN2] Similar unregistered trade and service marks have been used by UGAA in connection with the University of Georgia's athletic teams. The university's colors are red and black.

FN1. Although the record does not reveal the origins of the nickname itself, registration documents filed with the Office of the Secretary of State, State of Georgia, indicate that the University of Georgia first used a portrayal of an English bulldog wearing a sweater emblazoned with a "G," as a service mark, in the fall of 1963.

FN2. The applications for federal registration of the marks apparently were pending at the time of the injunction hearings in the court below.

In October, 1982, Laite began distributing the red-and-black

cans of "Battlin' Bulldog Beer" to stores in the Atlanta area and throughout Georgia. One side of the cans contained the portrayal of an English bulldog described earlier. The opposite side of the cans contained the words, "BATTLIN' BULLDOG BEER" (in prominent red block letters), and, "Not associated with the University of Georgia" (in small silver print). Laite previously had sought permission from UGAA to use an exact reproduction of the "University of Georgia Bulldog" on the cans, but such permission had been denied.

Upon learning of the appearance of "Battlin' Bulldog Beer" on the market, [FN3] UGAA informed Laite that it believed the cans infringed its registered and unregistered marks, and demanded that Laite cease distributing the beer. When Laite refused, UGAA filed suit against Laite in the United States District Court for the *1538 Middle District of Georgia. UGAA sought actual and punitive damages, an accounting of Laite's profits from the sale of the beer, a declaration that Laite's use of UGAA's marks was unlawful, and an injunction against further misuse of UGAA's marks, and costs and attorney's fees. The suit was based on five legal theories: (1) false designation of origin in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); [FN4] (2) trademark infringement in violation of Ga.Code Ann. § 10-1-450; [FN5] (3) deceptive trade practice in violation of the Uniform Deceptive Trade Practices Act, Ga.Code Ann. §§ 10-1-370 to -375; [FN6] (4) dilution of UGAA's marks in violation of the Georgia Anti- Dilution Statute, Ga.Code Ann. § 10-1-451(b); [FN7] and (5) unfair competition in violation of Ga.Code Ann. § 23-2-55. [FN8]

FN3. UGAA learned about the appearance of "Battlin' Bulldog Beer" through a newspaper article in the October 11, 1982 edition of the Atlanta Constitution. The article was entitled, " 'Dog beer a natural for Georgia," and contained pictures of the front and back of a can of "Battlin' Bulldog Beer."

FN4. 15 U.S.C. § 1125(a) provides:
(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers of goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which

756 F.2d 1535
225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
**(Cite as: 756 F.2d 1535)**

said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

FN5. Ga.Code Ann. § 10-1-450 provides, in pertinent part:
[A]ny person who shall:
(1) Use, without consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a trademark or service mark registered under this part in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services; or
(2) Reproduce, counterfeit, copy, or colorably imitate any such trademark or service mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in connection with the sale or other distribution in this state of such goods or services; shall be liable to a civil action by the owner of such registered trademark or service mark....

FN6. Ga.Code Ann. § 10-1-372 provides, in pertinent part:
(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
(1) Passes off goods or services as those of another;
(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; ...
(b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

FN7. Ga.Code Ann. § 10-1-451(b) provides, in pertinent part:
(b) Every ... association ... adopting and using a trademark, trade name, label, or form of advertisement may proceed by action; and all courts having jurisdiction thereof shall grant injunctions to enjoin subsequent use by another of the same or any similar trademark, trade name, label, or form of advertisement if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the trademark, trade name, label, or form of advertisement of the

prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services....

FN8. Ga.Code Ann. § 23-2-55 provides:
Any attempt to encroach upon the business of a trader or other person by the use of similar trademarks, names, or devices, with the intention of deceiving and misleading the public, is a fraud for which equity will grant relief.

UGAA moved for a preliminary injunction to prevent Laite from producing, distributing, or selling "Battlin' Bulldog Beer." After a hearing, the district court granted UGAA's motion, concluding that UGAA was likely to prevail on its Lanham Act claim and that the remaining conditions for preliminary injunctive relief were met. [FN9]

> FN9. Laite filed a notice of appeal and an emergency motion asking this court to stay the order granting the preliminary injunction. This court denied Laite's emergency motion. On January 19, 1983, Laite voluntarily dismissed the interlocutory appeal.

*1539 Meanwhile, Laite filed an answer to UGAA's complaint and requested a jury trial. At a pre-trial conference, counsel for both parties agreed to limit the evidence at trial to the transcript of the preliminary injunction hearing, the exhibits presented at that hearing, and supplementary documents to be submitted by the parties. [FN10] UGAA subsequently informed the district court that, if the court determined that Laite was entitled to a jury trial because of the presence of both legal and equitable claims in the complaint, UGAA would voluntarily dismiss the legal claims. The district court entered an order (1) ruling that Laite was entitled to a jury trial, (2) voluntarily dismissing UGAA's legal claims, (3) permanently enjoining Laite from marketing or distributing "Battlin' Bulldog Beer" under the challenged label design, and (4) awarding costs to UGAA, but denying UGAA's request for attorney's fees. The district court entered final judgment on the order.

> FN10. Counsel for both parties also agreed to waive the best evidence rule, unless one party or the other objected to the introduction of a particular document.

Laite then moved to alter or amend the district court's order and judgment, or in the alternative for a new trial, on the grounds that the parties had reserved the right to submit additional evidence in support of their respective positions. The district court took additional evidence from both parties, and, after reviewing the additional evidence, entered an order (1) granting Laite's motion to alter or amend the order and judgment for the purpose of including the

56 F.2d 1535
225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
(Cite as: 756 F.2d 1535)

additional evidence in the record, but (2) otherwise denying Laite's motion. This appeal ensued.

## II. DISCUSSION

We kick off our discussion by noting that the district court, in granting preliminary injunctive relief to UGAA, discussed only the Lanham Act claim and did not mention the claims arising under Georgia law. In the final order granting UGAA's request for a permanent injunction, the district court stated:

With respect to the claim for permanent injunctive relief, the court is convinced that its preliminary injunctive order dated October 22, 1982, was in all respects correct under the facts established at the preliminary injunction hearing. *i.e.*, that the label design at issue tends falsely to describe or represent the origin of the product at issue to the detriment of plaintiff. The findings of fact in that order are adopted here. It is therefore this court's conclusion of law, and it is hereby ORDERED and ADJUDGED, that the defendant be PERMANENTLY ENJOINED from marketing or distributing Battlin' Bulldog Beer under the label design adopted by defendant which was the subject of this action.

Again, the district court did not mention the state law claims. On appeal, therefore, we are limited to determining whether the district court's decision was proper under section 43(a) of the Lanham Act. [FN11]

FN11. We observe in passing, however, that the standards governing most of the claims under Georgia law are similar, if not identical, to those under the Lanham Act. *See, e.g. Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258-59 (5th Cir.) (test for deceptive trade practice and unfair competition under Georgia law same as test for false designation of origin under Lanham Act, namely, "whether defendants' use of the mark ... is likely to cause confusion, mistake, or deception"), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Rolls- Royce Motors, Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689, 693-94 (N.D.Ga.1976) (Georgia trademark statute "is, both in structure and purpose, similar to its federal counterpart," and federal standards may be used to construe state statute); *cf. Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 839 & n. 14 (11th Cir.1983) (district court held test for deceptive trade practice and unfair competition under Georgia law same as test for false designation of origin under Lanham Act). Thus, whatever conclusion we reach on the Lanham Act claim likely would apply to most of the state law claims as well.

*1540 A. Whether the "University of Georgia Bulldog" is a Valid Trade or Service Mark Worthy of Protection

Laite's first argument on appeal is that the "University of Georgia Bulldog" is not a valid trade or service mark worthy of protection. [FN12] Laite cites *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911 (S.D.N.Y.1983), *aff'd on other grounds,* 746 F.2d 112 (2d Cir.1984), for the proposition that "[t]o make a successful claim of false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), [plaintiff] must demonstrate that its trademark possesses 'secondary meaning'--'[t]he power of a name or other configuration to symbolize a particular business, product or company....' " *Id.* at 923 (citations omitted). Laite contends that the record does not contain sufficient proof of secondary meaning, and that the vagueness of UGAA's mark, coupled with extensive third-party uses of the same or similar marks, demonstrates the absence of secondary meaning.

FN12. We use the term, "University of Georgia Bulldog," to describe collectively the various portrayals of an English bulldog used by UGAA as a trade or service mark in connection with the University of Georgia's athletic teams. UGAA's claim in the instant case primarily relates to these pictorial images of a bulldog, and not to Laite's mere use of the word, "Bulldog."

[1][2][3] The threshold question, however, is whether *Universal City Studios* accurately states the law of this circuit concerning the need for proof of secondary meaning under section 43(a) of the Lanham Act. We conclude that it does not. The general rule in this circuit is that proof of secondary meaning is required *only* when protection is sought for descriptive marks, as opposed to arbitrary or suggestive marks. We have long recognized that:

Service marks fall into four categories. A strong mark is usually fictitious, arbitrary or fanciful and is generally inherently distinctive. It is afforded the widest ambit of protection.... A descriptive mark tells something about the product; it is protected only when secondary meaning is shown.... In contrast to the above is the suggestive mark, which subtly connotes something about the service or product. Although less distinctive than a fictitious, arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning. *See Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir.1980) ("If used as a trademark for refrigerators, the term 'Penguin' would be suggestive.") [*cert. denied.* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981) ]. Lastly, there are generic terms, which communicate 'information about the nature or class of an article or service,' *America[n] Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5th Cir.1974),

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

756 F.2d 1535
225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
**(Cite as: 756 F.2d 1535)**

and therefore can never become a service or trademark. *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n,* 651 F.2d 311, 315 (5th Cir.1981) [FN13] (citations and footnotes omitted); *accord, Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1165 n. 9 (11th Cir.1982); *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 115-16 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). Thus, secondary meaning is best characterized not as a general prerequisite for trade or service mark protection, but as a means by which otherwise unprotectible descriptive marks may obtain protection. *See Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 848 (5th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970). As one commentator has explained:

> FN13. The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

> Secondary meaning converts a word originally incapable of serving as a mark into a full fledged trademark.... An arbitrary, fanciful, or otherwise distinctive word qualifies as a trademark immediately, *1541 because in the particular industry it has no primary meaning to overcome. Therefore it is initially registrable, and also protectible at common law. In the case of words with primary meaning, the reverse is true. Such words, be they descriptive or geographical, are initially nonregistrable and unprotectible unless and until they have attained secondary meaning as trademarks.

3 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies §§ 19.25, 19.26 at pp. 19-79, 19-85 (4th ed. 1983).

Although most of our cases applying this general rule have involved claims under 15 U.S.C. § 1114(a) for infringement of federally registered marks, the same rule necessarily applies to section 43(a) claims based on non-federally-registered marks. After all, "registration of a trademark confers only procedural advantages and does not enlarge the registrant's rights, for ownership of the trademark rests on adoption and use, not on registration." *Turner v. HMH Publishing Co.,* 380 F.2d 224, 228 (5th Cir.) (citation omitted), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967). We also note that the Fifth Circuit, in an action under section 43(a) based on infringement of a trade dress, has held:

> [S]econdary meaning [need not] be shown in every trade dress infringement suit [under section 43(a) ].... If the features of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging, there is no

reason to require a plaintiff to show consumer connotations associated with such arbitrarily selected features.

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 702 (5th Cir. Unit A 1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). [FN14]

> FN14. Although *Chevron Chemical Co.* is not binding precedent in this circuit, *see infra* note 18, we have cited it with approval in at least four recent cases. *See Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 & n. 5 (11th Cir.1984); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854, 857 & n. 9 (11th Cir.1983); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 981 n. 25 (11th Cir.1983); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 831 & n. 14 (11th Cir.1982).

> The persuasive value of *Chevron Chemical Co.* is not diminished because the case involved a trade dress rather than a trade or service mark. In fact, the *Chevron Chemical Co.* court based its holding on the law of trademarks:

> The term "secondary meaning" was developed as part of the common-law of trademarks.... [T]rademark law requires a demonstration of "secondary meaning" only when the claimed trademark is not sufficiently distinctive of itself to identify the purchaser.

> The same principles should apply to protection of trade dresses.

> 659 F.2d at 702.

[4][5] We therefore hold that, contrary to the language of *Universal City Studios,* proof of secondary meaning is required in an action under section 43(a) *only* when protection is sought for a descriptive mark, as opposed to an arbitrary or suggestive mark. [FN15] Turning to the mark at issue in the instant case, we are convinced beyond a shadow of a doubt that the "University of Georgia Bulldog" is not a descriptive mark. In our view, the portrayal of an English bulldog chosen by the university as a symbol for its athletic teams is, at best, "suggestive," if not downright "arbitrary." [FN16] Thus, contrary to Laite's assertion, UGAA was not required to prove secondary meaning in order to prevail on its Lanham Act claim, and the district court did not err in granting injunctive relief to UGAA under *1542 section 43(a) despite the absence of proof of secondary meaning. [FN17]

> FN15. Of course, a plaintiff whose mark is unregistered and devoid of secondary meaning may find it difficult to establish priority in use of the mark. *See generally* 3 R. Callmann, The Law of

Unfair Competition, Trademarks and Monopolies § 19.15 at p. 19-37 (4th ed. 1983). In the instant case, however, it is undisputed that UGAA used the mark at issue long before Laite's allegedly improper use began.

FN16. We see very little connection between the attributes of an English bulldog and, for example, the University of Georgia tennis team. Furthermore, although the University of Georgia football team arguably may possess some of the attributes of a bulldog, one could hardly call the portrayal of a bulldog at issue in this case "descriptive" of the average University of Georgia football player.

FN17. An alternative interpretation of Laite's argument is that UGAA has "abandoned" its mark by failing diligently to protect it against third-party uses. We reject this argument on the grounds that the record reveals neither an actual abandonment of the mark by UGAA nor an intent on the part of UGAA to abandon the mark. *See Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1545 (11th Cir.1984) ("In order to prove abandonment, defendants must show that plaintiff actually abandoned the use of the mark, and, also, that plaintiff intended to abandon the mark."). On the contrary, the record shows that UGAA has engaged in licensing of the "University of Georgia Bulldog," indicating that UGAA views its mark as highly valuable and intends to continue capitalizing on that value.

**B. Whether the District Court Used the Wrong Factors in Comparing the "Battlin' Bulldog" with the "University of Georgia Bulldog"**

[6] Laite's next argument is that the district court used the wrong factors in comparing the "Battlin' Bulldog" with the "University of Georgia Bulldog." Laite correctly points out that this circuit has recognized seven factors as relevant to the determination of a "likelihood of confusion" between two trade or service marks: (1) the type of mark at issue, (2) the similarity of design between the two marks, (3) the similarity of product, (4) the identity of retail outlets and purchasers, (5) the identity of advertising media utilized, (6) the defendant's intent, and (7) actual confusion between the two marks. *See Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir.1975); *accord, Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514 (11th Cir.1984); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 840 (11th Cir.1983); *Safeway Stores, Inc.*, 675 F.2d at 1164; *Sun-Fun Products, Inc. v. Suntan Research & Development Inc.*, 656 F.2d 186, 189 (5th Cir. Unit B 1981); [FN18] *Sun Banks of Florida,*

*Inc.*, 651 F.2d at 314; *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). According to Laite, the court below erred by failing to consider all seven of the relevant factors before deciding that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion."

FN18. Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

The difficulty with this argument is two-fold. First, we are not convinced, after examining the record and the orders entered by the district court, that the court failed to consider all seven of the relevant factors. At the preliminary injunction hearing, counsel for Laite discussed at length the seven factors, as set out in the *Amstar Corp.* case. [FN19] Moreover, in the order granting the preliminary injunction, the district court cited *Amstar Corp.* and specifically mentioned two of the seven factors, namely, the similarity of design and the defendant's intent. The fact that the court did not discuss the other five factors may indicate only that the court found those factors insignificant under the circumstances. We never have held that a court must specifically mention each of the seven factors in order to avoid reversal on appeal. *Cf. Conagra, Inc.*, 743 F.2d at 1514 & n. 8 (appellate court found two of the seven factors sufficient to compel finding of likely confusion, and chose not to address the other five factors).

FN19. *See* Transcript of Preliminary Injunction Hearing at pp. 37- 45.

The second problem with Laite's argument is that it is inextricably intertwined with the question whether the district court's factual finding of "likelihood of confusion" was correct. In *Sun Banks of Florida, Inc.*, the appellant, like Laite, attempted to avoid the "clearly erroneous" standard of review for factual findings by arguing that the district court failed to consider the proper factors in determining "likelihood of confusion." We rejected this distinction, explaining:

> Our comment in *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368, 384 (5th Cir.1977), that "when a district court labors under a misapprehension **\*1543** concerning the governing legal norms, the 'clearly erroneous' standard no longer cirmcumscribes [sic] appellate review," may not be taken as an erosion of the standard of review applicable to a finding of likelihood of confusion.

651 F.2d at 314.

Similarly, in *Safeway Stores, Inc.*, we refused to treat as a separate ground for reversal the appellant's claim that the district court had failed to consider all seven of the relevant

756 F.2d 1535
225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
(Cite as: 756 F.2d 1535)

Page 8

factors. Instead, we indicated that "[o]ur review of the district court's ruling ... is governed by the clearly erroneous test *even though* the court's analysis of the factors relevant to a finding of likelihood of confusion was incomplete." 675 F.2d at 1164 n. 3 (emphasis added).

In short, even were we to agree with Laite that the court below failed to consider some of the relevant factors, this would not constitute an independent basis for reversing the court's decision. The real question is whether the court's ultimate determination about the "likelihood of confusion" was correct. [FN20] We therefore proceed to the third and final issue on appeal.

> FN20. Laite's argument really amounts to nothing more than a legal version of the old "hidden ball" trick.

C. Whether the District Court's Conclusion that the Sale of "Battlin' Bulldog Beer" Created a "Likelihood of Confusion" is Clearly Erroneous

[7] Laite's final argument is that the district court's conclusion that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion" is clearly erroneous. *See Jellibeans, Inc.,* 716 F.2d at 839-40 & n. 16 ("likelihood of confusion" factual finding subject to "clearly erroneous" standard of review); *Safeway Stores, Inc.,* 675 F.2d at 1163 (same); *Amstar Corp.,* 615 F.2d at 257-58 (same). *But see Elby's Big Boys of Steubenville, Inc. v. Frisch's Restaurants, Inc.,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982) (White, J., dissenting from denial of certiorari) (discussing split in circuits on whether "likelihood of confusion" is question of fact or legal conclusion). A district court's factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). While the "clearly erroneous" standard of review is less stringent than the well-known sports rule, "The referee is always right," it nevertheless presents a formidable challenge to appellants who, like Laite, seek to overturn the factual findings of a district court.

[8] After reviewing the record, we cannot say that we are "left with the definite and firm conviction that a mistake has been committed." *Id.* On the contrary, we agree with the district court that the sale of "Battlin' Bulldog Beer" created a "likelihood of confusion." We find most significant the same two factors that were identified by the district court, the similarity of design between the two marks and the defendant's intent. In our view, these two factors alone are sufficient to support the conclusion reached by the court below.

The most cursory visual examination of the two bulldogs in this case reveals their similarity:

*1544

 

A can of "Battlin' Bulldog Beer"

 

The "University of Georgia Bulldog"

As the district court pointed out, it is the combination of similar design elements, rather than any individual element, that compels the conclusion that the two bulldogs are similar. Had the cans of "Battlin' Bulldog Beer" been printed in different colors, or had the "Battlin' Bulldog" worn a different monogram on its sweater, we might have a different case. Instead, the cans are red and black, the colors of the University of Georgia, and the "Battlin' Bulldog" wears the letter "G." To be sure, the "Battlin' Bulldog" is not an exact reproduction of the "University of Georgia *1545 Bulldog." Nevertheless, we find the differences between the two so minor as to be legally, if not factually, nonexistent. [FN21]

> FN21. Laite contends that the "Battlin' Bulldog"

has a much longer tail than the "University of Georgia Bulldog," and wears a different kind of sweater. We find these distinctions trivial, especially in light of the similarities discussed in the text.

The defendant's intent likewise is apparent from the record. The record establishes that the Royal Brewing Company of New Orleans, Louisiana, the brewer of "Battlin' Bulldog Beer," wrote to several southeastern colleges, including the University of Georgia, seeking permission to use the colleges' symbols on cans of beer. [FN22] Furthermore, Laite candidly admitted in the court below, and at oral argument in this court, that "Battlin' Bulldog Beer" was intended to capitalize on the popularity of the University of Georgia football program. [FN23] In short, there can be no doubt that Laite hoped to sell "Battlin' Bulldog Beer" not because the beer tastes great, [FN24] but because the cans would catch the attention of University of Georgia football fans.

FN22. Royal Brewing Company apparently contacted Georgia Tech University ("Ramblin' Wreck Beer"), the University of Kentucky ("Fighting Wildcats Beer"), and Louisiana State University ("Fighting Tigers Beer").
Although the record does not reveal whether Royal Brewing Company contacted any other schools, one shudders to think of such possible concoctions as "Deacon Beer" (Wake Forest University) or "Quaker Beer" (the University of Pennsylvania).

FN23. This, of course, is why the "Battlin' Bulldog" carries a football under one "arm."

FN24. Nor is there any evidence in the record that "Battlin' Bulldog Beer" is, to borrow the words of a well-known commercial, "less filling."

[9] Although we find the defendant's intent and the similarity of design between the two marks sufficient to support the district court's finding of a "likelihood of confusion," we also note that the remaining five factors either support the same conclusion or, at least, do not undermine it. For example, as we previously noted, the type of mark at issue in this case is at best "suggestive," if not downright "arbitrary." Such marks traditionally have been characterized as "strong." See Safeway Stores, Inc., 675 F.2d at 1164-65 ("Safeway" mark held "a relatively strong one with at least the qualities of a suggestive mark"). The fact that many other colleges, junior colleges, and high schools use an English bulldog as a symbol [FN25] does not significantly diminish the strength of UGAA's mark, since almost all of the other schools (1) are geographically remote, (2) use a different color scheme, or (3) have names that begin with a letter other than "G." The remaining

schools are so few in number and small in size that they pose no real threat to the strength of UGAA's mark. [FN26] Cf. id. at 1165 (third-party use of word "Safeway" does not diminish strength of mark, since most third-party users also employ distinctive additional words or engage in different businesses from plaintiff's).

FN25. In the court below, Laite introduced a list of twenty-six high schools, fourteen junior colleges, and sixteen colleges that use an English bulldog as a mascot. The list includes the Citadel, Drake University, Fresno State University, Mississippi State University, Louisiana Tech University, and Yale University.

FN26. The only schools identified by Laite that use an English bulldog as a mascot, are located in Georgia, use red and black as the school colors, and have names that begin with the letter "G," are Georgia Military College (a junior college in Milledgeville, Georgia, with an enrollment of 365) and North Gwinnett High School.

[10] Nor do we find it significant that the record in this case includes numerous examples of products containing either exact or approximate reproductions of the "University of Georgia Bulldog." The record does not reveal how many of these products were licensed by UGAA; the widespread use of a mark by licensees would tend to support, rather than rebut, the proposition that UGAA's mark is a strong one. [FN27] On balance, we conclude that *1546 the "University of Georgia Bulldog" is a relatively strong mark, at least in Georgia.

FN27. In addition, we note that even unauthorized third-party uses of a mark do not necessarily render the mark "weak." The proper inquiry is whether the unauthorized third-party uses significantly diminish the public's perception that the mark identifies items connected with the owner of the mark. Cf. Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co., 676 F.2d 1079, 1082-85 (5th Cir.1982) (no "likelihood of confusion" when, because of unauthorized third-party uses of mark, public had no reasonable basis to assume that mark could only be used with approval or sponsorship of owner of mark).

We also find in the record persuasive evidence of actual confusion between the two marks. UGAA introduced an affidavit from a University of Georgia professor who stated:
During the week of October 11, 1982, I received approximately ten (10) to fifteen (15) inquiries in person or by telephone about the sale and distribution of Battlin' Bulldog Beer and its connection with the University of Georgia. Most of those who made the inquiries were

Page 10

56 F.2d 1535
25 U.S.P.Q. 1122, 23 Ed. Law Rep. 858
(Cite as: 756 F.2d 1535)

concerned that Battlin' Bulldog Beer was not the sort of product that should be licensed by or in any way related to the University of Georgia, and inquiries were made as to whether or not the University had granted permission to use its symbols on the product. According to the affidavit, one caller expressly stated that he thought it was clear that the "Battlin' Bulldog Beer" can included a "University of Georgia Bulldog."

[11] Laite argues that any "confusion" over the beer relates not to its origin, but to whether it has been licensed by the University of Georgia. According to Laite, no one actually believes that the University of Georgia has gone into the brewing business. Regardless of the validity of this statement, we find it irrelevant to the issues in this case. In *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975), this court's predecessor held that "confusion" need not relate to the origin of the challenged *product*. Rather, "confusion" may relate to the public's knowledge that the *trademark*, which is "the triggering mechanism" for the sale of the product, originates with the plaintiff. *See id.* at 1012. [FN28] The *Boston Pro. Hockey* *1547 rule applies to claims under section 43(a) of the Lanham Act, as well as to claims for infringement of federally registered trademarks. *See id.* at 1012-13.

FN28. See also *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979), in which the Second Circuit stated: Defendants assert that the Lanham Act requires confusion as to the origin of the film, and they contend that no reasonable person would believe that the film originated with plaintiff. Appellants read the confusion requirement too narrowly. In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.... The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement. *Id.* at 204-05 (citations omitted); *accord*, *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 659 (W.D.Wash.1982) ("Trademark law does not just protect the producers of products. The creation of confusion as to sponsorship of products is also actionable."); *cf. University of Pittsburgh v. Champion Products Inc.*, 686 F.2d 1040, 1047-48 (3d Cir.) (discussing development of "confusion of sponsorship" doctrine). *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982). In *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir.1980), the

Ninth Circuit sharply criticized the *Boston Pro. Hockey* decision for "extend[ing] the protection [of trademark law] beyond that intended by Congress and beyond that accorded by any other court." *Id.* at 919. The Ninth Circuit explained the basis for its criticism as follows:
We commonly identify ourselves by displaying emblems expressing allegiances. Our jewelry, clothing, and cars are emblazoned with inscriptions showing the organizations we belong to, the schools we attend, the landmarks we have visited, the sports teams we support, the beverages we imbibe. Although these inscriptions frequently include names and emblems that are also used as collective marks or trademarks, it would be naive to conclude that the name or emblem is desired because consumers believe that the product somehow originated with or was sponsored by the organization the name or emblem signifies.
*Id.* at 918.
We respectfully disagree. The record in the instant case reveals that, in one week, at least ten to fifteen members of the public contacted UGAA to inquire about the connection between "Battlin' Bulldog Beer" and the University of Georgia. *See infra text* at p. 1547. This evidence indicates that, contrary to the unsupported assertion of the Ninth Circuit in *Job's Daughters*, at least some members of the public *do* assume that products bearing the mark of a school or a sports team are sponsored or licensed by the school or team. *See also National Football League Properties, Inc.*, 532 F.Supp. at 659 (survey revealed that roughly half of all persons shown football jerseys containing names of National Football League teams and players "believed that the manufacturer was required to obtain authorization from the NFL or one of the member clubs in order to manufacture the jerseys"). Furthermore, in our view, most consumers who purchase products containing the name or emblem of their favorite school or sports team would prefer an officially sponsored or licensed product to an identical non-licensed product. Were this not true, the word "official" would not appear in so many advertisements for such products.

[12] Laite also argues that no confusion could result from the sale of "Battlin' Bulldog Beer" because the cans contain the disclaimer, "Not associated with the University of Georgia." We reject this argument for two reasons. First, the disclaimer is relatively inconspicuous when the cans are grouped together into six- packs. Second, in the *Boston Pro. Hockey* case we dismissed a similar argument, stating:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

The exact duplication of the symbol and the sale as the team's emblem satisfying the confusion requirement of the law, words which indicate it was not authorized by the trademark owner are insufficient to remedy the illegal confusion. Only a prohibition of the unauthorized use will sufficiently remedy the wrong.

510 F.2d at 1013.

Finally, we find the remaining three factors, similarity of product, identity of retail outlets and purchasers, and identity of advertising media utilized, *less significant in the instant case* than in most trade or service mark cases. These factors primarily relate to the "likelihood of confusion" between a plaintiff's and a defendant's *products*. Here, however, as in *Boston Pro. Hockey, the confusion stems not from the defendant's unfair competition with the plaintiff's products,* but from the defendant's misuse of the plaintiff's reputation and good will as embodied in the plaintiff's mark. [FN29] Therefore, under the circumstances, the nonexistence of these three factors does not undermine the district court's finding of a "likelihood of confusion."

> FN29. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979), the court emphasized that "[t]he trademark laws are designed not only to prevent consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.' " *Id.* at 205 (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir.1976) Markey, C.J.).

III. CONCLUSION

The "Battlin' Bulldog's" football career thus comes to an abrupt end. Laite devised a clever entrepreneurial "game plan," but failed to take into account the strength of UGAA's mark and the tenacity with which UGAA was willing to defend that mark. Like the University of Georgia's famed "Junkyard Dog" defense, UGAA was able to hold its opponent to little or no gain. Because we find that the district court did not err, in fact or in law, when it granted permanent injunctive relief to UGAA, we hereby AFFIRM.

756 F.2d 1535, 225 U.S.P.Q. 1122, 23 Ed. Law Rep. 858

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

580 S.E.2d 323
3 FCDR 1150
(Cite as: 260 Ga.App. 573, 580 S.E.2d 323)

Page 1

**C**

Court of Appeals of Georgia.

VAUGHN
v.
METROPOLITAN PROPERTY & CASUALTY
INSURANCE COMPANY

No. A02A2450.

March 26, 2003.

Insured homeowner brought action against insurer for alleged fraud arising from overcharging of premiums. The Glynn Superior Court, Scarlett, J., entered judgment in homeowner's favor, but denied request for punitive damages, and homeowner appealed. The Court of Appeals, Barnes, J., held that: (1) failure to comply with rules governing appellate briefs precluded appellate review of claims; (2) refusal to respond to request for admission that homeowner was not entitled to punitive damages precluded subsequent challenge to denial of award; (3) admission of evidence regarding insurer's handling of prior theft claim was not abuse of discretion; (4) evidence that insurer had settled other claims of alleged discrimination in setting rates was irrelevant to determination of whether it committed fraud in instant case; and (5) homeowner's proposed instruction regarding presumption arising from alleged spoliation of evidence was adequately covered by instruction given.

Affirmed.

West Headnotes

**[1] Appeal and Error ⬤⟿756**
30k756 Most Cited Cases

Insured homeowner's failure to comply with appellate rules governing form and content of briefs or to provide concise statement of applicable standard of review for each issue precluded appellate review of alleged errors in action against insurer for fraud. Court of Appeals Rule 27(a)(1, 3).

**[2] Appeal and Error ⬤⟿1079**
30k1079 Most Cited Cases

Insured homeowner abandoned claims of alleged trial error in allowing insurer to lead its witness, and in refusing insured's request to charge on concurrent causes, on misrepresentation of fact, and on deliberate misrepresentations, where insured failed to provide any argument supported with legal citation for claims. Court of Appeals Rule 27(c)(1, 2).

**[3] Pretrial Procedure ⬤⟿483**
307Ak483 Most Cited Cases

Insured homeowner was not entitled to punitive damages upon entry of judgment in her favor in action against insurer for fraud, insofar as insured's failure to respond to request for admission that she was not entitled to punitive damages constituted judicial admission to that fact, and she failed to raise challenge to scope of admission with trial court.

**[4] Pretrial Procedure ⬤⟿481**
307Ak481 Most Cited Cases

Requests for admission are comparable to admissions in pleadings or stipulations of fact, and courts regard them generally as judicial admissions rather than evidentiary admissions of parties; thus, unless the court allows the answers to be withdrawn, answers to requests for admissions are conclusive and not subject to contradiction or explanation. West's Ga.Code Ann. § 9-11-36.

**[5] Pretrial Procedure ⬤⟿481**
307Ak481 Most Cited Cases

**[5] Pretrial Procedure ⬤⟿486**
307Ak486 Most Cited Cases

Any matter admitted in request for admission is conclusively established unless the court, on motion, permits withdrawal or amendment of the admission. West's Ga.Code Ann. § 9-11-36.

**[6] Pretrial Procedure ⬤⟿481**
307Ak481 Most Cited Cases

In form and substance, an admission in a request for admissions is comparable to an admission in pleadings or stipulation of facts, and as such is generally regarded as a judicial admission rather than evidentiary admission of a party. West's Ga.Code Ann. § 9-11-36.

**[7] Evidence ⬤⟿265(7)**
157k265(7) Most Cited Cases

A judicial admission, unless allowed to be withdrawn by the court, is conclusive whereas an evidentiary admission is not conclusive but is always subject to be contradicted or explained. West's Ga.Code Ann. § 9-11-36.

**[8] Insurance ⬤⟿2069**
217k2069 Most Cited Cases

**[8] Insurance ⬤⟿3426**
217k3426 Most Cited Cases

Claim that evidence regarding insurer's handling of theft claim filed by insured homeowner was irrelevant, without more, was insufficient to establish that admission of such evidence in insured's action against insurer for fraud due to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

580 S.E.2d 323
3 FCDR 1150
(Cite as: 260 Ga.App. 573, 580 S.E.2d 323)

overcharging on premiums constituted abuse of discretion.

**[9] Appeal and Error ☞1079**
30k1079 Most Cited Cases

Insured homeowner failed to preserve for appellate review argument that insurer's question to her as to whether overcharging of premiums was result of mistake was misleading, in action against insurer for fraud for overcharging premiums, where entire argument was merely restatement of enumeration of error, and was not supported by further argument or citation to authority. Court of Appeals Rule 27(c)(2).

**[10] Evidence ☞129(1)**
157k129(1) Most Cited Cases

Evidence that homeowner's insurer settled other cases involving alleged discrimination in setting rate increases was irrelevant to determination whether insurer's overcharging of insured's premium was fraudulent, absent allegation or showing that similar discriminatory practices were involved in instant action. West's Ga.Code Ann. § 24-2-2.

**[11] Evidence ☞129(6)**
157k129(6) Most Cited Cases

*In a controversy between two persons regarding a given subject matter, evidence as to what occurred between one of them and a third person with reference to a similar, though entirely distinct, transaction is irrelevant.* West's Ga.Code Ann. § 24-2-2.

**[12] Evidence ☞135(1)**
157k135(1) Most Cited Cases

To render evidence of a party's conduct with respect to third person admissible in an action for fraud against the party, it must be shown that the other transactions were fraudulent, and it must appear that they were so connected in point of time and otherwise with the one in issue as to make it apparent that all were proposed or carried out in pursuance of a common fraudulent purpose. West's Ga.Code Ann. § 24-2-2.

**[13] Appeal and Error ☞232(2)**
30k232(2) Most Cited Cases

Insured homeowner waived claim on appeal from action against insurer for fraud that insurer's billing records were admitted without proper laying of foundation, where objection to admission of records at trial was based on alleged irrelevancy.

**[14] Appeal and Error ☞756**

30k756 Most Cited Cases

**[14] Appeal and Error ☞761**
30k761 Most Cited Cases

Mere claim that trial court erred by preventing insured homeowner from asking insurer's representative whether it had responded to letter from insured's counsel, without supporting argument and citation to legal authority, was insufficient to preserve issue for appellate review.

**[15] Appeal and Error ☞230**
30k230 Most Cited Cases

Insured homeowner failed to preserve for appellate review claimed error in instructing jury on nominal damages and mitigation of damages, in action against insurer for fraud arising from overcharged premiums, where homeowner failed to object to instructions after jury was charged and before verdict was rendered. West's Ga.Code Ann. § 5-5-24(a).

**[16] Appeal and Error ☞233(2)**
30k233(2) Most Cited Cases

**[16] Trial ☞273**
388k273 Most Cited Cases
In civil cases, exceptions or objections to charges must be *made after the jury is charged and before the verdict*; objections made at charging conferences before the charge is given do not preserve charging issues for appellate review. West's Ga.Code Ann. § 5-5-24(a).

**[17] Trial ☞260(1)**
388k260(1) Most Cited Cases

Insured homeowner's proposed instruction regarding presumption arising from alleged spoliation of evidence by insurer in action for fraudulent overcharging of premiums was adequately covered by instruction given.
**325 *578 Walter D. Adams, for appellant.

Lawrence L. Bennett, Jr., for appellee.

*573 BARNES, Judge.

Alleging that the verdict in her favor was inadequate, plaintiff Carolyn Vaughn appeals the judgment against Metropolitan Property & Casualty Insurance Company. The record shows that Vaughn sued Metropolitan, her homeowner's insurance carrier, to recover excessive premiums charged her and for fraud. Her complaint also sought punitive damages and attorney fees.

Metropolitan answered denying liability and asserting that it

580 S.E.2d 323
3 FCDR 1150
(Cite as: 260 Ga.App. 573, 580 S.E.2d 323)

had already refunded to Vaughn any amount to which she was entitled. Metropolitan also asserted that any overcharges were the result of clerical errors. Additionally, Metropolitan served several requests for admissions. One of the requests asked Vaughn to admit that Metropolitan was "not liable for punitive damages as alleged in [her] Complaint."

At the start of trial, Metropolitan moved in limine to strike Vaughn's demand for punitive damages. The motion asserted that Vaughn was served with a request asking her to admit that as a matter of fact that she was not entitled to punitive damages, that she had failed to answer it, and that she had not sought to withdraw the admissions. Based on Vaughn's failure to answer, the trial court found that she had admitted that punitive damages were not authorized and granted the motion.

The undisputed evidence shows that Metropolitan increased the premiums it charged Vaughn from $508 to $1,271 in 1995, and that over the next four years her premiums were increased to $1,282 in 1996, $3,099 in 1997, and to $4,181 in 1999.

After the judgment was entered in her favor for general damages equaling the excess premiums she paid, $6,548, interest, and attorney fees, Vaughn moved for a new trial asserting that the verdict denying recovery for "general and suffering [sic] is contrary to the evidence and inadequate," "the verdict denying any recovery for general damages is decidedly and strongly against the weight of the evidence and is inadequate," and the "verdict is contrary to law and the *574 principles of justice and equity." Later, Vaughn amended the brief in support of her motion to assert the other errors now raised in this appeal. After the trial court denied her motion, Vaughn filed this appeal. Finding no reversible error, we affirm.

[1] 1. Vaughn has not complied with the rules of this court. In addition to citing to the record sparingly in her statement of facts, see Court of Appeals Rule 27(a)(1), she has failed to number the pages in her brief, Rule 23(d), she failed to state how each enumeration of error was preserved for consideration, Rule 27(a)(1), and she has failed to provide a concise statement of the applicable standards of review for each issue presented. Rule 27(a)(3).

[2] 2. Additionally, the sequence of argument in her brief does not follow the sequence of her enumerations of error and the **326 argument is not numbered accordingly. Court of Appeals Rule 27(c)(1). Perhaps as a result of this, Vaughn has not supported with argument enumerations of error 5 (alleging the trial court erred by allowing Metropolitan to lead its witnesses); 10 (alleging the trial court erred by refusing Vaughn's request to charge on concurrent causes operating to bring about an injury); 12

(alleging the trial court erred by refusing to give Vaughn's requested charge on misrepresentation of a material fact constituting legal fraud); and 13 (alleging that the trial court erred by refusing to charge on deliberate misrepresentations authorizing recovery of punitive damages). Accordingly, any issue reasonably contained within these enumerations of error on which no argument or citation of authority has been made in Vaughn's brief is deemed abandoned. Court of Appeals Rule 27(c)(2); *Moore v. Winn-Dixie Stores*, 214 Ga.App. 157, 158(1), 447 S.E.2d 122 (1994) (overruled on other grounds).

[3] 3. Vaughn contends that the trial court erred by granting Metropolitan's motion to exclude the recovery of punitive damages. She argues that her allegation in the pretrial order that Metropolitan was guilty of fraud would authorize the award of punitive damages. We find no error.

[4][5][6][7] Requests for admissions under OCGA § 9-11-36 are comparable to admissions in pleadings or stipulations of fact, and courts regard them generally as judicial admissions rather than evidentiary admissions of parties. Thus, unless the court allows the answers to be withdrawn, answers to requests for admissions are conclusive and not subject to contradiction or explanation. *Wurlitzer Co. v. Watson*, 207 Ga.App. 161, 164 165(2), 427 S.E.2d 555 (1993). Consequently,

[a]ny matter admitted under OCGA § 9-11-36 is conclusively established unless the court, on motion, permits withdrawal or amendment of the admission. In determining this issue, we must recognize that the intended purpose of the Code *575 section is the facilitation of proof at trial. In form and substance an admission under OCGA § 9-11-36 is comparable to an admission in pleadings or stipulation of facts and as such is generally regarded as a judicial admission rather than evidentiary admission of a party. A judicial admission, unless allowed to be withdrawn by the court, is conclusive whereas an evidentiary admission is not conclusive but is always subject to be contradicted or explained. Past decisions of this court have recognized the binding effects of admissions under OCGA § 9-11-36. In *ETI Corp. v. Hammett*, 140 Ga.App. 618, 231 S.E.2d 545 (1976) it was held that evidence was not admissible to controvert matters deemed to have been admitted by failure to answer requests for admission even though the substance of the matter deemed admitted had been denied in the answer to the complaint.

(Citation and punctuation omitted.) *Pulte Home Corp. v. Woodland Nursery &c.* 230 Ga.App. 455(1), 496 S.E.2d 546 (1998).

Contrary to Vaughn's contention, *G.H. Bass & Co. v. Fulton County Bd. of Tax Assessors*, 268 Ga. 327-328(1), 486 S.E.2d 810 (1997), authorizes requests for admissions

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

580 S.E.2d 323
3 FCDR 1150
(Cite as: 260 Ga.App. 573, 580 S.E.2d 323)

relating to " 'statements or opinions of fact or of the application of law to fact.' " Further, having failed to challenge properly the scope of the request for admission in the trial court, it is too late now for Vaughn to make that challenge here. Id. at 331(2), 486 S.E.2d 810. Accordingly, based on Vaughn's admission by failing to answer the requests that she was not entitled to punitive damages, the trial court did not err by granting Metropolitan's motion.

[8] 4. Alleging that the information sought was not relevant, Vaughn also contends that the trial court erred by allowing Metropolitan to ask Vaughn if it had properly handled a theft claim she made on her homeowner's policy. Vaughn's entire argument on this enumeration of error states, "The Court allowed questioning of the Appellant regarding how Metropolitan had handled a claim many years ago, which had no relevance, and which was obviously intended to prejudice the jury." As a general rule, admission of evidence is a matter resting within the sound discretion of the trial court, and appellate courts will not disturb the exercise **327 of that discretion absent evidence of its abuse. Whisnant v. State, 178 Ga.App. 742, 743(1), 344 S.E.2d 536 (1986). Vaughn has not argued that the trial court abused its discretion in any way, and on the record before us shows none. Accordingly, this enumeration of error is without merit.

[9] 5. Vaughn also contends that the trial court erred by allowing Metropolitan to ask her a question that suggested that the increases in premium were the result of a mistake. Vaughn's entire argument *576 on this enumeration states, "The Court allowed Metropolitan's attorney to ask a question which assumed that Metropolitan's over charging of the plaintiff was a mistake, which was misleading, since there had been no evidence that the over charging was a mistake."

An argument, however, which merely restates or rephrases an enumeration of error is insufficient to present an issue for appellate review. Craig v. State, 205 Ga.App. 856(2), 424 S.E.2d 902 (1992). Therefore, this enumeration of error is deemed abandoned under Court of Appeals Rule 27(c)(2) because it is not supported by argument or citation of authority.

[10] 6. Vaughn also contends that the trial court erred by refusing to allow her to question Metropolitan about settlement of other cases against it concerning discrimination in rate increases. She contends the trial court's failure to allow the appellant to have a "thorough and shifting cross examination of Metropolitan's client representative, since the fact that Metropolitan had settled cases where rate increases had been based upon discrimination had relevance to the case of Carolyn Vaughn." When Vaughn asked this question of

Metropolitan's representative, Metropolitan objected based on relevancy, and Vaughn responded that Metropolitan had settled cases "that had to do with discrimination that could explain what happened here."

[11][12] Although such evidence can be admissible, see John W. Rooker & Assoc. v. Wilen Mfg. Co., 211 Ga.App. 519, 520, 439 S.E.2d 740 (1993), "[t]he general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." OCGA § 24-2-2. Here, it is apparent from Vaughn's argument in the trial court--that the other cases "could explain what happened here"-- she had no information showing the relevance of those cases to this case. Therefore, what Metropolitan may have done in other cases has little bearing on this case.

In a controversy between two persons regarding a given subject matter, evidence as to what occurred between one of them and a third person with reference to a similar, though entirely distinct, transaction is irrelevant.... To render such evidence admissible, it must be shown that the other transactions were fraudulent, and it must appear that they were so connected in point of time and otherwise with the one in issue as to make it apparent that all were proposed or carried out in pursuance of a common fraudulent purpose. The admission or exclusion of collateral evidence by the trial court is reviewed under an abuse of discretion standard.

(Citations and punctuation omitted.) *577 Ament v. Bennett's Fine Jewelry, 249 Ga.App. 683, 684-685, 549 S.E.2d 501 (2001). In the circumstances of this appeal, we find no abuse of that discretion.

[13] 7. Vaughn also alleges that the trial court erred by allowing Metropolitan to introduce in evidence certain billing records without laying a proper foundation. In her argument she asserts that this exhibit was prepared for litigation and did not fall within the business record exception of the hearsay rule. In the trial court, however, Vaughn first objected to introduction of this exhibit because it did not "have any relevancy to the case," and later objected because "we don't think that we've, they've established what those are."

As Vaughn failed to object to the admissibility of the exhibit on the same grounds in the trial court as she has now asserted in her enumeration of error and brief, she has waived on appeal all issues of admissibility to which she failed to pose a timely, specific objection at trial. Ray v. State, 187 Ga.App. 451, 452, 370 S.E.2d 629 (1988). Also, she **328 has waived all issues of admissibility not reasonably contained within the enumeration of error, regardless of whether such issues were subject to a timely objection at trial. Krehsbach v. State, 209 Ga.App. 474,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

580 S.E.2d 323
3 FCDR 1150
(Cite as: 260 Ga.App. 573, 580 S.E.2d 323)

Page 5

475(2), 433 S.E.2d 649 (1993).

[14] 8. Vaughn alleges that the trial court erred by preventing her from asking Metropolitan's representative whether it had ever responded to a letter from Vaughn's counsel. Vaughn's argument simply repeats the enumeration of error and states that it was error for the trial court not to allow this questioning. As we stated in Division 6 and for the same reasons, this argument is insufficient to preserve the issue for our consideration.

[15][16] 9. Contending that there was no evidence her injury was small nor any evidence of mitigating circumstances, Vaughn alleges that the trial court erred by instructing the jury on nominal damages and on mitigation of damages. Any error associated with the giving of these charges, however, has been waived because the record shows that Vaughn failed to object to the giving of them. OCGA § 5-5-24(a). The transcript shows that Vaughn's only objection to the charge after the trial court charged the jury was, "Your Honor, we object to the Court having failed to give plaintiff's request to charge numbers one, six, eight, and nine. And we object to the Court having given the instruction to the effect that if the jury finds that the plaintiff failed to use reasonable care, then that would affect the recovery." In civil cases, exceptions or objections to charges must be made after the jury is charged and before the verdict; objections made at charging conferences before the charge is given do not preserve charging issues for appellate review. *Bruno v. Evans,* 200 Ga.App. 437, 441(4), 408 S.E.2d 458 (1991); *Sims v. Johnson,* 185 Ga.App. 720-721, 365 S.E.2d 532 (1988). Failing to object to the giving of these charges, Vaughn has not preserved these issues for appeal. Id.

[17] *578 10. Vaughn further contends that the trial court erred by failing to give her requested charge on spoliation of evidence that "[a] fact that a party has spoiled evidence or otherwise made it unavailable raises a presumption that this evidence would be harmful to the party who spoiled such evidence" because "it was apparent that Metropolitan had destroyed or failed to produce evidence which was the subject of a Notice to Produce."

The transcript shows, however, that the trial court gave the following charge to the jury on this point:
> Where a party has evidence by which a party may repel a claim or charge against him or her and omits to produce it or having more certain or satisfactory evidence relies on that which is of a weaker or inferior nature, a presumption arises that the charge or claim is well-founded, but this presumption may be rebutted.

Because it is not error to fail to charge in the exact language of a requested charge when, as in this case, the principles of law embodied in the request are included in the charge

given, *Church's Fried Chicken v. Lewis,* 150 Ga.App. 154, 161(2), 256 S.E.2d 916 (1979), we find no error.

11. Finally, Vaughn alleges that the trial court erred by denying her motion for a new trial. She contends that "the rulings of the trial court, taken separately, and particularly when considered as a whole, mandated that the Superior Court grant [her] a new trial." Because we find that the evidence supports the verdict and Vaughn's other enumerations of error are without merit, we disagree.

*Judgment affirmed.*

RUFFIN, P.J., and ADAMS, J., concur.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

926 F.2d 42                                                                    Page 1
59 USLW 2576, 17 U.S.P.Q.2d 1688, 18 Media L. Rep. 1710
**(Cite as: 926 F.2d 42)**

☞

United States Court of Appeals,
First Circuit.

WCVB-TV, Plaintiff, Appellee,
v.
BOSTON ATHLETIC ASSOCIATION, et al., Defendants,
Appellants.

No. 90-1315.

Heard Dec. 3, 1990.
Decided Feb. 12, 1991.

Boston Athletic Association sued television channel, seeking to enjoin channel from televising Boston Marathon without being licensed to do so by Association, contending that channel, by broadcasting the words "Boston Marathon" in connection with the event, violated federal trademark law. The United States District Court for the District of Massachusetts, David S. Nelson, J., refused to issue a preliminary injunction, and Association appealed. The Court of Appeals, Breyer, Chief Judge, held that there was insufficient likelihood of consumer confusion to warrant an injunction.

Affirmed.

West Headnotes

**[1] Trade Regulation ☜334.1**
382k334.1 Most Cited Cases
(Formerly 382k334)

Trademark law prohibits unauthorized use of trademark or service mark, but only where that use creates likelihood of confusion about who produces goods or provides service in question. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[2] Trade Regulation ☜541**
382k541 Most Cited Cases

Unless plaintiff can convince district court that it will likely show "likelihood of confusion" on merits of its trademark claim (or can convince Court of Appeals that district court abused its discretion), it is not entitled to preliminary injunction. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[3] Trade Regulation ☜541**
382k541 Most Cited Cases

There was insufficient likelihood of consumer confusion to warrant injunction prohibiting television channel from televising Boston Marathon without being licensed to do so by Boston Athletic Association, as channel's use of words "Boston Marathon" would not likely confuse viewers that it bore imprimatur of Association; those words not only called attention to channel's program, they also described event that channel would broadcast. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[4] Trade Regulation ☜92.1**
382k92.1 Most Cited Cases
(Formerly 382k92)

Trademark statute does not give holders any "property right" in their mark except right to prevent confusion. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[5] Trade Regulation ☜389**
382k389 Most Cited Cases

Television channel was not estopped from televising Boston Marathon without being licensed to do so by Boston Athletic Association, even though channel, in earlier years, paid Association for license to use mark for its broadcast; there was no likelihood of confusion, and channel was not challenging validity of mark. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).
\*43 Thomas M.S. Hemnes, Robert E. Fast, and George J. Skelly with whom Steven W. Phillips, Bruce R. Parker, Teresa A. Maitland, Foley, Hoag & Eliot, H. Reed Witherby, Hale and Dorr, Thomas J. Dougherty, and Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., were on brief, for appellants Boston Athletic Ass'n, ProServ Television, Inc. and WBZ-TV.

Thomas P. Olson, Stuart P. Green, Wilmer, Cutler & Pickering, Steven A. Weiswasser, Washington, D.C., Charles Stanford, Joel Lulla, New York City, and Edwin M. Durso, Washington, D.C., on brief, for amici curiae ABC Sports, Inc. and ESPN, Inc.

Steven J. Comen with whom Wm. Gordon Prescott, William R. Moore, Christopher J. Petrini, Hinckley, Allen, Snyder & Comen, Boston, Mass., and Janine Ann Petit, New York City, were on brief, for appellee.

Roberta L. Cairney, James M. Wagstaffe, Kurtis J. Kearl and Cooper, White & Cooper, San Francisco, Cal., on brief for amici curiae The Chronicle Pub. Co., WGBH Educational Foundation and Post-Newsweek Stations, Inc.

Before BREYER, Chief Judge, and ALDRICH and COFFIN, Senior Circuit Judges.

BREYER, Chief Judge.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

926 F.2d 42

59 USLW 2576, 17 U.S.P.Q.2d 1688, 18 Media L. Rep. 1710

**(Cite as: 926 F.2d 42)**

Page 2

The Boston Athletic Association ("BAA"), its licensing agent (ProServ), and Channel 4 (WBZ-TV) appeal the district court's refusal to enjoin Channel 5 (WCVB-*44 TV) from televising the Boston Marathon. They point out 1) that the BAA has spent a great deal of money over the years promoting the annual Patriot's Day marathon event, 2) that it has registered the words "Boston Marathon" as a trade, or service mark, in connection with the event, 3) that it has licensed (for a fee) Channel 4 to broadcast the event on television, 4) that it has not licensed Channel 5 to broadcast the event or to use its mark, 5) that Channel 5 broadcast the event last year anyway, and intends to do so in 1991, simply by placing television cameras in the streets along the marathon route, and 6) that Channel 5 used the words "Boston Marathon" on the screen in large letters before, during, and after the event. They argue that Channel 5, by broadcasting the words "Boston Marathon" in connection with the event, violated federal trademark law. They asked the district court to issue a preliminary injunction, it refused to do so, and they have appealed that refusal.

[1][2][3] In our view, the district court's refusal to grant the preliminary injunction was lawful. The dispositive legal issue concerns "customer confusion." A trademark, or service mark, is an "attention getting symbol" used basically, and primarily, to make clear to the customer the origin of the goods or the service. See 1 J. McCarthy, *Trademarks and Unfair Competition* § 11.17 at 476 (2d ed. 1984). Trademark law prohibits the unauthorized use of such a mark, but *only* where doing so creates a "likelihood of confusion" about who produces the goods or provides the service in question. See 15 U.S.C. § 1114(1); 15 U.S.C. § 1125(a); *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 28-35 & n. 11 (1st Cir.1989); *see also Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir.1977). Unless a plaintiff can convince a district court that it will likely show such a "likelihood of confusion" on the merits of its trademark claim (or can convince a court of appeals that the district court abused its discretion), it is not entitled to a preliminary injunction. See *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) ("likelihood of success" on merits one of four requirements for grant of preliminary injunction; "abuse of discretion" standard for appellate review); *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 699 n. 2 (1st Cir.1987) (trademark case). Yet, we cannot find in the record before us sufficient evidence of relevant customer confusion, arising out of Channel 5's use of the words "Boston Marathon," to require the district court to issue the preliminary injunction that the appellants seek.

Obviously, we do not have before us the common, garden variety type of "confusion" that might arise with typical trademark infringement. This is not a heartland trademark case, where, for example, plaintiff uses the words "Big

" to mark his apple juice, defendant (perhaps a big man called Tom) uses the same words (or perhaps similar words, e.g., "Large Tommy") on his own apple juice label, and plaintiff says customers will confuse defendant's apple juice with his own. See, e.g., *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920 (10th Cir.1986) ("Beer Nuts" and "Brew Nuts" confusingly similar); 2 J. McCarthy § 23.3 at 56 ("Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports ... [and] are 'open and shut'...."). No one here says that Channel 5 is running its own marathon on Patriot's Day, which a viewer might confuse with the BAA's famous Boston Marathon.

Rather, BAA argues that the confusion here involved is somewhat special. It points to cases where a defendant uses a plaintiff's trademark in connection with a different type of good or service and a plaintiff claims that the public will wrongly, and confusedly, think that the defendant's product somehow has the plaintiff's official "O.K." or imprimatur. The Eleventh Circuit, for example, found trademark law violated when the defendant, without authorization, used the plaintiff's football team mark, a bulldog, not in connection with a different football team, but, rather, on his beer mugs. See *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535 (11th Cir.1985). This circuit has found *45 trademark law violated, when the defendant, without authorization, used this very appellant's foot race mark, "Boston Marathon," on his t-shirts, sold during the event, permitting the customer to wrongly or confusedly think that his t-shirts were somehow "official." See *Sullivan, supra*. BAA goes on to say that Channel 5's use of those words will lead viewers, wrongly, and confusedly, to believe that Channel 5 (like the t-shirt seller) has a BAA license or permission or authorization to use the words, i.e., that it broadcasts with the BAA's official imprimatur. It also notes that this court, in *Sullivan*, listed circumstances that create a "rebuttable presumption" of confusion. And, it quotes language from *Sullivan*, in which this court, citing *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), said that the defendant's t-shirts were "clearly designed to take advantage of the Boston Marathon and to benefit from the good will associated with its promotion by plaintiffs," and that defendants obtained a "free ride" at the plaintiffs' expense; they "reap where [they have] not sown." *Sullivan*, 867 F.2d at 33. Appellants say that Channel 5 is doing the same here.

[4] In our view, the cases BAA cites, and *Sullivan* in particular, do not govern the outcome of this case. Nor can we find a likelihood of any relevant confusion here. First, the *Sullivan* opinion, taken as a whole, makes clear that the court, in using the language appellants cite, referring to a "free ride," and taking "advantage" of another's good will, did not intend to depart from ordinary principles of federal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

926 F.2d 42
59 USLW 2576, 17 U.S.P.Q.2d 1688, 18 Media L. Rep. 1710
(Cite as: 926 F.2d 42)

trademark law that make a finding of a "likelihood of confusion" essential to a conclusion of "violation." As a general matter, the law *sometimes* protects investors from the "free riding" of others; and *sometimes* it does not. The law, for example, gives inventors a "property right" in certain inventions for a limited period of time; *see* 35 U.S.C. §§ 101 *et seq.*; it provides copyright protection for authors; *see* 17 U.S.C. §§ 101 *et seq.*; it offers certain protections to trade secrets. *See generally* 2 J. McCarthy § 29.16. But, the man who clears a swamp, the developer of a neighborhood, the academic scientist, the school teacher, and millions of others, each day create "value" (over and above what they are paid) that the law permits others to receive without charge. Just how, when and where the law should protect investments in "intangible" benefits or goods is a matter that legislators typically debate, embodying the results in specific statutes, or that common law courts, carefully weighing relevant competing interests, gradually work out over time. The trademark statute does not give the appellants any "property right" in their mark except "the right to prevent confusion." *See Quabaug Rubber Co.*, 567 F.2d at 160; 2 J. McCarthy § 23.1. And, nothing in *Sullivan* suggests the contrary.

Second, the "rebuttable presumption" of confusion that this court set forth in *Sullivan* does not apply here. We concede that the *Sullivan* court said that "there is a rebuttable presumption" of confusion "about the shirts' source or sponsorship" arising from the fact that the defendants used the words "Boston Marathon" on the shirts, which use made customers more likely to buy the shirts. The court wrote that when a manufacturer *intentionally* uses another's mark *as a means of establishing a link* in consumers' minds with the other's enterprise, and directly profits from that link, there is an unmistakable aura of deception. *Sullivan*, 867 F.2d at 35 (emphasis added). As we read these words, they mean that the *Sullivan* record indicated that the defendant wanted to give the impression that his t-shirt was an "official" t-shirt, a fact that, in the sports world, might give a shirt, in the eyes of sports fans, a special "cachet." It makes sense to presume confusion about a relevant matter (namely, official sponsorship) from such an intent, at least in the absence of contrary evidence.

Here, however, there is no persuasive evidence of any intent to use the words "Boston Marathon" to suggest official sponsorship of Channel 5's broadcasts. To the contrary, Channel 5 offered to "broadcast whatever disclaimers" the BAA might *46 want--"every thirty seconds, every two minutes, every ten minutes"--to make certain no one thought the channel had any special broadcasting status. Nor is there any evidence that Channel 5 might somehow profit from viewers' wrongly thinking that the BAA had authorized its broadcasts. Indeed, one would ordinarily believe that television viewers (unlike sports fans who might want to

buy an official t-shirt with the name of a favorite event, team or player) wish to see the event and do not particularly care about the relation of station to event-promoter. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir.1979) (when deciding whether there is confusion "the wholly indifferent [consumers] may be excluded") (citation omitted); 2 J. McCarthy § 23.27 at 129 & n. 20 (trademark law does not "protect those buyers who ... [are] 'indifferent' " to the mark).

Third, and perhaps most importantly, the record provides us with an excellent reason for thinking that Channel 5's use of the words "Boston Marathon" would *not* confuse the typical Channel 5 viewer. That reason consists of the fact that those words do more than call attention to Channel 5's program; they also *describe* the event that Channel 5 will broadcast. Common sense suggests (consistent with the record here) that a viewer who sees those words flash upon the screen will believe simply that Channel 5 will show, or is showing, or has shown, the marathon, not that Channel 5 has some special approval from the BAA to do so. In technical trademark jargon, the use of words for descriptive purposes is called a "fair use," and the law usually permits it even if the words themselves also constitute a trademark. *See* 15 U.S.C. § 1115(b)(4) (statutory fair use defense); *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 796 (5th Cir.1983) (fair use established if mark descriptive, not used in trademark sense, and used in good faith). If, for example, a t-shirt maker placed the words "Pure Cotton" (instead of the words "Boston Marathon") on his t-shirts merely to describe the material from which the shirts were made, not even a shirt maker who had a registered trademark called "Pure Cotton" could likely enjoin their sale. *Cf. Leathersmith of London, Ltd. v. Alleyn*, 695 F.2d 27, 30-31 (1st Cir.1982), cert. denied, 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983). As Justice Holmes pointed out many years ago, "[w]hen the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth." *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924).

This is not a case where it is difficult to decide whether a defendant is using particular words primarily as a mark, *i.e.*, as an "attention getting symbol," or primarily as a description. *Cf. Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 937-38 (10th Cir.1983); *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1027-28 (7th Cir.1979), cert. denied, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); *Venetianaire Corp. of America v. A & P Import Co.*, 429 F.2d 1079, 1083 (2d Cir.1970). Here there is little in the record before us to suggest the former (only the large size of the words on the screen); while there is much to show the latter (timing, meaning, context, intent, and surrounding circumstances). Consequently, the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

926 F.2d 42                                                                                           Page 4
59 USLW 2576, 17 U.S.P.Q.2d 1688, 18 Media L. Rep. 1710
**(Cite as: 926 F.2d 42)**

appellants have shown no real likelihood of relevant confusion.

We also note that the only federal court which has decided a case nearly identical to the one before us, a case in which a station planning to televise a public parade was sued by the parade's promoter who had granted "exclusive" rights to another station, reached a conclusion similar to the one we draw here. *See Production Contractors, Inc. v. WGN Continental Broadcasting Co.,* 622 F.Supp. 1500, 1504 (N.D.Ill.1985). Reviewing the promoter's Lanham Act claim that the "unauthorized" broadcast would create a "false impression" of sponsorship, the court concluded that it fell "far short of establishing likelihood of confusion" among viewers that the defendant station was the "official" or "authorized" broadcaster of the parade. *See id.* at 1504-05. Similarly, we do not see how Channel 5's broadcast could likely confuse viewers that it bore the imprimatur of the BAA.

[5] The BAA makes one further argument. It says that, because Channel 5, in *47 earlier years, paid it for a license to use the mark for its broadcasts, Channel 5 is "estopped" from contesting the mark's "validity." The estoppel cases that BAA cites, however, all concern a challenge to the *validity* of a mark, a challenge absent here. *See, e.g., Professional Golfers Ass'n v. Bankers Life & Casualty Co.,* 514 F.2d 665, 671 (5th Cir.1975) (challenge based on abandonment); *Seven-Up Bottling Co. v. Seven-Up Co.,* 420 F.Supp. 1246, 1251 (E.D.Mo.1976), *aff'd,* 561 F.2d 1275 (8th Cir.1977) (challenge based on false registration statements); *see also* 1 J. McCarthy § 18.20 ("trademark licensee is estopped from challenging the validity of the licensor's mark"). Regardless, we can find no case that would even prevent a challenge by a *prior* licensee, based upon *post-*license facts, after the license has expired. *See generally* 3 Callman, *Unfair Competition, Trademarks & Monopolies* § 19.48 (4th ed. 1989). We cannot think of any reason why such a licensee ought to be estopped; or why, a grant of a license should *permanently* immunize a trademark holder from legal attack. *Compare Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) (estoppel doctrine does not apply to patent licensees) *with Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 328-29 (6th Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973) (estoppel doctrine does apply to trademark licensees).

Finally, we note that *amici* in support of appellants have raised various questions of state law. Appellants themselves, however, have not raised those questions; consequently, they are not properly before us. *See United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 60 n. 2, 101 S.Ct. 1559, 2176 n. 2, 67 L.Ed.2d 732 (1981); *Knetsch v. United States,* 364 U.S. 361, 370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1960).

The district court's denial of the motion for preliminary injunction is

*Affirmed.*

926 F.2d 42, 59 USLW 2576, 17 U.S.P.Q.2d 1688, 18 Media L. Rep. 1710

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

## 5 6

(To be scanned in place of tab)

521 S.E.2d 619
99 FCDR 3103

Page 1

**(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)**

☞

Court of Appeals of Georgia.

WITTY et al.
v.
McNEAL AGENCY, INC. et al.

**No. A99A0907.**

Aug. 10, 1999.

Former employee of stock brokerage firm brought declaratory judgment action against firm and manager to determine validity of his employment contract with firm. Firm and manager counterclaimed, alleging breach of contract, tortious interference with contract, and slander, adding competitor that hired employee as additional defendant. The Superior Court, Houston County, Nunn, J., entered judgment for firm and manager on counterclaims, and against employee on his claims. Employee and competitor appealed. The Court of Appeals, Eldridge, J., held that: (1) exclusion of alleged evidence of firm's and manager's stubborn litigiousness was harmless; (2) award of attorney fees against competitor was warranted; (3) non-disclosure of information provision of employment contract was relevant; (4) non-disclosure of information provision of employment contract was reasonable as to time and nature of business interest sought to be protected; (5) finding that competitor tortiously interfered with employee's contract was supported by evidence; and (6) damages award of $82,690 to firm and manager for tortious interference with contract was not excessive.

Affirmed.

West Headnotes

**[1] Declaratory Judgment ☞392.1**
118Ak392.1 Most Cited Cases

Even if stock brokerage firm's and manager's refusal to submit to expedited arbitration constituted stubborn litigiousness that would warrant recovery of costs of litigation, exclusion of evidence of their refusal was harmless, in former employee's action for declaratory judgment determining validity of employment contract, where employee did not recover on his claims. O.C.G.A. § 13-6-11.

**[2] Costs ☞2**
102k2 Most Cited Cases

Absent a mandatory arbitration clause in a contract, refusal to arbitrate is not, in itself, "stubborn litigiousness," for purposes of statute permitting recovery of litigation costs,

because arbitration is only one of the alternative dispute resolution procedures to avoid trial and to resolve a controversy. O.C.G.A. § 13-6-11.

**[3] Arbitration ☞1.1**
33k1.1 Most Cited Cases

Unless made mandatory by state or federal law, arbitration is voluntary by agreement of all parties. O.C.G.A. §§ 9-9-2, 9-9-6, 9-9-32, 9-9-61.

**[4] Costs ☞2**
102k2 Most Cited Cases

"Stubborn litigiousness," for purposes of statute permitting recovery of costs of litigation, is not the failure to follow a procedure or the following of a particular procedure in seeking to resolve a legal dispute. O.C.G.A. § 13-6-11.

**[5] Costs ☞2**
102k2 Most Cited Cases

Within meaning of statute permitting recovery of litigation costs, "stubborn litigiousness" means forcing the opposite party to litigate when there exists no bona fide controversy. O.C.G.A. § 13-6-11.

**[6] Appeal and Error ☞226(2)**
30k226(2) Most Cited Cases

Whether attorney fees awarded to stock brokerage firm and its manager on its counterclaims against former employee and competitor that hired employee for breach of contract, tortious interference with contract, and slander were not authorized and were excessive was not preserved for review, where parties agreed that each side would state in their place the amount of attorney fees that each contended was recoverable without testimony, documentary evidence, or cross-examination, and employee and competitor made no objection to firm's and manager's statement as to amount of attorney fees contended or method used to arrive at amount.

**[7] Appeal and Error ☞1004(7)**
30k1004(7) Most Cited Cases

**[7] Costs ☞208**
102k208 Most Cited Cases

It is for the jury to decide if attorney fees are appropriate under the circumstances for bad faith, and a verdict will be upheld if there is any evidence to support it. O.C.G.A. § 13-6-11.

**[8] Costs ☞198**
102k198 Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)

Award of attorney fees against competitor that hired former employee of stock brokerage firm was warranted, though firm and its manager may not have asserted a claim for attorney fees against competitor in their amended complaint adding competitor as defendant in their counterclaim for breach of contract, tortious interference with contract, and slander, where they asked for attorney fees in connection with claim for tortious interference with contract, evidence at trial and jury verdict form made plain that they were seeking litigation expenses from competitor, and competitor made no objection. O.C.G.A. §§ 9- 11-15(b), 13-6-11.

**[9] Brokers ☞38(4)**
65k38(4) Most Cited Cases

Non-disclosure of information provision of employment contract entered into between former employee and stock brokerage firm was relevant and material to issue of whether employee breached his fiduciary duty to firm by soliciting existing business away from firm prior to his termination of employment and by taking customer lists with him when he left firm, even if portions were unenforceable.

**[10] Master and Servant ☞60**
255k60 Most Cited Cases

Upon terminating employment, an employee has the right to take with him all the knowledge he obtained so long as no property of the employer is taken.

**[11] Contracts ☞118**
95k118 Most Cited Cases

Non-disclosure of information provision of employment contract entered into between former employee and stock brokerage firm, which prohibited disclosure by employee of "other information" during period between notice of termination and actual termination, was not overly broad in that "other information" referred only to information that a competitor would want to use in obtaining an unfair competitive edge regarding securities, insurance policies, investments, policy holder lists, customer lists, and services provided to such clients, and notice period was only two weeks.

**[12] Contracts ☞156**
95k156 Most Cited Cases

A general term in contract that follows specific terms is confined to the same kind or category of thing. O.C.G.A. §§ 13-2-1, 13-2-2(4).

**[13] Contracts ☞118**
95k118 Most Cited Cases

Non-disclosure of information provision of employment contract entered into between former employee and stock

brokerage firm, which provided that firm's customer lists and related documents were property of firm that were to be used only at their place of employment during term of employment with firm and by no third person, and which provided that employee was prohibited from using firm's property after his termination for any purpose, was reasonable as to time and nature of business interest sought to be protected.

**[14] Contracts ☞118**
95k118 Most Cited Cases

The reasonableness of the non-disclosure provision of an employment contract turns on the factors of time and the nature of the business interest sought to be protected.

**[15] Appeal and Error ☞863**
30k863 Most Cited Cases

**[15] Appeal and Error ☞866(3)**
30k866(3) Most Cited Cases

Where there is any evidence to support the jury verdict, it is proper to affirm the denial of motions for directed verdict or to a judgment notwithstanding the verdict, unless it is demanded as a matter of law, because the jury is the sole and exclusive judge of the weight and credit to give to the evidence.

**[16] Appeal and Error ☞237(5)**
30k237(5) Most Cited Cases

**[16] Appeal and Error ☞238(2)**
30k238(2) Most Cited Cases

**[16] Appeal and Error ☞293**
30k293 Most Cited Cases

**[16] Appeal and Error ☞882(17)**
30k882(17) Most Cited Cases

Whether trial court erred in entering judgment for stock brokerage firm and its manager based on erroneous jury verdict form was not preserved for review, where competitor agreed to jury verdict form that erroneously characterized firm's and manager's claim for tortious interference with contract against competitor as claim for breach of contract, and competitor did not raise objection in its post trial motions for directed verdict, judgment notwithstanding verdict, and for new trial.

**[17] Trial ☞345**
388k345 Most Cited Cases

If the verdict is illegal and the trial court erroneously accepts the verdict, then litigants are under a duty to timely object to the irregularity before the jury is excused, and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)

Page 3

failure to do so waives any defects.

**[18] Trial ⬤➡345**
388k345 Most Cited Cases

A timely objection to improper verdict permits the trial court to reform or remodel the verdict in the presence of the jury before they are excused and saves precious judicial time and resources.

**[19] Trial ⬤➡345**
388k345 Most Cited Cases

Upon hearing an improper verdict rendered, a litigant should not sit silently by, hoping to gain a retrial by failing to object.

**[20] Appeal and Error ⬤➡223**
30k223 Most Cited Cases

**[20] Appeal and Error ⬤➡238(2)**
30k238(2) Most Cited Cases

**[20] Appeal and Error ⬤➡295**
30k295 Most Cited Cases

If the judgment from an illegal verdict based upon improper damages is objected to for the first time either on motions for new trial or judgment notwithstanding the verdict, or on direct appeal without post trial motions, then such is the first opportunity that the issue could be raised and such is preserved for appellate review.

**[21] Torts ⬤➡12**
379k12 Most Cited Cases

Finding that stock brokerage firm's competitor, that was a stranger to employment contract between former employee and firm, tortiously interfered with employee's contract was supported by evidence that employee breached notice provision and nondisclosure provision of contract with aiding, abetting, and urging of competitor, and that firm lost approximately one-third of its clients as a result.

**[22] Appeal and Error ⬤➡1005(2)**
30k1005(2) Most Cited Cases

Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence.

**[23] Torts ⬤➡12**
379k12 Most Cited Cases

The elements of tortious interference with contractual relations, business relations, or potential business relations are: (1)improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

**[24] Appeal and Error ⬤➡232(2)**
30k232(2) Most Cited Cases

Whether stock brokerage firm claiming lost profits resulting from former employee's breach of employment contract and competitor's tortious interference with employment contract was required to deduct expenses from earnings in order to establish lost profits was not preserved for review, where competitor and employee failed to object to firm's damages evidence on that ground.

**[25] Damages ⬤➡6**
115k6 Most Cited Cases

**[25] Damages ⬤➡163(1)**
115k163(1) Most Cited Cases

Where a party sues for specific damages, he has the burden of showing the amount of the loss, and of showing it in such a way that the jury may calculate the amount from the figures furnished, and will not be placed in the position where their allowance of any sum would be mere guesswork; however, the party does not lose his right of action for the damages because he can not furnish exact figures.

**[26] Damages ⬤➡6**
115k6 Most Cited Cases

The rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages; the losses must be directly traceable to the acts of the other party.

**[27] Damages ⬤➡40(1)**
115k40(1) Most Cited Cases

Generally, when the owner of a business seeks to recover lost profits, recovery can be had only if the business has a proven "track record" of profitability.

**[28] Damages ⬤➡176**
115k176 Most Cited Cases
Evidence of lost profits without proof of expenses was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)

Page 4

admissible, in stock brokerage firm's action against former employee for breach of employment contract and competitor that hired employee for tortious interference with contract, in light of firm's established business record of profits after deduction of expenses.

**[29] Damages** ☞137
115k137 Most Cited Cases

Damages award of $82,690 to stock brokerage firm and its manager for tortious interference with firm's contract of employment with former employee by competitor that hired employee was not excessive, where it was within range of evidence offered at trial.

**[30] Appeal and Error** ☞1004(13)
30k1004(13) Most Cited Cases

Absent a showing that the jury verdict was so flagrantly excessive as to shock the conscience, creating a clear implication of bias, prejudice, or gross mistake on the part of the jurors so as to warrant a new trial, the appellate court will not disturb a verdict approved by the trial court.
**623 *563 Jones, Cork & Miller, Hubert C. Lovein, Jr., Macon, Sutherland, Asbill & Brennan, Louise B. Duffy, Atlanta, for appellants.

Gambrell & Stolz, Irwin W. Stolz, Jr., Robert G. Brazier, Ronald C. Melcher, Seaton D. Purdom, Atlanta, for appellees.

*554 ELDRIDGE, Judge.

In 1988, Jack Witty, plaintiff-appellant ("Witty"), went to work for defendant-appellee McNeal-Jansson Financial Services, Inc. ("JFSI"). Eric Jansson, defendant-appellee ("Jansson"), was one of the stockholders and manager.

Upon being employed as a stockbroker, Witty signed an employment contract that was terminable at will by either party by delivering written notice of termination two weeks prior to the termination date. The purpose was to give JFSI two weeks within which to contact its clients prior to the employee beginning to work for a competitor brokerage house and soliciting the clients that he had handled. The contract also contained a non-disclosure provision and a liquidated damages provision.

Witty's compensation with JFSI was 40 percent of gross commissions generated by the brokerage house's clients' accounts. The remainder of the commissions were divided, with 40 percent to JFSI and 20 percent to IM & R and Raymond James, its parent companies. JFSI paid all office expenses.

In 1994, Witty decided to leave JFSI. Witty sought employment with a competitor Interstate Johnson Lane ("IJL"), plaintiff-appellant. On October 28, 1994, Witty gave JFSI written notice of his resignation, effective immediately, and accepted immediate employment with IJL.

On October 28, after receiving Witty's resignation, JFSI's personnel director wrote and called all clients that Witty worked with in an attempt to keep their accounts with JFSI; the staff worked through the weekend contacting clients. Of the 334 clients that Witty had serviced, JFSI retained 202 and 132 were lost to either IJL or another brokerage house.

On October 31, 1994, Jansson and JFSI, in written communication to Witty and IJL, threatened to sue Witty for breach of contract.

Witty brought a declaratory judgment action against Jansson and JFSI to declare the validity of the employment contract and his duties under it. Defendants answered, counterclaimed, and sought a TRO. Jansson and JFSI added IJL as an additional defendant in the counterclaim.

On July 25, 1997, a jury returned a verdict against all of Witty's claims and for the defendants on their counterclaims against Witty and IJL. On the contract claim, the jury found that there had been a breach of contract for violation of the notice provision and non-disclosure provision with no damages owed by Witty and $82,690 in damages owed by IJL. The jury found slander by Witty and IJL with damages by each of $2,409. No punitive damages were awarded. The *555 jury found that the defendants were entitled to attorney fees of $45,781 payable by Witty and $91,562 payable by IJL. Plaintiffs immediately made an oral motion for j.n.o.v., which was denied.

On August 4, 1997, judgment was entered as follows: $82,690 for breach of contract by IJL; $2,409 each against Witty and IJL for slander; attorney fees of $45,781 against Witty and attorney fees of $91,562 against IJL.

On September 2, 1997, plaintiffs moved for a new trial, and on November 7, 1997, the motion was denied. On December 4, 1997, the notice of appeal was filed. On January 5, 1999, the appeal was docketed in this Court.

1. Plaintiffs contend that the trial court erred in: (a) excluding evidence of defendants' stubborn litigiousness, (b) awarding of attorney fees which were not authorized by **624 the evidence and were grossly excessive, and (c) giving a charge under OCGA § 13-6-11, which was erroneous. We do not agree. While the court for convenience and clarity has combined three enumerations of error by subject matter, enumeration of error two raised multiple enumerations, which was improper. See *West v. Nodvin*, 196 Ga.App. 825, 397 S.E.2d 567 (1990).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)
Case 1:01-cv-00313-TWT   Document 233   Filed 02/02/04   Page 344 of 363

Page 5

[1] (a) Plaintiffs contend that the trial court erred in excluding evidence that plaintiffs had asked defendants to submit to expedited arbitration. According to the plaintiffs, defendants' alleged refusal constituted evidence of stubborn litigiousness on plaintiffs' claim and was also evidence of plaintiffs' defense to defendants' counterclaim for attorney fees. Since plaintiffs did not recover on their claims, then OCGA § 13-6-11 attorney fees were not recoverable, and there was no harm done to the plaintiffs by such admission, even if it were error to exclude such evidence. See *CSX Transp. v. Barnett*, 199 Ga.App. 611, 612(1), 405 S.E.2d 506 (1991).

[2][3][4] Absent a mandatory arbitration clause in a contract, refusal to arbitrate is not, in itself, stubborn litigiousness, because arbitration is only one of the alternative dispute resolution procedures to avoid trial and to resolve a controversy. Unless made mandatory by state or federal law, arbitration is voluntary by agreement of the parties. See OCGA §§ 9-9-2; 9-9-6; 9-9-32; 9-9-61. If refusal to do an act that is a voluntary exercise of rights constitutes stubborn litigiousness, then arbitration no longer would be voluntary. Thus, stubborn litigiousness is not the failure to follow a procedure or the following of a particular procedure in seeking to resolve a legal dispute.

[5] Within OCGA § 13-6-11, stubborn litigiousness means forcing the opposite party to litigate when there exists no bona fide controversy. *Wheat Enterprises v. Redi-Floors*, 231 Ga.App. 853, 857(1), 501 S.E.2d 30 (1998); *Typo-Repro Svcs. v. Bishop*, 188 Ga.App. 576, 580(2), 373 S.E.2d 758 (1988). Since the jury found for the defendants, *556 then the defendants had a bona fide controversy. Thus, the trial court did not abuse its discretion in denying admission of such irrelevant and immaterial evidence.

[6][7] (b) The jury awarded damages for slander and for contract interference. Both are intentional torts, which indicates bad faith and would authorize such damages. See *Professional Consulting Svcs. v. Ibrahim*, 206 Ga.App. 663, 665-666(3), 426 S.E.2d 376 (1992). It is for the jury to decide if attorney fees are appropriate under the circumstances for bad faith, and a verdict will be upheld if there is any evidence to support its verdict. OCGA § 13-6-11; *Professional Consulting Svcs. v. Ibrahim*, supra at 665-666, 426 S.E.2d 376; *Axford v. Blalock*, 199 Ga.App. 434, 439(9), 405 S.E.2d 698 (1991).

Plaintiffs agreed with the defense that each side would state in their place the amount of attorney fees that each contended was recoverable without testimony, documentary evidence, or cross-examination. When they had an opportunity to do so, plaintiffs made no objection to defendants' statement of the amount of attorney fees contended and the method that defendants used to arrive at

the alleged damages. Thus, they cannot raise the issue for the first time on appeal. See *Standard Guar. Ins. Co. v. Bundrage*, 264 Ga. 632, 633, 452 S.E.2d 474 (1994); *v. Peachtree Airport Park Joint Venture*, 231 Ga.App. 549, 550(2), 499 S.E.2d 690 (1998). To do so would be induced error by their agreement with such procedure. *Outdoor Systems v. Woodson*, 221 Ga.App. 901, 473 S.E.2d 204 (1996). In addition plaintiffs waived any objection by failing to contemporaneously make it. *MacDonald v. MacDonald*, 156 Ga.App. 565, 566(1)(a), 275 S.E.2d 142 (1980).

Further, without making an exception, plaintiffs allowed the trial court to charge the jury on such proffer of proof by the defendants regarding what plaintiffs now contend was substantial error of law under the circumstances. Accordingly, the plaintiffs waived all such exceptions. OCGA § 5-5- 24(c); *Irvin v. Oliver*, 223 Ga. 193, 195-196(2), 154 S.E.2d 217 (1967); see also *Orr v. CSX Transp.*, 233 Ga.App. 530, 531(2), 505 S.E.2d 45 (1998).

Further, IJL did not object to the jury verdict form either before it was sent out to **625 the jury or after the verdict was returned, which verdict form contained provision for the award of attorney fees against IJL. In fact, plaintiffs' counsel announced to the trial court: "I have no quarrel with this form.... I have no objection to this form, this verdict form."

[8] (c) Although the amended counterclaim adding IJL may not have asserted a claim for attorney fees against IJL under OCGA § 13-6-11 by citation, it asked for the award of attorney fees in its prayer in (k)(iii) as to Count 12 for tortious interference with contract, which is an implicit prayer under OCGA § 13-6-11 for litigation expenses. Further, *557 the evidence, defendants' argument, and the jury verdict form made plain that such damages under OCGA § 13-6-11 were sought from IJL, and IJL made no objection. Under OCGA § 9-11-15(b), pleadings are conformed to the evidence. See *Rockdale Body Shop v. Thompson*, 222 Ga.App. 821, 823(2), 476 S.E.2d 22 (1996). The award of attorney fees must be affirmed, because there is some evidence to support such award on either bad faith or stubborn litigiousness grounds. *Morris v. Savannah Valley Realty*, 233 Ga.App. 762, 764-765(3), 505 S.E.2d 259 (1998).

2. Plaintiffs contend that the trial court erred in admitting over objection evidence as to the non-disclosure clause in the employment contract and in not directing a verdict on such issue. We do not agree.

[9] (a) The non-disclosure of information provision of the employment contract was relevant and material to the issues in litigation and was admissible.

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)

[10] Defendants introduced evidence that Witty solicited existing business away from the defendants prior to his termination of employment. At the time of his leaving, Witty took customer lists and immediately began to use the lists to solicit defendants' clients. Thus, Witty violated his fiduciary duty of employment, because "[u]pon terminating employment, an employee has the right to take with him all the knowledge he obtained so long as no property of the employer is taken." *Wolff v. Protégé Systems.* 234 Ga.App. 251, 252, 506 S.E.2d 429 (1998). Therefore, the nondisclosure provision was relevant even if portions were unenforceable. Since the motion in limine was overly broad and not tailored to a legitimate objection, then it was proper to deny such motion. See *Jones v. Blackburn,* 75 Ga.App. 791, 794, 44 S.E.2d 555 (1947).

[11][12] The term "any other information" at first glance appears vague, overly broad, and ambiguous. However, when read in context with the other designated categories of items, it clearly refers only to information that a competitor would want to use in obtaining an unfair competitive edge regarding securities, insurance policies, investments, policyholder lists, customer lists, and services provided to such clients. It has long been a rule of construction, i.e., rule ejusdem generis, that a general term following specific terms is confined to the same kind or category of thing. See OCGA §§ 13-2-1; 13-2-2(4); *Gore v. State,* 79 Ga.App. 696, 54 S.E.2d 669 (1949).

The employment contract non-disclosure provision differentiates "other information" from "property" when the entire provision is examined, because "any use of this information or property by persons not in the employment of the Company would provide said persons an unfair competitive advantage," which indicates that "property" and "information" about the "property" are separate things within the non-disclosure provision. Further, the limitation on disclosure *558 of "information" or "information" about the "property" does not extend beyond the "term of the contract," i.e., "[t]he Employee agrees that during the term of this contract, he will not allow any person not employed by the Company access to said files or property"; however, "after the termination of his employment, he will not directly or indirectly, use, take, copy or appropriate any of the aforesaid property of the company."

The non-disclosure provision in no way affects a man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, [which] are not the property of his employer, and **626 the right to use and expand these powers remains his property unless curtailed through some restrictive covenant entered into with the employer.
(Citations and punctuation omitted.) *Thomas v. Best Mfg.*

*Corp.,* 234 Ga. 787, 788-789(2), 218 S.E.2d 68 (1975) ("*Thomas* "). Such factors are excluded from this nondisclosure provision. The limitation on nondisclosure of "other information" is limited to that period between notice of the termination date, i.e., two weeks and actual termination. The clear purpose of a two week head-start over the employee is so that the Company can protect its client base by contacting clients before the ex-employee can contact them. Such head-start enables the defendants to protect their investment in time, effort, and cost in acquiring the clients. This is a reasonable and restricted interest.

[13] (b) Defendants and Witty agreed by written contract that defendants' customer lists and related documents were the property of the defendants and were to be used only at their place of employment during the term of his employment with them and by no third person. Witty was further prohibited from using this proprietary property after his termination for any purpose.

Clearly, this provision has a limit as to "time ... or activity," because the provision is limited to "the term of this contract" as to the property and to two weeks as to "other information." However, similar clauses have "been upheld as a valid means of protecting documented confidential information of an employer even though the language used reflects no limits as to 'time, territory or activity.' [Cit.]" *Equifax Svcs. Inc. v. Examination Mgmt. Svcs.,* 216 Ga.App. 35, 38(1)(b), 453 S.E.2d 488 (1994); accord *Nunn v. Orkin Exterm. Co.,* 256 Ga. 558, 560(2), 350 S.E.2d 425 (1986). Thus, the non- disclosure provision was enforceable despite the breadth, because it does not affect the *Thomas* factors, including subjective knowledge acquired during the course of employment or ability to compete in any territory with *559 the former employer. See *Nunn v. Orkin Exterm. Co.,* supra at 560, 350 S.E.2d 425; *Howard Schultz & Assoc. v. Broniec,* 239 Ga. 181, 187- 188(4), 236 S.E.2d 265 (1977); *Thomas v. Best Mfg. Corp.,* supra at 788(1), 218 S.E.2d 68.

[14] The reasonableness of the non-disclosure provision turns on the factors of time and the nature of the business interest sought to be protected. *Durham v. Stand-By Labor of Ga.,* 230 Ga. 558, 563-564(2), 198 S.E.2d 145 (1973). Here, the contract sought to keep the identities of clients secret as well as what product, security, insurance, or service was provided to each of them. Id. at 564, 198 S.E.2d 145. The restraint was reasonably tailored to the protection of such information. By the very volatility of the stock and commodity markets and the nature of renewal premiums on insurance, such information has a short period of value once the employee leaves. Thus, the evidence showed that defendants only sought a two week head-start on Witty in contacting their clients in order to protect their information and customer lists. From the evidence, a weekend was

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)

enough to salvage approximately two thirds of the clients for the defendants. Documents, records, and other papers as property were to be protected indefinitely.

[15] (c) Contrary to the contentions of the plaintiffs, the non-disclosure provision of the contract was not invalid, and plaintiffs were not entitled as a matter of law to either a directed verdict or to a judgment notwithstanding the verdict. *Nunn v. Orkin Exterm. Co.,* supra at 560, 350 S.E.2d 425. Where there is any evidence to support the jury verdict, it is proper to affirm the denial of the motions, unless it is demanded as a matter of law, because the jury is the sole and exclusive judge of the weight and credit to give to the evidence. *General Ins. Svcs. v. Marcola,* 231 Ga.App. 144, 145(2), 497 S.E.2d 679 (1998).

[16] 3. Plaintiffs contend that the trial court erred in submitting to the jury an erroneous and ambiguous special verdict form regarding defendants' breach of contract claim against IJL, in accepting the verdict on such form, and in entering judgment on such verdict form. We do not agree.

**627 Neither the pleadings nor the evidence raised the issue that defendants sued IJL for breach of contract. Instead, defendants tried a tortious interference with contract claim. The only reason that the jury can be thought to have returned a verdict against IJL on the breach of contract count was because the jury verdict form that plaintiffs expressly agreed to submit to the jury provided only for breach of contract, instead of for tortious interference with contract. This was error.

However, IJL made no timely objection about such jury verdict form, but expressly agreed to it. After the verdict was returned, IJL did not object to the verdict or form and could have had the jury polled as to their intent and understanding regarding the verdict *560 returned against IJL for breach of contract. However, IJL failed to do so. Neither in its motions for j.n.o.v. nor for new trial was such objection made.

[17][18][19] (a) If the verdict was illegal and the trial court erroneously accepted the verdict, then plaintiffs were under a duty to timely object to the irregularity before the jury was excused. Plaintiffs' failure to do so waived any defects. A timely objection permits the trial court to reform or remodel the verdict in the presence of the jury before they are excused and saves precious judicial time and resources. *West Ga. Pulpwood &c. Co. v. Stephens,* 128 Ga.App. 864, 870(3), 198 S.E.2d 420 (1973); see *Folds v. Reese,* 140 Ga.App. 291, 292(2), 231 S.E.2d 808 (1976). "Upon hearing an improper verdict rendered, a litigant should not sit silently by, hoping to gain a retrial by failing to object." (Citation omitted.) *Clifton v. Clifton,* 249 Ga. 831, 832, 294 S.E.2d 518 (1982); accord *LaBanz v. Bank South Macon,* 198 Ga.App. 79, 82(1), 400 S.E.2d 357 (1990); *Folds v.*

*Reese,* supra at 292(1), 231 S.E.2d 808.

(b) On plaintiffs' motion for new trial and j.n.o.v., they failed to raise the issue that the judgment was entered against IJL on a theory of breach of contract instead of tortious interference with contract. Since this is not a case of either double recovery, change of the award by the trial court after dispersal of the jury, or the award of punitive damages without actual damages so that the "award was improper as a matter of law," then the objection to the judgment must have been raised in the trial court in plaintiffs' motion for directed verdict, j.n.o.v., or new trial. Otherwise, it is waived. *Ford Motor Co. v. Tippins,* 225 Ga.App. 128, 132-133(4), 483 S.E.2d 121 (1997); *Long v. Marion,* 182 Ga.App. 361, 365(3), 355 S.E.2d 711 (1987); see also *Nalley Northside Chevrolet v. Herring,* 215 Ga.App. 185, 188(5), 450 S.E.2d 452 (1994).

[20] If the judgment from an illegal verdict based upon "improper damages" is objected to for the first time either on motions for new trial or j.n.o.v. or on direct appeal without post trial motions, then such is the first opportunity that the issue could be raised and such is preserved for appellate review. See *Ford Motor Co. v. Tippins,* 132(5), 483 S.E.2d 121; *Long v. Marion,* supra at 365-366(5), 355 S.E.2d 711; *Preferred Risk Ins. Co. v. Boykin,* 174 Ga.App. 269, 276-277(10), 329 S.E.2d 900 (1985). However, this is not such a case. Plaintiffs raised the issue for the first time on appeal and not in their motions for directed verdict, j.n.o.v., or new trial. Therefore, IJL's failure to timely object at the first opportunity as to the form of the judgment results in a waiver of such alleged error. See *First Union Nat. Bank v. Boykin,* 216 Ga.App. 732, 735(1), 455 S.E.2d 406 (1995); see also *Ford Motor Co. v. Tippins,* supra at 133, 483 S.E.2d 121.

[21] 4. Plaintiffs contend that the trial court erred in denying IJL's *561 motion for directed verdict on the defendants' counterclaim for tortious interference with Witty's employment contract. We do not agree.

[22] "Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence." (Citations omitted.) *Taylor v. Ga. Power Co.,* 136 Ga.App. 412, 413(1), 221 S.E.2d 222 (1975); accord *General Ins. Svcs. v. Marcola,* supra at 145, 497 S.E.2d 679.

IJL was a stranger to the employment contract between Witty and the defendants **628 and acted without privilege. While IJL could hire Witty away from the defendants, it had no privilege to induce Witty to terminate his employment with the defendants without giving the defendants two weeks notice as required in the contract. IJL lacked a legitimate economic interest in inducing Witty to terminate

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)

Page 8

the contract early and bring his customer lists with him. *Disaster Svcs. v. ERC Partnership,* 228 Ga.App. 739, 740-741, 492 S.E.2d 526 (1997). In fact, IJL had a wrongful motive in having Witty make the termination immediate without the required notice period; such action gave Witty time to solicit the defendants' clients as soon after the termination that the defendants would not have time to contact their clients first. Witty sought to acquire the clients for IJL to the detriment of the defendants during the two weeks. *Equifax Svcs. v. Examination Mgmt. Svcs., Inc.,* supra at 37, 453 S.E.2d 488. Further, IJL expected Witty to bring some or all of the customer lists, even if he had to hand write them (as he did), so that he could solicit them to move their accounts during the two week period.

Witty breached the notice provision and the nondisclosure provision of the employment contract with the aiding, abetting, and urging of IJL. The defendants lost approximately one third of the clients as a result, either to IJL or others, because the defendants did not have adequate time to properly contact them due to lack of notice.

[23] The elements of tortious interference with contractual relations, business relations, or potential business relations are: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff. See *Disaster Svcs. v. ERC Partnership,* supra at 740, 492 S.E.2d 526; *Renden, Inc. v. Liberty Real Estate &c.,* 213 Ga.App. 333, 334-335(2), 444 S.E.2d 814 (1994). In this case IJL intermeddled with Witty's employment contract to persuade him to come to work for it without giving the required two weeks notice.

*562 The any evidence standard of review for the denial of the motion for directed verdict requires the affirmance of the trial court. *McCannon v. McCannon,* 231 Ga.App. 601(1), 499 S.E.2d 684 (1998); *Doubletree, Inc. v. Schanley,* 226 Ga.App. 776, 487 S.E.2d 506 (1997).

[24][25][26] 5. Plaintiffs contend that the trial court erred in admitting speculative and incompetent evidence of defendants' damages and lost profits. We do not agree.

Where a party sues for specific damages, he has the burden of showing the amount of the loss, and of showing it in such a way that the jury may calculate the amount from the figures furnished, and will not be placed in the position where their allowance of any sum would be mere guesswork.

*National Ref. &c. Co. v. Parmalee,* 9 Ga.App. 725, 726(1), 72 S.E. 191 (1911). "However, the party does not lose his

right of action for the damages because he can not furnish exact figures." Id. at 726, 72 S.E. 191. "The rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages." (Citations and punctuation omitted.) *Molly Pitcher Canning Co. v. Central of Ga. R. Co.,* 149 Ga.App. 5, 11(4), 253 S.E.2d 392 (1979); see also *Second Continental v. Atlanta E-Z Builders,* 237 Ga.App. 304, 514 S.E.2d 846 (1999). The losses must be directly traceable to the acts of the other party. *Grossberg v. Judson Gilmore Assoc.,* 196 Ga.App. 107, 109(2), 395 S.E.2d 592 (1990). Such was done in this case.

[27] "It is the general rule in this state, when the owner of a business seeks to recover lost profits, that recovery can be had only if the business has a proven 'track record' of profitability." *Stern's Gallery of Gifts v. Corp. Property Investors,* 176 Ga.App. 586, 592(3), 337 S.E.2d 29 (1985). Here, this was a going concern with a history of profits; therefore, lost profits can be shown by the evidence of past earnings, expenses, and profits with reasonable certainty to enable **629 the jury to calculate the damages. *Radlo of Ga. v. Little,* 129 Ga.App. 530, 534(2), 199 S.E.2d 835 (1973); accord *Topvalco, Inc. v. Garner,* 210 Ga.App. 358, 361(3), 436 S.E.2d 25 (1993).

While plaintiffs repeatedly objected to the defendants' evidence of damages, plaintiffs never made the specific objection urged before this Court for the first time that expenses must be deducted from earnings to establish lost profits. Plaintiffs waived its objection to the admission of evidence of loss profits without proof of expenses for failure to assert such reason before the trial court, because the objection at trial must be on the specific ground enumerated as error on appeal and not as a new ground raised for the first time on appeal. See *Williams v. State,* 191 Ga.App. 217, 218(2), 381 S.E.2d 399 (1989); *Bryant v. State,* 182 Ga.App. 609, 610(1), 356 S.E.2d 698 (1987); see also *Yelverton v. State,* 199 Ga.App. 41, 43-44(2), 403 S.E.2d 816 (1991). [FN1]

FN1. However, the testimony in the transcript was that there were no additional costs related to the commissions lost, because the overhead was fixed.

[28] *563 In this case, the defendants had an established business with a record of profits after deduction of expenses. Therefore, the trial court did not abuse its discretion in admitting such evidence.

[29] 6. Finally, plaintiffs contend that the award of $82,690 against IJL was not authorized by the evidence and was grossly excessive. We do not agree.

The testimony of Jansson, J.C. Armstrong, and Karen Suggs

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

521 S.E.2d 619
99 FCDR 3103
(Cite as: 239 Ga.App. 554, 521 S.E.2d 619)

Page 9

showed that Witty's leaving without two weeks prior notice cost the defendants $165,379.99 over three years in lost commissions from clients that they lost to Witty or others and that there were no expenses attached to such commissions, because the overhead was fixed. Such evidence was sufficient to create a jury question as to damages, which can be determined with reasonable accuracy, and to support the verdict for lost profits. *Gipson v. Phillips,* 232 Ga.App. 235, 236, 501 S.E.2d 570 (1998); *R.T. Patterson Funeral Home v. Head,* 215 Ga.App. 578, 584-585(4), 451 S.E.2d 812 (1994) (physical precedent only); *Crosby v. Spencer,* 207 Ga.App. 487, 488(1), 428 S.E.2d 607 (1993); *Bowdish v. Johns Creek Assoc.,* 200 Ga.App. 93, 96(4), 406 S.E.2d 502 (1991).

[30] The award of $82,690 was within the range of the evidence before the jury. Absent a showing that the jury verdict was so flagrantly excessive as to shock the conscience, creating a clear implication of bias, prejudice, or gross mistake on the part of the jurors so as to warrant a new trial, the appellate court will not disturb a verdict approved by the trial court. *Morris v. Savannah Valley Realty,* supra at 765(4), 505 S.E.2d 259; *Wells v. Roberts,* 225 Ga.App. 112, 113(1), 483 S.E.2d 339 (1997).

*Judgment affirmed.*

POPE, P.J., and SMITH, J., concur.

521 S.E.2d 619, 239 Ga.App. 554, 99 FCDR 3103

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

57

58 S.E. 551

2 Ga.App. 361

**(Cite as: 58 S.E. 551)**

Page 1

**C**

Court of Appeals of Georgia.

WOODRUFF et al.

v.

HUGHES.

**No. 405.**

July 18, 1907

Syllabus by the Court.

Where civil liability for a conspiracy is sought to be imposed, the conspiracy of itself furnishes no cause of action. The gist of the action is not the conspiracy alleged, but the tort committed against the plaintiff and the damage thereby done.

[Ed. Note.-For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 4, 5.]

A conspiracy is the combining of two or more persons for the purpose of doing something unlawful, oppressive, or immoral, as a means or an end. The allegation and proof of conspiracy is important to the action only because it will enable the plaintiff to recover his damages in case the conspiracy can be proved, not only from the actual participants engaged in committing the injury, but also from those defendants who conspired to accomplish it, although neither present nor participating. An averment that the acts alleged were done in pursuance of a conspiracy does not change the nature of the action, but it may be pleaded and proved as aggravating the wrong of which the plaintiff complained, and to enable him to recover against all the conspirators as joint tort-feasors, or (in case no conspiracy be shown) that the plaintiff may *552 still recover against such of the defendants as may be guilty of the tort.

[Ed. Note.-For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 1, 2.]

In an action on the case for conspiracy, the allegation with reference to the combination, conspiring, and concert of action are mere matters of inducement leading up to the relation of the acts from which conspiracy may be inferred. To show conspiracy, it is not necessary to prove that the parties met together or entered into any specific or formal agreement, or that by words or writing they formulated their unlawful objects. Proof that two or more persons, either positively or tacitly, come to an understanding that they will accomplish an unlawful design, or a lawful design unlawfully, is sufficient.

Possession of realty is presumed to be lawful until the contrary appears, and, where possession is alleged, that such

possession is lawful is such a conclusion as can properly be pleaded.

In neither petition nor answer is an exhaustive statement of the exact evidence upon which a party will rely in the establishment of his contentions required. On the contrary, so far as matters of inducement and other minor matters are concerned, a clear, brief statement of immaterial matters (the briefer the better) is to be commended.

[Ed. Note.-For cases in point, see Cent. Dig. vol. 39, Pleading, § 31.]

There was no error in overruling the demurrer.

Error from City Court of Atlanta; H. M. Reid, Judge.

Action by J. A. Hughes against G. W. Woodruff and others. G. W. Woodruff was dismissed for want of proper service, and from a judgment for plaintiff the other defendants bring error. Affirmed.

West Headnotes

**Conspiracy** 💬2
91k2 Most Cited Cases

A conspiracy is the combining of two or more persons for the purpose of doing something unlawful, oppressive, or immoral, as a means to an end.

**Conspiracy** 💬5
91k5 Most Cited Cases

Where civil liability for a conspiracy is sought to be imposed the gist of the action is not the conspiracy alleged, but the tort committed against plaintiff and the damage thereby done.

**Conspiracy** 💬18
91k18 Most Cited Cases

In an action on the case for conspiracy, the allegation and proof of conspiracy is important to the action only because it will enable plaintiff to recover his damages in case the conspiracy can be proved, not only from the actual participants engaged in committing the injury, but also from those defendants who conspired to accomplish it, though neither present nor participating.

**Conspiracy** 💬19
91k19 Most Cited Cases

In an action on the case for conspiracy, the allegation with reference to the combination, conspiring, and concert of action are mere matters of inducement, leading up to the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

58 S.E. 551                                                                       Page 2
2 Ga.App. 361
**(Cite as: 58 S.E. 551)**

relation of the acts from which conspiracy may be inferred, and to show conspiracy it is not necessary to prove that the parties met together or entered into any specific or formal agreement, or that by words or writing they formulated their unlawful objects, but proof that two or more persons, either positively or tacitly came to an understanding to accomplish an unlawful design, or a lawful design unlawfully, is sufficient.

**Pleading ⟳8(11)**
302k8(11) Most Cited Cases

Where possession is alleged, that such possession is lawful is such a conclusion as can properly be pleaded; possession of realty being presumed to be lawful until the contrary appears.

**Pleading ⟳11**
302k11 Most Cited Cases

In neither petition nor answer is an exhaustive statement of the exact evidence on which a party will rely in the establishment of his contentions required; on the contrary, so far as matters of inducement and other minor matters are concerned, a clear brief statement of immaterial matters is to be commended.

Payne, Jones & Jones, for plaintiffs in error.

R. B. Blackburn and Westmoreland Bros., for defendant in error.

RUSSELL, J.

J. A. Hughes brought suit in the city court of Atlanta against G. W. Woodruff, E. Woodruff, J. C. Gentry, Robert P. Jones, and Winfield Jones, to recover damages for an alleged conspiracy to oust the plaintiff from the lawful possession of certain premises. Some time after the institution of the suit, G. W. Woodruff was dismissed as a party defendant, on account of failure to properly serve him with copy process. To the original petition, the defendants, jointly and severally, demurred generally, as well as specially. The demurrer, on being heard before his honor, Judge Reid, was overruled. To the order overruling said general and special demurrers, the defendants except. The petition alleges, in substance, that on the 3d of February, 1906, the plaintiff was in lawful possession of a certain house and lot in the city of Atlanta, known as "No. 16 Railroad street," having been in lawful possession thereof from the 10th of January, 1906, up to and including the 3d of February, 1906; that the defendants, conspiring and confederating for the purpose of evicting the plaintiff from said premises, undertook forcibly to eject him therefrom, failing in which, one of the defendants, acting for and on behalf of the others, caused a warrant to issue against the plaintiff charging him with the offense of criminal trespass;

and that under said warrant the plaintiff was arrested and carried before a magistrate, where, upon securing his recognizance bond, he was released from custody. The petition thereupon proceeds to allege that, being released from custody, the plaintiff returned to the said premises, unlocked the door, he having the keys of said house in his custody, and went into the house, and found therein and on the premises agents and servants of the defendants; that immediately thereafter and on the same day the defendants, still further carrying out the conspiracy, caused a warrant to issue charging the plaintiff with the offense of forcible entry and detainer, under which warrant plaintiff was arrested, incarcerated in jail for four or five hours, and, upon giving his bond, was finally released from custody; that, after being released the second time, the plaintiff repaired to said premises and undertook to repossess himself thereof, but was by force and violence on the part of the defendants prevented from repossessing himself of said property, and that the defendants took possession thereof and retained the same over his objection and protest; that, the warrants coming on to be heard, the magistrate dismissed them, and plaintiff was discharged from custody; that both of the warrants were sued out maliciously and without probable cause, defendants well knowing that the plaintiff was in lawful possession of said premises and had not committed the crimes charged in said warrants; that said prosecutions were pressed against him maliciously and without probable cause, there being aggravating circumstances both in act and intention in the conduct of proceedings against him; and that the plaintiff, by reason of said conduct on the part of said defendants, was greatly wounded in his feelings, held up to contempt and ridicule, and humiliated in the extreme. It is alleged that both of the prosecutions alleged were a part of one and the same scheme, conspiracy, and confederation of the defendants to oust the plaintiff from the possession of said property and gain the physical possession thereof. The plaintiff seeks punitive as well as actual damages, and asks judgment against the defendants in the sum of $10,000.

We will first consider the general demurrer of the defendants alleging that the petition sets forth no cause of action, because, if that contention is well taken, the special demurrers need not be considered. We think the petition sets forth such a cause of action as will withstand the general demurrer. It has *553 been frequently said that there is no legal term of which it is more difficult to give an exact definition than conspiracy, and yet its essentials are easily enumerated. "The elements of a conspiracy are: (a) The confederating: The combining together of two or more persons. (b) The intent: For the purpose. (c) The object: Of doing something unlawful or oppressive, or immoral, as a means of an end." Eddy on Combinations, § 365, p. 238. The law of civil conspiracy is only an extension of the law of criminal conspiracy, and, as far as rights and remedies are concerned, all criminal conspiracies are embraced within

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

civil conspiracies. In a criminal conspiracy, the conspiring together is the essence of the charge. It must be either to do an unlawful act or to do a lawful act by criminal or unlawful means, but proof of the conspiracy to do either will authorize a conviction. On the other hand, where civil liability for a conspiracy is sought to be imposed, the conspiracy of itself furnishes no cause of action. The gist of the action is the damage, and not the conspiracy. As said by Devens, J., in Boston v. Simmons, 150 Mass. 463, 23 N. E. 211, 6 L. R. A. 629, 15 Am. St. Rep. 230: "The averment of a conspiracy in the declaration does not ordinarily change the nature of the action, nor add to its legal force or effect. The gist of the action is not the conspiracy alleged, but the tort committed against the plaintiff and the damage thereby done wrongfully. Where damage results from an act which, if done by one alone, would not afford ground of action, the like act would not be rendered actionable because done by several in pursuance of a conspiracy. On the other hand, when the tort committed and the damage resulting therefrom proceed from a series of connected acts, the averment that they were done by several in pursuance of a conspiracy does not so change the nature of the action, that, if the wrongful acts are shown to have been done by one only, it cannot be maintained against him alone, and the other defendants exonerated." Whether a conspiracy be civil or criminal, if the person who is the object of such conspiracy is damage, he has his remedy in an action on a case. As pointed out in 8 Cyc. 645, the statement that the conspiracy is not itself the cause of action has two meanings: (1) That the conspiracy is executed to the injury of another; and (2) that the conspiracy will not render an act unlawful which is lawful when committed by one. But all parties to a conspiracy are jointly and severally liable for damages occasioned by the unlawful combination and acts done by any one of the conspirators in furtherance of a common object become the acts of all. Conceding, then, that averments that the acts alleged were done in pursuance of a conspiracy does not change the nature of the action or add anything to its legal effect, the allegation and proof of conspiracy is important to the action only because it will enable the plaintiff to recover his damages against such of the defendants as may be shown to be guilty of the tort, even should he fail to prove a conspiracy or concerted design; and it may be pleaded and proved as aggravating the wrong of which the plaintiff complains and to enable him to recover against all the defendants as joint tort-feasors. If the conspiracy can be proved, the party wronged may look beyond the actual participants in committing the injury and join with them as defendants whoever conspired to accomplish it. "An action will not lie for the greatest conspiracy imaginable, if nothing be put in execution; but, if the party be damaged, the action will lie." Savile v. Roberts, 1 Ld. Raym. 374.

In passing upon the general demurrer, then, only two questions need be considered: Were sufficient facts alleged in the petition to set forth and constitute a conspiracy within the above definition? And does it appear that the plaintiff was damaged by reason thereof? If both of these questions be answered in the affirmative (as we think they should be), then there was no error in overruling the general demurrer. The law recognizes the intrinsic difficulty of proving a conspiracy. The allegations with reference to conspiracy are treated as matters of inducement leading up to a more particular description of the acts from which conspiracy may be inferred. It has even been held that, when it becomes necessary to prove a conspiracy in order to connect the defendant with the wrong complained of, no averment of the conspiracy need be made in the pleadings to entitle it to be proved. Parker v. Huntington, 2 Gray (Mass.) 124. Less certainty is required in setting out matters of inducement than in setting out the gist of the action. We think, therefore, that paragraph 3 of the plaintiff's petition sufficiently sets forth a conspiracy between the defendants to enable him, if he can, to hold all of them liable as joint tort-feasors, and to aggravate and increase his damages should he be found to be entitled to any. The conspiracy may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances. The rule is to allow great latitude in setting out in the complaint the particular act upon which the conspiracy is to be inferred, and even to allow individual acts of the conspirators to be averred. "To show conspiracy, it is not necessary to prove an express contract or agreement to the parties thereto. The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally, or entered into any explicit or formal agreement, nor is it essential that it should appear that either by words or by writings they formulated their unlawful objects. It is sufficient that two or more persons in any manner either positively or tacitly come to a mutual *554 understanding that they will accomplish the unlawful design. And any one, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto as if he had been an original member." 1 Eddy on Comb. § 368. The petition, then, sufficiently alleged "the combining together of two or more persons." It also alleged the intent (for the purpose) of evicting plaintiff from the premises described. Then was the object of their conspiracy, either in the means used or in the end sought to be attained, unlawful, oppressive, or immoral? According to the allegations of the petition, the means used to accomplish the eviction was the unlawful and malicious use of legal process. According to those allegations, two warrants without any foundation were sworn out against the plaintiff. He was twice arrested, was confined in jail, and subjected to humiliation without cause. If these allegations be true, even if the defendants had the right to the possession of the premises, they used unlawful and immoral means to obtain it. If this action was taken in pursuance of a common intent, understanding, or design, all

58 S.E. 551
2 Ga.App. 361
(Cite as: 58 S.E. 551)

Page 4

who participated in the acts alleged would be liable. If the proof failed to show conspiracy, then any one guilty of either of the unlawful means by which petitioner was damaged (if he was damaged as alleged) should respond. In view of what has been said above, there was no error in overruling the general demurrer. The conspiracy was sufficiently alleged. It is immaterial whether the act which it is alleged the defendant intended to do was or was not unlawful, oppressive, or immoral. "Conspiracy is the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means." 1 Eddy on Comb. § 171. The means alleged, in either event, were unlawful and oppressive. The damages were such as were connected with and would naturally flow from the tortious acts alleged. The damages being the gravamen of the action, the act or acts causing such damages are required to be set forth with particularity; but no complaint is made upon this score by defendants, and, indeed, we think there is no room for such complaint.

The defendants demurred specially as follows:

(1) To the allegation in paragraph 2 of the petition, that plaintiff was in lawful possession of a certain house and lot in the city of Atlanta, etc., on the ground that the allegation is a mere conclusion of the pleader and not based upon any alleged facts to substantiate it; and to the allegation in the same paragraph with reference to the length of time which plaintiff's lawful possession is stated to have existed, upon the same ground; and because it is not shown, by the allegation of said paragraph alone or in conjunction with other paragraphs of the petition, by virtue of what authority, right, interest, or title, or by consent or authority of what person holding title or right of possession of said premises the plaintiff was in lawful possession of said premises. We think that this demurrer was properly overruled, because, if it is specific enough to reach the word "lawful" as being the conclusion of the pleader, it would not be well taken, because possession is presumed to be lawful until the contrary appears, and the statement that the possession was lawful would be such a conclusion as naturally followed the statement of possession. For the same reason, it is not necessary for the petitioner to state by what authority or title he is in possession. Indeed, from our standpoint, the matter is entirely immaterial, because it is a statement made by the way of inducement leading up to the tort alleged later in the petition.

(2, 3) The second ground of demurrer complains specially to the allegation that "the defendants each and all confederated and conspired together for the purpose of evicting plaintiff from said premises," on the ground that said allegation

neither by itself, nor with conjunction with other paragraphs of the petition, alleges any circumstances upon which the conspiracy can be based. As we have already stated, the conspiracy is not the cause of action, and the statement of conspiracy is only for the purpose of aggravating the damages and of joining defendants who may have conspired, and yet have not personally participated in the acts done. This demurrer is settled by the case of Parker v. Huntington, above cited. And, for the same reason, the statement in the petition in regard to defendants causing Winfield Jones to appear before a justice of the peace and make oath that the plaintiff had committed the offense of forcible entry and detainer is sufficiently ample.

(4, 5) Defendants demur specially to the allegation that plaintiff "sought to repossess himself thereof, but was by force and violence, menace, and threats made by defendants, their agents and servants, prevented from repossessing himself of said property," on the ground that it is not alleged by what authority or title the plaintiff sought to repossess himself, and because it is not alleged how the parties seeking to prevent the plaintiff from entering the premises were the agents of the defendants. They also demurred specially to the allegation that "the defendants, their agents and servants, took possession thereof and retained the same," on the ground that the allegation does not show that the defendants, their agents and servants, had no authority or right to take possession of said premises. We think this special demurrer was properly overruled, not *555 only because it fails "to put its finger on the point" by specifically stating what further allegation should have been made, but also because no amendment was necessary. It is impossible and impracticable for a pleader to do more than state the fact upon which he relies. He is not required to insert in his petition or plea a statement of the evidence upon which he expects to rely any more than to give the names of the witnesses by whom he hopes to establish his contentions. The same ruling applies to the fifth special ground of demurrer.

(6) The sixth special ground of demurrer complains that the plaintiff fails to show any facts constituting lawful possession on the part of the plaintiff, or how the defendants could have known of such alleged lawful possession. As already stated in ruling upon the first demurrer, the insertion of the word "lawful" was a conclusion properly to be derived from the other facts stated, and could be averred. And, in the absence of proof to the contrary, the defendants would be presumed to have notice and knowledge of the character and extent of the plaintiff's possession. Defendant also demurs to the statement of the petition contained in paragraph 11, "there being aggravating circumstances, both in act and intent, *** and said acts were wanton and willful and oppressive in the extreme," the demurrer being that the allegation fails to show how the act and intent of defendants

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

were wanton and willful, and of what the aggravating circumstances consisted. We think it clear that the aggravating circumstances and the wanton, willful, and oppressive conduct of the defendants can well be derived from the allegation with reference to the issuance of the warrant and the arrest thereunder. If those allegations are proved, the jury would have the right to infer that the act and conduct of the defendants were willful and wanton and oppressive in the extreme.

(7) The seventh special ground of demurrer, that the allegations of the petition failed to show any facts or circumstances upon which the conspiracy to oust the plaintiff from possession is based, was without merit; for, as hereinbefore ruled, no averment is necessary on the subject of conspiracy further than that one was entered into between the defendants.

(8, 9, 10) The eighth, ninth, and tenth special grounds of demurrer were properly overruled, because, although the petition may have contained the statement of facts which might have constituted separate and distinct causes of action and alleged acts done at different times, and differing in character, still each of these acts, as clearly appears from the petition, are state to have been done in pursuance of and with a sole view to effectuate the illegal conspiracy, unlawfully to deprive the plaintiff of his possession of the premises.

The allegations of plaintiff's petition are consistent, and will entitle him, if proved as laid, to a recovery. A conspiracy to oust him by unlawful means from premises of which he was in possession is alleged. The unlawful acts used in carrying out the intent and purpose formed are fully detailed, and his damages, flowing from these acts, are set forth.

Judgment affirmed.

58 S.E. 551, 2 Ga.App. 361

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

_ *58* _

(

43 U.S.P.Q.2d 1440

1997 WL 440268 (Trademark Tr. & App. Bd.)

**(Cite as: 43 U.S.P.Q.2d 1440)**

Page 1

▷

Woodstock's Enterprises Inc. (California)

v.

Woodstock's Enterprises Inc. (Oregon)

Cancellation No. 21,229

U.S. Patent and Trademark Office Trademark Trial and Appeal Board

Decided June 26, 1997
Released June 27, 1997

United States Patents Quarterly Headnotes

## TRADEMARKS AND UNFAIR TRADE PRACTICES
[1] Registration and its effects — Federal registration -- Procedure, form, and content — Applications (Section 315.0303.01)
Practice and procedure in Patent and Trademark Office — Fra ud or inequitable conduct (Section 325.07)
Trademark application oath is phrased in terms of subjective belief, thereby making it extremely difficult to prove fraud so long as signer has honestly held, good faith belief, and this wording of oath in terms of applicant's "belief" precludes definitive statement by affiant that could ordinarily be used to support charge of fraud.

## TRADEMARKS AND UNFAIR TRADE PRACTICES
[2] Practice and procedure in Patent and Trademark Offic e — Fraud or inequitable conduct (Section 325.07)
President of respondent Oregon corporation, at time she signed oath in application for registration of "Woodstock's" marks for restaurant services, had good faith belief that respondent was owner of mark and that "Woodstock's" corporations in California did not have right to use registered mark without respondent's authorization, since it is undisputed that respondent is senior user of "Woodstock's" marks, and since record shows that Oregon restaurant and five California restaurants had all appearances of being chain of "Woodstock's" pizza parlors with common ownership; respondent's failure to disclose permissive use by California junior users is irrelevant and could not have been material to grant of federal registration to respondent.

## TRADEMARKS AND UNFAIR TRADE PRACTICES
[3] Practice and procedure in Patent and Trademark Offic e — Fraud or inequitable conduct (Section 325.07)
Cancellation petitioner has failed to prove that respondent Oregon corporation obtained registration for "Woodstock's" mark for restaurant services through fraudulent application oath of its president, who failed to disclose that five independent corporations in California owned and used "Woodstock's" mark, since even if respondent's president,

who was also president of California corporations at time she signed oath, was less than candid with her fellow board members and shareholders, her actions do not taint her underlying good faith belief that respondent corporation, as undisputed senior user of mark, was entitled to unrestricted federal registration.

## TRADEMARKS AND UNFAIR TRADE PRACTICES
[4] Acquisition, assignment, and maintenance of marks -- Abandonment — In general (Section 305.0701)
Maintenance of exclusivity of rights in mark is not required in order to avoid finding of abandonment, since few longstanding trademarks could survive such rigid standard; rather, so long as at least some purchasers identify respondent with registered mark, it cannot be held that respondent's course of conduct has caused registered mark to lose its significance as source indicator.

## TRADEMARKS AND UNFAIR TRADE PRACTICES
[5] Acquisition, assignment, and maintenance of marks -- Abandonment — In general (Section 305.0701)
Cancellation petitioner's right to continue to use registered mark is not determinative of whether respondent has abandoned mark, since focus must be on what rights, if any, respondent has in registered mark, and since mark becomes abandoned only when it loses its significance as indication of origin, rather than as sole identification of source; thus, regardless of whether petitioner has right to use "Woodstock's" mark for restaurant services, fact that registered "Woodstock's Pizza Parlor" and design identifies respondent as one of two sources of restaurant services negates any inference of abandonment.

## TRADEMARKS AND UNFAIR TRADE PRACTICES
[6] Acquisition, assignment, and maintenance of marks — Abandonment — In general (Section 305.0701)
Rationale behind finding abandonment of mark where licensor has failed to exercise quality control over licensee's operations is that public has right to expect consistent quality of goods or services associated with trademark or service mark; in present case, "Woodstock's" mark for restaurant services retains it source-identifying function so long as customers can expect consistent level of quality.

## TRADEMARKS AND UNFAIR TRADE PRACTICES
[7] Acquisition, assignment, and maintenance of marks -- Abandonment -- In general (Section 305.0701)
Cancellation respondent has not abandoned its "Woodstock's" mark for restaurant services by failing to exercise quality control over its licensee's operations, even though there has never been formal system of quality control over such operations, since inference of abandonment is not drawn if satisfactory quality has been maintained, such that no deception of purchasers has occurred, and since registered mark in present case has not

43 U.S.P.Q.2d 1440
1997 WL 440268 (Trademark Tr. & App. Bd.)
(Cite as: 43 U.S.P.Q.2d 1440)

Page 2

ceased to function as indicator of origin, and quality of services has, by all accounts, remained at acceptable level.

*1441 Service mark cancellation no. 21,229 brought by Woodstock's Enterprises Inc. (California) against Woodstock's Enterprises Inc. (Oregon), owner of registration no. 1,614,417, issued September 18, 1990 ("Woodstock's Pizza Parlor" and design, for restaurant services). Petition dismissed.

Kenneth S. Klarquist and James E. Geringer, of Klarquist, Sparkman, Campbell, Leigh & Whinston, Portland, Ore., for petitioner Woodstock's Enterprises Inc. (California).

Nancy J. Moriarty and J. Peter Staples, of Chernoff, Vilhauer, McClung & Stenzel, Portland, for respondent Woodstock's Enterprises Inc. (Oregon).

Rice, Cissel, and Quinn, administrative trademark judges.

Quinn, administrative trademark judge.

Woodstock's Enterprises, Inc., a California corporation (hereinafter "petitioner" or "Woodstock's Enterprises, Inc.-California"), has petitioned to cancel the registration issued to Woodstock's Enterprises, Inc., an Oregon corporation (hereinafter "respondent" or "Woodstock's Enterprises, Inc.- Oregon"), for the mark shown below for "restaurant services." [FN1]



*1442 As grounds for cancellation, petitioner alleges that respondent committed fraud on the Office in obtaining its registration. More specifically, petitioner alleges that respondent obtained the involved registration through the fraudulent application oath of its president, Carol Lee Woodstock, who intentionally failed to disclose that five independent corporations in California owned and used the mark WOODSTOCK'S in connection with pizza restaurant services in California. Petitioner further alleges, in an amended petition for cancellation, that the registered mark has been abandoned due to respondent's failure to exercise control over the nature and quality of the services rendered by the restaurants in California.

Respondent, in its answer, denied the salient allegations of the petition for cancellation.

The record is voluminous, consisting of the pleadings; the file of Registration No. 1,614,417; trial testimony, with

related exhibits, taken by each party; and a discovery deposition, with related exhibits, and a state of Washington trademark registration introduced by way of petitioner's notice of reliance. [FN2] Both parties filed briefs on the case. Both parties were represented by counsel at an oral hearing held before the Board.

This case presents a story of a successful business relationship gone sour, a situation brought on principally by the untimely deaths of Chuck Woodstock, the founder of the WOODSTOCK'S pizza parlors, and Michael Chew, his friend and business partner in the expansion of Mr. Woodstock's pizza restaurant business. We turn, at the outset, to recount generally the pertinent chronological history that has culminated in the present litigation.

The story begins in 1977 when Charles "Chuck" Woodstock formed respondent and opened the original WOODSTOCK'S pizza restaurant in the college town of Corvallis, Oregon, home of Oregon State University. Mr. Woodstock served as the president and 100 percent shareholder of Woodstock's Enterprises, Inc.-Oregon. Mr. Woodstock's motto, among others, was "the best pizza for the best price." Chuck Woodstock followed up his Oregon endeavor in 1981 when he and Michael Chew formed Woodstock's Enterprises, Inc.-California, and opened the first of five WOODSTOCK'S PIZZA PARLOR restaurants in California. This first restaurant is located in San Luis Obispo. Messrs. Woodstock and Chew each owned 50 percent of the corporation. They later opened four other restaurants, each time forming a new corporation and taking in additional investors. The second California corporation, Woody, Woodstock, Chew, Inc., was formed by Michael Chew, Chuck Woodstock and Mr. Woodstock's brother, Larry Woodstock. This corporation opened a restaurant in Isla Vista, California, near Santa Barbara, in 1982. The next restaurant opened in 1983 in Chico, California; this restaurant was owned by Woodstock's Enterprises Chico, Inc., with Michael Chew, Chuck Woodstock and John Broadbent as shareholders. Subsequently, Michael Chew, Chuck Woodstock and Jeff Ambrose formed Woodstock's Enterprises San Diego, Inc. which opened a restaurant in San Diego, California in March 1985. Lastly, Michael Chew and Chuck Woodstock formed Woodstock's Enterprises Davis, Inc. (Tammy Rumpel later became an investor) which opened a restaurant in Davis, California in December 1985.

Chuck Woodstock and Michael Chew were killed in a private plane crash on December 9, 1985. The ownership interests of Messrs. Woodstock and Chew passed to their heirs, leaving Carol Woodstock, Chuck Woodstock's widow, as 100 percent owner of Woodstock's Enterprises, Inc.- Oregon, and various individuals, including Ms. Woodstock, as owners of the California corporations.

COPR. © 2004 The Bureau of National Affairs, Inc.

43 U.S.P.Q.2d 1440

1997 WL 440268 (Trademark Tr. & App. Bd.)

**(Cite as: 43 U.S.P.Q.2d 1440)**

As a result of the deaths mentioned above, the shareholders in the Oregon and California corporations held an election for a new president. Carol Woodstock was elected, on January 23, 1986, president of each of the Woodstock's corporations, that is, of both petitioner and respondent, as well as of each of the other California corporations.

On May 17, 1989, Carol Woodstock, as president of Woodstock's Enterprises, Inc.- Oregon, signed an oath that she believed respondent to be the owner of the mark WOODSTOCK'S PIZZA PARLOR and design and that, to the best of her knowledge, no other person, firm or corporation or association had the right to use the mark in commerce without authorization by respondent. The oath supported the underlying application **\*1443** to register WOODSTOCK'S PIZZA PARLOR and design that was filed on October 23, 1989 in the name of respondent. It is the registration that issued from this application that petitioner now seeks to have canceled.

Carol Woodstock's presidency continued until August 14, 1990, at which time a special meeting of the board of directors of Woodstock's Enterprises, Inc.- California was held. By a majority vote, the board decided to remove Carol Woodstock as president of the California corporations. The testimony reveals that board members were unhappy with her performance, alleging inaccessibility and lack of direction. The board further resolved to appoint Jeff Ambrose, part owner of the San Diego restaurant and general manager of the California restaurants, as president of the California corporations. At the same meeting, Carol Woodstock indicated that she was willing to sell her shares in the California restaurants.

Although the record reveals a number of proposals (from both those within the corporations and those outside the corporations) relating to the purchase/sale of the California restaurants, nothing in this regard was ever consummated. What did take place was an assignment involving trademark rights between Woodstock's Enterprises, Inc.-California and the other California corporations. By way of the assignment agreement dated October 1, 1992, the California corporations assigned to Woodstock's Enterprises, Inc.- California all of their respective rights to the marks WOODSTOCK'S and WOODSTOCK'S PIZZA. Contemporaneously, Woodstock's Enterprises, Inc.-California granted back licenses to each of the other California corporations to use the aforementioned marks in connection with their restaurant services.

Against this general historical background, we now turn to consider the two grounds for cancellation, namely fraud and abandonment.

*FRAUD*

Petitioner alleges that respondent committed fraud on the Patent and Trademark Office because respondent's president, Carol Woodstock, failed to disclose, when respondent filed its application for the registration now sought to be canceled, the rights of the respective California corporations. Among other things, petitioner places importance on the fact that a California state trademark registration of the mark WOODSTOCK'S PIZZA PARLOR was issued in 1983 in the name of petitioner.

Carol Woodstock, in her capacity as president of respondent, executed the oath supporting the underlying application on May 17, 1989. Ms. Woodstock's oath included the following statements:

. . . she believes the applicant to be the owner of the mark sought to be registered; to the best of her knowledge and belief, no other person, firm, corporation or association has the right to use the mark in commerce *without authorization by the applicant,* either in the identical form or in such near resemblance thereto as to be likely, when applied to the services of such other person, to cause confusion, or to cause mistake or to deceive . . . [emphasis added]

The application was filed on October 23, 1989. At the time that the statements were made, and five months later when the application was filed, Ms. Woodstock was president (and sole shareholder) of Woodstock's Enterprises, Inc.-Oregon and president (and part shareholder) of each of the California corporations, including petitioner, as well as a member of the board of directors of each of the California corporations. No reference to the California corporations was made in the application.

In considering the charge of fraud here, the following principles control:

Fraud implies some intentional deceitful practice or act designed to obtain something to which the person practicing such deceit would not otherwise be entitled. Specifically, it involves a willful withholding from the Patent and Trademark Office by an applicant or registrant of material information which, if disclosed to the Office, would have resulted in disallowance of the registration sought or to be maintained. Intent to deceive must be "willful." If it can be shown that the statement was a "false misrepresentation" occasioned by an "honest" misunderstanding, inadvertence, negligent omission or the like rather than one made with a willful intent to deceive, fraud will not be found. Fraud, moreover, will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true or that the false statement is not material to take issuance or maintenance of the registration. It does appear that the very nature of the fraud requires that it be proven "to the hilt" with clear and convincing evidence. There is not **\*1444** room for speculation, inference or

COPR. © 2004 The Bureau of National Affairs, Inc.

43 U.S.P.Q.2d 1440
1997 WL 440268 (Trademark Tr. & App. Bd.)
(Cite as: 43 U.S.P.Q.2d 1440)

Page 4

surmise and, obviously, any doubt must be resolved against the charging party.

First International Services Corp. v. Chuckles Inc., 5 USPQ2d 1628, 1634 (TTAB 1988); and Smith International, Inc. v. Olin Corp., 209 USPQ 1033, 1043-44 (TTAB 1981). See also: Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986). See generally: J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* Sections 31:76-31:77 (4th ed. 1996).

[1] The first thing that should be noted about the application oath is that it is phrased in terms of a subjective belief, thereby making it extremely difficult to prove fraud so long as the signer has an honestly held, good faith belief. The Board has noted in the past that the wording of the oath in terms of a "belief" of applicant "preclude [s] a definitive statement by the affiant that could be ordinarily used to support a charge of fraud." Kemin Industries, Inc. v. Watkins Products, Inc., 192 USPQ 327 (TTAB 1976). [FN3] Another noteworthy point about the specific oath under consideration here is that it contains additional language not usually found in boilerplate application oaths, namely, that "to the best of [Carol Woodstock's] knowledge and belief, no other person, firm, corporation or association has the right to use the mark in commerce *without authorization by [Woodstock's Enterprises, Inc.- Oregon]* . . ." (additional language is highlighted)

Upon careful consideration of the record, we find that Carol Woodstock reasonably held, at the time she signed the application oath, an honest, good faith belief that her corporation, Woodstock's Enterprises, Inc.- Oregon, as the senior user of the registered mark, was the owner of the mark and that the California corporations did not have the right to use the registered mark without respondent's authorization.

There is no dispute over the fact that respondent is the senior user of the WOODSTOCK'S marks. Further, while it is true that the subsequent California restaurants were owned by separate entities, the record shows that the Oregon restaurant and the five California restaurants had all the appearances of being a chain of WOODSTOCK'S pizza parlors. Having said this, we also recognize that there is no agreement (such as a license or franchise agreement), written or oral, which covers trademark rights as between respondent and petitioner. Nonetheless, witnesses of both sides have testified as to their perceptions about the restaurants. They assumed that there was some relationship between the Oregon and California restaurants, some referring to them as a "chain" or "brother-sister."

There are other facts which lend credence to the perception that the Oregon and California restaurants were part of the

same chain with common ownership. In corporate business records, the restaurants were numbered "1" (the Oregon restaurant) through "6" (the Davis, California restaurant). The new employees' handbook indicated that the first Woodstock's Pizza Parlor opened in Corvallis, Oregon and "since then, five more shops have been opened." After listing these five locations in California, the handbook reads " [t]he employees at any one of these six shops are truly dedicated to their work and to their fellow employees." There were joint Oregon/California promotional efforts like the squeeze bottle in 1989 (listing all six locations), and the T-shirts which were purchased in bulk by respondent and distributed to the other restaurants. Respondent lent money to the California corporations to cover start-up costs, and some of the employees in California were trained at the Oregon restaurant. Until 1990, corporate records for all six restaurants were kept in Oregon, the corporations used a joint payroll to pay their employees, the restaurants engaged in some bulk ingredient purchases, similar employment contracts for managers were used for all restaurants, and the restaurants were covered under the same insurance policy.

[2] The above facts, coupled with Carol Woodstock's own testimony, lead us to conclude that her oath was not fraudulent. Simply put, in view of the totality of circumstances surrounding the operations of the Oregon and California restaurants, we find that Carol Woodstock, when she signed the application oath, had a good faith, honest belief that respondent, as the senior user, owned the mark and that no other entity, including any of the California corporations, had the right to use the same or similar mark without respondent's authorization. Respondent's failure to disclose in 1989 the permissive use by the California junior users is irrelevant and could not have been material to the grant of a federal registration to respondent. Respondent, as the senior user, and in the absence of a court holding or a concurrent use proceeding, is entitled to an *1445 unrestricted federal registration in spite of the existence of junior users who might have common law rights of use in California. That is to say, even though, as petitioner alleges, Ms. Woodstock "failed to acknowledge the conflicting rights of the Woodstock California corporations", one simple fact remains -- Woodstock's Enterprises, Inc.- Oregon is the senior user of the WOODSTOCK'S marks. Further, the Oregon/ California operations had the appearances of being a chain of pizza parlors with common ownership. Thus, there is no fraud. See: Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 216 USPQ 11 (7th Cir. 1982); Giant Food, Inc. v. Malone & Hyde, Inc., 522 F.2d 1386, 187 USPQ 374 (CCPA 1975); Hollowform, Inc. v. Aeh, 515 F.2d 1174, 185 USPQ 790 (CCPA 1975); American Security Bank v. American Security & Trust Co., 571 F.2d 564, 197 USPQ 65 (CCPA 1978); Selfway, Inc. v. Travelers Petroleum, Inc., 579 F.2d 75, 198 USPQ

COPR. © 2004 The Bureau of National Affairs, Inc.

43 U.S.P.Q.2d 1440
1997 WL 440268 (Trademark Tr. & App. Bd.)
**(Cite as: 43 U.S.P.Q.2d 1440)**

271 (CCPA 1978); Metro Traffic Control Inc. v. Shadow Network Inc., ___ F.3d ___, 41 USPQ2d 1369 (Fed. Cir. 1997); Pennsylvania Fashion Factory, Inc. v. Fashion Factory, Inc., 215 USPQ 1133 (TTAB 1982); International House of Pancakes, Inc. v. Elca Corp., 216 USPQ 521 (TTAB 1982); Heaton Enterprises of Nevada, Inc. v. Lang, 7 USPQ2d 1842 (TTAB 1988); and Space Base, Inc. v. Stadis Corp., 17 USPQ2d 1216 (TTAB 1990).

[3] In reaching this conclusion, we obviously recognize Carol Woodstock's less than candid approach with her fellow boards of directors members and shareholders in not disclosing to them the filing of a trademark application in the name of the Oregon corporation; the facts surrounding the dismissal of Carol Woodstock as president of the California corporations in 1990; and the proposals to purchase the California businesses, with purchasers' placing importance on the unfettered right to continue to use the WOODSTOCK'S marks. Petitioner claims that Carol Woodstock "intentionally helped herself to a corporate opportunity at the direct expense of the California corporations which had placed her in a position of trust." (reply brief, p. 8) While it may be that Carol Woodstock rushed to the Office with the thought of shoring up her ownership position with respect to the mark at issue (and, consequently, her leverage and potential financial gain in any sale of the California restaurants), it does not necessarily follow that she lacked a good faith belief that respondent, as the senior user, was entitled to the registration then sought. Even assuming *arguendo* that petitioner's assertions are true, and that Ms. Woodstock may be culpable in some type of shareholder suit involving a breach of fiduciary duties, her actions do not taint her underlying good faith belief that Woodstock's Enterprises, Inc.- Oregon, as the undisputed senior user, was entitled to an unrestricted federal trademark registration.

In view of the above, the fraud claim must fail.

### ABANDONMENT

Petitioner alleges that respondent has abandoned the registered mark as a result of respondent's failure to exercise control over the nature and quality of the restaurant services rendered by the California restaurants. Petitioner contends that there never was any trademark license between the parties, and that respondent simply gave the mark away (by permitting the mark's use without any kind of restriction or control) to each California corporation when it was founded. Petitioner maintains that it is the only one who is exercising control over the quality of the services rendered in California by the California restaurants under the WOODSTOCK'S marks. Petitioner again places importance

on the fact that the California state trademark registration of WOODSTOCK'S PIZZA PARLOR, issued in 1983, is owned by petitioner. Petitioner also points to the fact that petitioner removed Carol Woodstock as president of the California corporations in 1990 due to poor job performance and that, since that time, Ms. Woodstock, in her capacity as president of respondent, has not even pretended to exercise control over the California operations.

Respondent contends, on the other hand, that it has exercised sufficient control over the nature and quality of the services rendered by the California restaurants. Respondent points to its alleged control over recipes and advertising, as well as its preparation of certain documents such as cleaning lists, instructional guidelines, managers' reports, job descriptions, and guidelines for interviewing prospective employees. Respondent further asserts that it has been satisfied with the quality maintained by the California restaurants, and that it has had no problems with Jeff Ambrose's job performance in running the California operations; therefore, according to respondent, it has relied, by and large, upon the integrity of petitioner in rendering a quality product in California.

Section 45(2) of the Trademark Act provides, in relevant part, that a mark is deemed *1446 to be abandoned when the course of conduct of the owner of the mark causes the mark to lose its significance as an indication of origin. [FN4] This course of conduct includes acts of omission as well as acts of commission. The prevailing view is that since abandonment is in the nature of a complete forfeiture, it carries a strict burden of proof. P.A.B. Produits et Appareils de Beaute v. Satinine Societa, 670 F.2d 1031, 196 USPQ 801 (CCPA 1978); Girard Polly-Pig, Inc. v. Polly-Pig by Knapp, Inc., 217 USPQ 1338 TTAB 1983); and The Nestle Company Inc. v. Nash-Finch Co. 4 USPQ2d 1085, 1089 (TTAB 1987).

[4] We begin our analysis with the premise that maintenance of exclusivity of rights in a mark is not required in order to avoid a finding of abandonment, since " [f]ew longstanding trademarks could survive so rigid a standard." Wallpaper Manufacturers, Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 214 USPQ 327, 333 (CCPA 1982). Instead, so long as at least some purchasers identify respondent with the registered mark, it cannot be said that respondent's course of conduct has caused the registered mark to lose its significance as a mark . *Id.* [214 USPQ] at 335. As in *Crown*, it is necessary to remember the following:

[There is a] distinction between conduct of a trademark owner which results in a loss of right to enjoin a particular use because of an affirmative *defense* available to that user and conduct which results in a loss of *all* rights of protection

COPR. © 2004 The Bureau of National Affairs, Inc.

3 U.S.P.Q.2d 1440
997 WL 440268 (Trademark Tr. & App. Bd.)
Cite as: 43 U.S.P.Q.2d 1440)

as a mark against use by anyone. Only when all rights of protection are extinguished is there abandonment. E. Vandenburgh, Trademark Law and Procedure 267-68 (2d ed. 1968). While this states only a conclusion without any guides as to when all rights are deemed to have been lost, it is helpful, nevertheless, to keep the distinction in mind.

*Id.* See also: *University Book Store v. University of Wisconsin Board of Regents,* 33 USPQ2d 1385 (TTAB 1994).

[5] Thus, under *Crown,* whether petitioner in this case has a right to continue to use the registered mark is not determinative of the question of abandonment; rather, the focus must be on what rights, if any, respondent has in the registered mark. *Id.* Moreover, as emphasized by the court in *Crown,* "a mark becomes abandoned only when the mark loses its significance as an indication of origin, not the sole identification of source." *Crown, supra* [214 USPQ] at 336. In other words, regardless of whether petitioner has the right to use the WOODSTOCK'S PIZZA PARLOR and design mark identifies respondent as one of two sources of the restaurant services negates any inference of abandonment. *Girard Polly-Pig, Inc. v. Polly-Pig by Knapp, Inc., supra.* Here, it is clear that members of the purchasing public identify respondent with the registered mark for restaurant services. Thus, respondent's mark has not lost its significance as an indication of origin.

Further, to the extent that petitioner urges that respondent has not exercised quality control over petitioner's operations, the claim must fail. In a licensing situation, the question to be determined is whether the licensor exercises sufficient control to guarantee the quality of the goods sold to the public under the mark. An uncontrolled license, that is, a licensing arrangement in which the licensor retains no quality control or supervision over the use of the mark by the licensees, results in an abandonment of rights in the mark. Whether, in fact, sufficient control is exercised is a question of fact in each case and the burden of proving lack of control or insufficient control is on the party claiming the abandonment.

In order to avoid abandonment of its mark, a licensor need not show that its quality control efforts are comprehensive or extensive. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 193 USPQ 649, 655 (5th Cir. 1978) ("Retention of a trademark requires only minimal quality control"); *Midwest Plastic Fabricators v. Underwriters Laboratories,* 906 F.2d 1568, 15 USPQ2d 1359 (Fed. Cir. 1990) (defining the control requirement to be "reasonable control, i.e. such control as is practicable under the circumstances of the case"). Sufficient control by

a licensor may exist despite the absence of any formal arrangements for policing the quality of the goods sold or services rendered under the mark by its licensee(s). See *Winnebago Industries. Inc. v. Oliver & Winston, Inc.,* 207 USPQ 335, 337 (TTAB 1980). Control may also be adequate where the licensor justifiably relies on the integrity of the licensee to ensure the consistent quality of the services performed under the mark. See *Taco Cabana International Inc. v. Two Pesos Inc.,* 19 USPQ2d 1253, 1259 (5th Cir. 1991), aff'd 505 U.S. 763, 23 USPQ2d 1081 (1993).

[6] The rationale behind quality control is that the public has a right to expect a consistent *1447 quality of goods or services associated with a trademark or service mark. Here, so long as customers entering a WOODSTOCK'S pizza parlor in Oregon or a WOODSTOCK'S pizza parlor in California can expect a consistent level of quality, the WOODSTOCK's mark retains its source-indicating function. The rationale has been explained in the following terms:

The purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality standards under the same mark or dress. Where the particular circumstances of the licensing arrangement persuade us that the public will not be deceived, we need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions. Where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities. See *Embedded Moments, Inc. v. International Silver Co.,* 648 F. Supp. 187, 194 (E.D.N.Y. 1986) (license agreement without explicit provision for supervisory control and absence of actual inspection nevertheless no basis for abandonment where prior working relationship and history of manufacture was "trouble-licensee's integrity and history of manufacture was "trouble-free").

*Taco Cabana International Inc. v. Two Pesos Inc., supra* at 1259. See also: *Exxon Corporation v. Oxxford Clothes Inc.,* ____ F.3d ____, 42 USPQ2d 1417, 1424 (5th Cir. 1997) [". . . if a trademark has not ceased to function as an indicator of origin there is no reason to believe that the public will be misled. . ."]

Both parties here agree that there is no formal, written agreement between them covering use of the WOODSTOCK'S marks. It is settled, however, that a license can be implied. See, e.g.: *McCoy v. Mitsubishi*

43 U.S.P.Q.2d 1440
1997 WL 440268 (Trademark Tr. & App. Bd.)
(Cite as: 43 U.S.P.Q.2d 1440)

Cutlery Inc., 67 F.3d 917, 36 USPQ2d 1289, 1291 (Fed. Cir. 1995); University Book Store v. University of Wisconsin Board of Regents, *supra* at 1396; and Nestle Co. v. Nash-Finch Co., *supra*. We find that to be the case here; that is, rather than constituting uncontrolled use by petitioner in California which resulted in the registered mark losing all source indicating significance, the reality of the situation is akin to an informal, implied license from respondent to petitioner to use the registered mark in California. Given the circumstances that respondent lent money to the California corporations to start their restaurants under the WOODSTOCK'S mark, we find, as a result of the parties' course of conduct through the years, that respondent essentially gave petitioner and the other corporations permission to use the WOODSTOCK'S mark. [FN5]

We have paid particular attention to the common origins and history of the Oregon and California restaurants. Although there was a falling out in 1990 when Carol Woodstock was removed as president, the restaurant operations have been conducted, as indicated earlier in this opinion, much like a chain. The restaurants' and their owners' close association warrant a relaxation of policing formalities. Some of petitioner's employees who remain to this day, including Jeff Ambrose, petitioner's president, received their training from the Oregon restaurant staff. Thus, it is not surprising that the Oregon and California restaurants use significantly similar procedures and products. Although there are specific differences between the Oregon and California restaurants to be sure, the operations are, by and large, very similar. The dough recipes are the same, and the same brand of pizza sauce is used, with the California restaurants using slightly less pepper. The restaurants' decors, while different, are, in several respects, very similar. Given the common roots and history of the restaurants, it is not surprising that a customer walking into the WOODSTOCK'S restaurant in Oregon and then into a WOODSTOCK'S restaurant in California would assume that they were related in some fashion. It is only natural that the two operations would draw on their mutual experience, which has resulted in success, to maintain the requisite quality consistency. In point of fact, all the evidence indicates that there has been no decline in the level of *1448 quality at any of the parties' restaurants. In this connection, we note that sales at the California restaurants have increased over the years, and that the restaurant in Chico has won an award for "best pizza in Chico." Further, Carol Woodstock testified that she is quite satisfied with the performance of Jeff Ambrose in running the California restaurants, and that he is very quality conscious. It bears repeating that Mr. Ambrose started as an employee at the Oregon restaurant in 1981, receiving training there on how to make pizzas. Later, Chuck Woodstock had Mr. Ambrose set up the San Diego restaurant.

[7] While there was never a formal system of quality control over the California operations, it must be remembered that "the inference of abandonment is not drawn . . . [where] satisfactory quality was maintained, and, hence, no deception of purchasers occurred." Stockpot, Inc. v. Stock Pot Restaurant, Inc., 220 USPQ 52, 59 (TTAB 1983), *aff'd*, 737 F.2d 1576, 222 USPQ 665 (Fed. Cir. 1984). Therefore, even without, essentially, a formal system of quality control over the restaurant services rendered by petitioner in California, the registered mark was not abandoned by respondent since respondent's mark has not ceased to function as an indicator of origin and the quality of the services has, by all accounts, remained at an acceptable level. Exxon Corporation v. Oxxford Clothes Inc., *supra*. In summary, the fraud claim fails and the abandonment claim fails.

Decision: The petition for cancellation is dismissed.

P.T.O. T.T.A.B.

> FN1 Registration No. 1,614,417, issued September 18, 1990; Section 8 affidavit accepted. The words "Pizza Parlor" are disclaimed apart from the mark.
>
> FN2 Respondent's notice of reliance on a portion of Jeffrey Ambrose's July 7, 1994 deposition is superfluous; all his testimony is part of the record under Trademark Rule 2.123.
>
> FN3 See also: McCarthy, *McCarthy on Trademarks and Unfair Competition, supra* at Section 31:76. This commentator has pointed out that " [t]he oath is phrased in terms of a subjective *belief*, such that it is difficult, if not impossible, to prove objective falsity and fraud so long as the affiant or declarant has an honestly held, good faith belief." (emphasis in original)
>
> FN4 We are concerned in the present case only with this portion of the statutory definition of "abandonment", and not "abandonment" which results from nonuse as provided in Section 45(1).
>
> FN5 We so find notwithstanding the following remark in the minutes of respondent's July 20, 1980 meeting of its board of directors:

"After a long examination of deciding how to expand to California, it was decided that the new pizza parlor to be built in California would be under a new corporation and would have nothing to do with the original Oregon corporation." At the same meeting, the board also resolved to lend money, if needed, to the new California corporation. Suffice it to say that, contrary to the statement in the minutes, subsequent events through the years show a close

43 U.S.P.Q.2d 1440
1997 WL 440268 (Trademark Tr. & App. Bd.)
**(Cite as: 43 U.S.P.Q.2d 1440)**

Page 8

relationship between respondent and the California
restaurants.

43 U.S.P.Q.2d 1440

END OF DOCUMENT

COPR. © 2004 The Bureau of National Affairs, Inc.